# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN, | Case No. 1:25-cv-10810 |

*Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense,

*Defendants.*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      The President's constitutional role in elections is limited to competing in them and enforcing election laws enacted by Congress.  Nonetheless, on March 25, 2025, Defendant President Donald J. Trump issued Executive Order No. 14248, entitled "*Preserving and*

*Protecting the Integrity of American Elections*" ("Elections EO"), to transform how federal elections are conducted throughout the Nation.

2. The United States Constitution is clear about the power to regulate elections: as the sovereigns closest to the people, the States have primary responsibility. As Madison explained at the Virginia Convention, "[i]t was found necessary to leave the regulation of [federal elections], in the first place, to the state governments, as being best acquainted with the situation of the people." 3 Records of the Federal Convention of 1787, p. 312 (M. Farrand ed. 1911).

3. Under the Elections Clause, Congress may preempt State elections law for federal contests but nowhere does the Constitution provide the President, or the Executive Branch, with *any* independent power to modify the States' procedures for conducting federal elections.

4. The Elections EO usurps the States' constitutional power and seeks to amend election law by fiat.

5. In large measure, the unconstitutional Elections EO targets the Election Assistance Commission (the "Commission"), an independent, bipartisan agency that Congress established under its constitutional elections authority. To protect our elections, Congress required the Commission to operate independently. It also required the Commission to make its decisions under standards of bipartisanship, reasoned decision-making, and collaboration with the States, which actually administer the Nation's elections. The Elections EO seeks to eradicate all those safeguards—aiming to force the Commission to rubberstamp the President's policy preferences on, among other things, voter registration and voting systems.

6. If not enjoined, the Elections EO would impose onerous "documentary proof of citizenship" requirements for federal voter registration forms that would harm both Plaintiff States and their citizens. This portion of the Order directly impacts most Plaintiff States because the National Voter Registration Act ("NVRA") requires all States subject to its provisions—44

out of 50—to make the federal mail registration form (the "Federal Form"), or its equivalent, available to register voters for federal elections. 52 U.S.C. §§ 20506, 20508.[1]

7.      The Elections EO would also effectively preclude Plaintiff States from administering vote-by-mail systems that permit voters to make their choices by Election Day, upending processes that accommodate more voters, decrease obstacles, and increase voter participation. While unclear, it may also prohibit voters in Plaintiff States from curing minor technical problems with timely ballots after Election Day. The Elections EO relies on a fundamentally incorrect interpretation of federal Election Day statutes to support this command, which itself is an unconstitutional invasion of State and Congressional election regulation.

8.      The Elections EO thus unconstitutionally treats Plaintiff States as mere instruments of the President's policy agenda. To implement the President's policies, the Elections EO necessarily commandeers Plaintiff States' elections apparatus because States administer almost the entirety of the national elections system. For instance, there is no federal voter registration database—each State maintains its own registration system. The mandates of the Elections EO therefore require State officials to participate in the verification of voters' citizenship documentation, a purported requirement that is itself contrary to the NVRA.

9.      Likewise, Section 2(d) of the Elections EO commands the head of each State-designated federal voter registration agency under the NVRA to immediately begin "assess[ing] citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs." This ambiguous provision potentially sweeps in a wide range of State and local

---

[1] The NVRA applies to Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, and West Virginia. Six states are exempt. *See* 52 U.S.C. § 20503(b); *see also* U.S. Dep't of Justice, *The National Voter Registration Act Of 1993 (NVRA) Questions and Answers* (Nov. 1, 2024), https://tinyurl.com/43whaduz. Some of the exempt states, however, like Minnesota, accept the Federal Form as a valid voter registration form and will be required to make the same changes to that form for voters who choose to register in that manner. Minn. Stat. § 201.071, subd. 1.

offices serving low-income and disabled residents, obligating them to bear new administrative burdens.

10.    Likewise, there is no national ballot; again, each State provides its own ballots, tabulates votes, and certifies its own results.  Each of these steps are governed by State law.  The Elections EO unilaterally and baselessly attempts to rewrite those laws to prohibit States from counting ballots that arrive after Election Day, even though they were postmarked on or before that date.

11.    The Elections EO violates the Constitution.  It interferes with States' inherent sovereignty and their constitutional power to regulate the time, place, and manner of federal elections.  It also usurps Congress's powers to legislate (under the Elections Clause) and to appropriate (under the Spending Clause) because Congress has not chosen to implement the changes the President seeks to impose by decree.  The critical funds at issue have in large measure already been appropriated by Congress.  And if these coercive threats were not enough, the Elections EO threatens to target Plaintiff States with Department of Justice investigations and potential prosecution.

12.    It bears emphasizing: the President has no power to do any of this.  Neither the Constitution nor Congress has authorized the President to impose documentary proof of citizenship requirements or to modify State mail-ballot procedures.  Indeed, the text, structure, and history of the NVRA itself confirm that the Federal Form can only require citizenship verification by attestation.  The President cannot add a documentary proof of citizenship requirement to the Federal Form, because even the Commission could not impose that requirement.  Even if a documentary proof of citizenship requirement were substantively consistent with the NVRA, which it is not, only the Commission can change the Federal Form, and then only "in consultation" with the States, with the majority approval of its bipartisan Commissioners, and through reasoned decision-making subject to Administrative Procedures Act ("APA") review.  *See* 52 U.S.C. §§ 20508, 20921, 20923, 20928; 5 U.S.C. § 706; *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).  As a consequence,

the Elections EO is facially unconstitutional, ultra vires, and an affront to the States' sovereignty and their constitutional authority to regulate the administration of elections.

13.    The injuries Plaintiff States face are real, imminent, and irreparable.  If the provisions of the Elections EO challenged in this lawsuit are not enjoined, they will immediately impose significant harm on Plaintiff States.  Elections administration is complex, and the Elections EO effectively orders Plaintiff States, at breakneck pace, to implement trainings, testing, coordination, implementation, and voter education across multiple State agencies and databases.  Forcing Plaintiff States to complete these tasks effectively orders them to invest enormous time and resources, diverting election staff from vital election priorities—like ensuring the operation of State voter registration systems and the sound operation of State and local elections, as well as primary preference elections, which occur regularly.  In the compressed and finite timeline of State elections and legislative sessions, this work cannot simply be picked up later.  For this reason, implementation of the Elections EO's unlawful directives necessarily comes at the cost of serving Plaintiff States' residents and implementing State priorities.  Even with this effort, the Elections EO sows confusion and sets the stage for chaos in Plaintiff States' election systems, together with the threat of disenfranchisement.

14.    If instead Plaintiff States choose not to comply with the President's blatantly unconstitutional attempt to legislate-by-fiat, they will suffer severe cuts in federal funding that will throw the national electoral system into disarray.  The Framers carefully crafted a federal compact that protects the States from this Hobson's choice.

15.    For all these reasons, the Elections EO is unconstitutional, antidemocratic, and un-American.  It intrudes on the constitutionally reserved powers of the States and Congress.  It purports to subvert laws that Congress has passed, in ways that Congress did not allow and in conflict with the text of those laws.  Through this action, Plaintiff States seek a judgment declaring certain, specific provisions of the Elections EO to be unlawful and void and corresponding preliminary and permanent orders enjoining action on or enforcement of those specific provisions by any Defendant except the President.

## JURISDICTION & VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities.

18.     The Commonwealth of Massachusetts is a resident of this District, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within the District of Massachusetts.

## THE PARTIES

### I.    PLAINTIFFS

19.     The State of California is a sovereign state of the United States.  California is represented by Attorney General Rob Bonta, who is the State's Chief Law Officer.

20.     The State of Nevada is a sovereign state of the United States.  Nevada is represented by Attorney General Aaron Ford, who is the State's Chief Law Officer.

21.     The Commonwealth of Massachusetts is a sovereign state of the United States. Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the Commonwealth's Chief Law Officer.

22.     The State of Arizona is a sovereign state of the United States.  Arizona is represented by Attorney General Kris Mayes, who is the State's Chief Law Officer.

23.     The State of Colorado is a sovereign state of the United States.  Colorado is represented by Attorney General Philip J. Weiser, who is the State's Chief Law Officer.

24.     The State of Connecticut is a sovereign state of the United States.  Connecticut is represented by Attorney General William Tong, who is the State's Chief Law Officer.

25.     The State of Delaware is a sovereign state of the United States of America.  This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del.

1941).  Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority.  29 Del. C. § 2504.

26.     The State of Hawaii is a sovereign state of the United States.  Hawaii is represented by Attorney General Anne E. Lopez, who is the State's Chief Legal Officer.

27.     The State of Illinois is a sovereign state of the United States.  Illinois is represented by Attorney General Kwame Raoul, who is the State's Chief Law Officer.

28.     The State of Maine is a sovereign state of the United States.  Maine is represented by Attorney General Aaron M. Frey, who is the State's Chief Law Officer.

29.     The State of Maryland is a sovereign state of the United States.  Maryland is represented by Attorney General Anthony G. Brown who is the State's Chief Legal Officer.

30.     The People of the State of Michigan are represented by Attorney General Dana Nessel.  The Attorney General is Michigan's chief law enforcement officer and is authorized to bring this action on behalf of the People of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.

31.     The State of Minnesota is a sovereign state of the United States.  Minnesota is represented by Attorney General Keith Ellison, who is the State's Chief Law Officer.

32.     The State of New Jersey is a sovereign state of the United States.  The Attorney General of New Jersey is the State's chief legal adviser and is authorized to act in federal court on behalf of the State on matters of public concern.

33.     The State of New Mexico is a sovereign state of the United States.  New Mexico is represented by Attorney General Raúl Torrez, who is the State's Chief Legal Officer.

34.  The State of New York, represented by and through its Attorney General, is a sovereign state of the United States.  The Attorney General is New York State's chief law enforcement officer and is authorized under N.Y. Executive Law § 63 to pursue this action.

35.     The State of Rhode Island is a sovereign state of the United States.  Rhode Island is represented by Attorney General Peter F. Neronha, who is the State's Chief Law Officer.

36.     The State of Vermont is a sovereign state of the United States.  Vermont is represented by Attorney General Charity R. Clark, who is the State's Chief Law Officer.

37.     The State of Wisconsin is a sovereign state of the United States.  Wisconsin is represented by Attorney General Josh Kaul, who is the State's Chief Law Officer.

## II.    DEFENDANTS

38.     Defendant Donald J. Trump is the President of the United States.  He is responsible for the actions and decisions that are being challenged by Plaintiff States in this action and is sued in his official capacity, and only for declaratory relief.

39.     Defendant Pamela Bondi is the Attorney General of the United States.  She is sued in her official capacity.

40.     Defendant United States Election Assistance Commission is an independent federal commission established under 52 U.S.C. § 20921.  The Commission is responsible for developing the Federal Form, in consultation with the chief election officers of the States, for the registration of voters for elections for federal office.  52 U.S.C. § 20508(a)(2).  The Commission is further responsible for disbursing statutory elections funds to Plaintiff States.  *Id.* § 21001.

41.     Defendant Donald L. Palmer is a Commissioner and the Chairman of the Election Assistance Commission.  He is sued in his official capacity.

42.     Defendant Thomas Hicks is a Commissioner and the Vice Chair of the Election Assistance Commission.  He is sued in his official capacity.

43.     Defendants Christy McCormick and Benjamin W. Hovland are Commissioners of the Election Assistance Commission.  They are sued in their official capacities.

44.     Defendant Pete Hegseth is the Secretary of Defense.  He is sued in his official capacity.

## FACTUAL ALLEGATIONS

45.     On March 25, 2025, the President issued Executive Order No. 14248, entitled "Preserving and Protecting the Integrity of American Elections" ("Elections EO").  Although the

President invoked "the authority vested in [him] as President by the Constitution and the laws of the United States of America," the Elections EO is not authorized by either.

46.     Through the Elections EO, the President seeks to unconstitutionally seize the right to prescribe regulations for federal elections, authority reserved to the States and Congress. The Elections EO also seeks to repurpose a set of existing federal programs and funding streams and use them as a cudgel to enforce rules that Congress never enacted.

47.     The Elections EO accomplishes these aims in part by purporting to order the independent, bipartisan, and multimember Commission to take actions that are contrary to law, trampling upon the protections that Congress created to ensure that the Commission's work would be evenhanded and independent. The Elections EO is a unilateral attempt by the Executive to assume powers that the Constitution assigns exclusively to Plaintiff States and Congress.

48.     Plaintiff States and local elections officials, as frontline election administrators, will be directly harmed by the Elections EO's unconstitutional purported amendment of federal voting law.

49.     By this Complaint, Plaintiff States challenge the following specific provisions of the Elections EO (the "Challenged Provisions") that will cause imminent and irreparable harm to the States if they are not enjoined:

   a.    **Section 2(a).**  The Elections EO orders the Commission "to require, in its national mail voter registration form issued under 52 U.S.C. 20508 . . . documentary proof of United States citizenship," contrary to existing federal law and the status of the Commission as an independent agency. *See* Elections EO, § 2(a).  The Elections EO directs State and local elections officials to implement the burdensome documentation requirements associated with this provision, though the President has no authority over State and local officials. *See id.* § 2(a)(i)(B).

   b.    **Section 2(d).**  The Elections EO orders "the head of each Federal voter registration executive department or agency" to "assess citizenship prior to

9

providing a Federal voter registration form to enrollees of public assistance programs," raising the specter of commandeering Plaintiff State agencies and resources in violation of fundamental State sovereignty if it extends to State and local agencies designated under the NVRA.  *See id.* § 2(d).

c.    **Section 3(d).**  The Elections EO orders the Secretary of Defense to "update the Federal Post Card Application, pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. 20301, to require documentary proof of United States citizenship" and "proof of eligibility to vote in elections in the State in which the voter is attempting to vote[,]" drastically amending the statute contrary to its purpose and text and rendering the application costly and challenging to implement.  *See id.* § 3(d).

d.    **Section 4(a).**  The Elections EO orders the Commission to "take all appropriate action to cease providing Federal funds to States that do not comply with the Federal laws set forth in 52 U.S.C. 21145, including the requirement in 52 U.S.C. 20505(a)(1) that States accept and use the national mail voter registration form issued pursuant to 52 U.S.C. 20508(a)(1), including any requirement for documentary proof of United States citizenship adopted pursuant to" the unlawful Elections EO's requirements.  *See id.* § 4(a).

e.    **Section 7(a).**  The Elections EO directs the Attorney General to "take all necessary action to enforce" a draconian and incorrect interpretation of federal Election Day statutes that would preclude States from counting ballots that arrive after Election Day, even if they were mailed on or before that day.  *See id.* § 7(a). This erroneous interpretation might also conflict with State laws that allow voters to cure ballots with minor technical problems that were timely submitted.

f.    **Section 7(b).**  The Elections EO orders the Commission to enforce this interpretation of the Election Day statutes by conditioning "any available funding to a State on that State's compliance" with the Elections EO's new institution of a

"ballot receipt deadline of Election Day," even though the Commission has no

statutory authority to condition funding on these grounds.  *See id.* § 7(b).

## I.    STATE AND CONGRESSIONAL REGULATION OF ELECTIONS

50.    The President's unlawful order amending statutes governing the conduct of

federal elections dramatically oversteps the limits of Presidential power.

51.    The Constitution's Elections Clause reserves elections administration to the

States, subject only to Congress's preemption power: "The Times, Places and Manner of holding

Elections for Senators and Representatives, shall be prescribed in each State by the Legislature

thereof; but the Congress may at any time by Law make or alter such Regulations, except as to

the Places of chusing Senators."  U.S. Const. art. I, § 4, cl. 1.  Similarly, the Electors Clause

specifies that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a

Number of Electors, equal to the whole Number of Senators and Representatives to which the

State may be entitled in the Congress."  U.S. Const. art. II, § 1, cl. 2.

52.    The Constitution, then, "invests the States with responsibility for the mechanics of

[federal] elections," but allows Congress—not the President, unilaterally—to preempt those

choices in the context of federal elections.  *Foster v. Love*, 522 U.S. 67, 69 (1997).  Unless

Congress provides otherwise, States have the authority "to provide a complete code for [federal]

elections, not only as to times and places, but in relation to notices, registration, . . . protection of

voters, [and] prevention of fraud and corrupt practices."  *Smiley v. Holm*, 285 U.S. 355, 366

(1932); *see also Arizona v. Inter Tribal Council of Ariz., Inc.* ("*ITCA*"), 570 U.S. 1, 8–9 (2013)

(quoting *Smiley*, 285 U.S. at 366).  In short, States are authorized "to enact the numerous

requirements as to procedure and safeguards which experience shows are necessary in order to

enforce the fundamental right involved."  *Smiley*, 285 U.S. at 366.

53.    U.S. elections are administered consistent with the constitutional command.  State

legislatures, as representatives of their constituents, enact statutes that comprehensively structure

State and federal elections.  Plaintiff States' election officials implement and clarify those laws

with regulations and guidance.  These laws and regulations govern a wide range of election

issues, including early voting, vote-by-mail, and voter identification.  Plaintiff States also design their own ballots and do their own redistricting—including redrawing congressional district boundaries. Election codes can differ significantly by State, with each State tailoring its rules to the needs and preferences of its residents.

54.    Beyond setting most election rules, Plaintiff States and their subdivisions also administer elections.  Plaintiff States and their subdivisions purchase, maintain, test, and certify all voting machines, and maintain their election information management systems and poll books.  Plaintiff States answer questions from voters and local election officials and develop a wide range of training and educational resources for their staff, counties, poll workers, and voters.  These resources range from technical instructions for the voting machines to guidance on the implementation of a new law.  Plaintiff States design and issue ballots; provide support for local officials who operate polling locations; and collect and secure ballots.  Once voting has closed, States canvass and certify the vote.  Finally, in a Presidential election, after all votes have been counted and the vote audited, Plaintiff States certify the results to Congress.  3 U.S.C. § 5.

55.    Especially relevant here, Plaintiff States also register voters, coordinate maintenance of voter registration lists, and ensure that voter registration data is secure and accurate.  But they do not have free reign in deciding who to register and how.  To facilitate registering voters and to ensure maximum access to the ballot in federal elections by eligible citizens, Congress exercised its Elections Clause preemptive authority—first with the Uniformed Overseas Citizen Absentee Voting Act ("UOCAVA"), then with the NVRA and the Help America Vote Act ("HAVA")—to regulate aspects of voting registration.  Congress has also exercised its Spending Power under the U.S. Constitution, Article I, Section 8, to allocate federal funds to support States in implementing federal law and conducting elections.  *See, e.g.*, 52 U.S.C. § 21001.

56.    In contrast, the President has no constitutional authority to "make or alter" laws governing federal elections.  In fact, the Constitution grants the President no legislative power at all.  *Cf.* U.S. Const. art. I, § 4.  Although the President may "recommend to [Congress's]

12

consideration such measures as he shall judge necessary and expedient," *id.*, art. II, § 3, and may

veto legislation passed by Congress, *id.*, art. I, § 7, he may neither alter a duly enacted law nor

impose his own law by fiat.

57.    Instead of granting the President a free hand to rewrite federal law, the

Constitution imposes on him the mandatory duty to "take care that the laws be faithfully

executed." *Id.*, art. II, § 3.

58.    For these reasons, and as explained below, the Challenged Provisions are

unconstitutional, ultra vires, and violative of the separation of powers and State sovereignty.

## II.    FEDERAL LAWS ENACTED BY CONGRESS GOVERNING FEDERAL ELECTIONS

### A.    The National Voter Registration Act & the "Federal Form"

59.    Congress passed the NVRA in 1993 to reduce barriers to voter registration,

protect the integrity of federal elections, and improve the accuracy of voter registration rolls. *See*

52 U.S.C. § 20501(b).

60.    In crafting the NVRA, Congress sought to "make it possible for Federal, State,

and local governments to implement" the law "in a manner that enhances the participation of

eligible citizens as voters in elections for Federal office." *Id.*

61.    The NVRA establishes several methods to register to vote in federal elections, in

addition to any registration method provided by State law. Those options include an "application

made simultaneously with an application for a motor vehicle driver's license," 52 U.S.C.

§ 20503(a)(1), a "mail application," *id.* § 20503(a)(2), and "by application in person" at a variety

of qualifying sites, including federal, state, and local agencies designated by the States, *id.* §

20503(a)(3).

62.    The NVRA requires States to accept and use a federal "mail voter registration

application form"—commonly referred to as the "Federal Form"—or its equivalent for mail

registration and during in-person registration at certain government or nongovernment offices

designated in the statute. *See id.* §§ 20505(a)(1), 20506(a)(6)(A). States may also create and use

their own mail registration forms for federal elections if they satisfy the NVRA's statutory criteria. *See id.* § 20505(a)(2).

63.    Responsibility for creating the Federal Form rests with the Commission, which was created by HAVA in 2002. Congress made clear that the Commission must develop the Federal Form "in consultation with the chief election officers of the States." *Id.* § 20508(a)(2).

64.    The Commission's discretion in developing the Federal Form is carefully circumscribed by statute. For example, the Federal Form "may require *only* such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant) as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." *Id*. § 20508(b)(1) (emphasis added).

65.    Likewise, the Federal Form "may *not* include any requirement for notarization or other formal authentication." *Id.* § 20508(b)(3) (emphasis added).

66.    As the D.C. Circuit has explained, the statutory text of the NVRA is "straightforward." *Newby*, 838 F.3d at 10. If a given datapoint is "'necessary' to enforce voter qualifications, then the NVRA and probably the Constitution require its inclusion" in the Federal Form. *Id.* But "if not, the NVRA does not permit its inclusion and the Constitution is silent." *Id.*

67.    The NVRA addresses citizenship by providing that the Federal Form must require the applicant to attest that they meet "each eligibility requirement (including citizenship)" and sign under penalty of perjury. *Id.* § 20508(b)(2). The decision to address citizenship through attestation rather than documentary proof reflects the considered judgment of Congress, which considered, but declined to adopt, a requirement of documentary proof of citizenship, reasoning that it was "not necessary or consistent with the purposes of" the NVRA. H.R. Rep. No. 103–66, at 23–24 (1993).

68.    Indeed, the Commission has previously denied requests to include requirements for documentary proof of citizenship on the Federal Form. In January 2014, acting on requests

from both Kansas and Arizona, the Commission declined to amend the Federal Form to include requirements for registrants in those States to provide documentary proof of citizenship.  Among other reasons for its decision, the Commission highlighted Congress's explicit rejection of proposals related to documentary proof of citizenship as inconsistent with the purposes of the NVRA and likely to interfere with its registration provisions, to the point of "effectively eliminat[ing]" mail-in registration.  The Commission also determined that the Federal Form "currently provides the necessary means for assessing applicants' eligibility," and that the States had "myriad of means available to enforce their citizenship requirements without requiring additional information from Federal Form applicants."  Finally, the Commission determined that granting the requests would undermine the purposes of the NVRA by imposing additional burdens on registrants and thwarting organized voter registration programs, which the NVRA sought to encourage in 52 U.S.C. § 20505(b) by directing States to make mail-in registration forms available for distribution, "with particular emphasis on making them available for organized voter registration programs."

69.    Even in the limited set of circumstances where the Commission may lawfully amend the Federal Form by adding required information, the Commission must comply with key procedural requirements.  Among other things, the Federal Form must be developed and amended "in consultation with the chief election officers of the States."  52 U.S.C. § 20508.  In other words, the Commission cannot act unilaterally.  And, even after consulting the States, the Commission can only amend the form following the normal notice-and-comment process mandated by the APA, with judicial review.  *See Newby*, 838 F.3d at 11–12.

70.    Congress took pains to define the Federal Form's substance and the process for development and amendment because the Federal Form is enormously important to the complex process of registering voters and administering federal elections.  The 44 States subject to the NVRA must "accept and use" the Federal Form for registering voters in federal elections.  52 U.S.C. § 20505(a)(1).

71.     These requirements mean that, in practice, most Plaintiff States' voter registration mechanisms are intertwined with the Federal Form's requirements.

72.     In some Plaintiff States, the overlap is particularly extensive.  For example: Nevada registers voters online, by mail, at county clerks' offices, and at polling locations.  It also registers votes at the Nevada Department of Motor Vehicles; certain offices of the Nevada Department of Health and Human Services; the Nevada Department of Employment, Training and Rehabilitation; and U.S. Armed Forces Recruitment Offices.  Right now, each agency offers Nevada's version of the Federal Form, whether on paper or through verbal questions—which workers must be trained to administer.

**B.     The Help America Vote Act**

73.     Congress passed HAVA in 2002 following the 2000 presidential election.  HAVA sought to upgrade voting systems by setting standards for voting machines and voter registration databases and by providing federal funding to the States for elections purposes.  *See* 52 U.S.C. §§ 20901, 21081, 21083.  HAVA also established rules allowing voters to cast provisional ballots.  *Id.* § 21082.

74.     As explained above, HAVA established the independent, bipartisan Commission. *Id.* § 20921.  The four members of the Commission are appointed to four-year terms and are evenly split between the two political parties.  *Id.* § 20923(a), (b).  The four-year terms of Commission members are staggered at two-year intervals, and a Commission member may serve no more than two four-year terms.  *Id.* § 20923(b)(1), (2).  The Commission may only act within its statutory authority and with the "approval of at least three of its members."  *Id.* § 20928.

**C.     The Uniformed and Overseas Citizens Absentee Voting Act**

75.     In 1986, Congress passed UOCAVA, which governs voting by overseas citizens. 52 U.S.C. §§ 20301–20311.

76.     Under UOCAVA, each State is required to permit absent uniformed services voters and overseas voters to use absentee registration procedures and vote by absentee ballot in all federal elections.  52 U.S.C. § 20302(a)(1).

77.     The President is required to designate the head of an executive department to have the primary responsibility for federal functions under UOCAVA.  52 U.S.C. § 20301(a).  Chief among those responsibilities is to prescribe a single post card registration form and absentee ballot (the "Federal Post Card Application") to be sent to overseas voters and voters in the uniformed services for federal elections and which will be used by the States.  *Id.* § 20301(b)(2).

78.     Under UOCAVA, States must "use the official post card form" prescribed by the Secretary of Defense and "accept and process . . . any otherwise valid voter registration application and absentee ballot application from an absent uniformed services voter or overseas voter," which would include the Federal Post Card Application.  52 U.S.C. § 20302(a)(2), (4).  Several Plaintiff States have codified this requirement.  *See, e.g.*, Cal. Elec. Code §§ 3102(c), 3105(b)(2); Mass. Gen. Laws c. 54, § 91C.

### D.     Federal Laws Governing the Date of Federal Elections

79.     States have the authority to regulate the "Times, Places, and Manner" for congressional elections, unless preempted or supplemented by Congress.  U.S. Const. art. I, § 4, cl. 1.  And States establish the "Manner" of choosing Presidential electors, *id.* art. II, § 1, cl. 2, while Congress "determine[s] the Time of chusing the Electors, and the Day on which they shall give their Votes," *id.* art. II, § 1, cl. 4.  Among the "Manner[s]" left for the States to decide is the "counting of votes."  *Smiley*, 285 U.S. at 366.

80.     Congress has set days for federal elections, consistent with these constitutional mandates.  In 2 U.S.C. § 7, Congress has "established . . . the day for the election" of members of the House of Representatives, and in 3 U.S.C. §§ 1 and 21(1), the "election day" for Presidential electors.  Election Day statutes addressed the problem of some States setting their election day earlier than others, strongly influencing elections before they were concluded.  *Foster*, 522 U.S. at 73–74.  These laws required "only that if an election does take place, it may not be *consummated prior to election day*."  *Id.* at 71–72 & n.4 (emphasis added).  They do not prohibit States from receiving and counting ballots that were indisputably mailed by Election Day or

curing minor, technical errors after Election Day to ensure that ballots timely cast ballots before Election Day are counted.

81.     52 U.S.C. § 21081(a)(6) requires "[e]ach State" to "adopt . . . standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State."  It does not prescribe *what* standards must be used, nor does it provide that the President or the EAC has authority to dictate those standards.  Each Plaintiff State has adopted such standards.

82.     Consistent with this federal regulation, Plaintiff States have exercised their own constitutional and statutory authority to determine for each of their respective jurisdictions how to best receive and count votes that are timely cast by mail in federal elections.  Many of the Plaintiff States provide for the counting of otherwise timely absentee and mail ballots received after Election Day including, ballots postmarked by Election Day but received after the close of polls.  *See, e.g.*, Cal. Elec. Code § 3020(b); Mass. Gen. Laws c. 54, § 93; Nev. Rev. Stat. § 293.269921(1)(b), (2); N.J. Stat. Ann. § 19:63-22(a); N.Y. Election Law sec. 8-412(1), 8-710(1).  Others offer procedures allowing voters to fix or "cure" minor errors in timely cast ballots after Election Day to allow their ballot to be counted.

### E.     Congressional Efforts to Pass the SAVE Act

83.     Although some version of a bill amending the NVRA to impose proof of citizenship requirements for federal registrants has been introduced in the last two Congresses, it has never passed the Senate or been presented to the President for signature.

84.     In May 2024, Texas Congressman Chip Roy introduced the "Safeguard American Voter Eligibility Act," more commonly known as the "SAVE Act."  The SAVE Act would have amended the NVRA to provide that "[u]nder any method of voter registration in a State, the State shall not accept and process an application to register to vote in an election for Federal office unless the applicant presents documentary proof of United States citizenship with the application."  H.R. 8281 (118th Cong.), § 2.

85.     Although this version of the bill passed the House on a near party line vote, it was never referred to committee in the Senate or considered for final passage.

86.     The most recent version of Congressman Roy's bill, H.R. 22, was introduced on the first day of the new Congress, January 3, 2025. The House referred the reintroduced version of the SAVE Act to the Committee on Administration, where it languished until March 27, 2025—three days after the President issued the Elections EO. Then, without hearing, the bill was transferred to the House Rules Committee. On April 1, 2025, the Rules Committee passed a resolution providing for the consideration of H.R. 22 by the House.

87.     Neither version of the SAVE Act has ever proven popular enough to pass through the ordinary democratic process. President Trump and his administration cannot bypass the ordinary legislative process to legislate by fiat, assuming for the Executive Branch powers that are reserved for the States and the Legislative Branch.

### III.   THE ELECTIONS EO

88.     The Elections EO commands several significant changes to federal elections law and practice. Some of these changes would be effectuated through the Commission and other federal agencies. Others are imposed directly on the States, enforced by punitive funding conditions and investigatory threats. This lawsuit addresses the following Challenged Provisions:

89.     **Forcing the Elections Assistance Commission and the States to Require Documentary Proof of Citizenship with the Federal Form.** The Elections EO directs the Commission to take action to revise the Federal Form—within 30 days—to require "documentary proof of United States citizenship, consistent with 52 U.S.C. § 20508(b)(3)." Elections EO, § 2(a)(i). The Elections EO defines the scope of documents sufficient to prove citizenship narrowly: a U.S. passport, a driver's license indicating citizenship, military identification indicating citizenship, or other "valid Federal or State government-issued photo identification if such identification indicates that the applicant is a United States citizen or if such identification is otherwise accompanied by proof of United States citizenship." *Id.* § 2(a)(ii).

90.     The Elections EO requires State and local officials to implement that mandate by "record[ing] on the [registration] form the type of document that [an] applicant present[s] as documentary proof of United States citizenship, including the date of the document's issuance, the date of the document's expiration (if any), the office that issued the document, and any unique identification number associated with the document . . . while taking appropriate measures to ensure information security." *Id.* § 2(a)(i)(B).

91.     The Elections EO requires the Commission to "take all appropriate action to cease providing Federal funds to States" that do not accept the Federal Form, as unlawfully amended to require documentary proof of citizenship. *See id.* § 4(a).

92.     **Commandeering State Agencies to Determine Citizenship Before Registering Voters.**  Section 2(d) of the Elections EO commands the head of each State-designated federal voter registration agency under the NVRA to immediately begin "assess[ing] citizenship prior to" providing public assistance to residents.  These agencies represent a wide range of direct service providers.

93.     **Requiring Military and Overseas Voters to Submit Documentary Proof of Citizenship and Eligibility to Vote in State Elections.**  The Elections EO requires similar changes to the Federal Post Card Application form used for voters in the military or living abroad.  It orders the Secretary of Defense to "update the Federal Post Card Application, pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. 20301, to require" documentary proof of citizenship, as defined above, and "proof of eligibility to vote in elections in the State in which the voter is attempting to vote." *Id.* § 3(d).

94.     **Coercing States to Alter Their Ballot Counting Laws.**  The Elections EO purports to enforce a single, "uniform day for appointing Presidential electors and electing members of Congress," which requires States to exclude "absentee or mail-in ballots received after Election Day [from] the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives." *Id.* § 7(a).  The EO directs the Commission to "condition any available funding to a State on that

State's compliance with" the requirement that "each State adopt uniform and nondiscriminatory standards within that State that define what constitutes a vote and what will be counted as a vote," including the requirement that States exclude absentee or mail ballots received after election day in the final tabulation of the vote for federal elections. *Id.* § 7(b).

## IV.    FEDERAL FUNDING STREAMS IMPLICATED BY THE ELECTIONS EO

95.     The Elections EO threatens to withhold various streams of federal funding to the States for purported noncompliance with the Challenged Provisions. HAVA funds, upon which many Plaintiff States rely, are directly implicated.

96.     Section 4(a) of the Elections EO requires that the Commission "take all appropriate action to cease providing Federal funds to States that do not comply with the Federal laws set forth in 52 U.S. 21145, including the requirement in 52 U.S.C. 20505(a)(1) that States accept and use the national mail voter registration form issued pursuant to 52 U.S.C. 20508(a)(1), including any requirement for documentary proof of United States citizenship adopted pursuant to section 2(a)(ii) of this order."

97.     Section 7(b) of the Elections EO similarly directs that the Commission "condition any available funding to a State on that State's compliance with the requirement in 52 U.S.C. 21081(a)(6) that each State adopt uniform and nondiscriminatory standards within that State that define what constitutes a vote and what will be counted as a vote," including that there be a uniform ballot receipt deadline of Election Day for all methods of voting.

98.     Pursuant to HAVA, the Commission provides "requirements payments" to States for the primary purpose of improving the administration of elections for Federal offices. *See* 52 U.S.C. § 21001(b). These include grants to improve election infrastructure, update voting equipment, enhance cybersecurity, ensure accessibility, and support voter education initiatives. The amount of funding a State receives is determined through a formula that considers multiple factors. By statute, each State must receive a minimum payment, not less than one-half of one percent of the total amount appropriated for the year. *Id.* § 21002(c)(1). A State's remaining amount is then determined by its "allocation percentage," a fixed calculation that is the quotient

of the State's voting age population and the total voting age population of all the States.  *Id.* § 21002(b).

99.    Requirements payments disbursed by the Commission are statutorily conditioned on States' certification of a funding plan that directs money to activities to improve the administration of elections.  *Id.* § 21003(b)(1); *see id.* § 21004(a).  States must also certify compliance with a list of enumerated laws, including the Voting Rights Act of 1965, the Voting Accessibility for the Elderly and Handicapped Act, the Americans with Disabilities Act of 1990, and the NVRA.  *Id.* § 21003(b); *see id.* § 21145(a) (listing laws).  With respect to the NVRA, each State is required to accept and use the Federal Form issued by the Commission pursuant to 52 U.S.C. § 20508.  *See id.* § 20505(a)(1).  However, outside of design and issuance of the Federal Form and promulgation of related regulations, the Commission does not have "any authority to issue any rule, promulgate any regulation, or take any other action which imposes any requirement on any State or unit of local government."  *Id.* § 20929.

100.    Since 2003, the Commission has administrated more than $4.35 billion in HAVA formula funding to States and territories.  In that time, California has received a total of over $505 million from the Commission.  Nevada has received over $36 million.  New York has received more than $49 million in HAVA Election Security Grants since 2018, more than $172 million in HAVA Requirements Payments since 2005, and more than $16 million in HAVA Election Improvement funds since 2003.  Michigan has similarly been awarded more than $27 million in HAVA Security Grant funding.  Delaware has received $13 million in HAVA Requirements Payments.  Minnesota has received $17 million in HAVA funding.  Colorado has received more than $16 million in HAVA Election Security Grants, and prior to 2018 received more than $38 million in HAVA Election Improvement grants.  Arizona has received approximately $12 million in HAVA funds since 2020, which the State apportions among election officials at the county and State level to administer elections.  Massachusetts has received more than $94 million in HAVA funding.  New Jersey has received more than $76 million in HAVA Section 251 payments.  Vermont has received $5 million in HAVA Election

Improvement Funds, over $12 million in HAVA Section 251 Requirements Payments, and $12 million in HAVA Security Grant funding.  Connecticut has received more than $13 million in HAVA Security Grant funding since 2018.  Rhode Island has received a total of $9.2 million in HAVA section 101 elections security grants since 2018, and previously received $13 million in HAVA section 251 grants.  Maine has received at least $9,634,743 in HAVA funds since 2018.

## V.    HARM TO PLAINTIFF STATES

101.    If the Challenged Provisions are implemented, they will irreparably harm Plaintiff States in several concrete ways.

102.    To start, the Challenged Provisions will blatantly transgress on the Plaintiff States' constitutional power to prescribe the time, place, and manner of federal elections.  The Elections EO amounts to an unprecedented seizure of power over elections administration by the federal Executive Branch, which has no constitutional authority over elections.  The Challenged Provisions seek to amend and dictate election law by fiat and relegate Plaintiff States to mere instruments of the President's policy agenda.  Its provisions do affirmative harm to Plaintiff States' efforts to secure the voting rights of their citizens.  This invasion of State constitutional power, in and of itself, amounts to concrete constitutional injury.

103.    Aside from usurping Plaintiff States' constitutional power over elections, the Challenged Provisions in the Elections EO directly harms them in at least three additional ways.

104.    *First*, the Elections EO's documentary proof of citizenship requirement would impose a significant burden on the voter registration systems maintained at the State and local level in the Plaintiff States.

105.    As required under HAVA, Plaintiff States maintain statewide voter registration databases.  52 U.S.C. § 21083(a).  In many Plaintiff States, counties and other smaller political subdivisions likewise maintain their own voter registration databases that push information to a statewide voter registration database.  The Elections EO commandeers this infrastructure wholesale, requiring State and local officials to check documentary proof of citizenship and record the type of proof shown when an applicant uses the Federal Form to register.  Elections

EO, § 2(a)(i)(B).  State and local elections officials would be required to devote time and personnel to setting up the infrastructure, policies, and technology to implement the new requirements, including by implementing "appropriate measures to ensure information security" with regard to the new information they are charged with collecting.  *Id.*, § 2(a).  Such sweeping changes to interconnected databases are a huge undertaking; they require time, money, and significant people power.[2]  Because elections administration is generally decentralized, implementing these changes requires substantial lead-time.

106.    ***Second***, the Elections EO presents Plaintiff States with a lose-lose proposition: implement the President's unconstitutional orders to change their elections administration systems, even though the changes would disenfranchise lawful voters and are contrary to the States' and Congress's judgment, or lose access to essential federal funding.

107.    The funding that Plaintiff States receive from Defendants is significant and ongoing.  Since 2003, the Commission has administered more than $4.35 billion in HAVA funding to the States and territories, including funding totaling $1.4 billion from 2018 to 2024.  These critical funds support the administration of elections for federal office, election security, and improvements to voting and elections systems.  This money is critical to some of the Plaintiff States.  For example, California has received a total of over $505 million from the Commission.  Nevada received at least $12 million for 2018 to 2024.  New York has received more than $49 million in HAVA Election Security Grants since 2018, more than $172 million in HAVA Requirements Payments since 2005, and more than $16 million in HAVA Election Improvement funds since 2003.  Michigan has similarly been awarded more than $27 million in HAVA Security Grant funding.  Delaware has received $13 million in HAVA Requirements Payments.  Minnesota has received $17 million in HAVA funding.  Colorado has received more than $16 million in HAVA Election Security Grants and prior to 2018 received more than $38

---

[2] One of the Plaintiff States, Arizona, already requires documentary proof of citizenship for voter registration, at least for State elections.  However, Arizona defines documentary proof of citizenship quite differently from how the Elections EO defines it.  *Compare* A.R.S. § 16-166(F) *with* Elections EO, § 2(a)(ii).

million in HAVA Election Improvement grants. Arizona has received approximately $12 million in HAVA funds since 2020, which the State apportions among election officials at the county and State level to administer elections. Massachusetts has received more than $94 million in HAVA funding. New Jersey has received more than $76 million in HAVA Section 251 payments, including more than $22 million from 2019 to the present. Vermont has received $5 million in HAVA Election Improvement Funds, over $12 million in HAVA Section 251 Requirements Payments, and $12 million in HAVA Security Grant funding, which are essential to administering elections in the state. Connecticut has received more than $13 million in HAVA Security Grant funding since 2018. Rhode Island has received a total of $9.2 million in HAVA section 101 elections security grants since 2018, and previously received $13 million in HAVA section 251 grants. Maine has received at least $9,634,743 in HAVA funds since 2018. These existing funding amounts were not meant to cover the new requirements purportedly imposed by the Elections EO, and they are insufficient to cover the dramatic changes to voter registration systems and election administration procedures contemplated by the Executive Order. Such unfunded mandates harm the States.

108. The Elections EO presents Plaintiff States with an unconstitutional choice: either lose access to essential funds, harming States' practical ability to conduct their elections, or institute unlawful and unfunded conditions that would have the effect of disenfranchising their own citizens in order to continue receiving existing funding.

109. ***Third***, the Elections EO further impacts Plaintiff States' administration of elections because it sets forth an interpretation of the federal Election Day statutes that is not consistent with the text of those statutes and conflicts with many Plaintiff States' method for counting ballots. Under federal law, Plaintiff States must adopt standards that define what constitutes a vote and what will be counted as a vote. 52 U.S.C. § 21081(a)(6). Plaintiff States have adopted varying standards pursuant to this requirement, including many Plaintiff States that allow absentee and mail-in ballots postmarked before or on Election Day to be counted, so long as they are received within a limited period of time after Election Day. *See, e.g.*, Cal. Elec. Code

§ 3020(b); Mass. Gen. Laws c. 54, § 93; N.J. Stat. Ann. § 19:63-22(a); Nev. Rev. Stat. §
293.269921(1)(b), (2); N.Y. Election Law sec. 8-412(1), 8-710(1).  Many Plaintiff States also
have laws that allow rejected ballots—e.g., ballots with a non-matching signature—to be cured
by voters and counted.  Even these laws could be deemed to violate the Elections EO.

110.    The Elections EO declares these State laws that allow for counting a vote received
after Election Day to be "violations" of the federal Election Day statutes and directs the Attorney
General to enforce those Election Day statutes against States.  Plaintiff States with laws allowing
for the tabulation of timely cast ballots received or cured after Election Day intend to administer
federal elections in accordance with these State laws, notwithstanding this conflict.  Because the
Elections EO directs the Attorney General to "take all necessary action to enforce" the
President's incorrect and conflicting interpretation of federal law, there is an actual controversy
between Plaintiff States and the Attorney General and there is a credible threat of immediate
enforcement by the Attorney General against Plaintiff States.

111.    The Elections EO also seeks to give immediate, punitive effect to the President's
legal position by ordering the Commission to withhold funding from States that do not
acquiesce.  The Elections EO therefore directly interferes with Plaintiff States' administration of
federal elections because it attempts to force changes in the way votes are counted.  Were
Plaintiff States compelled to follow the President's erroneous interpretation of the federal
Election Day statutes, it would upend their established State laws and procedures for
administering federal elections, resulting in widespread voter confusion and disenfranchisement.

112.    No adequate remedy at law is available to redress these irreparable harms.

## FIRST CAUSE OF ACTION

**Elections EO § 2(a) - Ultra Vires / Separation of Powers - Presidential Action in Excess of
Authority; Usurping the Legislative Function; Violation of the Bicameralism and
Presentment Clauses**

**(Against the President, the Commission, and Commissioners)**

113.    Plaintiff States restate and reallege paragraphs 1 to 112 as if fully set forth herein.

114.    Plaintiff States have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

115.    The Elections EO instructs the Commission to amend the Federal Form to require documentary proof of citizenship.  Elections EO, § 2(a).  It also directs that State and local elections officials be tasked with implementing the burdensome documentation requirements associated with this provision.  *Id.* § 2(a)(I)(B).

116.    The Commission is a multimember, bipartisan body composed of experts in elections and their administration.  *See* 52 U.S.C. § 20923.  To ensure its trustworthy and neutral work, Congress established the Commission as an "independent entity."  *Id.* § 20921.  Congress also required the Commission to have a bipartisan majority to approve any action.  *Id.* § 20928.

117.    The President has no constitutional authority to interfere with State and Congressional regulations of the times, places, and manner of elections, including voter registration.  *See* U.S. Const. art. I, § 4, art. II, § 1; *ITCA*, 570 U.S. at 8, 14–15.  Where, as here, the President takes action that undermines the authority and independence of Congress, his action is properly struck down as violative of the constitutional separation of powers.  The Elections EO's attempt to dictate policy and actions of the Commission in a manner inconsistent with Congressional approval requirements is ultra vires and in excess of the President's powers.

118.    Because a substantive change to the Federal Form functions as a command to the sovereign States, the Commission can change the Federal Form only upon "consultation with the chief election officers of the States."  52 U.S.C. § 20508(a)(2).  And, like all Commission decisions, such changes require the approval of at least three out of four Commissioners.  *Id.* § 20928.  Commission changes to the Federal Form must also be made through reasoned decision-making subject to APA review.  *See id.* §§ 20921, 20923, 20928; 5 U.S.C. § 706; *Newby*, 838 F.3d at 11–12.

119.    Regardless, Congress has never authorized the Commission's creation of a documentary proof of citizenship requirement on the Federal Form.  In fact, in drafting the NVRA, Congress determined that a documentary proof of citizenship requirement was "not

necessary or consistent with the purposes of" the statute.  H.R. Rep. No. 103–66, at 23–24 (1993).

120.    The Commission may exercise only that authority which is conferred by statute. *See City of Arlington v. FCC*, 569 U.S. 290, 297–98 (2013).  By directing the Commission and imposing duties on it that are not contained in federal law, the Elections EO attempts to amend, repeal, rescind, or circumvent duly enacted federal statutes based on the President's own policy preferences.  These actions exceed the President's Article II powers, unconstitutionally infringe upon Congress's powers, and attempt to amend federal legislation while bypassing Article I's Bicameralism, Presentment, and Elections Clauses.

121.    The Plaintiff States will be harmed by implementing these burdensome, harmful, and costly requirements.

122.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that Section 2(a) of the Elections EO violates the separation of powers and impermissibly arrogates to the Executive power that is reserved to Congress.

123.    Plaintiff States are further entitled to a preliminary and permanent injunction preventing the Commission and the Defendant Commissioners from enforcing or implementing Section 2(a) of the Elections EO.

## SECOND CAUSE OF ACTION

**Elections EO § 2(a) - Ultra Vires / Contrary to Statute - Presidential Action in Excess of Authority; Usurping the Legislative Function; Violation of the Bicameralism and Presentment Clauses**

**(By all Plaintiff States except Arizona Against the President, the Commission, and Commissioners)[3]**

124.    Plaintiff States restate and reallege paragraphs 1 to 123 as if fully set forth herein.

125.    Plaintiff States have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

---

[3] Due to unique requirements of Arizona law, Arizona does not join this cause of action.

126.    The Elections EO instructs the Commission to amend the Federal Form to require documentary proof of citizenship.  Elections EO, § 2(a).  It also directs State and local elections officials to implement the burdensome documentation requirements associated with this provision.  *Id.* § 2(a)(i)(B).

127.    The Elections EO violates the substantive provisions of the NVRA, which permits the Federal Form to "require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."  52 U.S.C. § 20508(b)(1).

128.    The "statutory text is straightforward."  *Newby*, 838 F.3d at 10.  If an aspect of the Federal Form is "'necessary' to enforce voter qualifications, then the NVRA and probably the Constitution require its inclusion; if not, the NVRA does not permit its inclusion and the Constitution is silent."  *Id.* at 11; *see also Tenn. Conf. of Nat'l Ass'n for Advancement of Colored People v. Lee*, 730 F. Supp. 3d 705, 740 (M.D. Tenn. 2024).

129.    The President has no constitutional authority to interfere with State and Congressional regulations of the times, places, and manner of elections, including voter registration.  *See* U.S. Const. art. I, § 4, art. II, § 1; *ITCA*, 570 U.S. at 8, 14–15.  Where, as here, the President takes action that undermines the authority and independence of Congress, his action is properly struck down as violative of the constitutional separation of powers.  The Elections EO's attempt to dictate policy and actions of the Commission in a manner inconsistent with Congressional requirements is ultra vires and in excess of the President's powers.

130.    Congress has already decided that documentary proof of citizenship is not "necessary" for identifying eligible voters.  Citizenship is one aspect of a voter's eligibility. Under the NVRA, citizenship is proven through attestation: the Federal Form "shall include a statement that" (a) "specifies" all voter eligibility requirements, "including citizenship"; (b) "contains an attestation that the applicant meets each such requirement each such requirement;"

29

and (c) "requires the signature of the applicant, under the penalty of perjury."  52 U.S.C. § 20508(b)(2).  In drafting the NVRA, Congress concluded that attestation under penalty of perjury and criminal penalties were "sufficient safeguards to prevent noncitizens from registering to vote."  S.Rep. No. 103–6, at 11 (1993).  Indeed, the NVRA specifically prohibits including in the Federal Form "any requirement for notarization or other formal authentication."  52 U.S.C. § 20508(b)(3).

131.    Nor has the Commission deemed documentary proof of citizenship "necessary" for identifying eligible voters.  To the contrary, the Commission has previously rejected that proposition.

132.    The Elections EO attempts to amend, repeal, rescind, or circumvent duly enacted federal statutes based on the President's own policy preferences.  These actions exceed the President's Article II powers, unconstitutionally infringe upon Congress's powers, and attempt to amend federal legislation while bypassing Article I's Bicameralism, Presentment, and Elections Clauses.

133.    The Plaintiff States will be harmed by this requirement, which would be burdensome, harmful, and costly to implement and administer.

134.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that Section 2(a) of the Elections EO violates the separation of powers and impermissibly arrogates to the Executive power that is reserved to Congress.

135.    Plaintiff States are further entitled to a preliminary and permanent injunction preventing the Commission and Defendant Commissioners from enforcing or implementing Section 2(a) of the Elections EO.

## THIRD CAUSE OF ACTION

**Elections EO § 3(d) - Ultra Vires / Separation of Powers - Presidential Action in Excess of Authority; Usurping the Legislative Function; Violation of the Bicameralism and Presentment Clauses**

### (Against the President and the Secretary of Defense)

136.    Plaintiff States restate and reallege paragraphs 1 to 135 as if fully set forth herein.

137.    Plaintiff States have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

138.    The Elections EO commands the Secretary of Defense to update the federal post card application provided under UOCAVA to require documentary proof of citizenship and proof of eligibility to vote in state elections.  Elections EO § 3(d).

139.    The President has no constitutional authority to interfere with State and Congressional regulations of the times, places, and manner of elections, including voter registration.  *See* U.S. Const. art. I, § 4, art. II, § 1; *ITCA*, 570 U.S. at 8, 14–15.  Where, as here, the President takes action that undermines the authority and independence of Congress, his action is properly struck down as violative of the constitutional separation of powers.  The Elections EO's attempt to dictate policy in a manner inconsistent with Congressional requirements is ultra vires and in excess of the President's powers.

140.    Congress has never authorized the Election EO's additional requirements for the "official post card form" prescribed by the Secretary of Defense under UOCAVA for military and overseas voters to use to register to vote in federal elections.  52 U.S.C. § 20302(a)(4). Nowhere in the Act is there a requirement that this form demand documentary proof of citizenship or proof of eligibility to vote in elections in the State in which the applicant is attempting to vote.  Rather, the Act unequivocally grants military and overseas voters the ability to register and cast a ballot "in the last place in which the person was domiciled before leaving the United States."  *Id.* § 20310(5)(B).

141.    By directing the Secretary of Defense to include requirements for the Federal Post Card Application not contained in federal law, the Elections EO attempts to amend, repeal,

rescind, or circumvent duly enacted federal statutes based on the President's own policy preferences. These actions exceed the President's Article II powers, unconstitutionally infringe upon Congress's powers, and attempt to amend federal legislation while bypassing Article I's Bicameralism, Presentment, and Elections Clauses.

142. The Plaintiff States will be harmed by this requirement, which would be burdensome and costly to implement and administer.

143. Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that Section 3(d) of the Elections EO violates the separation of powers and impermissibly arrogates to the Executive power that is reserved to Congress.

144. Plaintiff States are further entitled to a preliminary and permanent injunction preventing the Secretary of Defense from enforcing or implementing Section 3(d) of the Elections EO.

## <u>FOURTH CAUSE OF ACTION</u>

**Elections EO § 4(a) - Ultra Vires / Separation of Powers - Presidential Action in Excess of Authority; Usurping the Legislative Function; Violation of the Bicameralism and Presentment Clauses**

**(Against the President, the Commission, and Commissioners)**

145. Plaintiff States restate and reallege paragraphs 1 to 144 as if fully set forth herein.

146. Plaintiff States have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

147. The Elections EO orders the Commission to condition federal funding to States on their acceptance of the Federal Form as unlawfully amended to require documentary proof of citizenship. Elections EO, § 4(a).

148. The President has no constitutional authority to interfere with State and Congressional regulations of the times, places, and manner of elections, including voter registration. *See* U.S. Const. art. I, § 4, art. II, § 1; *ITCA*, 570 U.S. at 8, 14–15. Where, as here,

the President takes action that undermines the authority and independence of Congress, his action is properly struck down as violative of the constitutional separation of powers.

149.    The Commission is a multimember, bipartisan body composed of experts in elections and their administration.  *See* 52 U.S.C. § 20923.  To ensure its trustworthy and neutral work, Congress established the Commission as an "independent entity."  *Id.* § 20921.  Congress also required the Commission to have a bipartisan majority to approve any action.  *Id.* § 20928. The Elections EO's attempt to dictate policy and actions of the Commission in a manner inconsistent with Congressional approval requirements is ultra vires and in excess of the President's powers.

150.    Nor has Congress authorized the Commission to withhold funds on these grounds. To the contrary, it has specified the precise formula for calculating the grants that the Commission administers and the conditions for those funds.  52 U.S.C. §§ 21001–21003, 21142(c)(1).  Plaintiff States are statutorily entitled to those funds upon satisfaction of the requirements of the program under which the funds are provided.

151.    The Commission may exercise only that authority which is conferred by statute. *See City of Arlington*, 569 U.S. at 297–98.  By directing the Commission and imposing duties on it that are not contained in federal law, the Elections EO attempts to amend, repeal, rescind, or circumvent duly enacted federal statutes based on the President's own policy preferences.  These actions exceed the President's Article II powers, unconstitutionally infringe upon Congress's powers, and attempt to amend federal legislation while bypassing Article I's Bicameralism, Presentment, and Elections Clauses.

152.    This unlawful order will harm the Plaintiff States by targeting them for loss of federal funding.

153.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that Section 4(a) of the Elections EO violates the separation of powers and impermissibly arrogates to the Executive power that is reserved to Congress.

154.    Plaintiff States are further entitled to a preliminary and permanent injunction preventing the Commission and the Defendant Commissioners from enforcing or implementing Section 4(a) of the Elections EO.

### FIFTH CAUSE OF ACTION

**Elections EO § 7(a) - Ultra Vires / Separation of Powers - Presidential Action in Excess of Authority; Usurping the Legislative Function; Violation of the Bicameralism and Presentment Clauses; Violation of the Elections Clause and the Electors Clause**

**(Against the President and the Attorney General)**

155.    Plaintiff States restate and reallege paragraphs 1 to 154 as if fully set forth herein.

156.    Plaintiff States have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

157.    The Elections EO directs the Attorney General to "take all necessary action to enforce" federal statutes setting the date of federal elections against States that purportedly "violate these provisions" by counting absentee or vote-by-mail ballots received after Election Day "in the final tabulation of votes for" federal office, adopting a draconian and incorrect rule that would preclude States from counting ballots that arrive after Election Day, even if they were mailed on or before that day.  Elections EO, § 7(a).

158.    The President has no constitutional authority to interfere with State and Congressional regulations of the times, places, and manner of elections, including voter registration.  *See* U.S. Const. art. I, § 4, art. II, § 1; *ITCA*, 570 U.S. at 8, 14–15.  Where, as here, the President takes action that undermines the authority and independence of Congress, or invades the constitutional and statutory rights of the States, his action is properly struck down as violative of the constitutional separation of powers.

159.    The Elections EO attempts to direct the Attorney General to adopt and enforce an interpretation of the federal Election Day statutes, 2 U.S.C. § 7 and 3 U.S.C. § 1, that conflicts with State laws allowing for votes validly cast by Election Day but received after that date to be counted.  The President has no legal authority to amend the Election Day statues to prohibit the

counting of ballots validly cast under State law, nor to direct the Attorney General to enforce his erroneous interpretation of federal law against States.

160.    By directing the Attorney General to enforce the President's incorrect interpretation of federal law, the Elections EO attempts to amend, repeal, rescind, or circumvent duly enacted federal statutes based on the President's own policy preferences.  These actions exceed the President's Article II powers, unconstitutionally infringe upon Congress's powers, and attempt to amend federal legislation while bypassing Article I's Bicameralism, Presentment, and Elections and Electors Clauses.

161.    This unlawful order harms Plaintiff States by the imminent threat of enforcement by the Attorney General.  There is an actual controversy about whether Plaintiff States can count ballots that are received after Election Day.  Plaintiff States intend to administer federal elections according to State laws, notwithstanding that many of those laws directly conflict with the Elections EO's incorrect interpretation of the federal Election Day statutes.  The Elections EO directs the Attorney General to take all appropriate actions to enforce the Elections EO's incorrect interpretation, establishing an actual controversy and a credible threat of civil prosecution.

162.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that Section 7(a) of the Elections EO violates the separation of powers and impermissibly arrogates to the Executive power that is reserved to Congress and the Plaintiff States.

163.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the federal Election Day statutes do not preclude the Plaintiff States from enacting and implementing State laws that allow for counting a timely cast ballot received after Election Day.

164.    Plaintiff States are further entitled to a preliminary and permanent injunction preventing the Attorney General from enforcing or implementing Section 7(a) of the Elections EO.

## SIXTH CAUSE OF ACTION

**Elections EO § 7(b) - Ultra Vires / Separation of Powers - Presidential Action in Excess of Authority; Usurping the Legislative Function; Violation of the Bicameralism and Presentment Clauses**

**(Against the President, the Commission, and Commissioners)**

165.    Plaintiff States restate and reallege paragraphs 1 to 164 as if fully set forth herein.

166.    Plaintiff States have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

167.    The Elections EO requires the Commission to condition federal funding on Plaintiff States' acquiescence to an incorrect interpretation of federal Election Day statutes that would preclude Plaintiff States from counting ballots that arrive after Election Day, even if they were mailed on or before that day.  Elections EO, § 7(b).

168.    The President has no constitutional authority to interfere with State and Congressional regulations of the times, places, and manner of elections, including voter registration.  *See* U.S. Const. art. I, § 4, art. II, § 1; *ITCA*, 570 U.S. at 8, 14–15.  Where, as here, the President takes action that undermines the authority and independence of Congress, his action is properly struck down as violative of the constitutional separation of powers.

169.    The Commission is a multimember, bipartisan body composed of experts in elections and their administration.  *See* 52 U.S.C. § 20923.  To ensure its trustworthy and neutral work, Congress established the Commission as an "independent entity."  *Id.* § 20921.  Congress also required the Commission to have a bipartisan majority to approve any action.  *Id.* § 20928. The Elections EO's attempt to dictate policy and actions of the Commission in a manner inconsistent with Congressional approval requirements is ultra vires and in excess of the President's powers.

170.    Nor has Congress authorized the Commission to withhold funds on these grounds. To the contrary, it has specified the precise formula for calculating the grants that the Commission administers and the conditions for those funds.  52 U.S.C. §§ 21001–21003; *see*

*also* 21142(c)(1).  Plaintiff States are statutorily entitled to those funds upon satisfaction of the requirements of the program under which the funds are provided.

171.    Moreover, outside of specified duties regarding the design and issuance of the Federal Form, the Commission does not have "any authority to issue any rule, promulgate any regulation, or take any other action which imposes any requirement on any State or unit of local government," such as adopting the draconian position insisted upon in the Elections EO.  *Id.* § 20929.

172.    The Commission may exercise only that authority which is conferred by statute. *See City of Arlington*, 569 U.S. at 297–98.  By directing the Commission and imposing duties on it that are not contained in federal law, the Elections EO attempts to amend, repeal, rescind, or circumvent duly enacted federal statutes based on the President's own policy preferences.  These actions exceed the President's Article II powers, unconstitutionally infringe upon Congress's powers, and attempt to amend federal legislation while bypassing Article I's Bicameralism, Presentment, and Elections Clauses.

173.    This unlawful order will harm Plaintiff States by targeting them for loss of federal funding.

174.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that Section 7(b) of the Elections EO violates the separation of powers and impermissibly arrogates to the Executive power that is reserved to Congress.

175.    Plaintiff States are further entitled to a preliminary and permanent injunction preventing the Commission and the Defendant Commissioners from enforcing or implementing Section 7(b) of the Elections EO.

## SEVENTH CAUSE OF ACTION

**All Challenged Provisions – Separation of Powers / Intrusion on States' Election Powers Granted by Article I, Section 4 and Article II, Section 1 of the United States Constitution**

**(Against All Defendants)**

176.    Plaintiff States restate and reallege paragraphs 1 to 175 as if fully set forth herein.

177.    The Constitution "invests the States with responsibility for the mechanics of [federal] elections, but only so far as Congress declines to preempt legislative choices." *Foster*, 522 U.S. at 69 (citations omitted); *see also* U.S. Const. art. I, § 4, cl. 1; Art. II, § 1, cl. 2.  It is "solicitous of the prerogatives of the States, even in an otherwise sovereign federal province" because "the Framers recognized that state power and identity were essential parts of the federal balance." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 841 (1995).

178.    The President has no constitutional authority to interfere with State and Congressional regulations of the times, places, and manner of elections, including voter registration.  *See* U.S. Const. art. I, § 4, art. II, § 1; *ITCA*, 570 U.S. at 8, 14–15.  Where, as here, the President takes action that undermines the authority and independence of Congress, his action is properly struck down as violative of the constitutional separation of powers.  For the same reasons, where the President takes action unauthorized by the Constitution or statute that undermines the constitutional powers of the States, his action is properly struck down as violative of the vertical separation of powers.

179.    Plaintiff States have a non-statutory right of action to enjoin and declare unlawful official action that commandeers State executive power or otherwise intrudes on Plaintiff States' inherent sovereignty and powers granted by the Constitution.  In the Elections EO, the President invades Plaintiff States' sovereignty and their powers to regulate federal elections by Presidential fiat and commandeers State election administrative personnel and processes to implement a Presidential decree.

180.    Pursuant to their constitutional authority, Plaintiff States have each enacted statutes governing elections, and each maintains a complex administrative apparatus to carry out federal elections.  The Elections EO purports to overwrite State laws, regulations, and processes relevant to registration, voting systems, and ballot counting.  But it is *Congress*, not the Executive, in which the Constitution vests the power to "make or alter" State regulations governing federal elections.  *See* U.S. Const., art. I, § 4.  The Elections EO goes far beyond any statute lawfully enacted by Congress.

181.    The Elections EO conditions critical funding streams on Plaintiff States' capitulation to its new and unlawful rules.  It thus seeks to control Plaintiff States' exercise of their sovereign powers through raw Executive domination, contrary to the Constitution and its underlying principles of federalism and the separation of powers.

182.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Challenged Provisions of the Elections EO violates the separation of powers, intrudes on Plaintiff States' sovereignty and the election powers granted to them by Article I, Section 4 and Article II, Section 1 of the Constitution, and unconstitutionally commandeers States' executive powers to implement a Presidential decree.

183.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing all Defendants, except the President, from enforcing or implementing the Challenged Provisions of the Elections EO.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff States pray that this Court:

1.    Issue a judicial declaration that the Challenged Provisions of the Elections EO are unconstitutional and void, because they are ultra vires and violate both the separation of powers and the States' sovereignty and elections power under the United States Constitution;

2.    Preliminarily and permanently enjoin all Defendants, except President Trump, from implementing or enforcing the Challenged Provisions of the Elections EO;

3.    Award Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees; and

4.    Grant any other relief as this Court may deem just and proper.

Dated: April 3, 2025

**ROB BONTA**
Attorney General of California

By: */s/ Nicholas R. Green*
Nicholas R. Green (BBO No. 698510)
    Deputy Attorney General
Anne P. Bellows*
    Deputy Attorney General
Thomas S. Patterson*
    Senior Assistant Attorney General
John D. Echeverria*
    Supervising Deputy Attorney General
Michael S. Cohen*
Malcolm A. Brudigam*
Kevin L. Quade*
Lisa Ehrlich*
    Deputy Attorneys General

Counsel for the State of California

**KRISTIN K. MAYES**
Attorney General of the State of Arizona

By: */s/ Joshua M. Whitaker*
Joshua M. Whitaker*
Karen J. Hartman-Tellez*
Kara Karlson*
    Assistant Attorneys General

Counsel for the State of Arizona

**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ Shannon Stevenson*
Shannon Stevenson*
    Solicitor General
Peter Baumann*
    Senior Assistant Attorney General

Counsel for the State of Colorado

Respectfully Submitted,

**AARON FORD**
Attorney General of Nevada

By: */s/ Craig Newby*
Craig Newby*
    First Deputy Attorney General
Heidi P. Stern*
    Solicitor General

Counsel for the State of Nevada

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ M. Patrick Moore*
M. Patrick Moore (BBO No. 670323)
    First Assistant Attorney General
Anne Sterman (BBO No. 650426)
    Chief, Government Bureau
Phoebe Fischer-Groban (BBO No. 687068)
    Deputy Chief, Constitutional &
    Administrative Law Division
Chris Pappavaselio (BBO No. 713519)
    Assistant Attorney General

Counsel for the Commonwealth of
Massachusetts

**WILLIAM TONG**
Attorney General for the State of
Connecticut

*/s/ Maura Murphy*
Maura Murphy*
    Deputy Associate Attorney General

Counsel for the State of Connecticut

*(additional counsel on following page)*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Ian R. Liston*
Ian R. Liston*
 Director of Impact Litigation
Vanessa L. Kassab*
Maryanne T. Donaghy*
 Deputy Attorneys General

Counsel for the State of Delaware

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ David D. Day*
David D. Day*
 Special Assistant to the Attorney
 General
Kalikoʻonālani D. Fernandes*
 Solicitor General

Counsel for the State of Hawaiʻi

**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Alex Hemmer*
Alex Hemmer*
 Deputy Solicitor General

Counsel for the State of Illinois

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Jonathan R. Bolton*
Jonathan R. Bolton*
 Assistant Attorney General

Counsel for the State of Maine

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Adam D. Kirschner*
Adam D. Kirschner*
 Senior Assistant Attorney General

Counsel for the State of Maryland

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Erik Grill*
Erik Grill*
Danny Haidar*
Heather S. Meingast*
 Assistant Attorneys General

Counsel for the People of the State of
Michigan

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Peter J. Farrell*
Peter J. Farrell*
 Deputy Solicitor General
Angela Behrens*
 Assistant Attorney General

Counsel for the State of Minnesota

**MATTHEW J. PLATKIN**
Attorney General Of New Jersey

By: */s/ Meghan K. Musso*
Meghan K. Musso*
Jonathan Mangel*
 Deputy Attorneys General

Counsel for the State of New Jersey

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ James W. Grayson*
James W. Grayson*
 Chief Deputy Attorney General

Counsel for the State of New Mexico

**LETITIA JAMES**
Attorney General of New York

By: */s/ Colleen K. Faherty*
Colleen K. Faherty*
 Special Trial Counsel

Counsel for the State of New York

*(additional counsel on the following page)*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ James J. Arguin*
James J. Arguin (BBO No. 557350)
    Special Assistant Attorney General

Counsel for the State of Rhode Island

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane*
    Deputy Solicitor General

Counsel for the State of Vermont

**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: */s/ Charlotte Gibson*
Charlotte Gibson*
    Assistant Attorney General

Counsel for the State of Wisconsin

*Pro hac vice applications forthcoming*