## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA; STATE OF
NEVADA; COMMONWEALTH OF
MASSACHUSETTS; STATE OF
ARIZONA; STATE OF COLORADO;
STATE OF CONNECTICUT; STATE OF
DELAWARE; STATE OF HAWAII;
STATE OF ILLINOIS; STATE OF
MAINE; STATE OF MARYLAND;
PEOPLE OF THE STATE OF
MICHIGAN; STATE OF MINNESOTA;
STATE OF NEW JERSEY; STATE OF
NEW MEXICO; STATE OF NEW YORK;
STATE OF RHODE ISLAND; STATE OF
VERMONT; STATE OF WISCONSIN,

               *Plaintiffs,*

v.

DONALD J. TRUMP, in his official
capacity as President of the United States;
PAMELA BONDI, in her official capacity
as Attorney General of the United States;
UNITED STATES ELECTION
ASSISTANCE COMMISSION; DONALD
L. PALMER, in his official capacity as
Chairman of the U.S. Election Assistance
Commission; THOMAS HICKS, in his
official capacity as Vice Chair of the U.S.
Election Assistance Commission;
CHRISTY McCORMICK and BENJAMIN
W. HOVLAND, in their official capacities
as Commissioners of the U.S. Election
Assistance Commission; PETE HEGSETH,
in his official capacity as Secretary of
Defense,

               *Defendants.*

No. 1:25-cv-10810-DJC

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A
## PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

Introduction ........................................................................................................... 1

Background ........................................................................................................... 1

    I.     State and Congressional Elections Power Under the Constitution ........... 1

    II.    Existing Federal Law ................................................................................. 2

          A.    Congress Has Lowered Barriers to Voter Registration and
               Provided Funding for State Elections Administration ................. 2

          B.    Congress Has Enacted Statutes Setting a Date for Federal
               Elections ..................................................................................... 4

    III.   Elections Executive Order ......................................................................... 4

Legal Standard ..................................................................................................... 6

Argument .............................................................................................................. 6

    I.     Plaintiff States Have a Strong Likelihood of Success on the Merits ......... 6

          A.    Plaintiff States Are Likely to Succeed on Their Claims
               Challenging the EO's Attempt to Require Documentary
               Proof of Citizenship ................................................................... 7

               1.    Section 2(a) violates the Constitution and federal
                      statutes in ordering the EAC to impose a documentary
                      proof of citizenship requirement ....................................... 7

                      a.    Plaintiff States' challenge to Section 2(a) is
                            ripe ............................................................................ 7

                      b.    The EO cannot require the EAC to change the
                            Federal Form ............................................................ 8

                   2.    Section 3(d) is contrary to UOCAVA .............................. 12

                 3.    The EO unconstitutionally commandeers States'
                      resources to implement presidential policy requiring
                      proof of citizenship .......................................................... 13

           B.    Plaintiff States Are Likely to Succeed on Their Claims
                Challenging Provisions That Purport to Preempt State Ballot
                Counting Laws ........................................................................... 14

                 1.    Section 7(a) is ultra vires and violates the separation
                        of powers ......................................................................... 15

                        a.    Plaintiff States' challenge to Section 7(a) is
                              justiciable ................................................................. 15

                        b.    The EO's ballot receipt deadline requirement
                            finds no support in the Election Day statutes ....... 16

**TABLE OF CONTENTS**
**(continued)**

Page

2.    Section 7(b) imposes unlawful conditions on statutory funding ............................................................................ 19

3.    Section 7 invades the States' constitutional powers and sovereignty ................................................................. 20

II.    Irreparable Harm to Plaintiff States ....................................................... 20

A.    The Provisions Mandating Documentary Proof of Citizenship Cause Imminent and Irreparable Harm to Plaintiff States .......... 20

B.    The New Ballot Receipt Deadline and Related Enforcement Mechanisms Cause Imminent and Irreparable Harm to Ballot Receipt Plaintiffs .......................................................................... 24

III.    The Equities and the Public Interests Favor Injunctive Relief ............... 29

Conclusion ................................................................................................ 30

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Abbott v. Perez*
    585 U.S. 579 (2018)....................................................................................22, 25

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*
    458 U.S. 592 (1982)....................................................................................25, 30

*Arizona v. Inter Tribal Council of Arizona, Inc.*
    570 U.S. 1 (2013)....................................................................................... *passim*

*Bognet v. Sec'y Commonwealth of Pa.*
    980 F.3d 336 (3d Cir. 2020)................................................................16, 17, 18

*Bost v. Ill. State Bd. of Elections*
    684 F. Supp. 3d 720 (N.D. Ill. 2023) .............................................................17

*Boumediene v. Bush*
    553 U.S. 723 (2008)...........................................................................................7

*City & Cnty. of S.F. v. Trump*
    897 F.3d 1225 (9th Cir. 2018) ...........................................................19, 28, 29

*City of Providence v. Barr*
    945 F.3d 23 (1st Cir. 2020)..............................................................................19

*Clinton v. City of New York*
    524 U.S. 417 (1998).........................................................................................18

*CMM Cable Rep., Inc. v. Ocean Coast Props.*
    48 F.3d 618 (1st Cir. 1995).............................................................................29

*Colon-Marrero v. Velez*
    813 F.3d 1 (1st Cir. 2016)..................................................................................3

*Concord Hosp., Inc. v. N.H. Dep't of Health & Human Servs.*
    743 F. Supp. 3d 325 (D.N.H. 2024).................................................................28

*Democratic Nat'l Comm. v. Wisconsin State Legislature*
    141 S. Ct. 28 (2020).............................................................................8, 20, 24

*Doe v. Trump*
    2025 WL 485070 (D. Mass. Feb. 13, 2025) ..................................................21

*Does 1-6 v. Mills*
    16 F.4th 20 (1st Cir. 2021)..............................................................................29

## TABLE OF AUTHORITIES
### (continued)

Page

*Donald J. Trump for President, Inc. v. Way*
492 F. Supp. 3d 354 (D.N.J. 2020) ...............................................................17

*Fed. Elec. Comm'n v. Democratic Senatorial Campaign Comm.*
454 U.S. 27 (1981)........................................................................................3

*Fish v. Kobach*
840 F.3d 710 (10th Cir. 2016) ......................................................................30

*Fish v. Schwab*
957 F.3d 1105 (10th Cir. 2020) ....................................................................29

*Foster v. Love*
522 U.S. 67 (1997)................................................................................*passim*

*Gonzalez v. Arizona*
677 F.3d 383 (9th Cir. 2012) ........................................................................16

*Griffin v. N.C. State Bd. of Elections*
___ S.E.2d ___, 2025 WL 1090903 (N.C. S.Ct. Apr. 11, 2025) ...................27

*Harmon v. Brucker*
355 U.S. 579 (1958)........................................................................................6

*Harris v. Fla. Elections Canvassing Comm'n*
122 F. Supp. 2d 1317 (N.D. Fla. 2000).........................................................18

*In re Aiken Cnty.*
725 F.3d 255 (D.C. Cir. 2013) ......................................................................20

*Kansas v. United States*
249 F.3d 1213 (10th Cir. 2001) ....................................................................25

*Kobach v. U.S. Election Assistance Comm'n*
772 F.3d 1183 (10th Cir. 2014) ..............................................................10, 11

*League of United Latin Am. Citizens, et al. v. Exec. Office of the President,
et al.*
___ F. Supp. 3d ___, 2025 WL 1187730 (D.D.C. Apr. 24, 2025)........... *passim*

*League of Women Voters of U.S. v. Newby*
838 F.3d 1 (D.C. Cir. 2016) .................................................................. *passim*

*Louisiana v. Biden*
55 F.4th 1017 (5th Cir. 2022) ................................................................20, 25

## TABLE OF AUTHORITIES
### (continued)

Page

*Maryland v. U.S. Dep't of Agric.*
2025 WL 973159 (D. Md. Apr. 1, 2025) .......................................................................22

*Mass. Ass'n of Afro-Am. Police, Inc. v. Bos. Police Dep't*
973 F.2d 18 (1st Cir. 1992) ..............................................................................................8

*Me. Forest Prods. Council v. Cormier*
586 F. Supp. 3d 22 (D. Maine 2022) ............................................................................29

*Medellin v. Texas*
552 U.S. 491 (2008) ..........................................................................................6, 7, 20

*MedImmune, Inc. v. Genentech, Inc.*
549 U.S. 118 (2007) ........................................................................................................16

*Mi Familia Vota v. Fontes*
129 F.4th 691 (9th Cir. 2025) ........................................................................................10

*Mi Familia Vota v. Fontes*
719 F. Supp. 3d 929 (D. Ariz. 2024) ............................................................................29

*Millsaps v. Thompson*
259 F.3d 535 (6th Cir. 2001) ........................................................................................17

*Morales v. Trans World Airlines, Inc.*
504 U.S. 374 (1992) ........................................................................................................28

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*
407 F. Supp. 2d 323 (D. Mass. 2005) ...........................................................................29

*New York v. United States*
505 U.S. 144 (1992) ..............................................................................................14, 20

*Obama for Am. v. Husted*
697 F.3d 423 (6th Cir. 2012) ........................................................................................30

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*
461 U.S. 190 (1983) ..........................................................................................................8

*Purcell v. Gonzalez*
549 U.S. 1 (2006) ....................................................................................................26, 30

*Republican Nat'l Comm. v. Wetzel*
120 F.4th 200 (5th Cir. 2024) ........................................................................................17

*Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*
199 F.3d 26 (1st Cir. 1999) ......................................................................................15, 16

**TABLE OF AUTHORITIES**
(continued)

Page

*Rodriguez v. Robbins*
715 F.3d 1127 (9th Cir. 2013) ........................................................29

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*
102 F.3d 12 (1st Cir. 1996)..............................................................26

*Seila Law LLC v. Consumer Fin. Prot. Bureau*
591 U.S. 197 (2020)...................................................................11, 12

*Shurtleff v. City of Bos.*
928 F.3d 166 (1st Cir. 2019) .............................................................6

*Smiley v. Holm*
285 U.S. 355 (1932)...........................................................................2

*State v. Meadows*
88 F.4th 1331 (11th Cir. 2023) ............................................9, 14, 20

*Susan B. Anthony List v. Driehaus*
573 U.S. 149 (2014).......................................................................8, 15

*Trump v. United States*
603 U.S. 593 (2024)...........................................................................2

*United States v. Alabama*
778 F.3d 926 (11th Cir. 2015) ....................................................12, 13

*United States v. Alabama*
998 F. Supp. 2d 1283 (M.D. Ala. 2014) ...........................................12

*Vaqueria Tres Monjitas, Inc. v. Irizarry*
587 F.3d 464 (1st Cir. 2009)............................................................28

*Voting Integrity Project, Inc. v. Bomer*
199 F.3d 773 (5th Cir. 2000) ...........................................................18

*Voting Integrity Project, Inc. v. Keisling*
259 F.3d 1169 (9th Cir. 2001) .........................................................18

*Youngstown Sheet & Tube Co. v. Sawyer*
343 U.S. 579 (1952).........................................................6, 8, 12, 14

**TABLE OF AUTHORITIES**
(continued)

Page

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Article I
  § 4, cl. 1 ..........................................................................................................2, 7, 20
  § 7 ...................................................................................................................................9

U.S. Const. Article II
  § 1, cl. 2 ......................................................................................................2, 11, 20
  § 1, cl. 4 .............................................................................................................2, 11
  § 3 .........................................................................................................................2, 7, 9

U.S. Constitution, Article III ..............................................................................29

Mich. Const. 1963, Article II
  § 4(1)(b) ...........................................................................................................15

**FEDERAL STATUTES**

2 U.S.C.
  § 7 ........................................................................................................... *passim*

3 U.S.C.
  § 1 .............................................................................................................4, 5, 17, 18
  § 21(1) ...................................................................................................................4

5 U.S.C.
  § 553 .....................................................................................................................4, 9

**TABLE OF AUTHORITIES**
(continued)

Page

52 U.S.C.

 §§ 20301-20311 ............................................................................................2, 3

 § 20301(b) ..........................................................................................12, 13

 § 20302(a) ......................................................................................12, 13, 14

 § 20302(i) ................................................................................................13

 § 20303(b) ..............................................................................................18

 § 20304(b) ..............................................................................................18

 §§ 20501 et seq. ........................................................................................3

 § 20501(b) ................................................................................................3

 § 20503(a) ................................................................................................3

 § 20503(b) ................................................................................................3

 § 20505(a) ............................................................................................3, 5

 § 20506(a) ......................................................................................3, 14, 23

 § 20508(a) ......................................................................................3, 4, 9, 11

 § 20508(b) ......................................................................................3, 10, 12

 § 20901 ....................................................................................................4

 § 20901(a) ..............................................................................................19

 § 20901(c) ..............................................................................................19

 § 20901(d) ..............................................................................................19

 § 20903(a) ..............................................................................................19

 § 20921 ..............................................................................................3, 11

 § 20922 ..................................................................................................11

 § 20923 ....................................................................................................3

 § 20923(a) ..............................................................................................11

 § 20923(b) ..............................................................................................11

 § 20928 ..............................................................................................3, 11

 § 20929 ..................................................................................................11

 §§ 21001-21003 ........................................................................................4

 § 21083 ..................................................................................................10

Pub. L.

 No. 103-31, § 9, 107 Stat. 87 (1993) ............................................................3

 No. 115-141, 132 Stat. 348, 562 (2018) ........................................................4

 No. 116-93, 133 Stat. 2317, 2461 (2019) ......................................................4

 No. 117-103, 136 Stat. 49, 268 (2022) ..........................................................4

 No. 117-328, 136 Stat. 4459, 4679 (2022) ..............................................4, 18

 No. 118-47, 138 Stat. 460, 549 (2024) ....................................................4, 19

 No. 119-4, 139 Stat. 9, 10-11, 26 (2025) ................................................4, 19

STATE STATUTES

Ariz. Rev. Stat.

 § 16-550 ................................................................................................15

**TABLE OF AUTHORITIES**
(continued)

Page

Cal. Elec. Code
 § 3000.5.................................................................................26
 § 3019......................................................................................15
 § 3019(d), (e)..........................................................................27
 § 3020(b)...................................................................15, 25, 26

Colo. Rev. Stat.
 § 1-7.5-107.3...........................................................................15

Haw. Rev. Stat.
 § 11-106..................................................................................15

Ill. Comp. Stat.
 5/18A-15.................................................................................15
 5/19-8.....................................................................................15

Mass. Gen. Laws Chapter 54
 § 93........................................................................................15

Md. Elec. Law
 § 11-302(c), (c)(1).............................................................15, 26

Mich. Comp. Laws
 § 168.759a(18)........................................................................15

N.J. Stat. Ann.
 § 19:63-17...............................................................................15
 § 19:63-22(a)....................................................................15, 26

N.Y. Elec. Law
 § 8-412(1)...............................................................................15
 § 8-710(1)...............................................................................15
 § 9-209...................................................................................15

Nev. Rev. Stat.
 § 293.269921(1)(b)................................................................15
 § 293.269921(2)......................................................................15
 § 293.269927..........................................................................15

R.I. Gen. Laws
 § 17-20-16.........................................................................15, 26

**REGULATORY MATERIALS**

11 C.F.R. § 9428.4.........................................................................4

ix

## TABLE OF AUTHORITIES
### (continued)

Page

Executive Order No. 14248, *Preserving and Protecting the Integrity of
American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025) ..................................... *passim*

Notice of Proposed Rulemaking, 75 Fed. Reg. 47729 (Aug. 9, 2010) ..................................4

Federal Post Card Application, https://perma.cc/AWL3-SWWB .......................................13

EAC, Election Sec. Grant, https://perma.cc/8EMJ-9VA8 ..................................................4

Md. Code Regs. § 33.11.03.08(B)(4)..................................................................................15

N.M. Code R. § 1.10.12.16 ................................................................................................15

**OTHER AUTHORITIES**

Adam's Legal Newsletter, *The soul of "election day"*, ADAM'S LEGAL
NEWSLETTER (Nov. 3, 2024) ,
https://adamunikowsky.substack.com/p/the-soul-of-election-day..................................17

Brennan Center for Justice, "House Bill Would Hurt American Voters,"
https://perma.cc/5VKK-EC28.........................................................................................30

Cong. Globe, 42d Cong., 2d Sess. 3407-08 (1872) .............................................................18

H.R. Rep. No. 103-66, 1993 WL 235764 (1993) .................................................................10

MIT Election Data and Science Lab, https://perma.cc/3HU7-TGL4 ...................................18

## INTRODUCTION

On March 25, 2025, President Trump issued Executive Order No. 14248, *Preserving and Protecting the Integrity of American Elections* (EO), which—among other things—orders the United States Election Assistance Commission (EAC) and the Secretary of Defense to implement onerous and unnecessary documentary proof of citizenship requirements with federal voter registration forms.  Likewise, the EO seeks to impose by fiat a new rule that would prohibit some Plaintiff States from counting, in accordance with their election laws, ballots that are timely cast but received shortly after Election Day.

By issuing these directives, the President attempts to seize a power that does not belong to him.  The constitutional provisions that govern federal elections are clear:  the power to regulate federal elections rests *exclusively* with the States and Congress.  By arrogating to the President regulatory authority over voter registration and the counting of mail ballots, the EO transgresses the Framers' unambiguous allocation of constitutional power.

Several unconstitutional and ultra vires provisions of the EO, which violate multiple federal statutes, pose real and imminent harm to Plaintiff States.  The EO's highly disruptive requirements related to documentary proof of citizenship and ballot receipt deadlines will force Plaintiff States to bear significant financial and administrative burdens to overhaul their elections.  More fundamentally, upending Plaintiff States' elections processes, disenfranchising their voters, and purporting to preempt their election laws injures Plaintiff States' compelling interest in the integrity of their elections processes and undermines public confidence in our most sacred of democratic institutions.  Those injuries are constitutionally intolerable.  This Court must enjoin the challenged provisions of the EO.

## BACKGROUND

### I.    STATE AND CONGRESSIONAL ELECTIONS POWER UNDER THE CONSTITUTION

The U.S. Constitution grants States the primary authority to regulate federal elections, subject only to preemption by legislation enacted by Congress.  As Madison explained at the Virginia Convention, the Framers assigned the regulation of federal elections "in the first place,

to the state governments, as being best acquainted with the situation of the people."  3 Records of the Federal Convention of 1787, at 312 (M. Farrand ed. 1911).

To that end, the Constitution's Elections Clause empowers States to prescribe the "Times, Places, and Manner of holding" congressional elections.  U.S. Const. art. I, § 4, cl. 1.  This grant of power authorizes States to "provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, [and] protection of voters," among other issues.  *Smiley v. Holm*, 285 U.S. 355, 366 (1932).  The Elections Clause simultaneously grants Congress the power to "make or alter" election laws.  U.S. Const. art. I, § 4, cl. 1.  Thus, States have primary responsibility for congressional elections, "but only so far as Congress declines to pre-empt state legislative choices.'"  *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 9 (2013) (*ITCA*) (citation omitted).  For presidential elections, the Electors Clause grants States primary authority to decide how electors are chosen.  U.S. Const. art. II, § 1, cl. 2, 4.  States also administer "the mechanics of [federal] elections," consistent with state and federal law.  *Foster v. Love*, 522 U.S. 67, 69 (1997).

The Constitution does not grant the President any specific powers over elections.  Rather, the President is only bound to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3; *see also Trump v. United States*, 603 U.S. 593, 627 (2024) (the President "plays no direct role in" appointing electors, "nor does he have authority to control the state officials who do.").

## II.   EXISTING FEDERAL LAW

### A.   Congress Has Lowered Barriers to Voter Registration and Provided Funding for State Elections Administration

Congress has exercised its Elections Clause power to simplify voter registration in federal elections.  It has also used its spending powers to fund state elections administration.

In 1986, Congress passed the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) to streamline registration and voting rules for members of the military and U.S. citizens living abroad.  52 U.S.C. §§ 20301-20311.  As relevant here, UOCAVA provides for the creation of "an official post card form, containing both an absentee voter registration application

2

and an absentee ballot application" and requires States to use the prescribed form (Post Card Form). *Id.* §§ 20301(a) & (b)(2), 20302(a)(4).

In 1993, Congress passed the National Voter Registration Act (NVRA), setting baseline requirements for voter registration binding on 44 States.[1]  *Id.* §§ 20501 et seq.  The "NVRA's primary emphasis is on simplifying the methods for registering to vote in federal elections." *Colon-Marrero v. Velez*, 813 F.3d 1, 9 & n.13 (1st Cir. 2016); *see also* 52 U.S.C. § 20501(b)(1)-(2).  The NVRA requires States to allow voters to register by mail, in tandem with a driver's license application, or at designated voter registration agencies.  *Id.* § 20503(a).  Designated voter registration agencies must include offices providing public assistance or state-funded disability services and may include additional entities chosen by States.  *Id.* § 20506(a)(2)-(3).

The NVRA establishes a national "mail voter registration form" (Federal Form), a standard form intended to serve as a "backstop" guarantee that "a simple means of registering to vote in federal elections will be available," regardless of state procedures.  *ITCA*, 570 U.S. at 12. The NVRA prescribes the Federal Form's parameters.  52 U.S.C. § 20508(b).  States subject to the NVRA must "accept and use" the Federal Form.  *Id.* § 20505(a)(1).  Designated voter registration agencies must distribute either the Federal Form or its "equivalent." *Id.* § 20506(a)(6)(A).  Consequently, States must design their voter registration systems, down to their back-end databases, to accommodate the Federal Form's components.

Congress initially gave responsibility for promulgating the Federal Form to the Federal Election Commission (FEC), an "inherently bipartisan," independent, multimember body.  *See Fed. Elec. Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981); Pub. L. No. 103-31, § 9, 107 Stat. 87 (1993).  In 2002, Congress passed the Help America Vote Act (HAVA), creating the EAC, a multimember, bipartisan, "independent entity," and transferring to it responsibility for the Federal Form.  52 U.S.C. §§ 20508(a), 20921, 20923, 20928.

---

[1] Six states are exempt from the NVRA because they either did not have a voter registration system or allowed voter registration on Election Day when the law was passed.  *See* 52 U.S.C. § 20503(b).  All Plaintiff States except Wisconsin and Minnesota are subject to the NVRA.

The contents of the Federal Form are set by regulation.  11 C.F.R. § 9428.4.  Alterations require notice-and-comment rulemaking.  5 U.S.C. § 553; *see, e.g.*, 75 Fed. Reg. 47729 (Aug. 9, 2010) (proposed rule).  Additionally, the NVRA requires the EAC to consult "with the chief election officers of the States" on changes to the Federal Form.  52 U.S.C. § 20508(a)(2).

HAVA also established funding programs to support States' administration of elections and tasked the EAC with distributing those funds according to statutory mandates.  These formula grant programs include:  (1) "requirement payments" to fund compliance with federal standards for elections systems and other improvements, *id.* §§ 21001-21003; (2) "election improvement" funds, *id.* § 20901; and (3) "election security" matching grants authorized by the Consolidated Appropriations Acts of 2018, 2022, and 2023, and the Further Consolidated Appropriations Act of 2024, to be administered under statutory authority for election improvement funds.[2]  In March, Congress appropriated an additional $15 million for election security grants.  Pub. L. No. 119-4, 139 Stat. 9, 10-11, 26 (2025).

### B.    Congress Has Enacted Statutes Setting a Date for Federal Elections

Congress has also enacted statutes setting a uniform date for congressional and presidential elections (Election Day statutes).  *See* 2 U.S.C. § 7 (establishing "the day for the election" for congressional representatives); 3 U.S.C. §§ 1, 21(1) (setting the "election day" for Presidential electors).  The Election Day statutes addressed the problem of some States setting their election day earlier than others, strongly influencing election results in other states, as well as the burden on voters to turn out on multiple election days.  *Foster*, 522 U.S. at 73-74.

### III.   ELECTIONS EXECUTIVE ORDER

President Trump issued the EO on March 25, 2025.  *See* 90 F.R. 14005.  Plaintiff States seek preliminary relief from five of the EO's unconstitutional and illegal provisions.

---

[2]  Pub. L. No. 115-141, 132 Stat. 348, 562 (2018); Pub. L. No. 116-93, 133 Stat. 2317, 2461 (2019); Pub. L. No. 117-103, 136 Stat. 49, 268 (2022); Pub. L. No. 117-328, 136 Stat. 4459, 4679 (2022); Pub. L. 118-47, 138 Stat. 460, 549 (2024) (each appropriating funds for election security grants to be administered under the election improvement funding statute, 52 U.S.C. §§ 20901, 20903, 20904); *see also* EAC, Election Sec. Grant, https://perma.cc/8EMJ-9VA8.

*First*, Section 2(a) commands the EAC to "take appropriate action" within 30 days (1) "to require" with the Federal Form "documentary proof of United States citizenship," and (2) to "require . . . a State or local official to record on the [Federal Form] the type of document the applicant presented" to prove U.S. citizenship and identifying information for the document, "while taking appropriate measures to ensure information security."  In Section 4(a), the EO orders the EAC to withhold federal funding from any States that do not accept and use the updated Federal Form with a documentary proof of citizenship requirement.

*Second*, Section 2(d) orders "[t]he head of each Federal voter registration executive department or agency [] under the National Voter Registration Act" to "assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs."  This command has no effective date and appears to take effect immediately.

*Third*, Section 3(d) directs the Secretary of Defense to "update the Federal Post Card Application . . . to require (i) documentary proof of United States citizenship . . . and (ii) proof of eligibility to vote in elections in the State in which the voter is attempting to vote."  This provision also has no effective date and appears to take effect immediately.

*Fourth*, Section 7(a) directs the Attorney General to "take all necessary action to enforce 2 U.S.C. 7 and 3 U.S.C. 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes" for federal offices.

*Fifth*, Section 7(b) purports to direct the EAC to "condition any available funding to a State" on the State's compliance with "a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," except for voting under UOCAVA.

The EAC has already begun implementing the EO.  On April 11, numerous States' chief election officials received a letter from the EAC's Executive Director citing the EO's instruction that the Federal Form require documentary proof of citizenship and seeking feedback pursuant to the consultation requirements in the NVRA.  *See, e.g.*, Lean Decl. ¶ 8, Ex. A.  The EAC Executive Director initially set a deadline of May 2, 2025 for responses.  *Id.* ¶ 8.  In a preliminary injunction hearing in another action challenging the EO, Defendants argued that the

EAC will necessarily implement the documentary proof of citizenship requirement "because it's contemplated by the executive order," and explained that the administrative process will solely address details like wording or formatting. Bellows Decl. Ex. A at 70-74.

On April 24, 2025, the federal court in the District of Columbia preliminarily enjoined EO Sections 2(a) and 2(d), temporarily halting their implementation. *League of United Latin Am. Citizens, et al. v. Exec. Office of the President, et al.*, ___ F. Supp. 3d ___, 2025 WL 1187730 (D.D.C. Apr. 24, 2025) (*LULAC*). The court denied relief on Sections 7(a) and 7(b) because plaintiffs were not the proper parties to challenge them. The court repeatedly recognized that it was instead *States* that are best situated to challenge those provisions. *Id.* at *1, *52, *56.

## LEGAL STANDARD

"Before it grants a preliminary injunction, a district court is required to consider (1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest." *Shurtleff v. City of Bos.*, 928 F.3d 166, 171 (1st Cir. 2019).

## ARGUMENT

### I. PLAINTIFF STATES HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS

The EO purports to set new rules for federal elections by Presidential fiat, usurping the power that the Constitution allocates exclusively to the States and Congress. The President lacks the authority to alter election law in such dramatic fashion.

"The President's authority to act . . . 'must stem either from an act of Congress or from the Constitution itself.'" *Medellin v. Texas*, 552 U.S. 491, 524 (2008) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) (*Youngstown*)). Plaintiffs may sue in equity to enjoin federal measures that trespass the constitutional and statutory limits of Executive power. *Youngstown*, 343 U.S. at 584-89; *Harmon v. Brucker*, 355 U.S. 579, 581-82 (1958) ("Generally, judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers.").

It is a "fundamental constitutional principle that 'the power to make the necessary laws is in Congress; the power to execute in the President." *Medellin*, 552 U.S. at 526 (quoting *Hamdan v. Rumsfeld*, 548 U.S. 557, 591 (2006)). The Constitution "refutes the idea that [the President] is to be a lawmaker.'" *Id.* at 526-27 (quoting *Youngstown*, 343 U.S. at 587). Injunctive relief is proper "to enforce separation-of-powers principles" and halt measures that unconstitutionally treat the States as mere instrumentalities of presidential policy. *See Boumediene v. Bush*, 553 U.S. 723, 743 (2008); U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2.

These authorities both give Plaintiff States the right to sue and confirm their likelihood of success on the merits of their claims. The EO's attempt to dictate election law and impose unauthorized conditions on appropriated funds exceeds the President's power and usurps the constitutional authority of the States and Congress.

### A. Plaintiff States Are Likely to Succeed on Their Claims Challenging the EO's Attempt to Require Documentary Proof of Citizenship

The EO attempts to insert burdensome proof-of-citizenship requirements into processes that Congress designed to simplify voter registration. *See* EO, §§ 2(a), 2(d), 3(d). These provisions of the EO are wholly inconsistent with both statutory and constitutional law.

#### 1. Section 2(a) violates the Constitution and federal statutes in ordering the EAC to impose a documentary proof of citizenship requirement

Section 2(a) directs the EAC to alter the Federal Form to achieve a very specific result, rendered in multi-part detail: the EAC must require documentary proof of citizenship as part of the Federal Form, it must adopt particular standards defining acceptable proof, and it must require that state and local officials keep specified records while ensuring information security. *See* EO, § 2(a)(i)(A), (a)(i)(B), & (a)(ii)(A)-(D). These directives are ripe for review, and their grave statutory and constitutional defects require that they be enjoined.

##### a. Plaintiff States' challenge to Section 2(a) is ripe

Section 2(a) leaves nothing of importance to this case uncertain. Ripeness "turns on the fitness of the issues for judicial decision and the hardship to the parties of withholding court

consideration." *Mass. Ass'n of Afro-Am. Police, Inc. v. Bos. Police Dep't*, 973 F.2d 18, 20 (1st Cir. 1992) (citation omitted). The instant challenge to Section 2(a) easily satisfies both criteria.

The fitness for review prong asks "whether the claim involves uncertain and contingent events," *id.*, and is more easily satisfied where the challenge "presents an issue that is 'purely legal,'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (citation omitted). "[I]n no uncertain terms," Section 2(a) orders EAC action, imposes a deadline, and dictates the "precise contours of the mandated requirement." *LULAC*, 2025 WL 1187730, at *27. The EAC had already begun implementing this requirement prior to the preliminary injunction entered in *LULAC*. Lean Decl. ¶ 8 & Ex. A. Defendants represent that any administrative process before implementation will address only technical details like the "words chosen" or "the way the form is designed," which will not alter the issues before this Court. *See* Bellows Decl. Ex. A at 70.

The hardship factor also supports ripeness. Running statewide elections requires "clear and settled rules" to guide a "massive coordinated effort" of voter registration and elections administration. *Democratic Nat'l Comm. v. Wisconsin State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring). Deferring judicial review exacerbates the disruption to this delicate process, particularly as changing voter registration processes requires "considerable advance planning." *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983). In such a case it is well settled that "[o]ne does not have to await the consummation of threatened injury to obtain preventing relief." *Id.*

> **b.    The EO cannot require the EAC to change the Federal Form**

Section 2(a) of the EO is ultra vires because the President lacks authority to dictate the contents of the Federal Form. Where, as here, "the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb," and the measures can only be justified by "his own constitutional powers minus any constitutional powers of Congress over the matter." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). For multiple reasons, Section 2(a) fails this test.

Under the Constitution, States' power over federal elections is "'comprehensive.'" *ITCA*, 570 U.S. at 8-9 (citation omitted).  Congress, in turn, has the power to override state laws pertaining to federal elections, subject to constitutional constraints.  *See Foster*, 522 U.S. at 69.  Absent from this constitutional arrangement is any mention of the President.  The President's role in enacting elections law is limited to proposing and signing legislation.  U.S. Const. art. I, § 7; *id.* art. II, § 3; *see State v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023) ("the President has no 'direct control' over the individuals—members of Congress and state officials—who conduct federal elections").  The President cannot alter federal elections law by Executive order.

Yet Section 2(a) of the EO attempts to do just that.  The President purports to mandate, through the EAC, that Federal Form applicants provide documentary proof of citizenship, and that state and local elections officials record details related to the documents presented with registration.  But the President has no constitutional or congressionally delegated authority to change the Federal Form.  To the contrary, in exercising its power under the Elections Clause, Congress expressly gave that task to the EAC, in consultation with the States.  52 U.S.C. § 20508(a); *LULAC*, 2025 WL 1187730, at *36-38.  Congress further prescribed a formal process for amending the Federal Form, as well as strict limits on the contents of the Form itself.  In other words, Congress has not only selected *who* can amend the Federal Form, but also *how* and *in what way*.  Section 2(a) contradicts each of these deliberate choices.

As to *how*, Congress ensured that changes cannot be made to the Federal Form by mere fiat.  To amend the Form, the EAC must consult with the States' chief elections officials.  52 U.S.C. § 20508(a)(2).  The EAC must also undertake the Administrative Procedure Act's notice and comment process.  *See* 5 U.S.C. § 553; *ITCA*, 570 U.S. at 19; *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 10-11 (D.C. Cir. 2016).  The EO bypasses all of this, assuming unilateral power to dictate that a specific requirement be added to the Federal Form through—at most—a process with a preordained result.  *See* EO, § 2(a).  Defendants have conceded as much.  Bellows Decl. Ex. A at 71-74; *LULAC*, 2025 WL 1187730, at *40 ("Defendants affirmed that the Executive Order means what it says: The EAC *must* add a documentary-proof-of-citizenship

9

requirement to the Federal Form, regardless of the feedback it receives from the States or other participants in the notice-and-comment process or of its own conclusions").

As to *what*, the EO's requirement that documentary proof of citizenship be added to the Federal Form also contravenes Congress's careful judgment to establish citizenship by attestation.[3]  *See LULAC*, 2025 WL 1187730, at *6-7 (summarizing legislative history). Pursuant to the NVRA, the Federal Form may include "only such identifying information . . . and other information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant."  52 U.S.C. § 20508(b)(1).  This provision has been described as "at once requir[ing] and restrict[ing] the inclusion of certain information on the Federal Form." *Newby*, 838 F.3d at 5.  The statute provides that applicants establish citizenship by "attestation" signed "under penalty of perjury."  *Id.* § 20508(b)(2); *see also id.* § 21083(b)(4)(A)(i) (mandating that the Federal Form include a checkbox for citizenship).  Apart from this attestation, the Federal Form "may not include any requirement for notarization *or other formal authentication*."  *Id.* § 20508(b)(3) (emphasis added).

By refusing to adopt a documentary proof of citizenship requirement and instead providing for proof of citizenship through attestation, Congress confirmed that the former is not "necessary to enable the appropriate State election official to assess . . . eligibility."  *See id.* § 20508(b)(1); *see* H.R. Rep. No. 103-66 at 23-24, 1993 WL 235764 (1993) (documentary proof of citizenship was "not necessary or consistent with the purposes of" the NVRA); *see also Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1195 & n.7 (10th Cir. 2014) (summarizing legislative history).  In other words, because Congress chose to have applicants establish their citizenship through a checkbox and attestation, documentary proof is "not legitimately necessary for registration."  *Mi Familia Vota v. Fontes*, 129 F.4th 691, 719 (9th Cir. 2025) (explaining that "[t]he ordinary meaning of 'necessary' is 'essential'").  And where Congress has determined that

---

[3] Due to unique requirements of Arizona law, Arizona does not join the argument that the NVRA prohibits a documentary proof of citizenship requirement on the Federal Form.

a proposed change to the Federal Form is not "necessary" to assess a voter's eligibility, "the NVRA does not permit its inclusion." *Newby*, 838 F.3d at 11.

In recognition of this clear congressional choice, the EAC has repeatedly rejected States' attempts to require documentary proof of citizenship with the Federal Form. *See Kobach*, 772 F.3d at 1189, 1196-98; *see also ITCA*, 570 U.S. at 6. The President has no power—under the Constitution or governing statutes—to override Congress's intentional decision about what is and is not necessary to ensure voter eligibility.

As to *who*, Congress made a deliberate structural choice to place responsibility for the Federal Form in the hands of the EAC—an independent, multimember commission. 52 U.S.C. § 20508(a). That choice "reflects a careful allocation of regulatory power to a bipartisan panel of experts, accompanied by a requirement for consultation with the States." *LULAC*, 2025 WL 1187730, at *37. Congress established the EAC as an "independent entity," designed to "serve as a national clearinghouse and resource for the compilation of information and review of procedures with respect to the administration of Federal elections." 52 U.S.C. §§ 20921, 20922. The EAC consists of four members, appointed to staggered four-year terms. *Id.* §§ 20923(a)(1)-(2). Commissioners must "have experience with or expertise in election administration or the study of election," *id.* § 20923(a)(3), and no more than two of the EAC's four members can be "affiliated with the same political party," *id.* § 20923(b)(2)(A), (B). Any action taken by the EAC requires bipartisan "approval of at least three of its members." *Id.* § 20928.

All of these characteristics confirm that the EAC is a validly created independent entity that is not subject to the direct control of the President. *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 216, 218-19 (2020) (contemplating that multimember, bipartisan commissions composed of experts can validly operate insulated from presidential control consistent with Article II). The EAC's lack of meaningful Executive authority reinforces this conclusion. *Cf. id.* at 224-25. Outside of promulgation of regulations related to the Federal Form, the EAC does not have "any authority to issue any rule, promulgate any regulation, or take any other action which imposes any requirement on any State or unit of local government." 52

U.S.C. § 20929; *cf. Seila Law*, 591 U.S. at 218 (emphasizing CFPB's authority to promulgate binding interpretive regulations on 19 federal statutes).  And the EAC's narrow charge to develop and issue the Federal Form is sharply cabined by the NVRA.  *See* 52 U.S.C. § 20508(b).  Indeed, the EAC's functions are "best characterized as 'quasi-legislative' rather than 'purely executive.'"  *LULAC*, 2025 WL 1187730, at *40 n.48 (citation omitted).

Congress thus clearly intended that the EAC act as expert stewards of the Federal Form, making independent but carefully circumscribed decisions about its contents insulated from the President's direct control.  Section 2(a) offends that structure.  The President commands that the Federal Form be amended to meet his policy preference.  But Congress gave the EAC, not the President, responsibility for the Federal Form.  In this context, the President cannot direct the actions of the EAC, nor countermand Congress's judgment that proof of citizenship is not a necessary component of the Federal Form.  Section 2(a)'s contrary directives unequivocally exceed the President's authority.  *See Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

### 2.    Section 3(d) is contrary to UOCAVA

Section 3(d) of the EO orders that applicants be required to prove both citizenship and eligibility with the Post Card Form, the distinct voter registration form for military and overseas voters.  This provision, too, cuts squarely against applicable law.

Enacted in 1986, Congress intended UOCAVA "to protect the voting rights of military members, their families, and other United States citizens living overseas."  *United States v. Alabama*, 998 F. Supp. 2d 1283, 1286 (M.D. Ala. 2014).  By passing and later strengthening the law, "Congress unequivocally committed to eliminating procedural roadblocks" that historically prevented many service members and overseas voters from exercising their basic democratic rights. *United States v. Alabama*, 778 F.3d 926, 928 (11th Cir. 2015).  The Post Card Form is an integral component of this legislative scheme.  *See* 52 U.S.C. §§ 20301(b)(2), 20302(a)(2) & (4).

Congress expressly addressed how the Post Card Form must verify applicant eligibility, including citizenship, for federal elections.  Like the Federal Form, the Post Card Form requires applicants to attest to their citizenship on the form with a "standard oath," signed under penalty

12

of perjury, that information entered on the Form is accurate.  52 U.S.C. § 20301(b)(7).[4]  This provision reflects Congress's judgment that attestation constitutes sufficient proof of an applicant's eligibility to vote.  Indeed, the "standard oath" requirement preempts state laws that "require[] an oath or affirmation" from overseas voters.  *Id.* § 20302(a)(5).  Congress likewise prohibited States from rejecting a Post Card Form for absence of formalization through notarization.  *Id.* § 20302(i)(1).  The President cannot require something more than the "standard oath" that Congress designed.

Section 3(d) of the EO is additionally contrary to UOCAVA because inclusion of proof-of-citizenship and proof-of-eligibility requirements renders the Post Card Form unusable for its intended purpose in federal elections.  In requiring the Form to be a "*post card*," Congress necessarily precluded any requirement that an applicant submit documentation with the Form to federally register.  *See* 52 U.S.C. § 20301(b)(1) (emphasis added).  By this choice, Congress sought to avoid the "procedural roadblocks" that had previously deprived overseas voters of their right to the franchise.  *Alabama*, 778 F.3d at 928.  Section 3(d) eviscerates this careful design and resurrects the "procedural roadblocks" that Congress meant UOCAVA to eliminate.  *Id*.

As for the demand that applicants submit "proof of eligibility to vote in elections in the State in which the voter is attempting to vote," the EO does not even explain what proof of eligibility might suffice, or how a UOCAVA voter might obtain such proof.  *See* EO, § 3(d)(ii).  This requirement, too, is inconsistent with the statute's design.

The President has no power to annul an exercise of Congress's constitutional authority to regulate federal elections.  Because Section 3(d) of the EO violates UOCAVA, it is ultra vires and a violation of the constitutional separation of powers.

### 3. The EO unconstitutionally commandeers States' resources to implement presidential policy requiring proof of citizenship

The EO's attempt to require documentary proof of citizenship via Sections 2(a), 3(d), and 2(d) suffers from another constitutional flaw:  it unconstitutionally commandeers States'

---

[4] *See* Federal Post Card Application, https://perma.cc/AWL3-SWWB.

personnel, infrastructure, and funds to implement a presidential decree. The President has no authority to transgress States' constitutional powers under the Elections Clause and infringe upon their inherent sovereignty.

"State governments are neither regional offices nor administrative agencies of the Federal Government," and state and local agencies "appear nowhere" in the Executive Branch's "most detailed organizational chart." *See New York v. United States*, 505 U.S. 144, 188 (1992). Yet Section 2(a) directly conscripts States by directing that the EAC "require . . . a State or local official to record on the [Federal Form] the type of document" presented to prove citizenship, along with specified information about that document, all "while taking appropriate measures to ensure information security." Section 3(d) has the same effect, as UOCAVA requires States to use the Post Card Form. *See* 52 U.S.C. § 20302(a)(4). It will necessarily fall to state and local officials to furnish the guidance, processes, and infrastructure to implement these requirements.

To the extent Section 2(d) applies to state and local agencies, it is constitutionally defective for the same reason. Citing the NVRA provision that requires States to designate voter registration agencies, Section 2(d) provides that "[t]he head of each Federal voter registration executive department or agency" under the NVRA "shall assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs." EO, § 2(d) (citing 52 U.S.C. § 20506). The President has no power under the NVRA or otherwise to require these state and local agencies to assess citizenship prior to providing registration forms. *See Meadows*, 88 F.4th at 1347 (Executive cannot "interfere[] with state election procedures based solely on the federal executive's own initiative."). Section 2(d) may therefore violate the States' constitutional power and sovereignty. *See Youngstown*, 343 U.S. at 587-88; *New York*, 505 U.S. at 188.

## B.    Plaintiff States Are Likely to Succeed on Their Claims Challenging Provisions That Purport to Preempt State Ballot Counting Laws

Using enforcement threats and conditions on funding, Section 7 of the EO seeks to impose on States a draconian and incorrect interpretation of federal Election Day statutes that forbids "including absentee or mail-in ballots received after Election Day in the final tabulation of votes"

for federal offices.  EO, § 7(a).  That interpretation conflicts with state laws providing for the counting of ballots mailed on or before Election Day but received just days afterward,[5] and might also conflict with state laws that allow voters to fix or "cure" timely-submitted ballots with minor technical problems, such as a missing signature.[6]  In total, thirteen Plaintiff States (Ballot Receipt Plaintiffs) maintain one or both types of laws.  The President has no power to overwrite those duly enacted state laws with his preferred policy.

### 1.    Section 7(a) is ultra vires and violates the separation of powers

#### a.    Plaintiff States' challenge to Section 7(a) is justiciable

The threat of enforcement action by the Attorney General against States with laws that run contrary to the EO's new ballot receipt deadline has created a case or controversy demanding swift judicial resolution.  Every requirement for a pre-enforcement action is met here.

Courts have found standing to mount a pre-enforcement challenge where plaintiffs intend to engage in conduct that is proscribed by a challenged government action, and they face a credible threat of enforcement for that conduct.  *Susan B. Anthony List*, 573 U.S. at 159; *see also Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 30-31 (1st Cir. 1999).  That test is met here.  The EO's new Election Day deadline creates a current, unequivocal conflict with States' extended ballot receipt deadlines, and it even potentially jeopardizes state laws that allow voters to cure ballot errors after Election Day.  Ballot Receipt Plaintiffs face an inarguable risk of enforcement because Section 7(a) instructs the Attorney General to "take all necessary action to enforce" the new ballot receipt deadline "against States" with conflicting procedures.  Defendants have threatened "any number of actions, including criminal actions" or civil

---

[5] *See* Cal. Elec. Code § 3020(b); 10 Ill. Comp. Stat. 5/19-8, 5/18A-15; Mass. Gen. Laws ch. 54, § 93; Md. Elec. Law, § 11-302(c); Md. Code Regs. § 33.11.03.08(B)(4); Mich. Const. 1963, art. II, § 4(1)(b); Mich. Comp. Laws § 168.759a(18); Nev. Rev. Stat. § 293.269921(1)(b), (2); N.J. Stat. Ann. § 19:63-22(a); N.Y. Elec. Law §§ 8-412(1), 8-710(1); 17 R.I. Gen. Laws § 17-20-16.

[6] *See* Ariz. Rev. Stat. § 16-550; Cal. Elec. Code § 3019; Colo. Rev. Stat. § 1-7.5-107.3; Haw. Rev. Stat. § 11-106; 10 Ill. Comp. Stat. 5/19-8; Md. Elec. Law § 11-302; Mich. Comp. Laws § 168.766a; Nev. Rev. Stat. § 293.269927; N.J. Stat. Ann. § 19:63-17; N.M. Code R. § 1.10.12.16; N.Y. Elec. Law § 9-209; 410 Code R. § 20-00-23.12.

litigation.  Bellows Decl. Ex. A at 87, 89.  In the face of threatened action by the government, courts "do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007).

The same imminent threat of enforcement confirms that this action is ripe.  *See Rhode Island Ass'n of Realtors*, 199 F.3d at 33.  Because Ballot Receipt Plaintiffs' existing state laws allow ballots to be received or cured after Election Day, contrary to the EO, there is a "precise shape" to the dispute that poses "a specific legal question fit for judicial review."  *Id.*  Hardship is also clear because the EO "'creates a direct and immediate dilemma'" for the Ballot Receipt Plaintiffs, who must either undertake significant legislative and administrative efforts to comply or face enforcement actions that would sow confusion and doubt regarding the validity of their election rules and results.  *See id.* (citation omitted).

Ballot Receipt Plaintiffs need to know now whether their laws are consistent with federal law.  A challenge by the Attorney General on the eve of the election, or even after it concludes, would cast an intolerable shadow on election results, undermining the public's faith in the States' election administration.  The conflict created by the EO is justiciable now.

### b.    The EO's ballot receipt deadline requirement finds no support in the Election Day statutes

The President's ballot receipt deadline cannot be found in federal law.  States retain "default" authority under the Constitution to regulate the mechanics of elections.  *Foster*, 522 U.S. at 69.  Congressional authority supersedes state law in this area only "so far as it is exercised, *and no farther*," *ITCA*, 570 U.S. at 9 (citation omitted and emphasis added), and then only when state and federal laws cannot "operate harmoniously in a single procedural scheme," *Gonzalez v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012), *aff'd sub nom. ITCA*, 570 U.S. 1.  There is nothing in the text, purpose, or history of the Election Day statutes suggesting that Congress intended to adopt the President's preferred ballot receipt deadline.  Courts have nearly universally agreed.  *See, e.g.*, *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 353-54 (3d Cir. 2020), *cert. granted, judgment vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S.

Ct. 2508 (2021); *Bost v. Ill. State Bd. of Elections*, 684 F. Supp. 3d 720, 736-37 (N.D. Ill. 2023), *aff'd on other grounds*, 114 F.4th 634 (7th Cir. 2024); *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 372 (D.N.J. 2020).[7]

The statutes cited in the EO merely set out the date for federal elections.  *See* 2 U.S.C. § 7; 3 U.S.C. § 1.  That is, they require—at most—that voters make a "final act of selection" by Election Day.  *Foster*, 522 U.S. at 71.  Such is the case when voters cast their ballots by Election Day, making their final selection on or before the date set in federal law—which is precisely what Plaintiff States' laws require.  *See, e.g.*, *Bognet*, 980 F.3d at 354 (post-Election Day ballot receipt deadlines and Election Day statutes "can, and indeed do, operate harmoniously").  Nowhere do the Election Day statutes set a deadline to receive and count the votes cast in federal elections, and "there is no compelling reason not to read [Election Day] legislation simply to mean what it says."  *See ITCA*, 570 U.S. at 15; *see also Millsaps v. Thompson*, 259 F.3d 535, 549 (6th Cir. 2001) ("there is no reason to think that simply because Congress established a federal election day it displaced all State regulation of the times for holding federal elections").

Indeed, Congress never intended to set a deadline for receiving and counting ballots.  The Election Day statutes addressed the problem of some States setting their elections earlier than others, strongly influencing election results in other States.  *Foster*, 522 U.S. at 73-74.  The statutes also addressed the burden on voters to turn out on multiple election days.  *Id.*  Congress therefore only sought to provide "that if an election does take place, it may not be *consummated prior to election day*."  *Id.* at 71-72 & n.4 (emphasis added).  And while States have long maintained their own procedures for receiving and counting timely-cast ballots, "Congress has never stepped in and altered the rules."  *Bost*, 684 F. Supp. 3d at 736.  This is true even as Congress has amended other aspects of federal election administration within the last few years

---

[7] The lone outlier is *Republican National Committee v. Wetzel*, 120 F.4th 200 (5th Cir. 2024), a flawed decision largely untethered from the applicable statutes and contrary to a chorus of authority on point.  *See, e.g.*, Adam Unikowsky, *The soul of "election day"*, ADAM'S LEGAL NEWSLETTER (Nov. 3, 2024), https://adamunikowsky.substack.com/p/the-soul-of-election-day.

and as voters cast mail ballots at record levels.[8]  *See, e.g.*, Electoral Court Reform and Presidential Transition Improvement Act, Pub. L. No. 117-328, 136 Stat. 4459 (2022).

Instead, Congress has passed statutes, like UOCAVA, that directly acknowledge and incorporate into federal law "deadline[s] for receipt of the State absentee ballot under State law." 52 U.S.C. § 20303(b)(3); *see also id.* § 20304(b)(1) (officials must count UOCAVA ballots if received by "the date by which an absentee ballot must be received in order to be counted in the election"); *Bognet*, 980 F.3d at 354 ("[M]any States also accept absentee ballots mailed by overseas uniformed servicemembers that are received after election day, in accordance with [UOCAVA].").  This "long history of congressional tolerance"—and even "express . . . approval"—of States' laws further supports their consistency with the Election Day statutes. *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1175 (9th Cir. 2001).

Nor could Congress have "intended the federal election day statutes to have the effect of impeding citizens in exercising their right to vote," as the EO would accomplish.  *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 777 (5th Cir. 2000).  Rather, "[t]he legislative history of the Election Day statutes reflects Congress's concern that citizens be able to exercise their right to vote."  *Id.* (citing Cong. Globe, 42d Cong., 2d Sess. 3407-08 (1872)); *see also Harris v. Fla. Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317, 1325 (N.D. Fla.), *aff'd sub nom. Harris v. Fla. Elections Comm'n*, 235 F.3d 578 (11th Cir. 2000) ("Congress did not intend 3 U.S.C. § 1 . . . to disenfranchise voters whose only reason for not being able to have their ballots arrive by the close of election day is that they were serving their country overseas.").  In jeopardizing ballots cast by Election Day, the EO acts directly contrary to Congress's intent.

The President's interpretation of the Election Day statutes is nothing less than an amendment to federal law, transgressing the limits on his powers at the Plaintiff States' expense. *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

---

[8] This period saw an unprecedent spike in mail voting.  MIT Election Lab, "Voting by mail and absentee voting," https://perma.cc/3HU7-TGL4.

### 2.    Section 7(b) imposes unlawful conditions on statutory funding

In Section 7(b), the EO also seeks to punish States that do not change their election rules by ordering the EAC to "condition any available funding to a State on that State's compliance with" the EO's unlawful "ballot receipt deadline" for all but UOCAVA ballots.  Section 7(b) unlawfully imposes extra-statutory conditions on congressionally authorized funds, violates the separation of powers, and violates the independence of the EAC.

First, the EAC has no authority to attach new conditions to statutory formula grants.  "When an executive agency administers a federal statute"—such as the funding statutes at issue here—"the agency's power to act is 'authoritatively prescribed by Congress.'"  *City of Providence v. Barr*, 954 F.3d 23 31 (1st Cir. 2020) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)).  The First Circuit has held that an agency acts ultra vires in attaching unauthorized conditions to formula grants.  *Id.* at 27-28, 45.  That holding controls here.

Just as in the *City of Providence*, the EAC "is obliged to distribute funding pursuant to a statutory formula."  *See id.* at 27.  Congress carefully dictated the terms of these grant programs.  Election security grants, for example, must be administered according to the statutory authority for election improvement funds.  *See, e.g.*, Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 549 (2024) (citing HAVA sections 101, 103, and 104, *i.e.*, 52 U.S.C. §§ 20901, 20903, 20904).  The statute sets the distribution formula based on a minimum payment amount and state voting age population.  52 U.S.C. § 20901(d).  It also lists the certifications necessary to receive funds.  *Id.* § 20901(c).  The EAC is required to make the payments.  *See id.* §§ 20901(a), 20903(a), *as modified by* Pub. L. No. 118-47, 138 Stat. at 549; *see also* Pub. L. No. 119-4, 139 Stat. 9, 10-11, 26 (2025) (appropriating $15 million for election security grants).  Any policy to cut off funding based on "conditions that Congress ha[s] not vested the [EAC] with the authority to impose" is ultra vires.  *City of Providence*, 954 F.3d at 45.

Second, by imposing an extra-statutory condition on funds appropriated by Congress, Section 7(b) usurps Congress's constitutional powers.  *See, e.g.*, *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) ("[U]nder the principle of Separation of Powers, . . . the

Executive Branch may not refuse to disperse" funds "without congressional authorization."); *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.) (holding that "settled, bedrock principles of constitutional law" prohibit the President from refusing to carry out congressional mandates "simply because of policy objections.").

Third, as explained above, Congress created the EAC as a bipartisan, independent entity. Nowhere did it authorize the President to interfere with its disbursement of appropriated funds.

### 3.    Section 7 invades the States' constitutional powers and sovereignty

Sections 7(a) and 7(b) also violate the vertical separation of powers by purporting to overwrite state law governing ballot receipt deadlines, invading the States' power granted by the Constitution. *See* U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2. Ballot Receipt Plaintiffs' choices "reflect[]our constitutional system of federalism" which vests States with the responsibility to weigh tradeoffs between different election rules and administer elections with the rules they select. *See Democratic Nat'l Comm.*, 141 S. Ct. at 32 (Kavanaugh, J. concurring). Congress did not preempt the States' valid choices regarding ballot receipt deadlines when it enacted the Election Day statutes. Yet in Section 7, the EO attempts to do just that.

The President has no power to unilaterally preempt state law. *See Medellin*, 552 U.S. at 530. Just as plainly, Executive officers acting without congressional authorization cannot require States to shoulder the burden of changing their elections rules and procedures to carry out the President's preferred policy. *See Meadows*, 88 F.4th at 1347; *New York*, 505 U.S. at 188.

## II.    IRREPARABLE HARM TO PLAINTIFF STATES

### A.    The Provisions Mandating Documentary Proof of Citizenship Cause Imminent and Irreparable Harm to Plaintiff States

Adding a documentary proof of citizenship requirement to the Federal Form and Post Card Form will compel a significant diversion of Plaintiff States' resources, impose unrecoverable implementation and compliance costs, and injure the States' efforts to ensure all eligible voters can register to vote. *See Louisiana v. Biden*, 55 F.4th 1017, 1033-34 (5th Cir. 2022) (affirming preliminary injunction based on "diversion of resources" resulting in "nonrecoverable

compliance costs"). The burden of the mandated change and the speed at which Defendants contemplate its implementation threaten "serious administrative upheaval," constituting irreparable harm. *See Doe v. Trump*, 2025 WL 485070, at *13 (D. Mass. Feb. 13, 2025).

Requiring documentary proof of citizenship will upend Plaintiff States' voter registration processes. Because States are required by federal law to accept and use both the Federal Form and the Post Card Form, the EO would require many Plaintiff States to change their voter registration databases and registration processes to account for documentary proof of citizenship and the corresponding recordkeeping requirement. Lean Decl. ¶¶ 9-13, 25-27; Wlaschin Decl. ¶¶ 13, 20-27; Tassinari Decl. ¶¶ 9, 12, 16; Barber Decl. ¶¶ 10-12, 19; Brater Decl. ¶¶ 6, 8-10, 20; Dorsey Decl. ¶¶ 22-40, 54-56; Flynn Decl. ¶¶ 9, 11-12, 22; Fontes Decl. ¶¶ 12-13, 24-25; Hanzas Decl. ¶¶ 8-12, 23; Michalowski Decl. ¶¶ 5-7; Rock Decl. ¶¶ 12-13, 15, 24-26; Rudy Decl. ¶¶ 12, 15-16, 25, 27; Stavisky Decl. ¶¶ 9-10, 20; Sullivan Decl. ¶¶ 18-20, 38-42; Vigil Decl. ¶¶ 8, 10-11. Changing a statewide database to record new information is complicated, expensive, and time-consuming. For example, in California, adding new fields to the database could take up to a year and requires designing changes to the system, programming and testing the software, implementing the update, and ensuring that the changes in the database are connected to all 58 California counties, each with its own election management systems. Lean Decl. ¶¶ 11-13, 16-17, 26. That project demands corresponding changes at the local level. Adona Decl. ¶¶ 9-12; Logan Decl. ¶¶ 13-15, 20. As set forth in their declarations above, other Plaintiff States face similarly complex changes to conform their voter registration databases and registration processes to the EO's documentary proof of citizenship requirements.[9]

These changes to registration databases and processes will divert Plaintiff States' resources away from worthwhile projects that elections officials are already working on, such as voter registration list maintenance, and other critical duties, like preparing for upcoming elections. Lean Decl. ¶ 13; Wlaschin Decl. ¶ 10, 15-19, 40; Tassinari Decl. ¶ 13; Barber Decl. ¶¶ 13, 19-

---

[9] Although Arizona requires documentary proof of citizenship for at least some elections, Arizona defines the proof required differently from the EO. Fontes Decl. ¶¶ 10-12.

20; Brater Decl. ¶¶ 8-10, 21-22; Dorsey Decl. ¶¶ 13-18, 26-28, 56-57; Flynn Decl. ¶¶ 9, 11-12, 24; Fontes Decl. ¶¶ 7-9, 27; Hanzas Decl. ¶¶ 8, 23; Linnell Decl. ¶¶ 14-15; Michalowski Decl. ¶¶ 5-7; Rock Decl. ¶¶ 9, 25-26; Rudy Decl. ¶¶ 12, 26-27; Stavisky Decl. ¶¶ 8,16, 22; Sullivan Decl. ¶¶ 16, 18-20, 41-42; Vigil Decl. ¶¶ 8, 10-11, 23.  California, for instance, is preparing to implement a significant voter registration list maintenance project pursuant to a new state law; after over a year of work, the update was slated to commence in June 2025 but would likely have to be paused to address the EO's mandates regarding documentary proof of citizenship.  Lean Decl. ¶¶ 9, 13, 16.  So, too, of local elections projects and duties in the State.  Adona Decl. ¶¶ 9, 13; Logan Decl. ¶¶ 27-28.  Other Plaintiff States have their own specific projects and duties that are being similarly impacted.  Wlaschin Decl. ¶¶ 10, 15-19, 27, 40; Tassinari Decl. ¶ 9; Brater Decl. ¶¶ 8-9, 22; Dorsey Decl. ¶¶ 13-14, 17, 21, 56-57; Flynn Decl. ¶ 9; Fontes Decl. ¶ 7; Hanzas Decl. ¶¶ 8-12, 23; Linnell Decl. ¶¶ 8, 15, 25; Rock Decl. ¶ 9; Rudy Decl. ¶ 12; Sullivan Decl. ¶ 20.  At bottom, the EO diverts resources away from Plaintiff States' existing policy priorities in favor of the President's top-down mandate.  This conflict and "inability to enforce [their] duly enacted plans clearly inflicts irreparable harm on the State[s]."  *Abbott v. Perez*, 585 U.S. 579, 603 n.17 (2018); *Maryland v. U.S. Dep't of Agric.*, 2025 WL 973159, at *31 (D. Md. Apr. 1, 2025) (finding that the "multifaceted and complex nature of the impacts of the Government's actions," including "divert[ing] resources and personnel," constituted irreparable harm).

These technical changes to statewide voter registration databases and processes would have cascading effects.  Plaintiff States would have to issue guidance related to proof of citizenship processes, conduct trainings for local elections officials and state and local agencies, and develop public education campaigns regarding registering to vote.  Lean Decl. ¶¶ 14-17, 19-20; Wlaschin Decl. ¶¶ 28-37; Tassinari Decl. ¶¶ 13-17; Barber Decl. ¶¶ 11, 13-15, 19-20; Brater Decl. ¶¶ 11-15, 22; Dorsey Decl. ¶¶ 41-48, 56-57; Flynn Decl. ¶¶ 13-17; Fontes Decl. ¶¶ 14-19, 26; Hanzas Decl. ¶¶ 13-18, 23; Linnell Decl. ¶¶ 16-17, 19, 23-24; Michalowski Decl. ¶¶ 5-7; Rock Decl. ¶¶ 9, 14-19, 25-26; Rudy Decl. ¶¶ 17-19, 25; Stavisky Decl. ¶¶ 11-15, 22; Sullivan Decl. ¶¶ 24-27, 40-41; Vigil Decl. ¶¶ 8, 12-16, 23; *see also* Adona Decl. ¶¶ 14-17; Logan Decl.

¶¶ 14, 28.  As the foregoing declarations show, this would also significantly burden Plaintiff States and divert limited resources.

While Plaintiff States will be compelled to divert their resources to implement the new requirements, the expected result is that *fewer* of their citizens will become registered to vote. Adona Decl. ¶¶ 18-19; Lean Decl. ¶¶ 18, 21; Wlaschin Decl. ¶¶ 7, 19, 32, 34, 38; Tassinari Decl. ¶ 21; Brater Decl. ¶ 16; Dorsey Decl. ¶ 49; Flynn Decl. ¶ 18; Fontes Decl. ¶ 20; Hanzas Decl. ¶ 19; Linnell Decl. ¶¶ 20-21; Logan Decl. ¶¶ 12, 16; Michalowski Decl. ¶ 8; Rock Decl. ¶¶ 20-21; Rudy Decl. ¶ 20; Stavisky Decl. ¶ 16; Sullivan Decl. ¶¶ 25, 28; Vigil Decl. ¶ 17.  As noted in the foregoing declarations, documentary proof of citizenship acts as a barrier to registration for those who lack ready access to the necessary citizenship documents, thereby harming Plaintiff States' efforts to secure their citizens' voting rights.  *See Newby*, 838 F.3d at 9 (finding proof of citizenship laws impose "new obstacles [that] unquestionably make it more difficult . . . to accomplish [plaintiffs'] primary mission of registering voters," establishing irreparable harm).

The EO also requires the head of each NVRA designated voter registration agency to "assess citizenship" before providing the Federal Form "to enrollees of public assistance programs."  EO, § 2(d).  This may include "all offices in the State that provide public assistance" and "all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities."  52 U.S.C. § 20506(a)(2).  In California, for instance, this would thrust new, complex duties on dozens of agencies with hundreds of offices across the State.  Lean Decl. ¶¶ 22-24.  Because these agencies typically lack voter registration expertise, Plaintiff States would be forced to divert resources to guide the implementation of the EO's vague mandate to "assess citizenship" before providing the Federal Form.  *Id.*; Wlaschin Decl. ¶¶ 23, 26; Tassinari Decl. ¶ 23; Barber Decl. ¶¶ 16-17; Brater Decl. ¶¶ 17-18; Dorsey Decl. ¶¶ 50-52; Flynn Decl. ¶¶ 19-20; Fontes Decl. ¶¶ 21-22; Hanzas Decl. ¶¶ 20-21; Rock Decl. ¶¶ 22-23; Rudy Decl. ¶¶ 21-23; Sullivan Decl. ¶¶ 29-30; Vigil Decl. ¶¶ 18-19.

All these harms are concrete and imminent because changes to the Post Card Form could take place at any time, requiring States to prepare now.  Additionally, Defendants have

represented that the EAC *must* adopt a documentary proof of citizenship requirement in connection with the Federal Form and could do so in as little as 120 days. Bellows Decl. Ex. A at 70-74, 103. Indeed, prior to the preliminary injunction in *LULAC*, the EAC had already begun consulting with state elections officials on changes contemplated by Section 2(a) of the EO. Lean Decl. ¶ 8 & Ex. A.

The imminence of documentary proof of citizenship requirements has necessitated an immediate response from State elections officials, who must consider how to carry out their voter registration duties subject to the new requirements by meeting with their staff, speaking with local elections officials, and beginning to plan for a near future with the requirements in place. Lean Decl. ¶¶ 9-10, 28; Wlaschin Decl. ¶¶ 13, 40; Tassinari Decl. ¶¶ 9-11; Barber Decl. ¶¶ 9-11, 13, 20; Brater Decl. ¶¶ 8-10, 22; Dorsey Decl. ¶¶ 13, 19-22; Flynn Decl. ¶¶ 9-12, 24; Fontes Decl. ¶¶ 7-9, 27; Hanzas Decl. ¶¶ 6-11; Linnell Decl. ¶¶ 8, 13, 25; Michalowski Decl. ¶ 7; Rock Decl. ¶¶ 9-11, 26; Rudy Decl. ¶¶ 12-15, 27; Stavisky Decl. ¶¶ 8-10, 22; Sullivan Decl. ¶¶ 16, 18-20, 22, 41-42; Vigil Decl. ¶¶ 8-11, 23; *see also* Adona Decl. ¶¶ 9-13; Logan Decl. ¶¶ 8-12. This accelerated timeline causes immediate and irreparable harm to Plaintiff States as they prepare for the next election. *See Democratic Nat'l Comm.*, 141 S. Ct. at 31 (Kavanaugh, J., concurring). And that irreparable harm is compounded by the automatic loss of federal funding that would result from Plaintiff States' inability to instantly accept and process documentary proof of citizenship within the timeframe mandated by the EO. *See* EO, § 4(a).

**B.    The New Ballot Receipt Deadline and Related Enforcement Mechanisms Cause Imminent and Irreparable Harm to Ballot Receipt Plaintiffs**

Like the EO's documentary proof of citizenship requirements, the Election Day directives will divert state resources, impose unrecoverable compliance costs, and injure the States' efforts to ensure the integrity of their elections by confusing and disenfranchising the States' voters. The Election Day directives also threaten the States with loss of federal funding, unlawful intrusion into the States' sovereign prerogatives, and enforcement harms.

The EO transgresses the Plaintiff States' "sovereign power . . . to create and enforce a legal code." *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982). Ballot Receipt Plaintiffs have each exercised their own constitutional and statutory authority to create ballot receipt deadlines and cure processes. *See, e.g.*, Cal. Elec. Code § 3020(b).  The EO forces these States either to abandon their own policies or suffer enforcement actions and the loss of critical funding.  Injuries where "sovereign interests and public policies [are] at stake" are irreparable. *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001).

Imminent harm to elections administration is equally palpable.  Section 7 immediately forces state officers, on pain of losing federal funds or even prosecution, to divert resources to execute the President's agenda. *See Louisiana*, 55 F.4th at 1033-34.  Doing so requires States to turn away from their own priorities.  Lean Decl. ¶ 28; Wlaschin Decl. ¶ 6; Tassinari Decl. ¶ 28; Adona Decl. ¶ 22; Barber Decl. ¶¶ 23, 32-33; Brater Decl. ¶¶ 22, 29; Dorsey Decl. ¶¶ 60-61; Linnell Decl. ¶ 8; Logan Decl. ¶¶ 10, 27; Michalowski Decl. ¶ 5; Rock Decl. ¶ 26; Rudy Decl. ¶¶ 27, 37-38; Stavisky Decl. ¶¶ 22, 25; Vigil Decl. ¶ 23.  The resulting harm to their "duly enacted plans" is "clearly" irreparable. *Abbott*, 585 U.S. at 602-03 n.17.

To properly administer elections in line with the Election Day directives, state elections administrators must devote significant resources to training, education, and support of local elections officials and the voting public.  For example, States must train local elections officials "to ensure that votes are received and tabulated consistent with the EO's Election Day provisions."  Lean Decl. ¶ 32; Wlaschin Decl. ¶ 48; Tassinari Decl. ¶ 32; Barber Decl. ¶ 33; Brater Decl. ¶ 26; Dorsey Decl. ¶ 61; Logan Decl. ¶¶ 10, 27; Michalowski Decl. ¶ 14; Rock Decl. ¶ 31; Stavisky Decl. ¶ 26; Vigil Decl. ¶¶ 26-27.  State administrators must also provide significant public education on the change, including updating "[a]ll voter facing website, documents, and ballot packet information."  Dorsey Decl. ¶ 61; Lean Decl. ¶ 32; Barber Decl. ¶ 33; Rock Decl. ¶ 31.  In States where voters are accustomed to later deadlines for receipt of their mail ballots, this public information campaign "would be a significant undertaking."  Lean Decl. ¶ 32; Tassinari Decl. ¶ 32; Barber Decl. ¶ 33; Brater Decl. ¶¶ 26, 27; Dorsey Decl. ¶ 61;

Logan Decl. ¶¶ 26, 28; Michalowski Decl. ¶ 14; Rock Decl. ¶¶ 29, 31; Rudy Decl. ¶ 38; Stavisky Decl. ¶ 26; Vigil Decl. ¶ 27.

The Election Day directives present an "obstacle[] [that] unquestionably make[s] it more difficult" for Plaintiff States "to accomplish [their] primary mission" and establishes irreparable harm. *Newby*, 838 F.3d at 9 (citing *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996)). A preliminary injunction would preserve the status quo and prevent an inevitable and irreparable "cascading effect" of missed project deadlines, untested changes to systems and databases, delayed public outreach and legislative efforts, and overextended elections officials. *See, e.g.*, Barber Decl. ¶ 33; Dorsey Decl. ¶ 61; Michalowski Decl. ¶ 14.

The Election Day directives additionally injure the States' "compelling interest in preserving the integrity of [their] election process[es]" by upending longstanding state law and confusing and disenfranchising the States' voters. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (citation omitted). Several specific injuries follow from this uncertainty and threaten to undermine voters' goodwill and the States' reputations in administering elections. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) ("By its very nature injury to goodwill and reputation is not easily measured" and "is often held to be irreparable.").

First, the EO threatens to disenfranchise a significant number of eligible voters. In California, for example, every active registered voter is mailed a ballot, and approximately 80 percent of voters return their voted ballot by mail. Cal. Elec. Code § 3000.5; Lean Decl. ¶ 33; Adona Decl. ¶ 23; *see also* Wlaschin Decl. ¶ 49; Barber Decl. ¶ 24; Brater Decl. ¶ 28; Dorsey Decl. ¶ 63; Michalowski Decl. ¶ 10; Rock Decl. ¶¶ 29-30; Stavisky Decl. ¶ 27. California law allows those ballots to be counted if postmarked on or before Election Day and received by elections officials no later than seven days later. Cal. Elec. Code § 3020(b); *see also, e.g.*, MD Elec. Law § 11-302(c)(1); N.J. Stat. Ann. § 19:63-22(a); R.I. Gen. Laws § 17-20-16; § 17-20-6.1. Ballot Receipt Plaintiffs receive tens of thousands of ballots after Election Day but before state law receipt deadlines. Dorsey Decl. ¶¶ 61-64; Logan Decl. ¶ 29; Michalowski Decl. ¶ 11; Rock Decl. ¶ 30; Stavisky Decl. ¶ 27. Now, however, mail voters will "be required to complete

and mail their ballots well in advance of Election Day" and still have "no guarantee they will arrive by Election Day" and be counted.  Lean Decl. ¶ 33.  In fact, based on the time of receipt of mail ballots in New Jersey elections over the past four years, "nearly 125,000 otherwise-valid ballots" would not have been counted "merely because of the delay between mailing and receipt."  Barber Decl. ¶ 24.

Second, the Election Day directives will disrupt the States' election administration by casting doubt on the validity of existing ballot "curing" procedures.  For example, in California, a voter may cure signature issues on the mail ballot envelope up to two days before certification of election results, allowing elections officials to ultimately count their ballot.  Cal. Elec. Code § 3019(d), (e); Lean Decl. ¶ 34; Logan Decl. ¶ 30; *see also* Wlaschin Decl. ¶ 50; Barber Decl. ¶ 25; Brater Decl. ¶¶ 25, 26; Dorsey Decl. ¶ 65; Vigil Decl. ¶ 29.  Tens of thousands of ballots undergo the curing process, often after Election Day.  *See, e.g.*, Fontes Decl. ¶ 30; Rock Decl. ¶ 32; Rudy Decl. ¶¶ 31-37; Stavisky Decl. ¶ 28.  The EO creates uncertainty over whether States may tabulate ballots cured after Election Day, "or if [that] would instead be a basis for enforcement action" or the loss of funding.  Lean Decl. ¶ 34; Wlaschin Decl. ¶ 50; Adona Decl. ¶ 24; Brater Decl. ¶ 26; Dorsey Decl. ¶ 65; Logan Decl. ¶ 23; Michalowski Decl. ¶ 12; Rock Decl. ¶ 32; Rudy Decl. ¶¶ 36-37; Vigil Decl. ¶ 29.

Third, the Election Day directives create confusion that introduces significant independent risk to the States' election systems so long as it exists without an injunction from the Court.  Specifically, the existence of a presidential decree invalidating certain state ballot receipt deadlines casts an intolerable shadow over the validity of election results, raising the specter of legal challenges and disenfranchisement if the conflict between state laws and the EO is not resolved.  *Cf.*, *Griffin v. N.C. State Bd. of Elections*, ___ S.E.2d ___, 2025 WL 1090903, at *2 (N.C. S.Ct. Apr. 11, 2025) (ordering that thousands of military and overseas ballots cast in compliance with state law will not be counted unless voters take additional steps to prove validity).  Thus, absent an injunction, the Election Day directives create a current and acute injury to the integrity of the States' election systems.

The States also face harm from the imminent loss of promised federal funds under Section 7(b).  *See City & Cnty. of S.F.*, 897 F.3d at 1236 (identifying harm where plaintiffs showed that "if their interpretation of the Executive Order is correct, they will be forced to either change their policies or suffer serious consequences"); *Concord Hosp., Inc. v. N.H. Dep't of Health & Human Servs.*, 743 F. Supp. 3d 325, 363 (D.N.H. 2024).  Because Ballot Receipt Plaintiffs' laws do not comply with the Election Day directives, the States risk losing federal funding "that is integral to [each] state's ability to efficiently conduct elections."  Lean Decl. ¶ 35; Wlaschin Decl. ¶ 51; Barber Decl. ¶ 26; Brater Decl. ¶ 29; Dorsey Decl. ¶ 66; Fontes Decl. ¶ 31; Logan Decl. ¶ 32; Michalowski Decl. ¶ 17; Rock Decl. ¶ 33; Vigil Decl. ¶ 31.

HAVA funding administered by the EAC has historically been immensely consequential. For example, Cook County, Illinois received $2.3 million during the last election cycle. Michalowski Decl. ¶ 17.  Since 2003, California has received a total of $505 million in federal HAVA funding, and the funds are "critical to California's ability to safely and efficiently conduct elections."  Lean Decl. ¶ 35; *see also* Wlaschin Decl. ¶ 51; Adona Decl. ¶ 25; Barber Decl. ¶¶ 28-32; Brater Decl. ¶ 29; Dorsey Decl. ¶¶ 66-67; Fontes Decl. ¶¶ 31-32; Logan Decl. ¶¶ 31-32; Rock Decl. ¶ 33; Rudy Decl. ¶ 39; Stavisky Decl. ¶ 29; Sullivan Decl. ¶ 45-47.  Loss of funds critical to the States' ability to safely and efficiently conduct elections causes an irreparable injury to the States' election administration and the goodwill of the voting public. *See Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) (loss of funds leading to loss of business, ability to function, and loss of goodwill are "irreparable harm").

Finally, the Ballot Receipt Plaintiffs face legal jeopardy given the directive to the Attorney General to enforce a ballot receipt deadline that directly conflicts with those States' laws.  *See* EO, § 7(a).  The choice imposed on Ballot Receipt Plaintiffs—comply with an unconstitutional presidential decree or face civil and criminal prosecution—constitutes an irreparable injury.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (relief proper where party faces "Hobson's choice: continually violate the Texas law and expose themselves to potentially huge

liability; or violate the law once as a test case and suffer the injury of obeying the law during the pendency of the proceedings"); *City & Cnty. of S.F.*, 897 F.3d at 1236.[10]

### III.   THE EQUITIES AND THE PUBLIC INTERESTS FAVOR INJUNCTIVE RELIEF

The equities and public interest weigh heavily in favor of the narrow and targeted relief requested here. *See, e.g.*, *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (these factors "merge when the [g]overnment is the opposing party" (citation omitted).

The public interest here follows the merits because "[t]he public has an important interest in making sure government agencies follow the law." *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005), *aff'd*, 463 F.3d 50 (1st Cir. 2006). Indeed, "[i]t is hard to conceive of a situation where the public interest would be served by enforcement of an unconstitutional law or regulation." *Me. Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 33 (D. Maine 2022), *aff'd*, 51 F.4th 1 (1st Cir. 2022) (citation omitted). Similarly, the federal government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

Moreover, the requested relief would do no more than "preserve the status quo" while the court engages in "full adjudication." *CMM Cable Rep., Inc. v. Ocean Coast Props.*, 48 F.3d 618, 620 (1st Cir. 1995). Preserving the status quo will not harm the federal government, as it has been repeatedly demonstrated that fraudulent voting, the EO's purported target, is "quite rare." *See Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 967 (D. Ariz. 2024), *aff'd in part, vacated in part, remanded,* 129 F.4th 691 (9th Cir. 2025); *see also Fish v. Schwab*, 957 F.3d 1105, 1142 (10th Cir. 2020) (affirming that, after a trial on the merits, plaintiff failed to show "that substantial numbers of noncitizens successfully registered to vote" with current procedures). Indeed, Congress determined in the NVRA that requiring applicants to attest to their citizenship was "sufficient to protect the public interest" in electoral integrity; that determination should be given decisive weight here. *See LULAC*, 2025 WL 1187730, at *50.

---

[10] For these reasons, Plaintiff States have Article III standing to bring this action against all challenged provisions of the EO.

Separately, the public has a profound interest in preventing the irreparable harm of losing access to voting.  *See, e.g.*, *Purcell*, 549 U.S. at 4 (the public has a "strong interest in exercising the fundamental political right to vote"); *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012) ("The public interest therefore favors permitting as many qualified voters to vote as possible.").  That is "[b]ecause there can be no 'do-over' or redress of a denial of the right to vote after an election."  *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016); *see also Newby*, 838 F.3d at 14 (injunction barring requirement to prove citizenship with Federal Form serves "the strong public interest in ensuring that unlawful agency decisionmaking does not strip citizens of the right to vote.").  Particularly where there are grave concerns regarding eligible voters' access to sufficient documentation of citizenship, Defendants cannot show that there is a public interest in imposing such an onerous burden on voting.[11]  Nor can it serve the public interest to reject ballots timely cast under state law but received after Election Day.

Finally, by injecting chaos into the elections process and disenfranchising the States' voters, the EO injures the States' "compelling interest in preserving the integrity of [their] election process," and consequently the public's reliance on that process.  *Purcell*, 549 U.S. at 4.  An injunction here would protect Plaintiff States' interests in "the power to create and enforce a legal code," and the public's interest in protection of state laws under our federal system.  *See Alfred L. Snapp & Son, Inc.*, 458 U.S. at 601.

## CONCLUSION

For the foregoing reasons, Plaintiff States respectfully request that the Court grant Plaintiff States' motion for a preliminary injunction.

---

[11] *See, e.g.*, Brennan Ctr., "House Bill Would Hurt American Voters," https://perma.cc/5VKK-EC28 (reporting that 50% of Americans do not have a passport, two-thirds of Black Americans lack a passport, and passport ownership increases dramatically with income).

Dated: May 5, 2025                                    Respectfully Submitted,


**ROB BONTA**
Attorney General of California

By: _/s/_          _Anne P. Bellows_
  *Anne P. Bellows
      Deputy Attorney General
  *Thomas S. Patterson
      Senior Assistant Attorney General
  *John D. Echeverria
      Supervising Deputy Attorney General
  *Michael S. Cohen
  *Malcolm Brudigam
  *Kevin L. Quade
  *Lisa Ehrlich
  Nicholas R. Green (BBO No. 698510)
      Deputy Attorneys General
Office of the California Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3847
Anne.Bellows@doj.ca.gov
  _Counsel for the State of California_
  _*Admitted pro hac vice_


(_additional counsel on following pages_)

31

**AARON D. FORD**
Attorney General of Nevada

By: */s/ Heidi Parry Stern*
Heidi Parry Stern*
    Solicitor General
Craig Newby*
    First Assistant Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-9246
hstern@ag.nv.gov
*Counsel for the State of Nevada*


**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ M. Patrick Moore*
M. Patrick Moore (BBO No. 670323)
    First Assistant Attorney General
Anne Sterman (BBO No. 650426)
    Chief, Government Bureau
Phoebe Fischer-Groban (BBO No. 687068)
    Deputy Chief, Constitutional & Administrative Law Division
Chris Pappavaselio (BBO No. 713519)
    Assistant Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2495
Pat.Moore@mass.gov
*Counsel for the Commonwealth of Massachusetts*


**KRISTIN K. MAYES**
Attorney General of the State of Arizona

By: */s/ Joshua M. Whitaker*
Joshua M. Whitaker*
Karen J. Hartman-Tellez*
Kara Karlson*
    Assistant Attorneys General
2005 North Central Ave.
Phoenix, AZ 85004
(602) 542-7738
Joshua.Whitaker@azag.gov
*Counsel for the State of Arizona*

**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ Shannon Stevenson*
Shannon Stevenson*
    Solicitor General
Peter Baumann*
    Senior Assistant Attorney General
1300 Broadway
Denver, Colorado 80203
(720) 508-6400
shannon.stevenson@coag.gov
*Counsel for the State of Colorado*

**WILLIAM TONG**
Attorney General for the State of Connecticut

*/s/  Maura Murphy*
Maura Murphy*
    Deputy Associate Attorney General
Hartford, CT 06106
(860) 808-5020
Maura.Murphy@ct.gov
*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Maryanne T. Donaghy*
Maryanne T. Donaghy*
    Deputy Attorney General
Vanessa L. Kassab
    Deputy Attorney General
Ian R. Liston
    Director of Impact Litigation
820 N. French Street
Wilmington, DE 19801
(302) 683-8843
maryanne.donaghy@delaware.gov
*Counsel for the State of Delaware*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ David D. Day*
David D. Day*
    Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes*
    Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
 david.d.day@hawaii.gov
*Counsel for the State of Hawaiʻi*


**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Alex Hemmer*
Alex Hemmer*
    Deputy Solicitor General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-5526
Alex.Hemmer@ilag.gov
*Counsel for the State of Illinois*


**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Jonathan R. Bolton*
Jonathan R. Bolton*
    Assistant Attorney General
6 State House Station
Augusta, ME  04333-0006
(207) 626-8800
Jonathan.Bolton@maine.gov
*Counsel for the State of Maine*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Adam D. Kirschner*
Adam D. Kirschner*
    Senior Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-6424
akirschner@oag.state.md.us
*Counsel for the State of Maryland*


**DANA NESSEL**
Attorney General of Michigan

By: */s/ Erik Grill*
Erik Grill*
Danny Haidar*
Heather S. Meingast*
    Assistant Attorneys General
525 W. Ottawa, 5th Floor
P.O. Box 30736
Lansing, MI 48909
(517) 335-7659
grille@michigan.gov
*Counsel for the People of the State of Michigan*


**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Peter J. Farrell*
Peter J. Farrell*
    Deputy Solicitor General
Angela Behrens*
    Assistant Attorney General
445 Minnesota Street, Suite 600
St. Paul, MN 55101
(651) 757-1424
Peter.Farrell@ag.state.mn.us
*Counsel for the State of Minnesota*

**MATTHEW J. PLATKIN**
Attorney General Of New Jersey

By: */s/ Meghan K. Musso*
Meghan K. Musso*
Jonathan Mangel*
   Deputy Attorneys General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5276
meghan.musso@law.njoag.gov
*Counsel for the State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ James W. Grayson*
James W. Grayson*
   Chief Deputy Attorney General
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
jgrayson@nmdoj.gov
*Counsel for the State of New Mexico*

**LETITIA JAMES**
Attorney General of New York

By: */s/ Colleen K. Faherty*
Colleen K. Faherty*
   Special Trial Counsel
28 Liberty Street
New York, NY 10005
(212) 416-6046
Colleen.Faherty@ag.ny.gov
*Counsel for the State of New York*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ James J. Arguin*
James J. Arguin (BBO No. 557350)
   Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400, Ext. 2078
jarguin@riag.ri.gov
*Counsel for the State of Rhode Island*

36

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane*
    Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov
*Counsel for the State of Vermont*


**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: */s/ Charlotte Gibson*
Charlotte Gibson*
    Assistant Attorney General
P.O. Box 7857
Madison, WI  53707-7857
(608) 287-4713
GibsonCJ@DOJ.STATE.WI.US
*Counsel for the State of Wisconsin*


*\*Admitted pro hac vice or pro hac vice applications forthcoming*


## CERTIFICATE OF SERVICE

    I, Anne P. Bellows, hereby certify that I served a true copy of the above document upon all counsel of record via this Court's electronic filing system.


Dated:  May 5, 2025

                                   */s/ Anne P. Bellows*
                                   Anne P. Bellows
                                   Deputy Attorney General
                                   *Counsel for the State of California*