UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN, <br><br>       *Plaintiffs,*<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense,<br><br>       *Defendants.* | Case No. 1:25-cv-10810-DJC |

## DECLARATION OF JANA M. LEAN

I, Jana M. Lean, declare as follows:

1. I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except those matters stated upon information

1

and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Chief of the Elections Division, employed in the Office of the California Secretary of State. I work for Secretary of State Shirley N. Weber, Ph.D. and support her in her official capacity as the Chief Elections Officer for the State of California. In my role, I assist her in the execution and enforcement of all state and federal laws relating to elections.

3. I have served as the Chief of the Elections Division at the California Secretary of State's Office since 2010.

4. As California's Chief Elections Officer, the Secretary of State is responsible for executing and enforcing all state and federal law relating to elections within the state. *See* Cal. Gov't Code § 12172.5(a); Cal. Elec. Code § 10. The Elections Division is responsible for implementing the Secretary of State's responsibilities with regard to elections, including enforcing laws, ensuring that elections are conducted efficiently, and providing technical information, advice, and assistance to County Clerks and Registrars of Voters ("county elections officials") and the public. However, the Secretary's role does not include actually conducting elections, which is primarily administered at the county level in California.

5. In my role as Chief of the Elections Division at the California Secretary of State's Office, I am responsible for overseeing the work of the Elections Division. The Elections Division oversees the administration of federal and state elections within the State of California, including by providing guidance on election laws and procedures to county elections officials, assisting National Voter Registration Act ("NVRA") agencies in California and county elections officials in ensuring compliance with the NVRA, including the training of county elections officials and NVRA agencies preparing state voter information guides, printing and distributing

voter registration cards, maintaining a statewide database of all registered voters, coordinating and compiling all statewide voter registration statistics, qualifying candidates for statewide and special elections, certifying the list of candidates for state office, tracking and certifying ballot initiatives, surveying all of California's 58 counties regarding ballot transmittal statistics on military and overseas voters and reporting those statistics to the United States Department of Justice, administering a Voter Assistance Hotline for the entire state, receiving Election Day complaints from the public and coordinating the resolution of those complaints with all of California's 58 counties, coordinating the tabulation of votes from each county, certifying the election results, issuing nomination and election certificates to all victorious statewide candidates, educating California citizens about their voting rights, and promoting voter registration and participation.

6. I am familiar with the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO"). Sections 2(a), 2(d), and 3(d) of the EO have already caused considerable confusion and disruption in California election administration and will likely continue to do so.

7. It is my understanding that Section 2(a) of the EO directs the Election Assistance Commission ("EAC") to amend the federal mail voter registration form ("Federal Form"), as provided by the NVRA, to require applicants to provide "documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It outlines a limited number of specific documents that constitute acceptable DPOC: (1) a United States passport; (2) an identification document that both complies with the requirements of the REAL ID Act of 2005 and indicates the applicant is a citizen of the United States; (3) an official military identification card that indicates the applicant is a citizen of the United States; or (4) a valid Federal or State government-issued

photo identification if such identification indicates that the applicant is a United States citizen or if such identification is otherwise accompanied by proof of United States citizenship. EO, § 2(a)(ii)(A)-(D). It is my understanding that California residents can be issued U.S. passports that comply with Section 2(a)(ii)(A), although I do not have knowledge of how many Californians possess valid U.S. passports. It is also my understanding that the California Department of Motor Vehicles does not issue identification documents that indicate U.S. citizenship. And I am not sure what documents would comply with Sections 2(a)(ii)(C) and (D). The EO also requires state and local officials to "record . . . the type" of DPOC presented at the time of voter registration, including recording specific information about the document. *Id.* § 2(a)(i)(B). The EO directs the EAC to "take appropriate action" within 30 days (i.e., by April 24, 2025) to impose these changes. *Id.* § 2(a)(i).

8. Since the EO was issued, the EAC has communicated to states that it is moving forward with implementing the EO. I personally participated in a call with the National Association of State Election Directors where the EAC's Chair and General Counsel communicated that the EAC would be proceeding with implementation of the EO. On April 11, 2025, the EAC's Executive Director sent the Secretary of State a letter stating that it was seeking consultation on the development of the Federal Form by including a requirement for DPOC. The letter directly references and quotes from the EO and states that the EO "instructs" that DPOC be required in the Federal Form. Attached as **Exhibit A** is a true and correct copy of the April 11, 2025, letter sent to the California Secretary of State. Five days later, on April 16, 2025, the EAC's Executive Director sent an email to the Secretary of State's office indicating that consultation feedback was due by May 2, 2025. Thus, it is my understanding that the EAC is moving to implement the DPOC requirement on the Federal Form based on the EO's directive.

4

9. The provisions of the EO, including Section 2(a), have directly impacted the Elections Division. After the EO was issued, it required immediate attention from me and my team to consider how the various provisions of the EO could even be implemented, including coordinating with county elections officials across California. We have had to conduct an analysis of all the various ways the EO will impact elections from both the state and local perspective. In particular, I met with the head of our statewide voter registration database ("VoteCal") to discuss how it could be modified to securely account for and record DPOC. These efforts to address the directed changes and impacts of the EO will continue to divert significant time and attention from other critical election preparation and will likely increase as the EAC moves forward with implementing DPOC on the Federal Form.

10. Within my own team, the EO has created an immediate need for answers to various questions related to its implementation, ranging from big-picture considerations to granular issues. For example, it is unclear: how DPOC would be accepted and reviewed by state and county elections officials; where images of DPOC would be scanned and uploaded (i.e., "recorded") to the statewide voter registration database and how much capacity the existing system has to handle this new information; whether county elections officials could keep copies of DPOC and input the necessary information into their election management systems and provide that information to VoteCal; what exact modifications would need to occur to VoteCal to ensure that sensitive DPOC-related information will be secure (as required under the EO); what modifications county elections officials will have to make to their election management systems to be able to record DPOC and then transmit that record to the statewide voter registration database; and how much will these changes cost, how long will it take to implement, and whether adequate staffing is available to implement the change. In other words, the EO raises a

host of practical challenges that would be a huge undertaking at the state and county level in California.

11. Notably, the EO requires significant changes to California's voter registration database, i.e., VoteCal. To integrate Section 2(a)'s requirements for DPOC on the Federal Form and record that information into VoteCal, it will require modifying the database to include new fields for recording the new DPOC-related information. Specifically, Section 2(a) requires that state or local officials record the type of document presented as documentary proof, including the date of the document's issuance, the dates of the document's expiration, the office that issued the document, and any unique identification number associated with the document. The statewide voter registration database currently does not record DPOC, or any of the other related information required under the EO. That is a significant change because it requires designing exactly the types of changes that are desired, programing a software update to enact those changes, and thoroughly testing and implementing the update to ensure that it works correctly before it can be safely rolled out. Seemingly small problems can complicate this process. For example, the EO contemplates that certain documents constitute DPOC. EO, § 2(a)(ii)(A)-(C). However, the EO also includes a sweeping category in § 2(a)(ii)(D) to allow for the use of a federal or state government-issued photo identification card that is "otherwise accompanied by proof of United States citizenship." Because it is unclear what precise documents could constitute DPOC pursuant to the EO, it is difficult to determine at this time how our office will need to revise data fields in VoteCal to account for those documents. The update to VoteCal for DPOC would have to be designed with an appropriate code for each potential DPOC presented so the information could be recorded. This simple problem is merely representative of the countless questions and obstacles that arise when updating VoteCal. Past changes to VoteCal

6

have taken up to a year or longer to implement and have cost over $1 million. Though it is not possible to predict exactly how long implementing DPOC would take or how much it would cost, I anticipate that it would be a fundamental change to the system of voter registration in California.

12. Indeed, the impact would be significant because changes would need to be made at the individual county-level. County elections officials in each of the 58 counties oversee their own county's election management systems, and each of those systems would have to be modified to ensure that they could record the DPOC-related information. In turn, these county-level election management systems must be able to communicate the DPOC information to VoteCal. In my conversations with county elections officials since the EO was issued, county elections officials have expressed significant concern about the feasibility of implementing a DPOC requirement into their election management systems, the cost to implement, the extensive testing of the election management systems with VoteCal, and how to administer the requirement. They have also expressed concern about the speed at which the EO appears to contemplate imposing DPOC, whether they would have adequate resources to accept in-person DPOC, the necessary training on how to implement the requirement, and how the DPOC requirement could lead to disenfranchisement of their residents.

13. Taking on such a huge endeavor for the Secretary of State would divert our resources away from other important projects. For example, we have ongoing voter registration list maintenance duties under the NVRA. And the California Legislature has passed specific voter registration maintenance legislation (Assembly Bill 2841 (2021-2022 Reg. Sess.)) that required state courts to provide certain information to the Secretary of State, and for the VoteCal registration list to be updated based on that information. That project is scheduled to be

7

implemented into VoteCal in June 2025 and is something that we have spent over a year preparing for. If the EO's DPOC requirement had to be implemented imminently, that project, which is being implemented pursuant to state law, would likely need to be put on hold to divert our efforts to implementing the EO's DPOC requirement.

14. While overseeing the database changes discussed above, we must concurrently develop training materials and guidance documents for use by county elections officials. This is yet another aspect of the EO's implementation that will divert significant resources to accomplish the EO's directives.

15. The Federal Form is currently used and accepted in California. It is widely available and well known to county elections officials. That is why the EO's directive to include a new DPOC requirement on the Federal Form, as well as the requirement that state or local elections officials record the type of DPOC presented, will require substantial education and coordination with county elections officials on topics such as: (1) the new requirements and the documents that suffice (e.g., can copies be provided in the mail, or must a registrant present original documents in person), (2) how to implement the EO's requirement to record DPOC and its related information, and (3) ceasing use of the old Federal Form.

16. Specifically, educating county elections officials would involve preparing and disseminating a written advisory to county elections official (known as "CC/ROVs") providing written guidance and information from the Secretary of State's office on how best for county elections officials to implement the new DPOC requirement. In addition, our office frequently conducts training on various topics, especially when there are changes to the state's elections system that affect all 58 counties. When we need to train county elections official in all 58 counties, the state is split into five regions and the trainings require coordination with all the

8

county elections officials in each region to conduct. In short, a rollout of a statewide change to our elections system on an accelerated timeline like the EO would generate a significant need for trainings around the state, written advisories, and constant follow-up and iterations in these materials based on feedback. And there would be an ongoing responsibility of ensuring that county elections officials are complying with the EO so long as it remains in effect. An analogous situation arose in 2020. The COVID-19 pandemic led to rapid changes to our state election laws to successfully run an election during an ongoing pandemic on short notice. This endeavor took massive coordination from the Secretary of State's Office involving statewide calls daily to respond to problems and issues arising in real time. I expect a similar demand on our time would arise to implement a DPOC requirement.

17. Aside from the newly targeted advisories and training, the Secretary of State's Office has already produced training materials on voter registration and database management, including detailed training materials on implementing the NVRA (see, e.g., https://www.sos.ca.gov/elections/voter-registration/nvra/training/). Instituting DPOC would require modifying existing training materials and other public-facing materials.

18. Apart from the impacts of immediately creating and implementing an education process for county elections officials to learn about the EO's directed changes and requirements, I believe the compressed timeline on which the EO purports to operate creates a substantial risk of confusion or mistake by county elections officials in their administration of voter registration and upcoming elections. These mistakes would have serious consequences. Eligible voters could be disenfranchised, or the federal government could take punitive action against California, such as withholding funding or pursuing enforcement actions for these any mistakes.

19. Another impact from the EO is that it creates a need for a wide-ranging public education campaign to ensure that eligible voters are aware of the new DPOC registration requirements for the Federal Form. To begin the process of educating the public, we will need to change our website and external-facing resources with updated and correct information regarding the documentation required to register to vote with the Federal Form, and we will need to do so on the accelerated timeline required by the EO. We will also have to direct county elections officials to make these same changes.

20. This public education campaign, which we will need to run at least through the conclusion of the 2026 elections, and perhaps thereafter, will require a significant amount of money and resources that are not currently contained in our state election budget.

21. The EO's DPOC requirement also risks voter disenfranchisement. Approximately 15 percent of eligible voters in California are not registered. If any of those voters register using the Federal Form, or an existing voter re-registers with the Federal Form, the requirement for DPOC can act as a barrier to registration for those individuals who lack ready access to DPOC. For example, many people might not have their DPOC readily available, the DPOC might not match their current identification due to a name change (e.g., when a spouse changes their last name to match their partner's), or the required documents may have been lost or destroyed, for example, in one of the fires or other natural disasters that has impacted many Californias over the last few years. Moreover, it is unclear to me whether the new DPOC requirement will only be prospective, or whether it will be necessary for voters who registered under the Federal Form to have to verify their citizenship retroactively. The EO's directives impose practical barriers to registering to vote that can lead to unnecessary disenfranchisement.

22. It is my understanding that Section 2(d) of the EO immediately requires "[t]he head of each Federal voter registration executive department or agency" under Section 20506(a) of the NVRA to "assess citizenship" before providing a Federal Form to enrollees of public assistance programs. *See* EO § 2(d). This section of the EO is ambiguous but potentially encompasses a wide range of state and local offices that provide public assistance to low-income and disabled residents. In other words, the EO potentially requires state voter registration agencies to immediately begin assessing clients' citizenship before they may even offer a Federal Form to a potential registrant. It is unclear what kind of "assessment" the EO contemplates, but I am unaware of any current legal requirement for an assessment of citizenship before a form is provided. Most concerning is that this requirement appears to take effect immediately.

23. This requirement would be particularly burdensome for California voter registration agencies that provide public assistance. Those agencies currently do not provide the Federal Form, but instead provide our state voter registration form, and often do so through the state's online voter registration portal. California's state voter registration forms have affidavit numbers assigned to them; these affidavit numbers are used as a way for the state voter registration agencies to be kept accountable and tracked for the number of voter registrations that are occurring with enrollees through those agencies, and for compliance with California law. *See* Cal. Elec. Code §§ 2400-2408. Under Section 2(d) of the EO, it appears those voter registration agencies would have to begin providing the Federal Form, which would both disrupt any usage of the online state voter registration form and undermine California law to track and record voter registration through state voter registration agencies.

24. Because Section 2(d) of the EO seems to require designated state voter registration agencies to "assess citizenship" before providing recipients of public assistance a

11

copy of the Federal Form, substantial coordination between the Secretary of State's Office, county elections officials, and state voter registration agencies is likely necessary. This requirement affects all 58 county elections offices, dozens of state and local agencies and *hundreds* of their offices across California. *See* 52 U.S.C. § 20506; Cal. Elec. Code §§ 2400–2408. The scope and breadth of implementing Section 2(d) is potentially staggering. These state and local agencies have minimal expertise in voter registration. Given that Section 2(d) seems to take effect immediately, this would require dedicating significant resources to assist the hundreds of voter registration agency offices in California.

25. It is my understanding that Section 3(d) of the EO requires the Secretary of Defense to "update" the Federal Post Card Application ("Federal Post Card") pursuant to the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") to require (1) DPOC as described in Section 2(a) of the EO, and (2) proof of eligibility to vote in elections in the state in which the voter is attempting to vote. The EO does not provide a timeframe within which the updating of the Federal Post Card must occur, but it appears these changes could take place at any time at the direction of the Secretary of Defense. *See* EO, § 3(d).

26. Pursuant to the EO, registering to vote using the Federal Post Card will create substantial administrative burdens on the Secretary of State's Office and county elections officials. By requiring DPOC on the Federal Post Card, the Secretary of State's Office and county elections officials from all 58 counties must change how they process their Federal Post Cards to account for DPOC. This raises many of the same challenges as the DPOC requirement for the Federal Form and the impacts to VoteCal.

27. In addition, as with the changes outlined in Sections 2(a) and 2(d), the EO's changes to UOCAVA will require the Secretary of State's Office to expend resources to educate

county elections officials on the new requirements and to ensure their continued compliance with their obligations moving forward.

28. The EO disrupts the Secretary of State's ongoing work to prepare for upcoming elections. The start of the candidate filing period for the 2026 midterm elections is less than eight months away. The Secretary of State has obligations to California residents to prepare for those elections and work on behalf of their interests; these obligations are and will continue to be greatly impacted by the review of and planning for the implementation of the EO.

29. It is my understanding that Section 7(a) of the EO requires the Attorney General to "take all necessary action" to enforce the federal Election Day statutes "against States that violate these provisions," including by counting absentee or mail-in ballots received after Election Day in the final tabulation of the vote for federal offices. This provision of the EO appears to take immediate effect. *See* EO, § 7(a).

30. It is also my understanding that Section 7(b) of the EO directs the EAC to "condition any available funding to a State on that State's compliance with" federal law that requires States to adopt "uniform and nondiscriminatory standards" for what constitutes a valid and countable vote, including that "there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," which would exclude ballots received after Election Day from tabulation. This direction to the EAC appears to take immediate effect. *See* EO, § 7(b).

31. Sections 7(a) and 7(b) of the EO will have substantial and adverse impacts on voting in California, as well as the State's ability to adequately administer elections.

32. To properly administer elections in accordance with the EO's Election Day rule, and to minimize the number of voters whose ballots will be disregarded for being received after

Election Day, the Secretary of State's Office will be required to devote significant additional resources to address the EO's Election Day provisions. As with other parts of the EO, the Secretary of State's Office will be required to provide county elections officials with training and support to ensure that votes are received and tabulated consistent with the EO's requirements. At the same time, the Secretary of State's Office will need to provide public information and educational resources to voters regarding the new ballot deadline rule. In California, voters have become accustomed to an extended deadline for the receipt of their vote-by-mail ballots by their county elections office; the public information campaign necessary to inform voters of this new ballot deadline rule would be a significant undertaking as it fundamentally affects our elections now that all active registered voters receive their ballots in the mail.

33.     A significant portion of eligible voters in California will be affected by the EO's directive for Attorney General enforcement of the new ballot deadline rule. In California, every active registered voter is mailed a ballot, and approximately 80 percent of voters return their voted ballot by mail. Cal. Elec. Code § 3000.5.  Under state law, such ballots can be counted if post marked on or before Election Day and received by the county elections official no later than seven days after Election Day. Cal. Elec. Code § 3020(b). Vote-by-mail voters would be required to complete and mail their ballots well in advance of Election Day to ensure that their ballots arrive by Election Day. Returning ballots well in advance is still no guarantee they will arrive by Election Day.

34.     California law also allows voters who cast vote-by-mail ballots on or before Election Day to cure signature issues on their vote-by-mail ballot return envelope up to two days before certification of election results (which occurs up to 30 days after Election Day), potentially allowing their ballots to ultimately be counted. Cal. Elec. Code § 3019(d), (e). It is

not clear whether the EO prohibits tabulating ballots cured after Election Day, or if counting those cured ballots would instead be a basis for enforcement action against California or the loss of funding under Sections 7(a) and 7(b).

35. In addition, because California law does not currently comply with the Election Day rule outlined in Section 7 of the EO, California risks a loss of federal elections funding that is integral to the state's ability to efficiently conduct elections. Since 2003, California has previously received a total of $505 million in federal funding under the Help Americans Vote Act ("HAVA"). This funding is used to help facilitate the administration of elections at the state and local level. The funding threatened in Section 7(b) is critical to California's ability to safely and efficiently conduct elections. For example, recent HAVA funds, known as Election Security funding, were distributed to counties and can be used for four high-level categories: cybersecurity, physical security, security and awareness training, and incident response.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 23, 2025, at Sacramento, California.

_____
Jana M. Lean
Chief of Elections Division
California Secretary of State's Office

15

# EXHIBIT A

**U.S. ELECTION ASSISTANCE COMMISSION**
633 3rd St. NW, Suite 200
Washington, DC 20001

VIA EMAIL

Aprill 11, 2025

Dear Chief Election Officials,

Consistent with 52 U.S.C. § 20508(a)(2), the U.S. Election Assistance Commission ("EAC") is seeking consultation on development of the national mail voter registration form.

Executive Order 14248 of March 25, 2025, "Preserving and Protecting the Integrity of American Elections" ("EO 14248") provides instruction to the EAC. Section 2 of EO 14248 instructs the following be required in the national mail voter registration form:

> (A) documentary proof of United States citizenship, consistent with 52 U.S.C. 20508(b)(3); and
> (B) a State or local official to record on the form the type of document that the applicant presented as documentary proof of United States citizenship, including the date of the document's issuance, the date of the document's expiration (if any), the office that issued the document, and any unique identification number associated with the document as required by the criteria in 52 U.S.C. 21083(a)(5)(A), while taking appropriate measures to ensure information security.

Section 2 of EO 14248 also instructs that "documentary proof of United States citizenship" shall include a copy of:

> (A) a United States passport;
> (B) an identification document compliant with the requirements of the REAL ID Act of 2005 (Public Law 109-13, Div. B) that indicates the applicant is a citizen of the United States;
> (C) an official military identification card that indicates the applicant is a citizen of the United States; or
> (D) a valid Federal or State government-issued photo identification if such identification indicates that the applicant is a United States citizen or if such identification is otherwise accompanied by proof of United States citizenship.

A current copy of the national mail voter registration form is available here: https://www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Registration_ENG.pdf. The EAC is seeking consultation on how states would propose to implement Section 2 of EO 14248, if required. The EAC is also seeking feedback on the impact of implementation on voter registration in your state. As required by 52 U.S.C. § 20508, the EAC will consider responses in any amendments to the national mail voter registration form or EAC implementing regulations.

The EAC looks forward to your input. Comments may be sent to [NVRAUpdates@eac.gov](mailto:NVRAUpdates@eac.gov) or by mail at 633 3rd Street NW, Suite 200 Washington, DC 20001.

Thank you,

*Brianna Schletz*

Briannna Schletz
EAC Executive Director