UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN,<br><br>*Plaintiffs,*<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense,<br><br>*Defendants.* | Case No. 1:25-cv-10810-DJC |

### DECLARATION OF MARK WLASCHIN

I, Mark Wlaschin, declare as follows:

1. I am a resident of the State of Nevada. I am over the age of 18 and have personal knowledge of all the facts stated herein, except those matters stated upon information and belief;

1

as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Deputy Secretary of State for Elections in Nevada. I work for the Secretary of State and support him in his official capacity as the Chief Officer of Elections for the State of Nevada. In my role, I assist him in the execution and enforcement of all state and federal laws relating to elections.

3. I have served as the Deputy Secretary of State for Elections for over four and a half years (since October 2020). I have worked at the Nevada Secretary of State for five and a half years (since October 2019), previously serving as the Deputy Secretary of State for Operations at the Nevada Secretary of State from October 2019 to October 2020. Prior to working for the Nevada Secretary of State, I served over 20 years in the United States Marine Corps. I earned a BA in History from the University of South Carolina, an MBA in Strategic Leadership from New England College, and I am certified as a Project Management Professional (PMP).

4. The Nevada Secretary of State is the State's Chief Officer of Elections, responsible for executing and enforcing all state and federal law relating to elections within the state. *See* Nev. Rev. Stat. 293.124. The Elections Division of the Office of the Secretary of State is responsible for implementing the Secretary's responsibilities with regard to elections, including enforcing laws and providing technical information to the public and other parties. *See* Election Procedures Manual, Chapter 2: Administration of Elections (Jan. 2025), https://www.nvsos.gov/sos/home/showpubisheddocument/13555/638681287129030000.

5. In my role as Deputy Secretary of State for Elections, I am responsible for overseeing the Secretary of State's Elections Division, and thus I am responsible for the team of

2

elections officials who ensure the correct and legal administration of election processes in the State and enforcement of state and federal election laws and procedures, including compliance with the National Voter Registration Act, 52. U.S.C. §§ 20501-11, *et. seq.* ("NVRA"). In my role, I develop binding election-related regulations on a biannual basis and routinely provide non-binding guidance to elections officials across the state. I also oversee implementation of election administration-related projects, processes, training, and public communications materials.

6. I am extremely familiar with the system and administration of elections in Nevada, including, as relevant here, voter registration requirements, voter registration agencies, and the statewide voter database. I am directly involved in our State's work to implement state and federal law regarding voter registration and voting, as well as our continuing work to implement and improve Nevada's transition to a "top-down" statewide voter database as we prepare for the 2026 midterm elections.

7. I am familiar with the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO"). Sections 2(a), 2(d), and 3(d) of the EO have already caused considerable harm, confusion, and disruption in Nevada election administration, and will likely continue to do so. Like elections officials across the country, I take my job very seriously and routinely work over 50 hours a week. But I only have 24 hours in a day, and this imposes a natural limit on my ability to dedicate the time necessary to carry out my office's mandatory tasks, including implementing this EO. Below, I describe in detail the harm this EO is currently causing and its immediate consequences to Nevada's election administration. In sum, implementing this EO will divert more than half of my team for significant portions of the next few months, and likely more. It will hinder and even temporarily

3

halt our ability to accomplish other priorities established by the Secretary, including providing technical and operational analysis to support our Legislators during the current biennial legislative session, as well as focusing on the second phase of the implementation of Nevada's new "top-down" statewide voter database project. Diverting our resources now will have a cascading effect, preventing us from accomplishing important office priorities and causing significant harm to Nevada and Nevadans. And this is not to mention the elections officials and other agency officials statewide who will need to implement changes in the same timeframe. Furthermore, the EO purports to require changes potentially immediately that are likely to cause chaos, confusion, and inadvertent voter disenfranchisement in Nevada.

8.  It is my understanding that Section 2(a) of the EO directs the Election Assistance Commission ("EAC") to amend the national mail voter registration form ("Federal Form"), as provided by the NVRA, to require applicants to provide "documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It outlines a limited number of specific documents that constitute acceptable DPOC, including several document types that are not generally issued to Nevada residents. The EO also requires state and local officials to "record . . . the type" of DPOC presented at the time of voter registration, including recording specific information about the document. *Id.* § 2(a)(i)(B). The EO directs the EAC to "take appropriate action" within 30 days (i.e., by April 24, 2025) to impose these changes. *Id.* § 2(a)(i).

9.  The provisions of the EO, including Section 2(a), require immediate action from me and my team to implement and to coordinate with other State and local agencies across Nevada. Our efforts to address the directed changes and impacts of the EO will divert time and attention from other critical election preparation.

4

10. Preparation for elections is constantly underway—there is no off-cycle for election administrators. While voters primarily experience our work directly at most a few times per year—during a period for in-person early voting or when they receive and cast their mail ballot—we are working year-round, every year to collaborate closely with county and city elections officials to conduct voter registration list maintenance pursuant to state and federal law; discuss the election cycle with county and city elections officials so as to capture and address their lessons learned from the previous elections cycle; inform the public about elections processes and procedures, cyber- and physical- security measures, and other ongoing enhancements; review and refine training plans and classes for state, county, and city elections officials in preparation for our annual training conference; review and revise elections regulations spanning nine chapters of state law; review vendor contracts and, when necessary, submit Requests For Proposal and initiate the procurement process pursuant to the State Administrative Manual and other State Purchasing requirements to ensure that the Nevada electorate is provided the best possible services and support throughout the electoral process; review and refine the voter experience relating to online applications, forms and templates, and other public-facing tools to ensure ADA compliance and to increase accessibility for voters; and support the biennial legislative session by reviewing, on average, more than 50 elections-related proposed Bill Draft Requests and provide fiscal, operational, and technical feedback relating to the possible implementation of each bill. Right now, we are preparing for the 2026 election cycle, where the first candidate filings will occur here in Nevada in January 2026, approximately nine months from now. In other words, with only our current work, my staff and I are fully occupied in preparing for our next election. Introducing additional requirements means that we must deprioritize those critical election tasks.

11. Notwithstanding this ongoing work, shortly after the EO was issued, I immediately took action on it, including initiating implementation. Every day for at least the first two weeks after the EO was published, I spent significant time briefing relevant individuals and delegating key planning tasks to members of our team. Unfortunately, those are days and hours that I was unable to spend on other office priorities preparing for the next election—time that my staff and I cannot get back.

12. Upon reading the EO on Tuesday, March 25, I immediately circulated the text of the EO to the Secretary and Executive team, then to all state, county and city elections officials, and even sent a text message to all 17 county elections officials to confirm receipt, a rare move that I only take with the most urgent and time sensitive of notifications. Local elections officials then immediately began responding with questions, and I have continued to receive a steady stream of questions and comments ever since. My team has also started receiving inquiries about the EO from members of the public. These questions relate to the implementation, timelines, and types of acceptable documentation, requiring additional time to begin developing an FAQ for the staff to use to answer questions while concurrently drafting information that will go on the Secretary's website to inform and reassure the public.

13. On Wednesday, March 26, once our team had time to initially digest the contents of the EO, I began overseeing the changes necessary to comply with the EO, as detailed further below. This included bringing together relevant project teams to discuss the terms of the EO and the steps required to comply with it. For example, because the EO appears to require changes to our statewide voter database system, I called a meeting that afternoon with representatives from three different groups involved in the statewide voter database project: the senior leaders of the project team working on implementation of the database and election management system (a

6

product called TotalVote) across the state, Secretary of State IT staff, and representatives from the external vendor (KNOWiNK). I informed this nearly 20-person group of the EO's requirements, and that implementation would need to be fully in production and ready to go "live" statewide by April 24. We began discussing the new requirements and identifying questions the project team needs answered, either from our legal counsel or, if it relates to a policy decision, from the Secretary of State. The decisions that we need to make range from big-picture considerations regarding process and timeline (e.g., how to handle voter registration forms completed without DPOC, whether and how to develop a bifurcated list of state- and federal-voters, and technical steps necessary to add multiple new DPOC-related fields to the database), to granular issues like the meaning of the unique identifying number for certain documents required by Section 2(a)(i)(B) of the EO (e.g., how many digits? Should they be alpha-numeric?). Because this team has been working on a highly time-sensitive and complex merger project for the statewide system that must be in place before the start of Nevada's judicial candidate filing period (January 5, 2026), I typically avoid diverting their attention at all costs. But given the timeline required in the EO, unfortunately the EO planning conversation could not wait.

      14.      The EO forces our team in Nevada to make a range of both small and big-picture decisions now about how to dedicate and prioritize limited staff and state resources to update our elections systems pursuant to the EO. In doing so, we must both implement the EO and avoid the risk of inadvertently disenfranchising eligible voters.

      15.      Yet my staff's focus on EO implementation comes at a significant cost to Nevada election administration and preparation. We have several priorities with their own time-sensitive timelines that have had to be sidelined to address the EO.

7

16. For example, the Nevada legislature is currently in session through June 2 of this year—just a little over one more month. Because the legislature ordinarily meets only every two years, supporting and informing legislative decision making for the next five weeks is a top priority. There is significant analysis required for all election-related legislation, especially the development and publication of fiscal notes from my office. After the EO was published, I had to delay review and analysis of critical fiscal notes.

17. Additionally, changing the data required and stored in the state's voter registration database will require significant resources, interrupting an ongoing multi-phase statewide database effort required by Nevada law to consolidate the statewide voter registration database. Based on the timeline in the EO, however, the work to implement the EO must start now.

18. Just last fall, Nevada implemented the Voter Registration and Election Management Solution (VREMS), a statewide voter registration database and election management system called TotalVote. *See* Press Release, Nevada Secretary of State's Office announces the implementation of the voter registration and election management solution, Nevada Secretary of State (Sept. 11, 2024), https://www.nvsos.gov/sos/Home/Components/News/News/3510/33. Our team is currently working through phase 2 of this project, which involves merging the largest county database in the state—Clark County—with the statewide database. This is an extremely technical, high-stakes process that needs to be in place by September or October of this year so that Nevada is prepared for the 2026 elections. Our team is hard at work ensuring that there are no glitches or errors that could result in confusion, inconvenience, or even disenfranchisement. This work ranges from highly technical programming issues, to ensuring that multiple voters with the same name (e.g., "John Smith") are not merged together in the transfer, that voter data is not lost or

improperly converted, and that all required checks and balances needed to maintain the statewide voter registration list are conducted pursuant to state and federal law. Any delay in this team's ability to complete the product development and testing required for this merger risks creating a domino effect and missed deadlines for further phases of this effort in the future. With something as important as a voter registration database merger, any hiccups or errors in rollout could be catastrophic. But any time spent implementing the EO puts this project on hold and at risk.

19. Our choices on how to implement the EO will have significant consequences for both election administrators and voters in Nevada. Take, for example, an implementation question that came up almost immediately: what should elections officials do with a registration form from an otherwise eligible voter who completes the anticipated new Federal Form or new state form, but does not provide one of the specific DPOC documents required by the EO? In Nevada, REAL ID-compliant IDs do not "indicate[]" the applicant's citizenship as is necessary to satisfy the EO's requirement, nor to my knowledge do military IDs contain such an indication; that leaves only a U.S. passport as the acceptable documentation for most Nevadans under this EO. See EO §2(a)(ii)(A)-(D). In collaboration with other state officials, we must work though whether and how the State should implement a bifurcated election system, where some voters are only eligible to vote in State elections, to accommodate individuals who cannot provide proof of citizenship in the form of a passport. The decision to administer and track a bifurcated registration system alone would have massive consequences for both election administrators and voters. As described below, it will require updates to our systems and voter registration form. And it will require updates to our state trainings and public educational materials. These are just some of the many consequential decisions this EO forces us to make and implement immediately as there is no clarity on when there may be a change to the Federal Form.

9

20. Implementing E.O. Sections 2(a) and 2(d) will require a series of changes to voter registration forms, database systems, and processes. To be consistent with prior practices, changing voter registration requirements in Nevada would mean changing six separate forms and systems: the state paper application form, Nevada's online voter registration application, the online downloadable PDF form, the form used at the Nevada Department of Motor Vehicles ("DMV"), our Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") voting and registration system called the Effective Absentee System for Elections ("EASE"), and the statewide voter registration system and database. And in Clark County, voter registration forms must be translated into both Spanish and Filipino to comply with the county's obligations under Section 203 of the Voting Rights Act. Significantly changing any one of these forms alone is typically a time-intensive process involving testing for functionality, legal review, and user design testing to reduce or prevent confusion with voters. Making changes to all of these forms and systems all at once is a herculean undertaking for all of the teams involved, particularly when there are still outstanding questions from the EO about requirements.

21. Section 2 of the EO also purports to require significant changes to the Automatic Voter Registration ("AVR") process at the DMV. The DMV is a designated voter registration agency in Nevada. Nev. Rev. Stat. 293.504. It is therefore required to either accept the Federal Form or a state form that must be "equivalent" to the federal form under 52 U.S.C. § 20506. And EO Section 2(d)'s directive that heads of voter registration agencies "assess citizenship" before providing applicants with the opportunity to register has already purportedly taken effect. It is unclear whether state agencies that are designated as voter registration agencies under the NVRA are included within Section 2(d)'s scope, but I must proceed under the assumption that they are.

22. In Nevada, applications from DMV transactions for driver's license and state identifications are transmitted to the Secretary of State as applications to register to vote, so long as the applicant meets eligibility requirements, including attestation of U.S. citizenship. Applicants later receive a notification from their county registrar allowing for party selection or opt-out. But under Section 2(a) and the NVRA's command that voter registration agencies use an "equivalent" form to the Federal Form, our team has had to assume that it needs to immediately take several actions, including coordinating with the DMV to add a DPOC requirement to the agency's form, providing clear guidance on the narrow set of documents that satisfy that standard, and advising on the internal database changes they will need to make to ensure the Secretary of State and ultimately local elections officials receive all necessary information.

23. Additionally, as mentioned above, Section 2(d) appears to impose an additional requirement that the DMV "assess citizenship" prior to providing a federal registration form, which directs designated state agencies to "assess citizenship" before even providing the form to register to vote to enrollees of public assistance programs. I will oversee coordination with the DMV to determine how the DMV will implement that screening in the context of AVR, and what internal database changes the DMV will need to make to ensure that all required steps are followed. The first calls with the DMV already occurred the morning of Friday March 28, 2025. We had considered waiting until Monday, but ultimately both the DMV staff and I agreed that the time sensitive nature of the EO demanded adjustment to our calendars to talk three days earlier to begin implementing these changes.

24. Under normal circumstances, this amount of change would require much longer than 30 days to develop, test, and implement, because these changes would require changing the DMV process, the DMV form, testing the form, changing the database, testing the database and

11

its ability to transmit data successfully to the Secretary of State, and training all line staff on how the new form works and how to answer the questions they will likely be asked (e.g., "is my birth certificate sufficient?," "What about a Consular Report of Birth Abroad" (a document my youngest son was issued upon his birth overseas and that is also not mentioned anywhere in the EO)?, "What if I don't have a passport?"). For reference, past discussions about expanding AVR in the state began over one year before the programmatic go-live date.

25. Sections 2(a) and 2(d) also require changes to the form and processes at other designated voter registration agencies. Currently, there are five categories of offices designated and certified as voter registration agencies in Nevada, pursuant to the NVRA (52 U.S.C. § 20506) and Nev. Rev. Stat. 293.504: the Nevada DMV, Offices of the City and County Clerks, United States Armed Forces Recruitment Offices, and divisions of the Nevada Department of Health and Human Services and Nevada Department of Employment, Training and Rehabilitation. *See* Nev. Sec'y of State, Voter Registration Agencies Designation, https://www.nvsos.gov/sos/home/showpublisheddocument/8250/638593034891230000

26. As with the DMV, because the state form provided at designated voter registration agencies must be either the Federal Form or "equivalent" to the Federal Form under the NVRA, we have had to assume that the form used at these designated agencies would require DPOC per EO Section 2(a) by late April. This means our team at the Elections Division has already started discussing required guidance for any new forms and preparing new forms. Additionally, Section 2(d) appears to require a change in process for the other designated voter registration agencies in Nevada, as the EO appears to direct them, too, to "assess citizenship" prior to providing a registration form for individuals applying for public assistance. It is unclear what kind of "assessment" the EO contemplates, but I am unaware of any federal legal

12

requirement for an assessment of citizenship before a form is provided. Our team has already started coordinating with the DMV on how to comply with this "assess citizenship" requirement, how to implement the DPOC requirement, and other changes necessary to comply with the EO.

27. The same immediate need for action applies to any changes to the statewide voter database and the online voter registration portal that interfaces with it. To integrate Section 2(a)'s requirements for DPOC on the Federal Form and record of document type into the statewide voter registration system will require modifying the database to include fields for recording the new information (e.g., whether DPOC was provided, the type of DPOC provided, the date of the document's issuance, any date of the document's expiration, the office that issued the document, and any unique identification number associated with the document). The project team working on TotalVote implementation across the state, Secretary of State IT staff, and representatives from the TotalVote vendor (KNOWiNK) will need to divert time, attention, and resources from phase 2 of the statewide database project to work on an expedited basis to have Section 2(a) requirements operational in the statewide database and online voter registration portal as soon as possible. Practically speaking, this means they will have to modify their current work schedules and the planned "Agile sprints" and "mock elections" they have planned over the coming months as part of their current work on the statewide merger project—which is required by law and of critical importance for election administration in the state.

28. At the same time that my team oversees the database and application form changes discussed above, we must concurrently develop training materials, guidance documents, and public educational materials to be published as soon as possible. This is yet another aspect of the EO's implementation that will divert more than half of our team's limited resources to accomplish.

13

29. My office is responsible for producing training, materials, and communications for a variety of different constituencies related to voter registration, including county and city elections officials, voter registration agencies, nongovernmental organizations, and the voting public. This will take a variety of forms, including PowerPoint presentations, uploading new materials and videos to the online learning portal, and producing reference documents and guidance such as checklists and frequently asked questions guides.

30. Currently, the Federal Form is used and accepted in Nevada. It is widely available, and county officials routinely receive them from Nevadan applicants. Thus, when the Federal Form changes, our office will need to communicate with local elections officials, voter registration agencies and organizations, and the public about, at a minimum, (1) the new requirements and the documents that suffice, (2) how to implement the EO's commands regarding memorializing DPOC, and (3) ceasing to use the old form. This means our team must start developing guidance documents, communications materials, and answers to potential questions starting now.

31. The same is true for developing a new state form for use at state voter registration agencies that is substantially "equivalent" to the Federal Form's new DPOC requirements. To prepare for that change, our office will need to communicate with local elections officials, voter registration agencies and organizations, and the public about the new information and documentation required. The first conversation with our county and city elections officials took place on Tuesday April 1, 2025. Nevada has 17 county clerks and 18 city clerks, and we have regularly scheduled twice a month one-hour calls to discuss relevant topics ranging from legislative discussions, TotalVote implementation, AVR enhancement, and other detailed topics. The call on April 1 would normally have included an update about state legislation but was

14

primarily focused on the EO and implementation. Again, this means our team must start developing guidance documents, communications materials, and answers to potential questions starting now. And given the lack of specificity and clarity in the EO, the meeting resulted in considerable frustration from the individuals most responsible for carrying it out.

32. All state agencies and local clerks who use old state forms will need to completely eliminate their use, including throwing out copies and printing the new forms for distribution statewide. We will have to ensure this process is adequately overseen to avoid registration errors which would lead to disenfranchisement.

33. The EO requires my team to immediately begin developing training for local elections officials on all of the changes to voter registration forms, requirements, and processes. We will also begin developing training and guidance for state voter registration agencies, as the Secretary of State is required to provide these materials. This training must be developed and begin being implemented shortly given the uncertainty around when the EAC might change the Federal Form so that our elections officials and voter registration agencies are ready to comply with their obligations. We will also need to develop guidance and answers to frequently asked questions to provide to state staff and local elections officials because of the uncertainty of the timeline for implementation.

34. All of these training and guidance measures are important to have in place by the time of any change to the Federal Form to minimize voter and elections official confusion, ensure that eligible voters are not disenfranchised, and ensure that applicants receive consistent treatment across the state.

35. To begin the process of educating the public, we will also need to change our website and external-facing resources with updated and correct information on the

15

documentation. I have already met with the person from our office who is responsible for interfacing with the public directly and asked them to begin formulating answers to the questions we will receive.

36.     Nevadans have already started calling our office to ask questions about how this EO affects them and their right to vote. We need to have answers now.

37.     We also need to plan to implement a public-facing education campaign pursuant to the EO that will need to be ready as soon as any modification is made to the Federal Form and run until the conclusion of the 2026 midterms. This education campaign will likely cost more than a million dollars from our budget—funds that were allocated to other critical election priorities and that may demand changes to our budget request that was submitted prior to the start of the legislative session.

38.     This communication to all relevant stakeholders and education for the public is essential, because Nevadans' confidence in our elections and their right to vote is at stake. We must make sure that changes are implemented uniformly while avoiding voter disenfranchisement to the greatest extent possible.

39.     Further, with an administrative challenge as significant as this one, we typically are very careful, especially when it comes to voter registration systems and voter-facing user interfaces. We test every possible use case to the fullest extent practicable, at all hours of the day, including every type of form, and think through possible pressure points before implementing dramatic changes for our elections officials and voters. By working methodically but efficiently, we minimize the risk that we will inadvertently discourage or disenfranchise voters. Particularly when it comes to online and database functionality, even small changes take time, and our resources are zero-sum.

40.     In sum, responding to just two provisions of the EO—Sections 2(a) and 2(d)—will require an all-hands-on-deck approach from the entire Elections Division, our state voter registration agencies, and our local elections officials across the state, and even then, it will still threaten confusion and chaos in Nevada's election system.

41.     It is my understanding that Section 3(d) of the EO requires the Secretary of Defense to "update" the Federal Post Card Application pursuant to the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") to require (1) DPOC as described in Section 2(a) of the EO, and (2) proof of eligibility to vote in elections in the state in which the voter is attempting to vote. It appears that these changes to the UOCAVA voting process could take place at any time. *See* EO § 3(d).

42.     The mandated changes to voting pursuant to UOCAVA will create substantial administrative burdens on state and local elections officials. Local elections officials will be burdened by increased questions relating to the validity of an application and an increased need to follow up with voters, including those overseas, who are historically the hardest group of voters to communicate with because of their location and inconsistent access to communication systems. The state would also need to modify EASE to ensure that military and overseas registrants can provide all required information.

43.     In addition, as with the changes outlined in Sections 2(a) and 2(d), the EO's changes to UOCAVA will require the Secretary of State to expend time to educate state and local elections officials on the new requirements and to ensure their continued compliance with their obligations moving forward. The Secretary of State would also have to expend time educating military and overseas voters.

44. The EO's commands therefore disrupt my team's ongoing work to prepare for upcoming elections. We are only nine months away from the start of the candidate filing periods for the 2026 midterm elections. I have obligations to Nevadans to prepare for those elections and work on behalf of their interests that are now largely put on hold to oversee the response to this EO so long as it remains in effect.

45. It is my understanding that Section 7(a) of the EO requires the Attorney General to "take all necessary action" to enforce the federal Election Day statutes "against States that violate these provisions," including by counting absentee or mail-in ballots received after Election Day in the final tabulation of the vote for federal offices. This provision of the EO appears to take immediate effect. *See* EO § 7(a).

46. It is also my understanding that Section 7(b) of the EO directs the EAC to "condition any available funding to a State on that State's compliance with" federal law that requires States to adopt "uniform and nondiscriminatory standards" for what constitutes a valid and countable vote, including that "there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," excluding ballots received after Election Day from tabulation. This direction to the EAC appears to take immediate effect. *See* EO § 7(b).

47. Sections 7(a) and 7(b) of the EO have substantial and adverse impacts on voting in Nevada, as well as the State's ability to adequately administer elections.

48. To properly administer elections in accordance with the EO's Election Day rule, and to minimize the number of voters whose ballots will be disregarded for being received after Election Day, the Secretary of State will be required to devote significant additional resources to address the EO's Election Day provisions. As with other parts of the EO, the Secretary of State will be required to provide state and local elections officials with training and supervision to

18

ensure that votes are received and tabulated consistent with the EO's requirements. At the same time, the Secretary of State will be required to offer additional public information and educational resources to provide voters with awareness and familiarity with the new ballot deadline rule. This would take the form of, at a minimum, newspaper notices, social media posts, mail notifications, and press briefings throughout 2026.

49. As to voting, a significant portion of eligible voters in Nevada will be affected if the EO's directive for Attorney General enforcement against states that permit the counting of timely cast ballots received after Election Day is permitted to take effect. In Nevada, all active registered voters generally receive and can use mail ballots to cast their votes. Nev. Rev. Stat. 293.269911(1). Under state law, such ballots can be counted in the tabulation of votes if sent on or before Election Day, so long as they are received by state elections officials shortly after Election Day. Nev. Rev. Stat. 293.269921. For the 2024 general election, 669,334 voters cast their ballot by mail ballot, representing nearly 45 percent of the total 1,490,334 ballots cast in that election.

50. Nevada law also allows voters who cast mail ballots on or before Election Day to cure technical errors within six days after Election Day, allowing their ballots to ultimately be counted. Nev. Rev. Stat. 293.269927(6). For the 2024 general election, nearly 33,000 mail ballots needed to be cured in Nevada. It is not clear whether the EO prohibits tabulating ballots cured after Election Day, or if they would instead be a basis for enforcement action against Nevada or the loss of funding under Sections 7(a) and 7(b).

51. In addition, to the extent Nevada law does not currently comply with the Election Day rule outlined in Section 7 of the EO, Nevada risks a loss of federal elections funding that is used to, among other things, "[i]mprov[e] the administration of elections for Federal office." 52

U.S.C. § 20901(b)(1)(B). Nevada has previously received over $36 million of federal funding pursuant to the Help Americans Vote Act ("HAVA"). This funding is used to help facilitate the administration of elections at the state and local level. The funding threatened in Section 7(b) is important to Nevada's ability to safely and efficiently conduct elections.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 28, 2025, at Carson City, Nevada.

_____
Mark Wlaschin
Deputy Secretary of State for Elections
Nevada Secretary of State