IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN, <br><br> *Plaintiffs,* <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense, <br><br> *Defendants.* | Case No. 1:25-cv-10810-DJC |

**DECLARATION OF NATALIE ADONA**

I, Natalie Adona, declare as follows:

1. I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except those matters stated upon information

1

and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Elected Nevada County Clerk-Recorder/Registrar of Voters in California. In my role, I am responsible for the county-level administration of all state and federal laws relating to elections.

3. I have served as the Elected Clerk-Recorder/Registrar of Voters for over two years and have served with Nevada County, California for over five years. I am an officer for the California Association of Clerks and Election Officials ("CACEO") and have served on the statewide Ballot Design Advisory Committee and various state working groups. Additionally, I serve in an advisory capacity for several nonprofit groups focused on elections, including the Bipartisan Policy Center, the Center for Election Innovation and Research, and the Overseas Voting Initiative. I hold a Master of Public Administration and a Juris Doctor from American University. I am a Certified Elections/Registration Administrator, a certificate program administered by the Election Center and Auburn University.

4. The Nevada County Clerk-Recorder/Elections Office is responsible for administering all federal, state, and local elections. My staff and I follow all federal, state, and local election laws and provide information and education to the public and other parties. Nevada County is one of California's 58 counties that administer registration and election services. The State of California is a "bottom-up" state, meaning that the counties maintain a local voter registration roll and send data up to the statewide voter registration database ("VoteCal"). VoteCal simultaneously sends counties data on new and existing registrations, along with other data that are critical for managing the local voter roll—including, but not limited to data that may disqualify a voter. Counties use local election management systems ("EMS") to maintain the

2

local voter roll. There are three EMS that are certified for use in California, all of which must be able to maintain near real-time updates to registration and voter participation history, generate accurate lists of registrants, and successfully communicate with VoteCal. Successful VoteCal integration with the local EMS must include all required fields that are essential for maintaining an accurate voter roll.

5. In my role as Elected Clerk-Recorder/Registrar of Voters, I oversee Nevada County's candidate filing services, voter registration services, vote-by-mail operations, warehouse/drayage operations, election security, voter education and outreach, and in person election services, among other duties. In addition to my elections responsibilities, I also oversee all of the functions of the County Clerk-Recorder, which includes preservation of official records, recording documents relating to real property, marriage licensing, and other functions critical to the lives of Nevada County residents.

6. My office manages the roll of approximately 76,000 Nevada County registered voters, and I oversee all list maintenance activities. Every business day, my staff add new registrants from all data sources, update current registrant information, maintain voter participation history, and perform synchronization activities in partnership with VoteCal. My staff also ensure that voters receive the proper notifications when they register, move, or are disqualified from voting, pursuant to federal and state laws. Nevada County receives approximately 1,750 updates to voter registration a week during non-election periods, and around 3,500 updates a week during an election cycle. In Nevada County, there are three permanent staff who work in elections full time. My assistant, our administrative assistant, and I split our time between the Clerk-Recorder and Elections departments.

7.  I am familiar with the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO"). Section 2(a) has undermined established election protocols and created widespread confusion. As a result, these provisions have already inflicted harm and, if left unaddressed, are poised to further destabilize the orderly administration of elections in Nevada County.

8.  It is my understanding that Section 2(a) of the EO directs the Election Assistance Commission ("EAC") to amend the national mail voter registration form ("Federal Form"), as provided by the National Voter Registration Act ("NVRA"), to require applicants to provide "documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It outlines a limited number of specific documents that constitute acceptable DPOC. In my opinion, three of the four acceptable forms of DPOC will not be sufficient for a voter to establish citizenship. California's REAL ID and other identification cards from the Department of Motor Vehicles do not indicate citizenship status, nor do military IDs like the Common Access Card ("CAC"). The only identification we could accept is a U.S. passport or supporting documentation that is currently used to obtain a passport or REAL ID. The EO also requires state and local officials to "record . . . the type" of DPOC presented at the time of voter registration, including recording specific information about the document. *Id.* § 2(a)(i)(B). Eligible Californians would have to carry their U.S. passport, birth certificate, naturalization papers, or other document evidencing citizenship to an elections official or entity that offers registration services so that the document type can be recorded. It is my understanding that obtaining the proper supporting documentation can take weeks or even months to acquire, especially if the voter requires documents that are not available in the county where they are registered. For example, our office can verify citizenship if the voter was born in Nevada County, as my office has access to official records like births and

deaths, assuming that such a process is permissible under the EO; that is not true for voters born outside of the County. The EO directs the EAC to "take appropriate action" within 30 days (i.e., by April 24, 2025) to impose these changes. *Id.* § 2(a)(i). This leaves Nevada County with little direction or time to figure out how quickly to administer these changes, which may be detrimental to our ability to administer the next regularly scheduled election, the June 2, 2026 statewide primary.

9. The provisions of the EO, including Section 2(a), likely require immediate action from me and my team in Nevada County to implement these changes, but the full scope of those changes and the timing is currently unknown. It is very likely that our efforts to address the directed changes and impacts of the EO will divert time and attention from critical election preparation and will distract from my ability to oversee Clerk-Recorder operations. In every election, our small staff (including myself) conducts every aspect of election administration, including candidate filing, designing ballots, ordering supplies for mail and in person voting, testing voting equipment, voter registration list maintenance, site-specific accessibility compliance checks, community engagement, replenishing supplies, and many, many more tasks. Additionally, my office is completing a move of our vote-by-mail operation, implementing new technologies to better serve the public (including a new EMS), preparing paperwork and educational materials, finalizing our budgets, updating contingency plans and informational materials, conducting outreach activities, and participating in ongoing education and training. I will also likely have to spend significant time re-evaluating our fiscal budget to ensure that the EO's directives can be implemented.

10. Shortly after the EO was issued, I was notified by the state's chief of elections. After reading the EO several times, I connected with other CACEO leaders, where we discussed

the content of the EO and related federal legislation and shared our preliminary analyses and concerns. I then began to outline the actions that Nevada County would need to take to implement the EO—a process that is ongoing and continues to raise questions around process and cost.

   11.  The EO has created an immediate need for answers to various questions related to implementation, ranging from big-picture considerations to granular issues. It is not clear, for example, whether the EO requires the voter to appear in person to show DPOC, whether a copy of the DPOC must be retained by elections officials along with the affidavit of registration, or if the state and counties can make reasonable accommodations for voters who are away (e.g., military and overseas voters). In any circumstance, additional staff will be required to successfully implement the EO to ensure the same level of service and continuity of operations in my office. Whether there are in person or other requirements attached to providing DPOC can determine how many staff ought to be added. One staff member can range between $85,000-$106,000 (base pay + benefits) in additional annual costs to the County per person depending on the staff person's qualifications. It is also unclear how long it might take to include any of the available federal sources of citizenship information in VoteCal (see *id.* § 2(b)(i)-(ii)) and how local elections officials should treat those data if voters have the onus of providing DPOC when they register. If a voter must submit multiple DPOC to prove citizenship, it is not clear which document ought to be recorded to satisfy the EO's directives. If a voter fails to provide DPOC in any NVRA agency, whether that be the DMV or other entity, the presumption is that the voter's registration will not be received by the county elections official, but there is no direction on how to treat an existing registration for that same voter. There are also outstanding questions about how much the cost of elections must increase as a result of the EO's directives, as Nevada

County and other counties have been required to shrink their budgets for the upcoming fiscal year and any future adjustments will prompt counties to make modifications.

12. My team and I have taken preliminary steps to figure out how we might meet the EO's recording requirement given the current limitations within our EMS and VoteCal. The EO will require significant changes to VoteCal and all local EMS. For instance, integrating Section 2(a)'s requirements for DPOC on the Federal Form and recording document type into VoteCal will require modifying the database to include fields for recording the new information. After performing some due diligence, my staff and I found no field in the Nevada County EMS that would record the type of document the voter submitted as their DPOC, nor is there currently a way to communicate such data to VoteCal through the EMS to ensure proper document collection. Based on the conversations I have had with my county peers I believe that no certified EMS includes a field for DPOC. My experience suggests that adding a new DPOC field may take at least several months for VoteCal and for EMS vendors to implement.

13. At the same time that my team oversees the database changes discussed above, we must concurrently develop training materials and guidance documents for use by election staff as soon as possible. This is yet another aspect of the EO's implementation that I believe will divert more than half of our team's time and resources to accomplishing the EO's directives. Our staff will have to map out the details on office process updates, update manuals, incorporate any future state-based laws or regulations, and train temporary staff for the next election cycle. Because our small staff does not specialize in any single elections function, accomplishing the EO's directives on top of our regular elections responsibilities will result in increased overtime and put a strain on other parts of elections planning and implementation.

14. The Federal Form is currently used and accepted in California. It is widely available and well known to local elections officials. The EO's directive to include a new DPOC requirement on the Federal Form, as well as the requirement that state and local elections officials record the type of DPOC presented, will require substantial education and coordination on topics like: (1) the new requirements and the documents that suffice, (2) how to implement the EO's commands regarding memorializing DPOC, (3) the process for notifying voters that their registration is incomplete, should they fail to provide DPOC for any reason, and (4) ceasing use of the old federal and state forms.

15. Apart from the impacts of immediately creating and implementing an education process for elections staff to learn about the EO's directed changes and requirements, the compressed timeline on which the EO purports to operate raises a distinct and substantial risk of confusion or mistake by local elections officials in their administration of voter registration and upcoming elections. As Nevada County's chief election official, I am ultimately responsible for all actions taken by me and my staff. I have serious concerns about the impact the EO will have on my staff's confidence and ability to keep pace with the EO's directives.

16. A separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters are aware of the new registration requirements. To begin the process of educating the public, we will need to update our website and external-facing resources with updated and accurate information regarding the documentation required to register to vote with the Federal Form, and we will need to do so on the accelerated timeline contemplated by the EO. Our office has already begun its research for what kinds of DPOC may be acceptable under the EO and what steps Nevada County voters

must take to acquire DPOC if it is not available in our Clerk-Recorder Department (i.e., citizens born out of state or county, or in another country).

17. This public education campaign, which we will need to run at least through the conclusion of the 2026 midterm election, and likely thereafter, will increase the cost of election administration in Nevada County. Based on my office's preliminary calculations, we would have to increase our communications budget by as little as $115,000 and upwards of $133,000 through at least the next regularly scheduled election, the low end of which represents more than double what we currently spend on elections-related communications.

18. In fact, Nevada County residents have already expressed concerns about what the EO will mean for them as voters. Many voters are generally worried about the uncertainty that the EO represents. Several have expressed concerns about the need for DPOC and the impact on married women who choose to take their spouse's last name. Some have shared with me personally that they had difficulty obtaining a REAL ID as a result of their last name change and worry that they might encounter similar obstacles with voter registration. While I and my staff will do our best to help voters, we cannot promise them that their particular circumstances will not present issues if the EO is implemented in California.

19. Apart from the costs associated with the massive public education campaign required to reach eligible voters, the directives in the EO also risk voter disenfranchisement. Nevada County's electorate includes married women, elderly individuals, unhoused individuals, and young persons, all of whom may experience unique barriers to acquiring DPOC and may not know where to go if their DPOC cannot be obtained in the County. In the last election, Nevada County sent ballots to approximately 500 military and overseas ("UOCAVA") voters. Even if elections officials can use remote tools like phone, email, and video chats to record an overseas

voter's DPOC, my office may be ill-equipped to assist our UOCAVA voters, who are only available during non-business hours due to their location in the world. It is my understanding that service members typically carry the CAC. While my office can provide copies of birth certificates for anyone born in Nevada County, service members with only a CAC may need to seek DPOC in another jurisdiction. Ordering the appropriate DPOC can take weeks or months. Non-military U.S. citizens who were not born in the United States may find it even harder to obtain DPOC, and neither me nor my staff may have the expertise necessary to help the voter work through their particular issue.

20. It is my understanding that Section 7(a) of the EO requires the Attorney General to "take all necessary action" to enforce the federal Election Day statutes "against States that violate these provisions," including by counting absentee or mail-in ballots received after Election Day in the final tabulation of the vote for federal offices. This provision of the EO appears to take immediate effect. *See* EO, § 7(a).

21. It is also my understanding that Section 7(b) of the EO directs the EAC to "condition any available funding to a State on that State's compliance with" federal law that requires States to adopt "uniform and nondiscriminatory standards" for what constitutes a valid and countable vote, including that "there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," thereby excluding ballots received after Election Day from tabulation. This direction to the EAC appears to take immediate effect. *See* EO, § 7(b).

22. Sections 7(a) and 7(b) of the EO will have substantial and adverse impacts on Nevada County's ability to adequately administer elections.

23. As to voting, a significant portion of eligible Nevada County voters will be affected if the EO's directive for Attorney General enforcement against states that permit the counting of timely cast ballots received after Election Day is allowed to take effect. In Nevada County, anywhere between 90-94 percent of returned ballots were cast using vote-by-mail. Thousands of Nevada County ballots are placed in blue US Mail receptacles or in official drop boxes on Election Day. Under state law, mailed ballots can be counted in the tabulation of votes if post-marked on or before Election Day, even if received by local elections officials after Election Day, as long as the ballot is delivered no later than seven days after the Election. State law further allows voters to drop off a ballot in any official drop box in the state and provides that elections officials deliver the ballot to the proper county no later than eight days after receipt. If the EO's requirements under this provision were enforced, our office would have to reject hundreds or thousands of ballots cast by Nevada County citizens who used the US Mail or delivered a ballot out of county on or in the days before Election Day.

24. California law also allows voters who cast ballots on or before Election Day to cure technical errors up to two days prior to certification of the election, allowing their ballots to ultimately be counted. Nevada County estimates that there are several dozen voters every cycle who cure a missing or mismatched signature after Election Day. It is not clear whether the EO prohibits tabulating ballots cured after Election Day, or if they would instead be a basis for enforcement action against Nevada County or the loss of funding under Sections 7(a) and 7(b).

25. In addition, to the extent California law does not currently comply with the Election Day rule outlined in Section 7 of the EO, Nevada County risks a loss of federal elections funding supporting key activities that ensure our elections are secure and accessible to all voters. Since my tenure in Nevada County began in 2019, our office has received

11

$508,330.00 of federal funding pursuant to the Help America Vote Act ("HAVA"). This funding has provided the County with the support it needs to purchase accessibility tools for our voters with disabilities, has made in person voting locations more accessible and safer for all who choose to use them, provided us with the support to fortify our physical and cybersecurity infrastructure, supported our voter education and outreach efforts, and provided us with the support we needed to keep voting safe during the COVID-19 pandemic. Loss of this important federal funding source would put a further strain on Nevada County's general fund and may result in a reduction in services or higher elections costs for the districts within the County that request election services.

I declare under penalty of perjury that the foregoing is true and correct.

    Executed on April 22, 2025, at Nevada City, California.

                                          Natalie Adona
                                          Clerk-Recorder/Registrar of Voters
                                          Nevada County, California