# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN,<br><br>                *Plaintiffs,*<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense,<br><br>                *Defendants.* | Case No. 1:25-cv-10810-DJC |

## DECLARATION OF DEAN C. LOGAN

I, Dean C. Logan, declare as follows:

1.     I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except those matters stated upon information

and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

**Introduction and Background**

2. I am the Registrar-Recorder/County Clerk ("RR/CC") for the County of Los Angeles ("County") in the State of California ("State"). In my role, I oversee the County's voter registration process and voter file maintenance, and administer all federal, state, local and special elections conducted in the County, in addition to verification and certification of initiative, referenda and recall petitions, real property document recording; maintenance and custody of vital records of births, deaths and marriages; and other related programs.

3. I have served as Los Angeles County Registrar-Recorder/County Clerk for more than 16 years. I have more than 25 years of experience in election administration, records management, and public service. Prior to moving to Southern California, I served as the director of records, elections, and licensing services for King County, Washington; as state elections director for the Washington Secretary of State; and as the elected county clerk and chief deputy county auditor in Kitsap County, Washington. I serve on the Board of Advisors and the Standards Board for the United States Election Assistance Commission ("EAC"), on the Board of Directors (past President) for the California Association of Clerks and Election Officials ("CACEO"), on the Board of Directors for the Election Center (National Association of Election Officials), and on advisory bodies for the MIT Election Data Science Lab, the Auburn University Graduate Certificate in Elections Administration program, and the Electoral Psychology Observatory at the London School of Economics and Political Science. Additionally, I serve on the California Secretary of State's Language Accessibility Advisory Committee, and as President of the County Recorders' Association of California. I am an instructor for the MPA program at

California State University, Northridge. I hold a degree in organizational leadership from Azusa Pacific University and an executive MPA from the Evans School of Public Policy and Governance at the University of Washington, and I am a Certified Elections and Registration Administrator through Auburn University and the Election Center (National Association of Election Officials).

4.      The Los Angeles County Registrar-Recorder/County Clerk serves as the ex-officio Supervisor of Elections for the County and is one of 58 county elections officials in the State working together with the State's chief elections officer, the Secretary of State, to register voters, maintain voter registration records, administer elections and certify election results, among other things. *See e.g.*, National Voter Registration Act of 1993, 52 U.S.C. Section 20501 et seq., Cal. Elec. Code Sections 2162, 2168, 2170, 2187, 2188, 2193, 2194, 2201, 2206, 2211.5, 2212, 2214, 2225, 2226, 2404, 2405, 2407, 2501,2550, 2600, 3019.7, 3025, ,3026, 3101, 4005 et seq., 8020.5, 8025, 8026, 8070, 8081, 8082, 8083, 8100, 8105, 8106, 8120, 8123, 8124, 8125, 8148, 8228. At the County level, the RR/CC is responsible for registering voters, maintaining voter files, and conducting federal, state, local and special elections in the County. This includes the development, purchase, licensing, contracting, use and maintenance of equipment and materials used to facilitate the modern, accessible and secure administration of elections, including the devices used to check voters in when voting in-person - Electronic Pollbooks ("ePollbooks"); the devices voters use for in-person voting - Ballot Marking Devices ("BMD"); the equipment and processes used to issue and process vote by mail ballots; the programs and processes used for ballot layout, and modernized systems for scanning ballot images, recognizing and interpreting votes, tabulating vote totals and producing election results - Tally Systems. Los Angeles County is unique among all jurisdictions in having developed the first and only

publicly-designed and publicly-owned voting system, Voting Solutions for All People ("VSAP"). Each year, the office facilitates the administration and certification of elections for approximately 200 school districts, cities and special districts in addition to all state and federal executive, legislative, and judicial elections held within Los Angeles County. There are approximately 5.8 million registered voters, as well as 5,000 voting precincts established for countywide elections. The County is the largest and most complex electoral jurisdiction in the country, with 88 cities, over 100 school and community college districts, 55 general and special districts, approximately 140 unincorporated areas, and provides voting materials in 19 languages under provisions of the Federal Voting Rights Act and the California Elections Code.

5.  As Los Angeles County Registrar-Recorder/County Clerk, I oversee Los Angeles County's voter registration process, voter file maintenance, and federal, state, local and special election administration.

6.  I reviewed the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO") including Sections 2(a), 2(d), 3(d), 7(a), and 7(b).

7.  It is my understanding that Section 2(a) of the EO directs the EAC to amend the national mail voter registration form ("Federal Form"), as provided by the National Voter Registration Act ("NVRA"), to require applicants to provide "documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It outlines a limited number of specific documents that constitute acceptable DPOC. *Id.* § 2(a)(ii). The EO also requires state and local officials to "record . . . the type" of DPOC presented at the time of voter registration, including recording specific information about the document. *Id.* § 2(a)(i)(B). The EO directs the EAC to

"take appropriate action" within 30 days (i.e., by April 24, 2025) to impose these changes. *Id.* § 2(a)(i).

**Immediate Impacts and Response by RR/CC**

8. The provisions of the EO, including Section 2(a), require immediate action from me and the staff of the RR/CC to identify compliance requirements, modify or develop new programs or procedures, implement associated activities, and coordinate with jurisdictions and stakeholders across the County. The RR/CC anticipates efforts to address the directed changes and impacts of the EO, which, if unchanged, will divert time, resources, and attention from other critical departmental responsibilities and election preparation, including assisting voters displaced by the Palisades and Eaton Canyon fires; upgrading the County's Election Management System ("EMS") which serves as the backbone of the voter registration intake and database; and engaging in a site by site analysis of all 600-plus Vote Center locations to ensure they meet accessibility standards.

9. Shortly after the EO was issued on March 25, 2025, I immediately began fielding questions from Los Angeles County and state elected officials and staff, election administrators in other jurisdictions, and media. The department began researching and holding multiple meetings with key staff and counsel to discuss and research how the EO's language might be interpreted and implemented.

10. In the discussions of the immediate and known impacts of the EO and based on our understanding of the EO, we are researching the impacts and resources needed to amend, modify, or expand the existing contract for development of a new EMS system that the County uses to receive and store voter registration and election information, to enable receipt, scanning, and storage of DPOC images as specified in the EO; to purchase hundreds of new scanning or

image capture devices; to expand storage capacity; and to hire and train hundreds of additional staff to manage a modified registration process. We are also assessing the impact of having to modify and/or replace over 31,000 Ballot Marking Devices because the EO disallows the use of a QR Code (except as necessary to accommodate persons with disabilities), even when the voter can verify their choices on a Voter Verifiable Paper Ballot as required under provisions of the California Elections Code and through the County's publication of a verification key. These are the devices that County voters use for in-person voting to mark their ballot selections on a touchscreen and print out a paper ballot before casting the ballot. These devices, valued at more than $141,000,000, are also necessary to comply with the accessibility provisions of the Help America Vote Act ("HAVA") and language provisions of the federal Voting Rights Act. We have also begun analyzing and planning to restructure our ballot intake processes to segregate mailed ballots that were cast on or before Election Day but arrived after because the EO would disallow counting ballots cast on or before but received after Election Day in contradiction to existing provisions of the California Elections Code. As Section 6 of the EO appears to require any and all individuals involved with federal election administration to be U.S. citizens, we further discussed how we could set up a citizenship verification process for all County employees and community, multi-lingual, and student election workers; contractors; truck drivers; translators; vendors; school principals; librarians; Elks Lodge building managers; and the thousands of others who are involved in specific and essential aspects of election administration. We are looking at what the impact might be if we excluded people who are lawfully in the United States but not citizens from providing support in election administration. We further discussed the extensive public education campaign that would be needed to inform voters of the EO's requirements and of the new and revised processes for voter registration and

election administration in order to reduce the substantial risk of voter disenfranchisement. We also discussed the need for an overhaul of State laws and processes to align with the directives in the EO. As such, this initial research and planning process involved staff from across the entire RR/CC, including senior leadership, the Information Technology Bureau, Candidate and Voter Services Bureau, Election Operations and Logistics Bureau, as well as the Media and Creative Services team and the Policy and Program Compliance team. These early discussions alone have minimally diverted 250 work hours of RR/CC staff time and are ongoing and continuous.

11. The EO has created an immediate need for answers to various questions related to implementation, ranging from big-picture considerations to granular issues. At a high level, the County faces the difficulty of compliance where the EO conflicts with provisions of other laws, including the National Voter Registration Act, HAVA, Voting Rights Act, and a myriad of state laws and local practices. As an example, the NVRA has strict requirements for what information may be obtained to register a voter and what may not. The NVRA currently requires the acceptance and processing of an application where the prospective voter has attested to age and citizenship requirements for voting by signature and check box responses. If we comply with the EO, we risk violating the NVRA. If the County elects to comply with federal law, but violate the EO, the EO provides for the U.S. Attorney General and/or private individuals a right of action to litigate or deny federal funding to a jurisdiction and contemplates broad prosecution powers against elections officials.

12. Additional granular questions arise about what documents serve as DPOC — several documents are explicitly listed in the list of documents that can be used as proof of citizenship, but not a birth certificate issued by a U.S. jurisdiction. We are informed and believe 90% of eligible voters are citizens who derive their citizenship from being born within the

jurisdiction of the United States. The State Department reports that approximately 50% of Americans have passports. For the remaining 45-50% of U.S.-born citizens, there is an open question about whether they can present a birth certificate alone as proof of citizenship. Additional questions include whether a registrant can provide a copy or image of DPOC or if the original document must be presented; whether a registered voter who is updating their name, address, party preference, language selection, or other information will need to also provide DPOC; if DPOC is required for any such registration updates, what document(s) will a person who has changed their name (e.g.: because of marriage) need to provide; will we need to store scanned images of DPOC in our EMS and for how long; and how will we address the increased risks of privacy violations and data breaches associated with storing and maintaining extensive personally identifiable information.

**Potential Impacts of Executive Order Section 2(a)**

13.     In addition to the immediate and continuing need to assess and understand the EO, my team and I had to quickly commence multiple work streams relevant to the implementation of the EO's directives. In particular, the EO requires significant changes to the State's voter registration database, and Los Angeles County's EMS.

14.     **Potential Costs to Taxpayers.** To integrate Section 2(a)'s requirements for DPOC on the Federal Form and record the DPOC type into the County EMS, RR/CC would have to determine what document or combination of documents are acceptable and responsive to multiple user scenarios (naturalized citizens; U.S.-born citizens; people who have to change their names, have moved, want to change their party preference, or register their language need). We anticipate this would involve a plan to design for workflow integration, database schema changes and User Interface changes to build a new process that can receive new data including potentially

the type of DPOC provided, the identifying number, the date of document(s) issuance and expiration, and an image of the document(s). RR/CC also anticipates the need to engage County resources and contractors to write or re-write code, test, and deploy new fields to record the DPOC information in the EMS. To comply with the EO, we anticipate needing to design, test and purchase new equipment (scanners or other image capture devices) to collect images when people come to register in person at the RR/CC Headquarters, satellite sites, or one of over 600 Vote Centers throughout the County during elections. To be able to assist the thousands of new registrants each year in person, RR/CC estimates needing to hire and train hundreds of new permanent and temporary workers and expand physical capacity to respond to the increased volume of in-person registrants and extra work associated with keying in data, learning what documents or combination of documents are permitted to establish DPOC, reviewing documents, and scanning the DPOC documents. Because there is a possibility that registrations can no longer be received online, through the mail, or via fax, we may have to prepare for the dramatic increase of registrants who register in person, and the additional volume of work that entails. One related critical task would be to carry out an education campaign to help eligible voters navigate a new process that likely will involve longer wait times and lines, additional documentary requirements, and potentially multiple, in-person visits. In total, we preliminarily estimate these costs to be $30 million.

      15.     Change of this magnitude requires multiple years of planning and careful execution. It would be impossible to complete in the shortened timeframe contemplated by the EO without significant risk of administrative error, false positive data matching, and under-resourcing other critical elements of election administration and security. Moreover, there is a

significant likelihood of a drop in eligible voter participation, higher registration data error rates, and non-compliance with conflicting federal and state laws, and additional costs to taxpayers.

16. **Risk of Disenfranchisement**. Apart from the costs associated with the massive public education campaign required to reach eligible voters to inform them of changes to the registration process and the other state costs identified above, the directives in the EO also pose a high risk of voter disenfranchisement. In Kansas, which implemented a law that required DPOC, federal courts found that over 30,000 U.S. citizens otherwise eligible to vote, were unconstitutionally blocked from registering to vote because of the documentation requirements and ordered the suspension of the law. Using the Kansas rate of denial (12% of new registrants unconstitutionally disenfranchised), this EO could result in over 40,000 U.S. citizens blocked from registering to vote in Los Angeles County in any given year.

**Potential Impacts of Executive Order Section 2(d)**

17. It is my understanding that Section 2(d) of the EO requires "[t]he head of each federal voter registration executive department or agency" under Section 20506(a) of the NVRA to "assess citizenship" before providing a federal voter registration form to enrollees of public assistance programs. *See* EO § 2(d). This section of the EO is ambiguous, but potentially encompasses a wide range of state and local offices that provide services to low-income and disabled residents. In other words, the EO potentially requires state voter registration agencies to immediately begin assessing for citizenship before they may even offer a federal voter registration form to a potential registrant. It is unclear what kind of "assessment" the EO contemplates and whether retention of the DPOC documents, electronic data associated with the DPOC, or images or physical copies of the DPOC would be required by the agency or the elections official. I am not aware of any federal legal requirement, guidance, or uniform practice

for an assessment of citizenship before a registration application is provided. This provision purports to take effect immediately. *Id.*

18. Because Section 2(d) of the EO may require designated state voter registration agencies to "assess citizenship" before providing applicants for public assistance benefits a voter registration application, the EO may require substantial coordination between Los Angeles County and County and State voter registration agencies. In the County, the offices or agencies that engage in voter registration include the 88 cities in the county; libraries; the Sheriff's Department; schools, community colleges and universities; parks and recreation; Department of Social Services; Probation; and others, pursuant to the NVRA. *See* 52 U.S.C. § 20506. Los Angeles County RR/CC anticipates needing to research, identify, and develop new guidelines, training, and a deployment plan in collaboration with these local entities and agencies to implement changes within a short period of time. Because of the restrictions prescribed by Section 6 of the EO, prohibiting non-citizens from participating in the administration of federal elections, these changes may also necessitate system-wide protocols for verifying the citizenship status of every individual who assists in the administration of the elections, including registering people to vote, providing facilities to serve as voting locations, and providing staff and volunteers to serve as election workers. These changes will require a significant investment of time and resources, given the significant policy and protocol changes, the thousands of people affected, and the challenges associated with implementing any changes necessary at state voter registration agencies on a short timeline, and absent established guidelines and uniform practices, especially because Section 2(d) purports to be in effect immediately.

**Potential Impacts of Executive Order Section 3(d)**

19. It is my understanding that Section 3(d) of the EO requires the Secretary of Defense to "update" the Federal Post Card Application pursuant to the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") to require (1) DPOC as described in Section 2(a) of the EO, and (2) proof of eligibility to vote in elections in the state in which the voter is attempting to vote. It appears that these changes to the UOCAVA voting process could take place at any time. *See* EO, § 3(d).

20. The mandated changes to voting pursuant to UOCAVA will create substantial administrative burdens on Los Angeles County RR/CC. The Federal Voting Assistance Program (FVAP) process is designed to allow registration by members of the military, their families, and Americans living abroad who cannot register to vote in-person while in their county of domicile. Depending on how the EO is implemented, it is possible that UOCAVA voters will not be allowed to register to vote at all, particularly if there is a requirement that they present DPOC in person in Los Angeles County. If the EO is implemented to allow individuals to upload an image or send a copy of their DPOC along with the completed Federal Post Card (voter registration) application (FPCA), RR/CC staff would need to review, determine the sufficiency, scan and upload an image(s) of the provided DPOC. As with other parts of the EO, additional staff, training and resources would be required. In addition, if the DPOC provided was determined not to be sufficient, additional staff time is expected to communicate with the individual to assist in curing the deficiency, if possible. In 2024, the County received over 14,000 FPCA voter registration applications from UOCAVA voters via fax, emails, and mail.

**Potential Impacts of Executive Order Sections 7(a) and 7(b)**

21. It is my understanding that Section 7(a) of the EO requires the Attorney General to "take all necessary action" to enforce the federal Election Day statutes "against States that violate these provisions," including by counting absentee or mail-in ballots received after Election Day in the final tabulation of the vote for federal offices. This provision of the EO appears to take immediate effect. *See* EO, § 7(a).

22. It is also my understanding that Section 7(b) of the EO directs the EAC to "condition any available funding to a State on that State's compliance with" federal law that requires states to adopt "uniform and nondiscriminatory standards" for what constitutes a valid and countable vote, including that "there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting" - but excluding ballots cast pursuant to the UOCAVA – "after which no additional votes may be cast." This direction to the EAC appears to take immediate effect. *See* EO, § 7(b).

23. Sections 7(a) and 7(b) of the EO could have substantial and adverse impacts on voting in Los Angeles County, as well as on the County's ability to adequately administer elections. First, the two sections present seemingly conflicting language, making it impossible for RR/CC to comply.  Section 7(a) appears to require the Attorney General to take all action necessary to enforce states from counting any ballots that are received by mail after Election Day. Section 7(b) appears to require the EAC to condition funding to states based on their creation of rules for enforcing Election Day receipt as the standard for what ballots are tabulated — with one exception, for Uniformed and Overseas Voters.  If RR/CC disqualifies all ballots received by mail after Election Day, in accordance with Section 7(a), we risk violating UOCAVA and state laws, and, based on the EO's language, we risk denial of federal funding.

Conversely, if RR/CC counts the ballots of Uniformed and Overseas voters cast on or before Election Day, but arriving after, RR/CC risks prosecution by the Attorney General under Section 7(a).

24. Further, Section 7(b) of the EO could potentially create two standards for handling ballots: UOCAVA ballots received by mail after Election Day, cast on or before Election Day could be counted; and those received under the same conditions from all other voters would not be counted.

25. In Los Angeles County, conservative estimates are that as many as 70,000-100,000 voters who cast ballots on or before Election Day could have their ballots disqualified from being counted because of the EO's ballot receipt requirements, which conflict with existing provisions of the California Elections Code and voting practices in the State of California that have existed for decades. Data shows that impacted voters are representative of the range and distribution of voter demographics in the County's voter population, including age, geographic location, and political party preference.

26. The County will be required to devote significant additional resources to a voter education campaign to properly administer elections in accordance with the EO's changes to ballot receipt deadlines and potential elimination of certain voting options. As with other parts of the EO, the County will be required to provide staff and election workers with training and supervision to ensure that votes are received and tabulated consistent with the EO's requirements.

**Potential Impacts of the Executive Order Generally**

27. The EO's commands will almost certainly disrupt RR/CC's ongoing work to prepare for upcoming elections. We are only months away from the start of the candidate filing

periods for the 2026 midterm elections. I have obligations to Los Angeles County's 5.8 million registered voters and its electoral districts/jurisdictions to prepare for those elections and work on behalf of their interests to ensure the administration of safe and fair elections but that work is now largely on hold given conflicting directives in Federal and State Law and the directives in the EO that must be resolved.

28.  To minimize disenfranchisement of eligible voters unable to register to vote because of new DPOC requirements, ballots being disqualified because of new ballot receipt deadlines, and other changes promulgated by the EO, the County will be required to mount a large-scale public information and educational campaign. Based on past experience, a voter education campaign designed to help County residents navigate significant election process changes is estimated to require a minimum investment of $20,000,000 for media and outreach. These resources would be used to educate an estimated 6 million registered and eligible voters about the election law changes and new processes to ensure minimal confusion and avoid disenfranchisement; thereby diminishing resources and activities that have been previously effective at encouraging voter participation and advising voters of verification options. The cost and effort of such a large-scale campaign is compounded by the fact that there is no lead time for the media campaign and voter outreach; typically, a Countywide media and outreach campaign of the EO's magnitude would require years in lead time to effectively plan and implement.

29.  **Risk of Disenfranchisement**. As to voting, a significant portion of eligible voters in the County are anticipated to be adversely affected if the EO's directive for Attorney General enforcement against states that permit the counting of timely cast ballots received after Election Day is permitted to take effect. In Los Angeles County, 2,732,752 voters utilized mail-in or absentee ballots to cast their votes in the 2024 General Election. Under state law, ballots that are

cast on or before Election Day may be counted in the tabulation of votes; Vote By Mail ballots must be post-marked on or before Election Day. State law allows Vote By Mail ballots that are appropriately post-marked to arrive within 7 days of Election Day at county election offices and be counted if all requirements are met. (Cal. Elec. Code § 3020). Based on our 2024 General Election experience, between 60,000-150,000 voters could be disenfranchised by the EO, if their ballots are disqualified because they arrive after Election Day.

30.     California law also allows voters who cast ballots on or before Election Day to cure technical errors within the canvassing period after Election Day, allowing their ballots to ultimately be counted. (Cal. Elec. Code § 3019). It is not clear whether the EO prohibits tabulating ballots cured after Election Day, or if doing so would be a basis for an enforcement action or the loss of funding against the County or State under Sections 7(a) and 7(b).

31.     **Potential Costs to Taxpayers.** In addition, to the extent California law does not currently comply with the Election Day ballot receipt rule outlined in Section 7 of the EO, the County risks a loss of federal elections funding that is integral to the County's ability to conduct elections. The County has previously received $7,085,920.49 of federal funding pursuant to HAVA. In this fiscal year, the County has dedicated staff and resources for network security, cyber threat monitoring and analysis, incident response, and training programs of security and network services teams amounting to approximately $700,000 (currently budgeted) with $49,000 in newly-awarded federal HAVA funding. The County also expects to spend $1.8 million in HAVA funds for Polling Place Accessibility work in 2024 and 2025 related and responsive to HAVA accessibility requirements.

32.     The funding threatened in Section 7(b) is critical to Los Angeles County's ability to conduct elections safely, accessibly and securely. For instance, LA County utilizes grants of

HAVA funding to make voting locations, including the path of travel, entrances, exits, and voting areas of each polling facility, physically accessible to individuals with the full range of disabilities to enhance their access to and participation in elections for federal and State office. LA County additionally uses federal grants to ensure the entire voting experience, including the design of ballots and ballot marking devices, provide the same opportunity for access, privacy and independence to individuals with the full range of disabilities as for other voters. These funds would also support acquisition or deployment of a remote accessible vote by mail system, which allows voters with disabilities to receive a blank ballot to mark electronically, print, and then cast by returning the printed ballot to the elections office. The funds also would cover the development, production, translation, and transcription into Braille of manuals, programs, posters, brochures, and other printed materials for training of election workers or Vote Center leads; formatting and re-printing materials into "large-type"; and the acquisition of items such as accessible voting tables, handrails, and magnifying glasses for voters with a range of disability accommodations. These funds are necessary to improve accessibility in accordance with the Americans with Disabilities Act.

I declare under penalty of perjury that the foregoing is true and correct.

    Executed on April __23__, 2025, at Norwalk, California.

                                                  */s/ Dean C. Logan*
                                                  Dean C. Logan
                                                  Registrar-Recorder/County Clerk
                                                  Los Angeles County