# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA; STATE OF
NEVADA; COMMONWEALTH OF
MASSACHUSETTS; STATE OF ARIZONA;
STATE OF COLORADO; STATE OF
CONNECTICUT; STATE OF DELAWARE;
STATE OF HAWAII; STATE OF ILLINOIS;
STATE OF MAINE; STATE OF
MARYLAND; PEOPLE OF THE STATE OF
MICHIGAN; STATE OF MINNESOTA;
STATE OF NEW JERSEY; STATE OF NEW
MEXICO; STATE OF NEW YORK; STATE
OF RHODE ISLAND; STATE OF
VERMONT; STATE OF WISCONSIN,

                 *Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity
as President of the United States; PAMELA
BONDI, in her official capacity as Attorney
General of the United States; UNITED
STATES ELECTION ASSISTANCE
COMMISSION; DONALD L. PALMER, in
his official capacity as Chairman of the U.S.
Election Assistance Commission; THOMAS
HICKS, in his official capacity as Vice Chair
of the U.S. Election Assistance Commission;
CHRISTY McCORMICK and BENJAMIN W.
HOVLAND, in their official capacities as
Commissioners of the U.S. Election Assistance
Commission; PETE HEGSETH, in his official
capacity as Secretary of Defense,

                 *Defendants.*

Case No. 1:25-cv-10810-DJC

## DECLARATION OF ROB ROCK

I, Rob Rock, declare as follows:

1.      I am a resident of the State of Rhode Island. I am over the age of 18 and have

personal knowledge of all the facts stated herein, except those matters stated upon information

1

and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.    I am the Deputy Secretary of State/Director of Administration for the State of Rhode Island. I work for Secretary of State Gregg M. Amore and support him in his official capacity as the Chief State Election Official for the State of Rhode Island. In my role, I assist Secretary Amore in the execution and enforcement of all state and federal laws relating to elections.

3.    I have served as the Deputy Secretary of State/Director of Administration for the RI Department of State for two years and three months. Prior to serving in this capacity, I was the state Elections Director from 2015-2023. I have undergraduate (Political Science) and Master's (Public Administration) degrees from the University of Rhode Island.

4.    The Secretary of State is Rhode Island's third ranking elected official, following the Governor and Lt. Governor. State law gives the Secretary of State many different duties. As Rhode Island's chief state election official, the Secretary of State oversees the state's voter registration system, certifies candidates, prepares ballots, and administers oaths of office. The Secretary of State also works with companies registered to do business in Rhode Island and regulates lobbying activity in the Executive and Legislative branches of government. The Secretary of State also must sign all laws and other official acts, such as issuing bonds, to make them official. Additionally, the Secretary of State processes, preserves, and gives public access to hundreds of thousands of historic documents and public records.

5.    The Secretary of State is Rhode Island's chief state election official responsible for the coordination of the State's responsibilities under the National Voter Registration Act of 1993 (NVRA) and complying with all state and federal laws relating to elections within the state.

2

*See* R.I. Gen. Laws § 17-6-1 (general powers), § 17-6-1.3 (designated chief elections official). The Department of State's Elections Division is responsible for implementing the Secretary of State's responsibilities regarding elections, including providing technical information to the public and other parties. In Rhode Island, elections administration is a collaboration among the Secretary of State's Elections Division, the State Board of Elections, and local cities and towns (local boards of canvassers).

6.      In my role as Deputy Secretary of State/Director of Administration, I am responsible for overseeing the administration of elections in Rhode Island, including overseeing the state's voter registration system, training local election officials on elections administration, maintaining the online voter registration and mail ballot application portals, certifying state and federal candidates, preparing ballots, preparing and sending mail ballots to voters, preparing election calendars, providing candidate and voter information guides, implementing a statewide elections education campaign, and providing voter identification cards. I have personally overseen these responsibilities since February 2015 and, therefore, have substantial first-hand knowledge of administering elections in Rhode Island, including voter registration requirements and the statewide voter registration system.

7.      I am familiar with the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO"). Sections 2(a), 2(d), and 3(d) of the EO have already caused considerable harm, confusion, and disruption in Rhode Island elections administration, and will likely continue to do so.

8.      It is my understanding that Section 2(a) of the EO directs the Election Assistance Commission ("EAC") to amend the national mail voter registration form ("Federal Form"), as provided by the National Voter Registration Act ("NVRA"), to require applicants to provide

3

"documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It outlines a limited number of specific documents that constitute acceptable DPOC, including several document types, like the REAL ID with proof of citizenship, that are not issued to Rhode Island residents. The EO also requires state and local officials to "record . . . the type" of DPOC presented at the time of voter registration, including recording specific information about the document. *Id.* § 2(a)(i)(B). The EO directs the EAC to "take appropriate action" within 30 days (i.e., by April 24, 2025) to impose these changes. *Id.* § 2(a)(i).

9.    The provisions of the EO, including Section 2(a), require immediate action from me and my team in the Elections Division to educate voters across Rhode Island. Our efforts to address the directed changes and impacts of the EO will divert time and attention from other critical election preparations. Despite being slightly over a year away from candidates filing for the 2026 election cycle, our team is involved in election preparations such as voter list maintenance activity, a training and certification program for our local election officials, and lobbying for legislation that would improve the conduct of elections in Rhode Island. There are also several special elections that state and local election officials are currently administering.

10.    In fact, shortly after the EO was issued, I immediately undertook steps to ensure that all Rhode Island election officials were well versed in the contents of the EO. These measures included briefings for office staff, including the Secretary of State, on the EO; ensuring distribution of the EO to all state and local elections officials; and preparing press releases and fielding questions from the public on the EO's new requirements.

11.    The EO has created an immediate need for answers to various questions related to implementation, ranging from big-picture considerations to granular issues. Specific concerns center around how cities and towns would handle the new voter registration requirements, how

4

our military and overseas citizens would comply with the new mandates, and how to combat the clear disenfranchisement of eligible Rhode Island voters.

12.    In addition to the immediate and continuing need to assess and understand the EO, my team and I were forced to quickly begin to think about multiple streams of work relevant to implementation of the EO's directives. In particular, the EO requires significant changes to Rhode Island's voter registration database. For instance, to integrate Section 2(a)'s requirements for DPOC on the Federal Form and record the document type into the statewide voter registration system will require modifying the database to include fields for recording the new information. The system will also need to be updated to create a second voter registration list containing voters who are eligible to vote yet do not have the means to provide proof of citizenship. These voters would be eligible to vote in state and local elections but would not be eligible to vote in federal elections. These modifications must be done carefully and must not be rushed. Updating complex systems risk unintended consequences because even minor changes have a ripple effect throughout the system. Additionally, updates to the system will be expensive which makes this EO an unfunded mandate on state and local election officials. Even if state funds are available, there is an annual budget process that does not align with the timetable of this EO, which makes it impossible to expend state funds on this matter.

13.    In addition to modifications to the voter registration system, the electronic poll book system would have to be updated to handle the bifurcated voter lists. Like voter registration system updates, backend software changes cannot be made in an accelerated and rushed timeframe. Additionally, these changes would require a significant allocation of funds, that were not provided for or contemplated in the EO.

5

14. While my team oversees the database changes discussed above, we must concurrently develop training materials and guidance documents for use by state and local election officials as soon as possible. This is yet another aspect of the EO's implementation that will divert resources to accomplish the EO's directives on the purported timeline. The State Board of Elections would also be required to redo all the poll worker training materials and modify their training procedures to comply with the EO.

15. The Federal Form is currently used and accepted in Rhode Island. It is widely available and well-known to local elections officials. The EO's directive to include a new DPOC requirement on the Federal Form, as well as the requirement that state and local election officials record the type of DPOC presented, will require substantial education on topics like (1) the new requirements and the documents that suffice, (2) how to implement the EO's commands regarding memorializing DPOC, and (3) ceasing use of the old form. Most notably, this EO will require a major revision to our online voter registration portal. Currently, tens of thousands of Rhode Island voters register to vote or update their voter registration information at vote.ri.gov. The portal requires a voter to enter their first name, last name, date of birth, zip code, and driver's license/state identification number to register to vote or update their address. Currently, the portal has no mechanism to accept a proof of citizenship document. Even if we update the portal to allow a document to be provided, this will further disenfranchise voters who do not have scanning equipment or are unable to visit a local board of canvassers office in-person during their municipality's operating business hours to register or update their information.

16. Apart from the impacts of immediately creating and implementing an education process for state and local election officials to learn about the EO's directed changes and requirements, the compressed timeline on which the EO purports to operate raises a distinct and

6

substantial risk of confusion or mistake by state and local election officials in their administration of voter registration and upcoming elections. Since the EO would fundamentally make online voter registration illegal in its current form, local boards of canvassers will have to manually enter most new and changed voter registrations by hand. This will undoubtedly lead to a significant increase in manual data entry mistakes, which ultimately will lead to a less accurate voter registration database. Local boards of canvassers will be forced to rely more frequently on poor handwriting and illegible documents when entering voter data. This will inherently make our state's elections less secure than they are at present, causing immediate and irreparable harm to the integrity of any elections conducted under the EO's directed framework.

17.     A separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters are aware of the new registration requirements. To begin the process of educating the public, we will need to change our website and external-facing resources with updated and corrected information regarding the documentation required to register to vote with the Federal Form, and we will need to do so on the accelerated timeline contemplated by the EO. To ensure voters are educated on the new processes, our office will engage in a statewide campaign in which significant resources will be dedicated. It is imperative that we visit senior and community centers, high schools, colleges, community events, parades, nursing homes, assisted living facilities and many more to educate voters about the drastic changes in the EO. Additionally, our office spent $83,000 to ensure voters had relevant elections information ahead of the 2024 election. I expect outreach to cost significantly more regarding this EO.

18.     This public education campaign, which we will need to run at least through the conclusion of the 2026 midterm election, and perhaps thereafter, will likely cost hundreds of

7

thousands of dollars. Due to state budget constraints, the forced reliance on federal grant money means other important aspects of elections administration like cybersecurity improvements and voting equipment upgrades will be in jeopardy.

19.    Since the EO was announced, we have received several inquiries from the public related to the new registration requirements. Responding to these requests has required the Office to develop talking points and devote staffing to respond to these inquiries.

20.    Apart from the costs associated with the massive public education campaign required to reach eligible voters to inform them of changes to the registration process and the other state costs identified above, the directives in the EO also risk voter disenfranchisement. The most common way to prove citizenship is by producing a US passport or a birth certificate. According to Massachusetts Institute of Technology (MIT) professor Charles Stewart, 40% of Rhode Island residents do not have a passport. To obtain one, it can cost up to $165, not to mention the time and effort required. Additionally, people who have changed their name (whether because of marriage or another reason) do not have a birth certificate that has their current information on it. As an example, to obtain a certified vital record birth certificate from the City of Providence, it costs $22. Hundreds of thousands of Rhode Island voters will potentially be disenfranchised or forced to spend money to register to vote or change their voter information.

21.    The risk of voter disenfranchisement is far outweighed by the lack of evidence of any widespread voter fraud in Rhode Island. In 2020 over 521,000 people cast a ballot and only three people were prosecuted for voter fraud. None of those cases involved non-citizen voting. Rather, in each of the three cases, the voters cast ballots in Rhode Island and in another state. Those three prosecutions represent .0000057% of the total votes case in that election.

8

22.     It is my understanding that Section 2(d) of the EO requires "[t]he head of each Federal voter registration executive department or agency" under Section 20506(a) of the NVRA to "assess citizenship" before providing a federal voter registration form to enrollees of public assistance programs. *See* EO § 2(d). This section of the EO is ambiguous, but potentially encompasses a wide range of state and local offices that provide services to low-income and disabled residents. In other words, the EO potentially requires state voter registration agencies to immediately begin assessing for citizenship before they may even offer a federal voter registration form to a potential registrant. It is unclear what kind of "assessment" the EO contemplates, but I am unaware of any federal legal requirement for an assessment of citizenship before a form is provided. This provision purports to take effect immediately. *Id.*

23.     Because Section 2(d) of the EO may require designated state voter registration agencies to "assess citizenship" before providing applicants for public assistance benefits a federal voter registration form, the EO may require substantial coordination among the Secretary of State, the State Board of Elections, and state voter registration agencies like the Division of Motor Vehicles. There are currently six state offices or agencies designated as voter registration agencies in Rhode Island pursuant to the NVRA. *See* 52 U.S.C. § 20506; R.I. Gen. Laws § 17-9.1-7 (registration at DMV), § 17-9.1-8 (permitting registration at other designated places). The State Board of Elections oversees voter registration at state agencies. Their office will be responsible for ensuring that those agencies comply with the EO and affected rules, regulations, and procedures which will draw their attention away from other important elections administration tasks such as improvements to poll worker training and assessments of the state's current voting equipment. The Board is also currently overseeing several special elections.

9

24.     It is my understanding that Section 3(d) of the EO requires the Secretary of Defense to "update" the Federal Post Card Application pursuant to the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") to require (1) DPOC as described in Section 2(a) of the EO, and (2) proof of eligibility to vote in elections in the state in which the voter is attempting to vote. It appears that these changes to the UOCAVA voting process could take place at any time. *See* EO, § 3(d).

25.     As with the changes outlined in Sections 2(a) and 2(d), the EO's changes to UOCAVA will require our office to expend resources to educate military and overseas voters on the new requirements and to do everything we can to ensure their ballot will be received in time and that they will not be disenfranchised. We will utilize resources updating our educational materials, mail ballot instructions, and online content. These resources will take away from other important elections administration work like securing our systems.

26.     The EO's commands also disrupt my team's ongoing work to prepare for upcoming elections. We are only 14 months away from the start of the candidate filing period for the 2026 midterm elections. I have obligations to Rhode Islanders to prepare for those elections and work on behalf of their interests, but that work is now sidetracked as I oversee Rhode Island's response to the EO.

27.     It is my understanding that Section 7(a) of the EO requires the Attorney General to "take all necessary action" to enforce the federal Election Day statutes "against States that violate these provisions," including by counting mail ballots received after Election Day in the final tabulation of the vote for federal offices. This provision of the EO appears to take immediate effect. *See* EO, § 7(a).

10

28.    It is also my understanding that Section 7(b) of the EO directs the EAC to "condition any available funding to a State on that State's compliance with" federal law that requires States to adopt "uniform and nondiscriminatory standards" for what constitutes a valid and countable vote, including that "there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," excluding ballots received after Election Day from tabulation. This direction to the EAC appears to take immediate effect. *See* EO, § 7(b).

29.    Sections 7(a) and 7(b) of the EO have substantial and adverse impacts on voting in Rhode Island, as well as the State's ability to adequately administer elections. Although R.I. Gen. Laws § 17-20-16 generally requires that ballots must be received by 8 p.m. on Election Day, the Rhode Island General Assembly provided an exception for ballots cast by uniformed and overseas citizens pursuant to UOCAVA, which may be counted if received by 4 p.m. on the seventh day following an election or the third day following a primary. R.I. Gen. Laws § 17-20-16; § 17-20-6.1. Due to the various locations around the world that our military and overseas voters are stationed or live, the mail service is oftentimes inadequate, at best. Providing the extra seven days for an election and extra three days for a primary allows those who are fighting for our country more time for mail services to deliver their ballots to the proper election officials.

30.    This EO will undoubtedly prevent some of our military personnel from casting their ballots in a timely fashion. They will be disenfranchised if the EO's directive for Attorney General enforcement against states that permit the counting of timely cast ballots received after Election Day is permitted to take effect. In Rhode Island, 3,564 voters utilized the UOCAVA mail ballot process to cast their votes in the 2024 federal elections. Under state law, such ballots can be counted in the tabulation of votes if cast on or before Election Day, even if the mail ballot is received by state election officials within 7 days after Election Day. In the 2024 general

11

election, 34 UOCAVA mail ballots were mailed before but received after Election Day. Under the EO, these votes would be excluded from the final count, even though timely received under state law.

31. Additionally, to properly administer elections in accordance with the EO's Election Day rule, and to minimize the number of voters whose ballots will be disregarded for being received after Election Day, Rhode Island will be required to devote additional resources to address the EO's Election Day provisions. As with other parts of the EO, Rhode Island will be required to change processes to ensure that votes are received and tabulated consistent with the EO's requirements. At the same time, Rhode Island will be required to offer additional public information and educational resources to provide voters with awareness and familiarity with the new ballot deadline rule.

32. Rhode Island law also allows voters who cast ballots on or before Election Day to cure technical errors within seven days after an election and within three days after a primary, allowing their ballots to ultimately be counted. *See* 410 R.I. Code of Regulations § 20-00-23.12. Over 100 voters were contacted about curing their mail ballot in the 2024 general election. It is not clear whether the EO prohibits tabulating ballots cured after Election Day, or if they would instead be a basis for enforcement action against Rhode Island or the loss of funding under Sections 7(a) and 7(b).

33. In addition, to the extent Rhode Island law does not currently comply with the Election Day rule outlined in Section 7 of the EO, Rhode Island risks a loss of substantial federal elections funding that could adversely affect the state's ability to conduct functional elections. Since 2018, Rhode Island has received $9.2 million of federal funding pursuant to the Help Americans Vote Act ("HAVA"). This funding is used to help facilitate the administration of

12

elections at the state and local levels. In the last six years, we have provided security grants to the cities and towns, built a new voter registration system, purchased state-of-the-art voting equipment, and procured cybersecurity training for the state's election officials all with federal funds. Additionally, through September 30, 2022, Rhode Island received over $13 million of federal funding pursuant to HAVA section 251 grants, which were used to buy new voting equipment and keep up with federal laws related to accessible voting units. The loss of funding threatened in Section 7(b) would adversely impact Rhode Island's ability to safely and efficiently conduct elections. Technological improvements, law changes, and directives from federal and state leaders, though often well-intended, create challenges for election officials. Federal funds have been instrumental in making elections administration better in Rhode Island. The loss of federal funds would have a significant negative impact on how elections are administered in Rhode Island.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 23, 2025, at Providence, RI.

Rob Rock
Deputy Secretary of State/Director of Administration
Rhode Island Department of State

13