**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF CALIFORNIA, *et al.*,

      *Plaintiffs*,

v.

DONALD J. TRUMP, *et al.*,

      *Defendants*.

Case No.: 1:25-cv-10810-DJC

Leave to file granted on May 16, 2025

## BRIEF OF *AMICI CURIAE* LOCAL ELECTION OFFICIALS IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Jonathan B. Miller (BBO #663012)
Michael Adame*
Shannon Eddy*
Samantha Perlman*
Public Rights Project
490 43rd Street, #115
Oakland, CA 94609

*Pro hac vice applications forthcoming*

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

STATEMENT OF INTEREST.................................................................................1

SUMMARY OF ARGUMENT ..............................................................................2

ARGUMENT ........................................................................................................3

I.   THE EXECUTIVE ORDER'S DOCUMENTARY PROOF OF
     CITIZENSHIP REQUIREMENTS ARE ILLEGAL, IMPRACTICAL,
     AND DISENFRANCHISING ............................................................................3

     A.  Sections 2(a) and 3(d) Would Disenfranchise Voters..................................4

     B.  Sections 2(a) and 3(d) Would Cause Significant Disruption to
         Local Election Administration..................................................................10

     C.  Noncitizen Voting Is Very Rare ...............................................................14

II.  THE EXECUTIVE ORDER'S IMPROPER ATTEMPT TO ALTER
     STATE BALLOT RECEIPT DEADLINES WOULD CAUSE
     ADMINISTRATIVE CONFUSION, PLACE BURDENS ON LOCAL
     ELECTION OFFICIALS, AND LEAD TO VOTER
     DISENFRANCHISEMENT ...........................................................................16

     A.  Section 7 Would Lead to Voter Disenfranchisement .................................17

     B.  Section 7 Creates Administrative Confusion and Burdens.........................18

CONCLUSION...................................................................................................20

Appendix A—List of *Amicus Curiae* .....................................................................22

# TABLE OF AUTHORITIES

**CASES**

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*,
  48 F.3d 618 (1st Cir. 1995) ............................................................................2, 4

*Coal. for Open Democracy v. Formella*,
  24-cv-00312 (D.N.H.) ..........................................................................................8

*Democratic Nat'l Comm. v. Wisconsin State Legislature*,
  141 S. Ct. 28 (2020) ...........................................................................................20

*Fish v. Schwab*,
  957 F.3d 1105 (10th Cir. 2020) .....................................................................6, 15

*Kobach v. U.S. Election Assistance Comm'n*,
  772 F.3d 1183 (10th Cir. 2014) ...........................................................................5

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
  2025 WL 1187730 (D.D.C. Apr. 24, 2025) .........................................................4

*Mi Familia Vota v. Fontes*,
  719 F. Supp. 3d 929 (D. Ariz. 2024)............................................................14, 16

*N.H. Youth Movement v. Scanlan*,
  24-cv-00291 (D.N.H) ............................................................................................8

*United States v. Alabama*,
  778 F.3d 926 (11th Cir. 2015) ..............................................................................5

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ...............................................................................................3, 4

**STATUTES**

42 U.S.C. § 405 (note) .............................................................................................13

49 U.S.C. § 30301 (note) ...........................................................................................6

52 U.S.C. § 20301(a) .................................................................................................3

52 U.S.C. § 20301(b) ............................................................................................3, 5

52 U.S.C. § 20302(a) ............................................................................................3, 5

52 U.S.C. § 20501(a) ........................................................................................1, 4, 9

52 U.S.C. § 20501(b) ...........................................................................................5, 7

52 U.S.C. § 20505(a) ...........................................................................................3, 5

52 U.S.C. § 20506(a) ..............................................................................................5

52 U.S.C. § 20507 ..................................................................................................15

52 U.S.C. § 20508(b) ...........................................................................................3, 5

Mich. Comp. Laws § 168.497(1)-(2) ....................................................................11

Or. Rev. Stat. § 247.292........................................................................................15

Or. Rev. Stat. § 247.555........................................................................................15

Or. Rev. Stat. § 247.563........................................................................................15

Or. Rev. Stat. § 247.570........................................................................................15

25 Pa. Stat. § 1329 ...............................................................................................15

Wash. Rev. Code §§ 29A.08.810-.850 ..................................................................15

**CONSTITUTIONAL PROVISIONS**

Cal. Const. art. XX, § 3...........................................................................................1

Mich. Const. art. XI, § 1 .........................................................................................1

N.M. Const. art. XX, § 1 .........................................................................................1

**EXECUTIVE ORDERS**

Executive Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025)................ *passim*

**OTHER AUTHORITIES**

*Access to and Usage of faxing by Military and Overseas Voters*, The
    Council of State Governments (July 2022)........................................................12

*Apply for your First Adult Passport*, U.S. Dep't of State ........................................8

*Birth, death, and other vital records*, Colorado Dep't of Public Health and
    Environment ......................................................................................................8

iii

Caitlyn Freeman & Jenn Smith, *As Real ID deadline becomes reality, WA wait times stretch really long*, THE SEATTLE TIMES (May 6, 2025)..................11

*Celebrate National Voter Registration Day!*, City of Madison (Sept. 16, 2024)......................................................................................................................9

*Federal Post Card Application*, Federal Voting Assistance Program...................13

H.R. Rep. No. 115-150 (2017)...............................................................................14

Holly Ramer, *et. al.*, *New Hampshire town elections offer a preview of citizenship voting rules being considered nationwide*, ASSOCIATED PRESS (Mar. 25, 2025)..........................................................................................8

Letter from Nat'l Ass'n of Sec's of State and Nat'l Ass'n of State Election Directors to Postmaster General Louis DeJoy (Sept. 11, 2024)........................18

Matt Mencarini, *Township clerks run elections for half of Michigan residents. But what if no one wants the job?*, LANSING STATE JOURNAL (Oct. 23, 2024)..................................................................................................11

*Mobile Voter Services Satellite Office Outreach*, Montgomery County (May 2, 2025)......................................................................................................9

*Mobile Voter Services Satellite Office Outreach*, Montgomery County (May 8, 2025)......................................................................................................9

National Voter Registration Application Form for U.S. Citizens, OMB Control No. 3265-0015.......................................................................................13

Nikki DeMentri & Tom Gardiner, *On final day of mail ballot voting on demand in Pennsylvania, Bucks County voters face long lines*, CBS NEWS (Oct. 30, 2024).......................................................................................11

Olivia Rubin, *Georgia voter roll audit finds only 20 noncitizens out of 8 million registered voters*, ABC NEWS (Oct. 23, 2024)......................................16

*Processing Times*, Commonwealth of Pennsylvania ...............................................8

Steve Simon, *ICYMI: Secretary Simon Remarks on Federal Support for Election Security*, Office of the Minnesota Secretary of State (Mar. 4, 2025).................................................................................................................14

*Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots*, National Conference of State Legislatures, (Apr. 24, 2025).............................17

Trishna Begam, *Center for Internet Security facing federal funding cuts*,
    NEWS10 (Apr. 22, 2025)......................................................................................14

*U.S. courts prepare for increase in election lawsuits*, American Bar
    Association (Oct. 28, 2024)..............................................................................19

U.S. Election Assistance Comm'n, Dkt. No. EAC-2013-0004, Mem.
    Concerning State Requests to Include Additional Proof-of-Citizenship
    Instructions on the National Voter Registration Form (Jan. 17, 2014) .........9, 15

Wayne Schutsky, *Arizona counties are contacting 200,000 voters who
    haven't provided proof of citizenship*, KJZZ PHOENIX (Apr. 2, 2025)................6

*Who Lacks Documentary Proof of Citizenship?*, Center for Democracy and
    Civic Engagement (Mar. 2025)..........................................................................7

Yvonne Wingett Sanchez & Patrick Marley, *Grants tie Trump's anti-DEI
    order to election security money*, WASH. POST (Apr. 29, 2025) .......................20

## STATEMENT OF INTEREST

*Amici* are local election officials from 30 jurisdictions and sign this brief in their individual capacities in support of Plaintiffs' Motion for a Preliminary Injunction against the implementation of an executive order entitled, "Preserving and Protecting the Integrity of American Elections." Executive Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025) ("EO," or "Executive Order").[1] *Amici* are responsible for administering local, state, and federal elections in their respective localities. Upon taking office, many *amici* swore to uphold or defend the Constitution of the United States,[2] including the right to vote, and are duty-bound under the National Voter Registration Act ("NVRA") to "promote the exercise of that right," 52 U.S.C. § 20501(a). All are unified in their commitment to ensuring that every eligible voter has an opportunity to cast a ballot. To carry out these duties, *amici* develop policies and procedures for their offices, train staff and poll workers, educate voters, and respond to real-time constituent needs within their respective states and localities.

As the front-line workers of election administration, *amici* are well-positioned to understand the practicalities of running elections and write to offer their perspective on the potential impact of the EO to the Court. Variances in state election codes mean that local election officials across

---

[1] No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparation or submission of this brief. A list of all *amici* is attached at Appendix A.

[2] *See, e.g.*, Cal. Const. art. XX, § 3 (". . . all public officers and employees . . . swear (or affirm) [to] support and defend the Constitution of the United States . . . ."); Mich. Const. art. XI, § 1 ("All officers . . . [swear to] support the Constitution of the United States . . . ."); N.M. Const. art. XX, § 1 ("Every person elected or appointed to any office shall . . . take and subscribe to an oath or affirmation that he will support the constitution of the United States . . . .").

1

the country do not share the exact same day-to-day experience—some serve hundreds of thousands of voters, operating bustling offices with multiple full-time staff members, while others serve individual townships, operating part-time as the jurisdiction's sole election administrator. But while their day-to-day operations may differ, *amici* agree on the effects of the EO: it will disenfranchise voters and cause significant disruption to local election administration.

## SUMMARY OF ARGUMENT

In addition to violating the Constitution and federal statutes as the Plaintiffs demonstrate, the EO's directives do not "protect the integrity" of election administration. Instead, if implemented, they would severely disrupt election administration at the local level. Requiring voters to present documentary proof of citizenship to register to vote makes it more difficult to register, contrary to the purposes of federal statutes passed to facilitate the right to vote. Such requirements would both disenfranchise voters and compromise state and local election administration resources that are already stretched thin by adding burdensome steps to registration processes. Likewise, the EO directs states to stop accepting and counting mail-in ballots that arrive after Election Day, often in violation of states' own election laws. If implemented, this change would also cause voter disenfranchisement and augment election administration workloads. These results are not in the public interest.

"The purpose of a preliminary injunction is to preserve the status quo . . . ." *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 620 (1st Cir. 1995). An injunction would prevent the expenditure of very limited local government resources to address provisions of the Executive Order that will likely eventually be found to be unlawful. Attempts to implement the EO would cause significant disruption to election administration and voter registration.

Accordingly, this Court should enjoin its enforcement to preserve the status quo and ensure the orderly administration of elections while litigation continues.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). *Amici* agree with Plaintiffs' assessment that they are likely to succeed on the merits and write to affirm that not only will Plaintiffs suffer irreparable harm, but so will voters and local elections officials who serve on the front lines of election administration. Granting the injunction is emphatically in the public interest.

## I.   THE EXECUTIVE ORDER'S DOCUMENTARY PROOF OF CITIZENSHIP REQUIREMENTS ARE ILLEGAL, IMPRACTICAL, AND DISENFRANCHISING

The EO's documentary proof of citizenship ("DPOC") directives are contrary to the public interest because, in addition to being unlawful as the Plaintiffs make clear, the directives would disenfranchise voters and cause significant disruption to the orderly administration of elections at the local level. The EO directs the Election Assistance Commission ("EAC") and the Secretary of Defense to take action to require DPOC to register to vote using both the National Mail Voter Registration Form (the "Federal Form"), prescribed by the NVRA, 52 U.S.C. §§ 20505(a)(1), 20508(b), and the Federal Post Card Application ("Post Card Form"), mandated by the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 52 U.S.C. §§ 20301(a)-(b)(2), 20302(a)(4). In addition to ordering the EAC to "take appropriate action to require" DPOC as part of the Federal Form, Executive Order § 2(a)(i)(A), the EO also requires state or local officials who

3

process Federal Forms to record information about each registrant's DPOC "while taking appropriate measures to ensure information security," *id*. § 2(a)(i)(B).

The President cannot order these changes. *See* Pl. Mem. in Supp. of Mot. for Prelim. Inj. at 7-14 ("Pl. Br."), ECF No. 76. Congress and the EAC have both already considered, and rejected, the prospect of adding proof of citizenship requirements to the voter registration process, which would disenfranchise voters and significantly disrupt the orderly administration of elections. The President does not have authority to override those decisions by executive order. Granting the injunction to "preserve the status quo," *CMM Cable Rep.*, 48 F.3d at 620, is absolutely in the "public interest," *Winter*, 555 U.S. at 20.

### A.    Sections 2(a) and 3(d) Would Disenfranchise Voters

Implementation of the EO's DPOC requirements would frustrate the purposes of the NVRA and UOCAVA by making it harder to vote. It would require voter registration applicants who do not have official copies of DPOC at home to overcome multiple administrative hurdles to obtain DPOC in advance of registration deadlines, straining scarce local government resources and rendering ineffective the efforts of *amici* to fulfill their duty to make voter registration accessible to all eligible voters. 52 U.S.C. § 20501(a). Indeed, in parallel litigation, one court has already found "a substantial risk that, absent an injunction, . . . citizens will be disenfranchised in the present federal election cycle." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 2025 WL 1187730, at *43 (D.D.C. Apr. 24, 2025) (quotation omitted).

Congress passed the NVRA to "*increase* the number of eligible citizens who register to vote in elections for Federal office . . . [and] make it possible for Federal, State, and local governments to implement this chapter in a manner that *enhances* the participation of eligible

citizens as voters . . . ." 52 U.S.C. § 20501(b) (emphasis added). The NVRA created the Federal Form, which participating states must accept to register voters, *id*. § 20505(a)(1), along with any "equivalent" forms of their own, *id*. § 20506(a)(6). Congress has already determined how the Form may evaluate citizenship: by including an attestation from the voter that they are eligible to vote. *Id*. § 20508(b)(2)-(3); *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1195 n.7 (10th Cir. 2014) ("Both houses of Congress debated and voted on the specific question of whether to permit states to require documentary proof of citizenship in connection with the Federal Form, and ultimately rejected such a proposal.").

Similarly, UOCAVA, the statute that provides for the creation of the Post Card Form, 52 U.S.C. §§ 20301(b)(2), 20302(a)(4), is "aimed at ending the widespread disenfranchisement of military voters stationed overseas" and in it "Congress unequivocally committed to eliminating procedural roadblocks, which historically prevented thousands of service members from sharing in the most basic of democratic rights." *United States v. Alabama*, 778 F.3d 926, 928 (11th Cir. 2015). UOCAVA directs the President's designee to "prescribe an official post card form" for military and overseas voters to use to register and request ballots, 52 U.S.C. § 20301(b)(2), and "consult State and local election officials in carrying out" that effort, *id.* § 20301(b)(1).

It falls to many of *amici* to effectuate voter registration under UOCAVA and the NVRA, and to them, the reasoning of Congress in rejecting DPOC requirements is intuitive: more barriers to voting lead to more disenfranchisement. But that conclusion is not mere conjecture. When states institute DPOC requirements, fewer eligible voters are able to register to vote, and completing the registration process requires more time from election administrators. For example, when Kansas attempted to impose DPOC requirements in 2011, around 12 percent of all registrants' applications

were rejected, even though it was undisputed that nearly all of them were U.S. citizens. *Fish v. Schwab*, 957 F.3d 1105, 1128 (10th Cir. 2020). And in Arizona, where state law has required some form of proof of citizenship in state and local elections for over 20 years, county recorders are still grappling with paperwork issues, costing significant time to follow up with voter registration applicants who did not submit correct documentation in initial applications.[3]

This result is not surprising. To start, many eligible voters simply do not have proof of citizenship readily available. The EO's DPOC requirement appears to be met through production of a passport; military ID that indicates citizenship; or photo ID along with additional proof of citizenship. However, what qualifies as additional proof is unspecified in the order, a source of confusion and concern for local election officials. Executive Order § 2(a)(ii).[4] To someone removed from realities of voter registration, requiring DPOC may seem like a reasonable requirement, but *amici* know that it in fact presents significant challenges for many eligible voters that can ultimately result in disenfranchisement. For example, only about half of Americans have

---

[3] Wayne Schutsky, *Arizona counties are contacting 200,000 voters who haven't provided proof of citizenship*, KJZZ PHOENIX (Apr. 2, 2025), https://perma.cc/89DN-6X2H (Election officials are reaching out to an estimated 200,000 voters to resolve these issues; one official said she is handling them in batches "to give my small staff the ability to keep up with the influx of calls and responses.")

[4] In addition to standalone proof of citizenship documents (a passport or certain kind of military ID), the EO indicates that a REAL ID-compliant document that "indicates the [voter registration] applicant is a citizen of the United States" would also qualify as DPOC. EO § 2(a)(ii)(B). But the REAL ID Act does not require states to indicate citizenship status on the REAL ID card, and thus few do. REAL ID Act § 202(c)(2)(B) (codified at 49 U.S.C. § 30301 (note)).

a passport, Logan Decl. ¶ 12, Pl. Br., ECF No. 76-14, and millions of eligible voters do not have other traditional forms of DPOC like birth certificates ready to produce.[5]

Requiring proof of citizenship to register to vote would have a mass disenfranchising effect. It would disproportionately impact groups that include elderly voters, whose birth certificates were issued long ago; tribal members, whose documents may not align with federal standards; university students, who may live away from their residences for part of the year; unhoused people, who may not have secure locations to store documentation or reliable mailing addresses to receive documentation; eligible incarcerated voters, whose access to documentation is restricted; and low-income voters, for whom paying for new copies of DPOC is prohibitive, among many others.

The impact of the DPOC requirement is not limited to these groups. It can also make voter registration harder, not easier, for people amid other life events, contrary to the purpose of the NVRA. 52 U.S.C. § 20501(b). For example, people who change their names shortly before an election registration deadline will not have a passport or other proof of citizenship that matches the new name and may not be able to gather the appropriate documentation in time to register. Additionally, many local governments run passport acceptance facilities responsible for processing passport applications, which can leave passport applicants without DPOC as registration deadlines approach. Someone using their official birth certificate to apply for a

---

[5] A University of Maryland Survey conducted to gauge the potential impact of the SAVE Act, legislation that would require DPOC to register to vote, found that "[o]ver 21.2 million eligible voters (9%) across the county do not have, or do not have easy access to, DPOC." *Who Lacks Documentary Proof of Citizenship?*, Center for Democracy and Civic Engagement at 3 (Mar. 2025), https://perma.cc/53UU-YJM3.

passport will have to hand over citizenship documentation for the duration of the passport processing time, which can be over two months.[6] New birth certificates can take weeks to process.[7] Eligible voters who do not have voting registration deadlines top of mind when applying for a passport can thus have their right to vote ensnared by red tape.

One area of particular concern includes whether people who have changed their name are required to obtain extra documentation about their name change to vote. The experience of New Hampshire, which just adopted a new voter identification law requiring DPOC to register, has shown that this concern is not hypothetical. While the impact of the law is still being assessed in litigation,[8] news reports indicate that multiple people attempting to register and vote in a recent lower-turnout local election had to be turned away, including one who did not have sufficient documentation from her first marriage in the 1970s, while at least one other voter who had changed her name in marriage had to make three trips to her polling place before she was able to vote due to confusion over the proof of identification requirements related to her name change.[9]

---

[6] *Apply for your First Adult Passport*, U.S. Dep't of State, https://perma.cc/HML2-NSNA (indicating that passport applicants nationwide should allow for up to ten weeks to receive their passport in the mail between processing and mailing times).

[7] *See, e.g.*, *Processing Times*, Commonwealth of Pennsylvania, https://perma.cc/7E3T-8SHP (birth certificates take about three weeks to process); *Birth, death, and other vital records*, Colorado Dep't of Public Health and Environment, https://perma.cc/QXM4-7YN8 (normal birth vital records processing time is thirty days).

[8] *See N.H. Youth Movement v. Scanlan*, 24-cv-00291 (D.N.H); *Coal. for Open Democracy v. Formella*, 24-cv-00312 (D.N.H.).

[9] Holly Ramer, *et. al.*, *New Hampshire town elections offer a preview of citizenship voting rules being considered nationwide*, ASSOCIATED PRESS (Mar. 25, 2025), https://perma.cc/4SNA-Y26U.

Additionally, some *amici* run voter registration drives in the community to meet eligible voters where they are—an effort that would be stymied by DPOC requirements. For example, one *amici's* elections office in Madison, Wisconsin prides itself on attending community events to register voters. Their National Voter Registration Day activities in 2024 included events held at food pantries, botanical gardens, pizza shops, libraries, churches, and bakeries.[10] And Montgomery County, Pennsylvania, invested in a voter services van to reach voters where they are. Thus far in May 2025, it has been scheduled to register voters and perform other voter services at a town's "First Friday" community event and at a shopping mall.[11] If registration required DPOC, *amici* in counties that provide such services would find their efforts to fulfill their duty to promote registration to be ineffective under the EO's directives: most people do not bring their passports or birth certificates to pick up their pizza.[12]

Local, state, and federal governments all have a statutory duty to promote the exercise of the right to vote. 52 U.S.C. § 20501(a). The EO not only abdicates the federal government's

---

[10] *Celebrate National Voter Registration Day!*, City of Madison (Sept. 16, 2024), https://perma.cc/LMH7-ZX8D.

[11] *Mobile Voter Services Satellite Office Outreach*, Montgomery County (May 2, 2025), https://perma.cc/9ZYS-2RZP; *Mobile Voter Services Satellite Office Outreach*, Montgomery County (May 8, 2025), https://perma.cc/N2PC-K34K.

[12] In fact, the EAC identified the harmful effect that DPOC requirements would have on community voter registration drives when rejecting Arizona's and Kansas's bids to add DPOC to the federal form in 2014. U.S. Election Assistance Comm'n, Dkt. No. EAC-2013-0004, Mem. Concerning State Requests to Include Additional Proof-of-Citizenship Instructions on the National Voter Registration Form at 42 (Jan. 17, 2014), https://perma.cc/3BZK-2B4L (The EAC found that requiring DPOC on the federal form could "discourage the conduct of organized voter registration programs, undermining one of the statutory purposes of the Federal Form.").

responsibility to facilitate voting by making it more difficult and complicated to vote but also would impede local governments' efforts to promote the right to vote.

**B.      Sections 2(a) and 3(d) Would Cause Significant Disruption to Local Election Administration**

Local elections offices will face extensive administrative challenges if the EAC were to carry out the EO's direction to require DPOC on the Federal Form, Executive Order § 2(a), and Post Card registration, *id*. at § 3(d). The directive to review and record DPOC would require significant staff time and resources, already strained in many local elections offices.

First, DPOC review would require additional policy development and training for staff, followed by creation and dissemination of voter education materials. For example, the Clerk-Recorder in Nevada County, California explained that her office would have to "map out the details on office process updates, update manuals, incorporate any future state-based laws or regulations [related to the EO], and train temporary staff for the next election cycle." Adona Decl. ¶ 13 Pl. Br., ECF No. 76-6. Then, in addition to answering voter calls from confused or concerned voters, *amici* and their staff would have to devote time to educating voters. Such outreach would vary by county depending on resources and voter needs, but could include updating website and social media materials, taking out ad space on the radio, sending mailers, and translating all such outreach materials into languages sufficient to reach all voters in their communities.

Second, DPOC review would require additional staff time to process each Federal Form and Post Card Form in states where local officials would be responsible for such review. In many

10

cases, this is simply not possible with current staff and infrastructure.[13] If every voter registration application took even only a few more minutes to process, offices could be overwhelmed. In smaller jurisdictions, minimal staff and resources can make it difficult to tolerate major administrative changes. For example, in Michigan, local clerks who are responsible for carrying out voter registration often work part time in smaller townships, without any support staff. Mich. Comp. Laws § 168.497(1)-(2) (qualified individuals may register to vote with township clerks).[14] These part-time clerks may not be sufficiently resourced to review and record paperwork required to prove citizenship on top of their existing duties.

Longer processing times could overload government functions beyond elections as eligible voters rush to vital records offices to get DPOC like birth certificates in time to meet voter registration deadlines. *Amici* have seen these rushes cause service bottlenecks as deadlines approach in the voting context, requiring additional staff time to meet voter needs and creating longer waits for voters.[15] Adding steps to review and record DPOC would not only worsen these

---

[13] Adona Decl. ¶ 11, Pl. Br., ECF No. 76-6 (The Nevada County Clerk-Recorder/Registrar further testified: "[A]dditional staff will be required to successfully implement the EO to ensure the same level of service and continuity of operations in my office.").

[14] Matt Mencarini, *Township clerks run elections for half of Michigan residents. But what if no one wants the job?*, LANSING STATE JOURNAL (Oct. 23, 2024), https://perma.cc/S82P-K8N5 (For example, a clerk in Noble Township in Michigan serves 400 voters on a salary of $4,000 per year and cannot afford basic office resources like a photocopier.).

[15] Nikki DeMentri & Tom Gardiner, *On final day of mail ballot voting on demand in Pennsylvania, Bucks County voters face long lines*, CBS NEWS (Oct. 30, 2024), https://perma.cc/N6VX-VNHW. In a recent example of ID-related bottlenecks, governments have been overwhelmed by appointments to obtain REAL IDs, even though the REAL ID deadline has been pushed back repeatedly. Caitlyn Freeman & Jenn Smith, *As Real ID deadline becomes reality, WA wait times stretch really long*, THE SEATTLE TIMES (May 6, 2025), https://perma.cc/M8JB-QZNA.

long waits and overtime hours at offices that process voter registration, but also would extend such bottlenecks to other local government offices that process identification documents.

Apart from general administrative burdens, the EO also creates an unfunded requirement that election officials collect and store sensitive data—an endeavor that could require building new databases and increasing cybersecurity. Specifically, it requires state or local officials to record information about the DPOC, including sensitive information like any "unique identification number associated with the document," while also "tak[ing] appropriate measures to ensure information security." Executive Order § 2(a)(i)(B). While that requirement seems to apply to the Federal Form but not the Post Card, the very act of receiving copies of sensitive data like DPOC creates data security risks and costs.[16]

First, the process of creating the data infrastructure to store DPOC information would be enormous. Most local elections offices are not already in the business of processing and storing citizenship documentation. Building appropriate systems to accommodate this processing and storing would be a complicated and time-consuming endeavor. It would require analyzing current data processing capabilities against new needs, including compatibility with state-level databases[17]; determining how to accommodate new fields, including complex data entry like

---

[16] All states accept the Post Card Form by mail, and many *amici* accept submissions via email or secure websites, meaning that DPOC would at least be temporarily stored as a hard copy or digital copy, including in the recipient's email inbox. *Access to and Usage of faxing by Military and Overseas Voters*, The Council of State Governments at 23 (July 2022), https://perma.cc/G747-ZDBA.

[17] For example, in California, all 58 counties have their own election management systems, and would have to devote resources to ensuring that those systems are compatible with the statewide "VoteCal" system when it comes to DPOC records. *See* Lean Decl. ¶ 12, Pl. Br., ECF No. 76-3.

Section 2(a)(ii)(D)'s photo identification "accompanied by proof of United States citizenship"[18]; reviewing state data privacy laws to determine whether there are specific storage requirements; building out the infrastructure to accommodate the changes; testing processes; and training staff to use the systems. Depending on how offices store data, recording DPOC could also require additional staff time when producing information responsive to public records requests, because local elections offices would have to ensure that any personally identifiable information ("PII") is not included in such productions.

Second, storing sensitive PII would require additional cybersecurity resources. Best data security practices begin with limiting the amount of PII that an organization, including a local government, processes and maintains. Nearly all states that use the Federal Form require that applicants fill out only the last four digits of their social security number, if a driver's license number is not available or is not an option under state law.[19] Likewise, the Post Card Form currently only requires "a state-issued ID number or the last four digits of [the applicant's] Social Security Number" to be included on the form.[20] Such limited data collection is in line with standard data collection practices that focus on minimizing sensitive data collection, including those mandated in the federal government. *See, e.g.*, 42 U.S.C. § 405 (note) (The Social Security Fraud

---

[18] Such database updates could take "at least several months . . . to implement." Adona Decl. ¶ 12, Pl. Br., ECF No. 76-6.

[19] National Voter Registration Application Form for U.S. Citizens, OMB Control No. 3265-0015, https://perma.cc/6SE8-RPD7. Only Kentucky, Tennessee, and Virginia require the full social security number, though Kentucky notes that: "[N]o person shall be denied the right to register because of failure to include social security number." *Id*. at 9.

[20] Federal Post Card Application, Federal Voting Assistance Program, https://perma.cc/F2UU-ZDAR.

Prevention Act of 2017 restricts the use of full social security numbers in mailings from federal agencies and requires redacted versions where possible); H.R. Rep. No. 115-150, at 2 (2017) (Conf. Rep.) (The Social Security Fraud Prevention Act was implemented because "[t]he theft and misuse of an SSN can cause significant disruptions for an individual . . . .").

Critically, at the same time as the EO attempts to create an unfunded data security mandate, the federal government has *reduced* cybersecurity resources to support local governments. For example, the Department of Government Efficiency ("DOGE") recently cut funding to the Center for Internet Security, which had been designated by the federal government to run the Elections Infrastructure Information Sharing and Analysis Center ("EI-ISAC"), a program that provides resources and services to local elections offices to combat cybersecurity threats.[21] Many *amici* have relied on its no-cost and low-cost cybersecurity defense software, its security operations center that provided cyber incident response assistance, and its threat intelligence reports, among other services that local elections offices cannot fund on their own.[22]

## C.    Noncitizen Voting Is Very Rare

The EO's DPOC requirement would burden voters' rights and disrupt local election officials' duties in the name of ensuring that noncitizens do not vote—an occurrence that is exceedingly rare. *See, e.g.*, *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 967 (D. Ariz. 2024)

---

[21] Trishna Begam, *Center for Internet Security facing federal funding cuts*, NEWS10 (Apr. 22, 2025), https://perma.cc/PH5G-ST2X (Albany County's Chief Information Officer said: "The loss of programs like . . . EI-ISAC will certainly impact our nation's collective ability to quickly detect cyber threats and remediate them.")

[22] Steve Simon, *ICYMI: Secretary Simon Remarks on Federal Support for Election Security*, Office of the Minnesota Secretary of State (Mar. 4, 2025), https://perma.cc/4T76-TPMX.

(finding that in Arizona, such attempts were "quite rare") (affirmed in part and vacated in part on other grounds); *Fish*, 957 F.3d at 1142 (determining that the plaintiff had not shown a substantial amount of noncitizen voter registrations when only 39 noncitizens had made it onto Kansas voter rolls from 1999 to 2013 and "administrative anomalies could account for the presence of many— or perhaps even most" of the 39) (quotation to district court omitted).[23]

State and local governments have myriad methods at their disposal to maintain accurate voting lists without impeding local election administration or disenfranchising eligible voters. In some states, for example, county officials are responsible for regularly updating voter registration records. *See, e.g.*, Or. Rev. Stat. §§ 247.292, 247.555, 247.563, 247.570. Many *amici* are responsible for overseeing voter challenges under state laws, whereby individual voters' eligibility may be challenged by local authorities or members of the public who have knowledge that the voter is not eligible. *See, e.g.*, 25 Pa. Stat. § 1329; Wash. Rev. Code §§ 29A.08.810-.850. The NVRA requires participating states to make a "reasonable effort" to remove from voter registration rolls voters who have died or changed residence. 52 U.S.C. § 20507.

The federal government and state governments also already have the power to investigate voter fraud, though targeted efforts to identify noncitizen voters using that power have produced minimal results. From 2002 to 2005, the U.S. Attorney General conducted such an investigation and, out of 200 million votes cast in federal elections in that period, the government's efforts

---

[23] The EAC has also found noncitizen voting to be extremely uncommon. In 2014 the EAC considered evidence of a certain number of noncitizens registered to vote submitted by Arizona and Kansas when they requested that the EAC add DPOC to the Federal Form. Mem. Concerning State Requests, *supra* n.12. The EAC noticed that if the data that the states submitted were accurate, it would mean that only 0.007% of registered voters could have been noncitizens in Arizona and only 0.001% in Kansas. *Id.* at 34.

ultimately resulted in indictments of only 15 people for noncitizen voting. *Mi Familia Vota v. Fontes*, 719 F. Supp. at 966 (affirmed in part and vacated in part on other grounds). Recently, Georgia reviewed voter rolls to identify noncitizens on voter rolls and has only uncovered twenty out of a pool of 8.2 million registered voters, just nine of whom had ever voted—that is 0.0001% of registered voters in the state.[24]

As the Kansas experience demonstrates, placing the burden of preventing noncitizens from registering on eligible voters risks cancellation of at least tens of thousands of eligible voter registrations nationwide. Despite what the EO contends, risking mass disenfranchisement and overwhelming local elections offices with additional unfunded responsibilities in the name of preventing the very rare occurrence of noncitizen voting is not in the public interest and does not preserve the integrity of elections.[25]

## II.    THE EXECUTIVE ORDER'S IMPROPER ATTEMPT TO ALTER STATE BALLOT RECEIPT DEADLINES WOULD CAUSE ADMINISTRATIVE CONFUSION, PLACE BURDENS ON LOCAL ELECTIONS OFFICIALS, AND LEAD TO VOTER DISENFRANCHISEMENT

The EO further attempts to improperly override state law that establishes mail-ballot and absentee ballot receipt deadlines after Election Day. Section 7(a) directs the Attorney General to "enforce" the EO's unsupported opinion that federal law prohibits the counting of mail-in and absentee ballots that arrive after Election Day, Executive Order § 7(a) (citing 2 U.S.C. § 7 and 3

---

[24] Olivia Rubin, *Georgia voter roll audit finds only 20 noncitizens out of 8 million registered voters*, ABC NEWS (Oct. 23, 2024), https://perma.cc/B4DQ-B74V.

[25] Likewise, to the extent that the citizenship assessment directive of Section 2(d) of the EO purports to apply to local agencies, many of the same administrative problems apply: assessment of citizenship would require additional staff time and training, seriously burdening administration of elections in pursuit of preventing the very rare occurrence of noncitizen voter registration.

U.S.C. § 1), notwithstanding state laws that allow those ballots to be counted. The EO also attempts to condition EAC funding to go only to states that do not have post-Election Day receipt deadlines. Executive Order § 7(b).

At least sixteen states—including some of *amici*'s—as well as Puerto Rico, the Virgin Islands, and Washington, D.C., accept certain mail-in or absentee ballots if those ballots are postmarked on or before Election Day.[26] *Amici* in those states maintain a strong interest in confirming that the EO does not conflict with existing state law, in order to minimize administrative burdens and confusion and voter disenfranchisement. *Amici* support Plaintiffs' position that Section 7(a) of the EO is *ultra vires* and violates the separation of powers, that Section 7(b) imposes unlawful conditions on statutory funding, and that Section 7 overall invades States' constitutional power and sovereignty.

### A.    Section 7 Would Lead to Voter Disenfranchisement

Section 7 would lead to disenfranchisement of *amici*'s voters in states that allow ballots to arrive after Election Day. In those states, voters are used to the post-Election Day deadline. *Amici* would have to devote significant resources to voter outreach and education about the change, which can get expensive. *See* Part I.B (documenting communication methods), *supra*. In their experience, no amount of such communication attempts could reach every eligible voter in the community, even if they had unlimited resources to carry them out. At least some voters

---

[26] *Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots*, National Conference of State Legislatures, (Apr. 24, 2025), https://perma.cc/XF3M-6E3T.

consequently will turn in their ballots without enough time to be received by Election Day, thus inadvertently throwing away their vote.

Even if voters are aware of the EO's new ballot receipt deadline and attempt to follow it, they could still be disenfranchised through no fault of their own given mail pick-up and drop-off delays. State and local elections officials have repeatedly noted, in a bipartisan fashion, that absentee and mail-in ballots, especially as mailed through the United States Postal Service, may be subject to delayed processing and delivery.[27] Some *amici* have experienced these delays directly and know that they can result in disenfranchisement and costly litigation.

State legislatures, having considered the potential problem of mail-service delays, have extended ballot receipt deadlines accordingly. Section 7 disregards state legislatures' attempts to protect voters and the franchise. This Court should not let an improper federal directive override state decision-making and should therefore enjoin Section 7 of the EO.

**B.**     **Section 7 Creates Administrative Confusion and Burdens**

Section 7's plain conflicts with state law regarding deadlines for mail-in ballots could result in complicated administrative burdens. In addition to being unlawful, Section 7 creates confusion amongst *amici* local election officials as well as *amici*'s voters. *Amici* are concerned that they and voters could both receive different instructions from federal and state officials on which ballots can be processed and tabulated, leading to the need for new voter education and resulting in voters losing trust in the election process, a serious problem that would require even more outreach by

---

[27] *See, e.g.*, Letter from Nat'l Ass'n of Sec's of State and Nat'l Ass'n of State Election Directors to Postmaster General Louis DeJoy (Sept. 11, 2024), https://perma.cc/CJ7X-FLBN.

local elections offices whose resources are already strained. This confusion also raises the risk of administrative delay and mistakes in ballot receipt, processing, and tabulation as local elections officials attempt to sort through which authorities to follow and how to follow them.

*Amici* are concerned about how to implement this unprecedented change and what those changes could look like, especially if forced to make a change close to any election day.[28] The directive to "enforce" the administration's preferred mail-ballot deadline suggests that the government might bring litigation against local elections offices or states for their decision to follow or not follow the EO's preferred ballot arrival deadline, state law notwithstanding. Some *amici* have wondered whether such a lawsuit could result in separate federal and state elections processes. The administrative fixes some *amici* have imagined would be overwhelming, potentially amounting to the equivalent of running two elections at once, like sending a separate state and federal ballot to each mail-in voter or running separate tabulations of duplicated ballots. The fallout of leaving this issue unresolved is of serious concern to some *amici*, who have borne the brunt of the recent uptick in election litigation that has turned the smallest seeds of legal doubt into last-minute emergency lawsuits that threaten to delay tabulation.[29]

---

[28] There is also risk of administrative confusion as related to the receipt and tabulation of provisional ballots and ballot curing process in the many states that allow these processes. Section 7's apparent aim is to eliminate the tabulation of ballots received after Election Day, and some *amici* are concerned that the section's prohibition extends to provisional ballots and ballot curing.

[29] *U.S. courts prepare for increase in election lawsuits*, American Bar Association (Oct. 28, 2024), https://perma.cc/W6RS-H99L.

## CONCLUSION

The Executive Order, which constitutes an illegal overreach by the executive branch, would harm the public interest by disenfranchising voters and disrupting local election administration. Moreover, the issues raised in the Plaintiffs' motion for a preliminary injunction require prompt resolution. "[R]unning a statewide election is a complicated endeavor" requiring "thousands of state and local officials and volunteers" to "participate in a massive coordinated effort . . . ." *Democratic Nat'l Comm. v. Wisconsin State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring). Even minor changes to election administration policies and processes take time to plan and implement, from legal review and IT coordination to responding to voter concerns at public meetings. Some local elections offices have already begun planning for the 2028 presidential election. As explained above, the changes demanded by the EO are costly, but at the same time the EO directs agencies to *withhold* election funds from states and local governments.[30] To account for unfunded changes, local elections officials would need to act well in advance of an election; the municipal budgeting process for many is a multi-*year* endeavor, and many of *amici*'s municipalities are already facing budget shortfalls. *Amici* respectfully ask the Court to grant the Plaintiffs' motion for a preliminary injunction to preserve the status quo and prevent loss of local government resources.

---

[30] Sections 4(a), 4(b), 5(b)(ii), and 7(b) each threaten to withhold funds to states and localities that are not in compliance with the EO's edicts. Separately, the federal government is also attempting to condition the disbursement of previously appropriated election funds based on conditions wholly unrelated to election security. *See* Yvonne Wingett Sanchez & Patrick Marley, *Grants tie Trump's anti-DEI order to election security money*, WASH. POST (Apr. 29, 2025), https://perma.cc/7G8W-YQWF.

Dated: May 16, 2025

Respectfully submitted,

*/s/ Jonathan B. Miller*
Jonathan Miller (BBO #663012)
Michael Adame*
Shannon Eddy*
Samantha Perlman*
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Phone: (510) 738-6788
jon@publicrightsproject.org
michael@publicrightsproject.org
shannon@publicrightsproject.org
samantha@publicrightsproject.org

*\* Pro hac vice applications forthcoming*

*Counsel for Amici Curiae*

21

## Appendix A—List of *Amicus Curiae* Local Election Officials, joining in their Individual Capacities

Jim Allen
*Director of Elections, Delaware County, Pennsylvania*

Lisa Brown
*Clerk and Register of Deeds, Oakland County, Michigan*

Barb Byrum
*Clerk, Ingham County, Michigan*

Mark Church
*Chief Elections Officer & Assessor-County Clerk-Recorder, San Mateo County, California*

Katharine Clark
*Clerk, Santa Fe County, New Mexico*

Domonique Clemons
*County Clerk and Register of Deeds, Genesee County, Michigan*

Kristin Connelly
*Clerk-Recorder and Registrar of Voters, Contra Costa County, California*

Lisa Deeley
*Commissioner and Vice Chair, Philadelphia City, Pennsylvania*

Jilline Dobratz
*Clerk, City of West Bend, Wisconsin*

Diane Ellis-Marseglia
*Commissioner and Vice-Chair, Bucks County, Pennsylvania*

Diana Fuentes
*Clerk, City of San Diego, California*

Cathy Garrett
*Clerk, Wayne County, Michigan*

Michael Haas
*Interim Clerk, City of Madison, Wisconsin*

Bob Harvie
*Commissioner and Chair, Bucks County, Pennsylvania*

Celia Israel
*Tax Assessor-Collector, Travis County, Texas*

Lisa Lawitzke
*Clerk, Bellevue Township, Michigan*

Nick Lima
*Registrar and Director of Elections, City of Cranston, Rhode Island*

Dyana Limon-Mercado
*Clerk, Travis County, Texas*

Jo Ellen Litz
*Commissioner, Lebanon County, Pennsylvania*

Paul Lopez
*Clerk and Recorder, City and County of Denver, Colorado*

Neil Makhija
*Commissioner and Chairman of the Board of Elections, Montgomery County, Pennsylvania*

Kirk McDonough
*Chairperson, City of Cranston Board of Canvassers, Rhode Island*

Rocky Raffle
*Board of Elections Member and Chairperson, Athens-Clarke County, Georgia*

Dante Santoni
*Commissioner, Berks County, Pennsylvania*

Dawn Marie Sass
*Clerk and Deputy Treasurer, City of Exeter Clerk, Wisconsin*

23

Michael Siegrist
*Clerk, Canton Township, Michigan*

Aubrey Sonderegger
*Recorder, Coconino County, Arizona*

David R. Voye
*Elections Division Manager, Allegheny County, Pennsylvania*

Baoky Vu
*Former Vice Chair, DeKalb County Board of Elections, Georgia*

Braxton White
*Commissioner, Clarion County, Pennsylvania*

Jamila Winder
*Commissioner, Montgomery County, Pennsylvania*

Julie Wise
*Director of Elections, King County, Washington*

## CERTIFICATION OF SERVICE

I hereby certify that a copy of the foregoing was this day served on all counsel via the court's electronic service system.

/s/ Jonathan B. Miller
Jonathan B. Miller (BBO#663012)
Public Rights Project

Dated: May 16, 2025

25