**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, *in his official capacity as President of the United States*, *et al.*, <br><br> *Defendants*. | Case No. 1:25-cv-10810 (DJC) <br><br> Leave to File Excess Pages Granted on 5/15/25 |

**OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Animated by an incorrect understanding of the President's Article II powers, the Plaintiff States' motion for a preliminary injunction seeks to enjoin the implementation of President Trump's Executive Order 14,248, which protects the integrity of United States elections. Because Plaintiffs' claims are likely to fail on the merits, and Plaintiffs cannot demonstrate that they are "likely to suffer irreparable harm in the absence of preliminary relief," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), they fail to meet the very high bar required for the "extraordinary and drastic remedy" they seek. *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). Accordingly, this Court should deny Plaintiffs' motion.

**BACKGROUND**

**1. Executive Order 14,248**

On March 25, 2025, President Trump issued Executive Order 14,248, entitled "Preserving and Protecting the Integrity of American Elections," 90 Fed. Reg. 14005 (Mar. 25, 2025) ("Executive Order"; sections cited as "EO § n").[1] The Executive Order explains that "[f]ree, fair,

---

[1] Federal Register, Preserving and Protecting the Integrity of American Elections (Mar. 28, 2025), https://www.federalregister.gov/documents/2025/03/28/2025-05523/preserving-and-protecting-the-integrity-of-american-elections.

and honest elections unmarred by fraud, errors, or suspicion are fundamental to maintaining our constitutional Republic. The right of American citizens to have their votes properly counted and tabulated, without illegal dilution, is vital to determining the rightful winner of an election." *Id.* § 1. "Under the Constitution, State governments must safeguard American elections in compliance with Federal laws that protect Americans' voting rights and guard against dilution by illegal voting, discrimination, fraud, and other forms of malfeasance and error." *Id.* President Trump declared that "[i]t is the policy of [his] Administration to enforce Federal law and to protect the integrity of our election process." *Id.*

For example, while "[s]everal Federal laws, including 18 U.S.C. [§§] 1015 and 611, prohibit foreign nationals from registering to vote or voting in Federal elections . . . States fail adequately to vet voters' citizenship, and, in recent years, the Department of Justice has failed to prioritize and devote sufficient resources for enforcement of these provisions." *Id.* In furtherance of that policy, and specifically "[t]o enforce the Federal prohibition on foreign nationals voting in Federal elections," the Executive Order stated "the Election Assistance Commission [("EAC")]" "shall take appropriate action to require, in its national mail voter registration form [("federal form")] issued under 52 U.S.C. 20508," "documentary proof of United States citizenship consistent with 52 U.S.C. 20508(b)(3)." *Id.* § 2(a)(i)(A). "Nothing in [this Executive Order]" is to "be construed to impair or otherwise affect [] the authority granted by law to an executive department or agency, or the head thereof[.]" *Id.* § 11(a)(i). And the Executive Order must "be implemented consistent with applicable law[.]" *Id.* § 11(b).

### 2. Procedural History

On April 3, 2025, Plaintiffs, the States of Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Massachusetts, Maryland, Michigan, Minnesota, Nevada, New

Jersey, New Mexico, New York, Rhode Island, Vermont, and Wisconsin, filed a complaint in this Court challenging the President's legal authority, under an *ultra vires* separation-of-powers theory, to direct the EAC to require documentary proof of citizenship pursuant to section 2(a) of the Executive Order. Compl., ECF No. 1. Plaintiffs also claim section 2(a) violates the National Voter Registration Act ("NVRA"). *Id*. Plaintiffs challenge sections 2(d), 3(d), 4(a), 7(a), 7(b) under similar theories. More than 30 days later, on May 5, 2025, Plaintiffs filed a motion for preliminary injunction, seeking to enjoin only sections 2(a), 2(d), 3(d), 7(a), and 7(b) of the Executive Order.[2]

## LEGAL STANDARD

A preliminary injunction "is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012) (citation omitted). A movant may be awarded such an extraordinary remedy only "upon a clear showing" that it is "entitled to such relief." *Winter*, 555 U.S. at 22. To establish entitlement, Plaintiffs bear the burden of establishing (1) a likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) the balance of the equities favor the movant, and (4) an injunction is in the public's interest. *See Allscripts Healthcare, LLC v. DR/Decision Res., LLC*, 592 F. Supp. 3d 1, 3 (D. Mass. 2002). The last two factors "merge when the Government is the [party] opposing" the preliminary injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Irreparable harm "constitutes a necessary threshold showing for an award of preliminary injunctive relief," *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009), and is "the basis for injunctive relief." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (citation omitted).

---

[2] Plaintiffs do not seek to preliminarily (or permanently) enjoin the President. Compl. ¶ 183, ECF No. 1; *see also* Mot. Prelim. Inj., ECF No. 75.

**ARGUMENT**

I.    **Plaintiffs are unlikely to succeed on the merits.**

    a.    **Plaintiffs' challenges to sections 2(a), 3(d) and 7(a) of the Executive Order are not justiciable.**

Article III restricts federal court jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2. This limitation on "[t]he judicial Power of the United States" is fundamental to the judiciary's role within our constitutional separation of powers. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (alteration in original) (quoting U.S. Const., art. III, § 1). Two of the limitation's manifestations are the justiciability doctrines of standing and ripeness, both of which are implicated here.

To establish Article III standing, a plaintiff must demonstrate that it (1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed by a favorable judicial decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Establishing an injury in fact that is "concrete and particularized" and "actual or imminent," not "conjectural" or "hypothetical," is the foremost concern in establishing standing. *Id.* (citation omitted). "An allegation of future injury may suffice if the threatened injury is 'certainly impending' or [if] there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Dreihaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). But if the future injury is "too speculative for Article III purposes and no prosecution is even close to impending," then there is no standing to sue. *Blum v. Holder*, 744 F.3d 790, 799 (1st Cir. 2014) (citation omitted).

Each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1281–82 (1st

Cir. 1996) (citation omitted). Each plaintiff must demonstrate its own Article III standing, as "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring). And each plaintiff must also maintain its personal interest in the dispute at all stages of the litigation. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008). Finally, because "standing is not dispensed in gross," each plaintiff must demonstrate standing for each claim that it presses against each defendant, and for each form of relief that it seeks. *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion v. Ramirez*, 594 U.S. 413, 431 (2021)).

While standing seeks to keep federal courts out of disputes involving conjectural injuries, the ripeness doctrine seeks to prevent the adjudication of claims relating to "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted). As explained by the Supreme Court, the basic function of ripeness is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967). As with standing, Plaintiffs bear the burden of alleging facts sufficient to demonstrate ripeness. *See Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 25 (1st Cir. 2007).

There are two prongs to the ripeness analysis: "fitness" and "hardship." *See Texas*, 523 U.S. at 300–01. These prongs are related but distinct: fitness "typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed," whereas hardship "typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir. 1995) (citation omitted).

1. Section 2(a).

Section 2(a) of the Executive Order orders the EAC to "take action" to require documentary proof of United States citizenship in its national mail voter registration form. This directive is consistent with the rulemaking authority given to the EAC by the NVRA, which allows the EAC to alter the federal form by promulgating regulations through notice-and-comment rulemaking. *See* 52 U.S.C. § 20929; *Final Rules: National Voter Registration Act of 1993*, 59 Fed. Reg. 32, 311 (June 23, 1994). As part of that process, the EAC must, among other things, develop the change as a proposed rule which must be approved by the EAC; issue a notice of proposed rulemaking and solicit public comments; consult with the chief election officers of the States pursuant to 52 U.S.C. § 20508(a)(2); consider revisions to the proposed rule based on feedback from the public— including the Plaintiff States—and then revise the rule as needed. *See* 5 U.S.C. § 553. Only after that process is completed may the EAC promulgate a final rule amending the federal form. *See* 5 U.S.C. § 553(c).

By its plain language, section 2(a) contemplates that future action is necessary—the EAC still needs to go through its rulemaking process before any changes to the federal form can be finalized. In other words—as Plaintiffs implicitly concede by bringing only *ultra vires* claims— there is no final agency action here, and Plaintiffs can only guess as to what the ultimate federal form will provide. *See Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (noting that whether the challenged action "is a reviewable final agency action" "contextualizes the standing inquiry"). Plaintiffs thus cannot establish the requisite "concrete and particularized" and "actual or imminent" injury in fact for standing purposes. *Lujan*, 504 U.S. at 560 (citation omitted).

Neither can they demonstrate that there is an "immediate dilemma" that is ripe for judicial intervention. *See Texas*, 523 U.S. at 300 ("Here, as is often true, '[d]etermination of the scope . . .

of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function.'" (quoting *Int'l Longshoremen's & Warehousemen's Union v. Boyd*, 347 U.S. 222, 224 (1954))). Under these circumstances—where a final rule has not even been promulgated—the Plaintiff States cannot establish that section 2(a) is "fit" for review because future events have not yet occurred and, indeed, they "may not occur as anticipated." *Texas*, 523 U.S. at 300 (citation omitted). This lack of finality and definiteness counsels against judicial intervention. *See Ernst & Young*, 45 F.3d at 535. Moreover, the controversy lacks "sufficient immediacy and reality to warrant the issuance of" the judicial relief sought. *Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healy*, 844 F.3d 318, 326 (1st Cir. 2016). Since a final rule does not yet exist, the Plaintiff States do not yet know how they will be harmed—if at all. This lack of harm is fatal to the justiciability of the Plaintiff States' claim.

2. Section 7(a)

Section 7(a) interprets 2 U.S.C. § 7 and 3 U.S.C. § 1 to require a national ballot receipt deadline and instructs the Attorney General to "take all necessary action to enforce [the statutes] against States that violate" them. This instruction to the Attorney General is a matter of enforcement discretion that belongs to the Executive Branch. *See United States v. Texas*, 599 U.S. 670, 678 (2023) ("The President 'shall take Care that the laws be faithfully executed.'" (quoting U.S. Const., art. II, § 1, cl. 1, § 3)); *see also TransUnion LLC*, 594 U.S. at 429 (Under Article II, the Executive Branch possesses authority to decide "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law."). As noted by the Supreme Court, the Attorney General acts as the President's "chief law enforcement officer" who "provides vital assistance to [him] in the performance of [his] constitutional duty to preserve, protect, and defend

the Constitution." *Trump v. United States*, 603 U.S. 593, 620 (2024) (alterations in original) (citation omitted). Moreover, the Executive Branch's enforcement decisions are not subject to judicial review because "courts generally lack meaningful standards for assessing the propriety of enforcement choices[.]" *Texas*, 599 U.S. at 679.

The Attorney General can lawfully enforce these statutes by, for example, sending letters to the Plaintiff States encouraging compliance with the President's interpretation of 2 U.S.C. § 7 and 3 U.S.C. § 1. Because the President can enforce these statutes "consistent with applicable law," as set forth in section 11 of the Executive Order, there is no risk of imminent harm, as the Plaintiff States allege. *See Trump v. New York*, 592 U.S. 125, 131 (2020); *see also LULAC v. Exec. Off. of the President*, No. CV 25-0946 (CKK), 2025 WL 1187730, at *51 (D.D.C. Apr. 24, 2025) ("[I]t is unclear on the present record whether Section 7(a) will lead imminently to any unlawful action" because the "Attorney General . . . must implement Section 7(a), as the Executive Order says, 'consistent with applicable law.'"). In *Trump v. New York*, for example, plaintiffs challenged a memorandum issued by President Trump instructing the Secretary of Commerce to implement a policy, "to the maximum extent feasible and consistent with the discretion delegated to the executive branch," that would have excluded "from the apportionment base aliens who are not in a lawful immigrant status." 592 U.S. at 129–30. The Supreme Court found that the plaintiffs failed to establish justiciability because the "case [was] riddled with contingencies and speculation that impede[d] judicial review" and "[a]ny prediction how the Executive Branch might eventually implement [its] general statement of policy is 'no more than conjecture' at this time." *Id.* at 131 (citing *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)). Such is the case here. *See LULAC*, 2025 WL 1187730, at *51 (declining to enjoin section 7(a) because the "Court 'cannot simply assume'

that the Attorney General will disregard the 'requirement of lawful implementation'" (citation omitted)).

3. Section 3(d)

Section 3(d) directs the Secretary of Defense to update the Federal Post Card Application pursuant to the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") to require documentary proof of United States citizenship, "as defined by section 2(a)(ii) of th[e] order," and "proof of eligibility to vote in elections in the State in which the voter is attempting to vote." EO § 3(d). But, as Plaintiffs concede, "what proof of eligibility might suffice, or how a UOCAVA voter might obtain such proof," have not yet been determined. Mem. of Law in Supp. of Mot. for Prelim. Inj. ("Pls.' Br.") at 13, ECF No. 76. This Court should deny Plaintiffs' motion with respect to 3(d) because it is not ripe.

Plaintiffs challenge section 3(d) as exceeding the President's constitutional authority and violating UOCAVA. Compl. at 31. This claim is not fit for judicial review because it "involves uncertain and contingent events that may not occur as anticipated or may not occur at all." *Ernst & Young*, 45 F.3d at 536 (citation omitted). The Secretary of Defense, via the Federal Voting Assistance Program ("FVAP"), has not yet updated the Federal Post Card Application ("FPCA"), and the Executive Order does not establish a deadline to do so. The particulars of how or when section 3(d) will be implemented are thus unsettled.[3] Without knowing what is required to establish proof of eligibility to vote in elections in the state in which the voter is attempting to vote, which could vary among states, one can only speculate about whether the requirement would

---

[3] The FPCA available on the FVAP website as of the date of this filing is still the 01-2023 revision. Moreover, FVAP must follow the Paperwork Reduction Act's notice-and-comment rule-making process to revise the FPCA. *See* 44 U.S.C. §§ 3501–3521; Proposed Collection, Comment Request (Federal Post Card Application (FPCA), Standard Form 76 (SF-76); OMB Control Number 0704-0503), Regulations.gov, https://www.regulations.gov/search?agencyIds=DOD&filter=%22SF-76%22 (listing FPCA-specific notice-and-comment dockets); https://www.regulations.gov/document/DOD-2017-OS-0008-0001 (example of information collection notice for FCPA revisions).

violate UOCAVA.

"[C]ognizable hardship is usually direct and immediate harm . . . ." *Id*. Plaintiffs have asserted no immediate harm that would result if they are unable to enjoin section 3(d) now. There is no reason to speculate that the Secretary will act unlawfully, and the Court should decline to issue an injunction on that basis. *Id*.; *see also Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) ("[T]he Secretary's decision is entitled to a presumption of regularity."); *United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926).

> **b.  The President has the authority to direct the EAC to prescribe regulations.**

Article II, section 1 of the Constitution provides that "[t]he executive power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1, cl. 1. "[T]he President's power necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)); *see Myers*, 272 U.S. at 135 (explaining that the President "may properly supervise and guide [agency officials'] construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone"). While the President is not a "lawmaker," he may "direct that a congressional policy be executed in a manner prescribed by Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–88 (1952).

Congress empowered the EAC to "prescribe such regulations as are necessary to . . . develop a mail voter registration application form for elections for Federal office" "in consultation with the chief election officers of the States." 52 U.S.C. § 20508(a). The EAC must also submit various reports to Congress "assessing the impact of [the NVRA] on the administration of elections

for Federal office . . . and . . . recommend[ing] . . . improvements." *Id.* § 20508(a)(3). The EAC exercises executive power when it carries out these duties and is therefore subject to the administrative control of the President. Accordingly, under section 2(a) of the Executive Order, the President was well within his authority to direct the EAC to "take appropriate action to require, in its national mail voter registration form . . . documentary proof of United States citizenship." EO § 2(a).

Plaintiffs argue that the EAC is not "subject to the direct control of the President" because it is an "independent, multimember commission,"[4] and its functions are "best characterized as 'quasi-legislative' rather than 'purely executive.'"[5] Pls.' Br. at 11–12 (citing 52 U.S.C. §§ 20508(a), (b), 20929; quoting *LULAC*, 2025 WL 1187730, at *40 n.48). But neither removes an agency from the President's control. "The entire 'executive Power' belongs to the President alone." *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020). The line drawn in the Supreme Court's precedents is not between "purely executive" or "quasi-legislative," but rather depends on whether the agency is said "to exercise *any* executive power." *Id.* at 216–17 (emphasis added). Plaintiffs' argument that the EAC must be completely independent of any Executive Branch direction merely because it is not "purely" executive thus transgresses "what up to now have been the outermost constitutional limits of permissible . . . restrictions on the President's" supervisory authority. *Id.* at 218; *see also id.* at 216 & n.2 (explaining that "[t]he Court's conclusion that the FTC did not exercise executive power has not withstood the test of time" and that "[i]t is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered

---

[4] Specifically, Plaintiffs rely on the fact that the EAC consists of four members, appointed to staggered four-year terms; Commissioners must have election-related expertise; no more than two members can be affiliated with the same political party; and EAC action requires bipartisan approval of at least three members. Pls.' Br. at 11.

[5] Plaintiffs argue that the EAC's functions are quasi-legislative because its duty to develop the federal form is "cabined by the NVRA" and it has no authority to promulgate rules imposing any requirement on states or local governments. Pls.' Br. at 11

'executive,' at least to some degree"); *City of Arlington v. FCC*, 569 U.S. 290, 305 n.4 (2013) (even though the activities of administrative agencies "take 'legislative' and 'judicial' forms," "they are exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power'" (quoting U.S. Const., art. II, § 1, cl. 1)).

In addition to challenging the President's authority to direct the EAC, Plaintiffs object to the way he exercised his authority. They argue that the President cannot unilaterally dictate changes to the federal form; rather, in their view, the EAC must consult with the states' chief election officials and undertake the APA's notice and comment process. Pls.' Br. 9–10. But the windmill Plaintiffs tilt at bears no resemblance to the Executive Order the President actually issued. Section 2(a)(i)(A) of the Executive Order states that "[w]ithin 30 days of the date of this order, the Election Assistance Commission shall take appropriate action to require, in is national mail voter registration form . . . documentary proof of United States citizenship." Plaintiffs' reading ignores the words "take appropriate action" and focuses only on "to require." But "to require" must be read in conjunction with "take appropriate action," and the appropriate action required here involves "consult[ing] with the chief election officers of the States," to "prescribe . . . regulations" to "develop a mail voter registration application form for elections for Federal office." 52 U.S.C. § 20508(a). The Executive Order instructs the EAC to take these steps.

### c. Section 2(a) does not violate the NVRA.

Plaintiffs assert that "[b]y refusing to adopt a documentary proof of citizenship requirement and instead providing for proof of citizenship through attestation, Congress confirmed that the former is not 'necessary to enable the appropriate state election official to assess . . . eligibility." Pls.' Br. at 10 (quoting 52 U.S.C. § 20508(b)(1)). Therefore, requiring documentary proof of citizenship, they say, violates the NVRA. *Id*. at 10–11. As explained, the President has the

authority to direct the EAC to take all necessary action to amend the mail voter registration form, *see supra* I.c., and the EAC's decision to amend the federal form to require documentary proof of citizenship would not violate the NVRA.

The NVRA charges the EAC with prescribing regulations to "develop a mail voter registration application form for elections." 52 U.S.C. § 20508(a). The form must "include a statement that . . . specifies each eligibility requirement (including citizenship)" and "contains an attestation that the applicant meets each such requirement." *Id*. § 20508(b)(2)(A)–(B). But the form "may require only such identifying information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration." *Id*. § 20508(b)(1). And it "may not include any requirement for notarization or other formal authentication." *Id*. § 20508(b)(3).

As the form's developer, the EAC determines what identifying information "is necessary" to assess an applicant's eligibility to vote. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 10 (D.C. Cir. 2016) ("It would be illogical for Congress to provide in section 20508(b)(1) that the consultant, rather than the developer, would determine 'necessity.'"); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 19 (2013). Congress's determination that the form must contain an attestation that the applicant meets the requirements to register to vote does not preclude the EAC from later determining that documentary proof of citizenship is necessary for state election officials to determine voter eligibility. If the EAC made such a determination through notice-and-comment rulemaking, it could prescribe regulations to alter the form. Adding a documentary proof requirement to the form would not run afoul of Congress's instruction that the form not include any requirement for notarization or formal authentication because the documentary proof is not being used to authenticate the applicant's identity but his citizenship. *See*

13

Authentication, Black's Law Dictionary (12th ed. 2024) ("Broadly, the act of proving that something (as a document) is true or genuine.").

### d. The Elections Clause expressly authorizes the federal government to override states' choices regarding the "Times" of federal elections.

Plaintiffs additionally claim that the Executive Order's "attempt to require documentary proof of citizenship via Sections 2(a), 3(d), and 2(d) . . . unconstitutionally commandeers States' personnel, infrastructure, and funds to implement a presidential decree." Pls.' Br. at 13–14. But the "Elections Clause establishes a unique relationship between the state and federal governments." *Gonzalez v. Arizona*, 677 F.3d 383, 390 (9th Cir. 2012) (en banc) *aff'd sub nom.*, *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013).

Article I, section 4 of the Constitution provides that state governments may choose "[t]he Times, Places and Manner of holding" federal elections, unless "Congress . . . make[s] or alter[s] such Regulations." U.S. Const., art. I., § 4, cl. 1. The Clause, in other words, "invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997). The Framers granted the federal government oversight over federal-election procedures to guard against potential state abuse. *Gonzalez*, 677 F.3d at 390 (citing The Federalist No. 59, at 168 (Alexander Hamilton) (Ron P. Fairfield ed., 2d ed.1981) (explaining that "[n]othing can be more evident, than that an exclusive power of regulating elections for the national government, in the hands of the State legislatures, would leave the existence of the Union entirely at their mercy")). Additionally, "the Elections Clause requires states to implement Congress's superseding regulations without compensation from the federal government." *Id*. at 391. "Thus, unlike virtually all other provisions of the Constitution, the Elections Clause gives Congress the power to 'conscript state agencies to carry out' federal mandates." *Id*. (citation omitted); *see also Foster*, 522 U.S. at 69; *Ass'n of Cmty.*

*Orgs. for Reform Now v. Miller*, 129 F.3d 833, 836 (6th Cir. 1997). The Elections Clause differs from the Supremacy Clause because it "affects only an area in which the states have no inherent or reserved power: the regulation of federal elections." *Gonzalez*, 677 F.3d at 392; *see also U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 805 (1995); *Inter Tribal*, 570 U.S. at 13–14 (noting that the presumption against preemption does not apply to Elections Clause legislation).

As part of its Elections Clause authority, Congress established the EAC and charged it with "prescrib[ing] . . . regulations . . . necessary to . . . develop a mail voter registration application form for elections for Federal office." 52 U.S.C. § 20508(a). It enacted the NVRA and directed states to "designate agencies for the registration of voters in elections, for Federal office," including "Federal . . . offices." *Id*. § 20506(a)(1), (a)(3)(B)(ii). Congress further specified that voter registration agencies that are "office[s] that provide[ ] service or assistance in addition to conducting voter registration" shall distribute the federal voter registration form, "including a statement that . . . specifies each eligibility requirement (including citizenship)" and "contains an attestation that the applicant meets each . . . requirement," "with each application for [that] service." *Id*. § 20506(a)(6)(A)(i). And Congress also set forth in UOCAVA the requirement that the President's designee "shall . . . prescribe an official post card form, containing both an absentee voter registration application and an absentee ballot application, for use by the States." [6] *Id*. § 20301(b)(2).

Because the Constitution vests "the entire 'executive Power'" in the "President alone," he properly oversees and controls those who execute the laws. *Seila Law*, 591 U.S. at 213; *see supra*

---

[6] "The President selected the Secretary of Defense as the UOCAVA presidential designee by Executive Order." *United States v. Alabama*, 778 F.3d 926, 930 n.2 (11th Cir. 2015) (citing Exec. Order No. 12,642, 53 Fed. Reg. 21,975 (June 8, 1988), *reprinted as amended in* 52 U.S.C. § 20301). "The Secretary administers [his] responsibilities through The Federal Voting Assistance Program ("FVAP")." *Id*. (citing Federal Voting Assistance Program (FVAP), 32 C.F.R. § 233 (2014)).

I.c. Accordingly, the President acted within his authority to direct executive officials in carrying out their statutory mandates. He had authority to direct the EAC to "take appropriate action to require" documentary proof of citizenship "in its national mail voter registration form," EO § 2(a); to direct "Federal voter registration executive department[s] or agenc[ies] . . . [to] assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs," *id*. § 2(d); and the Secretary of Defense to "update the Federal Post Card Application . . . [to] require[ ] documentary proof of United States citizenship," *id*. § 3(d). The President's Executive Order did not unlawfully commandeer Plaintiffs' personnel, infrastructure, and funds to implement a presidential decree.

### e. The President properly interpreted the Election Day statutes for the Executive Branch in sections 7(a) and (b) under his take-care authority.

Plaintiffs claim that "[t]here is nothing in the text, purpose, or history of the Election Day statutes suggesting that Congress intended to adopt the President's preferred ballot receipt deadline," as set forth in section 7(a). Pls.' Br. at 16. But the statutes' text, purpose, and history support the President's interpretation, and he has the authority to interpret for the Executive Branch what they require.

Article II, section 3 of the Constitution charges the President with the duty to "take Care that the Laws be faithfully executed." "[A]n essential part of execution of the law is the interpretation of that law." *Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 809 F.2d 979, 990 (3d Cir. 1986). Functionally, "the executive cannot execute [a] law's command until he decides what that command is, and absent a determination by the courts the executive must find the law's command himself." *Id*. Thus, the President's duty under the take-care clause "often puts upon him the duty to interpret [the law] for the Executive Department." *Id*. (quoting Edward S. Corwin, *The President: Office and Powers, 1787—1984* 141 (5th rev. ed. 1984)); *see also Bowsher v. Synar*,

478 U.S. 714, 751 n.16 (1986) (Stevens, J., concurring) (explaining that "interpret[ing]" a "law enacted by Congress" is "a power normally committed initially to the Executive under the Constitution's prescription that he 'take Care that the Laws be faithfully executed'" (quoting U.S. Const., art. II, § 3; *Synar v. United States,* 626 F. Supp. 1374, 1400 (D.D.C. 1986)); *Huggins v. Isenbarger*, 798 F.2d 203, 208 (7th Cir. 1986) (Easterbrook, J., concurring) ("The Executive Branch of any government has the authority to interpret the law, if only to the extent necessary to decide how to execute that law.").

The Election Day statutes establish a uniform, national Election Day for federal elections. 2 U.S.C. § 7; 3 U.S.C. § 1; *Foster*, 522 U.S. at 69. Section 7 provides that "[t]he Tuesday next after the 1st Monday in November, in every even numbered year, is established as *the day for the election*, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter." 2 U.S.C. § 7 (emphasis added). And section 1 further specifies that "[t]he electors of President and Vice President shall be appointed, in each State, *on election day*." 3 U.S.C. § 1 (emphasis added). But Congress enacted 2 U.S.C. § 7, to which 3 U.S.C. § 1 is tied, in 1872, when "[e]xcuse-required absentee voting" was in its infancy. Olivia B. Waxman, *Voting by Mail Dates Back to America's Earliest Years. Here's How It's Changed Over the Years*, Time (Sept. 28. 2020), https://time.com/5892357/voting-by-mail-history/; *Foster*, 522 U.S. at 69; *Republican Nat'l Comm. v. Wetzel*, 120 F.4th 200, 209 (5th Cir. 2024) ("Absentee voting began during the Civil War to secure the franchise of soldiers in the field."). With the advent of commonplace no-excuse-absentee voting, what are the implications of having a "day for the election"? *See* Waxman, *supra* p.17. Must ballots be received or counted on Election Day?

The President answered that question by interpreting the Election Day statutes for

Executive Branch officials in section 7(a) and 7(b) of the Executive Order. In section 7(a), he instructed the Attorney General to "take all necessary action to enforce 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives." EO § 7(a). And in 7(b) he directed the EAC to "condition any available funding to a State on that State's compliance with" 52 U.S.C. § 21081(a)(6)'s requirement "that each state adopt uniform and nondiscriminatory standards . . . including that, as prescribed in 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1, there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," except for UOCAVA votes. EO § 7(b). It was soundly within the President's authority to interpret the Election Day statutes in a manner consistent with the statutes' text so that Executive Branch officials could carry out their commands.

At least one court has held that the Election Day statutes require ballots to "be both cast by voters and received by state officials" on Election Day. *Wetzel*, 120 F.4th at 204. The term "election" in 2 U.S.C. § 7 has three "definitional elements": (1) official action, or one "involv[ing] an element of government action"; (2) finality, or "the polity's final choice of an office-holder"; and (3) consummation, or "when the last ballot is received and the ballot box is closed." *Id.* at 207–08. Continuing to receive ballots after Election Day means that the election is not final or consummated until after Election Day and therefore violates the Election Day statutes. *Id.* at 208–09, 215. Plaintiffs argue that "[c]ourts have nearly universally [dis]agreed" with *Wetzel*. Pls.' Br. at 16–17. But *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 365 (D.N.J. 2020), *Bognet v. Secretary Commonwealth of Pennsylvania*, 980 F.3d 336, 364 (3d Cir. 2020), *vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021) (mem.), and *Bost v. Illinois*

*State Board of Elections*, 684 F. Supp. 3d 720, 739 (N.D. Ill. 2023), do not consider the original meaning of "election" in 1872, and *Bognet* and *Bost* were both decided on standing. None of those cases require this Court to ignore the only on-point federal appellate opinion that remains on the books. Indeed, Plaintiffs' cited cases only confirm that the meaning of 2 U.S.C. § 7 in the context of ballot-receipt deadlines is an open question in *every* circuit (except the Fifth, which agrees with the President). There is no good reason for this Court to enjoin Defendants from enforcing 2 U.S.C. § 7.

Plaintiffs assert that "Congress never intended to set a deadline for receiving and counting ballots," because the "Election Day statutes addressed the problem of some States setting their elections earlier than others, strongly influencing election results in other States." Pls.' Br. at 17. Congress's failure to "step[ ] in to alter[ ]" certain states' practices "for receiving and counting timely-cast ballots," Plaintiffs say, indicates that Congress sought to cure the problem of early elections and no more. *Id*. at 17–18. But history reveals that the term "'election' include[d] both ballot casting and ballot receipt." *Wetzel*, 120 F.4th at 209. These two concepts were not bifurcated until the Civil War to "secure the franchise of soldiers in the field." *Id*. Even then, soldiers voted by casting their ballots in ballot boxes that election officials brought to the battlefield or else sending a proxy to deposit their votes in the ballot box at the soldier's home precinct. *Id*. In other words, the act of voting concluded when the vote was received. After that, states allowing civilian absentee voting still required votes to be received by Election Day. *Id*. at 210 (citing P. Orman Ray, *Absent-Voting Laws, 1917*, 12 Am. Pol. Sci. Rev. 251, 253 (1918)). By 1977, only two of 48 states allowing absentee voting counted ballots received after Election Day. *Id*. And in January 2020, 14 states and the District of Columbia counted ballots postmarked by Election Day, whereas the other 36 states required receipt on or before that date. *Id*. at 211. This history of absentee voting

practices supports that Congress intended "the day for the election" to include both vote casting and receipt.

As to purpose, Congress enacted the Election Day statutes to prohibit early federal elections in some states, which were influencing election results in states voting later. *Foster*, 522 U.S. at 73. But permitting absentee ballots to be received after Election Day is equally discriminatory. After all, "[h]aving once granted the right to vote on equal terms, [a] State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–05 (2000). But states arbitrarily treat some people's votes differently when they permit absentee votes to be received after Election Day. If postmarks are unenforced, for example, absentee voters have several extra days after Election Day to cast their votes.

Moreover, "[t]he postal service permits senders to recall mail," *Wetzel*, 120 F.4th at 208 (citing Domestic Mail Manual, §§ 507.5, 703.8; 39 C.F.R. § 111.1 and 39 C.F.R. § 211.2 (incorporating the Domestic Mail Manual by reference into the Postal Service Regulations)), which could permit "voters [to] . . . change their votes after Election Day," *id.* Some states such as Illinois even provide for counting mail-in ballots lacking a postmark so long as they are "received by the election authority after the polls close on election day and before the close of the period for counting provisional ballots" and "the date inserted on the certification," after opening the ballot, "is election day or earlier." 10 Ill. Comp. Stat. Ann. 5/19-8(c).

Under that regime, it is not hard to imagine that an un-postmarked ballot, delivered after Election Day but before counting concluded, could be counted based on a person's fraudulent certification date. Congress intended the Election Day statutes to curb that type of behavior, which results in treating some votes differently. *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1173–74 (9th Cir. 2001) ("Whenever you provide that elections shall take place upon the same

day, you do interpose a not inconsiderable check to frauds in elections, to double voting, to the transmission of voters from one State to another, and you do allow the people to vote for their Representatives undisturbed by considerations which they ought not to take at all into account." (quoting Cong. Globe, 42d Cong., 2d Sess. 618 (1872)). Permitting it to continue by allowing ballots to be received after Election Day contradicts Congress's purpose.

Furthermore, congressional inaction says very little, if anything, about congressional intent. *See Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495 n.13 (1985) ("[C]ongressional silence, no matter how 'clanging,' cannot override the words of the statute."); *Rapanos v. United States*, 547 U.S. 715, 749 (2006) (plurality op.) (noting the Court's "oft-expressed skepticism toward reading the tea leaves of congressional inaction"). Nor does it invalidate the President's interpretation of the Election Day statutes. The fact remains that Congress has not spoken to the issue, and the President's interpretation does not contradict the statutes.

The President's interpretation that the Election Day statutes require ballots to be received by Election Day also does not violate the vertical separation of powers or state sovereignty. Plaintiffs contend that the President has "unilaterally preempt[ed] state law" because "Congress did not preempt the States' valid choices regarding ballot receipt deadlines when it enacted the Election Day statutes." Pls.' Br. at 20. But according to its Article I, section 4 authority to "alter" the "Time, Places, and Manner of holding" federal elections, Congress did preempt state law when it enacted the Election Day statutes. The President merely interpreted the text of Congress's command. And at least one court has said that having a designated "day for the election" comprehends within it the idea that ballots will be received by that day. *See Wetzel*, 120 F.4th at 209; *see Foster*, 522 U.S. at 71 ("For all of petitioners' invocations of state sovereignty, there is no colorable argument that § 7 goes beyond the ample limits of the Elections Clause's grant of

authority to Congress.").

### f. Section 7(b) permissibly conditions funding on the adoption of nondiscriminatory standards.

Plaintiffs assert that section 7(b) imposes unlawful conditions on statutory funding, but section 7(b) only directs the EAC to condition state funds on a state's compliance with an existing statutory requirement to "adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State." 52 U.S.C. § 21081(a)(6). Section 7(b) only specifies that "what constitutes a vote and what will be counted as a vote" must "includ[e] that, as prescribed in 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1, there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting . . . after which no additional votes may be cast," except for UOCAVA votes. EO § 7(b). Requiring a uniform ballot receipt deadline of Election Day for all methods of voting simply ensures that a state's definition of what constitutes a vote is nondiscriminatory by not privileging absentee voters' ballots. *Supra* I.e. Thus, to comply with § 21081(a)(6)'s mandate, states must adopt a uniform ballot receipt deadline of Election Day. This condition does not usurp Congress's constitutional powers, contrary to Plaintiffs' assertion, Pls.' Br. at 19, because Congress itself set the condition in § 21081(a)(6) (as well as enacted the Election Day statutes).

Plaintiffs further claim that "Congress created the EAC as a bipartisan, independent entity" and did not "authorize the President to interfere with its disbursement of appropriated funds." Pls.' Br. at 20. But as explained above, because "[t]he entire 'executive Power' belongs to the President alone," *Seila Law*, 591 U.S. at 213, and the EAC is an executive agency, the President may direct the EAC to act within Congress's commands, *see supra* I.c.

### g. Requiring documentary citizenship does not violate UOCAVA

Section 3(d) of the Executive Order does not violate the UOCAVA. Rather, section 3(d) is

22

consistent with UOCAVA's text and design. Nothing in UOCAVA *limits* what kind of document requirements the Secretary of Defense may "prescribe" on the "official post card form." 52 U.S.C. § 20301(b)(2). And Plaintiffs cite no case law to support their novel interpretation—as there is none.

Instead, Plaintiffs ask this Court to adopt a strained reading of the legislative history whereby voter qualifications are "procedural roadblocks." Pls.' Br. at 12. But Congress has made eligibility requirements clear in the statute itself. *See, e.g.*, 52 U.S.C. § 20310(1), (5). The "roadblock" in *United States v. Alabama*, 778 F.3d 926, 928 (11th Cir. 2015), cited by Plaintiffs, was Alabama's runoff election schedule, not voter qualifications. On its face, Alabama's schedule made it impossible for Alabama counties to comply with UOCAVA's 45-day ballot transmission deadline, thus limiting the amount of time UOCAVA voters had to receive and return completed absentee ballots. *Alabama*, 778 F.3d at 928. This case differs because it involves existing voter qualifications that UOCAVA voters are already required to meet—citizenship and eligibility. Here, section 3(d) is aligned with UOCAVA—both require every person using the FPCA to be "qualified to vote," 52 U.S.C. § 20310(1), (5), which requires U.S. citizenship. 18 U.S.C. §§ 1015(f), 611 (unlawful for any alien to vote in Federal elections); *see United States v. Alabama*, 998 F. Supp. 2d 1283, 1290 (M.D. Ala. 2014) (it "is an obvious given" "that UOCAVA is aimed at only federal elections"). And this is made even more evident when observing that nothing in UOCAVA prohibits the State of Arizona's "unique requirements," Pls.' Br. at 10 n.3, that applicants must provide documentary proof of citizenship with the FPCA to receive a full ballot. *See* FVAP, Arizona Voting Assistance Guide, at section 6 (Aug. 2023), https://www.fvap.gov/guide/chapter2/arizona.

Plaintiffs also misread 52 U.S.C. § 20301(b)(7), which requires the Secretary of Defense

to "prescribe a standard oath for use with any document under this chapter affirming that a material misstatement of fact in the completion of such a document may constitute grounds for a conviction for perjury." UOCAVA instructs states to "use the standard oath" if a "State requires an oath or affirmation to accompany any document." *Id*. § 20302(a)(5). But the "standard oath" is not, as Plaintiffs argue, a substitute for proof of eligibility. *See* Pls.' Br. at 12–13. It is merely a mechanism by which applicants are held accountable for the veracity of *all* statements they make in completing required application documents.[7] Contrary to Plaintiffs' assertion that section 3(d)'s documentary citizenship requirement would render the FPCA unusable for its intended purpose, the FPCA already contemplates the submission of additional information or documents in the case of Arizona, Vermont, and Puerto Rico. FPCA, Voter Registration and Absentee Ballot Request, https://www.fvap.gov/uploads/fvap/forms/fpca.pdf (specifying in section 6 that Puerto Rico and Vermont require more information, providing a link to additional state guidelines, and indicating that the form may be used to clarify voter information); *see also* Arizona, Voting Assistance Guide at Section 6, https://www.fvap.gov/guide/chapter2/arizona (requiring documentary proof of citizenship for a full ballot).

Because U.S. citizenship and voter eligibility are already required for UOCAVA voters, and UOCAVA does not prohibit including a documentary-proof-of-citizenship requirement on the FPCA, section 3(d)'s directive does not violate UOCAVA.

## II.     Plaintiffs fail to demonstrate that they would be irreparably harmed absent a preliminary injunction.

Irreparable harm is "a necessary threshold showing for an award of preliminary injunctive relief." *Gonzalez-Droz*, 573 F.3d at 79 (citation omitted). "[A]n injury is irreparable if it 'cannot

---

[7] FVAP, Interpretation of the Help America Vote Act of 2002: Based on the Requirements for U.S. Citizens Covered by the Uniformed and Overseas Citizens Absentee Voting Act 14 (Aug. 2003), https://www.fvap.gov/uploads/FVAP/Policies/havamemo.pdf (stating the oath).

adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy.'" *Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 470 F. Supp. 2d 30, 64 (D.N.H. 2007) (quoting *Rio Grande Cmty. Health Ctr., Inc. v. Rullan,* 397 F.3d 56, 76 (1st Cir. 2005)). In addition, "[a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.,* 370 F.3d 151, 162 (1st Cir.2004). And the irreparable harm must "flow from the denial of an injunction." *Pauls v. Sec'y of Air Force,* 457 F.2d 294, 298 (1st Cir. 1972). Plaintiffs have failed to demonstrate that they have an inadequate remedy at law, *Together Emps. v. Mass Gen. Brigham Inc*., 32 F.4th 82, 85–86 (1st Cir. 2022), and that their alleged injuries could not be remedied after an adjudication on the merits.

Plaintiffs claim that the provisions mandating documentary proof of citizenship and enforcement of the Election Day ballot receipt deadline will irreparably harm them, if not enjoined. Pls.' Br. at 20–29. With respect to the first category, Plaintiffs state that adding a documentary proof of citizenship requirement to the federal form and the FPCA will compel them to divert resources,[8] impose unrecoverable implementation and compliance costs, and injure the States' efforts to ensure all eligible voters can register to vote. Pls.' Br. at 20. Concerning the second category, Plaintiffs also claim that the "Election Day directives" will cause them to "divert state

---

[8] To the extent Plaintiffs intend to rely on a diversion-of-resources theory of injury for standing, the Supreme Court has said that "standing" does not routinely "exist[ ] when an organization diverts its resources in response to a defendant's actions." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 370 (2024). "A plaintiff must show 'far more than simply a setback to the organization's abstract social interests.'" *Id*. at 394 (quoting *Havens Realty Corp v. Coleman*, 455 U.S. 363, 389 (1982)). Rather, an entity has to have had its core actions directly affected and interfered with, like in *Havens Realty*, when Havens gave HOME's employees false information about apartment availability, and the employees were able to sue because "Havens 'perceptibly impaired HOME's ability to provide counseling and referral services.'" *Id*. at 395 (quoting *Havens Realty*, 455 U.S. at 379). Here, Plaintiffs complain that they will have to expend resources to adapt to a change in the regulatory landscape. That is not the same as the type of harm remedied in *Havens*.

resources," "impose unrecoverable compliance costs," and "injure the States' efforts to ensure the integrity of their elections by confusing and disenfranchising the States' voters." Pls.' Br. at 24. But diverted resources and compliance costs are quantifiable amounts, and "[m]oney damages would adequately resolve all of the alleged harms." *Together Emps. v. Mass. Gen. Brigham Inc.*, 19 F.4th 1, 8 (1st Cir. 2021). Thus, those alleged harms cannot be irreparable.

That leaves the alleged injuries to the Plaintiff States' efforts to ensure all eligible voters can register to vote and to ensure the integrity of their elections by confusing and disenfranchising the Plaintiff States' voters. Plaintiffs argue that "documentary proof of citizenship acts as a barrier to registration for those who lack ready access to the necessary citizenship documents, . . . harming Plaintiff States' efforts to secure their citizens' voting rights." Pls.' Br. at 23. While Plaintiffs have asserted an alleged harm, they have failed to demonstrate the immediate necessity for an injunction. The Executive Order directs Executive Branch officials to take action to alter the federal form and the FPAC. Thus, the "accelerated timeline," which Plaintiffs argue causes them immediate harm, only directly applies to the named executive officials. Of course, Plaintiffs would have to implement the form in advance of the November 2026 election, but Plaintiffs have not shown that doing so now or in six months, for example, results in any different injury.

Concerning the Election Day provisions, Plaintiffs argue that injuries to their sovereign interests and public policies are irreparable because the Executive Order "threatens to disenfranchise a significant number of eligible voters"; "Election Day directives will disrupt the[ir] . . . election administration by casting doubt on the validity of existing ballot 'curing' procedures"; and "the Election Day directives create confusion that introduces significant independent risk to the[ir] . . . elections systems." Pls.' Br. at 25–27. Again, Plaintiffs do not explain why these concerns justify preliminary injunctive relief, since the next federal election is in November 2026,

and presumably this Court will adjudicate the merits of this case well before then.

Moreover, Plaintiffs waited more than 30 days after filing their complaint to move for preliminary injunctive relief. Their delay belies their claim of imminent irreparable harm. *See Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004); *Seafreeze Shoreside, Inc v. U.S. Dep't of Interior*, No. 1:22-CV-11091-IT, 2023 WL 3660689, at *4 (D. Mass. May 25, 2023). Plaintiffs have failed to show that they will suffer irreparable harm absent a preliminary injunction.

### III.    The balance of equities and public interest favor the government.

The balance of the equities and public interest weigh against granting injunctive relief. These last two factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. "Balancing harms requires the Court to weigh 'the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues.'" *Nuance Commc'ns, Inc. v. Kovalenko*, No. 22-CV-10656-DJC, 2022 WL 2347112, at *10 (D. Mass. June 29, 2022) (quoting *Get In Shape Franchise, Inc v. TFL Fishers, LLC,* 167 F. Supp. 3d 173 (D. Mass. 2016)).

The public has a "fundamental" interest in "maintaining our constitutional Republic" by ensuring that federal elections are "[f]ree, fair, and honest," and "unmarred by fraud, errors, or suspicion." EO § 1. "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). This Executive Order seeks to increase that confidence by directing executive officials to carry out their statutory duties to prohibit foreign nationals from participating in elections and to enforce the Election Day statutes. EO §§ 1, 2(a), 2(d), 3(d), 7(a), 7(b).

Comparatively, Plaintiffs claim that the public interest favors them because "[t]he public has an important interest in making sure government agencies follow the law," Pls.' Br. at 29 (quotation omitted), and because "the public has a profound interest in preventing the irreparable

harm of losing access to voting." *Id*. at 30. But as explained above, the President acted within his Article II authority when issuing the Executive Order, and the only potential voters it disenfranchises are noncitizens who are ineligible to vote anyway. *See* 18 U.S.C. § 611.

If, however, the Court finds injunctive relief appropriate, it "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). While "a district court retains substantial discretion to dictate the terms of an injunction bond," *Maine v. USDA*, No. 1:25-CV-00131-JAW, 2025 WL 1088946, at *29 (D. Me. Apr. 11, 2025), "injunction bonds are generally required," *NTEU v. Trump*, No. 25-5157, slip op. at 5 n.4 (D.C. Cir. May 16, 2025) (per curiam). Accordingly, Defendants request that this court require a bond if it grants a preliminary injunction.

## CONCLUSION

For these reasons, Defendants request that the Court deny Plaintiffs' motion for a preliminary injunction.

Dated: May 19, 2025                  Respectfully submitted,

                                     YAAKOV M. ROTH
                                     Acting Assistant Attorney General

                                     ERIC J. HAMILTON
                                     Deputy Assistant Attorney General
                                     Civil Division, Federal Programs Branch

                                     LESLEY FARBY
                                     Deputy Director
                                     Civil Division, Federal Programs Branch

                                     /s/ *Bridget K. O'Hickey*
                                     BRIDGET K. O'HICKEY
                                     Counsel to the Assistant Attorney General
                                     U.S. Department of Justice, Civil Division
                                     950 Pennsylvania Avenue, NW
                                     Washington, DC 20530
                                     (202) 353-8679
                                     Bridget.K.O'Hickey@usdoj.gov

                                     NICOLE M. O'CONNOR
                                     Assistant U.S. Attorney
                                     U.S. Attorney's Office
                                     John Joseph Moakley U.S. Courthouse
                                     1 Courthouse Way, Suite 9200
                                     Boston, MA 02210
                                     (617) 748-3112
                                     Nicole.O'Connor@usdoj.gov

                                     *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Bridget O'Hickey, hereby certify that I served a true copy of the above document upon all counsel of record via this court's electronic filing system and upon any non-registered participants via first class mail.

Dated: May 19, 2025                  /s/ *Bridget K. O'Hickey*
                                     BRIDGET K. O'HICKEY
                                     Counsel to the Assistant Attorney General