## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN, | |
| *Plaintiffs,* | |
| v. | No. 1:25-cv-10810-DJC |
| DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense, | |
| *Defendants.* | |

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Page

Introduction .................................................................................................. 1

Argument .................................................................................................... 1

I.      Plaintiffs' Claims Can and Should Be Resolved Now ............................. 1

      A.      Plaintiff States' Challenges to Sections 2(a), 2(d), and 3(d)
              Are Justiciable ...................................................................... 1

      B.      Plaintiff States' Challenge to Section 7(a) Is Similarly
              Justiciable ........................................................................... 4

      C.      Plaintiff States Face Imminent and Irreparable Harms ................. 6

II.     Plaintiffs Have Shown That They Are Likely to Succeed on the
      Merits ........................................................................................ 7

      A.      The President Cannot Impose New Requirements on the
              Federal Form ........................................................................ 7

            1.      The President cannot order the EAC to alter the
                        Federal Form ............................................................... 7

            2.      The NVRA precludes requiring documentary proof of
                        citizenship ................................................................ 10

      B.      The President Cannot Mandate the EO's Post Card Form
               Requirements ....................................................................... 11

      C.      The President Cannot Add Requirements to the Election Day
               Statutes .............................................................................. 14

      D.      The President Has No Authority to Add New Funding
               Conditions .......................................................................... 17

      E.      The EO Violates the Vertical Separation of Powers ................... 18

III.    The Equities and the Public Interest Favor a Preliminary Injunction ...... 19

Conclusion ................................................................................................. 20

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Arizona v. Inter Tribal Council of Arizona, Inc.*
570 U.S. 1 (2013)....................................................................8, 11, 19

*Axia NetMedia Corp. v. Mass. Technology Park Corp.*
889 F.3d 1 (1st Cir. 2018)..................................................................20

*Babbitt v. United Farm Workers Nat'l Union*
442 U.S. 289 (1979)............................................................................5

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*
295 F.3d 28 (D.C. Cir. 2002)..............................................................9

*Blum v. Holder*
744 F.3d 790 (1st Cir. 2014)...............................................................5

*Bognet v. Sec'y Commonwealth of Pa.*
980 F.3d 336 (3d Cir. 2020)..............................................................15

*Bost v. Ill. State Bd. of Elections*
684 F. Supp. 3d 720 (N.D. Ill. 2023).............................................15, 17

*City & Cnty. of San Francisco v. Trump*
897 F.3d 1225 (9th Cir. 2018) ............................................................6

*City of Providence v. Barr*
954 F.3d 23 (1st Cir. 2020).............................................................13, 18

*Clapper v. Amnesty Int'l, USA*
568 U.S. 398 (2013)............................................................................2

*Clinton v. City of New York*
524 U.S. 417 (1998)..........................................................................14

*CTS Corp. v. Waldburger*
573 U.S. 1 (2014)..............................................................................15

*Dep't of Commerce v. New York*
588 U.S. 752 (2019)............................................................................2

*DNC v. Wisconsin State Legislature*
141 S. Ct. 28 (2020)....................................................................6, 7, 18

*Donald J. Trump for President, Inc. v. Way*
492 F. Supp. 3d 354 (D.N.J. 2020) ................................................15, 16

**TABLE OF AUTHORITIES**
(continued)

Page

*FDA v. All. for Hippocratic Med.*
  602 U.S. 367 (2024)..................................................................................4, 5, 14, 18

*Fish v. Schwab*
  957 F.3d 1105 (10th Cir. 2020) ..........................................................................13, 19

*Foster v. Love*
  522 U.S. 67 (1997)...............................................................................................14, 16

*Holder v. Humanitarian Law Project*
  561 U.S. 1 (2010) ..........................................................................................................5

*Jama v. Immigr. & Customs Enf't*
  543 U.S. 335 (2005)....................................................................................................12

*Katz v. Pershing, LLC*
  672 F.3d 64 (1st Cir. 2012) .........................................................................................2

*League of United Latin American Citizens v. Exec. Off. of the President*
  ___ F. Supp. 3d ___, 2025 WL 1187730 (D.D.C. Apr. 24, 2025)......................... *passim*

*League of Women Voters of U.S. v. Newby*
  838 F.3d 1 (D.C. Cir. 2016) ...................................................................................10, 20

*Lujan v. Defenders of Wildlife*
  504 U.S. 555 (1992)..................................................................................................1, 2

*Martin v. Evans*
  241 F. Supp. 3d 276 (D. Mass. 2017) .........................................................................5

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.*
  923 F.3d 209 (1st Cir. 2019) .......................................................................................2

*Mi Familia Vota v. Fontes*
  129 F.4th 691 (9th Cir. 2025) ...............................................................................10, 11

*Millsaps v. Thompson*
  259 F.3d 535 (6th Cir. 2001) .....................................................................................17

*Myers v. United States*
  272 U.S. 52 (1926)..................................................................................................9, 10

*N. H. Right to Life Pol. Action Comm. v. Gardner*
  99 F.3d 8 (1st Cir. 1996)..............................................................................................4

*New York v. United States*
  505 U.S. 144 (1992)....................................................................................................19

iii

# TABLE OF AUTHORITIES
## (continued)

Page

*Pa. Democratic Party v. Boockvar*
  662 Pa. 39 (2020) ..........................................................................................................15

*PFLAG, Inc. v. Trump*
  ___ F. Supp. 3d ___, 2025 WL 685124 (D. Md. Mar. 4, 2025) ....................................20

*Reddy v. Foster*
  845 F.3d 493 (1st Cir. 2017) ................................................................... *passim*

*Republican Nat'l Comm. v. Mi Familia Vota*
  145 S. Ct. 108 (2024) .....................................................................................................11

*Republican Nat'l Comm. v. Wetzel*
  120 F.4th 200 (5th Cir. 2024) ..........................................................................15, 16, 17

*Republican Nat'l Comm. v. Wetzel*
  132 F.4th 775 (5th Cir. 2025) ...................................................................................16, 17

*Republican Nat'l Comm. v. Wetzel*
  742 F. Supp. 3d 587 (S.D. Miss.).................................................................................15

*Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*
  199 F.3d 26 (1st Cir. 1999)...........................................................................................4

*Seila Law LLC v. Consumer Fin. Prot. Bureau*
  591 U.S. 197 (2020)....................................................................................................9, 10

*State v. Meadows*
  88 F.4th 1331 (11th Cir. 2023) ....................................................................................18

*Susan B. Anthony List v. Driehaus*
  573 U.S. 149 (2014)........................................................................................................2

*Texas v. United States*
  523 U.S. 296 (1998).......................................................................................................1

*Texas v. United States Envtl. Prot. Agency*
  829 F.3d 405 (5th Cir. 2016) .........................................................................................7

*Together Emps. v. Mass Gen. Brigham Inc.*
  19 F.4th 1 (1st Cir. 2021)................................................................................................6

*United States v. Abreu*
  106 F.4th 1 (1st Cir. 2024)............................................................................................12

*United States v. Alabama*
  778 F.3d 926 (11th Cir. 2015) ......................................................................................13

**TABLE OF AUTHORITIES**
(continued)

Page

*United States v. Alabama*
998 F. Supp. 2d 1283 (M.D. Ala. 2014) ....................................................12, 13

*United States v. California*
921 F.3d 865 (9th Cir. 2019) ............................................................................5

*United States v. Herrera*
51 F.4th 1226 (10th Cir. 2022) ......................................................................13

*United States v. New York*
Case No. 1:25-cv-00205 (N.D.N.Y., filed Feb. 12, 2025) ...............................5

*United States v. Texas*
599 U.S. 670 (2023) ..........................................................................................5

*Voting Integrity Project, Inc. v. Bomer*
199 F.3d 773 (5th Cir. 2000) .........................................................................15

*Voting Integrity Project, Inc. v. Keisling*
259 F.3d 1169 (9th Cir. 2001) ..................................................................15, 17

*Wise v. Circosta*
978 F.3d 93 (4th Cir. 2020) ......................................................................14, 18

*Youngstown Sheet & Tube Co. v. Sawyer*
343 U.S. 579 (1952) .................................................................................8, 9, 10

*Zivotofsky ex rel. Zivotofsky v. Kerry*
576 U.S. 1 (2015) ..............................................................................................8

**CONSTITUTIONAL PROVISIONS**

United States Constitution, Article I
§ 3.......................................................................................................................9
§ 4, cl. 1 ..........................................................................................................8, 9

**FEDERAL STATUTES**

5 U.S.C.
§ 20921-20923 ...........................................................................................10, 18
§ 20928 ......................................................................................................10, 18

18 U.S.C.
§ 611 ..................................................................................................................9
§ 1015(f)............................................................................................................9

# TABLE OF AUTHORITIES
## (continued)

Page

44 U.S.C.
§ 3507(c) ...................................................................................................3

52 U.S.C.
§ 20301(b) ..............................................................................................13
§ 20301(b)(1) ..........................................................................................13
§ 20301(b)(2) ..........................................................................................11
§ 20301(b)(4) ..........................................................................................13
§ 20301(b)(7) ..........................................................................................12
§ 20502(1) .................................................................................................7
§ 20506 ...................................................................................................19
§ 20506(a)(6) ..........................................................................................19
§ 20508(a)(2) ............................................................................................8
§ 20508(b) ...............................................................................................10
§ 20508(b)(1)–(3) ...................................................................................10
§ 20508(b)(3) ..........................................................................................11
§ 21081(a)(6) .....................................................................................17, 18
§ 21081(b) ...............................................................................................17
§ 21085 ...................................................................................................17

REGULATORY MATERIALS

Executive Order No. 14248, *Preserving and Protecting the Integrity of American Elections,* 90 Fed. Reg. 14005 (Mar. 25, 2025) ..................................... *passim*

Federal Post Card Application, https://perma.cc/AWL3-SWWB .......................................12

FVAP (Aug. 2023), https://www.fvap.gov/guide/chapter2/arizona ....................................12

*Proposed Executive Order Entitled "Federal Regulation,"* 5 Op. O.L.C. 59, 62 (1981) .................................................................................................9

Voter Registration and Absentee Ballot Request Form, https://perma.cc/AWL3-SWWB ...................................................................................12

OTHER AUTHORITIES

Authentication, Black's Law Dictionary (12th ed. 2024) ...................................................11

*Postcard*, Merriam-Webster Dictionary, https://perma.cc/A955-M3WQ ...........................12

vi

## INTRODUCTION

Defendants' opposition fails to mount credible counterarguments to any of Plaintiff States' claims. The States have provided uncontroverted evidence of imminent and irreparable harm stemming from the EO's disruption of their ongoing election administration activities. Defendants' claim that the EO's implementation is uncertain is belied by the EO's unambiguous commands and Defendants' own arguments about presidential power to mandate specific agency action, contrary to statute. The States have also shown that the President has no statutory or constitutional authority to impose proof-of-citizenship requirements on federal voter registration forms. Defendants themselves concede that Congress never established a ballot receipt deadline. These points—taken together with the imperative to avoid voter disenfranchisement and electoral chaos—all support Plaintiff States' requested preliminary relief.

## ARGUMENT

### I.    PLAINTIFFS' CLAIMS CAN AND SHOULD BE RESOLVED NOW

Defendants wrongly contend that Plaintiff States fail to demonstrate imminent and concrete injury that is ripe for adjudication as to Sections 2(a), 3(d), and 7(a). Opp. at 4–10. Though Defendants cast the EO as only directing government officials to commence rulemaking or consider enforcement, the plain language of the EO and Defendants' own in-court assertions about the EO are clear. These commands threaten Plaintiff States with imminent, irreparable injury *now*, establishing standing and ripeness and weighing in favor of preliminary relief.

### A.    Plaintiff States' Challenges to Sections 2(a), 2(d), and 3(d) Are Justiciable

Jurisdiction here turns on standing and ripeness. *Reddy v. Foster*, 845 F.3d 493, 499–500 (1st Cir. 2017). To establish standing, a plaintiff must show: (1) a concrete and particularized injury in fact; (2) a causal connection to the defendant's conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Under the ripeness doctrine, a plaintiff must show that the case is fit for judicial resolution and that a delay in the court's consideration will cause hardship to the parties. *Texas v. United States*, 523 U.S. 296, 300–01 (1998).

An injury sufficient to confer standing (and that is ripe for redress) must be "actual or imminent." *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 409 (2013). Where the alleged injury has yet to occur, the imminence requirement is met "if the threatened injury is 'certainly impending' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (*SBA List*) (citation omitted). Imminently threatened fiscal injury—even "a relatively small economic loss"—is sufficient to confer federal court jurisdiction. *Katz v. Pershing, LLC*, 672 F.3d 64, 76 (1st Cir. 2012) (citation omitted); *see also Dep't of Commerce v. New York*, 588 U.S. 752, 765–67 (2019). The economic injury need not be direct, so long as the causal chain links that injury to the challenged federal action, and a State need not wait for an actual fiscal injury to occur before filing suit. *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 923 F.3d 209, 222–27 (1st Cir. 2019) (standing satisfied by "likely chain of events" resulting in imminent fiscal injury to State).

Plaintiff States imminently face multifaceted fiscal harms flowing from the EO's mandate that documentary proof of citizenship requirements be added to the Federal Form and Post Card Form. These provisions will require substantial expenditure and diversion of financial resources. *See* PI Mem. at 20–24. For instance, because States must accept both forms, the EO will require Plaintiff States to immediately initiate costly and time-consuming changes to their existing voter registration procedures and databases. *See id.* at 21. To ensure that the new documentation requirements are properly implemented, Plaintiff States will be required to spend time and money issuing new guidance for elections officials and conducting trainings. *See id.* at 22–23. The States will also have to fund and mount public education campaigns to counter confusion and disenfranchisement resulting from the changes. *See id.* Each of these expenditures will inevitably divert significant resources away from other election-related priorities. *See id.* at 21–23. Such direct fiscal injury—which is indisputably traceable to Defendants and redressable through an injunction—confirms Plaintiff States' standing. *Lujan*, 504 U.S. at 560–61.

Defendants argue that these harms are not imminent or fit for review because Sections 2(a) and 3(d) merely order the EAC and the Secretary to begin a process that could (but might not)

lead to documentary proof of citizenship requirements.  Opp. at 6–7, 9–10.  But there is no uncertainty about what the EO commands.  Section 2(a) states that the EAC "shall take appropriate action to require" documentary proof citizenship on the Federal Form.  Section 3(d) states that the Secretary "shall update [the Post Card Form] to require" documentary proof of citizenship.  These provisions leave no doubt about the requisite outcome of any procedures.  *See League of United Latin American Citizens v. Exec. Off. of the President*, ___ F. Supp. 3d ___, 2025 WL 1187730, at *27 (D.D.C. Apr. 24, 2025) (*LULAC*) ("[T]here is no mystery about what Section 2(a) purports to require or whether Section 2(a) purports to require it").

In fact, Defendants have *conceded* in open court that any process has a predetermined outcome.  *See* Bellows Decl. Ex. A at 70–74 (repeated confirmation by counsel in *LULAC* hearing that the EAC must impose documentary proof of citizenship given the EO, even if it determines that documentary proof of citizenship is not "necessary").  Defendants' claim before this Court that the imposition of documentary proof of citizenship is uncertain wholly ignores—and seemingly contradicts—their earlier concessions, as well as their current arguments that the President "acted within his authority" in issuing these mandates because "he properly oversees and controls those who execute the laws."  Opp. at 15–16.

Absent an injunction, documentary proof of citizenship could be required by the Federal Form in as little as 120 days, *see* Bellows Decl. Ex. A at 103, and in as little as 60 days for the Post Card Form, *see* Opp. at 9 n.3; *see also* 44 U.S.C. § 3507(c).  This accelerated timeline leaves Plaintiff States no choice but to incur significant costs necessary to anticipate and implement these requirements and administer upcoming elections.  Defendants' suggestion that Plaintiff States can simply wait to implement the EO's changes because the next federal election is in 2026, *see* Opp. at 26, betrays a striking naivete about the year-round nature of voter registration and the complexity of preparing for and administering elections, and the corresponding lead time required.  Plaintiff States' injuries caused by Sections 2(a), 2(d), and

3(d) are palpable and threaten to dramatically accelerate.[1]  These economic injuries are sufficiently imminent and fit for redress.

**B.    Plaintiff States' Challenge to Section 7(a) Is Similarly Justiciable**

Thirteen Plaintiff States (Ballot Receipt Plaintiffs) have challenged Section 7(a)—which requires the Attorney General to initiate enforcement against States that count ballots received after Election Day—based on imminently threatened injuries that are ripe for adjudication.

This is a textbook case of pre-enforcement standing.  Where enforcement is threatened, a plaintiff need not expose themselves to that enforcement before bringing a claim in federal court. *Reddy*, 845 F.3d at 500 (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).  The "straightforward" underlying rationale is that "a credible threat of present or future prosecution itself works an injury that is sufficient to confer standing, even if there is no history of past enforcement." *N. H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996). Thus, a plaintiff has pre-enforcement standing where the plaintiff intends to engage in proscribed conduct and faces a credible threat of enforcement for that conduct.  *Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 30–31 (1st Cir. 1999).  A credible threat of enforcement is shown where enforcement is "certainly impending" or there is a "substantial risk" that the enforcement will occur.  *Reddy*, 845 F.3d at 500 (citing *SBA List*, 573 U.S. at 158).

There can be no doubt that Ballot Receipt Plaintiffs face a "substantial risk" of impending enforcement action by the Attorney General.  The EO's new ballot receipt deadline currently conflicts with their state laws that extend ballot receipt deadlines beyond Election Day, and may also conflict with state laws permitting voters to cure ballot errors after Election Day.  The EO

---

[1] Defendants seize on the phrase "divert resources" to argue that organizational plaintiffs must show more than a setback to abstract social interests.  Opp. at 25 n.8 (citing *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 370, 394–95 (2024)).  But Plaintiff States are not advocacy organizations, and their injuries do not flow from diverting resources to challenge the EO. Rather, the resource diversion is a harm caused by compliance with the EO's mandates. Moreover, even if *FDA* were applicable here, Plaintiff States have established that implementation of Sections 2(a) and 3(d) would directly impair their core voter registration activities and require substantial resources to address.  *See FDA*, 602 U.S. at 395.

unequivocally commands the Attorney General to target States with conflicting laws, directing that she "*shall* take *all* necessary action *to enforce*" the President's new deadline. EO § 7(a) (emphasis added). Defendants themselves stress the President's power to issue mandatory orders to Executive officials, undermining any claim that Section 7(a) is merely advisory. Opp. at 10.

Critically, Defendants have not disavowed any intention to take enforcement actions against Ballot Receipt Plaintiffs. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979)) (non-disavowal of enforcement central to analysis); *accord Holder v. Humanitarian Law Project*, 561 U.S. 1, 15–16 (2010); *Blum v. Holder*, 744 F.3d 790, 799 (1st Cir. 2014); *Martin v. Evans*, 241 F. Supp. 3d 276, 283 (D. Mass. 2017) (credible threat of enforcement where law applied to plaintiffs and no disavowal of enforcement).

Defendants argue that the Attorney General's prosecutorial discretion is not "subject to judicial review." Opp. at 8 (citing *United States v. Texas*, 599 U.S. 670, 679 (2023)). But *Texas* did not nullify pre-enforcement standing jurisprudence. *Texas* held that States lacked standing to challenge the Executive's decision "*not* to arrest or prosecute" undocumented immigrants. 599 U.S. at 678. As the Supreme Court explained, "for standing purposes, the absence of coercive power over the plaintiff makes a difference." *Id.* But the coercive power here is unmistakable.

Defendants next suggest that the Attorney General may, under Section 7, simply "send letters to the Plaintiff States encouraging compliance with the President's interpretation" of the Election Day statutes. Opp. at 8. They cite *LULAC*, where the court proposed that such letters were a lawful alternative based on doubts that the Attorney General had legal authority to bring suit enforcing the Election Day statutes. 2025 WL 1187730, at *51. But Defendants have made no such concession.[2] To the contrary, counsel for Defendants represented to the *LULAC* court that the Attorney General's enforcement mandate encompasses "[a]ny number of actions, including criminal actions." Bellows Decl. Ex. A at 87. Moreover, suggesting that Section 7(a)

---

[2] Recent history shows examples of the Attorney General suing States in equity to invalidate state laws on preemption grounds. *See, e.g.*, *United States v. California*, 921 F.3d 865, 876 (9th Cir. 2019); *United States v. New York*, Case No. 1:25-cv-00205 (N.D.N.Y., filed Feb. 12, 2025).

would be satisfied by sending letters ignores the plain language of the provision, which mandates "*all necessary action*" and seemingly requires the Attorney General to proceed with other available enforcement mechanisms if letters do not elicit compliance. *See City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018) (a savings clause "cannot override" an unambiguous command in an Executive order).[3]

### C.    Plaintiff States Face Imminent and Irreparable Harms

Apart from justiciability, Plaintiff States' injuries are the type of irreparable harms that warrant immediate injunctive relief. Administering elections demands "rules of the road [that are] clear and settled" well in advance. *DNC v. Wisconsin State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring). Plaintiffs put forth a mountain of evidence (uncontroverted by Defendants) documenting the need for an injunction now. *See* PI Mem. at 20–28.

Defendants assert that Plaintiff States' alleged harms are not irreparable because "diverted resources and compliance costs are quantifiable amounts" and money damages "would adequately resolve all of the alleged harms." Opp. at 26. This misrepresents the harms established in Plaintiff States' declarations. The documentary proof of citizenship requirements and ballot receipt deadline would drain or divert the precious time, money, and workforce of state and local elections officials with limited resources. *See* PI Mem. at 20–28; Amicus Br. of Local Election Officials (LEO) at 10–14, 18–19. Defendants claim there is an adequate remedy at law available to Plaintiff States.[4] Opp. at 25–26. But what is the remedy? How can Plaintiff States obtain money damages from the federal government? Defendants do not explain.

In fact, by admitting that Plaintiff States "would have to implement the form in advance of the November 2026 election," Opp. at 26, Defendants effectively concede the irreparability of

---

[3] Ballot Receipt Plaintiffs also face a bevy of separate imminent injuries (which Defendants entirely ignore) that confer standing and establish ripeness. *See* PI Mem. at 24–29 (discussing sovereign injury, loss of goodwill and public faith in elections, and fiscal injuries for trainings).

[4] This case is nothing like *Together Emps. v. Mass Gen. Brigham Inc.*, 19 F.4th 1, 8 (1st Cir. 2021), where the plaintiffs sought injunctive relief for ordinary employment harms like loss of salary and health benefits and psychological injuries. Opp. at 25–26.

Plaintiff States' injuries.  Defendants fundamentally misunderstand what is required to administer elections and implement the EO's mandates.  Plaintiff States must plan for elections well over a year in advance.  *See DNC*, 141 S. Ct. at 31 ("running a statewide election is a complicated endeavor" requiring "thousands of state and local officials and volunteers" to "participate in a massive coordinated effort"); Amicus Br. LEO at 20.  Additionally, the Federal Form must also be honored in primary elections before November 2026, and voter registration occurs year-round.  *See* 52 U.S.C. § 20502(1).  The EO thus demands *immediate* actions from Plaintiff States, all of which are costly, time-consuming expenditures that cannot be recouped. PI Mem. at 21–25.  These Herculean efforts to comply with an order that Plaintiff States have shown is likely unlawful are necessarily irreparable.[5]  *See Texas v. United States Envtl. Prot. Agency*, 829 F.3d 405, 433 (5th Cir. 2016) ("complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs").

## II.    PLAINTIFFS HAVE SHOWN THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS

### A.    The President Cannot Impose New Requirements on the Federal Form

Section 2(a)'s command exceeds the power of the President.  The President has no authority to circumvent the NVRA and order the EAC to make specific changes to the Federal Form.  Even if he could, the NVRA prohibits requiring documentary proof of citizenship.

### 1.    The President cannot order the EAC to alter the Federal Form

Congress carefully legislated every aspect of the Federal Form, setting out requirements for its contents, prescribing procedural safeguards for amendments, and giving responsibility for the Form to the EAC as an independent, bipartisan commission.  *See* PI Mem. at 9–12.  Section 2(a) is unlawful because it "does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed

---

[5]  Plaintiff States did not delay in seeking preliminary injunctive relief.  This motion was filed 32 days after the filing of this suit and 41 days after the President issued his EO—far less than the 11 months and one year the plaintiffs waited in the cases Defendants cite.  *See* Opp. at 27.

by the President." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588 (1952).  None of Defendants' arguments justify the ways Section 2(a) runs roughshod over Congress's choices.

Defendants fail to meaningfully engage with three main pieces of Plaintiffs' argument. First, that the Constitution assigns power over elections to the States, subject only to congressional preemption.  U.S. Const. art. I, § 4, cl. 1; *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8–9 (2013) (*ITCA*); PI Mem. at 8–9.  Second, that pursuant to this power, Congress has enacted statutes dictating the contents of the Federal Form and a process for amendments that delegates power solely to a bipartisan, independent commission with a duty to make changes only "in consultation with the chief elections officers of the States."  52 U.S.C. § 20508(a)(2); PI Mem. at 9–11.  Third, that the EO contravenes the "manifest will of Congress, as expressed in the text, structure, and context of the NVRA and HAVA," leaving the President's power "at its lowest ebb."  *LULAC*, 2025 WL 1187730, at *37, citing *Youngstown*, 343 U.S. at 639; PI Mem. at 10–12.  In short, Section 2(a) "is incompatible with the express or implied will of Congress."  *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015).  Defendants make essentially no arguments on these points, confirming that this "separation-of-powers argument is substantially likely to succeed on the merits."  *LULAC*, 2025 WL 1187730, at *35.

Defendants instead argue that Section 2(a) does not "unilaterally dictate changes to the [F]ederal [F]orm" because it merely requires the EAC to take "'appropriate action'" to address the issue, which would include notice-and-comment and consultation.  Opp. at 12 (quoting EO § 2(a)(i)(A)).  This argument cannot be reconciled with the mandatory language of Section 2(a). Defendants have conceded that the EO mandates this requirement "regardless of the feedback [the EAC] receives from the States or other participants in the notice-and-comment process or of its own conclusions about whether such proof is 'necessary' to allow States to assess voter qualifications."  *LULAC*, 2025 WL 1187730, at *40.  Statutorily mandated procedures are made a nullity when the EO itself, and Defendants' own interpretation of it, allows only one possible outcome.  The EO ignores the constitutional and congressional structure set out above to govern this decision making.  Even the Office of Legal Counsel has disclaimed the position that a

President may claim for himself the power to make an ultimate determination that has been "delegated to [an agency] by law." *Proposed Executive Order Entitled "Federal Regulation,"* 5 Op. O.L.C. 59, 62 (1981). The President's dictate to require documentary proof of citizenship regardless of process and contrary to Congress's statutory design is ultra vires.

Defendants also claim that the Article II Vesting Clause gives the President plenary authority to direct the EAC according to his interpretation of the law and requires the EAC to obey his commands. Opp. at 10–12. This argument "is untethered from precedent and unsupported by even a maximalist view of 'the executive Power' under our Constitution." *LULAC*, 2025 WL 1187730, at *39. It exceeds even the Office of Legal Counsel's expansive views on Executive power. *Id.* at *41 (discussing OLC opinions rejecting "that the President may direct a predetermined outcome from a notice-and-comment rulemaking process").

Defendants go too far. A conclusion that "the President lacks the authority to direct the EAC to make specific, predetermined changes to the Federal Form . . . presents no impediment to 'the President's ability to perform his constitutional duty.'" *Id.* at *40 (quoting *Morrison v. Olson*, 487 U.S. 654, 691 (1988)). The Constitution assigns responsibility for regulating elections to the States and Congress. U.S. Const. art. I, § 4, cl. 1. The President has no constitutional duty to set the content of election regulations. The President can, however, ensure the laws are "faithfully executed," *id.* art. I, § 3, by enforcing existing criminal prohibitions on non-citizen registration and voting, 18 U.S.C. §§ 611, 1015(f).

Defendants' citations do not undermine this conclusion. *Youngstown* confirmed that the President's authority to act "must stem either from an act of Congress or from the Constitution itself," 343 U.S. at 585, and Plaintiff States have shown that neither source grants the President power to issue Section 2(a), *see* PI Mem. at 9–12. In *Allbaugh*, the court noted that the general guidance contained in the Executive order at issue was subordinate to the statutes that governed agencies' administration of federally funded projects. *See Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002). Nor do *Myers v. United States*, 272 U.S. 52 (1926) or *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020) require a different

outcome. The EAC is an "independent entity" composed of four commissioners, who are appointed to staggered four-year terms, must be election experts, and must be bipartisan in their makeup and actions. 5 U.S.C. §§ 20921–20923, 20928; *Seila Law*, 591 U.S. at 215–20 (contrasting the CFPB structure with that of independent agencies insulated from direct control); *Myers*, 272 U.S. at 135 (preserving independence for specifically committed statutory duties). The EAC also lacks meaningful Executive authority and is "best characterized as 'quasi-legislative.'" *LULAC*, 2025 WL 1187730, at *40, n.48; *see also* PI Mem. at 11–12.

Since the "President has no constitutional power over election regulation that would support this unilateral exercise of authority," *LULAC*, 2025 WL 1187730, at *38, Plaintiffs are likely to succeed in their challenge to Section 2(a) on this basis alone.

### 2.    The NVRA precludes requiring documentary proof of citizenship

Even if the President could order the EAC to alter the Federal Form, requiring documentary proof of citizenship would be "incompatible with the expressed or implied will of Congress." *See Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).[6] Congress explicitly determined that individuals must establish their citizenship through a checkbox and attestation and prohibited any "other formal authentication." 52 U.S.C. § 20508(b)(1)–(3). Thus, documentary proof of citizenship is "not legitimately necessary for registration," *Mi Familia Vota v. Fontes*, 129 F.4th 691, 719 (9th Cir. 2025), so the NVRA "does not permit its inclusion," *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 11 (D.C. Cir. 2016).

Defendants briefly argue that 52 U.S.C. § 20508(b) empowers the EAC to require documentary proof of citizenship on the Federal Form, but they fail to engage meaningfully with the text.[7] Defendants first focus on subsection (b)(1), arguing that it allows the EAC to

---

[6] Due to Arizona's unique legal requirements, the State does not join the argument that the NVRA prohibits a documentary proof of citizenship requirement on the Federal Form.

[7] Amicus Republican Party of Arizona (RPAZ) also brushes by the text of the statute, failing even to acknowledge in its discussion of the Federal Form that the NVRA requires attestation of citizenship under penalty of perjury, or that it prohibits any "formal authentication" requirement. *See* Proposed Amicus Br. of RPAZ, 3–11. RPAZ contends that "intimations" from the Supreme

"determine[] what identifying information 'is necessary' to assess an applicant's eligibility to vote." Opp. at 13. But the "[t]he ordinary meaning of 'necessary' is 'essential,'" and documentary proof of citizenship "is not 'essential' because the checkbox requirement already gives proof of citizenship." *Mi Familia Vota*, 129 F.4th at 719 (citing dictionary definitions).

Defendants then try to sidestep the limitation that the Federal Form "may not include any requirement for notarization or other formal authentication," 52 U.S.C. § 20508(b)(3), by arguing that the documentary proof "is not being used to authenticate the applicant's identity but his citizenship," Opp. at 13. Defendants' attempt to distinguish between proving citizenship and identity is illogical, and nothing in the statute limits the prohibition on requiring formal authentication to an applicant's identity alone. Defendants' own dictionary citation shows that authentication is "the act of proving that something"—here, a claim of citizenship—"is true or genuine." Authentication, Black's Law Dictionary (12th ed. 2024) *cited in* Opp. at 13–14.

If the Court reaches this issue, it should conclude that Plaintiff States are likely to succeed on their claim that the Federal Form cannot require documentary proof of citizenship, as the Ninth Circuit has held. *See Mi Familia Vota*, 129 F.4th at 719.

**B.    The President Cannot Mandate the EO's Post Card Form Requirements**

Defendants argue that Section 3(d), which mandates a documentary proof of citizenship requirement on the Post Card Form, is "consistent with UOCAVA's text and design" because nothing in the statute "*limits* what kind of document requirements the Secretary of Defense may 'prescribe' on the 'official post card form.'" Opp. at 23. That argument is inconsistent with UOCAVA's text, structure, and purpose.

To start, Section 3(d) conflicts with UOCAVA's text because the statute mandates that the voter registration form be a "post card." 52 U.S.C. § 20301(b)(2). The ordinary meaning of

---

Court resolve the issue. *See id*. at 9. But the Supreme Court has not held, nor even stated in dicta, that the NVRA allows the EAC to require documentary proof of citizenship. *See ITCA*, 570 U.S. at 19–20 (at most suggesting that the Administrative Procedure Act provides a vehicle to test any decision the EAC may make on a petition related to proof of citizenship); *Republican Nat'l Comm. v. Mi Familia Vota*, 145 S. Ct. 108 (Mem.) (2024) (giving no reasoning).

"post card" indicates that it must be sent without an envelope, precluding that any documentation be appended. *See* PI Mem. at 13; *Postcard*, Merriam-Webster Dictionary, https://perma.cc/A955-M3WQ ("[A] card . . . for mailing without an envelope and to which the sender must affix a stamp."); *United States v. Abreu*, 106 F.4th 1, 12 (1st Cir. 2024) (statutes interpreted "based on their plain and ordinary meaning"). Defendants fail to address this argument in their opposition, thus conceding it. *Compare* PI Mem. at 13 *with* Opp. at 22–24.

Defendants' reference to the additional state-specific requirements for Arizona, Vermont, and Puerto Rico on the Post Card Form does not support their interpretation that UOCAVA contemplates adding a documentary proof of citizenship requirement. *See* Opp. at 23–24. These state-specific requirements only affect whether voters can obtain a ballot for *state* elections through the Post Card Form, but UOCAVA is concerned with *federal* elections. *See United States v. Alabama*, 998 F. Supp. 2d 1283, 1290–91 (M.D. Ala. 2014). In any event, Vermont's and Puerto Rico's requirements are merely attestations. *See* Federal Post Card Application at 2 ("Section 6 Requirements"), https://perma.cc/AWL3-SWWB. And Arizona voters can still register and receive a ballot for federal elections if no documentary proof of citizenship requirement is included with their Post Card Form. *See* Arizona Voting Assistance Guide, Section 6, FVAP (Aug. 2023), https://www.fvap.gov/guide/chapter2/arizona.

The statutory text also indicates that the Secretary lacks discretion or authority to add a documentary proof of citizenship requirement to the Post Card Form. Congress's omission of that requirement strongly suggests the Secretary cannot add it, since courts "do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply," particularly where Congress has "shown elsewhere in the same statute that it knows how to make such a requirement manifest." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005). Here, UOCAVA requires the Secretary to prescribe "a standard oath for use with any document under this chapter."[8] 52 U.S.C. § 20301(b)(7). This "standard oath" both reflects

---

[8] The standard oath includes an affirmation of citizenship and eligibility to vote. *See* Federal Post Card Application, https://perma.cc/AWL3-SWWB.

Congress's determination that attestation constitutes the necessary proof of an applicant's eligibility to vote and shows that Congress knows how to make veracity requirements explicit. The determination that an *oath* is sufficient implies that other methods to verify statements in the Post Card Form—such as documentary proof—were intentionally excluded.

Additionally, UOCAVA carefully enumerates 11 different "Duties of [the] Presidential Designee" in 52 U.S.C. § 20301(b).  These duties include, among others, "consult[ing] with State and local election officials in carrying out this chapter" and "prescribe[ing] a suggested design for absentee ballot mailing envelopes."  *Id.* § 20301(b)(1), (4).  The careful listing of such specific duties—none of which grant broad powers to the Secretary, let alone contemplate a documentary proof of citizenship requirement—excludes those responsibilities or powers left unmentioned.  *See United States v. Herrera*, 51 F.4th 1226, 1287 (10th Cir. 2022) ("Under [the negative-implication] canon, 'the expression of one item of an associated group or series excludes another left unmentioned.'" (citation omitted)); *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) ("When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'" (citation omitted)).

Plaintiff States' position is also consistent with the purpose of UOCAVA, which is to "protect the voting rights" of military and overseas voters.  *Alabama*, 998 F. Supp. 2d at 1286. UOCAVA is meant to remove "procedural roadblocks," not erect new ones.  *See United States v. Alabama*, 778 F.3d 926, 928 (11th Cir. 2015); *see also* PI Mem. at 12–13.  Requiring documentary proof of citizenship on the Post Card Form would result in less registration and participation—the very problem Congress sought to remedy.  *See, e.g.*, *Fish v. Schwab*, 957 F.3d 1105, 1128, 1031 (10th Cir. 2020) (affirming finding that 12% of applicants were denied registration for failure to provide proof under law requiring documentary proof of citizenship).

As shown, Section 3(d) is inconsistent with the text, structure, and purpose of UOCAVA. It is thus "incompatible with the expressed or implied will of Congress," rendering it unlawful and ultra vires.  *See LULAC*, 2025 WL 1187730, at *37–38 (quoting *Kerry*, 576 U.S. at 10; *Youngstown*, 343 U.S. at 637, 639 (Jackson, J., concurring)).

C.    **The President Cannot Add Requirements to the Election Day Statutes**

Plaintiff States have shown that the President has no statutory or constitutional authority to mandate Section 7(a)'s new ballot receipt deadline.  *See* PI Mem. at 16–18.  Defendants fail to show otherwise, and even concede that "Congress has not spoken to the issue."  Opp. at 21.  That much is true, and the President cannot legislate in Congress's stead.

On the plain meaning of the Election Day statutes, Defendants offer only italics and rhetorical questions.  Opp. at 17.  Neither tactic undermines the Supreme Court's well-founded acknowledgment that the Election Day statutes require—at most—that voters make a "final act of selection" by Election Day.  *Foster v. Love*, 522 U.S. 67, 71 (1997); *see also* PI Mem. at 17.  Defendants agree that "Congress has not spoken" on a ballot receipt deadline.  Opp. at 21.  That concession alone establishes a likelihood of success on this claim.  The President cannot enact or amend statutes, *Clinton v. City of New York*, 524 U.S. 417, 438 (1998), nor "interpret the Election Day statutes" to inject a requirement that simply is not there, Opp. at 18.

Legislative intent alone cannot give the President authority that Defendants agree is found nowhere in the statutes' text.  Still, Defendants fail to show that Congress's intent in passing the Election Day statutes supports Section 7(a).  In passing the Election Day statutes, Congress meant to curb the problem of some States setting their elections earlier than others, influencing results in other States, and remove the burden on voters to turn out on multiple election days.  *Foster*, 522 U.S. at 73–74.  A ballot receipt deadline has nothing to do with these goals.  Defendants argue, however, that Ballot Receipt Plaintiffs' laws are "arbitrary," "discriminatory," "value one person's vote over that of another," and "treat[] some votes differently," which Congress could not have condoned.  Opp. at 20 (quotations omitted).  These claims do not withstand scrutiny.  Far from arbitrary, important public policy goals underlie Ballot Receipt Plaintiffs' laws, including avoiding voter disenfranchisement simply because of mailing delays "outside the voters' control."  *See Wise v. Circosta*, 978 F.3d 93, 100 (4th Cir. 2020).  Rather than discriminate or privilege one voter over another, these laws require *all* voters to cast ballots by the *same* day; that standard "could not be clearer or more uniform."  *Id.*

14

Defendants also claim that "congressional inaction says very little, if anything, about congressional intent." Opp. at 21. As Plaintiff States demonstrated, however, Congress *has* acted by passing legislation that recognizes state ballot receipt deadlines and incorporates them into federal law. PI Mem. at 17–18. In these circumstances, "'[t]he case for federal pre-emption is particularly weak.'" *CTS Corp. v. Waldburger*, 573 U.S. 1, 18 (2014) (citation omitted). Defendants themselves cite two cases that emphasize that statutes should be the lodestar of congressional intent. Opp. at 21. The fact that Congress has not overridden state-specific ballot receipt deadlines, in combination with its "express . . . approval" of them, supports their consistency with the Election Day statutes. *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1175 (9th Cir. 2001); *see also Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 776 (5th Cir. 2000) ("We are unable to read the federal election day statutes in a manner that would prohibit such a universal, longstanding practice of which Congress was obviously well aware.").

To support the President's erroneous interpretation of the Election Day statutes, Defendants heavily rely on a single flawed case: *Republican National Committee v. Wetzel*, 120 F.4th 200 (5th Cir. 2024). *See* Opp. at 18–21. *Wetzel* contradicts every other court to reach the issue, which have all correctly concluded that the Election Day statutes do not displace state laws governing the receipt deadlines for ballots timely cast by Election Day.[9] *Wetzel* is wrong at every level of its analysis. It disregards the plain meaning of the term "election" in favor of an arbitrary and fabricated three-part definition, applies that definition in strained and illogical ways, and misconstrues both history and law relevant to ballot receipt rules.

First, *Wetzel* claims to derive a three-part definition of the term "election" from *Foster*: "(1) official action, (2) finality, and (3) consummation." 120 F.4th at 207. But *Foster* expressly

---

[9] *Pa. Democratic Party v. Boockvar*, 662 Pa. 39, 77 & n.23 (2020); *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 354 (3d Cir. 2020), *cert. granted*, *vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021); *Bost v. Ill. State Bd. of Elections*, 684 F. Supp. 3d 720, 736–37 (N.D. Ill. 2023), *aff'd on other grounds*, 114 F.4th 634 (7th Cir. 2024); *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 371-72 (D.N.J. 2020); *Republican Nat'l Comm. v. Wetzel*, 742 F. Supp. 3d 587, 597–601 (S.D. Miss.), *rev'd* 120 F.4th 200 (5th Cir. 2024).

disavowed any attempt to offer an analytically conclusive definition of the term "election," and nowhere did the Court set out this tripartite definition or analyze those components as distinct concepts. *See* 522 U.S. at 71–73. At most, *Foster* postulates that "election" refers at a high level to "the combined actions of voters and officials meant to make a final selection of an officeholder." *Id.* at 71. Later, *Foster* refers simply to "the final act of selection," which aligns with the contemporaneous definition of "election" as "[t]he act of choosing a person to fill an office."[10] *Id.* at 71 (citations and quotations omitted)). *Wetzel* turns *Foster* on its head by conjuring a general rule from a case that deliberately avoided stating any such thing.

Second, *Wetzel*'s application of its three-part definition suffers from equally flawed reasoning. The court gives no reason why a deadline to mail a ballot does not satisfy any "official action" requirement, focusing narrowly on the passive act of ballot receipt and ignoring other election mechanics that occur before and after Election Day. *See* 120 F.4th at 207; *cf. Republican Nat'l Comm. v. Wetzel*, 132 F.4th 775, 782–83 (5th Cir. 2025) (Graves, J., dissenting from denial of rehearing en banc). For its view that "finality" can only be met when ballots are received, *Wetzel* relied on Mississippi law, and even more oddly, now-superseded Montana law from the 1940s.[11] 120 F.4th at 207–08; *Wetzel*, 132 F.4th at 783–85 (Graves, J., dissenting from denial of rehearing en banc). Finally, as to "consummation," *Wetzel* applied its arbitrary focus on ballot receipt to unconvincingly declare that "the election is consummated when the last ballot

---

[10] *Wetzel*, in contrast, discards dictionary definitions as unhelpful because they "make no mention of deadlines or ballot receipt." 120 F.4th at 206 & n.5 (collecting contemporaneous dictionary definitions). As Judge Graves aptly observed, "this sounds like an answer in search of a question." *Republican Nat'l Comm. v. Wetzel*, 132 F.4th 775, 781 (5th Cir. 2025) (Graves, J., dissenting from denial of rehearing en banc).

[11] *Wetzel* and Defendants claim that a receipt deadline is necessary to prevent voting after Election Day, but this is based on puzzling and incorrect theories about mail service. *See* 132 F.4th at 784-85 (Graves, J., dissenting from denial of rehearing en banc) ("Any piece of mail that is successfully recalled will receive a new postmark when mailed again"); *Way*, 492 F. Supp. 3d at 372 (provision allowing un-postmarked mail ballots to be counted if received within 48 hours of the close of the pools is a permissible and "conservative method to identify and count timely ballots that might otherwise be rejected" due to mail service errors). The concern about counting non-postmarked ballots is also a red herring where the EO prohibits the counting of *any* mail ballots received after Election Day, whether postmarked or not.

is received." 120 F.4th at 208; *contra Millsaps v. Thompson*, 259 F.3d 535, 546 (6th Cir. 2001)

(a "focus on the single act of receiving a ballot from a voter presents an unnatural and stilted

conception of the actions taken by [elections officials] and loses sight of the fact that an official's

mere receipt of a ballot without more is not an act meant to make a final selection"); *Keisling*,

259 F.3d at 1176 (tying election consummation to the conclusion of voting).

Third, *Wetzel* offered a dubious account of the historical record, intent on ignoring that the

Election Day statutes and extended ballot receipt deadlines have coexisted for decades. 120

F.4th at 209–10. As far back as the Civil War, some States allowed absentee ballots cast by

soldiers to be returned for counting after Election Day.[12] 132 F.4th at 785–87 (Graves, J.,

dissenting from denial of rehearing en banc). Absentee voting laws spread rapidly in the next

century. *See Keisling*, 259 F.3d at 1175. And while state absentee voting laws have for decades

allowed ballots to be received after Election Day, "Congress has never stepped in and altered the

rules." *Bost*, 684 F. Supp. 3d at 736. *Wetzel* failed to consider these critical facts.

### D.    The President Has No Authority to Add New Funding Conditions

Defendants claim that Section 7(b)'s mandate that the EAC condition funding on

compliance with an Election Day ballot receipt deadline implements HAVA's requirement that

"[e]ach State shall adopt uniform and nondiscriminatory standards that define what constitutes a

vote and what will be counted as a vote for each category of voting system used in the State." 52

U.S.C. § 21081(a)(6). But this provision plainly does not impose a uniform federal ballot receipt

deadline. As a threshold matter, it has nothing to do with ballot receipt, instead setting out rules

for "voting system[s]," a statutorily defined term focused on the technology used for voting and

tabulation. *See id.* § 21081(b). Even if the statute did reach ballot receipt rules, it expressly

vests *States* with power and responsibility to set standards defining valid votes, which is

incompatible with a uniform federal standard. *See id.* § 21081(a)(6); *see also id.* § 21085 (giving

---

[12] Defendants assert that "soldiers voted by casting their ballots in ballot boxes that election officials brought to the battlefield or else sending a proxy to deposit their votes in the ballot box at the soldier's home precinct." Opp. at 19. Defendants do not explain why this is any different from state laws requiring voters to deposit a ballot in the mail by a date certain.

States discretion over "the methods of complying" with this and related requirements). And Ballot Receipt Plaintiffs' laws *are* "uniform and nondiscriminatory" because they require *all* voters to cast a ballot by Election Day. *See id.* § 21081(a)(6); *see also Wise*, 978 F.3d at 100.

Because 52 U.S.C. § 21081(a)(6) cannot justify the funding condition mandated by Section 7(b), the EO effects an ultra vires amendment of the HAVA funding statutes and should be enjoined. *See City of Providence*, 954 F.3d at 31, 45; PI Mem. at 19–20. This provision of the EO is also unlawful on the grounds that it purports to control the EAC's administration of statutory funding programs, contrary to Congress's careful statutory design in creating the EAC as an independent, bipartisan commission. *See* 5 U.S.C. §§ 20921–20923, 20928.

### E.  The EO Violates the Vertical Separation of Powers

The EO provisions at issue here are each unlawful for the additional reason that they intrude on States' constitutional power and conscript States to implement presidential policy, contrary to the vertical separation of powers. *See* PI Mem. at 13–14.

Defendants fail to address this claim as it relates to Section 7 of the EO. Ballot Receipt Plaintiffs are likely to succeed on that claim because Section 7 purports to preempt their validly enacted laws related to the timing and manner of federal elections, even though "Congress has not spoken to the issue," *see* Opp. at 21, and implementing Section 7 would indisputably require States to devote governmental power and resources to changing their elections rules and procedures, *see DNC*, 141 S. Ct. at 31 (Kavanaugh, J. concurring) (noting the burdens and disruptions caused by such rule changes).

As to the proof-of-citizenship requirements, Defendants argue that Congress has the power to conscript States to carry out federal elections policy, even without compensation. *See* Opp. at 14–15 (citing U.S. Const. art. I, § 4, cl. 1 and case law). This case does not present the question of whether *Congress* can enact federal elections legislation that Plaintiff States must implement, but whether the *President* can conscript States to carry out his preferred voter registration methods in the absence of statutory authority. The answer to that question is no. *State v.*

*Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023) (rejecting the argument that the Executive has the power to "interfere[] with state election procedures based solely on the federal executive's own initiative."). Congress's concurrent power over federal elections displaces state law only "'so far as it is exercised, and no farther.'" *ITCA*, 570 U.S. at 9 (citation omitted). Because Sections 2(a) and 3(d) require States to administer voter registration requirements that go beyond those set by Congress, they violate the vertical separation of powers.

Plaintiff States have argued that Section 2(d) of the EO—which requires voter registration agencies to "assess citizenship" before offering voter registration forms to enrollees in public assistance programs—may apply to state and local offices designated as NVRA voter registration agencies under 52 U.S.C. § 20506. *See* PI Mem. at 14. Defendants conspicuously fail to address that ambiguity, leaving open the possibility that the requirement could be enforced against the States. *See* Opp. at 14–16. That, too, would conscript States to carry out a presidential policy not authorized by statute. *See* 52 U.S.C. § 20506(a)(6) (omitting any requirement to assess citizenship prior to providing a voter registration form). Article II is no answer to this constitutional defect because the President's authority does not extend to State agencies and instrumentalities. *See New York v. United States*, 505 U.S. 144, 188 (1992).

## III.   THE EQUITIES AND THE PUBLIC INTEREST FAVOR A PRELIMINARY INJUNCTION

Plaintiff States have explained that the equities and public interest weigh heavily in their favor because the targeted relief requested ensures that Defendants follow the law; avoids voter disenfranchisement and electoral chaos; and preserves a status quo where fraudulent voting is exceedingly rare. PI Mem. at 29–30; *see also* Amicus Br. LEO at 14–16.

Defendants do not credibly dispute these points. To start, Defendants assert without evidence that "the only potential voters" disenfranchised by the EO are "noncitizens who are ineligible to vote anyway." Opp. at 28. But the record is replete with evidence to the contrary. *See, e.g.*, *Fish*, 957 F.3d at 1128, 1031; PI Mem. at 23, 26; Amicus Br. LEO at 4–9, 17–18. Defendants also claim—again with no support—that refusing an injunction would preserve voter confidence and election integrity. Yet Congress already determined that existing federal law is

"sufficient to protect the public interest" in election integrity. *LULAC*, 2025 WL 1187730, at *50. Plaintiff States also "have other tools at their disposal to ensure the integrity of elections, including protections against voter fraud." *Newby*, 838 F.3d at 13. Unsurprisingly, then, fraudulent voting is rare. PI Mem. at 29; Amicus Br. LEO at 14–16. Any "harm to election integrity" stemming from the injunction of documentary proof of citizenship requirements therefore "appears minimal." *Newby*, 838 F.3d at 13–14. The same is true of any alleged damage to voter confidence. And because Plaintiff States have shown that the challenged provisions of the EO are likely unlawful, enjoining them serves the public interest. *See, e.g.*, *PFLAG, Inc. v. Trump*, ___ F. Supp. 3d ___, 2025 WL 685124, at* 29 (D. Md. Mar. 4, 2025).

Finally, the Court should reject Defendants' request for a bond. "[F]ederal courts typically require bonds only in suits between private parties with significant monetary interests at stake." *LULAC*, 2025 WL 1187730, at *61 (citing 11A C. Wright & A. Miller, *Federal Practice and Procedure* § 2954 nn.15–20 (3d ed. 2025) (collecting cases). "The purpose of such a bond is to ensure that the enjoined party may readily be compensated for the costs incurred as a result of the injunction should it later be determined that it was wrongfully enjoined." *Axia NetMedia Corp. v. Mass. Technology Park Corp.*, 889 F.3d 1, 11 (1st Cir. 2018). Defendants have not argued that they will incur costs as a result of the injunction.

## CONCLUSION

For the foregoing reasons, Plaintiff States respectfully request that the Court grant Plaintiff States' motion for a preliminary injunction.

20

Dated: May 27, 2025                                   Respectfully Submitted,


**ROB BONTA**
Attorney General of California

By: */s/            Anne P. Bellows*
  \*Anne P. Bellows
     Deputy Attorney General
  \*Thomas S. Patterson
     Senior Assistant Attorney General
  \*John D. Echeverria
     Supervising Deputy Attorney General
  \*Michael S. Cohen
  \*Malcolm A. Brudigam
  \*Kevin L. Quade
  \*Lisa C. Ehrlich
  Nicholas R. Green (BBO No. 698510)
     Deputy Attorneys General
Office of the California Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3847
Anne.Bellows@doj.ca.gov
 *Counsel for the State of California*
 *\*Admitted pro hac vice*


*(additional counsel on following pages)*

21

**AARON D. FORD**
Attorney General of Nevada

By: */s/ Heidi Parry Stern*
Heidi Parry Stern*
    Solicitor General
Craig Newby*
    First Assistant Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-9246
hstern@ag.nv.gov
*Counsel for the State of Nevada*


**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ M. Patrick Moore*
M. Patrick Moore (BBO No. 670323)
    First Assistant Attorney General
Anne Sterman (BBO No. 650426)
    Chief, Government Bureau
Phoebe Fischer-Groban (BBO No. 687068)
    Deputy Chief, Constitutional & Administrative Law Division
Chris Pappavaselio (BBO No. 713519)
    Assistant Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2495
Pat.Moore@mass.gov
*Counsel for the Commonwealth of Massachusetts*


**KRISTIN K. MAYES**
Attorney General of the State of Arizona

By: */s/ Joshua M. Whitaker*
Joshua M. Whitaker*
Karen J. Hartman-Tellez*
Kara Karlson*
    Assistant Attorneys General
2005 North Central Ave.
Phoenix, AZ 85004
(602) 542-7738
Joshua.Whitaker@azag.gov
*Counsel for the State of Arizona*

**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ Shannon Stevenson*
Shannon Stevenson*
 Solicitor General
Peter Baumann*
 Senior Assistant Attorney General
1300 Broadway
Denver, Colorado 80203
(720) 508-6400
shannon.stevenson@coag.gov
*Counsel for the State of Colorado*


**WILLIAM TONG**
Attorney General for the State of Connecticut

*/s/  Maura Murphy*
Maura Murphy*
 Deputy Associate Attorney General
Hartford, CT 06106
(860) 808-5020
Maura.Murphy@ct.gov
*Counsel for the State of Connecticut*


**KATHLEEN JENNINGS**
Attorney General of Delaware

By: */s/ Maryanne T. Donaghy*
Maryanne T. Donaghy*
 Deputy Attorney General
Vanessa L. Kassab
 Deputy Attorney General
Ian R. Liston
 Director of Impact Litigation
820 N. French Street
Wilmington, DE 19801
(302) 683-8843
maryanne.donaghy@delaware.gov
*Counsel for the State of Delaware*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ David D. Day*
David D. Day*
    Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes*
    Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
 david.d.day@hawaii.gov
*Counsel for the State of Hawaiʻi*

**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Alex Hemmer*
Alex Hemmer*
    Deputy Solicitor General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-5526
Alex.Hemmer@ilag.gov
*Counsel for the State of Illinois*

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Jonathan R. Bolton*
Jonathan R. Bolton*
    Assistant Attorney General
6 State House Station
Augusta, ME  04333-0006
(207) 626-8800
Jonathan.Bolton@maine.gov
*Counsel for the State of Maine*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Adam D. Kirschner*
Adam D. Kirschner*
    Senior Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-6424
akirschner@oag.state.md.us
*Counsel for the State of Maryland*


**DANA NESSEL**
Attorney General of Michigan

By: */s/ Erik Grill*
Erik Grill*
Danny Haidar*
Heather S. Meingast*
    Assistant Attorneys General
525 W. Ottawa, 5th Floor
P.O. Box 30736
Lansing, MI 48909
(517) 335-7659
grille@michigan.gov
*Counsel for the People of the State of Michigan*


**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Peter J. Farrell*
Peter J. Farrell*
    Deputy Solicitor General
Angela Behrens*
    Assistant Attorney General
445 Minnesota Street, Suite 600
St. Paul, MN 55101
(651) 757-1424
Peter.Farrell@ag.state.mn.us
*Counsel for the State of Minnesota*

**MATTHEW J. PLATKIN**
Attorney General Of New Jersey

By: */s/ Meghan K. Musso*
Meghan K. Musso*
Jonathan Mangel*
   Deputy Attorneys General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5276
meghan.musso@law.njoag.gov
*Counsel for the State of New Jersey*


**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ James W. Grayson*
James W. Grayson*
   Chief Deputy Attorney General
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
jgrayson@nmdoj.gov
*Counsel for the State of New Mexico*


**LETITIA JAMES**
Attorney General of New York

By: */s/ Colleen K. Faherty*
Colleen K. Faherty*
   Special Trial Counsel
28 Liberty Street
New York, NY 10005
(212) 416-6046
Colleen.Faherty@ag.ny.gov
*Counsel for the State of New York*


**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ James J. Arguin*
James J. Arguin (BBO No. 557350)
   Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400, Ext. 2078
jarguin@riag.ri.gov
*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane*
   Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov
*Counsel for the State of Vermont*


**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: */s/ Charlotte Gibson*
Charlotte Gibson*
    Assistant Attorney General
P.O. Box 7857
Madison, WI  53707-7857
(608) 287-4713
GibsonCJ@DOJ.STATE.WI.US
*Counsel for the State of Wisconsin*


*\*Admitted pro hac vice or pro hac vice applications forthcoming*


<u>**CERTIFICATE OF SERVICE**</u>

     I, Anne P. Bellows, hereby certify that I served a true copy of the above document upon all counsel of record via this Court's electronic filing system.

Dated:  May 27, 2025                */s/ Anne P. Bellows*

                                     Anne P. Bellows

                                     Deputy Attorney General

                                     *Counsel for the State of California*