**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:25-cv-10810-DJC |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | Leave to file granted May 28, 2025 |
| Defendants. | |

**BRIEF OF BIPARTISAN FORMER STATE SECRETARIES OF STATE AS AMICI
CURIAE IN SUPPORT OF PLAINTIFFS'
<u>MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 75)</u>**

## TABLE OF CONTENTS

INTEREST OF AMICI ................................................................................................ i

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 2

I.    The Constitution ensures that states play an irreplaceable and primary role in election regulation and administration. ........................................................... 3

   A.    The states' role in regulating and administering elections is constitutionally mandated. ........................................................................................... 3

   B.    The Constitution reflects an intentional choice to prioritize the states' accountability to voters. ................................................................................... 5

   C.    Because state officials are responsible for enacting and executing election laws, their election expertise surpasses that of the President. ............................ 6

II.   The President has no standalone power to regulate or administer elections. ............... 6

III.  The Executive Order violates federalism and the separation of powers by infringing on the Elections and Electors Clauses. ........................................................ 8

   A.    Executive Order Section 2(a) would write states out of the statutory process for developing the Federal Form. ........................................................... 10

   B.    Executive Order Section 2(b) would strip voter roll maintenance responsibilities from states that are delegated to them in federal law. ..................... 13

   C.    Executive Order Section 4 would severely burden states, in the process violating federal law regarding voting systems. ............................................. 14

   D.    Executive Order Section 7 attempts to invalidate numerous states' laws for receiving and tabulating votes. ....................................................................... 15

IV.   State election administrators face actual, imminent, and irreparable harm from the Executive Order. ........................................................................................ 17

   CONCLUSION ........................................................................................................ 19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. C.R. Union v. Philadelphia City Commissioners,*
   872 F.3d 175 (3d Cir. 2017) .......................................................................... 14

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,*
   576 U.S. 787 (2015) ...................................................................................... 1

*Ariz. v. Inter Tribal Council of Ariz., Inc.,*
   570 U.S. 1 (2013) ............................................................... 4, 5, 10, 11, 12

*Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar,*
   56 F.3d 791 (7th Cir. 1995) ........................................................................... 4

*Bellitto v. Snipes,*
   935 F.3d 1192 (11th Cir. 2019) .................................................................... 14

*Bognet v. Sec'y Commonwealth of Pennsylvania,*
   980 F.3d 336 (3d Cir. 2020) ......................................................................... 16

*Bond v. United States,*
   564 U.S. 211 (2011) ........................................................................................ 7

*Bost v. Ill. State Bd. of Elections,*
   684 F. Supp. 3d 720 (N.D. Ill. 2023) ........................................................... 16

*Bush v. Gore,*
   531 U.S. 98 (2000) .......................................................................................... 6

*Campanale & Sons, Inc. v. Evans,*
   311 F.3d 109 (1st Cir. 2002) ........................................................................ 13

*Clinton v. City of New York,*
   524 U.S. 417 (1998) ........................................................................................ 9

*Colorado v. DeJoy,*
   No. 20-CV-2768, 2020 WL 5513567 (D. Colo. Sept. 14, 2020) ...................... 8

*Donald J. Trump for President, Inc. v. Way,*
   492 F. Supp. 3d 354 (D.N.J. 2020) ............................................................... 16

*Georgia v. Clark,*
   119 F.4th 1304 (11th Cir. 2024) ..................................................................... 7

*Georgia v. Meadows,*
   692 F. Supp. 3d 1310 (N.D. Ga. 2023) ........................................................... 7

*Gonzalez v. Arizona,*
   677 F.3d 383 (9th Cir. 2012) .......................................................................... 4

*Gregory v. Ashcroft,*
   501 U.S. 452 (1991) ........................................................................................ 8

*Harkless v. Brunner*,
   545 F.3d 445 (6th Cir. 2008) ................................................................................ 4

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
   --- F. Supp. 3d ----, No. CV 25-0946, 2025 WL 1187730 (D.D.C. Apr. 24, 2025).......... passim

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ............................................................................... 12

*Libertarian Party of Va. v. Alcorn*,
   826 F.3d 708 (4th Cir. 2016) .............................................................................. 5

*Louisiana v. Biden*,
   55 F.4th 1017 (5th Cir. 2022) ............................................................................ 17

*Moore v. Harper*,
   600 U.S. 1 (2023) ............................................................................................ 4

*New York Times Co. v. United States*,
   403 U.S. 713 (1971) ......................................................................................... 16

*Patchak v. Zinke*,
   583 U.S. 244 (2018) ......................................................................................... 20

*Republican National Committee v. Wetzel*,
   120 F.4th 200 (5th Cir. 2024) ....................................................................... 15, 16

*Roudebush v. Hartke*,
   405 U.S. 15 (1972) ........................................................................................... 6

*Sandusky Cnty. Democratic Party v. Blackwell*,
   387 F.3d 565 (6th Cir. 2004) .............................................................................. 11

*Smiley v. Holm*,
   285 U.S. 355 (1932) ......................................................................................... 4

*State v. Meadows*,
   88 F.4th 1331 (11th Cir. 2023) ..................................................................... 6, 7, 9

*Storer v. Brown*,
   415 U.S. 724 (1974) ......................................................................................... 6

*U.S. Term Limits, Inc. v. Thornton*,
   514 U.S. 779 (1995) ......................................................................................... 4

*U.S. v. Gradwell*,
   243 U.S. 476 (1917) ...................................................................................... 5, 6

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ............................................................................. 10, 16, 19

## Statutes

2 U.S.C. § 7 ..................................................................................................... 16

3 U.S.C. § 1 ..................................................................................................... 16

52 U.S.C. § 20507 ................................................................................................ 14

52 U.S.C. § 20508 ................................................................................... 10, 11, 12

52 U.S.C. § 20962 ................................................................................................ 15

52 U.S.C. § 21083 ................................................................................................ 14

**Other Authorities**

3 Records of the Federal Convention of 1787 (M. Farrand ed. 1911); .......................... 5

Consultation, *Black's Law Dictionary* (12th ed. 2024). ............................................ 13

Lisa Marshall Manheim, *Presidential Control of Elections*, 74 Vand. L. Rev. 385 (2021). ........ 10

Mitch McConnell, *Trump Gives Democrats a Voting Gift*, Wall St. J. (Apr. 7, 2025) ............ 7, 11

National Conference of State Legislatures, *Helping America Vote, Election Administration in the United States 2024* (2025) ................................................................ 17, 18

Patrick Marley and Yvonne Wingett Sanchez, *Trump's order could force states to buy costly new voting machines*, Wash. Post (April 13, 2025) .......................................... 14

Presidential Statement on Signing National Voter Registration Act of 1993 (May 20, 1993) ..... 12

The Federalist No. 47, p. 301 (C. Rossiter ed. 1961) ............................................... 20

The Federalist No. 59, p. 360 (C. Rossiter ed. 1961) ............................................... 5

U.S. Dep't of Just., Just. Manual (2022) ............................................................... 7

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 ............................................................................ 3

U.S. Const. art. II, § 1 .................................................................................. 4

# INTEREST OF AMICI

Amici are a bipartisan group of former state secretaries of state.[1] As the District Court for the District of Columbia concluded in granting Amici leave to file a similar amicus brief in overlapping litigation there, "[a]s former state election officials, [A]mici offer a unique perspective not presented by the parties. And their proposed brief is relevant and helpful." Minute Order, *League of United Latin American Citizens, et al. v. Executive office of the President, et al.*, No. 25-946, (April 24, 2025).

Although Amici may not always have agreed about what constitute the best election policies, Amici nonetheless share a common commitment to ensuring that elections are free and fair, and Amici are unified in their understanding of states' pivotal role in enacting and executing election laws, as set forth in the U.S. Constitution. Amici are:

- **Former Secretary of State for the State of Colorado** – The Colorado Secretary of State is an elected member of the Executive Branch of Colorado's state government. The Secretary of State serves as the chief executive of an office that oversees and administers many laws, including the Colorado Election Code, Voter Registration Law, and Campaign Finance Laws. As a result, the Secretary of State supervises elections, maintains the statewide voter registration file, and verifies initiative petition signatures.

  - **Mary Estill Buchanan** was a public servant in Colorado for many years and a tireless advocate for democracy and women in public service. Most relevant here, Buchanan served two terms as Colorado's Secretary of State—from 1974 to 1983—as a Republican. She was the first woman to hold that office in the State's then-98-year existence. During her tenure as Colorado's Secretary of State, Buchanan was the only Republican in statewide office, working across the aisle to ensure efficient, effective administration of Colorado's elections. As Secretary, Buchanan advocated for and implemented reforms to improve transparency for elections and public office. Before being elected Secretary of State, Buchanan served on the Colorado Board of Agriculture and the Colorado Commission on the Status of Women, for which she created and served as chair for the Women in Government Committee to recruit and elect women to serve in public office.

---

[1] Amici state that no counsel for a party has authored this brief in whole or in part and that no person or entity, other than Amici or their counsel, has made a monetary contribution to the preparation or submission of this brief.

i

- **Former Secretary of State for the State of Connecticut** – The Secretary of State of Connecticut is the Commissioner of Elections for the State. The Secretary is charged with administering, interpreting and implementing election laws and ensuring fair and impartial elections. The Elections and Voting Division of the office administers, interprets and implements all state and federal laws pertaining to elections, primaries, nominating procedures, and the acquisition and exercise of voting rights. Additionally, in conjunction with local officials in the state, the office encourages and monitors the implementation of the National Voter Registration Act and other voter registration efforts in Connecticut.

  o **Miles Rapoport** was elected Connecticut's Secretary of the State as a Democrat in 1995 and served until 1998, leading multiple initiatives to expand voting and participation. Before that, Rapoport served five terms in the Connecticut House of Representatives, from 1984 to 1994, chairing the committee on elections. Rapoport was President of Dēmos from 2001 to 2014 and then President of Common Cause from 2014 to 2016. He then served as a Senior Practice Fellow in American Democracy at the Ash Center of the Harvard Kennedy School from 2017 to 2022. Since 2021 he has served as the Executive Director of 100% Democracy, an initiative committed to promoting a more representative democracy. He is the co-author, with *Washington Post* columnist E.J. Dionne, of *100% Democracy: The Case for Universal Voting,* published in March 2022 by the New Press.

- **Former Secretary of State for the State of Minnesota** – The Secretary of State of Minnesota is an elected constitutional officer serving in the State's Executive Branch. One of the office's primary responsibilities is overseeing statewide elections and operating the statewide voter registration system.

  o **Joan Anderson Growe** served first in the Minnesota House of Representatives before being elected as Minnesota Secretary of State as a Democrat. When she was elected Minnesota Secretary of State, Growe became the first woman to be elected to a Minnesota statewide office without having been appointed first. During her six-term tenure, Growe was tireless in her advocacy of voter participation, and, for most of her tenure, Minnesota led the nation in voter turnout. In addition to her work as Secretary of State, Growe also has served as an international election observer in Romania, South Africa, and Azerbaijan and as a member of the advisory committee for the Hubert H. Humphrey Institute of Public Affairs at the University of Minnesota.

- **Former Secretaries of the Commonwealth of Pennsylvania** – the Secretary of the Commonwealth is the chief state election official in Pennsylvania and leads the Pennsylvania Department of State. The Department of State is responsible for ensuring the security, integrity, and accessibility of the electoral process in Pennsylvania, by overseeing free, fair, and accurate elections.

  o **Kathy Boockvar** served as the Secretary of the Commonwealth from 2019 until 2021, and before that as Senior Advisor on election security to Governor Tom Wolf (D). Boockvar was also co-chair of the National Association of Secretaries of State (NASS)'s Elections Committee from 2019 to 2020, and a NASS

Representative on the Election Infrastructure Subsector Government Coordinating Council (EIS-GCC), a collaboration among federal, state, and local officials. During her tenure, Boockvar co-chaired Pennsylvania's Inter-Agency Election Security and Preparedness Workgroup, strengthened election security and voting rights measures across the state, and oversaw secure and accessible elections amid a global pandemic, marked by unparalleled transparency and voter participation. In prior years, Boockvar served as a poll worker and as a voting-rights attorney for a national civil rights organization and has been dedicated to public service throughout her career. After serving as Secretary, Boockvar became Vice President of Election Operations for the Center for Internet Security, and she is currently President of Athena Strategies, continuing work to strengthen election security and amplify understanding and civil discourse about elections.

- o **Leigh M. Chapman** served as the acting Secretary of the Commonwealth from January 2022 until January 2023 under Governor Wolf. Chapman also previously held the position of Policy Director for the Pennsylvania Department of State, from July 2015 until May 2017. In that role, Chapman managed the Department's policy and regulatory development process in coordination with the Governor's Office of Policy, including in the elections program area. Chapman also has served as the Executive Director for Deliver My Vote, the Voting Rights Program Director at The Leadership Conference on Civil and Human Rights, as a Senior Policy Advisor at Let America Vote, and as a Staff Attorney at the Advancement Project in the Voter Protection Program.

- **Former Secretary of State for the State of Washington** – The Secretary of State of Washington is the state's chief elections officer. The Secretary of State serves as an elected constitutional officer, and the duties of the office includes supervising state and local elections, and certifying the results of state primaries and general elections, filing and verifying initiatives and referendums, and producing and distributing the state voters pamphlet and election-notice legal advertising.

- o **Kim Wyman** was elected as a Republican to serve as Secretary of State for Washington State from 2013 to 2021. Wyman's career reflects thirty years of federal, state, and county-level elections experience. Previously, Wyman served as the Senior Election Security Advisor for the Cybersecurity and Infrastructure Security Agency. Before that, she was elected as Washington Secretary of State and Thurston County Auditor. Wyman began her career in election administration as the Thurston County Elections Director. She has earned state and national election administration certifications and served in leadership roles in many civic and professional associations. She has received numerous awards and distinctions, including her selection as a Rodel Fellow by the Aspen Institute in 2013, and her induction into The Election Center Hall of Fame in 2022 for her contributions to the election community. She is currently the president of ESI Consulting.

- **Former Secretary of State for the State of West Virginia** – The Secretary of State of West Virginia is the state's chief elections officer and is a member of the State Election

iii

Commission. The Secretary of State oversees the election process throughout the state along with the recording of official campaign financial records and candidate filings.

- o **Natalie E. Tennant** was elected as a Democrat as West Virginia's Secretary of State. She served eight years, earning the reputation as an innovative and visionary leader who was recognized nationally as a pioneer in elections administration, business development and financial accountability. Tennant has worked with the Brennan Center for Justice at New York University School of Law as a Manager of State Advocacy for Voting Rights and Elections. A respected voting rights leader, she has also testified in front of the U.S. Senate and Congressional committees as well as state legislative committees about the importance of improving the election process and access to voting. Tennant served as a resident fellow at the Harvard Kennedy School's Institute of Politics in 2022, and the first West Virginian chosen to participate in the highly respected Aspen Institute's Rodel Fellowship for Public Leadership that brings together a select group of America's most promising political leaders for bipartisan discussion and problem solving.

## INTRODUCTION

Amici—a bipartisan group of former secretaries of state—faithfully oversaw elections across the "laboratories" of electoral democracy: the states. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015). In their roles, Amici witnessed firsthand the Framers' wisdom in giving states' authority to enact election laws and administer elections, as set forth in the Elections Clause and Electors Clause of the U.S. Constitution. That is because, as the Supreme Court recognized in reaffirming the states' role under the Elections Clause, "[d]eference to state lawmaking allows local policies more sensitive to the diverse needs of a heterogeneous society, permits innovation and experimentation, enables greater citizen involvement in democratic processes, and makes government more responsive by putting the States in competition for a mobile citizenry." *Id.* at 817 (cleaned up).

The March 25, 2025, Executive Order—"Preserving and Protecting the Integrity of American Elections" (the "Executive Order")—seeks to upend this constitutional order by using *mandatory* language to (purportedly) *require*: unilaterally adding new requirements to the federal voter registration form (the "Federal Form"); federalizing some voter roll list maintenance; requiring the review and potential decertification of certain voting systems; and prohibiting states from processing absentee and mail-in ballots received after Election Day. Contrary to the federalism and separation of powers principles codified in the Constitution's Elections and Electors Clauses, the Executive Order would unilaterally coronate *the President* as the country's chief election policymaker and administrator. To Amici's successors and every state legislator in the country, the Executive Order therefore represents an existential threat. Indeed, the District Court for the District of Columbia recognized exactly that just a few weeks ago, when it enjoined enforcement of Executive Order Sections 2(a) and 2(d) because our "Constitution entrusts

Congress and the States—not the President—with the authority to regulate federal elections . . . [a]nd no statutory delegation of authority to the Executive Branch permits the President to short-circuit Congress's deliberative process by executive order." *League of United Latin Am. Citizens v. Exec. Off. of the President*, --- F. Supp. 3d ----, No. CV 25-0946, 2025 WL 1187730, at *1 (D.D.C. Apr. 24, 2025) ("*LULAC*").

That conclusion applies just as forcefully here. Unless the Court enjoins enforcement of the at-issue portions of the Executive Order, the Court would not just endorse the President and Executive Branch immediately usurping the authority of lawmakers and officials constitutionally responsible for making and enforcing election policy, it also would write any President a blank check to arrogate to themself powers that the Constitution explicitly reserves for the states and Congress.

## ARGUMENT

When Amici served in their roles, they were links in a chain of election administrators reaching back centuries to the enactment of the Constitution itself. In all aspects of their work, Amici respected and incorporated a deep historical understanding of the states' crucial role in enacting and enforcing election laws. Drawing from this experience, Amici have no doubt that the Executive Order is unconstitutional.

*First*, under the Elections and Electors Clauses, states play an irreplaceable role in election regulation and administration. Recognizing this, the Supreme Court has held the U.S. Constitution permits only the states and Congress to regulate the time, places, and manner of federal elections, the qualifications for voter registration, and the manner of appointing presidential electors.

*Second*, caselaw reaffirms that the President plays no standalone role in regulating elections.

*Third*, to the extent that the Executive Order attempts to draw power from federal laws enacted by Congress, none of the laws at issue have displaced states' traditional role in elections—indeed those laws explicitly reserve powers for states that the Executive Order disregards.

*Fourth*, executive overreach and the imposition of new requirements onto state election officials will irreparably harm states election administrators' ability to carry out their constitutionally mandated role.

At bottom, the Executive Order intrudes on the states' and Congress's powers and attempts to seize for the Executive Branch power that it does not and cannot exercise.

## I.    The Constitution ensures that states play an irreplaceable and primary role in election regulation and administration.

### A.  The states' role in regulating and administering elections is constitutionally mandated.

The Constitution explicitly gives states the responsibility to enact election laws and administer elections. The Elections Clause provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed *in each State by the Legislature thereof*; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1 (emphasis added). Similarly, the Electors Clause states: "Each state shall appoint, in such Manner as the *Legislature thereof may*

*direct*, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." U.S. Const. art. II, § 1 (emphasis added).[2]

These provisions endow the states with "sweeping" authority to enact election laws, subject only to the rest of the Constitution and preemption by Congress. *LULAC*, 2025 WL 1187730, at *4. The Elections Clause's "substantive scope is broad. 'Times, Places, and Manner,' . . . are '*comprehensive* words,' which 'embrace authority to provide a *complete* code for congressional elections. . . .'" *Ariz. v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013) ("ITCA") (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)) (emphasis added). The Elections Clause therefore "has two functions. [1] Upon the States it imposes the duty ('shall be prescribed') to prescribe the time, place, and manner of electing Representatives and Senators; [2] upon Congress it confers the power to alter those regulations or supplant them altogether." *Id.* at 8 (citing *U.S. Term Limits*, 514 U.S. at 804-05); *see also Moore v. Harper*, 600 U.S. 1, 29 (2023) (States hold a "constitutional duty to craft the rules governing federal elections.").

In addition to giving the states and Congress the power to regulate elections, under the current regime enacted pursuant to the Elections and Electors Clauses, states are responsible for administering federal elections. The Elections Clause "places the burden of administering federal elections on the states." *Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 796 (7th Cir. 1995); *Harkless v. Brunner*, 545 F.3d 445, 454 (6th Cir. 2008); *accord Gonzalez v. Arizona*, 677 F.3d 383, 391 (9th Cir. 2012) ("[A] state's role in the creation and implementation of federal election procedures . . . is to administer the elections through its own procedures . . .

---

[2] A state's "duty" under the Elections Clause "parallels the duty" described in the Electors Clause. *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 804-05 (1995).

.") *aff'd sub nom. ITCA*, 570 U.S. 1; *ITCA*, 570 U.S. at 41 (Alito, J., dissenting) (The Elections Clause "reserve[es] to the States default responsibility for administering federal elections . . . .").

In sum, it is "clearly established" that the Constitution "leave[s] the conduct of [federal elections] to state laws, administered by state officers," and separately Congress may also "assume[] to regulate such elections . . . by positive and clear statutes." *U.S. v. Gradwell*, 243 U.S. 476, 485 (1917).

### B. The Constitution reflects an intentional choice to prioritize the states' accountability to voters.

The Elections Clause reflects the Framers' view that states are well situated to regulate and administer federal elections, subject to Congressional preemption. That is because of state officials' accountability and proximity to local needs. "All other things being equal, it is generally better for states to administer elections. . . . [L]ocal administration . . . allows for greater individual input and accountability; a distant bureaucracy is in danger of appearing out of reach and out of touch." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 715-16 (4th Cir. 2016) (Wilkinson, J.). As James Madison explained, "[i]t was found necessary to leave the regulation of [federal elections], in the first place, to the state governments, as being best acquainted with the situation of the people." 3 Records of the Federal Convention of 1787, p. 312 (M. Farrand ed. 1911); *Gradwell*, 243 U.S. at 484; *ITCA*, 570 U.S. at 41 (Alito, J., dissenting). Indeed, even ardent federalist Alexander Hamilton conceded that, because the states are closer to the people, state regulation of federal elections is "in ordinary cases . . . both more convenient and more satisfactory." The Federalist No. 59, p. 360 (C. Rossiter ed. 1961) (A. Hamilton); *accord Gradwell*, 243 U.S. at 485; *ITCA*, 570 U.S. at 41 (Alito, J., dissenting); *LULAC*, 2025 WL 1187730, at *5. Of course, Madison and Hamilton also agreed that under the Elections Clause,

Congress—*but not the President*—was a necessary check on potential abuses by state legislatures. *See Gradwell*, 243 U.S. at 484-85.

### C. Because state officials are responsible for enacting and executing election laws, their election expertise surpasses that of the President.

In practice, the Elections Clause creates a regime in which state officials like Amici possess unique expertise in local election procedures that the Federal Government and in particular the President simply does not have. "[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). As a result, states have "comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates." *Id.* In turn, it is state and local officials like Amici— *i.e.*, those charged with developing and operationalizing those comprehensive election codes— who possess the "expertise" necessary to implement such a complex system. *Bush v. Gore*, 531 U.S. 98, 109 (2000).

### II. The President has no standalone power to regulate or administer elections.

"The Constitution empowers *only* the states and Congress to 'regulate the conduct of [federal] elections.'" *State v. Meadows*, 88 F.4th 1331, 1346 (11th Cir. 2023) (emphasis added), *cert. denied*, 145 S. Ct. 545 (2024) (quoting *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972)). That is because, with respect to the Elections and Electors Clauses, "[t]he President does not feature at all. In fact, Executive regulatory authority over federal elections does not appear to have crossed the Framers' minds." *LULAC*, 2025 WL 1187730, at *5. As a result, given that the "Constitution clearly grants the States the power to manage elections under the Elections Clause[,]" the

Executive Branch cannot declare, on its own initiative, "power to involve itself in States' election procedures[.]" *Georgia v. Meadows*, 692 F. Supp. 3d 1310, 1327-28 (N.D. Ga. 2023) (quoting *Bond v. United States*, 564 U.S. 211, 221 (2011)); *see also LULAC*, 2025 WL 1187730, at *36 (The Elections Clause and federal law "vest control over federal election regulation in other actors, leaving no role for the President.").

The Executive Branch does not, because it cannot, have constitutional authority to exercise—let alone usurp—the states' and Congress's Constitutionally delegated power to regulate and administer elections. Rather, federal courts have consistently found that "neither the Constitution, nor statutory law, nor precedent" support a broad authority to "superintend the states' administration of elections." *Meadows*, 88 F.4th at 1346. Indeed, Executive Branch officials have themselves "long recognized that the States – *not the federal government* – are responsible for administering elections, determining the validity of votes, and tabulating the results, with challenges handled by the appropriate election administrators, officials, legislatures, and courts." U.S. Dep't of Just., Just. Manual § 9-85.300 (2022) (emphasis added); *accord Georgia v. Clark*, 119 F.4th 1304, 1315 (11th Cir. 2024) (Rosenbaum, J., concurring). Or as Senator Mitch McConnell bluntly stated in a recent article: "[D]elegation of authority over election administration is crystal clear. Elections may have national consequences but the power to conduct them rests in state capitols."[3]

To the extent Executive Branch *agencies or commissions* play any role in the states' administration of elections, their authority to do so is strictly limited to the parameters set by Congress under the Elections Clause. *See Colorado v. DeJoy*, No. 20-CV-2768, 2020 WL

___

[3] Mitch McConnell, *Trump Gives Democrats a Voting Gift*, Wall St. J. (Apr. 7, 2025), https://archive.ph/30TWq.

5513567, at *2 (D. Colo. Sept. 14, 2020) ("Although the Constitution allows Congress to override a State's authority regarding its elections, it does not extend the same authority to the Postal Service – an agency of the federal executive branch"). When a similar conflict of authority arose in *Colorado v. DeJoy*, concerning whether a federal executive official of the Postal Service could implement policy that would intrude on the state's power to administer its election, the court enjoined the policy because if found no caselaw that "would permit this constitutional authority, specifically delegated to Congress, to be massively enlarged so as to cloak [a federal agency] and its agents with the power over-ride the election functions of a state sovereign." *Id.* The Executive Order at issue here attempts to do exactly this, epitomizing unconstitutional executive overreach of the highest and most alarming degree.

### III.    The Executive Order violates federalism and the separation of powers by infringing on the Elections and Electors Clauses.

Irrespective of Amici's views about the policy decisions reflected in the Executive Order, Amici all agree that the Executive Order violates the Constitution, and its implementation would represent a cataclysmic sea change in election administration. "Perhaps the principal benefit of the federalist system is a check on abuses of government. 'The constitutionally mandated balance of power between the States and the Federal Government was adopted by the Framers to ensure the protection of our fundamental liberties.'" *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) (citation omitted). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Id.*

The Executive Order represents the Executive Branch mounting a direct assault on these principles by claiming for the President powers reserved for the states and Congress under the

Elections and Electors Clauses. Put differently, "by increasing the power of the President beyond what the Framers envisioned," the Executive Order "compromises the political liberty of our citizens, liberty which the separation of powers seeks to secure." *Clinton v. City of New York*, 524 U.S. 417, 452 (1998) (Kennedy J., concurring). Amici are particularly sensitive to the risks inherent in the Executive Order's reallocation of power over elections. Election administration is already intricate and demanding; it requires an enormous amount of manpower and careful coordination, with preparation beginning months if not years in advance. Allowing the President to change election rules and procedures on that one single person's whim whenever they see fit, without any input from the election administrators charged with executing those rules and without the checks and balances provided by Congress, would be equivalent to dropping an anvil onto the carefully balanced scales of justice.

Fortunately, the law reflects that the president has no such authority. To start, the Executive Order purports to require—in mandatory terms—that various executive agencies and the Elections Assistance Commission ("EAC") unilaterally execute policy changes that neither the states nor Congress has enacted in accordance with the Elections Clause. *See*, *e.g.*, Executive Order, §§ 2, 4, 7 (using the verb "shall" to direct action by EAC).[4] But of course, as established above, "[t]he President has no 'direct control' over the individuals—members of Congress and state officials—who conduct federal elections." *Meadows*, 88 F.4th at 1347. In other words, "the President has done much more than state his views: He has issued an 'Order' directing that an independent commission 'shall' act to 'require' changes to an important document, the contents of which Congress has tightly regulated. That command exceeds the President's authority." *LULAC*, 2025 WL 1187730, at *40.

---

[4] Plaintiffs only seek to preliminarily enjoin Executive Order §§ 2(a), 2(d), 3(d), and 7.

Though the Executive Order attempts to obscure the President's attempt to exercise unilateral control over the election administration by directing the EAC to do the President's dirty work, that nonetheless stretches the separation of powers past its breaking point. "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). That is especially true "in the field of election administration," where "Congress appears to have granted the president vanishingly little power to exercise unilateral control." Lisa Marshall Manheim, *Presidential Control of Elections*, 74 Vand. L. Rev. 385, 435 (2021). Thus, "the President's power is 'at its lowest ebb' because his unilateral instruction" to change election procedures "is contrary to the manifest will of Congress, as expressed in the text, structure, and context of" federal election law. *LULAC*, 2025 WL 1187730, at *37 (quoting *Youngstown*, 343 U.S. at 639 (Jackson, J., concurring)). And because, beyond federal election statutes, "the President has no constitutional power over election regulation that would support this unilateral exercise of authority," the Executive Order is unlawful. *Id.* at *38.

Moreover, the Executive Order directly conflicts with statutes that Congress *did* in fact enact using its authority under the Elections Clause—statutes that maintain states' central role in election administration.

### A. Executive Order Section 2(a) would write states out of the statutory process for developing the Federal Form.

The Executive Order ignores that states must play a role in developing the Federal Form. The National Voter Registration Act ("NVRA"), which Congress enacted under the Elections Clause, requires that the EAC "*shall* develop a mail voter registration application form" "*in consultation with the chief election officers of the States*." 52 U.S.C. § 20508(a)(2) (emphasis added); *see also ITCA*, 570 U.S. at 5 ("The EAC is explicitly instructed, however, to develop the

Federal Form 'in consultation with the chief election officers of the States.'"). Further, the

Federal Form:

> may require *only* such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), *as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process.*

52 U.S.C. § 20508(b)(1) (emphasis added). The Government has previously argued to the

Supreme Court that this "means that the EAC *'shall require* information that's necessary [to

states], but may only require that information." *ITCA*, 570 U.S. at 18. As a result, to determine

whether information is necessary to state officials, the EAC necessarily *must* seek pre-

implementation input from state officials, as reaffirmed by the requirement that the Federal Form

be developed "in consultation with" states. 52 U.S.C. § 20508(a)(2). "Critically, Congress has

never assigned any responsibility for the content of the Federal Form to the President or to any

other individual in the Executive Branch with the power to act unilaterally." *LULAC*, 2025 WL

1187730, at *37. The President simply cannot carve the states out of a process in which federal

law requires their involvement.

The statutory division of responsibility between the EAC and states regarding the Federal

Form makes sense, as Congress created the Federal Form in the NVRA and established the EAC

in the Help America Vote Act ("HAVA"), which both ensure states' continued role in election

administration. "Nowhere in the language or structure of HAVA as a whole is there any

indication that the Congress intended to strip from the States their traditional responsibility to

administer elections . . . ." *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 576

(6th Cir. 2004); *see also* McConnell *supra* n. 3 ("When we wrote the Help America Vote Act, we

took care to reinforce—not undermine—the limits of federal involvement in America's

elections."). And under the NVRA, the very "purpose of the federal form is *not* to supplant the States' authority in this area but to facilitate interstate voter registration drives." *ITCA*, 570 U.S. at 46 (Alito, J., dissenting) (emphasis added); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) ("[T]he Federal Form requires registrants to supply information as part of their application only insofar as it is '*necessary* to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process.'" (quoting 52 U.S.C. § 20508(b)(1))); Presidential Statement on Signing National Voter Registration Act of 1993 (May 20, 1993) (describing NVRA's "implementation by States"), https://tinyurl.com/4mzydfa7. Executive Order Section 2(a) therefore contravenes both the text and intent of HAVA and the NVRA, by stripping from federal law the mandatory role that secretaries of state like Amici must play in developing the federal voter registration form.

Nor can the Government conceivably argue that Executive Order Section 2(a) is anything other than mandatory. In the *LULAC* case, "[a]t the hearing on Plaintiffs' Motions, [the Government] affirmed that the Executive Order means what it says: The EAC *must* add a documentary-proof-of-citizenship requirement to the Federal Form, regardless of the feedback it receives from the States or other participants in the notice-and-comment process or of its own conclusions about whether such proof is 'necessary' to allow States to assess voter qualifications." 2025 WL 1187730, at *40 (emphasis in original).

The EAC's initial steps to execute the Executive Order also prove this point. In April, the EAC's Executive Director sent a letter and email to state officials ostensibly gesturing towards states providing consultation in amending the Federal Form. *See* Exhibits to Declaration, *League of United Latin American Citizens, et al. v. Executive office of the President, et al.*, No. 25-946,

ECF No. 95-1 (April 16, 2025) (the "April EAC Communications"). However, purporting to seek the states' "input" on "on how states would propose to *implement*" the President's policy demands falls short of the participatory process envisioned by Congress. *Id.* (emphasis added). "Consultation" requires seeking the "advice or opinion of someone[,]" here, the election officers of the States. Consultation, *Black's Law Dictionary* (12th ed. 2024). "[I]f Congress has required consultation. . . we must presume that such consultation will have a serious purpose that is likely to produce tangible results." *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) (Stevens, J., concurring) (describing congressionally required consultation between agencies). Thus, as the First Circuit has emphasized, "[c]onsultation . . . must mean something more than general participation . . ., otherwise the consultation requirement would be rendered nugatory." *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 118 (1st Cir. 2002) (interpreting "consultation" in context of Atlantic Coastal Act). Moreover, the EAC's April EAC Communications communicates to the states that the Executive Order "instructs" new provisions are "required" to be included in the Federal Form, making clear that the EAC understands Executive Order Section 2 to require the EAC to unilaterally make certain specific and substantive changes to the federal national mail voter registration form.

It is undeniable that the Government views Executive Order Section 2(a) as a means to circumvent the states' statutory role in offering their advice or opinion regarding the substance of the Federal Form. This is unconstitutional and the Court should not sanction it.

### B. Executive Order Section 2(b) would strip voter roll maintenance responsibilities from states that are delegated to them in federal law.

Similarly, Executive Order Section 2(b)(iii) would improperly federalize other election functions that are left up to the states, by directing that the Department of Homeland Security and DOGE "shall" "review each State's publicly available voter registration list and available

records concerning voter list maintenance activities . . . for consistency with Federal requirements." Under the NVRA and HAVA, states—*not* Executive agencies—are responsible for voter roll list maintenance. The NVRA's "text unambiguously mandates that the *states* maintain a 'general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of' only two things: death or change of address." *Bellitto v. Snipes*, 935 F.3d 1192, 1200 (11th Cir. 2019) (quoting 52 U.S.C. § 20507(a)(4)) (emphasis added). And "[s]imilar to the NVRA, the HAVA requires *states* to 'perform list maintenance' of the computerized voting rolls." *Am. C.R. Union v. Philadelphia City Commissioners*, 872 F.3d 175, 181 (3d Cir. 2017) (quoting 52 U.S.C. § 21083(a)(2)(A) (emphasis added). The Executive Order ignores that the Executive Branch plays no role in conducting list maintenance.

### C.  Executive Order Section 4 would severely burden states, in the process violating federal law regarding voting systems.

Executive Order Section 4 seeks to impose on states, through unilateral executive fiat, an enormous unfunded mandate. By directing that the EAC "shall" "review and, if appropriate, re-certify voting systems," *see* Executive Order, § 4(b)(ii), the Executive Order attempts to force states to eliminate and replace what would likely amount to hundreds of thousands of voting systems, "hurl[ing] 2026 into turmoil by forcing states to hand-count ballots or scramble to spend millions of dollars on voting systems that aren't yet on the market."[5] Without passing on the merits of whether such systems should be *reviewed* and potentially replaced *over time*, Amici underscore that implementing this mandate would potentially cripple state and local election

---

[5] *See* Patrick Marley and Yvonne Wingett Sanchez, *Trump's order could force states to buy costly new voting machines*, Wash. Post (April 13, 2025), https://archive.ph/XKWyf#selection-391.0-409.22.

administration. Administering elections is extremely complicated and expensive, so funding for elections is carefully allocated with little wiggle room—and no ability to swallow such an enormous imposition.[6]

This directive is not just bad policy, it also is unlawful. Executive Order Section 4(b) requires that the EAC "*shall* provide that voting systems should not use a ballot in which a vote is contained within a barcode or quick-response code in the vote counting process except where necessary to accommodate individuals with disabilities and should provide a voter-verifiable paper record to prevent fraud or mistake." Executive Order, § 4(b)(i). But 52 U.S.C. § 20962 requires that, to adopt new voting system standards, the EAC *must* follow specific processes including providing notice and opportunities for public comment as well as receiving and considering review and feedback from their Technical Guidelines Development Committee, Board of Advisors, and Standards Board, before any changes may occur.[7] Importantly, states can choose to participate in the notice and comment process to ensure they have a seat at the table. Notice and comment can take months or years, and it would then take years for voting system manufacturers to create, test, and stock new voting systems that meet the new standards, thus allowing jurisdictions to begin the procurement process.

### D. Executive Order Section 7 attempts to invalidate numerous states' laws for receiving and tabulating votes.

Finally, Executive Order Section 7 seeks to unilaterally propagate one court's outlier interpretation of federal law regarding the meaning of "Election Day." *See Republican National Committee v. Wetzel*, 120 F.4th 200 (5th Cir. 2024) (interpreting federal "Election Day" laws, 2

---

[6] *See id.*

[7] 52 U.S.C. § 20962(a)-(d).

U.S.C. § 7 and 3 U.S.C. § 1). By imposing that interpretation on states across the country, the Government effectively seeks to nullify many other states' rules for vote counting. Under the Elections Clause, states have enacted laws that permit mail ballots to be returned after Election Day. *See* ECF No. 76 at 15, fn.5. As the Third Circuit has concluded, such states' laws "and federal laws setting the date for federal elections can, and indeed do, operate harmoniously" and thus the federal laws do not preempt the states laws. *Bognet v. Sec'y Commonwealth of Pennsylvania*, 980 F.3d 336, 354 (3d Cir. 2020), *cert. granted, judgment vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508, 209 L. Ed. 2d 544 (2021). Other federal courts agree. *See Bost v. Ill. State Bd. of Elections*, 684 F. Supp. 3d 720, 736-37 (N.D. Ill. 2023), *aff'd on other grounds*, 114 F.4th 634 (7th Cir. 2024); *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 372 (D.N.J. 2020).

Although the Fifth Circuit reached a different conclusion in *Wetzel*, *see* 120 F.4th at 215, that one court's ruling was explicitly limited to *Mississippi*. *See id.* Neither the President nor anyone else in the Executive Branch can extend *Wetzel*'s holding to invalidate the laws of states other than Mississippi—only Congress or the federal courts can do so. "The Constitution provides that Congress shall make laws, the President execute laws, and courts interpret laws. It did not provide for government by injunction in which the courts and the Executive Branch can 'make law' without regard to the action of Congress." *New York Times Co. v. United States*, 403 U.S. 713, 742 (1971) (Marshall, J., concurring) (citing *Youngstown Sheet & Tube Co.*, 343 U.S. 579). Because states have authority under the Elections Clause to enact laws regulating vote tabulation, unless or until Congress or some federal court invalidates laws permitting counting mail ballots received after Election Day, those state laws remain valid—no matter what the President might think about that fact.

**IV.    State election administrators face actual, imminent, and irreparable harm from the Executive Order.**

In addition to constituting an unlawful intrusion into the states' sovereign prerogative, the Order is immediately and irreparably harming states' abilities to administer their elections. In Amici's experience, any change to election law requires diverting resources away from states' existing processes for election administration—processes that are complicated, require careful planning far in advance of elections, and already rely on tenuous funding. Election administrators working across the country have confirmed that the Executive Order is already disrupting their work. *See* ECF No. 76. That alone constitutes irreparable harm. *See Louisiana v. Biden*, 55 F.4th 1017, 1033-34 (5th Cir. 2022) (affirming preliminary injunction based on "diversion of resources" resulting in "nonrecoverable compliance costs"). And because the Executive Order requires immediate implementation of certain provisions and provides little notice for others, *see*, *e.g.*, EO, § 7(a), 2(d), states' election administrators must already be preparing and even implementing processes to ensure that county officials and state agencies are following, and voters are aware of, the anticipated changes throughout registration and voting.

Administering elections is complicated. As the National Conference of State Legislatures ("NCSL") has described, election administration "requires proficiency in many areas, including event planning, logistics, procurement, warehouse management, human resources, physical security and cybersecurity skills…. These additional responsibilities come with unique funding and staffing challenges."[8] Though the Executive Order seemingly presupposes that changes to election administration can be made immediately and with the ease of flipping a switch or swiping a credit card, election administrators like Amici know that the work required for

---

[8] National Conference of State Legislatures, *Helping America Vote, Election Administration in the United States 2024* at 92 (2025), *available at* https://tinyurl.com/mr3hka63.

successful election administration spans across multiple state and local agencies, relies on many different stakeholders, and requires year-round dedication. The NCSL for example recognizes that "new voting policies" and "systems that require implementation and procedural changes" are among the factors that most significantly influence election workforces.[9] Amici's experience confirms this. Changes to election laws necessarily have a ripple effect, and implementing those changes and addressing their consequences takes away from the steady flow of tasks that are already on state election administrators' plates, including: managing outward facing websites, communicating with county and city elections officials, voter list maintenance, complying with state laws, informing the public about elections processes and procedures, reviewing and implementing cyber- and physical- security measures, reviewing and refining training plans and elections regulations, reviewing vendor contracts, initiating and submitting procurement process pursuant to the State law concerning purchasing equipment, ensuring ADA compliance and generally increasing accessibility for voters, supporting state legislative efforts related to elections, and countless other technical, operational, time-intensive aspects of election administration. And that is to say nothing of the fact that most state election administrators oversee the entire state's Department of State, which has many functions unrelated to election administration.

That burdensomeness of immediately implementing the Executive Order—so significant that it nears impossibility—is compounded by the Executive Order's threatened stripping of necessary, already-appropriated state election funding. *See* EO, § 4(a), 4(d), 5(b)(ii), 7(b). Election funding is already tenuous. The funds that the Executive Order claims to newly restrict, those mandated by HAVA, were directed to the states precisely because of the need to ensure

---

[9] *Id.* at 95.

safe and secure elections. By holding crucial state election funding hostage, the Executive Order actually jeopardizes rather than secures election administration, creating uncertainty where there previously was none.

Amici know well that, in anticipation of the many and complex additional steps required to effectuate new election requirements, state election officials must immediately and continually grapple with how to address the Executive Order. Each hour allocated to implementing the President's top-down mandate has irreversibly cost election administrator's time that should have been put toward existing policy priorities. Implementing the Order is increasingly unworkable as officials prepare for upcoming election deadlines.

*       *       *

The Elections Clause and numerous federal statutes implicated by the Executive Order make states a crucial part of enacting and administering federal elections. The President cannot use the Executive Order to crop states out of this picture, just as he cannot superimpose himself in.

## CONCLUSION

"The Executive, except for recommendation and veto, has no legislative power. The executive action we have here originates in the individual will of the President and represents an exercise of authority without law." *Youngstown Sheet & Tube Co.*, 343 U.S. at 655 (Jackson, J., concurring). As shown above, the Executive Order seeks to fundamentally reorder the Constitution's clear allocation of control over elections. The President plays no role in election regulation and administration—the Constitution explicitly leaves those tasks to the states and Congress. But if the Court does not grant Plaintiffs' targeted request to enjoin some of the most onerous portions of the Executive Order now, the snowball of executive overreach will grow

swiftly and exponentially. And then it is only a matter of time until the regime created by the

Elections and Electors Clauses is buried under an avalanche of Presidential power—"an

accumulation that would pose an inherent 'threat to liberty.'" *Patchak v. Zinke*, 583 U.S. 244,

250 (2018) (Plurality Op.) (Thomas, J.) (citation omitted); *see also* The Federalist No. 47, p. 301

(C. Rossiter ed. 1961) (J. Madison) ("The accumulation of all powers, legislative, executive, and

judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-

appointed, or elective, may justly be pronounced the very definition of tyranny."). The Court

should not countenance the Executive Order's attempted unconstitutional power grab by the

President. For the foregoing reasons, Amici respectfully request that the Court grant Plaintiffs'

motion for preliminary injunction.

Dated: May 28, 2025                    Respectfully submitted,

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2025, I electronically
filed the foregoing with the Clerk of the Court using
the CM/ECF system, which will send a Notice of
Electronic Filing to all counsel of record.

                    */s/ Brendan T. Jarboe*
                    Brendan T. Jarboe

*/s/ Brendan Jarboe*
Brendan Jarboe (BBO #691414)
**BLOCK & LEVITON, LLP**
260 Franklin St., Ste. 1860
Boston, MA 02110
Telephone: (617) 398-5600
brendan@blockleviton.com

Donald K. Sherman (D.C. Bar No. 90031810)
(*pro hac vice* motion forthcoming)
John B. Hill (PA Bar No. 328340)
(*pro hac vice* motion forthcoming)
Kalyn Mizelle McDaniel (D.C. Bar No. 90027120)
(*pro hac vice* motion forthcoming)
**CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON**
P.O. Box 14596
Washington, D.C. 20044
Telephone: (202) 408-5565
dsherman@citizensforethics.org
jhill@citizensforethics.org
kmcdaniel@citizensforethics.org

*Counsel for Amici*

20