# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| STATE OF CALIFORNIA, et al., | ) ) ) |  |
| Plaintiffs | ) ) |  |
| v. | ) ) ) | No. 25-cv-10810-DJC |
| DONALD TRUMP, et al., | ) ) ) |  |
| Defendants. | ) ) ) ) |  |

## MEMORANDUM AND ORDER

CASPER, J.                                                            June 13, 2025

## I.    Introduction

On March 25, 2025, President Donald J. Trump issued Executive Order No. 14248, Preserving and Protecting the Integrity of American Elections (the "Executive Order"). Among other things, the Executive Order requires the United States Election Assistance Commission (the "EAC") and the Secretary of Defense to implement documentary proof of citizenship requirements with federal voter registration forms required to be used by Plaintiffs, Attorney Generals representing nineteen states, California, Nevada, Massachusetts, Arizona, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, Rhode Island, Vermont and Wisconsin (collectively, the "Plaintiffs" or the "States"), commands the Attorney General to take action against thirteen of the States that have laws either allowing for the counting of ballots mailed on or before Election Day but received afterward, or laws allowing voters to cure timely-submitted ballots with minor technical problems ("Ballot

Receipt States"), and directs the EAC to condition statutory funding upon compliance with a ballot receipt deadline that is contrary to the respective state laws established by those thirteen States. The States have moved for a preliminary injunction barring the named Defendants (collectively, the "Defendants" or the "Executive Branch"), from implementing these mandates of the Executive Order.

After careful consideration of the parties' filings, briefs from *amici curiae* and oral argument by counsel, the Court ALLOWS the States' motion for preliminary injunction for the reasons explained at length below.

In sum, the challenges by the States to certain provisions of the Executive Order, namely §§ 2(a), 2(d), 3(d), 7(a) and 7(b), are ripe for review. Their challenge to § 2(a), that requires the EAC to take appropriate action to require documentary proof of U.S. citizenship for voter registration, is ripe because it imposes a deadline and dictates the precise contours of this new requirement and implementation of same poses an imminently threatened economic injury on the States. The same is true with § 3(d), that similarly mandates the Secretary of Defense to require documentary proof of U.S. citizenship for members of the military and other U.S. citizens living abroad. Although the Executive Order does not establish a deadline for this requirement, the command of § 3(d) is clear and, accordingly, fit for review and would pose the same hardship for the States as § 2(a). The States have a likelihood of success on the merits as to their challenges to both sections. There is no dispute (nor could there be) that U.S. citizenship is required to vote in federal elections and the federal voter registration forms require attestation of citizenship. The issue here is whether the President can require documentary proof of citizenship where the authority for election requirements is in the hands of Congress, its statutes (the UOCAVA, the NVRA and the HAVA) do not require it, and the statutorily created EAC is required to go through a notice and

comment period and consult with the States before implementing any changes to the federal forms for voter registration. As to both of their challenges to §§ 2(a) and 3(d), the States are likely to succeed on the merits.

The States are also reasonably likely to succeed as to their challenge to § 2(d) of the Executive Order, which requires the head of each voter registration agency to assess citizenship prior even to providing the federal voter registration form to enrollees of public assistance agencies. Defendants cannot point to any source of authority for the President to impose this requirement on the States, particularly where the Elections Clause gives power over federal elections to Congress, and, in acting on that authority, Congress established the EAC to prescribe rules and regulations for elections and the NVRA requires voter registration agencies, including all offices in the States that provide public assistance, to distribute the federal voter registration form.

As to §§ 7(a) and 7(b), the States have standing to challenge both provisions (unlike the DC Court found as to the private parties in that case) and these challenges are ripe for consideration. Pre-enforcement review of a threatened government action is appropriate if the threat of enforcement is sufficiently imminent. This is particularly true where the government has suggested that it could take civil and criminal enforcement action against the Ballot Receipt States for purported violation of the Election Day statutes. As to the merits of the challenge to § 7(a), there is nothing in the text of the Election Day statutes that bars the Ballot Receipt States from counting ballots received in accordance with their ballot receipt laws or that provides for civil enforcement or criminal action by the Attorney General against the Ballot Receipt States. Even if the Attorney General could take some other actions to enforce the Executive Branch's interpretation of the Election Day statutes (which is beyond what the States challenge here), that does not include civil or criminal enforcement action against the thirteen Ballot Receipt States under the current statutory

scheme.  As to the challenge to § 7(b), the HAVA does not condition election funding to States to their ballot receipt deadline and the President does not have the authority to direct the EAC to impose such a condition.  Accordingly, the States are likely to succeed on the merits of this challenge.

The States have also shown the risk of irreparable harm in the absence of an injunction where the challenged sections of the Executive Order would burden the States with significant efforts and substantial costs to revamp voter registration procedures and would impede the registration of eligible voters, many of whom lack ready access to documentary evidence of citizenship (e.g., U.S. passport and other forms of identification that reflect citizenship).  In light of the likelihood of success on the merits of their challenges to these aforementioned sections of the Executive Order, the risk of irreparable harm in the absence of the relief sought and having considered the balance of equities and the public interest in granting such relief, the Court ALLOWS the States' motion for a preliminary injunction.

## II.    Background

The Constitution's Elections Clause empowers states to prescribe the "Times, Places, and Manner of holding" congressional elections.  U.S. Const. art. I, § 4, cl. 1.  "[T]hese comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes" among other issues.  Smiley v. Holm, 285 U.S. 355, 366 (1932).  The Elections Clause empowers Congress to "make or alter" state election laws.  U.S. Const. art. I, § 4, cl. 1.  "In practice, the Clause functions as 'a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices.'"  Arizona v. Inter Tribal Council of

Arizona, Inc., 570 U.S. 1, 9 (2013) ("ITCA") (quoting Foster v. Love, 522 U.S. 67, 69 (1997)). For presidential elections, the Electors Clause provides States with the primary authority to decide how electors are chosen. U.S. Const. art. II, § 1, cl. 2.

The Constitution does not grant the President any specific powers over elections. Rather, the Constitution vests the President with "executive Power" and commands him to "take Care that the Laws be faithfully executed." U.S. Const. art. II, §§ 1, 3. The President "plays no direct role in the process" of appointing electors, "nor does he have authority to control the state officials who do." Trump v. United States, 603 U.S. 593, 627 (2024). As the Supreme Court has observed, "the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." Medellín v. Texas, 552 U.S. 491, 526-27 (2008) (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587 (1952)).

A.    **Existing Federal Law**

*1.    The Uniform Overseas Citizens Absentee Voting Act ("UOCAVA")*

In the exercise of its constitutional authority, Congress has adopted a comprehensive scheme regarding voter registration and federal elections. In 1986, Congress enacted the UOCAVA to streamline registration and voting rules for members of the military and for U.S. citizens living abroad. 52 U.S.C. §§ 20301 *et seq*. The UOCAVA provides for the creation of "an official post card form, containing both an absentee voter registration application and an absentee ballot application" and requires States to use the prescribed form. Id. §§ 20301(b)(2), 20302(a)(4). The UOCAVA does not include a documentary proof of citizenship requirement, but requires that voters are citizens and verifies their citizenship through attestation. Federal Post Card Application (FPCA), https://www.fvap.gov/uploads/FVAP/Forms/fpca.pdf (last visited June 12, 2025).

2.    *The National Voter Registration Act ("NVRA")*

Seven years later, in 1993, Congress, recognizing that "the right of citizens of the United States to vote is a fundamental right," enacted the NVRA to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," make it possible for federal, state and local governments to implement its provisions to enhance voter participation by eligible citizens, "protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(a), (b). The "NVRA's primary emphasis is on simplifying the methods for registering to vote in federal elections." Colón-Marrero v. Vélez, 813 F.3d 1, 10 n.13 (1st Cir. 2016); see 52 U.S.C. § 20506(a)(2)-(3).

As part of its effort to enhance voter participation, the NVRA established baseline voter registration procedures which every state must implement, alongside "any other method of voter registration provided for under State law." 52 U.S.C. § 20503(a). Specifically, the NVRA requires states to establish procedures to allow voters to register by mail, in tandem with a driver's license application or at designated voter registration agencies. Id. Designated voter registration agencies must include "all offices in the State that provide public assistance," "all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities" and other offices designated by the state. Id. § 20506(a)(2)-(3).

As relevant here, the NVRA requires the development of a mail voter registration application form for elections for Federal office (the "Federal Form"), which "may require only such identifying information . . . and other information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." Id. § 20508(b)(1). Citizenship is an eligibility requirement for which the Federal Form requires attestation. Id. § 20508(b)(2). States subject to the NVRA

"shall accept and use" the Federal Form.  Id. § 20505(a)(1).  The NVRA requires that certain federal and state agencies ("voter registration agencies") distribute the Federal Form.  Id. §§ 20506(a)(4)(i), (a)(6).  "[A]ll offices in the State that provide public assistance" and "all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities" must be designated as voter registration agencies.  Id. § 20506(a)(2)(A)-(B).

Congress initially gave responsibility for promulgating the Federal Form to the Federal Election Commission ("FEC"), an "inherently bipartisan" six-member body.  See Fed. Election Comm'n v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 37 (1981).  In 2002, Congress passed the Help America Vote Act ("HAVA"), which created the EAC, a multi-member, bipartisan, "independent entity" and transferred responsibility for the Federal Form to this body.  52 U.S.C. §§ 20508(a), 20921, 20923, 20928.

The contents of the Federal Form are set by regulation, 11 C.F.R. § 9428.4, and alterations to the Federal Form require notice-and-comment rulemaking, 5 U.S.C. § 553.  The NVRA also requires the EAC to consult "with the chief election officers of the States" on changes to the Federal Form.  52 U.S.C. § 20508(a)(2).  "States retain the flexibility to design and use their own registration forms, but the Federal Form provides a backstop:  [n]o matter what procedural hurdles a State's own form imposes, the Federal Form guarantees that a simple means of registering to vote in federal elections will be available."  ITCA, 570 U.S. at 12.

### 3.    The HAVA

In addition to creating the EAC, see 52 U.S.C. §§ 20508(a), 20921, 20923, 20928, the HAVA also established a funding program to support states' administration of elections and required that the EAC distribute the associated funds in accordance with statutory mandates.  These payments include "requirements payments," which support compliance with federal standards for

election systems and other improvements, 52 U.S.C. §§ 21001, 21002, 21003, election improvement funds, id. § 20901, and election security matching grants, Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. 348, 562 (2018); Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, 133 Stat. 2317, 2461 (2019); Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, 268 (2022); Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4679 (2022); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, 549 (2024) (each appropriating funds for election security grants to be administered under the election improvement funding statute, 52 U.S.C. §§ 20901, 20903, 20904); see U.S. Elections Assistance Comm'n, Election Sec. Grant, https://www.eac.gov/grants/election-security-funds (last visited June 12, 2025).  For example, in March of this year, Congress appropriated an additional $15 million for election security grants. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No., 119-4, 139 Stat. 9, 10-11, 26 (2025).

### B.    The Executive Order

The States here seek to enjoin the sections of the Executive Order which would require the EAC and the Secretary of Defense to implement a documentary proof of citizenship requirement with the federal voter registration form, would require voter registration agencies to assess citizenship before distributing the Federal Form to enrollees in public assistance programs, would prohibit Plaintiff States from counting ballots timely cast but received shortly after Election Day and would condition statutorily mandated funds under the HAVA upon compliance with an Election Day ballot receipt rule.

Specifically, the States challenge:  (1) § 2(a) of the Executive Order, which instructs the EAC to require "documentary proof of United States citizenship, consistent with 52 U.S.C.

[§] 20508(b)(3)," and to record information concerning that documentation; (2) § 2(d) of the Executive Order, which provides that "[t]he head of each Federal voter registration executive department or agency . . . under the [NVRA], shall assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs"; (3) § 3(d) of the Executive Order, which commands the Secretary of Defense to update the Federal Post Card Application provided under the UOCAVA to require documentary proof of citizenship and "proof of eligibility to vote in elections in the State in which the voter is attempting to vote"; (4) § 7(a) of the Executive Order, which orders the Attorney General to "take all necessary action to enforce" federal statutes setting the date of federal elections against States that "violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives," and (5) § 7(b) of the Executive Order, which requires the EAC to condition "any available funding to a State" upon its compliance with "a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting . . . ." Exec. Order No. 14248, 90 Fed. Reg. 14,005 (Mar. 25, 2025).[1] On April 11, 2025, numerous States' chief election officials received a letter from the EAC's Executive Director citing the Executive Order's instruction that the Federal Form require documentary proof of citizenship and seeking feedback pursuant to the consultation requirements of the NVRA. D. 76-3 at 17-18 (April 11 letter); D. 76-3 ¶ 8 (attesting to California's receipt of April 11 letter).

The lawfulness of §§ 2(a), 2(d), 7(a) and 7(b) has already been considered by the United States District Court for the District of Columbia (the "DC Court"), in consolidated cases brought

---

[1] Plaintiffs' complaint also purports to challenge § 4(a) of the Executive Order, D. 1 ¶ 49(d), but Plaintiffs raise no such challenge in their motion for preliminary injunction, D. 75, and the Court, therefore, does not consider the lawfulness of this section at this juncture.

by private parties comprised of two groups of nonpartisan, not-for-profit organizations, including the League of United Latin American Citizens, the League of Women Voters Education Fund and several national organizations affiliated with the Democratic Party, including the Democratic National Committee ("DNC"), the Democratic Governors Association ("DGA"), the Democratic Senatorial Campaign Committee ("DSCC") and the Democratic Congressional Campaign Committee ("DCCC"). League of United Latin Am. Citizens v. Exec. Off. of the President, No. 25-cv-0946-CKK, 2025 WL 1187730 (D.D.C. Apr. 24, 2025) ("LULAC"). The Plaintiffs before the DC Court sought to preliminarily enjoin enforcement of §§ 2(a), 2(b), 2(d), 7(a) and 7(b) of the Executive Order. Id. at *1. On April 24, 2025, the DC Court granted the injunction as to §§ 2(a) and 2(d) of the Executive Order, but denied relief as to §§ 2(b), 7(a) and 7(b). Id. at *63. As to §§ 7(a) and 7(b), the sections that concern ballot counting (which are parts of the Executive Order that the States challenge here), the DC Court concluded that the plaintiffs before it were not the proper parties to challenge these sections. Id. at *52, *56 (noting that "the most natural parties to seek an injunction against enforcement under [§] 7(a) are the States themselves, not the Democratic Party Plaintiffs" and observing that the standing of States to challenge § 7(b) presents "a question for another day").

## III.    Procedural History

The States filed this action on April 3, 2025. D. 1. On April 23, 2025, Defendants moved to transfer and consolidate this case with the matter before the DC Court, or in the alternative, stay the matter pending resolution of the matter before the DC Court. D. 62. On May 5, 2025, following the DC Court's ruling on the preliminary injunction in its case, the States moved to preliminarily enjoin §§ 2(a), 2(d), 3(d), 7(a) and 7(d) of the Executive Order, D. 75. On May 9, 2025, the Court denied the Executive Branch's motion to transfer and consolidate and denied the alternate motion

to stay this matter.  D. 79.  The Court heard oral argument from the parties on the motion for preliminary injunction on June 6, 2025, and took the matter under advisement.  D. 103.[2]

IV.    **Standard of Review**

In deciding whether to grant a preliminary injunction, the Court must assess "(1) the [movant]'s likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden [the nonmovant] less than denying an injunction would burden [the movant]; and (4) the effect, if any, on the public interest." González-Droz v. González-Colon, 573 F.3d 75, 79 (1st Cir. 2009) (quoting Bos. Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 11 (1st Cir. 2008)).  "The sine qua non of th[e] four-part inquiry" governing motions for preliminary injunctions is the first factor:  "likelihood of success on the merits."  New Comm. Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) (quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (*per curiam*)). Accordingly, the Court turns to this analysis as to each of the States' challenges.

V.    **Discussion**

A.    **The States are the Proper Parties to Seek the Injunctive Relief Sought Here**

While the consolidated matters before the DC Court raised questions concerning the standing of private parties to seek to enjoin the Executive Order, see LULAC, 2025 WL 1187730,

---

[2] The Court has received and considered three briefs from *amici curiae*.  Local election officials from thirty jurisdictions, and a bipartisan group of former secretaries of state have filed briefs in support of the States' motion for a preliminary injunction.  D. 87; D. 100.  The Republican Party of Arizona also has filed an *amicus curiae* brief to contend that regardless of whether the President can direct the EAC's activity, the EAC has the statutory authority to require documentary proof of citizenship.  D. 101.

at *21-25, *31-35, *46-48, *50-56, the States' standing to seek an injunction as to §§ 2(a), 2(d), 3(d), 7(a) and 7(b) presents a different question. "Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021). "Such a case or controversy exists only when the plaintiff demonstrates such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends." Gustavsen v. Alcon Lab'ys., Inc., 903 F.3d 1, 6-7 (1st Cir. 2018) (citations and internal quotation marks omitted). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case – in other words, standing." Ramirez, 594 U.S. at 423 (citation and internal quotation marks omitted). To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." Id. "If the plaintiff does not claim to have suffered an injury . . . there is no case or controversy for the federal court to resolve." Id. (citation and internal quotation marks omitted). In addition, a plaintiff must establish that the issues are ripe for review. "[T]he question of ripeness turns on the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 201 (1983) (internal citation and quotation marks omitted).

Here, the Executive Branch argues that §§ 2(a), 3(d) and 7(a) are not ripe for consideration, because they do not threaten a sufficiently imminent injury.[3] D. 91 at 4-10. Defendants do not contest that once enacted, these and the other challenged sections of the Executive Order would

---

[3] At oral argument, the Executive Branch confirmed that they only challenge the ripeness of the States' challenges to §§ 2(a), 3(d) and 7(a). D. 104 at 25.

injure states by, at a minimum, imposing compliance costs and jeopardizing a federal funding source.  See generally D. 91.  Nor do they contest that an order enjoining these sections could prevent each of these harms.[4]  Id.  Accordingly, the States are the appropriate parties to seek this injunction, but the Court will address the contested issue of ripeness as to §§ 2(a), 3(d) and 7(a) of the Executive Order in the discussion that follows.

**B.**    **Likelihood of Success on the Merits**

*1.    Section 2(a)*

The States seek to enjoin the implementation of § 2(a) of the Executive Order.  That section provides:

> (i) Within 30 days of the date of this order, the [EAC] shall take appropriate action to require, in its national mail voter registration form issued under 52 U.S.C. [§] 20508:

> > (A) documentary proof of United States citizenship, consistent with 52 [§] U.S.C. 20508(b)(3); and

> > (B) a State or local official to record on the form the type of document that the applicant presented as documentary proof of United States citizenship, including the date of the document's issuance, the date of the document's expiration (if any), the office that issued the document, and any unique identification number associated with the document as required by the criteria in 52 U.S.C. [§] 21083(a)(5)(A), while taking appropriate measures to ensure information security.

> (ii) For purposes of subsection (a) of this section, ''documentary proof of United States citizenship'' shall include a copy of:

> > (A) a United States passport;

---

[4] The States move for a preliminary injunction against all Defendants except for the President.  D. 75 at 2.  In general, courts have "no jurisdiction . . . to enjoin the President in the performance of his official duties."  Franklin v. Massachusetts, 505 U.S. 788, 803 (1992).  Accordingly, here, the States seek to enjoin members of the Executive Branch from carrying out the Executive Order.  Id.

(B) an identification document compliant with the requirements of the REAL ID Act of 2005 (Pub. L. 109–13, Div. B) that indicates the applicant is a citizen of the United States;

(C) an official military identification card that indicates the applicant is a citizen of the United States; or

(D) a valid Federal or State government-issued photo identification if such identification indicates that the applicant is a United States citizen or if such identification is otherwise accompanied by proof of United States citizenship.

Exec. Order No. 14248 § 2(a).

a)      The Challenge to § 2(a) is Ripe

As an initial matter, the Executive Branch contends that § 2(a) is not ripe for review because it "contemplates that future action is necessary—the EAC still needs to go through its rulemaking process before any changes to the federal form can be finalized."  D. 91 at 6.  "The question of ripeness turns on the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  Pac. Gas, 461 U.S. at 201 (internal citation and quotation marks omitted).

"The critical question concerning fitness for review is whether the claim involves uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all."  Mass. Ass'n of Afro-Am. Police, Inc. v. Bos. Police Dep't, 973 F.2d 18, 20 (1st Cir. 1992).  The fitness for review prong is more easily satisfied when it "presents an issue that is 'purely legal, and will not be clarified by further factual development.'"  Susan B. Anthony List v. Driehaus, 573 U.S. 149, 167 (2014) (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 581 (1985)). This prong is satisfied here, where, as the DC Court observed, § 2(a) of the Executive Order imposes a deadline (which effectively was April 24, 2024) and dictates the "precise contours of [its]

requirement." <u>LULAC</u>, 2025 WL 1187730, at *27.  "Section 2(a) does not merely 'authorize' the

EAC to change the Federal Form, or suggest that it 'consider' doing so.  Instead, it purports to

require the EAC to amend the Federal Form and dictate[s] the precise contents of the new rule."

<u>Id.</u> at *28 (citations omitted).  Indeed, the EAC has already started to implement this requirement,

D. 76-3 at 4 (noting that "[s]ince the [Executive Order] was issued, the EAC has communicated to

states that it is moving forward with implementing [it]"); <u>see, e.g.</u>, D. 76-3 at 17-18 (April 11 letter),

and the Executive Branch represented to the DC Court that the administrative process prior to

implementation will address only technical details.  <u>See</u> D. 76-2 at 5-9.

   The hardship prong is also met here.  "[R]unning a statewide election is a complicated

endeavor" requiring a "massive coordinated effort" and "rules of the road" which are "clear and

settled." <u>Democratic Nat'l Comm. v. Wis. State Legislature</u>, 141 S. Ct. 28, 31 (2020) (Kavanaugh,

J., concurring).  In addition, § 2(a) would force a diversion of state resources to implement its

mandate.[5]  As this Court later discusses in more detail with respect to the irreparable harm

requirement, and the States illustrate in their declarations, the Executive Order will require the

States to immediately update their voter registration processes and databases, issue new guidance,

conduct trainings and "fund and mount public education campaigns to counter confusion and

disenfranchisement resulting from the changes." D. 96 at 9.  Each of these responses has associated

costs, and an imminently threatened economic injury can ground a federal court's jurisdiction.  <u>Katz</u>

---

[5] Relying upon the Supreme Court's decision in <u>FDA v. All. for Hippocratic Med.</u>, 602 U.S. 367, 370 (2024), the Executive Branch suggests that an organization's diversion of resources in response to a defendant's actions does not routinely establish standing.  D. 91 at 25 n.8.  The Executive Branch does not, however, cite any cases applying this principle to a lawsuit brought by states against the federal government.  <u>Id.</u>  Even if it did, actions directly interfering with an organization's core mission suffice to ground standing, <u>Havens Realty Corp v. Coleman</u>, 455 U.S. 363, 379 (1982), and election administration is an integral function of the state, <u>see</u> U.S. Const. art. I, § 4, cl. 1.

v. Pershing, LLC, 672 F.3d 64, 76 (1st Cir. 2012); Dep't of Commerce v. New York, 588 U.S. 752,

766-67 (2019); Massachusetts v. U.S. Dep't of Health & Hum. Servs., 923 F.3d 209, 222-27 (1st

Cir. 2019) (concluding a state had standing when the "likely chain of events" resulted in its

imminent fiscal injury). Accordingly, the challenge to § 2(a) is ripe for consideration.

b)    Merits as to § 2(a) Challenge

As to merits, the DC Court has already enjoined enforcement of this section as to each of

the defendants named here, LULAC, 2025 WL 1187730, at *25-44, and this Court is persuaded by

its reasoning. In short, § 2(a) "purports to require the EAC to amend the Federal Form" and

precisely dictates what should be included, id. at *28, but "neither the Constitution nor the NVRA

grants the President the authority to direct the EAC to change the content of the Federal Form," id.

at *35. Rather, the Elections Clause of the Constitution provides that the "Times, Places, and

Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by

the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations

. . . ." U.S. Const. art. I, § 4, cl. 1. In other words, only Congress has the power to adjust state

election rules. It has done so through its enactment of the NVRA, which as discussed, includes a

mandatory procedure requiring States to "accept and use" the Federal Form. 52 U.S.C.

§ 20505(a)(1).

The Federal Form "may require only such" information "as is necessary to enable the

appropriate State election official to assess the eligibility of the applicant and to administer voter

registration and other parts of the election process." 52 U.S.C. § 20508(b)(1). The NVRA

mandates a specific procedure to determine what information is necessary for the Federal Form,

requiring that the agency responsible for maintaining it set that content "in consultation with the

chief election officers of the States" and through notice and comment rulemaking. 52 U.S.C.

§ 20508(a)(1)-(2).  On April 16, 2025, the EAC's Executive Director sent an email to state officials instructing that new provisions are "required" and seeking "input" on how the States "would propose to implement" the President's policy.  D. 76-3 ¶ 8.  Such consultation appears to concern only the implementation of the President's policy and not the policy itself, and, therefore, does not appear to be in line with the consultation Congress had envisioned.  See D. 100 at 21-22; Lujan v. Defs. of Wildlife, 504 U.S. 555, 585 (1992) (Stevens, J., concurring) (describing congressionally required consultation between agencies and explaining that "if Congress has required consultation . . . we must presume that such consultation will have a serious purpose that is likely to produce tangible results"); Campanale & Sons, Inc. v. Evans, 311 F.3d 109, 118 (1st Cir. 2002) (interpreting "consultation" in the context of Atlantic Coastal Act and explaining that it "must mean something more than general participation . . . otherwise the consultation requirement would be rendered nugatory").

Moreover, when Congress enacted the HAVA, it assigned responsibility for the Federal Form to the EAC, an independent and bipartisan panel, and required that the EAC can revise the Federal Form "only with the approval of at least three" of its four members.  52 U.S.C. §§ 20921-20923, 20928.  Section 2(a) flouts this procedure and is thus "contrary to the manifest will of Congress, as expressed in the text, structure, and context of the NVRA and HAVA."  LULAC, 2025 WL 1187730, at *37.

The Executive Branch insists that this is not the case, arguing that Plaintiffs misread the Executive Order's command to "take appropriate action to require . . . documentary proof of United States citizenship," by ignoring the words "take appropriate action" and focusing only upon the words "to require."  D. 91 at 12.  They insist that here, "'to require' must be read in conjunction with 'take appropriate action,' and the appropriate action required here involves 'consult[ing] with

17

the chief election officers of the States,' to 'prescribe . . . regulations' to 'develop a mail voter registration application form for elections for Federal office.'" Id. (quoting 52 U.S.C. § 20508(a)). The Executive Branch was, however, much firmer before the DC Court, where it characterized the documentary proof of citizenship requirement as "binary," D. 76-2 at 5, and explained that even after consultation with the states and notice and comment rulemaking, documentary proof of citizenship would have to be required, id. at 6, 9.  Given this position, the Executive Branch is judicially estopped from suggesting otherwise here.  New Hampshire v. Maine, 532 U.S. 742, 755 (2001) (holding the State of New Hampshire judicially estopped from taking a position inconsistent from its position in a previous case which the Court there had accepted).  By purporting to preordain the outcome of these required procedures, the Executive Order renders them meaningless.  See LULAC, 2025 WL 1187730, at *40-41 (concluding same).

The Executive Branch also suggests that "[t]he EAC exercises executive power when it carries out [its] duties and is therefore subject to the administrative control of the President."  D. 91 at 11.  As the DC Court explained, this argument "is untethered from precedent and unsupported by even a maximalist view of 'the executive Power' under our Constitution."  LULAC, 2025 WL 1187730, at *39 (citing U.S. Const. art. II, § 1, cl. 1).  While the Vesting Clause grants the President some supervisory authority over subordinate executive officials, that authority is not absolute and restrictions upon that authority that do "not unduly interfere with the functioning of the Executive Branch" are upheld.  Seila L. LLC v. Consumer Fin. Prot. Bureau, 591 U.S. 197, 217 (2020).  Here, where "the President has no constitutional duty to prescribe the content of election regulations," see LULAC, 2025 WL 1187730, at *40, the mandate of the Executive Order to the EAC, a bipartisan and independent entity, is such an undue interference.

Further, as the DC Court observed, "when enacting the NVRA, Congress considered and rejected a proposal that would have allowed States to impose exactly the kind of documentary proof of citizenship requirement that the President's Executive Order now directs the EAC to adopt, concluding that such a requirement was 'not necessary or consistent with the purposes of [the] Act.'"  LULAC, 2025 WL 1187730, at *37 (alteration in original) (quoting H.R. Rep. No. 103-66, at 23 (1993) (Conf. Rep.).  The Supreme Court has made this point clear and has concluded that the NVRA's requirement that states "accept and use" the Federal Form preempts an Arizona state-law requirement that officials "reject" the application of a prospective voter who submits a completed Federal Form unaccompanied by documentary evidence of citizenship.  ITCA, 570 U.S. at 14-15.[6]  In short, § 2(a)'s instruction to add a documentary proof of citizenship requirement to the Federal Form conflicts with the will of Congress, rendering the President's power "at its lowest ebb."  Youngstown, 343 U.S. at 637 (Jackson, J., concurring).  "The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself."  Id. at 585.  Congress, not the President, has the ultimate constitutional authority over elections.

The question then is whether § 2(a) can lawfully be interpreted more narrowly through its saving clause, i.e. that "[t]his order shall be implemented consistent with applicable law and subject to the availability of appropriations."  Exec. Order No. 14248 § 11(b).  The Supreme Court has "long rejected interpretations of sweeping saving clauses that prove 'absolutely inconsistent with the provisions of the act' in which they are found."  Atl. Richfield Co. v. Christian, 590 U.S. 1, 23 (2020) (quoting AT&T Co. v. Cent. Off. Tel., Inc., 524 U.S. 214, 228 (1998)).  "If 'consistent with

---

[6] Defendants and one of *amici curiae*, the Republican Party of Arizona, assert that the EAC would, on its own accord, have the power to adopt a documentary proof of citizenship requirement.  D. 91 at 13; D. 101 at 9-17; see D. 96 at 17-18 (responding to same).  This issue is not before the Court on this preliminary injunction, and the Court, therefore, does not reach it.  See LULAC, 2025 WL 1187730, at *38 (declining to consider same).

law' precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues." City & Cnty. of San Francisco v. Trump, 897 F.3d 1225, 1240 (9th Cir. 2018). "In other words, the act cannot be held to destroy itself" through a saving clause. Tex. & Pac. Ry. Co. v. Abilene Cotton Co., 204 U.S. 426, 446 (1907). Here, the saving clause cannot shield § 2(a) from review because that section unambiguously requires the EAC to implement a documentary proof of citizenship requirement as part of the Federal Form. The saving clause "does not and cannot override [this] meaning." City & Cnty. of San Francisco, 897 F.3d at 1240; see LULAC, 2025 WL 1187730, at *28 (concluding same). The States' separation of powers challenge to § 2(a) is, therefore, likely to succeed on the merits.

### 2.    Section 3(d)

The States also move to enjoin the implementation of § 3(d) of the Executive Order. That section provides:

> (d) The Secretary of Defense shall update the Federal Post Card Application, pursuant to the [UOCAVA] to require:
>
> (i) documentary proof of United States citizenship, as defined by section 2(a)(ii) of this order; and
>
> (ii) proof of eligibility to vote in elections in the State in which the voter is attempting to vote.

Exec. Order No. 14248 § 3(d).

### a)    The Challenge to § 3(d) is Ripe

The Executive Branch argues that this section is not ripe for review because the Secretary of Defense has not yet updated the Federal Post Card Application and the Executive Order does not establish a deadline for it to do so. D. 91 at 9. In addition, both parties agree that "what proof of

eligibility might suffice, or how a UOCAVA voter might obtain such proof" have not yet been determined.  D. 76 at 24; D. 91 at 9.  Like § 2(a), however, § 3(d)'s command is clear:  "[t]he Secretary of Defense shall update the Federal Post Card Application . . . to require . . . documentary proof of United States citizenship."  Exec. Order No. 14248 § 3(d).  Even if the timeframe for implementation and the specific form of identification § 3(d) requires are yet to be determined, § 3(d) does not merely authorize or suggest a change in the Federal Post Card Application, it leaves no doubt that documentary proof of citizenship will be required.  The fitness for review prong of the ripeness analysis is, therefore, satisfied.  The hardship prong is similarly met with respect to § 3(d) because its implementation would force a diversion of state resources and could cast uncertainty upon the "massive coordinated effort" necessary to run state elections.  See Democratic Nat'l Comm., 141 S. Ct. at 31 (Kavanaugh, J., concurring).

b)    Merits as to § 3(d) Challenge

As to the likelihood of success on the merits, the "UOCAVA was passed in 1986 to protect the voting rights of military members, their families, and other United States citizens living overseas."  United States v. Alabama, 998 F. Supp. 2d 1283, 1286 (M.D. Ala. 2014), aff'd, 778 F.3d 926 (11th Cir. 2015).  "By passing [the] UOCAVA, and later by strengthening its protections, Congress unequivocally committed to eliminating procedural roadblocks, which historically prevented thousands of service members from sharing in the most basic of democratic rights."  United States v. Alabama, 778 F.3d 926, 928 (11th Cir. 2015).  Like the Federal Form, the Federal Post Card Application requires applicants to attest to their citizenship with a "standard oath," signed under penalty of perjury.  52 U.S.C. § 20301(b)(7).  This "standard oath" preempts state laws requiring "an oath or affirmation" from overseas voters.  52 U.S.C. § 20302(a)(5).  The Executive Branch now insists that this "standard oath" is not a substitute for proof of eligibility.  D. 91 at 24.

Rather, according to the Executive Branch, the standard oath is "merely a mechanism by which applicants are held accountable for the veracity of all statements they make in completing required application documents." Id. (emphasis omitted).

The States assert that by mandating that the form is a postcard, "Congress necessarily precluded any requirement that an applicant submit documentation with the Form to federally register." D. 76 at 24; see D. 96 at 18-19. A postcard is "a card . . . for mailing without an envelope and to which the sender must affix a stamp" (citing Postcard, Miriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/postcard (last visited June 12, 2025)). Although 52 U.S.C. § 20301(b)(2) contains no express requirement "limit[ing] what kind of document requirements the Secretary of Defense may 'prescribe,'" D. 91 at 23 (emphasis omitted), this Court cannot presume that Congress ignored the meaning of "postcard" when it employed it in the statute. See TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (observing that "[i]t is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant'" (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001))); United States v. Abreu, 106 F.4th 1, 12 (1st Cir. 2024) (noting that statutes must be interpreted "based on their plain and ordinary meaning").[7]

In addition, as the States note, D. 96 at 20, the UOCAVA specifically enumerates eleven "Duties of [the] Presidential Designee." 52 U.S.C. § 20301(b). These include "consult[ing] State and local election officials in carrying out" the Act and "prescrib[ing] a suggested design for absentee ballot mailing envelopes." 52 U.S.C. § 20301(b)(1), (4). None of the enumerated duties

---

[7] The Executive Branch notes that "the [Federal Post Card Application] already contemplates the submission of additional information or documents in the case of Arizona, Vermont, and Puerto Rico," D. 91 at 24, but these state provisions affect only whether a voter can obtain a ballot for state elections and they have no impact on a voter's ability to obtain a ballot for federal selections, see D. 96 at 19; Alabama, 998 F. Supp. 2d at 1290-91.

contemplates a documentary proof of citizenship requirement.  See City of Providence v. Barr, 954

F.3d 23, 31 (1st Cir. 2020) (noting that "[w]hen an executive agency administers a federal statute,

the agency's power to act is 'authoritatively prescribed by Congress'" (citation omitted)).

Adding a documentary proof of citizenship requirement to the Federal Post Card Form also

appears to be contrary to the will of Congress, which sought to remove procedural roadblocks which

had prevented American citizens living abroad from voting.  See Alabama, 778 F.3d at 928; D. 76

at 24.  The Executive Branch denies that § 3(d) creates procedural roadblocks "because it involves

existing voter qualifications that UOCAVA voters are already required to meet—citizenship and

eligibility."  D. 91 at 23.  But many United States citizens who are otherwise eligible to vote lack

access to the citizenship documents the Executive Order requires and cannot easily obtain them.

See, e.g., D. 76-14 ¶ 12 (observing that, according to the State Department, only "approximately

50% of Americans have passports"); D. 76-3 ¶ 21 (noting that "many people might not have their

[documentary proof of citizenship] readily available, the [documentary proof of citizenship] might

not match their current identification due to a name change . . . or the required documents may have

been lost or destroyed"); D. 76-6 ¶ 8 (stating that obtaining "the proper supporting documentation

can take weeks or even months to acquire").

In sum, neither the Constitution nor any statute grants the President the authority to enact

§ 3(d), and its mandate appears to be in conflict with the will of Congress, which is duly authorized

to act in this area, and has acted through its enactment of the UOCAVA.  Nor can § 3(d) be

interpreted through the lens of the saving clause because, like § 2(a), its command is clear:  "[t]he

Secretary of Defense shall update the Federal Post Card Application . . . to require . . . documentary

proof of United States citizenship."  Exec. Order No. 14248 § 3(d).  Interpreting § 3(d) not to

require such proof of citizenship would override its meaning.  See City & Cnty. of San Francisco,

897 F.3d at 1240.  The States' challenge to this provision of the Executive Order is, therefore, likely to succeed on the merits.

### 3.  *Section 2(d)*

The States also challenge as *ultra vires* § 2(d), which requires the head of each federal voter registration agency within the meaning of the NVRA to "assess citizenship prior to providing" the Federal Form to "enrollees of public assistance programs."  Exec. Order No. 14248 § 2(d); see D. 76 at 24-25.  Per the NVRA, federal voter registration agencies include "all offices in the State that provide public assistance" and "all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities" and other offices designated by the state.  52 U.S.C. § 20506(a)(2)-(3).  The NVRA requires these voter registration agencies distribute the Federal Form,  Id. § 20506(a)(1), (a)(4), (a)(6), for voter registration with no pre-assessment of citizenship before doing so.

The Executive Branch suggests § 2(d)'s mandate is appropriate and lawful, insisting that "unlike virtually all other provisions of the Constitution, the Elections Clause gives Congress the power to 'conscript state agencies to carry out' federal mandates."  D. 91 at 14 (quoting Gonzalez v. Arizona, 677 F.3d 383, 391 (9th Cir. 2012) (en banc) aff'd sub nom., ITCA, 570 U.S. 1 (2013)).  Exercising this authority, Congress established the EAC and charged it with "prescrib[ing] . . . regulations . . . necessary to . . . develop a mail voter registration application form for elections for Federal office."  52 U.S.C. § 20508(a)(1), (2).  Neither the Constitution nor the NVRA, however, affords the President the power to conscript states (here, voter registration agencies in the States that include public assistance agencies) to carry out his Executive Order mandates, or to direct the outcome of the EAC's processes.  As the Supreme Court has recognized, "States are not mere political subdivisions of the United States.  State governments are neither regional offices nor

24

administrative agencies of the Federal Government." <u>New York v. United States</u>, 505 U.S. 144, 188 (1992). Because the President, therefore, has no authority to command agencies to "assess citizenship prior to providing" the Federal Form to "enrollees of public assistance programs," the States' separation of powers argument is likely to succeed on the merits. Like §§ 2(a) and 3(d), § 2(d) cannot be more narrowly interpreted through the lens of the saving clause because its mandate to voter registration agencies to assess citizenship prior to providing the Federal Form is clear. <u>City & Cnty. of San Francisco</u>, 897 F.3d at 1240.

        *4.*    *Section 7(a)*

While the DC Court considered a challenge to §§ 7(a) and 7(b), it did not ultimately rule on the merits, as it determined the plaintiffs there, private parties, had no standing to challenge these sections. <u>LULAC</u>, 2025 WL 1187730, at *1, *52, *56. The States here raise such a challenge, and although the Executive Branch presses a ripeness objection, the Executive Branch does not otherwise dispute their standing to assert this challenge. D. 91 at 7-9, 16-22.

The Ballot Receipt States, California, Nevada, Massachusetts, Arizona, Colorado, Hawaii, Illinois, Maryland, Michigan, New Jersey, New Mexico, New York and Rhode Island maintain laws either allowing for the counting of ballots mailed on or before Election Day but received afterward, or laws allowing voters to cure timely-submitted ballots with minor technical problems such as a missed signature.[8] The Ballot Receipt States move to preliminarily enjoin the implementation of § 7(a) of the Executive Order.

---

    [8] <u>See</u> Cal. Elec. Code § 3020(b); 10 Ill. Comp. Stat. 5/19-8, 5/18A-15; Mass. Gen. Laws ch. 54, § 93; Md. Elec. Law, § 11-302(c); Md. Code Regs. § 33.11.03.08(B)(4); Mich. Const. 1963, art. II, § 4(1)(b); Mich. Comp. Laws § 168.759a(18); Nev. Rev. Stat. § 293.269921(1)(b), (2); N.J. Stat. Ann. § 19:63-22(a); N.Y. Elec. Law §§ 8-412(1), 8-710(1); 17 R.I. Gen. Laws § 17-20-16. See Ariz. Rev. Stat. § 16-550; Cal. Elec. Code § 3019; Colo. Rev. Stat. § 1-7.5-107.3; Haw. Rev. Stat. § 11-106; 10 Ill. Comp. Stat. 5/19-8; Md. Elec. Law § 11-302; Mich. Comp. Laws § 168.766a;

"To achieve full compliance with the Federal laws that set the uniform day for appointing Presidential electors and electing members of Congress," Exec. Order No. 14248 § 7(a) provides:

> The Attorney General shall take all necessary action to enforce 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives.

Id.

### a)    The Challenge to § 7(a) is Ripe

With respect to justiciability, pre-enforcement review of a threatened government action is appropriate if the government's threat of enforcement is "sufficiently imminent."  Susan B. Anthony List, 573 U.S. at 159; see Rhode Island Ass'n of Realtors, Inc. v. Whitehouse, 199 F.3d 26, 30 (1st Cir. 1999).  Here, the Executive Branch insists that the Attorney General can lawfully enforce § 7(a) "by, for example, sending letters to the Plaintiff States encouraging compliance with the President's interpretation of 2 U.S.C. § 7 and 3 U.S.C. § 1."  D. 91 at 8.  According to the Executive Branch, "[b]ecause the President can enforce these statutes 'consistent with applicable law,'" as set forth in the Executive Order's saving clause, § 11, "there is no risk of imminent harm."  Id.  But the government has not indicated that the Attorney General will cabin enforcement of § 7(a) merely to sending such letters.  Rather, it has suggested that the Attorney General can take "[a]ny number of actions, including criminal actions" to enforce this section.  D. 76-2 at 10.  "Where threatened government action is concerned, a plaintiff is not required to expose himself to liability before bringing suit to challenge the basis for the threat."  MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 129 (2007) (emphasis omitted).

---

Nev. Rev. Stat. § 293.269927; N.J. Stat. Ann. § 19:63-17; N.M. Code R. § 1.10.12.16; N.Y. Elec. Law § 9-209; 410 Code R. § 20-00-23.12.

To the extent that the States must demonstrate that compliance with § 7(a) would pose hardship as they have with other ripeness challenges, they have done so.  As this Court discusses below in more detail with respect to the showing of irreparable harm, and the States illustrate in their declarations, the Executive Order will require the States to undergo extensive training and voter education efforts related to ballot receipt deadlines.  These efforts have associated costs, and an imminently threatened economic injury can ground a federal court's jurisdiction.  See Katz, 672 F.3d at 76.  The States' challenge to § 7(a) is, therefore, justiciable.

b)    Merits as to § 7(a) Challenge

As to the merits, the Executive Branch insists that § 7(a) is consistent with the President's duty to enforce statutes setting a uniform date for congressional and presidential elections ("Election Day statutes").  D. 91 at 16-22; 2 U.S.C. § 7 (setting "the day for the election" for congressional representatives); 3 U.S.C. §§ 1, 21(1) (setting a Presidential election day).  According to the Defendants, "[c]ontinuing to receive ballots after Election Day means that the election is not final or consummated until after Election Day and therefore violates the Election Day statutes." D. 91 at 18.  In Republican National Committee. v. Wetzel, 120 F.4th 200 (5th Cir. 2024), a case invoked in the Executive Order and relied upon by the Defendants, the Fifth Circuit recently concluded that a Mississippi statute permitting the counting of ballots postmarked on or before the date of the election but received up to five days later was preempted by the Election Day statutes. Id. at 214.  According to that court, "it makes no sense to say the electorate as a whole has made an election and finally chosen the winner before all voters' selections are received."  Id. at 207.  While the counting of ballots may conclude after Election Day, the Fifth Circuit held that "[r]eceipt of the last ballot . . . must occur on Election Day."  Id. at 209.

As other courts have noted, however, the text of the Election Day statutes require only that all votes are cast by Election Day, not that they are received by that date.  2 U.S.C. § 7; 3 U.S.C. §§ 1, 21(1); see Bost v. Illinois State Bd. of Elections, 684 F. Supp. 3d 720, 736 (N.D. Ill. 2023) (upholding an Illinois law allowing ballots postmarked on or before Election Day to be counted if received up to fourteen days thereafter, concluding that this provision "is facially compatible with the relevant federal statutes"), aff'd on other grounds, 114 F.4th 634 (7th Cir. 2024); Donald J. Trump for President, Inc. v. Way, 492 F. Supp. 3d 354, 372 (D.N.J. 2020) (concluding that "the Federal Election Day [s]tatutes are silent on methods of determining the timeliness of ballots" and, therefore, do not preempt a New Jersey law allowing ballots lacking a postmark to be counted if received within 48 hours after polls close).  The logic behind such a ruling is simple:  states that allow ballots received after Election Day to be counted still require that all votes are cast by Election Day, meaning a candidate's "electoral fate is sealed at midnight on Election Day, regardless of the resources he expends after the fact." Bost, 684 F. Supp. 3d at 733-34.

In addition, it is notable that Congress has not endorsed the Executive Branch's present interpretation of Election Day statutes even as Congress "has amended other aspects of federal election administration within the last few years."  D. 76 at 28-29; see Bost, 684 F. Supp. 3d at 736 (noting that "[d]espite these ballot receipt deadline statutes being in place for many years in many states, Congress has never stepped in and altered the rules").  Indeed, the UOCAVA acknowledges the variances in state ballot receipt deadlines.  52 U.S.C. § 20303(b)(3) (setting the deadline for counting absentee ballots of overseas voters as the "deadline for receipt of the State absentee ballot under State law"); 52 U.S.C. § 20304(b)(1) (noting that officials must count UOCAVA ballots if received by "the date by which an absentee ballot must be received in order to be counted in the election").  "The case for federal pre-emption is particularly weak where Congress has indicated its

awareness of the operation of state law in a field of federal interest and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." CTS Corp. v. Waldburger, 573 U.S. 1, 18 (2014) (alteration in original) (quoting Wyeth v. Levine, 555 U.S. 555, 575 (2009)). While "congressional silence, no matter how 'clanging,' cannot override the words of the statute," Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 495 n.13 (1985), here, where the Executive Branch's interpretation of the Election Day statutes is not reflective of their plain text, such silence is notable.

The Executive Branch insists that "states arbitrarily treat some people's votes differently when they permit absentee votes to be received after Election Day," noting that "[i]f postmarks are unenforced, for example, absentee voters have several extra days after Election Day to cast their votes." D. 91 at 20. To underscore this threat, the Executive Branch points to an Illinois statute permitting certain ballots without postmarks to be counted even if they are received after Election Day. Id.; 10 Ill. Comp. Stat. Ann. 5/19-8(c). But the Executive Branch has offered no evidence suggesting that this statute, or others, result in the counting of votes cast after Election Day.[9] Nor do they explain why this hypothetical risk justifies the potential disenfranchisement of voters whose ballots may not be received by Election Day, simply because of mailing delays outside of their control. See Wise v. Circosta, 978 F.3d 93, 100-01 (4th Cir. 2020) (concluding that a state court consent judgment extending the receipt deadline for ballots mailed on or before Election Day was clear and uniform and "impacts only an element outside the voters' control: how quickly their ballots must be received to be counted"). Moreover, as the States note, "[t]he concern about counting non-postmarked ballots is also a red herring where the [Executive Order] prohibits the

---

[9] The Executive Branch also cites concerns with voters recalling mail, D. 91, but as the States countered at oral argument, mail recalled should receive a fresh postmark if it is then resent. D. 104 at 41.

counting of any mail ballots received after Election Day, whether postmarked or not."  D. 96 at 23 n.11 (emphasis omitted).

Even if the Election Day statutes could be read to bar states from counting ballots received after Election Day, they do not authorize the President to enforce those statutes as he purports to through § 7(a).  Contrary to the suggestion by the Executive Branch to the DC Court, D. 76-2 at 10, criminal enforcement actions do not appear to be authorized by the Election Day statutes, as the statutes do not define any criminal offenses and the Executive Branch cites no statute criminalizing the counting of ballots in accordance with a state's ballot-receipt deadlines.  See LULAC, 2025 WL 1187730, at *51 (concluding same).  Civil enforcement actions likewise appear unavailable as the Election Day statutes, unlike other election-related statutes, do not include provisions allowing them.  Id. & n.65.

Nevertheless, as the Executive Branch and the DC Court have noted, there are at least some lawful actions the Attorney General can take to "enforce" his interpretation of Election Day statutes. Id.  For example, "[t]he Attorney General could 'send letters' to the States to 'encourage compliance' with the President's interpretation of the Election Day [s]tatutes and to change their ballot-counting practices accordingly."  Id.  Because the Executive Order requires the Attorney General to implement its mandates "consistent with applicable law," Exec. Order No. 14248 § 11(b), the Court "cannot simply assume" that the Attorney General will disregard this directive with other undefined actions.  LULAC, 2025 WL 1187730, at *51 (quoting Common Cause v. Trump, 506 F. Supp. 3d 39, 49 (D.D.C. 2020)) (further citation omitted).  The Court will not enjoin all applications of § 7(a), but does, however, enjoin the Attorney General from taking civil or criminal enforcement actions to enforce § 7(a) against the thirteen Ballot Receipt States.

     5.     *Section 7(b)*

The States move for a preliminary injunction barring the implementation of § 7(b) of the Executive Order.  Section 7(b), like § 7(a), is geared toward compliance with Election Day statutes and provides:

> Consistent with 52 U.S.C. [§] 21001(b) and other applicable law, the Election Assistance Commission shall condition any available funding to a State on that State's compliance with the requirement in 52 U.S.C. [§] 21081(a)(6) that each State adopt uniform and nondiscriminatory standards within that State that define what constitutes a vote and what will be counted as a vote, including that, as prescribed in 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1, there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting, excluding ballots cast in accordance with 52 U.S.C. [§] 20301 *et seq.,* after which no additional votes may be cast.

Exec. Order No. 14248 § 7(b).

     a)     <u>Merits as to § 7(b) Challenge</u>

The States argue that § 7(b) "unlawfully imposes extra-statutory conditions on congressionally authorized funds."  D. 76 at 30.  "When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'"  <u>City of Providence</u>, 954 F.3d at 31 (quoting <u>City of Arlington v. FCC</u>, 569 U.S. 290, 297 (2013)).  "Any action that an agency takes outside the bounds of its statutory authority is *ultra vires*."  <u>Id.</u>  Accordingly, an agency acts *ultra vires* if it attaches conditions to formula grants that are unauthorized by statute.  <u>Id.</u> at 45; <u>see</u> <u>City & Cnty. of San Francisco</u>, 897 F.3d at 1231 (concluding that "under the principle of Separation of Powers and in consideration of the Spending Clause, which vests exclusive power to Congress to impose conditions on federal grants, the Executive Branch may not refuse to disperse the federal grants in question without congressional authorization").

In <u>City of Providence</u>, 954 F.3d at 26, the First Circuit considered the validity of a DOJ policy conditioning states' entitlement to federal formula grants for law enforcement activities upon

their assistance with federal enforcement of certain immigration-related laws.  The court concluded that these funding conditions were unlawful, explaining that "the statutory formula [for the grants] is not so elastic:  it simply does not allow the DOJ to impose by brute force conditions on . . . grants to further its own unrelated law enforcement priorities" and "[n]one of the challenged conditions falls within the compass of" those allowed by the statute.  Id. at 34-35.

This holding controls here, where the HAVA does not allow the EAC to condition states' funding upon their ballot receipt deadlines.  Relevantly, to receive the payments outlined by the HAVA, "[e]ach State shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State."  52 U.S.C. § 21081(a)(6); see 52 U.S.C. § 21003.  The Executive Order references these statutory provisions, see Exec. Order No. 14248 § 7(b), but as the DC Court observed, "the reference to 'uniform and nondiscriminatory standards' appears to refer to uniformity within each State, not among the several States."  LULAC, 2025 WL 1187730, at *52 (citing H.R. Rep. 107-329, at 39 (2001)) (noting that "[a]s Americans learned in November and December 2000, a major part of the problem in Florida was that the vote-counting process was subjective and inconsistent, with definitions of what constitutes a vote varying from jurisdiction to jurisdiction").  In short, while the Defendants assert here that "Congress itself" set its condition upon funding through § 21081(a)(6) "as well as [through] the Election Day statutes," D. 91 at 22, those statutes do not support this contention, just as they do not empower the EAC to add additional conditions to funding.  See D. 76 at 30; City of Providence, 954 F.3d at 34-35.

Nor can the saving clause shield § 7(b) from review, because that section leaves no ambiguity that it would condition funding to states upon their adoption of a uniform ballot receipt deadline.  Any other interpretation of that section would override its meaning.  City & Cnty. of San

Francisco, 897 F.3d at 1240.  Because § 7(b) thus purports to impose an extra-statutory condition on the disbursement of congressionally authorized funds, the States' challenge to this section of the Executive Order is likely to succeed on the merits.

## C.    **Irreparable Harm**

The documentary proof of citizenship requirements, the assessment of citizenship prior to distribution of the Federal Form to enrollees in public assistance programs and the requirements related to ballot receipt deadlines pose the risk of irreparable harm to the States for at least three reasons:  (1) compliance with these provisions will require significant time, cost and effort; (2) with respect to § 7(b), the States may lose funding based upon their non-compliance with what this Court has determined is likely an unconstitutional condition and (3) these provisions threaten to chill voter registration and participation – the antithesis of Congress's purpose in enacting the UOCAVA and the NVRA.

### *1.    The Time, Cost and Effort Associated with Compliance*

The States have attested that the documentary proof of citizenship requirement and the corresponding recordkeeping requirements would force them to undertake the expensive and arduous task of updating their voter registration databases and their voter registration processes.[10] The Chief of the Election Division of California, for example, has attested that adding new fields to the voter registration database could take up to one year and would require, among other things,

---

[10] See D. 76 at 32; D. 76-3 ¶¶ 9-13, 25-27 (attesting for California); D. 76-4 ¶¶ 13, 20-27 (attesting for Nevada); D. 76-5 ¶¶ 9, 12, 16 (attesting for Massachusetts); D. 76-7 ¶¶ 10-12, 19 (attesting for New Jersey); D. 76-8 ¶¶ 6, 8-10, 20 (attesting for Michigan); D. 76-9 ¶¶ 22-40, 54-56 (attesting for Maryland); D. 76-10 ¶¶ 12-13, 24-25 (attesting for Arizona); D. 76-11 ¶¶ 9, 11-12, 22 (attesting for Maine); D. 76-12 ¶¶ 8-12, 23 (attesting for Vermont);  D. 76-15 ¶¶ 5-7 (attesting for Cook County, Illinois); D. 76-16 ¶¶ 12-13, 15, 24-25 (attesting for Rhode Island); D. 76-17 ¶¶ 12, 15-16, 25-26 (attesting for Colorado); D. 76-18 ¶¶ 8-10, 12, 20 (attesting for New York); D. 76-19 ¶¶ 18-20, 38-40, 42 (attesting for Connecticut); D. 76-20 ¶¶ 8, 10-11 (attesting for New Mexico).

programming and testing new software, implementing the update and ensuring that all changes in the database are connected to all 58 California counties, each with its own election management systems.  D. 76-3 ¶¶ 11-13, 16-17, 26.  In Maryland, the documentary proof of citizenship requirement will also require the state to update its electronic security features to accommodate storage of personal identifying information.  D. 76-9 ¶ 55.

The States have also shown that they would need to issue guidance related to the documentary proof of citizenship requirement, conduct trainings for agencies and local election officials and develop public education campaigns regarding registering to vote.[11]  In Maryland, the concurrent development of training materials and guidance documents for a new documentary proof of citizenship requirement on the Federal Form would require "35-40% of [its election] agency's full time resources and 75% of [its] contractual resources."  D. 76-9 ¶ 41.  In New York, this effort is expected to be "all consuming" and will require the concurrent development of "new materials and guidance documents for use by state election officials," none of which has "been contemplated in any state or local budgetary processes."  D. 76-18 ¶¶ 11-15, 22.  The same is true with the implementation of the § 2(d) requirement that voter registration agencies assess citizenship before distributing the Federal Form to enrollees in public assistance programs.  D. 76 at 34.  As the States have explained, such a change would impose new and complex duties on agencies across the States

---

[11] See D. 76-3 ¶¶ 14-17, 19-20 (attesting for California); D. 76-4 ¶¶ 28-37 (attesting for Nevada); D. 76-5 ¶¶ 13-17 (attesting for Massachusetts); D. 76-7 ¶¶ 11-15, 19-20 (attesting for New Jersey); D. 76-8 ¶¶ 11-15, 21-22 (attesting for Michigan); D. 76-9 ¶¶ 41-48, 56-57 (attesting for Maryland); D. 76-10 ¶¶ 14-19, 26 (attesting for Arizona); D. 76-11 ¶¶ 13-17, 23 (attesting for Maine); D. 76-12 ¶¶ 13-18, 23 (attesting for Vermont); D. 76-13 ¶¶ 16-17, 19, 23-24 (attesting for Minnesota); D. 76-15 ¶¶ 5-7 (attesting for Cook County, Illinois); D. 76-16 ¶¶ 9, 14-19, 25-26 (attesting for Rhode Island); D. 76-17 ¶¶ 17-19, 25-26 (attesting for Colorado); D. 76-18 ¶¶ 11-15, 22 (attesting for New York); D. 76-19 ¶¶ 24-27, 40-42 (attesting for Connecticut); D. 76-20 ¶¶ 8, 12-16, 22-23 (attesting for New Mexico); see also D. 76-6 ¶¶ 13-17 (attesting for Nevada County, California); D. 76-14 ¶¶ 14, 26-28 (attesting for Los Angeles County, California).

and would divert and require significant resources to train personnel in these agencies to assess citizenship where public assistance agencies do not have such expertise.  Id. (and declarations cited); see, e.g., D. 76-3 ¶¶ 22-24.

Compliance with § 7's requirements would also demand the States' time and resources. Specifically, the Ballot Receipt States will need to train local election officials "to ensure that votes are received and tabulated consistent with the [Executive Order]'s Election Day provisions."[12]  In Cook County, Illinois, compliance will require the County to hire at least one hundred additional staff members and "train and retain several hundred Cook County clerk staff and more than 8,000 election judges and deputy voter registrars."  D. 76-15 ¶ 14.  States will also need to update the public regarding the change, including by updating "[a]ll voter facing websites, documents, and ballot packet information."[13] D. 76-9 ¶ 61.  In Nevada, public education will entail, "at a minimum, newspaper notices, social media posts, mail notifications, and press briefings throughout 2026." D. 76-4 ¶ 48.  To educate the public, Vermont has begun outreach on social media and community forums and will need to update its websites and public-facing resources "on the accelerated timeline contemplated by the [Executive Order]."  D. 76-12 ¶ 16. The Ballot Receipt States have attested

---

[12] See D. 76-3 ¶ 32 (attesting for California); D. 76-4 ¶ 48 (attesting for Nevada); D. 76-5 ¶ 33 (attesting for Massachusetts); D. 76-7 ¶ 33 (attesting for New Jersey); D. 76-8 ¶ 27 (attesting for Michigan); D. 76-9 ¶ 61 (attesting for Maryland); D. 76-12 ¶¶ 13-14 (attesting for Vermont); D. 76-13 ¶ 16 (attesting for Minnesota); D. 76-14 ¶ 26 (attesting for Los Angeles County, California); D. 76-15 ¶ 14 (attesting for Cook County, Illinois); D. 76-16 ¶ 31 (attesting for Rhode Island); D. 76-18 ¶ 26 (attesting for New York); D. 76-19 ¶ 25 (attesting for Connecticut); D. 76-20 ¶ 27 (attesting for New Mexico).

[13] See D. 76-3 ¶ 32 (attesting for California); D. 76-4 ¶ 48 (attesting for Nevada); D. 76-5 ¶¶ 32-33 (attesting for Massachusetts); D. 76-7 ¶ 33 (attesting for New Jersey); D. 76-8 ¶ 27 (attesting for Michigan); D. 76-9 ¶ 61 (attesting for Maryland); D. 76-10 ¶ 18 (attesting for Arizona); D. 76-11 ¶ 16 (attesting for Maine); D. 76-12 ¶ 16 (attesting for Vermont); D. 76-13 ¶ 16 (attesting for Minnesota); D. 76-16 ¶ 31 (attesting for Rhode Island); D. 76-18 ¶ 14 (attesting for New York); D. 76-19 ¶ 26 (attesting for Connecticut); D. 76-20 ¶¶ 15, 27 (attesting for New Mexico); see also D. 100 at 27.

2e4f9e25aa5f5546

that this "would be a significant undertaking."[14] *Amici*, local election officials, caution that these additional requirements would be devastating: "[i]f every voter registration application took even only a few more minutes to process, offices could be overwhelmed." D. 87 at 17.

In addition, each of these changes would, in turn, divert the States' resources from other key projects such as voter registration list maintenance and preparing for upcoming elections.[15] Michigan, for example, has attested that these changes will disrupt the "crucial work" performed by "virtually all staff associated with election administration in the Bureau of Elections." D. 76-8 ¶¶ 8-10, 21-22, 29. As *amici*, bipartisan former secretaries of state, explain, "[a]llowing the President to change election rules and procedures on [his] whim whenever [he] see[s] fit, without any input from election administrators charged with executing those rules and without the checks and balances provided by Congress, would be equivalent to dropping an anvil onto the carefully balanced scales of justice." D. 100 at 18.

---

[14] D. 76-3 ¶ 32 (attesting for California); D. 76-5 ¶¶ 32-33 (attesting for Massachusetts); D. 76-7 ¶ 33 (attesting for New Jersey); D. 76-8 ¶ 27 (attesting for Michigan); D. 76-9 ¶ 61 (attesting for Maryland); D. 76-14 ¶¶ 26, 28 (attesting for Los Angeles County, California); D. 76-15 ¶ 14 (attesting for Cook County, Illinois); D. 76-17 ¶ 38 (attesting for Colorado); D. 76-18 ¶ 26 (attesting for New York); D. 76-20 ¶ 27 (attesting for New Mexico).

[15] See D. 76 at 36; D. 76-3 ¶¶ 13, 28 (attesting for California); D. 76-4 ¶¶ 10, 15-19, 40 (attesting for Nevada); D. 76-5 ¶¶ 13, 28 (attesting for Massachusetts); D. 76-6 ¶¶ 9, 13, 22 (attesting for Nevada County, California); D. 76-7 ¶¶ 13, 19-20, 23, 32-33 (attesting for New Jersey); D. 76-8 ¶¶ 8-10, 21-22, 25, 29 (attesting for Michigan); D. 76-9 ¶¶ 13-18, 26-28, 41, 56-57, 60-61 (attesting for Maryland); D. 76-10 ¶¶ 7-9, 14, 27 (attesting for Arizona); D. 76-11 ¶¶ 9, 11-12, 24 (attesting for Maine); D. 76-12 ¶¶ 8, 23 (attesting for Vermont); D. 76-13 ¶¶ 8, 15, 17-18 (attesting for Minnesota); D. 76-14 ¶¶ 8, 10, 27 (attesting for Los Angeles County, California); D. 76-15 ¶¶ 5, 7, 17 (attesting for Cook County, Illinois); D. 76-16 ¶¶ 9, 14, 25-26, 28, 33 (attesting for Rhode Island); D. 76-17 ¶¶ 12-13, 17, 23, 26-27, 37-38 (attesting for Colorado); D. 76-18 ¶¶ 8, 22, 25 (attesting for New York); D. 76-19 ¶¶ 16, 18-20, 24, 27, 36, 41 (attesting for Connecticut); D. 76-20 ¶¶ 8-12, 14, 22-23, 26 (attesting for New Mexico).

The Executive Branch insists that "diverted resources and compliance costs are quantifiable amounts, and '[m]oney damages would adequately resolve all of the alleged harms.'" D. 91 at 26 (alteration in original) (quoting Together Emps. v. Mass. Gen. Brigham Inc., 19 F.4th 1, 8 (1st Cir. 2021)). This is not the case for the States, for whom "the inability to enforce [] duly enacted plans clearly inflicts irreparable harm." Abbott v. Perez, 585 U.S. 579, 603 n.17 (2018); see Louisiana v. Biden, 55 F.4th 1017, 1033-35 (5th Cir. 2022) (affirming a district court's finding of irreparable harm based upon plaintiff states' diversion of resources to comply with an invalid regulation); Kansas v. United States, 249 F.3d 1213, 1227 (10th Cir. 2001) (noting that harms to a state's "sovereign interests and public policies" are irreparable).

### 2.    Threatened Loss of Federal Funding

The States receive millions of dollars in funding through the HAVA, which they rely upon to safely, securely and efficiently administer elections, including to purchase voting infrastructure and to pay employees.[16] As this Court has concluded, § 7(b) threatens to unlawfully deprive states of this crucial funding source. See City & Cnty. of San Francisco, 897 F.3d at 1236 (identifying harm where plaintiffs showed that "if their interpretation of the Executive Order is correct, they will be forced to either change their policies or suffer serious consequences").

---

[16] See D. 76-3 ¶ 35 (attesting that California, since 2003, has received $505 million in HAVA funding); D. 76-4 ¶ 51 (attesting that Nevada "has previously received over $36 million" in funding through HAVA); D. 76-7 ¶ 28 (attesting that New Jersey, between 2019 and 2025, received "$22.3 million in HAVA grants"); D. 76-8 ¶ 29 (attesting that in addition to the approximately $300,000 HAVA funding "recently approved by Congress" to go to Michigan, the state has received over $27.3 million through a HAVA Security Grant); D. 76-9 ¶ 66 (attesting that Maryland has received over $80.8 million under HAVA); D. 76-10 ¶ 31 (attesting that Arizona, since 2020, has received more than $12 million in HAVA grants); D. 76-16 ¶ 33 (attesting that Rhode Island, since 2018, has received $9.2 million under HAVA and attesting that the state has also received over $13 million HAVA section 251 grants through 2022); D. 76-17 ¶ 39 (attesting that Colorado, since 2022, has distributed through sub-grants $3.4 million in HAVA funding to counties); D. 76-18 ¶ 29 (attesting that New York, since 2003, has received over $237 million in HAVA grants); D. 76-20 ¶ 31 (attesting that New Mexico has received approximately $1 million under HAVA).

### 3.    Chilling of Voter Registration and Participation

The States' expectation is that as a result of the documentary proof of citizenship requirement, fewer of their eligible citizens will become registered to vote.[17]  This is unquestionably a harm to the States, with whom "[o]ur Constitution principally entrusts '[t]he safety and the health of the people . . . to guard and protect.'"  S. Bay United Pentecostal Church v. Newsom, __ U.S. __, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief) (quoting Jacobson v. Massachusetts, 197 U.S. 11, 38 (1905)).

According to the States, many otherwise eligible voters "lack ready access to the necessary citizenship documents."  D. 76 at 34; see League of Women Voters of United States v. Newby, 838 F.3d 1, 9 (D.C. Cir. 2016) (characterizing proof of citizenship laws as "new obstacles [that] unquestionably make it more difficult" to register voters).  As amici, local election officials note, "when Kansas attempted to impose [documentary proof of citizenship] requirements in 2011, around 12 percent of all registrants' applicants were rejected, even though it was undisputed that nearly all of them were U.S. citizens."  D. 87 at 11-12 (citing Fish v. Schwab, 957 F.3d 1105, 1128 (10th Cir. 2020)).  Those who have changed their names, "elderly individuals, unhoused individuals and young persons" often have a particularly difficult time obtaining documentary proof of citizenship.  D. 76-6 ¶ 19.  Citizenship documents are also expensive.  For example, in Rhode Island, it can cost up to $165 to obtain a passport and, in the City of Providence, $22 to obtain a

---

[17] See D. 76-3 ¶¶ 18, 21 (attesting for California); D. 76-4 ¶¶ 7, 19, 32, 34, 38 (attesting for Nevada); D. 76-5 ¶¶ 15-16, 21, 25 (attesting for Massachusetts); D. 76-6 ¶¶ 18-19 (attesting for Nevada County, California); D. 76-8 ¶ 16 (attesting for Michigan); D. 76-9 ¶¶ 28, 49 (attesting for Maryland); D. 76-10 ¶ 20 (attesting for Arizona); D. 76-11 ¶ 18 (attesting for Maine); D. 76-12 ¶ 19 (attesting for Vermont); D. 76-13 ¶¶ 19, 21 (attesting for Minnesota); D. 76-14 ¶¶ 12, 16, 28-29 (attesting for Los Angeles County, California); D. 76-15 ¶ 8 (attesting for Cook County, Illinois); D. 76-16 ¶¶ 20-21 (attesting for Rhode Island); D. 76-17 ¶¶ 19-20 (attesting for Colorado); D. 76-18 ¶ 16 (attesting for New York); D. 76-19 ¶¶ 25, 28 (attesting for Connecticut); D. 76-20 ¶ 17 (attesting for New Mexico).

birth certificate.   D. 76-16 ¶ 20.   For this reason and others, § 2(a) appears likely to disproportionately disenfranchise Black and poorer Americans.  See, e.g., Owen Backskai & Eliza Sweren-Becker, "House Bill Would Hurt American Voters," Brennan Ctr., https://www.brennancenter.org/our-work/analysis-opinion/house-bill-would-hurt-american-voters (Jan. 31, 2025) (reporting that approximately fifty percent of Americans do not have a passport, two-thirds of Black Americans lack a passport and passport ownership increases dramatically with income).

Some states' citizens will face specific challenges with respect to obtaining documentary proof of citizenship.  For example, in regions of Maine along the Canadian border, many residents are citizens but lack the required documentary proof of citizenship because they have Canadian birth certificates and do not have passports.  D. 76-11 ¶ 18.  New Mexico has attested that its "unique population and geographic dynamics," namely its remote villages and nineteen "federally-recognized Native American pueblo tribes, many of which are also remotely located," will cause the proof of citizenship requirement to have a greater impact.  D. 76-20 ¶ 17.  Massachusetts has a significant student population, many of whom will be registering to vote for the first time, and may not "have ready access to [documentary proof of citizenship] documents such as their birth certificate or passport."  D. 76-5 ¶ 21.

This likelihood of disenfranchisement is a serious harm because "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."  Reynolds v. Sims, 377 U.S. 533, 555 (1964); see Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886) (explaining that the right to vote "is regarded as a fundamental political right, because preservative of all rights").

4.    *These Risks of Harm are Imminent*

The Executive Branch questions the imminence of any of these harms because the Executive Order is geared towards the November 2026 election.  D. 91 at 26.  Voter registration is, however, a year-round process, and the implementation of voter registration requirements, the corresponding record-keeping requirements and voter-education campaigns demands significant lead time.  D. 96 at 10.  Further, any argument that what the Executive Order will require is still uncertain, see D. 91 at 24-27, "is belied by both the text of the Executive Order and the factual record before this Court," which make clear that documentary proof of citizenship will be required.  LULAC, 2025 WL 1187730, at \*42 (noting this with respect to § 2(a)); Newby, 838 F.3d at 8-9 (concluding that states need not be currently enforcing laws which would require proof-of citizenship to accompany the Federal Form for voter groups to challenge their enforcement as "it seems almost certain that similar obstacles to registration will spring up" and "a preliminary injunction requires only a likelihood of irreparable injury").  The documentary proof of citizenship requirements, assessment of citizenship prior to distribution of the Federal Form to enrollees in public assistance programs and the ballot counting requirements use mandatory language and would require states to imminently undertake the extensive efforts associated with compliance to avoid consequences.  This is sufficient to ground a finding of imminent, irreparable harm.[18]

---

[18] The Executive Branch also argues that the States' more than thirty-day delay between filing their complaint and moving for preliminary injunctive relief "belies their claim of imminent irreparable harm."  D. 91 at 27.  To make this point, however, they highlight cases involving months or a year of delay.  See Seafreeze Shoreside, Inc v. United States Dep't of Interior, No. 22-cv-11091-IT, 2023 WL 3660689, at \*5 (D. Mass. May 25, 2023), appeal dismissed, No. 23-1473, 2023 WL 8259107 (1st Cir. Oct. 20, 2023); Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162-63 (1st Cir. 2004).  Not only is any delay here much less significant, but it may also reflect a decision to wait for the DC Court's ruling as to the lawfulness of overlapping sections of the Executive Order.  Such a strategic decision is not unreasonable in these circumstances and does not undermine the risk of irreparable harm.

VI.    **Equities and the Public Interest**

To obtain a preliminary injunction against the implementation of the challenged sections of the Executive Order, the States must demonstrate that "the balance of equities tips in [their] favor" and that "an injunction is in the public interest." Winter, 555 U.S. at 20. The analysis regarding the balance of the equities and the public interest "merge when the [g]overnment is the opposing party." Does 1-6 v. Mills, 16 F.4th 20, 37 (1st Cir. 2021) (alteration in original) (quoting Nken v. Holder, 556 U.S. 418, 435 (2009)). "[T]he public has an important interest in making sure government agencies follow the law," Neighborhood Ass'n of The Back Bay, Inc. v. Fed. Transit Admin., 407 F. Supp. 2d 323, 343 (D. Mass. 2005), aff'd, 463 F.3d 50 (1st Cir. 2006), and agencies have no countervailing interest in perpetuating unlawful practices, Newby, 838 F.3d at 12; Rodriguez v. Robbins, 715 F.3d 1127, 1145 (9th Cir. 2013). Here, where, as determined, the States' challenge to the Executive Order is likely to succeed on the merits, the equities and the public interest favor an injunction.

The Executive Branch asserts that the "Executive Order seeks to increase [] confidence [in federal elections] by directing executive officials to carry out their statutory duties to prohibit foreign nationals from participating in elections and [by] enforc[ing] the Election Day statutes." D. 91 at 27. But there is little evidence in the record suggesting the Executive Order would accomplish these goals. See LULAC, 2025 WL 1187730, at *43 (concluding same); Fish, 957 F.3d at 1142 (affirming that, after a trial on the merits, plaintiff had not shown "that substantial numbers of noncitizens successfully registered to vote" under the current attestation procedures). In fact, Congress has already determined that a documentary proof of citizenship requirement is "not necessary or consistent with the purposes of the [NVRA]," LULAC, 2025 WL 1187730, at *6 (quoting H.R. Rep. No. 103-66, at 23 (1993) (Conf. Rep.)), which include "protect[ing] the integrity

of the electoral process," 52 U.S.C. § 20501(b)(3).  The Executive Branch can, instead, use the "other tools at their disposal to ensure the integrity of elections, including protections against voter fraud."  Newby, 838 F.3d at 13.  For example, the President can continue to enforce criminal statutes prohibiting non-citizens from voting or registering to vote in federal elections.  18 U.S.C. §§ 611, 1015(f).

The States, on the other hand, have shown a "substantial risk" that, absent an injunction, citizens will be disenfranchised.  LULAC, 2025 WL 1187730, at *43 (citing Newby, 838 F.3d at 12); see Purcell v. Gonzalez, 549 U.S. 1, 4 (2006) (noting the "strong interest in exercising the fundamental political right to vote" and observing that "the possibility that qualified voters might be turned away from the polls would caution any district judge to give careful consideration" to a challenge) (internal citation and quotation marks omitted).  The States have also credibly attested that the challenged requirements could create chaos and confusion that could result in voters losing trust in the election process.  See D. 76-9 ¶ 62; D. 87 at 24-25.  On balance, the equities and the public interest favor granting a preliminary injunction in the States' favor as to §§ 2(a), 2(d), 3(d), 7(a) and 7(b) of the Executive Order.[19]

## VII.   Injunction Bond

The Executive Branch asks that the Court require a bond if it issues a preliminary injunction.  D. 91 at 28.  "The bond requirement is not jurisdictional," and district courts have discretion to issue an injunction without requiring the States to post a bond.  Pineda v. Skinner Servs., Inc., 22

---

[19] In Purcell, 549 U.S. at 4-5, the Supreme Court cautioned that "orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls.  As an election draws closer, that risk will increase."  The principle articulated in this decision does not counsel against this Court issuing a preliminary injunction because here it is the Executive Order, not the Court's injunction of certain of its provisions, that purports to disturb the status quo by changing decades of established practice with respect to voter registration and ballot counting.  LULAC, 2025 WL 1187730, at *57 (concluding same).

F.4th 47, 57 (1st Cir. 2021) (citing cases); see Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc., 925 F.2d 6, 9 (1st Cir. 1991) (observing that "there is ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond").

The Executive Branch does not suggest and has not demonstrated that it will suffer a monetary loss from this Court's injunction.  See D. 91 at 28.  Further, as the DC Court observed, "requiring a bond as a condition of obtaining an injunction against unlawful executive action under the circumstances presented here would risk deterring other litigants from pursuing their right to judicial review of unlawful executive action."  LULAC, 2025 WL 1187730, at *62.  Other courts have declined to require a bond under these circumstances.  See New York v. McMahon, No. 25-10601-MJJ, 2025 WL 1463009, at *39 (D. Mass. May 22, 2025) (declining to require a bond in a suit to enforce important federal rights and the public interest); Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump, 767 F. Supp. 3d 243, 291 (D. Md. 2025) (setting "a nominal bond of zero dollars" where plaintiffs sought to protect their Constitutional rights and a bond "would essentially forestall [p]laintiffs' access to judicial review").  The Court, therefore, declines to require the States to post a bond.

## VIII.  Conclusion

For the foregoing reasons, the Court shall grant the motion for preliminary injunction as sought as to §§ 2(a), 3(d), 2(d),[20] 7(b) of the Executive Order and § 7(a) of the Executive Order as

---

[20] The Court's injunction as to §§ 2(a), 2(d), 3(d) applies as to all states, but it "is neither 'nationwide' nor 'universal.'  It is a remedy tailored to the irreparable harm that Plaintiffs in these consolidated case would suffer in the absence of an injunction."  LULAC, 2025 WL 1187730, at *59.  "To the extent the Court's 'injunction advantage[s] nonparties, that benefit [is] merely incidental.'"  Id. (quoting Trump v. Hawaii, 585 U.S. 667, 717 (2018) (Thomas, J., concurring)).  Were the Court to enjoin the Defendants only with respect to Plaintiff States, it would undermine

to civil or criminal enforcement actions.[21]

None of the States shall be required to post an injunction bond or any other security as a condition of obtaining the injunction described in this Memorandum or the accompanying Order.

Nothing in this Memorandum or the accompanying Order shall prevent the Executive Branch from taking any lawful action that is not based upon §§ 2(a), 2(d), 3(d), 7(a) or 7(b) of the Executive Order as described herein and in the accompanying Order. An Order of preliminary injunction shall be entered today in accordance with this Memorandum.

**So Ordered.**

/s Denise J. Casper
United States District Judge

---

the national uniformity central to the NVRA, the HAVA and the UOCAVA. "In these unique circumstances, an injunction tailored to the Plaintiffs before the Court is coextensive with an injunction tailored to the Defendants before the Court, who happen to be actors with . . . power . . . nationwide." Id. at *59. The injunctive relief sought as to §§ 7(a) and 7(b) is only sought as to the thirteen Ballot Receipt States and, accordingly, is limited as to them.

[21] The Executive Order contains a severability clause which provides that "[i]f any provision of this order, or the application of any provision to any agency, person, or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other agencies, persons, or circumstances shall not be affected thereby." Exec. Order No. 14248 § 10. In the absence of "strong evidence" suggesting otherwise, the Court will not presume that "the validity of the [Executive Order will] depend on the validity of the constitutionally offensive [sections]." Seila L. LLC, 591 U.S. at 234. Accordingly, the Court's ruling applies only to the challenged sections, §§ 2(a), 2(d), 3(d), 7(a) and 7(b) and only to the extent discussed above and incorporated into the accompanying Order.