## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | |
| *Plaintiffs*, | |
| v. | |
| DONALD J. TRUMP, *in his official capacity as President of the United States*, *et al.*, | Case No. 1:25-cv-10810 (DJC) |
| *Defendants*. | |

## <u>DEFENDANTS' MOTION TO DISMISS</u>

"Federal courts are courts of limited jurisdiction," possessing "only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). And the Constitution limits the judicial power to "Cases" and "Controversies." U.S. Const. art. III, § 2. "Under Article III, federal courts do not adjudicate hypothetical or abstract disputes," "do not possess a roving commission to publicly opine on every legal question," and "do not exercise general legal oversight of the Legislative and Executive Branches." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

On March 25 of this year, President Trump issued an Executive Order directing various agencies and federal officers to protect the integrity of the election process "consistent with applicable law." That was enough to spur Plaintiffs—comprising nineteen states—to launch a suit and seek a preliminary injunction. But "federal courts do not issue advisory opinions," *id.* at 424, and Plaintiffs either lack standing (for claims challenging actions that do not affect them) or their claims are not ripe (for claims challenging actions that have not yet occurred and which still need to go through additional legal and policy processes). In other words, Plaintiffs' suit is in search for a problem. Rather than accompany them on that journey, the Court should dismiss this case

without even reaching the merits.

Regardless, the merits avail Plaintiffs nothing. "The Constitution vests all executive power in the President." *Touby v. United States*, 500 U.S. 160, 168 (1991) (citing U.S. Const., art. II, § 1). "[I]t is the President to whom . . . the Secretary [of Defense] and the Attorney General report." *Id.* And the Elections Assistance Commission is itself an Executive agency. In this case, Plaintiffs challenge the President's direction to subordinate officials in the Executive Branch to take certain election-related actions within those officials' purview. Because the Constitution grants the President supervisory authority over members of the Executive Branch, he may lawfully direct how they carry out their statutory duties. For that reason, Plaintiffs fail to state a claim.

## BACKGROUND

The National Voter Registration Act of 1993 ("NVRA") requires States to "accept and use" a uniform federal form ("federal form") to register voters for federal elections. 52 U.S.C. § 20505(a)(1). Congress charged the Elections Assistance Commission ("EAC"), 52 U.S.C. § 20921, created under the Help America Vote Act of 2002 ("HAVA"), Pub. L. No. 107-252, 116 Stat. 1666, 1726 (codified as amended at 52 U.S.C. §§ 20901 *et seq.*), "in consultation with the chief election officers of the States," with "develop[ing] a mail voter registration application form for elections for federal office" and "promulgat[ing] regulations needed to carry out that task." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 5 (D.C. Cir. 2016); 52 U.S.C. § 20508(a)(2). Similarly, Congress charged the President's designee[1] in the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") with developing "an official post card form, containing both an absentee voter registration application and an absentee ballot application, for use by the States." 52 U.S.C. § 20301(b)(2). The Department of Defense's Federal Voting

---

[1] "The President selected the Secretary of Defense as the UOCAVA presidential designee by Executive Order. Exec. Order No. 12,642, 53 Fed. Reg. 21,975 (June 8, 1988), *reprinted as amended in* 52 U.S.C. § 20301.

Assistance Program ("FVAP"), the entity responsible for administering UOCAVA as delegated by the Secretary of Defense,[2] must similarly follow the Paperwork Reduction Act's notice-and-comment rule-making process to revise the federal post card application ("FPCA").[3]

On March 25, 2025, President Trump issued Executive Order 14,248, entitled "Preserving and Protecting the Integrity of American Elections," 90 Fed. Reg. 14005 (Mar. 25, 2025) ("Executive Order"; sections cited as "EO § n"). The Executive Order explains that "[f]ree, fair, and honest elections unmarred by fraud, errors, or suspicion are fundamental to maintaining our constitutional Republic. The right of American citizens to have their votes properly counted and tabulated, without illegal dilution, is vital to determining the rightful winner of an election." *Id.* § 1. "Under the Constitution, State governments must safeguard American elections in compliance with Federal laws that protect Americans' voting rights and guard against dilution by illegal voting, discrimination, fraud, and other forms of malfeasance and error." *Id.* President Trump declared that "[i]t is the policy of [his] Administration to enforce Federal law and to protect the integrity of our election process." *Id.*

To achieve that end, the Executive Order "enforce[s] the Federal prohibition on foreign nationals voting in Federal elections." *Id.* § 2. The Executive Order directs "the Election Assistance Commission" to "take appropriate action to require, in its national mail voter registration form issued under 52 U.S.C. [§] 20508," "documentary proof of United States citizenship consistent with 52 U.S.C. [§] 20508(b)(3)." *Id.* § 2(a)(i)(A). The Executive Order additionally states that

---

[2] The Secretary administers its responsibilities through The Federal Voting Assistance Program ('FVAP')." United States v. Alabama, 778 F.3d 926, 930 n.2 (11th Cir. 2015) (citing Federal Voting Assistance Program (FVAP), 32 C.F.R. § 233 (2014)).
[3] *See* 44 U.S.C. §§ 3501–3521; Proposed Collection, Comment Request (Federal Post Card Application (FPCA), Standard Form 76 (SF-76); OMB Control Number 0704-0503), Regulations.gov, https://www.regulations.gov/search?agencyIds=DOD&filter=%22SF-76%22 (listing FPCA-specific notice-and-comment dockets); https://www.regulations.gov/document/DOD-2017-OS-0008-0001 (example of information collection notice for FCPA revisions).

"[t]he head of each Federal voter registration executive department or agency (agency) under the National Voter Registration Act, 52 U.S.C. 20506(a), shall assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs." *Id*. § 2(d). The Executive Order also directs "[t]he Secretary of Defense" to "update the Federal Post Card Application, pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. 20301, to require . . . documentary proof of United States citizenship . . . and proof of eligibility to vote in elections in the State in which the voter is attempting to vote." *Id*. § 3(d). It further states that the EAC "shall, pursuant to 52 U.S.C. [§§] 21003(b)(3) and 21142(c) and consistent with applicable law," cease disbursing funds to states that do not comply with the laws set forth in 52 U.S.C. § 21145. *Id*. § 4(a). And it charges the Attorney General with enforcing the Election Day statutes, 2 U.S.C. § 7 and 3 U.S.C. § 1, which establish a day for federal elections, against states who do not require mail-in and absentee ballots to be received by Election Day and similarly instructs the EAC to withhold funds from states who do not adopt that interpretation, as required by 52 U.S.C. § 21081(a)(6). *Id*. §§ 7(a), (b).

On April 3, 2025, Plaintiffs, the States of Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Massachusetts, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Rhode Island, Vermont, and Wisconsin, filed a complaint in this Court challenging each of the sections described above—§§ 2(a), 2(d), 3(d), 4(a), 7(a), 7(b)—each under an *ultra vires* separation-of-powers theory.

## LEGAL STANDARD

### 12(b)(1)

A district court must dismiss claims under Fed. R. Civ. P. 12(b)(1) when it lacks subject-matter jurisdiction to decide them. In ruling on a motion to dismiss for lack of jurisdiction, a district

court must "accept the well-pleaded factual averments contained therein and indulge all reasonable inferences in the plaintiff's favor." *Gordo-González v. United States*, 873 F.3d 32, 35 (1st Cir. 2017) (cleaned up). But a "special gloss" applies here, because "[i]t is a bedrock rule that a party seeking to invoke the jurisdiction of a federal court must bear the burden of demonstrating the existence of such jurisdiction." *Id.*

### 12(b)(6)

A district court should dismiss claims under Fed. R. Civ. P. 12(b)(6) when the underlying allegations fail "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A district court should thus dismiss a claim "if the complaint does not set forth 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'" *U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 384 (1st Cir. 2011) (quoting *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008)). This requires a plaintiff to plead "more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

"When ruling on a Rule 12(b)(6) motion to dismiss, a district court is generally limited to considering 'facts and documents that are part of or incorporated into the complaint.'" *Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008) (quoting *Trans–Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008)). But those "limitations . . . are not absolute"—"[a] district court may also consider 'documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice.'" *Id.* (quoting *In re Colonial Mortgage Bankers Corp.*, 324 F.3d 12, 20 (1st Cir. 2003)). "Matters of public record, which include material on government websites, are generally subject to judicial notice." *Pietrantoni v. Corcept*

*Therapeutics Inc.*, 640 F. Supp. 3d 197, 204–05 (D. Mass. 2022) (citing *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 15, 15–16 (1st Cir. 2003); *Gent v. Cuna Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010)).

## ARGUMENT

### I.    Plaintiffs' claims are not justiciable.

Article III restricts federal court jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2. This limitation on "[t]he judicial Power of the United States" is fundamental to the judiciary's role within the constitutional separation of powers. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016). Two of the limitation's manifestations are the justiciability doctrines of standing and ripeness, both of which are implicated here.

To establish Article III standing, a plaintiff must demonstrate that it (1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed by a favorable judicial decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). An injury in fact must be "concrete and particularized" and "actual or imminent", not "conjectural" or "hypothetical." *Id.* (citation omitted). "An allegation of future injury may suffice only if the threatened injury is 'certainly impending' or [if] there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Dreihaus*, 573 U.S. 149 158 (2014) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n. 5 (2013)). But if the future injury is "too speculative for Article III purposes and no prosecution is even close to impending, then there is no standing to sue." *Blum v. Holder*, 744 F.3d 790, 799 (1st Cir. 2014) (citation omitted). At bottom, standing requires a plaintiff to have a "personal stake" in the case, and to "be able to sufficiently answer the question: 'What's it to you?'" *TransUnion*, 594 U.S. at 423 (cleaned up).

Each plaintiff must demonstrate its own Article III standing, as "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring). Finally, because "standing is not dispensed in gross," each plaintiff must demonstrate standing for each claim that it presses against each defendant, and for each form of relief that it seeks. *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion v. Ramirez*, 594 U.S. 413, 431 (2021)).

While standing seeks to keep federal courts out of disputes involving conjectural injuries, the ripeness doctrine seeks to prevent the adjudication of claims relating to "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted). The basic function of ripeness is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967).  As with standing, Plaintiffs bear the burden of alleging facts sufficient to demonstrate ripeness. *See Nulankeyutmonen Nkihtagmikon v. Impson*, 503 F.3d 18, 25 (1st Cir. 2007).

There are two prongs to the ripeness analysis: "fitness" and "hardship." *See Texas*, 523 U.S. at 300–01. These prongs are related but distinct:  fitness "typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed," whereas hardship "typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir. 1995) (citation omitted).

a.   **Section 2(a)**

Section 2(a) of the Executive Order orders the EAC to "take appropriate action to require" documentary proof of United States citizenship in its national mail voter registration form. EO

§ 2(a). This directive is consistent with—and indeed, contemplates the exercise of—the rulemaking authority permitted to the EAC by the NVRA, which allows the EAC to alter the federal form by promulgating regulations through notice-and-comment rulemaking. *See* 52 U.S.C. § 20929; *Final Rules: National Voter Registration Act of 1993*, 59 Fed. Reg. 32, 311 (June 23, 1994). Before the federal form can be altered, the EAC must, among other things, develop the change as a proposed rule, which must be approved by the EAC; issue a notice of proposed rulemaking and solicit public comments; consult with the chief election officers of the States pursuant to 52 U.S.C. § 20508(a)(2); consider revisions to the proposed rule based on feedback from the public—including the Plaintiff States—and then revise the rule as needed. *See* 5 U.S.C. § 553. Only after that process is completed may the EAC promulgate a final rule amending the federal form. *See* 5 U.S.C. § 553(c).  At that point, that final rule would presumably be subject to review under the APA.

By its plain language, Section 2(a) contemplates that future action is required—the EAC must go through its rulemaking process before any changes to the federal form can be finalized. In other words—as Plaintiffs implicitly conceded by bringing only *ultra vires* claims—there is no final agency action here, and Plaintiffs can only guess as to what the ultimate federal form will provide after the notice and comment and consultation process is required. *See Texas v. EEOC*, 933 F.3d 433, 441 (5h Cir. 2019) (noting that whether the challenged action "is a reviewable final agency action" "contextualizes the standing inquiry").  Plaintiffs do not explain how the start of a process that may eventually lead to new rulemaking at some future point injures them. Instead, they assume that the form as updated in the future will "impose a significant burden" on them. Compl. ¶ 104, ECF No. 1. Plaintiffs thus cannot establish the requisite "concrete and particularized" and "actual or imminent" injury in fact for standing purposes. *Lujan*, 504 U.S. at

560 (citation omitted). Indeed, it would be remarkable if Plaintiffs discovered a way to challenge the EO at this juncture, given how courts regularly dismiss challenges to NPRMs. *See In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015) ("We may review final agency rules. But we do not have authority to review proposed rules."); *National Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 659 (2007) ("The federal courts ordinarily are empowered to review only an agency's *final* action."). The Executive Order is not even an NPRM—it *predates* an NPRM.

Neither can they demonstrate that there is an "immediate dilemma" that is ripe for judicial intervention. *See Texas*, 523 U.S. at 300 ("Here, as is often true, '[d]etermination of the scope . . . of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function.'" (quoting *Int'l Longshoremen's & Warehousemen's Union v. Boyd*, 347 U.S. 222, 224 (1954))). Under these circumstances—where an operative rule has not even been proposed, much less promulgated in final form—Plaintiff States cannot establish that Section 2(a) is "fit" for review because future events have not yet occurred and, indeed, they "may not occur as anticipated." *See Texas*, 523 U.S. at 300. This lack of finality and definiteness counsels against judicial intervention. *See Ernst & Young*, 45 F.3d at 535. Moreover, the controversy lacks "sufficient immediacy and reality to warrant the issuance of" the judicial relief sought. *Lab. Rels. Div. of Const. Indus. of Mass., Inc. v. Healy*, 844 F.3d 318, 326 (1st Cir. 2016). Since a final rule does not yet exist, Plaintiff States do not yet know how they will be harmed—if at all. This lack of harm is fatal to the justiciability of Plaintiff States' claims challenging section 2(a).

### b.  Section 2(d)

Plaintiffs lack standing to pursue claims based on Section 2(d).  By its plain terms, Section 2(d) directs the "head of each ***Federal voter registration executive department or agency*** . . . [to]

assess citizenship prior to providing a Federal voter registration form to ***enrollees*** of public assistance programs." EO § 2(d) (emphasis added). This provision does not state that it applies to Plaintiff States, who are neither federal departments or agencies nor enrollees of public assistance programs. Indeed, Plaintiff States appear to recognize as much in their Complaint, stating that the provision "rais[es] the specter of commandeering Plaintiff State agencies and resources in violation of fundamental State sovereignty ***if*** it extends to State and local agencies designated under the NVRA." Compl. ¶ 49(b) (emphasis added). As pleaded, any such injury is definitionally speculative. Because section 2(d) does not apply to Plaintiffs, they lack standing to challenge this provision.

### c. Section 3(d)

Section 3(d) directs the Secretary of Defense to update the Federal Post Card Application pursuant to UOCAVA to require documentary proof of United States citizenship, "as defined by section 2(a)(ii) of th[e] order," and "proof of eligibility to vote in elections in the State in which the voter is attempting to vote." EO § 3(d). But, as Plaintiffs already conceded, "what proof of eligibility might suffice, or how a UOCAVA voter might obtain such proof," have not yet been determined. ECF No. 76 at 13.

The Secretary of Defense, via FVAP, has not yet updated the Federal Post Card Application, and the Executive Order does not establish a deadline to do so. The particulars of how or when section 3(d) will be implemented are thus unsettled.[4] Without knowing what is required to establish proof of eligibility to vote in elections in the state in which the voter is attempting to vote, which could vary among states, Plaintiffs (and the Court) can only speculate about whether the requirement would violate UOCAVA. This claim is not fit for judicial review because it "involves

---

[4] The FPCA available on the FVAP website as of the date of this filing is still the 01-2023 revision. FVAP, "Federal Post Card Application (FPCA)," https://www.fvap.gov/uploads/fvap/forms/fpca.pdf (last visited June 13, 2025).

uncertain and contingent events that may not occur as anticipated or may not occur at all." *Ernst & Young*, 45 F.3d at 536 (citation omitted). "Cognizable hardship is usually direct and immediate harm . . . ." *Ernst & Young*, 45 F.3d at 536. Plaintiffs have asserted no immediate harm to support ripeness. Accordingly, their claims regarding Section 3(d) are not ripe.

### d.  Section 7(a)

Plaintiffs' alleged injury is too speculative to support standing to challenge section 7(a), nor is their claim ripe. Section 7(a) interprets 2 U.S.C. § 7 and 3 U.S.C. § 1 to require a national ballot receipt deadline and instructs the Attorney General to "take all necessary action to enforce [the statutes] against States that violate" them. What that action will be, how it will be enforced, and against whom is entirely speculative, and is not a basis for Article III standing or ripeness.

This instruction to the Attorney General is a matter of enforcement discretion that belongs to the Executive Branch. *See United States v. Texas*, 599 U.S. 670, 678 (2023) ("The President 'shall take Care that the laws be faithfully executed.'" (quoting U.S. Const., art. II, § 1, cl. 1, § 3)); *see also TransUnion LLC*, 594 U.S. at 429 (Under Article II, the Executive Branch possesses authority to decide "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law."). As noted by the Supreme Court, the Attorney General acts as the President's "chief law enforcement officer" who "provides vital assistance to [him] in the performance of [his] constitutional duty to preserve, protect, and defend the Constitution." *Trump v. United States*, 603 U.S. 593, 620 (2024). Moreover, the Executive Branch's enforcement decisions are not subject to judicial review because "courts generally lack meaningful standards for assessing the propriety of enforcement choices[.]" *Texas*, 599 U.S. at 679.

At the outset, the Attorney General has done nothing so far—and so any dispute about what she may do in the future is necessarily speculative. And that means that it is speculative that any

such action would violate any legal rights Plaintiffs have. The Attorney General can lawfully enforce these statutes by, for example, sending letters to the Plaintiff States encouraging compliance with the President's interpretation of 2 U.S.C. § 7 and 3 U.S.C. § 1. Because the Attorney General can enforce these statutes "consistent with applicable law," as set forth in section 11 of the Executive Order, there is no risk of imminent harm, as the Plaintiff States allege. *See Trump v. New York*, 592 U.S. 125, 131 (2020); *see also LULAC v. Exec. Off. of the President*, No. CV 25-0946 (CKK), 2025 WL 1187730, at *51 (D.D.C. Apr. 24, 2025) ("[I]t is unclear on the present record whether Section 7(a) will lead imminently to any unlawful action" because the "Attorney General . . . must implement Section 7(a), as the Executive Order says, 'consistent with applicable law.'"). In *Trump v. New York*, for example, plaintiffs challenged a memorandum issued by President Trump instructing the Secretary of Commerce to implement a policy, "to the maximum extent feasible and consistent with the discretion delegated to the executive branch," that would have excluded "from the apportionment base aliens who are not in a lawful immigrant status." 592 U.S. at 129–30. The Supreme Court found that the plaintiffs failed to establish both standing and ripeness because the "case [was] riddled with contingencies and speculation that impede[d] judicial review" and "[a]ny prediction how the Executive Branch might eventually implement [its] general statement of policy is 'no more than conjecture' at this time." *Id.* at 131, 134 (citing *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)).

Such is the case here. At bottom, Plaintiffs' challenge to section 7(a) is based on a presumption of bad-faith execution by the Government. They allege no basis to support that presumption, and, in any event, such an assumption would be contrary to the presumption of good faith that courts routinely accord the Government. *See, e.g., Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010) ("[U]nlike in the case of a private party, [the courts]

presume the government is acting in good faith."); *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009) ("[G]overnment actors . . . are accorded a presumption of good faith because they are public servants, not self-interested private parties."). Because there is no reason for the Court to presume the Attorney General will enforce section 7(a) unlawfully, Plaintiffs' alleged injury is entirely speculative. Accordingly, they failed to establish both standing and ripeness. *See LULAC*, 2025 WL 1187730, at *51 (declining to enjoin section 7(a) because the "Court 'cannot simply assume' that the Attorney General will disregard the 'requirement of lawful implementation'" (citation omitted)).

## II.    Plaintiffs lack a cause of action.

To state an actionable claim, a plaintiff must provide a cause of action under which relief can be granted. *E.g.*, *Arroyo-Torres v. Ponce Fed. Bank, F.B.S.*, 918 F.2d 276, 280 (1st Cir. 1990). In the absence of a cause of action, the court must dismiss the claim for failure to state a claim. *Id.*; *see also Burks v. Lasker*, 441 U.S. 471, 476 n.5 (1979) ("The question whether a [private] cause of action exists is not a question of jurisdiction . . . ."). The Plaintiffs cannot sue the President under the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). Presumably recognizing this, Plaintiffs bring all their claims challenging the Executive Order pursuant to "a non-statutory right of action"—the first six "to enjoin and declare unlawful official action that is ultra vires," Compl. ¶¶ 114, 125, 137, 146, 156, 166, and the seventh "to enjoin and declare unlawful official action that commandeers State executive power or otherwise intrudes on Plaintiff States' inherent sovereignty and powers granted by the Constitution," *id.* ¶ 179. The First Circuit has held that "if a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still be able to institute a non-statutory review action." *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 59 (1st Cir. 2007). But it has made nonstatutory review

available only when "its absence would wholly deprive the party of a meaningful and adequate means of vindicating its rights," and Congress has not "clearly intended to preclude review." *Id*. (cleaned up).

Nonstatutory review is inappropriate here. Here, as in in *Commonwealth of Puerto Rico*, 490 F.3d at 59, Plaintiffs have a means of challenging provisions of the Executive Order, as they apply to the agencies tasked with specific responsibilities, without resorting to nonstatutory review: the APA.[5] *Id*. Instead, Plaintiffs attempt to shoehorn their claims into a nonstatutory cause of action to avoid the APA's final-agency-action requirement. 5 U.S.C. § 704. Because Plaintiffs have an avenue of statutory review available to them, their "rights" would not "be effectively lost absent judicial review." *Commonwealth of Puerto Rico*, 490 F.3d at 60. And the availability of the APA as a means for reviewing governmental action under the Executive Order "at least implies that nonstatutory review is inappropriate." *Id*. This Court should not permit Plaintiffs to make an end-run around the APA by bringing a nonstatutory cause of action simply because they ran to the courthouse too early to use the avenue Congress provided them.

## III. The President has the constitutional authority to direct the EAC to prescribe regulations, and section 2(a)'s directive is consistent with the NVRA.

Plaintiffs allege that section 2(a) "violates the separation of powers and impermissibly arrogates to the Executive power that is reserved to Congress," Compl. ¶¶ 122, 134, because it "exceed[s] the President's Article II powers, unconstitutionally infringe[s] upon Congress's powers, and attempt[s] to amend federal legislation," namely the NVRA, "while bypassing Article I's Bicameralism, Presentment, and Elections Clauses," *id*. ¶¶ 120, 132. But the President neither

---

[5] That Plaintiffs could not bring APA claims against the President directly is of little import because they do not seek to enjoin him (nor could they). Compl. at 39; *Dalton v. Specter*, 511 U.S. 462, 469 (1994) ("[T]he President's actions were not reviewable under the APA, because the President is not an 'agency' within the meaning of the APA."); *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality) (noting that, "in general," courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties").

exceeded his constitutional authority nor violated the NVRA in directing the EAC to "take appropriate action to require" documentary proof of citizenship on the federal form.

**a. Section 2(a) does not violate the Constitution.**

Article II, section 1 of the Constitution provides that "[t]he executive power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1, cl. 1. "[T]he President's power necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)); *see Myers*, 272 U.S. at 135 (explaining that the President "may properly supervise and guide [agency officials'] construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone"). While the President is not a "lawmaker," he may "direct that a congressional policy be executed in a manner prescribed by Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–88 (1952). This is why Presidents of both parties have long directed agencies to exercise their authority to take regulatory actions without any suggestion of constitutional impropriety. *See, e.g.*, Exec. Order No. 13693, 80 Fed. Reg. 15871 (Mar. 19, 2015); Exec Order No. 13338, 69 Fed. Reg. 26751 (May 11, 2004).

Congress empowered the EAC to "prescribe such regulations as are necessary to . . . develop a mail voter registration application form for elections for Federal office" "in consultation with the chief election officers of the States." 52 U.S.C. § 20508(a). The EAC must also submit various reports to Congress "assessing the impact of [the NVRA] on the administration of elections for Federal office . . . and . . . recommend[ing] . . . improvements." *Id*. § 20508(a)(3). The EAC

exercises Executive power when it carries out these duties and is therefore subject to the administrative control of the President. It is thus undisputed that the EAC has the authority to update the federal form. Accordingly, under section 2(a) of the Executive Order, the President was well within his authority to direct the EAC to "take appropriate action to require, in its national mail voter registration form . . . documentary proof of United States citizenship." EO § 2(a).

Plaintiffs allege that the EAC is "a multimember, bipartisan body composed of experts in elections and their administration," which "Congress established . . . as an 'independent entity.'" Compl. ¶ 116. The President's actions in section 2(a), they assert, "undermine[ ] the authority and independence of Congress." *Id*. ¶ 117. Simplified, then, their argument is the President lacks the power to direct multimember boards that exercise executive power. That argument is wrong, as the Supreme Court has recently noted. *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025). Because "[t]he entire 'executive Power' belongs to the President alone," when an agency, like the EAC "exercise[s] *any* executive power," it is subject to the President's supervisory authority. *Seila Law LLC v. CFPB*, 591 U.S. 197, 213, 216–17 (2020) (emphasis added); *see also id*. at 216 & n.2 (explaining that "[t]he Court's conclusion that the FTC did not exercise executive power has not withstood the test of time" and that "[i]t is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree"); *City of Arlington v. FCC*, 569 U.S. 290, 305 n.4 (2013) (even though the activities of administrative agencies "take 'legislative' and 'judicial' forms," "they are exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power'" (quoting U.S. Const., art. II, § 1, cl. 1)).

In addition to challenging the President's authority to direct the EAC, Plaintiffs object to the way he exercised his authority to so direct. They assert that the "President cannot add a

16

documentary proof of citizenship requirement to the federal form, because even the Commission could not impose that requirement." Compl. ¶ 12. "[O]nly the [EAC]," Plaintiffs allege, "can change the Federal Form, and then only 'in consultation' with the States, with the majority of approval of its bipartisan Commissioners, and through reasoned decision-making subject to the Administrative Procedures Act." *Id*. But the Executive Order skirts none of these processes. Section 2(a)(i)(A) of the Executive Order states that "[w]ithin 30 days of the date of this order, the Election Assistance Commission shall take *appropriate actio*n to require, in is national mail voter registration form . . . documentary proof of United States citizenship." (emphasis added). Plaintiffs' apparent reading ignores the words "take appropriate action" and focuses only on "to require." But "to require" must be read in conjunction with "take appropriate action," and the appropriate action required here involves "consult[ing] with the chief election officers of the States," to "prescribe . . . regulations" to "develop a mail voter registration application form for elections for Federal office." 52 U.S.C. § 20508(a). The Executive Order instructs the EAC to take these steps, which Plaintiffs recognize satisfy applicable legal requirements. *See* Compl. ¶ 12.

### b. Section 2(a) does not violate the NVRA.

Plaintiffs assert that section 2(a) "violates the substantive provisions of the NVRA," because it "permits the Federal Form to 'require only such identifying information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant." Compl. ¶ 127 (quoting 52 U.S.C. § 20508(b)(1)). And, they allege, "Congress has already decided that documentary proof of citizenship is not 'necessary' for identifying eligible voters" by specifying that "citizenship is proven through attestation" and prohibiting "any requirement for notarization or other formal authentication" in the NVRA. *Id*. ¶ 130 (quoting 52 U.S.C. § 20508(b)(2), (3)). But as explained, the President has the authority to direct the EAC to take all

necessary action to amend the mail voter registration form, *see supra* III.a., and the EAC's decision to amend the federal form to require documentary proof of citizenship—a decision that has not yet been made, *see supra* I.a.—would not violate the NVRA. (Indeed, precisely because such a decision has not occurred, any opinion by this court on the scope of the NVRA would be an impermissible advisory opinion.)

The NVRA charges the EAC with prescribing regulations to "develop a mail voter registration application form for elections." 52 U.S.C. § 20508(a). The form must "include a statement that . . . specifies each eligibility requirement (including citizenship)" and "contains an attestation that the applicant meets each such requirement." *Id*. § 20508(b)(2)(A)–(B). But the form "may require only such identifying information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration." *Id*. § 20508(b)(1). And it "may not include any requirement for notarization or other formal authentication." *Id*. § 20508(b)(3).

As the form's developer, the EAC determines what identifying information "is necessary" to assess an applicant's eligibility to vote. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 10 (D.C. Cir. 2016) ("It would be illogical for Congress to provide in section 20508(b)(1) that the consultant, rather than the developer, would determine 'necessity.'"); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 19 (2013). Congress's determination that the form must contain an attestation that the applicant meets the requirements to register to vote does not preclude the EAC from later determining that documentary proof of citizenship is necessary for state election officials to determine voter eligibility. If the EAC made such a determination through notice-and-comment rulemaking, it could prescribe regulations to alter the form. Adding a documentary proof requirement to the form would not run afoul of Congress's instruction that the

18

form not include any requirement for notarization or formal authentication. "[F]ormal authentication" must be read in light of "notarization." *See Inmates of Suffolk Cnty. Jail v. Sheriff of Suffolk Cnty.*, 952 F. Supp. 869, 877 (D. Mass. 1997) (citing *King v. St. Vincent's Hospital*, 502 U.S. 215, 221 (1991)) ("Moreover, a general guideline of statutory interpretation is that statutory terms must be read . . . in relation to each other."). Notarization requires a notary to "attest to the authenticity of . . . a signature," Notarize, Black's Law Dictionary (12th ed. 2024), for the purpose of "verifying that the person signing the document is who they claim to be," *see, e.g.*, *Wright v. Marjem Recovery, LLC*, No. CIV.A. 13-12058-TSH, 2014 WL 4274528, at *1 (D. Mass. Aug. 27, 2014). Formal authentication, therefore, must mean some requirement used to authenticate the applicant's identity. *See* Authentication, Black's Law Dictionary (12th ed. 2024) ("Broadly, the act of proving that something (as a document) is true or genuine."). The documentary proof of citizenship would serve to substantiate an applicant's U.S. citizenship not verify his or her identify. Said in a slightly different context, a photocopy of a driver's license would be a documentary proof of identification, even though it would not serve as *authentication* of that identification akin to a notarization. The same principle holds for passports and citizenship. Any documentary proof of citizenship requirement therefore does not constitute a requirement for formal authentication. And—again—even if Plaintiffs believe it is, they will have an opportunity to make such an argument during forthcoming notice and comment rulemaking, and in an eventual challenge to a final agency action. They cannot press that argument in an unripe context.

**IV.     The President has the constitutional authority to direct the Secretary of Defense to update the federal post card application, and section 3(d)'s directive is consistent with UOCAVA.**

Plaintiffs allege that "[b]y directing the Secretary of Defense to include requirements for the Federal Post Card Application not contained in federal law, [section 3(d)] attempts to amend,

repeal, rescind, or circumvent duly enacted federal statutes" and the President has "exceed[ed]" his "Article II powers." Compl. ¶ 141. Specifically, Plaintiffs contend section 3(d) circumvent[s]" UOCAVA because "[n]owhere in [UOCAVA] is there a requirement that [the federal post card application] demand documentary proof of citizenship or proof of eligibility to vote in elections in the State in which the applicant is attempting to vote." Compl. ¶ 140. But the President has the authority to direct the Secretary of Defense to "update the Federal Post Card Application" for the reasons explained above, *see supra* III.a, and section 3(d) is consistent with UOCAVA's text and design.

UOCAVA serves "to facilitate absentee voting by United States citizens, both military and civilian, who are overseas." *Igartua de la Rosa v. United States*, 842 F. Supp. 607, 611 (D.P.R.), *aff'd*, 32 F.3d 8 (1st Cir. 1994) (citing H.R. Rep. No. 99–765, 1986 U.S.C.C.A.N. at 2009)). To that end, the Secretary of Defense must, in consultation with State and local election officials, "prescribe an official post card form, containing both an absentee voter registration application and an absentee ballot application." 52 U.S.C. § 20301(b)(1), (2).

While this dispute is unripe, nothing in UOCAVA *limits* what kind of document requirements the Secretary of Defense may "prescribe" on the "official post card form." 52 U.S.C. § 20301(b)(2). And Congress has made clear in the statute itself that UOCAVA voters must be "qualified to vote" in their "place[s] of residence" or "the last place in which [they were] domiciled before leaving the United States." *See, e.g.*, 52 U.S.C. § 20310(1), (5). Being "qualified to vote" necessarily requires U.S. citizenship under federal law. 52 U.S.C. § 20310(1), (5); 18 U.S.C. §§ 1015(f), 611 (unlawful for any alien to vote in Federal elections); *see United States v. Alabama*, 998 F. Supp. 2d 1283, 1290 (M.D. Ala. 2014) (it "is an obvious given" "that UOCAVA is aimed at only federal elections"). Section 3(d)'s directive that the Secretary of Defense update the FPCA

to require "documentary proof of citizenship" and "proof of eligibility to vote in elections in the State in which the voter is attempting to vote" does not conflict with, and in fact aligns with, UOCAVA's requirements. Any suggestion that attaching additional documents to the FPCA contradicts Congress's intended purpose and makes the document unwieldy is wrong. Compl. ¶ 40c. Arizona, as Plaintiffs observe, already requires documentary proof of citizenship with the FPCA to receive a full ballot. *Id.* at 24 n.2. While this requirement may apply only to registering to vote in state elections, it demonstrates that the documentary proof of citizenship requirement is functional.

52 U.S.C. § 20301(b)(7), which requires the Secretary of Defense to "prescribe a standard oath for use with any document under this chapter affirming that a material misstatement of fact in the completion of such a document may constitute grounds for a conviction for perjury," does not change that analysis. UOCAVA instructs states to "use the standard oath" if a "State requires an oath or affirmation to accompany any document." *Id.* § 20302(a)(5). But the "standard oath" is not a substitute for proof of eligibility. It is merely a mechanism by which applicants are held accountable for the veracity of *all* statements they make in completing required application documents.[6]

Nor does section 3(d)'s documentary citizenship requirement render the FPCA unusable for its intended purpose, i.e. to facilitate absentee voting by United States citizens, both military and civilian, who are overseas. The FPCA already contemplates the submission of additional information or documents in the case of Arizona, Vermont, and Puerto Rico.[7] And visual

---

[6] FVAP, Interpretation of the Help America Vote Act of 2002: Based on the Requirements for U.S. Citizens Covered by the Uniformed and Overseas Citizens Absentee Voting Act 14 (Aug. 2003), https://www.fvap.gov/uploads/FVAP/Policies/havamemo.pdf (stating the oath).

[7] FPCA, Voter Registration and Absentee Ballot Request, https://www.fvap.gov/uploads/fvap/forms/fpca.pdf (specifying in section 6 that Puerto Rico and Vermont require more information, providing a link to additional state guidelines, and indicating that the form may be used to clarify voter information); *see also* Arizona, Voting Assistance Guide at Section 6, https://www.fvap.gov/guide/chapter2/arizona (requiring documentary proof of citizenship for a

inspection of the current FPCA reveals that it is no longer actually a postcard.[8]

Because U.S. citizenship and voter eligibility are already required for UOCAVA voters, and UOCAVA does not prohibit including a documentary-proof-of-citizenship requirement on the FPCA, should the court reach this issue (and it should not), section 3(d)'s directive does not violate UOCAVA.

## V.    Section 4(a) permissibly conditions funding on a state's compliance with the laws described in 52 U.S.C. § 21145.

Plaintiffs allege that section 4(a) unlawfully "condition[s] federal funding to States on their acceptance of the Federal Form as unlawfully amended to require documentary proof of citizenship," Compl. ¶ 148, and that Congress has not "authorized the [EAC] to withhold funds" on the basis set forth in section 4(a), *id*. ¶ 150. Rather, Plaintiffs argue Congress has "specified the precise formula for calculating the grants that the Commission administers and the conditions for those funds," and once states meet those conditions, they are "statutorily entitled to those funds." *Id*. (citing 52 U.S.C. §§ 21001–21003, 21142(c)(1)). But the statutory sections cited in the Executive Order provide for the condition it directs the EAC to apply.

For a state to be "eligible to receive a requirements payment" under the Help America Vote Act ("HAVA"), 52 U.S.C. § 21003(a) requires the state's "chief executive officer . . . or designee . . . [to] certify[ ] that the State is in compliance with the requirements referred to in subsection (b)," which include "compliance with each of the laws described in section 21145," *id*. § 21003(b)(3). The laws named in 52 U.S.C. § 21145 include the NVRA, among others. *Id*. § 21145(a). And the NVRA requires that states use the national mail voter registration form developed by the EAC. *See id*. § 20505(a)(1); *see also id*. § 20508(a)(1). Thus, to be eligible to

full ballot).

[8] *See supra* n.1.

receive HAVA requirements payments, states must use the EAC's national mail voter registration form.

Section 4(a) of the Executive Order only parrots the NVRA's requirement. The Executive Order directs the EAC to "cease providing Federal funds to States that do not comply with the Federal laws set forth in 52 U.S.C. [§] 21145, including the requirement in 52 U.S.C. [§] 20505(a)(1) that States accept and use the national mail voter registration form . . . , including any requirement for documentary proof of United States citizenship adopted pursuant to section 2(a)(ii)." EO § 4(a). The NVRA's command that states use the national mail voter registration form is not limited to the version of the federal form current at the date the NRVA was promulgated—it applies to all future iterations of that form developed by the EAC, including any version that requires documentary proof of citizenship. *See Newby*, 838 F.3d at 4 ("The NVRA directs each state to 'accept and use' a federally prescribed national mail voter registration form . . . ."); *Tenn. Conf. of NAACP v. Lee*, No. 24-5546, 2025 WL 1587965, at *1 (6th Cir. June 5, 2025) ("States must 'accept and use' a 'mail voter registration application form' that the Election Assistance Commission (or EAC) creates." (citing 52 U.S.C. §§ 20505(a)(1), 20508(a)(2)). By requiring states to certify compliance with the laws set forth in 52 U.S.C. § 21145, including the NVRA's requirement to use the federal form, Congress necessarily contemplated the possibility that states may not agree to the certification and that funding may be withheld on that basis. 52 U.S.C. § 21003(a) ("A State is eligible to receive a requirements payment for a fiscal year if . . . ."). Section 4(a) of the Executive Order lawfully directs the EAC to apply existing statutory funding conditions set forth by Congress.

## VI.    The President lawfully interpreted the Election Day statutes for the executive branch in sections 7(a) and (b) under his take-care authority.

Plaintiffs allege that "[t]he President has no legal authority to amend the Election Day

statues [sic] to prohibit the counting of ballots validly cast under State law, nor to direct the Attorney General to enforce his erroneous interpretation of federal law against States." Compl. ¶ 159. "By directing the Attorney General to enforce the President's incorrect interpretation of federal law," Plaintiffs maintain, the Executive Order "attempts to amend, repeal, rescind, or circumvent duly enacted federal statutes" and "exceed[s] the President's Article II powers." *Id*. ¶ 160.

That is wrong. To begin, the Executive Order does not alter existing federal statutes. The President, as the person responsible for taking care that the laws are properly executed, put forward his interpretation of the law. The Executive has interpreted the law for centuries—this is nothing new, and certainly nothing constitutionally objectionable. But, in any event, the President's interpretation of those laws accords with their text, purpose, and history, and he has the authority to interpret for the Executive Branch what they require.

Article II, section 3 of the Constitution charges the President with the duty to "take Care that the Laws be faithfully executed." "[A]n essential part of execution of the law is the interpretation of that law." *Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 809 F.2d 979, 990 (3d Cir. 1986). Functionally, "the executive cannot execute [a] law's command until he decides what that command is, and absent a determination by the courts the executive must find the law's command himself." *Id*. Thus, the President's duty under the take-care clause "often puts upon him the duty to interpret [the law] for the Executive Department." *Id*. (quoting Edward S. Corwin, *The President: Office and Powers, 1787—1984* 141 (5th rev. ed. 1984)); *see also Bowsher v. Synar*, 478 U.S. 714, 751 n.16 (1986) (Stevens, J., concurring)  (explaining that "interpret[ing]" a "law enacted by Congress" is "a power normally committed initially to the Executive under the Constitution's prescription that he 'take Care that the Laws be faithfully executed'" (quoting U.S.

Const., art. II, § 3; *Synar v. United States,* 626 F. Supp. 1374, 1400 (D.D.C. 1986)); *Huggins v. Isenbarger*, 798 F.2d 203, 208 (7th Cir. 1986) (Easterbrook, J., concurring) ("The Executive Branch of any government has the authority to interpret the law, if only to the extent necessary to decide how to execute that law."). Plaintiffs' attempt to elevate this commonplace reality to a violation of the separation of powers is mere hysteria.

This Count can be dismissed simply by respecting the unremarkable conclusion that the President can interpret the law—leaving the propriety of that interpretation for a day when that interpretation is properly ripe. But if the court addresses the substance of this dispute, Plaintiffs fail to state a claim. The Election Day statutes establish a uniform, national Election Day for federal elections.  2 U.S.C. § 7; 3 U.S.C. § 1; *Foster*, 522 U.S. at 69. Section 7 provides that "[t]he Tuesday next after the 1st Monday in November, in every even numbered year, is established as *the day for the election*, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter." 2 U.S.C. § 7 (emphasis added). And section 1 further specifies that "[t]he electors of President and Vice President shall be appointed, in each State, *on election day*." 3 U.S.C. § 1 (emphasis added). But Congress enacted 3 U.S.C. § 1 and 2 U.S.C. § 7, in 1845 and 1872, when absentee voting was in its infancy. *Republican Nat'l Comm. v. Wetzel*, 120 F.4th 200, 204, 209 (5th Cir. 2024) ("Absentee voting began during the Civil War to secure the franchise of soldiers in the field."); *Foster v. Love*, 522 U.S. 67, 69 (1997). The advent of commonplace no-excuse-absentee voting presents the question of what having a "day for the election" means for purposes of those statutes, including whether ballots must be received by that day. *See* David Horton, *The Dead Voter Rule*, 73 Ala. L. Rev. 341, 350 (2021).

The President answered that question by interpreting the Election Day statutes for

Executive Branch officials in section 7(a) and 7(b) of the Executive Order. In section 7(a), he instructed the Attorney General to "take all necessary action to enforce 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives." EO § 7(a). And in 7(b) he directed the EAC to "condition any available funding to a State on that State's compliance with" 52 U.S.C. § 21081(a)(6)'s requirement "that each state adopt uniform and nondiscriminatory standards . . . including that, as prescribed in 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1, there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," except for UOCAVA votes. EO § 7(b). It was soundly within the President's authority to interpret the Election Day statutes in a manner consistent with the statutes' text so that Executive Branch officials could carry out their commands.

At least one court—in the only on-point federal appellate opinion—has held that the Election Day statutes require ballots to "be both cast by voters and received by state officials" on Election Day. *Republican Nat'l Comm. v. Wetzel*, 120 F.4th 200, 204 (5th Cir. 2024). The term "election" in 2 U.S.C. § 7 has three "definitional elements": (1) official action, or one "involv[ing] an element of government action"; (2) finality, or "the polity's final choice of an office-holder"; and (3) consummation, or "when the last ballot is received and the ballot box is closed." *Id*. at 207–08. Continuing to receive ballots after Election Day means that the election is not final or consummated until after Election Day and therefore violates the Election Day statutes. *Id*. at 208–09, 215. Section 7(a) therefore does not "amend, repeal, rescind, or circumvent" 2 U.S.C. § 7.

History reveals that the term "'election' include[d] both ballot casting and ballot receipt." *Wetzel*, 120 F.4th at 209. These two concepts were not bifurcated until the Civil War to "secure

the franchise of soldiers in the field." *Id*. Even then, soldiers voted by casting their ballots in ballot boxes that election officials brought to the battlefield or else sending a proxy to deposit their votes in the ballot box at the soldier's home precinct. *Id*. In other words, the act of voting concluded when the vote was received. After that, states allowing civilian absentee voting still required votes to be received by Election Day. *Id*. at 210 (citing P. Orman Ray, *Absent-Voting Laws, 1917*, 12 Am. Pol. Sci. Rev. 251, 253 (1918)). By 1977, only two of 48 states allowing absentee voting counted ballots received after Election Day. *Id*.; *see also Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 670 (2021) ("[I]n 1982 States typically required nearly all voters to cast their ballots in person on election day and allowed only narrow and tightly defined categories of voters to cast absentee ballots."). And in January 2020, 14 states and the District of Columbia counted ballots postmarked by Election Day, whereas the other 36 states required receipt on or before that date. *Id*. at 211. This history of absentee voting "says nothing about whether States can extend the election past the uniform, singular Election Day required by federal law"; rather, "the practice of absentee voting that arose during the Civil War demonstrates that the election concludes when all ballots are received." *Wetzel*, 120 F.4th at 211. "'[L]ate-in-time outliers" have no bearing on "the original public meaning of the Election-Day statutes." *Id*. (citing *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 70 (2022); *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 250–51 (2022)).

As to purpose, Congress enacted the Election Day statutes to prohibit early federal elections in some states, which were influencing election results in states voting later. *Foster*, 522 U.S. at 73. But permitting absentee ballots to be received after Election Day is equally discriminatory. After all, "[h]aving once granted the right to vote on equal terms, [a] State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*

*v. Gore*, 531 U.S. 98, 104–05 (2000). But states arbitrarily treat some people's votes differently when they permit absentee votes to be received after Election Day. If postmarks are unenforced, for example, absentee voters have several extra days after Election Day to cast their votes.

Moreover, "[t]he postal service permits senders to recall mail," *Wetzel*, 120 F.4th at 208 (citing Domestic Mail Manual, §§ 507.5, 703.8; 39 C.F.R. § 111.1 and 39 C.F.R. § 211.2 (incorporating the Domestic Mail Manual by reference into the Postal Service Regulations)), which could permit "voters [to] . . . change their votes after Election Day," *id.* Some states such as Illinois even provide for counting mail-in ballots lacking a postmark so long as they are "received by the election authority after the polls close on election day and before the close of the period for counting provisional ballots" and "the date inserted on the certification," after opening the ballot, "is election day or earlier." 10 Ill. Comp. Stat. Ann. 5/19-8(c).

Under that regime, it is possible to imagine that an un-postmarked ballot, delivered after Election Day but before counting concluded, could be counted based on a person's fraudulent certification date. Congress intended the Election Day statutes to curb that type of behavior, which results in treating some votes differently. *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1173–74 (9th Cir. 2001) ("Whenever you provide that elections shall take place upon the same day, you do interpose a not inconsiderable check to frauds in elections, to double voting, to the transmission of voters from one State to another, and you do allow the people to vote for their Representatives undisturbed by considerations which they ought not to take at all into account." (quoting Cong. Globe, 42d Cong., 2d Sess. 618 (1872)). Permitting it to continue by allowing ballots to be received after Election Day contradicts Congress's purpose.

Furthermore, congressional inaction says very little, if anything, about congressional intent. *See Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495 n.13 (1985) ("[C]ongressional

silence, no matter how 'clanging,' cannot override the words of the statute."); *Rapanos v. United States*, 547 U.S. 715, 749 (2006) (plurality op.) (noting the Court's "oft-expressed skepticism toward reading the tea leaves of congressional inaction"). Nor does it invalidate the President's interpretation of the Election Day statutes. Congress legislated against the backdrop of the historical understanding of what an "election" meant in 1845 and 1872. The President's interpretation does not contradict the statutes.

The President's interpretation that the Election Day statutes require ballots to be received by Election Day also does not violate the vertical separation of powers or state sovereignty. *See* Compl. ¶ 158. According to its Article I, section 4 authority to "alter" the "Time, Places, and Manner of holding" federal elections, Congress did preempt state law when it enacted the Election Day statutes. The President merely interpreted the text of Congress's command. *See Foster*, 522 U.S. at 71 ("For all of petitioners' invocations of state sovereignty, there is no colorable argument that § 7 goes beyond the ample limits of the Elections Clause's grant of authority to Congress.").

## VII.   Section 7(b) permissibly conditions funding on the adoption of nondiscriminatory standards.

Plaintiffs allege that Congress has not "authorized the [EAC] to withhold funds on the[ ] grounds" specified in section 7(b) and that requiring it to do so "attempts to amend, repeal, rescind, or circumvent duly enacted federal statutes" and "exceed[s] the President's Article II powers." Compl. ¶¶ 170, 172. Instead, Plaintiffs assert that Congress "specified the precise formula for calculating the grants that the [EAC] administers and the conditions for those funds." *Id*. ¶ 170 (citing 52 U.S.C. §§ 21001–21003, 21141(c)(1)). But section 7(b) simply directs the EAC to condition state funds "consistent with 52 U.S.C. § 21001(b) and other applicable law," on a state's compliance with an existing statutory requirement: to "adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category

of voting system used in the State." 52 U.S.C. § 21081(a)(6).

52 U.S.C. § 21001(a) provides that the EAC "shall make a requirements payment each year . . . to each State which meets the conditions described in section 21003." Section 21003 requires states to certify their compliance with the requirements in § 21003(b) to be "eligible to receive a requirements payment." 52 U.S.C. § 21003(a). One of those requirements includes filing a state plan with the EAC that describes "[h]ow the State will use the requirements payment to meet the requirements of subchapter III," which includes § 21081(a)(6)'s directive to "adopt uniform and nondiscriminatory standards that define what constitutes a vote." 52 U.S.C. §§ 21003(b)(1)(A), 21004(a)(1), 21081(a)(6). A state's failure to meet that requirement would make it "[in]eligible to receive a requirements payment." *See* 52 U.S.C. § 21003(a).

To that end, Section 7(b) specifies that "what constitutes a vote and what will be counted as a vote" must "includ[e] that, as prescribed in 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1, there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting . . . after which no additional votes may be cast," except for UOCAVA votes. EO § 7(b).  Requiring a uniform ballot receipt deadline of Election Day for all methods of voting ensures that a state's definition of what constitutes a vote is nondiscriminatory by not privileging absentee voters' ballots. *Supra* VI. Thus, to comply with § 21081(a)(6)'s mandate, states must adopt a uniform ballot receipt deadline of Election Day. This condition does not usurp Congress's constitutional powers, because Congress itself set the condition in § 21081(a)(6) (as well as enacted the Election Day statutes).

Plaintiffs again allege that "Congress established the [EAC] as an 'independent entity,'" and that the President's s "attempt to dictate policy and action of the [EAC] in a manner inconsistent with Congressional approval requirements is ultra vires and in excess of the

President's powers." Compl. ¶ 169. But as explained above, because "[t]he entire 'executive Power' belongs to the President alone," *Seila Law*, 591 U.S. at 213, and the EAC is an executive agency, the President may direct the EAC to act within Congress's commands. *See supra* III.a.

**VIII. Sections 2(a), 2(d), 3(d), 4(a), 7(a), and 7(b) do not violate state sovereignty because the Elections Clause expressly authorizes the federal government to override states' choices regarding the "Times, Places and Manner" of federal elections.**

Finally, Plaintiffs allege that sections 2(a), 2(d), 3(d), 4(a), 7(a), and 7(b) of the Executive Order "invade[] Plaintiff States' sovereignty and their powers to regulate federal elections by Presidential fiat and commandeer[] State election administrative personnel and process to implement a presidential decree." Compl. ¶ 179. But the "Elections Clause establishes a unique relationship between the state and federal governments." *Gonzalez v. Arizona*, 677 F.3d 383, 390 (9th Cir. 2012) (en banc) *aff'd sub nom.*, *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013). As noted above, every directive in the Executive Order is tied to the President's execution of Congress's duly enacted laws, which the Constitution provides must control over the states' own.

Article I, section 4 of the Constitution provides that state governments may choose "[t]he Times, Places and Manner of holding" federal elections, unless "Congress . . . make[s] or alter[s] such Regulations." U.S. Const., art. I, § 4, cl. 1. The Clause, in other words, "invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to preempt state legislative choices." *Foster*, 522 U.S. at 69. The Framers granted the federal government oversight over federal-election procedures to guard against potential state abuse. *Gonzalez*, 677 F.3d at 390 (citing The Federalist No. 59, at 168 (Alexander Hamilton) (Ron P. Fairfield ed., 2d ed.1981) (explaining that "[n]othing can be more evident, than that an exclusive power of regulating elections for the national government, in the hands of the State legislatures,

would leave the existence of the Union entirely at their mercy")). Additionally, "the Elections Clause requires states to implement Congress's superseding regulations without compensation from the federal government." *Id*. at 391. "Thus, unlike virtually all other provisions of the Constitution, the Elections Clause gives Congress the power to 'conscript state agencies to carry out' federal mandates." *Id*. (citation omitted); *see also Foster*, 522 U.S. at 69; *Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d 833, 836 (6th Cir. 1997). The Elections Clause differs from the Supremacy Clause because it "affects only an area in which the states have no inherent or reserved power: the regulation of federal elections." *Gonzalez*, 677 F.3d at 392; *see also U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 805 (1995); *Inter Tribal*, 570 U.S. at 13–14 (noting that the presumption against preemption does not apply to Elections Clause legislation).

As part of its Elections Clause authority, Congress established the EAC and charged it with "prescrib[ing] . . . regulations . . . necessary to . . . develop a mail voter registration application form for elections for Federal office." 52 U.S.C. § 20508(a). It enacted the NVRA and directed states to "designate agencies for the registration of voters in elections, for Federal office," including "Federal . . . offices." *Id*. § 20506(a)(1), (a)(3)(B)(ii). Congress further specified that voter registration agencies that are "office[s] that provide[] service or assistance in addition to conducting voter registration" shall distribute the federal voter registration form, "including a statement that . . . specifies each eligibility requirement (including citizenship)" and "contains an attestation that the applicant meets each . . . requirement," "with each application for [that] service." *Id*. § 20506(a)(6)(A)(i). Congress also set forth in UOCAVA the requirement that the President's designee "shall . . . prescribe an official post card form, containing both an absentee voter registration application and an absentee ballot application, for use by the States." *Id*. § 20301(b)(2). Congress further enacted the Election Day statutes, specifying a "day for the

election," 2 U.S.C. § 7; 3 U.S.C. § 1, which historically meant ballots should be cast and received

on that date, *Wetzel*, 120 F.4th at 209 ("History confirms that 'election' includes both ballot casting

and ballot receipt."). And Congress conditioned requirements payments under HAVA on a state's

compliance with 52 U.S.C. § 21145 and § 21081(a)(6). *See supra* V., VII.

Because the Constitution vests "the entire 'executive Power'" in the "President alone," he

properly oversees and controls those who execute the laws. *Seila Law*, 591 U.S. at 213; *see supra*

III.a. Accordingly, the President acted within his authority to direct executive officials in carrying

out their statutory mandates. He had authority to direct the EAC to "take appropriate action to

require" documentary proof of citizenship "in its national mail voter registration form," EO § 2(a);

to direct "Federal voter registration executive department[s] or agenc[ies] . . . [to] assess

citizenship prior to providing a Federal voter registration form to enrollees of public assistance

programs," *id*. § 2(d); and the Secretary of Defense to "update the Federal Post Card Application

. . . [to] require[ ] documentary proof of United States citizenship," *id*. § 3(d).  He also lawfully

directed the EAC to condition HAVA requirements payments on a state's compliance with 52

U.S.C. § 21145 and § 21081(a)(6), *id*. §§ 4(a), 7(b), and the Attorney General to enforce the

Election Day statutes, *id*. § 7(a). The President's Executive Order did not unlawfully commandeer

Plaintiffs' personnel, infrastructure, and funds to implement a presidential decree.

To the extent Plaintiffs argue that the Executive Order "commandeers State election

administrative personnel and processes" by requiring states to provide the federal form (updated

or otherwise) to voter-registration applicants, Compl. ¶ 179, that argument would mean that the

NVRA is itself unconstitutional, separate and apart from the Executive Order. *See* 52 U.S.C.

§§ 20506, 20508; Compl. ¶ 6 (admitting that the NVRA requires states to provide the federal form

to applicants). Whether Congress may constitutionally require states to provide the federal form

does not depend on the form's content. The Elections Clause makes clear that Congress may preempt states' decisions regarding the times, places, and manner of holding federal elections. See U.S. Const., art. I., § 4, cl. The Court should dismiss this claim.

## CONCLUSION

For these reasons, the Court should dismiss Plaintiffs' complaint.

Dated: June 13, 2025                           Respectfully submitted,

                                               BRETT A. SHUMATE
                                               Assistant Attorney General

                                               YAAKOV M. ROTH
                                               Principal Deputy Assistant Attorney General

                                               ERIC J. HAMILTON
                                               Deputy Assistant Attorney General
                                               Civil Division, Federal Programs Branch

                                               LESLEY FARBY
                                               Deputy Director
                                               Civil Division, Federal Programs Branch

                                               /s/ Bridget K. O'Hickey_____
                                               BRIDGET K. O'HICKEY
                                               Counsel to the Assistant Attorney General
                                               U.S. Department of Justice, Civil Division
                                               950 Pennsylvania Avenue, NW
                                               Washington, DC 20530
                                               (202) 353-8679
                                               Bridget.K.O'Hickey@usdoj.gov

                                               NICOLE M. O'CONNOR
                                               Assistant U.S. Attorney
                                               U.S. Attorney's Office
                                               John Joseph Moakley U.S. Courthouse
                                               1 Courthouse Way, Suite 9200
                                               Boston, MA 02210
                                               (617) 748-3112
                                               Nicole.O'Connor@usdoj.gov

                                               *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Bridget O'Hickey, hereby certify that I served a true copy of the above document upon all counsel of record via this court's electronic filing system and upon any non-registered participants via first class mail.

Dated: June 13, 2025　　　　　　　　　/s/ *Bridget K.O'Hickey*
　　　　　　　　　　　　　　　　　BRIDGET K. O'HICKEY
　　　　　　　　　　　　　　　　　Counsel to the Assistant Attorney General