**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, <br><br>                *Plaintiffs*, <br><br>   v. <br><br> DONALD J. TRUMP, *in his official capacity as President of the United States*, *et al.*, <br><br>                *Defendants*. | Case No. 1:25-cv-10810 (DJC) |

## DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

A federal court's jurisdiction only extends to "Cases" and "Controversies." U.S. Const. art. III, § 2. "[H]ypothetical or abstract disputes" and claims requesting "general legal oversight of the Legislative and Executive Branches" do not present justiciable cases or controversies. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Plaintiffs challenge various sections of Executive Order 14248, directing federal agencies and officers to protect the integrity of the election process "consistent with applicable law." Exec. Order No. 14248, 90 Fed. Reg. 14005 (2025) ("EO"), § 11(b). But Plaintiffs' claims are based on future actions that have not yet taken place and speculation that Plaintiffs will be injured in the future. Because "federal courts do not issue advisory opinions," *TransUnion LLC*, 594 U.S. at 424, this Court should dismiss this case for lack of subject-matter jurisdiction without reaching the merits.

Plaintiffs' claims also fail on the merits because "[t]he Constitution vests all executive power in the President," *Touby v. United States*, 500 U.S. 160, 168 (1991) (citing U.S. Const. art. II, § 1), and the President lawfully directed subordinate Executive Branch officials to take certain election-related actions within their statutory duties. For that reason, Plaintiffs fail to state a claim.

**ARGUMENT**

I.     **The Court lacks jurisdiction to consider Plaintiffs' claims challenging sections 2(a), 3(d), 4(a), and 7(a).**

*a. Sections 2(a) and 3(d)*

Because sections 2(a) and 3(d) both require future action and no final agency action has occurred, Plaintiffs' alleged injuries are too speculative to confer standing and their claims are unripe. Defs.' Mot. to Dismiss ("Mot.") at 8–9, 10–11, ECF No. 109. But Plaintiffs argue that imminent harm is certain because "[t]hese provisions unequivocally provide that documentary proof of citizenship *will* be imposed" and "Defendants have conceded as much." Mem. of Law in Opp'n to Defs.' Mot. to Dismiss ("Resp.") at 3, ECF No. 113. As explained, however, section 2(a) directs the EAC to "take appropriate action"—or commence the rulemaking process—"to require . . . documentary proof of United States citizenship" on the national mail voter registration form (the "federal form"). Mot. at 7–9 (citation omitted). Similarly, the Department of Defense must undergo its rulemaking process to update the federal post card application to require "proof of eligibility to vote in elections in the State in which the voter is attempting to vote." EO § 3(d)(ii); Mot. 2–3. And Plaintiffs agree that what proof may be required or how a voter may obtain such proof is speculative. Mot. at 10.

Defendants have not preordained the outcome of the EAC's process. Section 2(a) directs the EAC to "take appropriate action to require" documentary proof of citizenship on the federal form. EO § 2(a)(i). The directive to "take appropriate action" instructs the agency to undergo its rulemaking process. And the instruction to "require" makes sense in view of the nature of the EAC's necessity determination. The NVRA empowers the EAC to "prescribe such regulations as are necessary to . . . develop a mail voter registration application form for elections for Federal office" "in consultation with the chief election officers of the States." 52 U.S.C. § 20508(a). The

form "may require only such . . . information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant." *Id*. § 20508(b)(1). "[T]he phrase 'may require only' in [§ 20508(b)(1)] means that the EAC '*shall require* information that's necessary, but may only require that information.'" *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 18 (2013) (citation omitted). Thus, if the EAC determines that documentary proof of citizenship is necessary, it must require it. The process's result is dictated only insofar as the necessity determination requires.[1]

Plaintiffs therefore lack standing to challenge sections 2(a) and 3(d) because their alleged injuries are speculative and no final agency action has occurred.

*b. Section 4(a)*

Section 4(a) directs the EAC to take "all appropriate action" to "cease providing Federal funds" to "States that do not comply with the Federal laws set forth in 52 U.S.C. § 21145," such as the requirement to use the federal form, including any requirement for documentary proof of citizenship adopted pursuant to section 2(a). Because Plaintiffs' challenges to section 2(a) are not justiciable, the same outcome is warranted with respect to their challenge to section 4(a).

*c. Section 7(a)*

Plaintiffs lack standing to challenge section 7(a), which instructs the Attorney General to "take all necessary action to enforce [the Election Day statutes] against States that violate" them. EO § 7(a). What actions the Attorney General will take to enforce those statutes is entirely speculative and cannot support standing or ripeness. *See* Mot. 11–13. Moreover, the Executive

---

[1] Plaintiffs assert that Defendants are "judicially estopped" from suggesting that the EAC may determine, at the end of its rulemaking process, not to adopt a documentary proof of citizenship requirement. Resp. at 9 (citation omitted). But judicial estoppel applies "when 'a party has adopted one position, secured a favorable decision, and then taken a contradictory position in search of legal advantage.'" *Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004). Plaintiffs identify no favorable decision secured through the attorney statements made during a hearing held on a motion for emergency relief. And those statements cannot supersede the text of the Executive Order, which as explained, contains a qualified direction to "take appropriate action." EO § 2(a).

Branch's enforcement decisions are not subject to judicial review. *United States v. Texas*, 599 U.S. 670, 679 (2023).

Still, the 13 Ballot Receipt Plaintiffs argue that they have standing to challenge section 7(a) because they have "plausibly alleged that they face a 'substantial risk' of impending enforcement" that may go beyond "letters if they fail to secure compliance." Resp. at 4–5 (citation omitted). But Plaintiffs have not and cannot allege a credible threat of future injury since it is entirely speculative what form, if any, the Attorney General's enforcement might take. Moreover, the Executive Order requires her to enforce the Election Day statutes "consistent with applicable law," EO § 11, and because she can do so, there is no reason to presume otherwise, *see Trump v. New York*, 592 U.S. 125, 131 (2020); *see also LULAC v. Exec. Off. of the President*, 2025 WL 1187730, at *51 (D.D.C. Apr. 24, 2025) ("[I]t is unclear on the present record whether Section 7(a) will lead imminently to any unlawful action" because the "Attorney General . . . must implement Section 7(a), as the Executive Order says, 'consistent with applicable law.'" (quoting EO)). In other words, because the Attorney General's "plans themselves are not before this Court, at this stage," the Court "thus ha[s] no occasion to consider whether they can and will be carried out consistent with the constraints of law." *Trump v. Am. Fed'n of Gov't Emps.*, No. 24A1174, 2025 WL 1873449, at *1 (U.S. July 8, 2025) (Sotomayor, J., concurring).

Plaintiffs contend that *Texas* is inapposite because, here, "Section 7(a) directs affirmative enforcement against States," whereas "*Texas* concerned a state challenge to *non-enforcement* decisions and purportedly harmful downstream effects." Resp. at 5. But Plaintiffs' arguments misconstrue the Court's statement in *Texas*. There, the Court explained why "federal courts have not traditionally entertained lawsuits" requesting that "a federal court order the Executive Branch to alter its arrest policies." *Texas*, 599 U.S. at 678, 686. The first reason it gave was because "when

the Executive Branch elects not to arrest or prosecute [someone], it does not exercise coercive power." *Id.* at 678 (emphasis omitted). But the second, and entirely distinct, reason the Court gave is the Executive Branch's "authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'" *Id.* (quoting *TransUnion*, 594 U.S. at 429). *Texas* plainly prohibits judicial review of Executive Branch enforcement decisions. *Id.* at 679–80. This Court should dismiss Plaintiffs' claims challenging section 7(a) on that basis.

## II.    Plaintiffs are not injured by section 2(d) because it applies only to "Federal voter registration executive department[s] or agenc[ies]."

Plaintiffs argue that Defendants claim for the first time that section 2(d) applies only to *federal* agencies. Resp. at 6. But Defendants properly raised this argument in their motion to dismiss, Mot. at 9–10., and previously argued that "[b]ecause the Constitution vests the entire executive Power in the President alone, he properly oversees and controls those who execute the laws," Opp'n to Pls.' Mot. for Prelim. Inj. at 15–16, ECF No. 91 (quoting *Seila L. LLC v. CFPB*, 591 U.S. 197, 213 (2020)) (quotation marks omitted). As a result "[h]e ha[s] [the] authority to direct . . . Federal voter registration executive departments or agencies to assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs." *Id.* at 16 (cleaned up).

As explained, section 2(d) directs "[t]he head of each Federal voter registration executive department or agency . . . under the National Voter Registration Act, 52 U.S.C. [§] 20506(a)" to "assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs." EO § 2(d). The NVRA requires states to "designate agencies for the registration of voters in elections for Federal office." 52 U.S.C. § 20506(a)(1). States must designate "as voter registration agencies," "all offices in the State that provide public assistance," "all offices in the State that provide state-funded programs primarily engaged in providing services

5

to persons with disabilities," and "other offices within the State," which "may include . . . Federal and nongovernmental offices, with the agreement of such offices." *Id*. § 20506(a)(2), (3). Each "voter registration agency that is an office that provides service or assistance" is tasked with distributing the federal voter registration form "with each application," "recertification," or "renewal," for "service or assistance." *Id*. § 20506(a)(6).

Section 2(d) does not apply to Plaintiffs, who are neither federal departments or agencies nor enrollees of public assistance programs. Rather, section 2(d) applies to "Federal voter registration *executive* department[s] or agenc[ies],"—*i.e.*, those departments or agencies that are part of the federal Executive Branch and subject to the President's supervisory control. EO § 2(d) (emphasis added); *Seila L.*, 591 U.S. 200 ("[I]ndividual executive officials . . . wield significant authority, but that authority remains subject to the ongoing supervision and control of the elected President."). Plaintiff States appear to recognize that section 2(d) does not apply to them, alleging that it "rais[es] the specter of commandeering Plaintiff State agencies . . . if it extends to State and local agencies." Compl. ¶ 49(b), ECF No. 1. Because section 2(d) does not extend to state voter registration agencies, it does not injure Plaintiffs, and they lack standing to challenge it. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (explaining that standing requires "the plaintiff" to have "suffered an injury in fact" (citation omitted)).

**III.     Plaintiffs cannot bring a nonstatutory cause of action.**

Plaintiffs contend that they are entitled to bring nonstatutory causes of action because otherwise "an Executive order could not face a direct legal challenge" and "those affected would have to wait for agencies and officials to consummate illegal and final agency action before suing." Resp. at 6. Plaintiffs cite *League of United Latin American Citizens v. Executive Office of the President*, 2025 WL 1187730, at *17, which relies on *Chamber of Commerce of U.S. v. Reich*, 74

F.3d 1322, 1328 (D.C. Cir. 1996), to support their argument. But the Supreme Court recently reiterated that ultra vires review is unavailable "if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review, or if a statutory review scheme forecloses all other forms of judicial review." *Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1776 (2025) (quotation omitted); *see also Am. Foreign Serv. Ass'n v. Trump*, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) ("[U]ltra vires review—which is a suit in equity, not a statutory cause of action—is 'strictly limited' when 'other judicial-review statutes' are present.").

Plaintiffs bring their claims challenging the Executive Order pursuant to "a non-statutory right of action"—the first six "to enjoin and declare unlawful official action that is ultra vires," Compl. ¶¶ 114, 125, 137, 146, 156, 166, and the seventh "to enjoin and declare unlawful official action that commandeers State executive power or otherwise intrudes on Plaintiff States' inherent sovereignty and powers granted by the Constitution," *id*. ¶ 179. The APA provides Plaintiffs with "a meaningful and adequate opportunity" to challenge the provisions of the Executive Order, which apply to the agencies tasked with specific responsibilities under the Executive Order.[2] *Nuclear Regul. Comm'n*, 145 S. Ct. at 1776. Plaintiffs attempt to bring their claims pursuant to a nonstatutory cause of action to avoid the APA's final-agency-action requirement. *See* 5 U.S.C. § 704. This Court should not allow Plaintiffs' request for "ultra vires review" to make "an easy end-run around the limitations of . . . judicial-review statutes," like the APA, simply because Plaintiffs filed their complaint too early to use the "statutory avenue" that Congress provided. *Nuclear Regul.*

---

[2] The APA provides Plaintiffs with a meaningful opportunity for judicial review even though they could not bring APA claims against the President directly because they do not seek to enjoin him (nor could they). Compl. at 39; *Dalton v. Specter*, 511 U.S. 462, 469 (1994) ("[T]he President's actions were not reviewable under the APA, because the President is not an 'agency' within the meaning of the APA."); *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality) (noting that, "in general," courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties" (citation omitted)).

*Comm'n*, 145 S. Ct. at 1772–75; *Massachusetts v. Trump*, 2025 WL 1836592, at *14 (D. Mass. July 3, 2025) (explaining that while "*ultra vires* relief is designed to permit courts to reestablish the limits on executive authority when it acts beyond its authority, . . . the Supreme Court has recently reiterated that such claims are essentially a Hail Mary pass, and are unavailable where plaintiffs have an alternative path to judicial review" (quotations omitted)).

### IV.    Section 2(a) does not violate the separation of powers or the NVRA.

Plaintiffs argue that section 2(a) "flouts congressional policy and procedure and is thus 'contrary to the manifest will of Congress, as expressed in the text, structure, and context of the NVRA and HAVA.'" Resp. at 9 (citation omitted). That is so, Plaintiffs state, because Defendants have "preordain[ed] the outcome of" the EAC's rulemaking process and are "judicially estopped from suggesting otherwise." *Id.* (citation omitted) But for the reasons explained above, that is wrong. *See supra* I.a.

Plaintiffs further argue that the President does not have "unlimited authority to direct the EAC" and that section 2(a)'s directive is unlawful—unlike cases addressing the President's removal authority—because it is "untethered from the statutory standards and processes that Congress mandated for changes to the Federal Form." Resp. at 9–10. But as the head of the Executive Branch, the President has the authority to instruct subordinate officials how to carry out their statutory duties. *See* Mot. 14–17. In section 2(a), the President instructed the EAC—an Executive agency—to take all appropriate action, pursuant to its duties under the NVRA, to require documentary proof of citizenship. EO § 2(a). The President's instruction is consistent with statutory standards and processes Congress mandated for changes to the federal form. *See* Mot. 14–19.

Setting aside any separation of powers concern, Plaintiffs contend that the NVRA

independently forecloses adding a documentary proof of citizenship requirement because it "require[s] individuals to establish citizenship by checkbox and attestation" and "prohibit[s] any 'other formal authentication.'" Resp. at 10. But requiring individuals to attest that they meet each voter eligibility requirement does not prevent the EAC from determining that documentary proof of citizenship is necessary to enable state election officials to assess applicants' citizenship and adding such a requirement to the form. 52 U.S.C. § 20508(b)(1), (b)(2)(B); *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 10 (D.C. Cir. 2016) ("It would be illogical for Congress to provide in section 20508(b)(1) that the consultant, rather than the developer, would determine 'necessity.'").

Plaintiffs rely on *Mi Familia Vota v. Fontes*, 129 F.4th 691, 719 (9th Cir. 2025), to support their argument that documentary proof of citizenship is not necessary to assess an applicant's eligibility to vote. Resp. at 11. The Ninth Circuit defined "necessary" as "essential" and determined that the "challenged requirement of DPOC for state-form applicants registering to vote in only federal elections is not 'essential' because the checkbox requirement already gives proof of citizenship." *Mi Familia*, 129 F. 4th at 719 (citation omitted). Therefore, they argue, the EAC may not add such a requirement to the form. But *Mi Familia* concerned whether *Arizona* could require documentary proof of citizenship from state-form applicants registering for only federal elections. *Id*. And as the federal form's developer, the *EAC* determines what is "necessary" to enable state election officials to assess applicants' eligibility to vote in federal elections—including citizenship. That the EAC has not yet completed its rulemaking process in response to the Executive Order and made its determination as to whether documentary proof of citizenship is necessary demonstrates that Plaintiffs' claim is not ripe.

Finally, 52 U.S.C. § 20508(b)(3)'s prohibition on "any requirement for notarization or

other formal authentication" does not foreclose adding a documentary proof of citizenship requirement to the form. "Formal authentication" must be read in light of "notarization" and is best understood as a mechanism to verify the applicant's identity rather than substantiate his citizenship. *See* Mot. 19. Moreover, authentication is not synonymous with proof. Authentication means "finding that" something "is what the proponent claims it is." Fed. R. Evid. 901(a). Plaintiffs appear to agree with that definition. Resp. at 11 (authentication means "the act of proving something is true or genuine" (citation omitted)). But whether something is authentic says nothing about whether it "has any tendency to make a fact more or less probable." Fed. R. Evid. 401(a). Here, the NVRA prohibits any formal requirement that the applicant demonstrate that something is genuine—like a genuine signature. But that does not prohibit the EAC from determining what level of proof is necessary to enable state election officials to assess an applicant's citizenship, which is a separate issue from authentication.

## V.    Section 3(d) does not violate the separation of powers or UOCAVA.

Plaintiffs argue that the President may not order the Secretary of Defense to update the federal post card application to include a documentary proof of citizenship requirement because it "contravenes UOCAVA." Resp. at 12. But section 3(d)'s directive is consistent with UOCAVA's text and design. Mot. at 19–22

Plaintiffs contend that this provision conflicts with UOCAVA's text because "the statute mandates that the voter registration form be a 'post card,'" which "indicates that it must be sent without an envelope, precluding that any documentation be appended." Resp. at 12. But the "post card" application is no longer an actual post card as examination of the form reveals and voter-registration organizations acknowledge.[3] *See, e.g.*, Federal Post Card Application, U.S. Vote

---

[3] FPCA, Voter Registration and Absentee Ballot Request, https://www.fvap.gov/uploads/fvap/forms/fpca.pdf (last visited July 25, 2025).

Foundation, https://voterhelpdesk.usvotefoundation.org/en/support/solutions/articles/1510000
49295-federal-post-card-application-fpca- (last visited July 25, 2025) (instructing voter
registration applicants "not [to] be confused" by the term "federal post card application" because
"the form was formerly an actual 'postcard' and the federal agency in charge of voting, the Federal
Voting Assistance Program, continues to use the term 'FPCA'").

Plaintiffs further contend that because UOCAVA enumerates 11 "Duties of [the]
Presidential Designee," none of which "contemplate a documentary proof of citizenship
requirement," that "responsibilities or powers left unmentioned" are excluded. Resp. at 12–13. But
52 U.S.C. § 20301(b)(2) provides that the Presidential designee shall "prescribe an official post
card form, containing both an absentee voter registration application and an absentee ballot
application, for use by the States," as one of his 11 enumerated duties. And none of those
enumerated duties dictates the contents of the federal post card application. Thus, the duty to
prescribe the post card application necessarily involves discretion in carrying it out. *See Ass'n of
Am. R.R.s v. Interstate Com. Comm'n.*, 600 F.2d 989, 997 (D.C. Cir. 1979) (because "[t]he
Interstate Commerce Act does not specify all of the multitudinous facets of carrier transportation
that are to be administered under the Act," "[i]t leaves room for the Commission to exercise its
discretion"). What Congress has made clear is that UOCAVA voters must be "qualified to vote"
in their "place[s] of residence" or "the last place in which [they were] domiciled before leaving
the United States," *see, e.g.*, 52 U.S.C. § 20310(1), (5), and that being "qualified to vote"
necessarily requires U.S. citizenship under federal law, 52 U.S.C. § 20310(1), (5); 18 U.S.C.
§§ 1015(f), 611. How the federal post card application elicits information to enable officials to
verify whether those requirements are met is left to the Secretary's discretion.

Third, Plaintiffs argue that Congress's omission of a documentary proof of citizenship

requirement suggests that the Secretary cannot add one. Resp. at 13. Specifically, Plaintiffs argue that the "standard oath" that 52 U.S.C. § 20301(b)(7) instructs the Secretary to "prescribe . . . for use with any document under this chapter" reveals "Congress's determination that attestation constitutes the necessary proof of an applicant's eligibility to vote and shows that Congress knows how to make veracity and proof of eligibility requirements explicit." *Id*. But the standard oath only requires those completing forms pursuant to this statutory chapter to "affirm[] that a material misstatement of fact in the completion of . . . [that] document may constitute grounds for a conviction for perjury." 52 U.S.C. § 20301(b)(7). It does not dictate what proof the Secretary may require to determine whether applicants are qualified to vote. It only requires applicants to affirm that all the statements they make on the application are true. As explained above, Congress left the post card application's particulars to the Secretary's discretion. By Plaintiffs' logic, Congress's omission of the requirement that an applicant provide his driver's license or state identification number suggests that the Secretary cannot add such a requirement to the form either. Rather, in Plaintiffs' view, the applicant's name and standard oath alone must be sufficient to prove identity.

Plaintiffs further argue that requiring documentary proof of citizenship on the federal post card application is incompatible with UOCAVA's purpose: to make it easier for military and overseas voters to exercise their right to vote. Resp. at 13. But the Secretary must carry out UOCAVA's purpose in compliance with other requirements under the statute and federal law. UOCAVA does not mandate making registering to vote easier for military and overseas voters at the expense of those requirements—unless federal law states otherwise. One such requirement includes that UOCAVA voters must be citizens to be eligible to vote. 52 U.S.C. § 20310(1), (5); 18 U.S.C. §§ 1015(f), 611. The Secretary has discretion when prescribing the federal post card application to determine what proof is necessary to determine if that requirement has been met. 52

U.S.C. § 20301(b)(2).

**VI.    Plaintiffs' argument that section 4(a) unlawfully conditions statutory funding is tantamount to an argument that the NVRA is unconstitutional.**

Plaintiffs assert that section 4(a) unlawfully conditions statutory funding because "the President lacks the authority to require the EAC to withhold statutorily appropriated funds" and because 4(a) does not only require "acceptance and use of the Federal Form" but "acceptance and use of the Federal Form 'issued pursuant to 52 U.S.C. 20508(a)(1), *including any requirement for documentary proof of United States citizenship adopted pursuant to section 2(a)(ii) of this order.*'" Resp. at 14 (citation omitted).

As explained in Defendants' motion to dismiss, section 4(a) lawfully directs the EAC to apply existing statutory funding conditions set forth by Congress. Mot. at 22–23. One of those conditions is the NVRA's requirement that states "accept and use the national mail voter registration form . . . , including any requirement for documentary proof of United States citizenship adopted pursuant to section 2(a)(ii)" of the Executive Order. EO § 4(a). But as previously mentioned, the NVRA's command that states use the federal form does not limit that command to a particular version of the federal form—even one requiring documentary proof of citizenship. Mot. at 23; 52 U.S.C. §§ 20506, 20508. Thus, Plaintiffs' real challenge is to the NVRA's requirement that states accept and use the federal form. Congress clearly has the authority to issue such a command to the states. U.S. Const. art. I., § 4. To the extent that Plaintiffs challenge the legality of section 2(a), they have already brought that claim, and it fails for the reasons explained above and in Defendants' motion to dismiss. Mot. at 14–19.

**VII.    The Election Day statutes impose a uniform ballot-receipt requirement across states.**

Plaintiffs argue that the President has no authority to displace state ballot-receipt

deadlines—only Congress can do that, and it has not. Resp. at 14–15. But the Election Day statutes—2 U.S.C. § 7 and 3 U.S.C. § 1—do impose a uniform ballot-receipt deadline of Election Day. *See Republican Nat'l Comm. v. Wetzel*, 120 F.4th 200, 209 (5th Cir. 2024). The Fifth Circuit held that the Election Day statutes' text, history, and purpose supported such a requirement. *Id*. at 206–09. On that basis, the President acted within his take-care authority to direct the Attorney General to enforce the Election Day statutes and the EAC to apply existing funding conditions accounting for the Election Day statutes' uniform ballot-receipt deadline. Mot. at 23–30.

Plaintiffs attempt to discredit *Wetzel* by relying on a dissent from denial of rehearing en banc, a pending petition for certiorari, and their own preliminary-injunction papers. Resp. at 17. But *Wetzel* remains the only federal court of appeals opinion to address the issue. The cases Plaintiffs cite do not consider the original meaning of "election" in 1872, and *Bognet* and *Bost* were both decided on standing. *Id*. at 17 n.5 (citing *Pa. Democratic Party v. Boockvar*, 662 Pa. 39, 77 & n.23 (2020); *Bognet v. Sec'y Commw. of Pa.*, 980 F.3d 336, 364 (3d Cir. 2020), *vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021) (mem.), and *Bost v. Ill. State Bd. of Elections*, 684 F. Supp. 3d 720, 739 (N.D. Ill. 2023)).

Plaintiffs assert that two points undermine the conclusion that the Election Day statutes impose a uniform ballot-receipt deadline: the "Election Day statutes only address federal general elections, not primaries or special elections," while the Executive Order "purports to apply its new ballot receipt deadline to *all* elections" and "neither the Election Day statues nor UOCAVA carve out UOCAVA ballots from any Election Day mandates." Resp. at 15. But both are unavailing. Plaintiffs' first argument misreads the Executive Order. The Election Day statutes set a day for only federal general elections. *See* 2 U.S.C. § 7; 3 U.S.C. § 1. And sections 7(a) and (b) of the Executive Order only tie their requirements concerning enforcement of the Election Day statutes

and a uniform and nondiscriminatory ballot receipt deadline as prescribed by the Election Day statutes, to Election Day itself—the day of the federal general election. There is no inconsistency.

Second, Plaintiffs claim that the Executive Order's exemption of UOCAVA votes from the ballot-receipt deadline reveals that it "reaches beyond what the Election Day statutes plainly say." Resp. at 15. But it demonstrates the inverse. The fact that the Election Day statutes and UOCAVA itself contain no exception for UOCAVA votes supports the long-standing rule that ballots were to be timely received by Election Day and any deviation from that rule must be specified. 52 U.S.C. § 20304(b)(1) (stating that federal officials must submit ballots to state election officials "not later than the date by which an absentee ballot must be received in order to be counted in the election").

Congressional silence with respect to modern mail-in ballot practices in certain states says nothing about the original meaning of "election" in the Election Day statutes. *See* Resp. at 24; *see also Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495 n.13 (1985); *Rapanos v. United States*, 547 U.S. 715, 749 (2006) (plurality op.). Despite Plaintiffs' protests to the contrary, permitting absentee ballots to be received after Election Day is discriminatory—it privileges mail-in ballots over others. *Bush v. Gore*, 531 U.S. 98, 104–05 (2000); Mot. at 27–28. If postmarks are unenforced, for example, absentee voters have several extra days after Election Day to cast their votes. Plaintiffs disparage Defendants' "concerns with recalling mail and an Illinois statute" and state that "[a]ny recalled mail should receive a fresh postmark by which to assess timeliness." Resp. at 17 n.4. But the U.S. Postal Service's own postmarking guidelines indicate that "[i]n the normal course of operations, the Postal Service does not postmark, or 'cancel' every piece of mail in the system." USPS Postmarking Guidelines, USPS, https://about.usps.com/kits/kit600/kit600_039.htm#:~:text=In%20the%20normal%20course%20of,before%20they%20enter%20the%20mailstream (last visited July 25, 2025).

**VIII.  Sections 2(a), 2(d), 3(d), 4(a), 7(a), and 7(b) instruct only Executive agencies and officials to carry out their directives and therefore pose no vertical separation of powers problem.**

Plaintiffs argue that sections 2(a), 2(d), 3(d), 4(a), 7(a), and 7(b) violate the vertical separation of powers because they "attempt to dictate [the President's] preferred election rules" and "require the States to carry them out." Resp. at 19. But the Constitution expressly permits Congress to preempt state law regarding the "[t]imes, [p]laces and [m]anner of holding" federal elections. U.S. Const. art. I, § 4, cl. 1; Mot. at 31–32. And the President, as the repository of "the entire 'executive Power,'" acts within his authority when he directs Executive officials in carrying out their statutory mandates, *Seila L.*, 591 U.S. at 213, and when interpreting the law for the Executive Branch, *Bowsher v. Synar*, 478 U.S. 714, 751 n.16 (1986) (Stevens, J., concurring); *Synar v. United States,* 626 F. Supp. 1374, 1400 (D.D.C. 1986)); *Huggins v. Isenbarger*, 798 F.2d 203, 208 (7th Cir. 1986) (Easterbrook, J., concurring). That is not "independent lawmaking." Resp. at 20. As explained above, and in Defendants' motion to dismiss, every directive in the Executive Order is tied to the President's execution of Congress's duly enacted laws, which the Constitution provides must control over the states' own. Mot. at 32–34.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss.

Dated: July 25, 2025                          Respectfully submitted,

                                             BRETT A. SHUMATE
                                             Assistant Attorney General

                                             ERIC J. HAMILTON
                                             Deputy Assistant Attorney General
                                             Civil Division, Federal Programs Branch

                                             LESLEY FARBY
                                             Deputy Director
                                             Civil Division, Federal Programs Branch

                                             /s/ *Bridget K. O'Hickey*_____
                                             BRIDGET K. O'HICKEY
                                             Counsel to the Assistant Attorney General
                                             U.S. Department of Justice, Civil Division
                                             950 Pennsylvania Avenue, NW
                                             Washington, DC 20530
                                             (202) 353-8679
                                             Bridget.K.O'Hickey@usdoj.gov

                                             NICOLE M. O'CONNOR
                                             Assistant U.S. Attorney
                                             U.S. Attorney's Office
                                             John Joseph Moakley U.S. Courthouse
                                             1 Courthouse Way, Suite 9200
                                             Boston, MA 02210
                                             (617) 748-3112
                                             Nicole.O'Connor@usdoj.gov

                                             *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Bridget O'Hickey, hereby certify that I served a true copy of the above document upon all counsel of record via this court's electronic filing system and upon any non-registered participants via first class mail.

Dated: July 25, 2025                          /s/ *Bridget K. O'Hickey*_____
                                             BRIDGET K. O'HICKEY
                                             Counsel to the Assistant Attorney General