# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense,

*Defendants*.

Case No. 1:25-cv-10810

(Leave to file granted July 28, 2025)

_____/

## BRIEF OF AMICI CURIAE MICHIGAN REPUBLICAN PARTY AND CHESTERFIELD TOWNSHIP (MICHIGAN) CLERK CINDY BERRY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS (ECF 109)

**TABLE OF CONTENTS**

I.     COUNTER-STATEMENT OF FACTS AND PROCEEDINGS.........................................1

II.    ANALYSIS.......................................................................................................................1

    A.    Introduction...........................................................................................................1

    B.    Directing the EAC to take appropriate action to amend the federal voter registration form to require documentary proof of citizenship and to require local election officials to record the details of that proof is a real solution to the very real problem of non-citizen voting. ...........................................................................................2

           i.      Non-citizen voting in Michigan is a real problem worthy of meaningful solutions like those called for in section 2(a) of the EO .............................3

           ii.     An amended federal voter registration form that requires documentary proof of citizenship is not unworkable ................................................................7

           iii.    Section 2(a) would not result in widespread disenfranchisement.............11

    C.    Section 2(d) directs the head of each *Federal* voter registration department to assess citizenship before handing out federal voter registration forms to enrollees in public assistance programs. There's nothing unclear, ambiguous, or problematic about that...........................................................................................................................15

III.   CONCLUSION...............................................................................................................16

## TABLE OF AUTHORITIES

**Cases**

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) ............................................... 3

*Fish v. Schwab*, 957 F.3d 1105, 1128 (10th Cir. 2020) ...................................................... 7

*Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 967, 1011 (D. Ariz. 2024) ............................... 7

**Statutes**

18 U.S.C. § 1015(f) ......................................................................................... 3

18 U.S.C. § 611 ............................................................................................ 3

18 U.S.C. § 911 ............................................................................................ 3

18 U.S.C. §611 ............................................................................................. 1

52 U.S.C. § 20501(b)(3) ................................................................................... 15

52 U.S.C. § 20511(a)(2) .................................................................................... 3

52 U.S.C. §30101(14) ..................................................................................... vi

M.C.L. 168.492 ............................................................................................ vii

M.C.L. 168.519 ............................................................................................ vii

M.C.L. 168.520 ............................................................................................ vii

M.C.L. 168.521 ............................................................................................ vii

M.C.L. 168.492 ............................................................................................. 3

**Rules**

F.R.A.P. 29(a)(4)(E) ...................................................................................... vi

**Constitutional Provisions**

Mich. Const. of 1963 ...................................................................................... 1

Mich. Const. of 1963, Art. II, §1 .......................................................................... 3

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Civil Procedure 7.1, Amicus Michigan Republican Party states that it is an unincorporated association located in Michigan that has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Amicus Cindy Berry is an individual who resides in Michigan.

## STATEMENT OF INTEREST FOR AMICI CURIAE MICHIGAN REPUBLICAN PARTY AND CINDY BERRY[1]

Amicus Michigan Republican Party (MRP) is a major political party under Michigan law and an unincorporated association that actively and extensively participates in campaigns, elections, and public policy debate. As a state-level organization of the Republican Party in Michigan, MRP promotes and assists Republican candidates who seek election or appointment to partisan federal, state, and local office in Michigan, and works to foster political debate and the exchange of ideas among its members and the public, and to express, promote, and support its members' political beliefs and ideas regarding public policy issues, including those relating to elections. The MRP engages in various other activities to help elect Republicans in Michigan, including efforts to register, educate, mobilize, assist, and turn out voters. The MRP also devotes significant resources to preserve voter confidence and turnout, which suffer when voters see news reports of non-citizens voting in Michigan elections and observe that election officials entrusted with ensuring the integrity of Michigan elections are failing to enforce the citizenship requirements of state and federal law.

Amicus Cindy Berry is the elected Clerk for the Charter Township of Chesterfield, Michigan. She joins this brief in her individual capacity. As the Clerk, she is responsible for administering local, state, and federal elections in Chesterfield Township elections. Her duties include hiring and training election inspectors (also known as poll workers), receiving and processing voter registration applications (including confirming an applicant's proof of residency),

---

[1] This brief was authored by Dickinson Wright PLLC on behalf of amici Michigan Republican Party and Cindy Berry. Although no court rule appears to directly control the filing of *amicus curiae* briefs in this Court, consistent with F.R.A.P. 29(a)(4)(E), amici MRP and Cindy Berry disclose that no party or party's counsel authored this brief in whole or in part or contributed money that was intended to fund the preparation or submission of this brief. A non-party, the Republican National Committee, the national committee of the Republican Party, as defined by 52 U.S.C. §30101(14), provided funding to MRP for the preparation and submission of this brief.

maintaining voter registration and absent voter records, removing unqualified voters from her registration records, and safeguarding the election materials of Chesterfield Township,

In Michigan, to be qualified to vote, a person "must be a citizen of the United States." M.C.L. 168.492. Clerk Berry "shall not register an individual if [she] knows or has good reason to believe that the individual is not a resident and qualified." M.C.L. 168.519. Likewise, she is authorized to "remove [a] name from the registration records" whenever she "determines that any name has been illegally or fraudulently entered upon the registration records of any precinct in the township…." M.C.L. 168.521. Further, Clerk Berry has "the power and duty to make a full investigation…and to ascertain whether any name has been illegally or fraudulently registered" whenever she has "knowledge that there is a probable illegal or fraudulent registration in the township." M.C.L. 168.520. As a result, one of Clerk Berry's statutory responsibilities is ensuring that the individuals registered to vote in Chesterfield Township are United States citizens.

In sum, elections are the cornerstone of MRP's and Clerk Berry's activities. For that reason, MRP and Clerk Berry both have a strong interest in the enforcement of laws and rules that pertain to Michigan elections and election administration, including the requirement that only United States citizens are allowed to vote in Michigan elections.

This action, which revolves around President Trump's executive order (EO) concerning a potential requirement that an individual provide documentary proof of citizenship before registering to vote in a federal election has a direct and significant impact on MRP, its members, its affiliated political candidates, and Clerk Berry. To that end, MRP and Clerk Berry seek to provide their unique and direct perspective as amicus in this litigation to assist the Court in its deliberations. MRP and Clerk Berry also seek to respond to the arguments advanced by the Michigan local election clerks who filed an amicus brief, ECF 87, and Michigan Bureau of

Elections Director Jonathan Brater, ECF 76-8, about the alleged effects of Sections 2(a) and 2(d) of the EO on the people of the state of Michigan. Specifically, MRP and Clerk Berry want to make clear to this Court that President Trump's executive order will make Michigan's elections safer and more secure, and that implementing the provisions of the executive order are workable and consistent with the efficient administration of Michigan elections.

## I.    COUNTER-STATEMENT OF FACTS AND PROCEEDINGS

Amici MRP and Clerk Berry rely on the statement of facts and proceedings in Defendants'

Motion to Dismiss, ECF 109.

## II.    ANALYSIS

### A.    Introduction

A person must be a United States citizen to vote in any federal election. 18 U.S.C. §611.

Likewise, the Michigan Constitution requires that a person be a "citizen of the United States" to

"be an elector and qualified to vote in any election" in Michigan. Mich. Const. of 1963, Art. II, §1.

Despite these crystal-clear prohibitions on non-citizen voting, at least 16 non-citizens voted in

Michigan during the 2024 general election.

In March 2025, to stop non-citizen voting, President Donald J. Trump issued Executive

Order (EO) 14248, "Preserving and Protecting the Integrity of American Elections." Among other

things, section 2(a) of the EO directed the Election Assistance Commission to "take appropriate

action" to update the federal voter registration form to require a person to provide "documentary

proof of United States citizenship" when they are seeking to register to vote. Additionally, section

2(d) of the EO required the head of each *Federal* voter registration agency under the NVRA to

"assess citizenship prior to providing a Federal voter registration form to enrollees of public

assistance programs." In this lawsuit, Plaintiffs challenge the legality of these and other portions

of President Trump's EO.

Given their interest in ensuring the integrity of Michigan elections, Amici MRP and Clerk

Berry submit this brief to rebut the arguments raised by the amicus brief signed by several local

Democratic election officials from Michigan, ECF 87, and the affidavit of Michigan Bureau of

Elections Director Jonathan Brater, ECF 76-8, regarding the alleged effects of Sections 2(a) and

2(d) of the EO on the people of the state of Michigan. First, MRP and Clerk Berry argue that non-

citizen voting is a real problem in Michigan and that directing the EAC to take steps to require a person to provide documentary proof of citizenship when registering to vote (and requiring election officials to record the details of that proof) is a reasonable, common-sense, and effective way to address that problem. Second, MRP and Clerk Berry argue that it is both possible and workable for the federal voter registration form to require documentary proof of citizenship, and that implementation of the EO would not lead to widespread disenfranchisement. Third, MRP and Clerk Berry argues that requiring *Federal* agencies designated as voter registration agencies under the NVRA to assess an individual's citizenship before providing them with a voter-registration form is a common-sense requirement that will benefit the integrity of elections in Michigan by adding an additional layer of citizenship verification to the federal voter registration form.

For these reasons, MRP asks that the Court grant the Defendants' motion to dismiss, ECF 109, dismiss Plaintiffs' complaint in its entirety with prejudice, and grant any other relief it deems just and equitable.

B.    <u>Directing the EAC to take appropriate action to amend the federal voter registration form to require documentary proof of citizenship and to require local election officials to record the details of that proof is a real solution to the very real problem of non-citizen voting.</u>

In their respective briefs, plaintiffs, Director Brater, and the local election officials all downplay the importance and necessity of the EO.[2] They now contend that non-citizen voting in Michigan and other states is so rare that it's not a meaningful problem and, thus, does not warrant taking action to require documentary proof of citizenship before registering. They also maintain that requiring documentary proof of citizenship on the registration form—and requiring local

---

[2] This argument is inconsistent with the statement of Director Brater's departmental spokesperson Angela Benander, who described non-citizens voting in Michigan as a "serious issue." *See* Craig Mauger, *Michigan review finds 15 probably non-US Citizens who voted in November*, THE DETROIT NEWS (April 3, 2024), https://www.detroitnews.com/story/news/politics/2025/04/03/michigan-non-citizens-voted-2024-election-jocelyn-benson-voter-rolls-review-drivers-licenses/82791504007/.

election officials to record the details of the proof of citizenship offered—would significantly disrupt election administration and cause mass disenfranchisement of voters. For the following reasons, their arguments fail.

> i.  *Non-citizen voting in Michigan is a real problem worthy of meaningful solutions like those called for in section 2(a) of the EO.*

As Michigan Secretary of State spokesperson Benander explained before the filing of this suit, non-citizens voting in Michigan is a "serious issue," and "it's the government's job to verify voter citizenship."[3]  Of course, the Constitution and laws of the United States limit the right to vote to citizens of the United States. *See* 18 U.S.C. § 611 (prohibiting non-citizens from voting); 18 U.S.C. § 1015(f) (prohibiting non-citizens from making false statements about their citizenship in order to register to vote); 52 U.S.C. § 20511(a)(2) (making it a crime to knowingly and willfully procure a materially false or fraudulent voter registration application); and 18 U.S.C. § 911 (making it illegal to knowingly and willfully make a false assertion of U.S. citizenship). So do the laws of most, if not all states, including Michigan. See Mich. Const. of 1963, Art. II, §1 (a person must be a "citizen of the United States" to "be an elector and qualified to vote in any election" in Michigan); M.C.L. 168.492. States like Michigan therefore have a legitimate interest in preventing non-citizen voting. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (opinion of STEVENS, J.) (noting that "the risk of voter fraud [is] real . . . [and] could affect the outcome of a close election"). That's because non-citizen voting poses a significant threat to the public's confidence in our electoral system. After all, as the Commission on Federal Election Reform chaired by former President Jimmy Carter and former Secretary of State James A. Baker III recognized, "[t]he electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or confirm the identify of voters." *Id.*, at 197 (citation omitted)).

---

[3] *Id.*

Non-citizen voting has recently gained prominence as a matter of public concern in MRP's and Clerk Berry's home state of Michigan. In October 2024, just days before the November 2024 general election, news broke that "[a] University of Michigan student who is from China and not a U.S. Citizen" voted in Ann Arbor, Michigan, even though "he couldn't legally cast a ballot."[4] The individual, a man named Haoxiang Gao, registered to vote using his University of Michigan student identification card.[5] But, although Gao allegedly "made false statements regarding his citizenship on his voter registration application and his early voting application" in order to vote, his ballot was still counted as part of the November 2024 election.[6] Gao was initially criminally charged by state and local authorities with perjury and attempting to vote as an unauthorized elector.[7] But, despite having surrendered a passport to the authorities, Gao fled the country using a second passport after being let out on personal bond.[8] And, even though he's now been charged with federal crimes, he is still unlikely to be prosecuted.[9] And, if that wasn't enough, Gao was only caught because he contacted the local elections clerk and asked for his ballot back—in other words, because he turned himself in.[10] Whether other non-citizens voted without subsequently confessing their misrepresentations to the authorities remains an open question.

Importantly, it's undisputed that Gao wasn't the only non-citizen to vote in Michigan last year. A subsequent limited investigation by the Michigan Department of State revealed that at least

---

[4] *See* Craig Mauger and Kim Kozlowski, *Chinese student to face criminal charges for voting in Michigan. Ballot will apparently count*, THE DETROIT NEWS (October 30, 2024), https://www.detroitnews.com/story/news/politics/elections/2024/10/30/chinese-university-of-michigan-college-student-voted-presidential-election-michigan-china-benson/75936701007/.

[5] *See US says student fled to China after being charged with voting illegally in Michigan*, AP NEWS (May 30, 2025), https://apnews.com/article/chinese-student-illegal-voting-michigan-674cff347c275fd2f1ca6cc5645e195b.

[6] *See Chinese National at the University of Michigan Charged with Illegally Voting in the 2024 Election*, UNITED STATES ATTORNEY'S OFFICE FOR THE EASTERN DISTRICT OF MICHIGAN (June 3, 2025), https://www.justice.gov/usao-edmi/pr/chinese-national-university-michigan-charged-illegally-voting-2024-election.

[7] *See supra*, n.5.

[8] *See supra*, n.6.

[9] *See supra*, n.5.

[10] *See supra*, n. 4.

sixteen non-citizens voted in Michigan during the November 2024 presidential election.[11] And, because of the cursory nature of Secretary of State Jocelyn Benson's investigation, it's extremely likely that list of sixteen individuals is incomplete. Per the Michigan Department of State's own press release, the investigation was limited to simply comparing Michigan motor vehicle records to voting records in the state's Qualified Voter File (QVF).[12] There is no indication that Secretary Benson did anything to identify any other voting non-citizens by, for example, comparing the QVF with any federal databases like the United States Citizenship and Immigration Services' Systematic Alien Verification for Entitlements (SAVE) database.[13]

In other words, Secretary Benson's limited "investigation" could only identify only those individuals who—like Gao—fraudulently self-identified themselves as citizens on their voter registration application and illegally cast a ballot *after* having self-identified themselves as noncitizens on their motor vehicle records.[14] She has, thus, never investigated the extent to which other non-citizens who didn't happen to self-incriminate might have voted in the 2024 election. There may be many more individuals like Gao whose ballots counted in the 2024 election but who never self-identified as a non-citizen voter. Yet Secretary Benson, as with so many other claims about the integrity of Michigan's elections, gave lip service to election integrity but failed to follow through.[15]

---

[11] *See Michigan Department of State review confirms instances of noncitizen voting are extremely rare*, MICHIGAN DEPARTMENT OF STATE (April 3, 2025), https://www.michigan.gov/sos/resources/news/2025/04/03/michigan-department-of-state-review-confirms-instances-of-noncitizen-voting-are-extremely-rare.

[12] *Id.*

[13] *See SAVE*, U.S. CITIZENSHIP AND IMMIGRATION SERVICE, https://www.uscis.gov/save.

[14] *See supra*, n.11.

[15] *See, e.g.*, *Jocelyn Benson Brought to Hell in Federal Lawsuit Settlement, but she blames Ruth Johnson*, THE BALLENGER REPORT (February 20, 2021), https://www.theballengerreport.com/jocelyn-benson-brought-to-heel-in-federal-lawsuit-settlement-but-she-blames-ruth-johnson/.

Secretary Benson and her office's downplaying of the problem of non-citizen voting in Michigan and her failure to adequately investigate the issue is all the more egregious given the high level of public concern from Michigan citizens—the very people Secretary Benson purports to represent—about the issue. Clerk Berry, the elected official responsible for administering elections in the Charter Township of Chesterfield Township, was approached many times before and after the 2024 election by citizens who were concerned about non-citizens casting ballots. *See* **Exhibit A, Affidavit of Cindy Berry**, p. 2. In fact, the issue of non-citizen voting was by far the most common concern brought to her after the 2024 election. *Id.* And many of the people who raised such concerns to here were shocked to learn that local election clerks like Clerk Berry have no way to actually verify citizenship and can, instead, only confirm that the individual registering to vote checked a box *attesting* that they are a citizen. *Id.* In other words, they were shocked that there was no requirement for prospective voters to present some sort of documentary proof of citizenship before registering to vote, and that citizenship-verification in Michigan is nothing more than a box-checking exercise. Yet, rather than take this public concern over non-citizen voting and the weakness of the attestation requirement seriously, Secretary Benson did nothing more than conduct a surface-level, bare-minimum investigation. And, since then, she's doubled down by making numerous public statements stridently opposing any attempt to require applicants to provide any proof of citizenship when they apply to register to vote.[16]

Disregarding what happened in Michigan, the local Democratic election officials' amicus brief nonetheless claims that non-citizen voting is "exceedingly rare" and, thus, doesn't warrant a

---

[16] *See* Hayley Harding, *Michigan secretary of state aims to fix loophole that allowed noncitizen to vote in 2024*, MICHIGAN ADVANCE (March 3, 2025), https://michiganadvance.com/2025/03/03/michigan-secretary-of-state-aims-to-fix-loophole-that-allowed-noncitizen-to-vote-in-2024/; *Michigan GOP Wants Voters To Prove Citizenship — Benson Warns of Disenfranchisement*, MEDIUM (January 30, 2025) https://medium.com/michigan-news/michigan-gop-wants-voters-to-prove-citizenship-benson-warns-of-disenfranchisement-2cd075f5b1f9.

solution. ECF 87, PgID 20. They reference several cases that, in their view, support their claim. *Id.*, citing *Fish v. Schwab*, 957 F.3d 1105, 1128 (10th Cir. 2020) (finding that 39 non-citizens made it into Kansas voting records between 1999 and 2013); and *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 967, 1011 (D. Ariz. 2024) (finding that non-citizen voting in Arizona was rare even though local officials had initiated 13 prosecutions for non-citizen voting in 2007 alone). The local election officials also reference a report showing that 20 non-citizens voted in Georgia in the 2024 election.[17] But these examples, rather than establishing that non-citizen voting is so rare that it isn't a real problem, actually suggest that non-citizen voting is a widespread problem that has been occurring in multiple states for decades. Indeed, if states as geographically diverse as Georgia, Arizona, Michigan, and Kansas are experiencing at least some level of non-citizen voting, it's apparent that non-citizen voting is a meaningful problem that is worthy of both serious consideration and an effective solution. That's especially true at the local level, where races can be decided by a very narrow margin of just a handful of votes. It follows that the concerns about non-citizen voting addressed by President Trump's EO are legitimate and should not be dismissed as breezily as they are in Plaintiffs' and the local election officials' briefing.

    ii.    *An amended federal voter registration form that requires documentary proof of citizenship is not unworkable. To the contrary, like any other change to the election laws or procedures, local election officials are entirely capable of implementing the changes needed to receive and process an amended form.*

Aside from hand-waving away the problem of non-citizen voter as too insignificant to matter, Director Brater and the local Democratic election officials also claim that any action taken by the EAC to implement a documentary proof of citizenship requirement pursuant to Section 2(a) of the EO would massively disrupt local election administration and strain election offices'

---

[17] *See* Olivia Rubin, *Georgia voter roll audit finds only 20 noncitizens out of 8 million registered voters*, ABC News (October 23, 2024), https://abcnews.go.com/US/georgia-voter-roll-audit-finds-20-noncitizens-8/story?id=115072461

already-scarce resources. ECF 87, PgID 16; ECF 76-8, PgID 2. Their claims, however, are not only largely hypothetical and speculative, they are also not true and/or immaterial.

The primary flaw with the local Democratic election officials' claim that action taken to implement the documentary proof of citizenship requirement called for by Section 2(a) will disrupt and overwhelm local election administration is that it's nothing but speculation and conjecture. For example, the local election officials assert that, if the EAC amends the federal voter registration form to require documentary proof of citizenship, it would result in waves of calls from confused voters and longer lines at voter registration locations. ECF 87, PgID 16. These claims may be correct, or they may not be. Nobody—not this Court, nor the local Democratic election officials making such claims—has any way to know, and the local Democratic election officials' amicus brief provides no evidence to support these claims. *See generally* ECF 87. Along the same lines, while Director Brater likewise claims that implementing a federal voter registration form with the amendments called for by Section 2(a) would potentially require hiring more election administration staff and performing unspecified list maintenance tasks, he offers no support for such assertions. ECF 86-7, PgID 16.

Director Brater and the local Democratic election officials also list a number of administrative tasks that they claim would either be expanded or added to their lists of pre-election responsibilities, were the EAC to amend the federal voter registration application to require documentary proof of citizenship. These include additional staff training, creating new voter education materials, additional voter application processing time, modifying the QVF registration system, and educating the public. ECF 87, PgID 16–17; ECF 76-8, PgID 5–8. Director Brater and the local Democratic election officials base their claims off of their experience working in election administration and their sense of what the amended voter registration application contemplated by

Section 2(a) could require before the next election. But any potential increase in the workload that might result from implementation of the changes to the federal voter registration form called for in the EO has nothing to do with the legal validity of the EO. Put differently, the fact that implementing the changes called for in the EO might affect how Director Brater and the local Democratic election officials who signed the amicus spend their time between now and November 2026 has nothing to do with the legality of the EO. That makes sense--the amount of work necessary to implement an executive branch directive, administrative regulation, or statutory provision has never been an adequate basis for challenging the legal validity of that directive, regulation, or provision, and neither Plaintiffs nor the local election officials provide any authority to the contrary.

What's more, many of Director Brater's and the local Democratic election officials' claims about Section 2(a)'s workability are contradicted by Clerk Berry, who, as the elected clerk of Chesterfield Township, Michigan, is directly and personally involved in the election processes implicated by Section 2(a) in a way that Director Brater isn't. *See* **Exhibit A, Affidavit of Clerk Berry**, p. 2. Unlike Director Brater, Clerk Berry personally processes voter registration applications, removes unqualified voters from voter registration records, and safeguards the election-related materials of Chesterfield Township. *Id.* In short, she is directly involved in almost every aspect of election administration in a boots-on-the-ground capacity. She is therefore well-situated to opine on matters of election integrity and election administration, including those raised by Section 2(a) of the EO.

Based on her experience administering elections, Clerk Berry disagrees with Director Brater and the local election clerks that Section 2(a) would disrupt or overwhelm current election administration processes. *Id.* at 3. Local election clerks, she explains, already have voter

registration checklists in place. At most, Section 2(a) would add a single step to those existing checklists by requiring local election clerks and their staff to (1) determine whether a voter registration application is accompanied by documentary proof of citizenship and (2) record the nature of the proof provided. *Id.* Assuming that the EAC provides clear guidance about what constitutes documentary proof of citizenship, incorporating Section 2(a)'s documentary proof of citizenship requirement into those checklists will not be inordinately difficult. *Id.* And because much of the infrastructure for implementing Section 2(a) is already in place, local election clerks and their staffs will not require all that much training to be able to implement Section 2(a) in time for the 2026 election. *Id.* at 3-4.

Indeed, Clerk Berry explains that local clerks are a resourceful, resilient bunch who are accustomed to implementing frequent changes in election law and election-related procedures. *Id.* at 3. They regularly review new legal authorities and attend trainings on how to incorporate those authorities into their election administration systems. *Id.* Thus, adapting to the guidance of Section 2(a) would not be an anomalous or overly difficult task for local election clerks. Rather, it would be accomplished as a routine part of their election administration responsibilities.

Clerk Berry also addresses Director Brater's and the local Democratic election clerks' data storage concerns by highlighting local clerks' role in storing and maintaining large amounts of sensitive information in physical and electronic databases. *Id.* at 2. This can include proofs of residency, driver's licenses, hiring information, and social security numbers. *Id.* Since local clerks already have sensitive information storage systems in place, they will have no difficulty storing sensitive information related to proof of citizenship. *Id.* In other words, the relevant systems are already in place; merely putting another piece of information into them will not overwhelm the system.

In sum, adoption by the EAC of an amended federal voter registration form that requires documentary proof of citizenship would be workable and entirely consistent with local clerks' other election-administration obligations. The arguments to the contrary raised by Plaintiffs, Director Brater, and the local Democratic election officials are simply wrong.

### iii.    Section 2(a) would not result in widespread disenfranchisement

Director Brater and the local Democratic election officials further contend that amending the federal voter registration form to require documentary proof of citizenship as called for in Section 2(a) would disenfranchise wide swaths of voters by imposing additional administrative hurdles before they can obtain the documentation necessary for registering to vote. ECF 87, PgID 10; ECF 76-8, PgID 9. These hurdles, they argue, would disproportionately impact elderly people, homeless people, tribal members, eligible incarcerated people, and low-income people. ECF 87, PgID 13. Again, their concerns are exaggerated, largely hypothetical, and—given their lack of faith in their fellow citizens—deeply condescending.

To begin with, Director Brater's and the local Democratic election officials' assertions about administrative hurdles for certain populations are overblown. Individuals who change their names because of marriage or personal reasons already have to go through various administrative hurdles to apply that name change to the various types of documentation they use. This is just as true for voting as it is for any number of other public activities, including boarding an airplane, booking a hotel room, or purchasing a fishing license. That a person who has changed their name one or more times might have to go through similar administrative hurdles to obtain the documentation necessary to vote is not a sufficient reason to do away with the administrative hurdle altogether.

The same is true for low-income individuals. The local Democratic election officials claim that low-income individuals would be disenfranchised if they are required to provide documentary

proof of citizenship as called for in Section 2(a) because obtaining one of the accepted documentation forms is cost-prohibitive for them. ECF 87, PgID 13. Obtaining a driver's license in Michigan, however, costs $25.[18] Ordering a copy of one's birth certificate costs only $34 if ordered from the State of Michigan, unless a person is over 65, in which case the birth certificate costs $14.[19] And those costs may be even lower if the birth certificate is ordered from a county clerk's office.[20] And applying for a passport book, while admittedly more expensive than a driver's license, still costs only $130.[21] Beyond that, an individual could obtain a "U.S. Passport card" that "is proof of U.S. Citizenship and identity, and has the same length of validity as the passport book" and only costs $30.[22] Such fees are, for the vast and overwhelming majority of Americans, not cost-prohibitive, especially when measured against the importance of ensuring that only U.S. Citizens are allowed to vote in federal elections.

For his part, Director Brater asserts that most Michiganders do not have any of the four types of documentation necessary to satisfy a documentary proof of citizenship requirement. ECF 76-8, PgID 3. In his view, the burden of obtaining such documentation could result in widespread disenfranchisement. *Id.* at 9. But, like so many of his other claims, Director Brater offers no factual basis for his entirely hypothetical claims other than his personal "belief." *See id.* at 3. The Court should disregard this unsupported conjecture. Moreover, while he may be correct that many

---

[18] *See First-time license or ID*, MICHIGAN DEPARTMENT OF STATE, https://www.michigan.gov/sos/all-services/first-time-license-or-id.

[19] *See Michigan Vital Records Fee Structure 2013 – House Bill 4786*, https://www.michigan.gov/mdhhs/-/media/Project/Websites/mdhhs/Folder1/Folder12/Fee_Structure.pdf.

[20] *See Birth Certificates*, COUNTY OF SAGINAW, https://www.saginawcounty.com/departments/county-clerk/birth-certificates/ ($15 if in person; $16 if by mail; and $26 if online); *Order Birth Certificate Online*, GENESEE COUNTY, https://www.geneseecountymi.gov/order_a_vital_record_online/order_birth_certificate_online.php ($25; $5.00 for anyone over 65); *Birth Records FAQs*, MACOMB COUNTY, https://www.macombgov.org/clerk/birth-records-faqs ($15); *Order Birth Certificates*, KENT COUNTY, https://www.kentcountymi.gov/791/Order-Birth-Certificates ($10).

[21] *See Passport Fees*, U.S. DEPARTMENT OF STATE — BUREAU OF CONSULAR AFFAIRS, https://travel.state.gov/content/travel/en/passports/how-apply/fees.html.

[22] *See id.*; *see also Compare a Passport Card and Book*, U.S. DEPARTMENT OF STATE — BUREAU OF CONSULAR AFFAIRS, https://travel.state.gov/content/travel/en/passports/need-passport/card.html.

Americans do not have a passport, the requirements in Section 2(a) can also be satisfied by other types of documentation, such as a birth certificate or a driver's license. And nearly every American has—or can easily obtain—a birth certificate[23] or a driver's license.[24]

The local Democratic election officials also argue that disenfranchisement would result from the implementation of Section 2(a) because it would stymie certain states' recent efforts to host voter registration drives. *Id.* at 15. For instance, Wisconsin election officials have hosted voter registration drives at pizza shops, food pantries, libraries, churches, and bakeries. *Id.* These efforts, argue the local Democratic election officials, would be "ineffective" under Section 2(a) because "most people do not bring their passports or birth certificates to pick up their pizza." *Id.*

This argument fails on multiple grounds. First, the local Democratic election officials ignore the fact that they can still conduct voter registration drives at which they register people who possess identification that establishes citizenship and hand out voter registration forms— along with guidance about the documentary proof of citizenship requirement—to anyone who doesn't. There is also nothing stopping local officials from advertising the voter registration drives in a way that informs individuals what documentation is needed to register. Second, the argument seems to assume that voter registration drives—which are a recent development—are the only bulwark holding back the looming threat of mass disenfranchisement. Not so. The emergence of voter registration drives as a means of public outreach does not suddenly mean that disenfranchisement will result if the voter registration drives cease to exist. And third, the

---

[23] *See How to get a certified copy of a U.S. birth certificate*, USA.GOV, https://www.usa.gov/birth-certificate#:~:text=Contact%20your%20birth%20state%20or,to%20get%20a%20copy%20fast (link for USAgov instructions on how to order a copy of your birth certificate).

[24] *See How Many People Drive in the US?*, HEDGES & COMPANY (May 24, 2025), https://hedgescompany.com/blog/2024/01/number-of-licensed-drivers-us/; Lisa Ro Judy, *How many people drive in the U.S.? 2025*, CONSUMER AFFAIRS (January 24, 2024), https://www.consumeraffairs.com/automotive/number-of-drivers-in-us.html; *see also supra* n.18.

argument also ignores the fact—presented in the citations to the local Democratic election officials' brief itself—that these voter registration events are advertised ahead of time.[25] Thus, potential voters who see the advertisement have the opportunity to prepare and gather their documents before attending. Nor would there be anything stopping local election officials from handing out voter registration applications at such events and providing prospective registrants with information and instructions about whatever documentary proof of citizenship requirements EAC ultimately chooses to incorporate into an amended federal voter registration form.

The local election clerks then turn to the National Voter Registration Act (NVRA) for support. That statute empowers state and local governments to "increase the number of *eligible* citizens who register to vote in elections for Federal office . . . [and] make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of *eligible* citizens as voters." 52 U.S.C. § 20501(b) (emphases added). They claim that the sort of documentary proof of citizenship requirement contemplated by Section 2(a) would "render ineffective" their efforts to make eligible voter registration more accessible under the NVRA. ECF 87, PgID 10. Not so. A documentary proof of citizenship requirement would actually work in tandem with the NVRA, which aims to increase the number of *eligible* citizens who register to vote, by enabling local election officials processing voter registration application to determine that an applicant is, in fact, *eligible*. Section 2(a) therefore furthers the work necessary for the NVRA to accomplish its stated goals. By helping local election officials to determine whether an individual is qualified to register to vote, the sort of documentary proof of citizenship requirement called for in Section 2(a) would streamline the NVRA's process of increasing the ability of those

---

[25] *See Celebrate National Voter Registration Day!*, CITY OF MADISON (September 16, 2024), https://www.cityofmadison.com/news/2024-09-16/celebrate-national-voter-registration-day.

eligible voters to register and cast their votes. Accordingly, the claim that Section 2(a) would hamper local election officials' efforts to implement the NVRA is simply incorrect.

    C.    <u>Section 2(d) directs the head of each *Federal* voter registration department to assess citizenship before handing out federal voter registration forms to enrollees in public assistance programs. There's nothing unclear, ambiguous, or problematic about that.</u>

Section 2(d) of the EO requires the "head of each Federal voter registration department" to "assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs."[26]  If implemented that would be nothing but a positive development for election administration in the state of Michigan. As Clerk Berry explains in her affidavit, Section 2(d) would not only bolster the integrity and security of elections but also make local election officials' jobs that much easier by adding an additional layer of citizenship verification into the voter-registration process before the application gets sent to a local clerk. *See* **Exhibit A**, p. 4. The local Democratic election officials' amicus brief implicitly admits as much by not addressing Section 2(d) of the EO in the slightest. *See generally* ECF 87.

For his part, Director Brater can only surmise that the section is "ambiguous" and that its implementation "would require [Michigan Department] of State coordination." ECF 76-8, PgID 10. But his position is isn't born out by the text of Section 2(d), which plainly refers only to "Federal" voter registration department(s) and, thus, does not implicate state and local voter registration offices like those Director Brater oversees. And even if his purview as Director of the Michigan Bureau of Elections would necessitate some level of interaction with *federal* voter registration agencies designated under the NVRA, his only claim is that Section 2(d) isn't as clear as he'd like it to be. What neither he nor the local election officials admit is that Section 2(d) would

---

[26] *See* President Donald J. Trump, *Preserving and Protecting the Integrity of American Elections*, THE WHITE HOUSE (March 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/preserving-and-protecting-the-integrity-of-american-elections/.

benefit the integrity of elections in Michigan by adding a layer of citizenship verification to the voter registration process. Critically, given its limited application to federal voter registration departments, it would do so *before* those applications reach the desks of state and local election clerks. Therefore, as with Section 2(a), Section 2(d) helps effectuate the NVRA's purpose of enabling eligible U.S. citizens to register to vote. *See* 52 U.S.C. § 20501(b)(3). The Court should therefore dismiss Plaintiffs' arguments as to Section 2(d).

## III.    **CONCLUSION**

The arguments raised by the Michigan local Democratic election clerks and Michigan Bureau of Elections Director Jonathan Brater about the alleged effects of Sections 2(a) and 2(d) on the people of the state of Michigan do not hold water. Not only do they contort the language of the EO, they are also factually incorrect and largely hypothetical. Non-citizen voting is a real problem in Michigan (and elsewhere) that demands a real solution. And the appropriate actions called for in Sections 2(a) and 2(d) of the EO would go a long way towards resolving that problem. Further, the actions called for in Sections 2(a) and 2(d) are workable and would not disrupt election administration or lead to widespread disenfranchisement. Instead, they would add an important layer of citizenship verification to the voter registration process. Amici the Michigan Republican Party and Cindy Berry therefore respectfully request that this Court grant Defendants' Motion to Dismiss (ECF 109) and dismiss Plaintiffs' Complaint with prejudice in its entirety.

Respectfully submitted,

Dated:        July 28, 2025                     */s/ Robert N. Driscoll*
Charles R. Spies
Robert N. Driscoll (BBO# 566545)
DICKINSON WRIGHT, PLLC
1825 Eye Street NW, Suite 900
Washington, DC 20006
(202) 466-5955
rdriscoll@dickinsonwright.com
cspies@dickinsonwright.com

16

Robert L. Avers
Thomas J. Philbrick
DICKINSON WRIGHT, PLLC
350 S. Main Street, Suite 300
Ann Arbor, MI 48104
(734) 623-1672
ravers@dickinsonwright.com

Jonathan B. Koch
DICKINSON WRIGHT, PLLC
200 Ottawa Ave NW, Suite 900
Grand Rapids, MI 49503
Washington, DC 20006
(616) 336-1076
jkoch@dickinsonwright.com

*Attorneys for Michigan Republican Party and Cindy Berry*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was electronically filed in this case with the clerk of the court and served on this 28th day of July, 2025, through the court's CM/ECF system, which will send notification of this filing to all counsel of record.

*/s/ Robert N. Driscoll*
Robert N. Driscoll (BBO# 566545)