**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| STATE OF CALIFORNIA, et al., | ) ) ) |
| Plaintiffs | ) ) |
| v. | ) ) No. 25-cv-10810-DJC |
| DONALD TRUMP, et al., | ) ) ) |
| Defendants. | ) ) ) |

<u>MEMORANDUM AND ORDER</u>

CASPER, C. J.                                      September 17, 2025

## I.    Introduction

On March 25, 2025, President Donald J. Trump issued Executive Order No. 14248, <u>Preserving and Protecting the Integrity of American Elections</u> (the "Executive Order").  Among other things, the Executive Order requires the United States Election Assistance Commission (the "EAC" or the "Commission") and the Secretary of Defense to implement documentary proof of citizenship requirements with federal voter registration forms required to be used by Plaintiffs, Attorney Generals representing nineteen states (collectively, the "States"), commands the Attorney General to take action against thirteen of the States that have laws either allowing for the counting of ballots mailed on or before Election Day but received afterward, or laws allowing voters to cure timely-submitted ballots with minor technical problems (the "Ballot Receipt States"), and directs the EAC to condition statutory funding upon compliance with documentary proof of citizenship

requirements for the Federal Form and with a ballot receipt deadline that is contrary to the respective state laws established by the Ballot Receipt States.

On April 3, 2025, the States brought this action against the named Defendants (collectively, the "Defendants" or the "Executive Branch") alleging that §§ 2(a), 2(d), 3(d), 4(a), 7(a), and 7(b) of the Executive Order (collectively, the "Challenged Provisions") are *ultra vires* (Counts I-VII).[1] It is undisputed, as this Court has already noted, that "U.S. citizenship is required to vote in federal elections and the federal voter registration forms require attestation of citizenship."  D. 107 at 2. The States do not challenge that fundamental principle, but do challenge the legality of the enumerated sections of the Executive Order.  On June 13, 2025, the Court granted the States' motion for preliminary injunction as sought as to §§ 2(a), 3(d), 2(d), 7(b) of the Executive Order and § 7(a) of the Executive Order as to civil or criminal enforcement actions, concluding, among other things, that the States' challenges to these provisions are timely and likely to succeed on the merits.  Id. at 11-33, 43-44.[2]  Defendants now have moved to dismiss the States' challenges against §§ 2(a), 2(d), 3(d), and 7(a) of the Executive Order under Fed. R. Civ. P. 12(b)(1) for lack of standing and moved to dismiss all of the States' claims against the Challenged Provisions under Fed. R. Civ. P. 12(b)(6).  D. 109.

After careful consideration of the parties' filings, a brief from *amicus curiae* and oral argument by counsel, the Court DENIES the Executive Branch's motion to dismiss under Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6), D. 109, for the reasons explained below.

---

[1] Due to Arizona law, Arizona does not join Count II of the States' challenge.  D. 1 at 28 n.3.

[2] The States did not move for a preliminary injunction as to § 4(a).  See D. 75 at 2.

## II.    Background

The States here challenge the sections of the Executive Order which would require the EAC and the Secretary of Defense to implement a documentary proof of citizenship requirement with the federal voter registration form, would require voter registration agencies to assess citizenship before distributing the Federal Form to enrollees in public assistance programs, would prohibit Plaintiff States from counting ballots timely cast but received shortly after Election Day and would condition statutorily mandated funds under the Help America Vote Act ("HAVA") upon compliance with the proof of citizenship requirement and an Election Day ballot receipt rule.

Specifically, the States challenge:  (1) § 2(a) of the Executive Order, which instructs the EAC to require "documentary proof of United States citizenship, consistent with 52 U.S.C. [§] 20508(b)(3)," and to record information concerning that documentation; (2) § 2(d) of the Executive Order, which provides that "[t]he head of each Federal voter registration executive department or agency . . . under the National Voter Registration Act [("NVRA")], shall assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs"; (3) § 3(d) of the Executive Order, which commands the Secretary of Defense to update the Federal Post Card Application provided under The Uniformed And Overseas Citizens Absentee Voting Act ("UOCAVA") to require documentary proof of citizenship and "proof of eligibility to vote in elections in the State in which the voter is attempting to vote"; (4) § 7(a) of the Executive Order, which orders the Attorney General to "take all necessary action to enforce" federal statutes setting the date of federal elections against States that "violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives," (5) § 7(b) of the Executive Order, which requires the EAC

to condition "any available funding to a State" upon its compliance with "a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," and (6) § 4(a) of the Executive Order, which requires the EAC to "cease providing Federal funds to States" unless "States accept and use the national mail voter registration form . . . including any requirement for documentary proof of United States citizenship." Exec. Order No. 14248, 90 Fed. Reg. 14,005 (Mar. 25, 2025).

The lawfulness of §§ 2(a), 2(d), 7(a) and 7(b) also has been considered by the United States District Court for the District of Columbia (the "DC Court"), in consolidated cases brought by private parties. League of United Latin Am. Citizens v. Exec. Off. of the President, 780 F. Supp. 3d 135 (D.D.C. 2025) ("LULAC"). The Plaintiffs before the DC Court sought to preliminarily enjoin enforcement of §§ 2(a), 2(b), 2(d), 7(a) and 7(b) of the Executive Order. Id. at 154. On April 24, 2025, the DC Court granted the injunction as to §§ 2(a) and 2(d) of the Executive Order, but denied relief as to §§ 2(b), 7(a) and 7(b). Id. at 226. As to §§ 7(a) and 7(b), the DC Court concluded that the plaintiffs before it were not the proper parties to challenge these sections. Id. at 212-14 (noting that "the most natural parties to seek an injunction against enforcement under [§] 7(a) are the States themselves").

## III. Procedural History

The States filed this action on April 3, 2025. D. 1. On May 5, 2025, the States moved to preliminarily enjoin §§ 2(a), 2(d), 3(d), 7(a) and 7(b) of the Executive Order. D. 75. The Court granted the motion for preliminary injunction as sought as to §§ 2(a), 3(d), 2(d), 7(b) of the Executive Order and § 7(a) of the Executive Order as to civil or criminal enforcement actions on June 13, 2025. D. 107; D. 108 (as revised by D. 116). The same day, Defendants moved for

dismissal of the complaint. D. 109.[3]  The Court heard the parties on the pending motion to dismiss and took the matter under advisement. D. 130.[4]

## IV.    Discussion

### A.    <u>Standing</u>

When confronted with a Rule 12(b)(1) motion, "the district court must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the plaintiff." <u>Aversa v. United States</u>, 99 F.3d 1200, 1209-10 (1st Cir. 1996) (citing <u>Murphy v. United States</u>, 45 F.3d 520, 522 (1st Cir. 1995)).  The Court may widen its gaze, however, and look beyond the pleadings to determine subject matter jurisdiction. <u>Martínez-Rivera v. Commonwealth of Puerto Rico</u>, 812 F.3d 69, 74 (1st Cir. 2016) (citing cases for the proposition that the court can "rely on facts outside the pleadings" to decide a Rule 12(b)(1) motion).  "[T]he party invoking the jurisdiction of a federal court carries the burden of proving its existence." <u>Murphy</u>, 45 F.3d at 522 (quoting <u>Taber Partners, I v. Merit Builders, Inc.</u>, 987 F.2d 57, 60 (1st Cir. 1993)).  Standing is a jurisdictional issue, <u>see</u> <u>P.R. Tel. Co. v. T-Mobile P.R. LLC</u>, 678 F.3d 49, 57 (1st Cir. 2012), and, accordingly, challenges to standing are properly considered under Rule 12(b)(1), <u>see</u> <u>Kolancian v. Snowden</u>, 532 F. Supp. 2d 260, 261 (D. Mass. 2008).

---

[3] Although Defendants have now appealed the Court's grant of preliminary injunctive relief, D. 123, "[t]he general rule for an interlocutory appeal of a preliminary injunction is that it 'does not defeat the power of the trial court to proceed further with the case.'" <u>Pharm. Care Mgmt. Ass'n v. Me. Att'y Gen.</u>, 332 F. Supp. 2d 258, 259 (D. Me. 2004) (internal citation omitted).  Neither side here suggests otherwise.

[4] The Court has received and considered the *amicus curiae* brief filed by the Michigan Republican Party and Chesterfield Township (Michigan) Clerk Cindy Berry in support of Defendants' motion to dismiss. D. 122.

Defendants move to dismiss the States' claims against §§ 2(a), 2(d), 3(d), and 7(a) under Rule 12(b)(1), arguing that the claims are not justiciable. D. 109 at 6-13. In their reply, Defendants additionally argue that the States also do not have standing to challenge § 4(a). D. 120 at 3. It is correct, as Defendants point out, that "Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021). "Such a case or controversy exists only when the plaintiff demonstrates such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends." Gustavsen v. Alcon Lab'ys., Inc., 903 F.3d 1, 6-7 (1st Cir. 2018) (citations and internal quotation marks omitted). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case – in other words, standing." TransUnion, 594 U.S. at 423 (citation and internal quotation marks omitted). To establish Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." Id. In determining whether a plaintiff has met this burden, a court "takes all well-pleaded facts in the complaint as true and indulge[s] all reasonable inferences in [plaintiff's] favor." Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc., 958 F.3d 38, 46-47 (1st Cir. 2020) (internal quotation marks omitted). "If the plaintiff does not claim to have suffered an injury . . . there is no case or controversy for the federal court to resolve." TransUnion, 594 U.S. at 423 (citation and quotation marks omitted). In addition, a plaintiff must establish that the issues are ripe for review. "[T]he question of ripeness turns on the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 201 (1983) (internal citation and quotation marks

omitted).  "The critical question concerning fitness for review is whether the claim involves uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all." Mass. Ass'n of Afro-Am. Police, Inc. v. Bos. Police Dep't, 973 F.2d 18, 20 (1st Cir. 1992).  The fitness for review prong is more easily satisfied when it "presents an issue that is 'purely legal, and will not be clarified by further factual development.'"  Susan B. Anthony List v. Driehaus, 573 U.S. 149, 167 (2014) (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 581 (1985)).  Hardship "typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties." Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 535 (1st Cir. 1995) (citation and internal quotation marks omitted).

As to §§ 2(a), 3(d), and 7(a), Defendants raise substantially similar justiciability arguments as those advanced in their opposition to the States' motion for preliminary injunction.  D. 91 at 4-10.  As the Court explained fully in its preliminary injunction ruling and incorporates by reference into this decision, D. 107 at 14-16, 20-21, 26-27, the States' challenges to §§ 2(a), 3(d), and 7(a) are justiciable, id.  Likewise, as explained below, the States' challenges to §§ 2(d) and 4(a) also are justiciable.

      *1.    § 2(a)*

§ 2(a) of the Executive Order provides:

(i) Within 30 days of the date of this order, the [EAC] shall take appropriate action to require, in its national mail voter registration form issued under 52 U.S.C. [§] 20508:

    (A) documentary proof of United States citizenship, consistent with 52 U.S.C. [§]  20508(b)(3); and

    (B) a State or local official to record on the form the type of document that the applicant presented as documentary proof of United States citizenship, including the date of the document's issuance, the date of the document's expiration (if any), the office that issued the document,

> and any unique identification number associated with the document as
> required by the criteria in 52 U.S.C. [§] 21083(a)(5)(A), while taking
> appropriate measures to ensure information security.

Exec. Order No. 14248 § 2(a)(i).  The Executive Order also dictates what constitutes "documentary

proof of United States citizenship."  Id. § 2(a)(ii).

As to § 2(a), Defendants argue that:  (1) the States have failed to plead an injury in fact and

(2) the challenge is not ripe for judicial review.  D. 109 at 7-9.  A standing-conferring injury must

be "actual or imminent."  Clapper v. Amnesty Int'l, USA, 568 U.S. 398, 409 (2013) (quotation

omitted).  Where the alleged injury has yet to occur, the imminence requirement is met "if the

threatened injury is 'certainly impending' or there is a 'substantial risk' that the harm will occur."

Susan B. Anthony List, 573 U.S. at 158 (citation omitted).  Imminently threatened fiscal injury,

even "a relatively small economic loss," is sufficient to confer jurisdiction in federal court.  Katz

v. Pershing, LLC, 672 F.3d 64, 76 (1st Cir. 2012) (citing Adams v. Watson, 10 F.3d 915, 924 (1st

Cir. 1993)).  The States have alleged an injury in fact.  "'[R]unning a statewide election is a

complicated endeavor' requiring a 'massive coordinated effort' and 'rules of the road' which are

'clear and settled.'"  D. 107 at 15 (quoting Democratic Nat'l Comm. v. Wis. State Legislature, 141

S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring)).  The States allege that § 2(a) will require States

"to implement trainings, testing, coordination, implementation, and voter education across

multiple State agencies and databases," D. 1 ¶ 13, as well as "devote time and personnel to setting

up the infrastructure, policies, and technology to implement the new requirements, including by

implementing 'appropriate measures to ensure information security' with regard to the new

information they are charged with collecting," id. ¶ 105, all of which would result in "enormous

time and resources," id. ¶ 13, including "time, money, and significant people power," id. ¶ 105.

These costs are sufficient to support a finding that the States pled "an imminently threatened

economic injury."  D. 107 at 15-16 (citing <u>Katz</u>, 672 F.3d at 76; <u>Dep't of Commerce v. New York</u>,

588 U.S. 752, 766-67 (2019); <u>Massachusetts v. U.S. Dep't of Health & Hum. Servs.</u>, 923 F.3d 209,

222-27 (1st Cir. 2019) (concluding a state had standing when the "likely chain of events" resulted

in its imminent fiscal injury)).  Accordingly, the States have alleged an injury.

Additionally, the States' challenge to § 2(a) is ripe for judicial review.  The fitness prong

of the ripeness inquiry "is satisfied here, where, as the DC Court observed, § 2(a) of the Executive

Order imposes a deadline (which effectively was April 24, 2024) and dictates the 'precise contours

of [its] requirement.'"  <u>Id.</u> at 14-15 (quoting <u>LULAC</u>, 780 F. Supp. 3d at 184).  Thus, "'Section

2(a) does not merely "authorize" the EAC to change the Federal Form, or suggest that it "consider"

doing so'" but "'instead purports to require the EAC to amend the Federal Form and dictate[s] the

precise contents of the new rule.'"  <u>Id.</u> at 15 (citing <u>LULAC</u>, 780 F. Supp. 3d at 185).  The hardship

prong is also satisfied because, as explained above, the States have alleged that compliance with §

2(a) would result in "enormous time and resources."  D. 1 ¶ 13; <u>see id.</u> ¶ 105.

Accordingly, the States' challenge to § 2(a) is justiciable.  D. 107 at 14-16.

      *2.*    *§ 3(d)*

§ 3(d) of the Executive Order provides:

(d) The Secretary of Defense shall update the Federal Post Card Application,
pursuant to the [UOCAVA] to require:

      (i) documentary proof of United States citizenship, as defined by section
      2(a)(ii) of this order; and

      (ii) proof of eligibility to vote in elections in the State in which the voter
      is attempting to vote.

Exec. Order No. 14248 § 3(d).

Defendants argue that as "[t]he particulars of how or when section 3(d) will be implemented are [] unsettled," the States "can only speculate about whether the requirement would violate UOCAVA" and thus they fail to allege an immediate harm to support ripeness. D. 109 at 10-11. As the Court previously explained, "§ 3(d)'s command is clear: '[t]he Secretary of Defense shall update the Federal Post Card Application . . . to require . . . documentary proof of United States citizenship.'" D. 107 at 21 (quoting Exec. Order No. 14248 § 3(d)). Thus, as with § 2(a), the fitness prong of the ripeness analysis is satisfied. Likewise, as the Court explained as to § 2(a), the hardship prong is also satisfied with respect to § 3(d) "because its implementation would force a diversion of state resources and could cast uncertainty upon the 'massive coordinated effort' necessary to run state elections." Id. (citing Democratic Nat'l Comm., 141 S. Ct. at 31 (Kavanaugh, J., concurring)).

Accordingly, the States' challenge to § 3(d) is justiciable. Id. at 20-21.

        *1.*    *§ 4(a)*

Section 4(a) of the Executive Order provides:

> The Election Assistance Commission shall, pursuant to 52 U.S.C. [§§] 21003(b)(3) and 21142(c) and consistent with applicable law, take all appropriate action to cease providing Federal funds to States that do not comply with the Federal laws set forth in 52 U.S.C. [§] 21145, including the requirement in 52 U.S.C. [§] 20505(a)(1) that States accept and use the national mail voter registration form issued pursuant to 52 U.S.C. 20508(a)(1), including any requirement for documentary proof of United States citizenship adopted pursuant to section 2(a)(ii) of this order.

Exec. Order No. 14248 § 4(a).

Although the Court need not reach Defendants' standing challenge to the States' claim against § 4(a) because "arguments raised for the first time on reply are deemed waived," Acevedo-Garcia v. Monroig, 351 F.3d 547, 568 n.8 (1st Cir. 2003), the Court addresses it here in the interest of completeness. Defendants contend that "[b]ecause [the States]' challenges to section 2(a) are

not justiciable, the same outcome is warranted with respect to their challenge to section 4(a)."  D. 120 at 3.  This argument fails because, as explained above, the States' challenge to § 2(a) is justiciable.  Moreover, the States' challenge to § 4(a) itself is justiciable.  The States allege that § 4(a) places states at risk to lose millions of dollars of "critical" and statutorily-mandated federal funding under HAVA.  D. 1 ¶¶ 107, 152; see 52 U.S.C. §§ 21001-21003.  This potential loss of federal funding is an imminently threatened economic injury sufficient to confer standing.  Katz, 672 F.3d at 76.  As § 4(a)'s implementation is contemporaneous with § 2(a), the States' challenge to § 4(a) is fit for the same reasons as stated as to § 2(a).  The hardship prong is also satisfied because, as explained above, the States have alleged that § 4(a) places states at risk to lose millions of dollars of federal funding under HAVA.  D. 1 ¶¶ 107, 152.

Accordingly, the States' challenge to § 4(a) is justiciable.

2.      § 7(a)

"To achieve full compliance with the Federal laws that set the uniform day for appointing Presidential electors and electing members of Congress," Exec. Order No. 14248 § 7(a) provides:

> The Attorney General shall take all necessary action to enforce 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives.

Id.

Defendants argue that because the Attorney General has yet to take any enforcement actions, and the "Attorney General may enforce statutes 'consistent with applicable law,'" the States' challenge to 7(a) is based on an unsupported "presumption of bad-faith execution by the Government" that is speculative and thus fails to establish both standing and ripeness.  D. 109 at 11-13 (internal quotations omitted).  With respect to justiciability, pre-enforcement review of a

threatened government action is appropriate if the government's threat of enforcement is "sufficiently imminent." Susan B. Anthony List, 573 U.S. at 159; see Rhode Island Ass'n of Realtors, Inc. v. Whitehouse, 199 F.3d 26, 30 (1st Cir. 1999). The Ballot Receipt States (California, Nevada, Massachusetts, Arizona, Colorado, Hawaii, Illinois, Maryland, Michigan, New Jersey, New Mexico, New York and Rhode Island) have plausibly alleged that the new deadline for tabulating votes under the Executive Order conflicts with their state laws that "allow[] for the tabulation of timely cast ballots received or cured after Election Day," exposing them to a "substantial risk" of impending enforcement. D. 1 ¶¶ 110, 161; D. 113 at 12-14; see D. 107 at 25, 25 n.8 (citing state laws that conflict with § 7(a)). Defendants' insistence that the Attorney General can lawfully enforce § 7(a) "by, for example, sending letters to the Plaintiff States encouraging compliance with the President's interpretation of 2 U.S.C. § 7 and 3 U.S.C. § 1," D. 109 at 12, is unavailing, as "the government has not indicated that the Attorney General will cabin enforcement of § 7(a) merely to sending such letters," D. 107 at 26; D. 113 at 13. Here, "'[w]here threatened government action is concerned, a plaintiff is not required to expose himself to liability before bringing suit to challenge the basis for the threat.'" D. 107 at 26 (quoting MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 129 (2007) (emphasis omitted)). The Ballot Receipt States have alleged an injury sufficient to support standing and ripeness to challenge § 7(a).

Accordingly, the Ballot Receipt States' challenge to § 7(a) is justiciable.[5] Id. at 26-27.

---

[5] Although the complaint does not distinguish between Ballot Receipt States and non-Ballot Receipt States (Connecticut, Delaware, Maine, Minnesota, Vermont, and Wisconsin) as to the States' claim against § 7(a), see D. 1 ¶¶ 155-64, the States and the Executive Branch cabin their standing argument to the thirteen Ballot Receipt States, D. 113 at 12-14; D. 120 at 4. Thus, the Court's standing analysis of the States' challenge to § 7(a) is likewise cabined to the Ballot Receipt States. Accordingly, the Court also cabins its analysis of the sufficiency of the States' allegations as to their challenge against §§ 7(a) and 7(b), discussed below, to the Ballot Receipt States.

3.    *§ 2(d)*

§ 2(d) requires "[t]he head of each Federal voter registration executive department or agency" under Section 20506(a) of the NVRA to "assess citizenship prior to providing" the Federal Form to "enrollees of public assistance programs." Exec. Order No. 14248 § 2(d). Defendants contend that the States fail to allege standing because "section 2(d) does not apply to Plaintiffs." D. 109 at 9-10. Defendants argue that "[b]y its plain terms, Section 2(d) directs the 'head of each ***Federal voter registration executive department or agency*** . . . [to] assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs,'" id. (citing Exec. Order No. 14248 § 2(d) (emphasis in original)), and because the States "are neither federal departments or agencies nor enrollees of public assistance programs," the States' allegation that the section "'rais[es] the specter of commandeering Plaintiff State agencies and resources,'" is "definitionally speculative," id. at 10 (citing D. 1 ¶ 49(b)). In their reply, Defendants point the Court to 52 U.S.C. § 20506(a)(3)(ii) which provides that voter registration agencies designated by states pursuant to 52 U.S.C. § 20506(a)(2) "may include . . . Federal and nongovernmental offices." D. 120 at 5-6. In this refinement, Defendants concede that § 20506(a) implicates states, see id. at 5-6, but contend that § 2(d) applies only to the portion of § 20506(a) that refers to "'Federal voter registration *executive* department[s] or agenc[ies],'—i.e., those departments or agencies that are part of the federal Executive Branch," id. at 6 (citing Exec. Order No. 14248 § 2(d) (emphasis and alterations in original)); see 52 U.S.C. § 20506(a)(3)(ii); see also LULAC, 780 F. Supp. 3d at 161 n.9 (noting that although some federal offices serving as state-designated voter registration agencies provide public assistance, "they are distinct from 'offices in the State that provide public assistance' referred to elsewhere in the NVRA" which "are *State* offices") (citing 52 U.S.C. § 20506(a)(2)(A) (emphasis in original)).

In response, the States challenge Defendants' contention that § 2(d) applies only to federal agencies, noting that Section 20506(a) of the NVRA, "primarily concerns *state* voter registration agencies," and thus the States have properly alleged that § 2(d), which incorporates this provision, "attempts to commandeer their agencies and resources, conferring standing for this claim." D. 113 at 14 (emphasis in original). In response to Defendants' reply at oral argument, the States argued that § 2(d) is at best ambiguous as to its scope, thus favoring the conferral of standing to the States to challenge the provision.

"In contrast to the many established principles for interpreting legislation, there appear to be few such principles to apply in interpreting executive orders." City & Cnty. of San Francisco v. Trump, 897 F.3d 1225, 1238 (9th Cir. 2018). "However, one interpretive principle is clear . . . 'the interpretation of an Executive Order begins with its text,' which 'must be construed consistently with the Order's "object and policy."'" Id. (quoting Bassidji v. Goe, 413 F.3d 928, 934 (9th Cir. 2005) (quotation omitted). There is no dispute that § 2(d) incorporates the definition in Section 20506(a) of the NVRA. Exec. Order No. 14248 § 2(d) (citing 52 U.S.C. § 20506(a)). While "voter registration agencies," however, are defined under Section 20506(a), 52 U.S.C. § 20506(a)(2)-(3), the phrase "Federal voter registration executive department or agency," the term of phrase used in § 2(d), is not, see id., leaving some ambiguity over to which voter registration agencies § 2(d) applies. Under 52 U.S.C. § 20506(a), "federal voter registration agencies include 'all offices in the State that provide public assistance' and 'all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities.'" D. 107 at 24 (quoting 52 U.S.C. § 20506(a)(2)-(3)). Additionally, states must designate "other offices" as voter registration agencies, 52 U.S.C. § 20506(a)(3)(A), and have the discretion to include "Federal and nongovernmental offices, with the agreement of such offices" as voter

registration agencies under this requirement, id. § 20506(a)(3)(B)(ii).  Thus, Section 20506(a) implicates both state offices, by mandating that certain state offices serve as voter registration agencies, and federal offices, by permitting federal offices to serve as state-designated voter registration agencies if a state so designates them and the federal offices so agree.

Defendants do not contend that 52 U.S.C. § 20506(a)'s definition of voter registration agencies does not include state offices.  See D. 109 at 9-10; D. 120 at 5-6.  Instead, Defendants urge the Court to read the word "executive" within § 2(d)'s phrase "Federal voter registration executive department or agency" to narrow the definition of voter registration agencies to refer only to the federal offices under subsection 52 U.S.C. § 20506(a)(3)(B)(ii), and not the state offices listed under Section 20506(a).  D. 120 at 6.  However, as the States' allegations suggest, see D. 1 ¶¶ 9, 49(b), 92, this reading is not plain from § 2(d) text.  Indeed, Defendants' reading of § 2(d) assumes that the insertion of the word "executive" between "federal voter registration" and "department or agency" is sufficient to narrow the definition of voter registration agencies under Section 20506(a), which mandates that voter registration agencies include certain state offices, 52 U.S.C. § 20506(a)(2), and only permits state-designated voter registration agencies to be federal offices under certain conditions, 52 U.S.C. § 20506(a)(3)(B)(ii).  Even if this were so, this reading also hinges on other considerations, i.e., whether the word "executive" as employed under § 2(d) modifies both "department" and "agency" in the phrase "Federal voter registration executive department or agency," a matter of construction for which different courts have taken different approaches, see Karmely v. Wertheimer, 737 F.3d 197, 205 (2d Cir. 2013), and without which § 2(d) can reasonably be read to apply to both federal and state offices.[6]  But even assuming,

---

[6] The DC Court's standing discussion of § 2(d) in LULAC focused on § 2(d)'s limitation to "eligible voters' access to the Federal Form at federal offices," LULAC, 780 F. Supp. 3d at 207; see id. at 207-12, where it faced the issue of whether private plaintiffs had standing to request an

*arguendo*, without deciding, that Defendants' reading of § 2(d) is reasonable, it is equally reasonable to read § 2(d) to encompass all voter registration agencies defined under Section 20506(a), including, namely, "all offices in the State that provide public assistance." 52 U.S.C. § 20506(a)(2)(B); Exec. Order No. 14248 § 2(d). This is particularly so as § 2(d) cites and incorporates Section 20506(a) in full to define voter registration agencies, without any focus on the lone subsection permitting, but not requiring, federal offices to serve as state-designated voter registration agencies, Exec. Order No. 14248 § 2(d), Section 20506(a) "primarily concerns *state* voter registration agencies," D. 113 at 14 (emphasis in original); 52 U.S.C. § 20506(a), and the objectives of the Executive Order include addressing "States['] fail[ure] adequately to vet voters' citizenship," Exec. Order No. 14248 § 1; see City & Cnty. of San Francisco, 897 F.3d at 1238.

Without any further insight into § 2(d)'s scope, see Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 665 F. Supp. 31, 34 (D.D.C. 1987), rev'd on other grounds, 870 F.2d 723 (D.C. Cir. 1989), the Court declines to decide as a matter of law at this juncture that § 2(d) does not apply to states. At this stage, and for purposes of the States' standing to challenge § 2(d), the ambiguity over whether § 2(d) applies to state agencies favors conferring the States standing to challenge § 2(d). See Brown v. Kemp, 86 F.4th 745, 765-66 (7th Cir. 2023) (citing Majors v. Abell, 317 F.3d 719, 721 (7th Cir. 2003) (reversing dismissal for lack of standing where statute was unclear as to whom it applies); California Pro-Life Council, Inc. v. Getman, 328 F.3d 1088, 1094-95 (9th Cir. 2003) (reversing dismissal of pre-enforcement challenge for lack of standing where plaintiff

---

injunction against the "four specific federal agencies" named as defendants in that suit, id. at 206, not the issue of whether § 2(d) applies to states. Further, the DC Court did not suggest that § 2(d) does not also apply to the state offices defined under 52 U.S.C. § 20506(a). See id. at 222 (noting that "Section 2(d) purports to require the head of each federal voter registration agency within the meaning of the NVRA to 'assess citizenship prior to providing' the Federal Form to 'enrollees of public assistance programs'") (quoting Exec. Order No. 14248 § 2(d)).

reasonably believed statute could and would be enforced against it)).  Thus, the Court assumes, *arguendo*, without deciding, that § 2(d) applies to states and concludes that the States' challenge to § 2(d) is justiciable.  The States have alleged concrete and imminent harms resulting from the implementation of § 2(d), including the additional burdens § 2(d) places on "State and local offices serving low-income and disabled residents."  D. 1 ¶ 9; see id. ¶¶ 13, 105.  As such, the States have pled an injury in fact.  The States' challenge to § 2(d) is also ripe for judicial review because, as the DC Court noted, § 2(d) purports to direct the head of voter registration agencies "to begin implementing its provisions immediately."  LULAC, 780 F. Supp. 3d at 207.  The hardship prong is also satisfied because, as explained above, the States have alleged that compliance with § 2(d) would result in "administrative burdens." D. 1 ¶ 9.

Accordingly, the States' challenge to § 2(d) is justiciable.

For the aforementioned reasons, Defendants' Rule 12(b)(1) motion to dismiss the States' challenges against §§ 2(a), 2(d), 3(d), 4(a) and 7(a) is DENIED.

## B.    Cause of Action

The States bring nonstatutory causes of action to support their *ultra vires* claims against the Challenged Provisions.  D. 1 ¶¶ 113-83.  Defendants contend that "[n]onstatutory review is inappropriate here" because the States can challenge provisions of the Executive Order under the Administrative Procedure Act ("APA").  D. 109 at 13-14.  "The basic premise behind nonstatutory review is that, even after the passage of the APA, some residuum of power remains with the district court to review agency action that is *ultra vires*."  Commonwealth of Puerto Rico v. United States, 490 F.3d 50, 59 (1st Cir. 2007) (quoting Rhode Island Dep't of Env't Mgmt. v. United States, 304 F.3d 31, 42 (1st Cir. 2002) (citation omitted)).  "To act *ultra vires* a government official is either acting in a way that is impermissible under the Constitution or acting outside of the confines of his

statutory authority." New York v. McMahon, No. 25-cv-10601-MJJ, 2025 WL 1463009, at *23 (D. Mass. May 22, 2025) (quotation omitted). "[I]f 'a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still be able to institute a non-statutory review action.'" Chamber of Commerce v. Reich, 74 F.3d 1322, 1327 (D.C. Cir. 1996). "The nonstatutory review action finds its jurisdictional toehold in the general grant of federal-question jurisdiction of 28 U.S.C. § 1331." Rhode Island Dep't of Env't Mgmt., 304 F.3d at 42.

The States may bring nonstatutory causes of action against the Challenged Provisions. As the DC Court in LULAC recognized, "plaintiffs 'are entitled to bring a non-statutory cause of action questioning the legality of [an] Executive Order.'" LULAC, 780 F. Supp. 3d at 172 (quoting Reich, 74 F.3d at 1327); see New York, 2025 WL 1463009, at *23 (noting that "[a] claim alleging that the President acted in excess of his statutory authority is judicially reviewable even absent an applicable statutory review provision") (quoting Am. Forest Res. Council v. United States, 77 F.4th 787, 796 (D.C. Cir. 2023)). In that case, as with this case, nonstatutory review of the Executive Order was appropriate "because 'the President is not an agency within the meaning of' the APA," thus "his issuance of an executive order is not a final agency action" and "[a]s a consequence, the APA does not supply a cause of action to challenge an executive order." LULAC, 780 F. Supp. 3d at 171 (quoting Franklin v. Massachusetts, 505 U.S. 788, 796 (1992)). Instead, "when the President has issued an unlawful order, 'the proper course is to seek to enjoin a member of the executive branch from carrying out the executive order at issue'" as "courts have power to compel subordinate executive officials to disobey illegal Presidential commands," id. at 173 (internal quotations omitted), which American courts have used through our nation's history to "review[], construe[], and revise[] executive orders," id. at 172 (collecting cases); D. 113 at 15

(citing <u>Reich</u>, 74 F.3d at 1328 (noting that "it is now well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive'"); <u>Murphy Co. v. Biden</u>, 65 F.4th 1122, 1128-31 (9th Cir. 2023); <u>PFLAG, Inc. v. Trump</u>, 769 F. Supp. 3d 405, 427 (D. Md. 2025)).   Accordingly, non-statutory *ultra vires* challenges against the Executive Order are valid causes of action.   <u>LULAC</u>, 780 F. Supp. 3d at 171-73; <u>see</u> D. 107 at 16-20, 21-25, 27-33.

Defendants' reference to <u>Nuclear Regul. Comm'n v. Texas</u>, 605 U.S. 665 (2025) does not disturb this conclusion.   Defendants contend that <u>Nuclear Regul. Comm'n</u> "reiterated that ultra vires review is unavailable 'if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review, or if a statutory review scheme forecloses all other forms of judicial review.'"   D. 120 at 7 (quoting <u>Nuclear Regul. Comm'n</u>, 605 U.S. at 681 (internal citation and quotation marks omitted); <u>Am. Foreign Serv. Ass'n v. Trump</u>, No. 25-5184, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) (noting same)). However, this "reiterat[ion]," <u>id.</u>, does not alter the non-statutory review standard, and, as explained above, the APA does not provide a cause of action to challenge an executive order, thus the States lack a meaningful and adequate opportunity for judicial review of the Executive Order under the APA.   Defendants' analogy to <u>Commonwealth of Puerto Rico</u>, D. 109 at 14, is likewise unavailing.   In <u>Commonwealth of Puerto Rico</u>, Puerto Rico asserted a nonstatutory claim against the FBI to obtain information related to a criminal investigation.   <u>Commonwealth of Puerto Rico</u>, 490 F.3d at 56.   There, Puerto Rico's claim presented a "conflict" for which "Congress had provided a mechanism—the APA–" to resolve, and that mechanism was not "constitutionally insufficient" such that "Puerto Rico must have a nonstatutory cause of action to vindicate its law enforcement interests."   <u>Id.</u> at 59-60.   Here, however, the APA falls short of providing a mechanism

to challenge the Executive Order, and as such "an equitable action may go forward." LULAC, 780 F. Supp. 3d at 171-72. Accordingly, the States may proceed with their nonstatutory causes of action to challenge the Executive Order.

## C.    Sufficiency of Allegations

A defendant may move to dismiss an action arguing that it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The Court must determine if the facts alleged "plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted). To decide a Rule 12(b)(6) motion to dismiss, the Court must, reading the complaint "as a whole," conduct a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein. Id. Factual allegations must be accepted as true, while conclusory legal allegations are not entitled credit. Id. Second, the Court must "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." Schatz, 669 F.3d at 55. If they do not, then dismissal is warranted. See Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011). The Court confines itself to and accepts as true all well-pleaded facts in the complaint, save for considering "documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011).

Defendants here also have moved to dismiss the States' claims against the Challenged Provisions under Rule 12(b)(6). D. 109 at 13-34. As against §§ 2(a), 2(d), 3(d), 7(a), and 7(b), Defendants again raise substantially similar arguments as those advanced in their opposition to the States' preliminary injunction motion. D. 91 at 10-24. As explained fully in the Court's

preliminary injunction ruling, which the Court incorporates here, D. 107 at 16-20, 21-25, 27-33, these arguments are unpersuasive.  Moreover, the Court has concluded that the States have a likelihood of success on the merits of their claims challenging §§ 2(a), 2(d), 3(d), 7(a), and 7(b), id., establishing that these claims satisfy a standard higher than that needed to state a claim at the motion to dismiss stage, Hasan v. Educ. Comm'n for Foreign Med. Graduates, No. 24-CV-10438-DJC, 2024 WL 5008882, at *3 (D. Mass. Dec. 6, 2024) (noting that "[t]he standard for showing a likelihood of success on the merits is higher than the plausibility standard for a claim to survive a Rule 12(b)(6) motion to dismiss") (citing Ayoub v. CitiMortgage, Inc., No. 15-cv-13218-ADB, 2018 WL 1318919, at *8 (D. Mass. Mar. 14, 2018)).  Accordingly, Defendants' arguments that the States fail to state a claim as to their challenges against §§ 2(a), 2(d), 3(d), 7(a), and 7(b) are unavailing.  The States also plausibly allege their claim against § 4(a).

       *1.*     *§ 2(a)*

In their § 2(a) challenge, the States allege that § 2(a) is *ultra vires* and violates the separation of powers by dictating EAC policy in a manner inconsistent with congressional approval. D. 1 ¶¶ 113-23.  Further, the States, except Arizona, allege that § 2(a) violates the NVRA by instructing the EAC to amend the Federal Form to require documentary proof of citizenship and by requiring state and local election officials to implement said requirements.  Id. ¶¶ 124-35. Defendants move to dismiss on the grounds that:  (1) the President has constitutional authority to direct the EAC to prescribe regulations and (2) § 2(a) is consistent with the NVRA.  D. 109 at 14-19.  As previously explained, D. 107 at 16-20, both arguments fail.

The States have plausibly alleged that § 2(a) is inconsistent with the Constitution as § 2(a) "'purports to require the EAC to amend the Federal Form' and precisely dictates what should be included, but 'neither the Constitution nor the NVRA grants the President the authority to direct

the EAC to change the content of the Federal Form.'" Id. at 16 (quoting LULAC, 780 F. Supp. 3d at 185, 194). Contrary to Defendants' contention, D. 109 at 15-17, "only Congress has the power to adjust state election rules" which it has done "through its enactment of the NVRA, which . . . includes a mandatory procedure requiring States to 'accept and use' the Federal Form," D. 107 at 16 (citing U.S. Const. art. I, § 4, cl. 1; 52 U.S.C. § 20505(a)(1)). The argument that "[t]he EAC exercises Executive power when it carries out these duties and is therefore subject to the administrative control of the President," D. 109 at 15-16, "'is untethered from precedent and unsupported by even a maximalist view of "the executive Power" under our Constitution,'" D. 107 at 18 (quoting LULAC, 780 F. Supp. 3d at 198 (citing U.S. Const. art. II, § 1, cl. 1)). "While the Vesting Clause grants the President some supervisory authority over subordinate executive officials, that authority is not absolute and restrictions upon that authority that do 'not unduly interfere with the functioning of the Executive Branch' are upheld." Id. (quoting Seila L. LLC v. Consumer Fin. Prot. Bureau, 591 U.S. 197, 217 (2020)). "Here, where 'the President has no constitutional duty to prescribe the content of election regulations,' the mandate of the Executive Order to the EAC, a bipartisan and independent entity, is such an undue interference." Id. (citing LULAC, 780 F. Supp. 3d at 198).

The States have also plausibly alleged that § 2(a) is inconsistent with the NVRA. Under 52 U.S.C. § 20508(b)(1), the Federal Form "may require only such" information "as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." "The NVRA mandates a specific procedure to determine what information is necessary for the Federal Form, requiring that the agency responsible for maintaining it set that content 'in consultation with the chief election officers of the States" and through notice and comment rulemaking.'" D. 107 at 16-17 (citing 52

22

U.S.C. 17 § 20508(a)(1)-(2)).  § 2(a)'s directive flouts this procedure, id., as well as HAVA's procedures for the EAC to revise the Federal Form, id. at 17 (citing 52 U.S.C. §§ 20921-20923, 20928), and § 2(a)'s "instruction to add a documentary proof of citizenship requirement to the Federal Form conflicts with the will of Congress, rendering the President's power 'at its lowest ebb,'" id. at 19 (citing Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)).  Additionally, the Executive Order's saving clause, see Exec. Order No. 14248 § 11(b) (providing that "[t]his order shall be implemented consistent with applicable law and subject to the availability of appropriations"), cannot shield § 2(a) from review because § 2(a) "unambiguously requires the EAC to implement a documentary proof of citizenship requirement as part of the Federal Form."  D. 107 at 19-20 (citing City & Cnty. of San Francisco, 897 F.3d at 1240; LULAC, 780 F. Supp. 3d at 186 (concluding same)).

Accordingly, for the reasons stated above (and incorporated herein, id. at 16-20), the States plausibly allege this claim.

### 2.    § 3(d)

In their § 3(d) challenge, the States allege that § 3(d) is *ultra vires* and violates the separation of powers because it attempts to alter federal statutes by directing the Secretary of Defense to include documentary proof of citizenship or proof of eligibility to vote requirements for the Federal Post Card Application that are not mandated under UOCAVA.  D. 1 ¶¶ 136-44. Defendants move to dismiss on the grounds that:  (1) the President had constitutional authority to direct the Secretary of Defense to update the Federal Post Card Application and (2) § 3(d) is consistent with UOCAVA.  D. 109 at 19-22.  As explained fully, D. 107 at 21-24, both arguments fail.  "[N]either the Constitution nor any statute grants the President the authority to enact § 3(d), and its mandate appears to be in conflict with the will of Congress, which is duly authorized to act

in this area, and has acted through its enactment of the UOCAVA." Id. at 23; D. 1 ¶¶ 139-41. By passing UOCAVA, an act "to protect the voting rights of military members, their families, and other United States citizens living overseas," United States v. Alabama, 998 F. Supp. 2d 1283, 1286 (M.D. Ala. 2014), aff'd, 778 F.3d 926 (11th Cir. 2015), "and later by strengthening its protections, Congress unequivocally committed to eliminating procedural roadblocks, which historically prevented thousands of service members from sharing in the most basic of democratic rights," United States v. Alabama, 778 F.3d 926, 928 (11th Cir. 2015). Thus, the States plausibly allege that § 3(d), which adds requirements to those mandated under UOCAVA, is *ultra vires* and violates the separation of powers, D. 1 ¶¶ 140-41, and, as the Court previously has concluded, D. 107 at 23-24, § 3(d) cannot be interpreted through the lens of the saving clause.

Accordingly, for the reasons stated above (and incorporated herein, id. at 21-24), the States plausibly allege this claim.

### 3. § 7(a)

In their § 7(a) challenge, the Ballot Receipt States allege that directing the Attorney General to enforce the President's interpretation of Election Day vote tabulation requirements alters enacted federal statutes and exceeds the President's Article II powers. D. 1 ¶¶ 155-64. Defendants move to dismiss on the grounds that: (1) § 7(a) does not alter existing federal statutes and (2) the President may lawfully interpret the Election Day statutes for the Executive Branch under his take-care authority. D. 109 at 23-29. As this Court has addressed, D. 107 at 27-30, these arguments fail.

First, the Ballot Receipt States plausibly allege that § 7(a) alters existing federal statutes. "[T]he text of the Election Day statutes require[s] only that all votes are cast by Election Day, not that they are received by that date," id. at 28 (citing 2 U.S.C. § 7; 3 U.S.C. §§ 1, 21(1); Bost v.

Illinois State Bd. of Elections, 684 F. Supp. 3d 720, 736 (N.D. Ill. 2023), aff'd on other grounds, 114 F.4th 634 (7th Cir. 2024); Donald J. Trump for President, Inc. v. Way, 492 F. Supp. 3d 354, 372 (D.N.J. 2020), and the Court has already addressed at length and rejected Defendants' reliance on the reading of same in Republican Nat'l Comm. v. Wetzel, 120 F.4th 200 (5th Cir. 2024), id. at 27-28; see D. 113 at 17. The logic behind the requirement only that all votes are cast by Election Day "is simple: states that allow ballots received after Election Day to be counted still require that all votes are cast by Election Day, meaning a candidate's 'electoral fate is sealed at midnight on Election Day, regardless of the resources he expends after the fact.'" D. 107 at 28 (quoting Bost, 684 F. Supp. 3d at 733-34). Moreover, the Election Day statutes do not appear to authorize § 7(a)'s enforcement provision, as "the statutes do not define any criminal offenses," "the Executive Branch cites no statute criminalizing the counting of ballots in accordance with a state's ballot-receipt deadlines" and "the Election Day statutes, unlike other election-related statutes, do not include provisions allowing [for civil enforcement actions]." Id. at 30 (citing LULAC, 780 F. Supp. 3d at 213 & n.65).

Second, the Ballot Receipt States also plausibly allege that § 7(a)'s tabulation and enforcement provisions interfere with these federal election statutes as well as the Ballot Receipt States' "laws allowing for votes validly cast by Election Day but received after that date to be counted." D. 1 ¶¶ 158-59. "Congress has not endorsed the Executive Branch's present interpretation of Election Day statutes even as Congress 'has amended other aspects of federal election administration within the last few years.'" D. 107 at 28 (citing Bost, 684 F. Supp. 3d at 736). "While 'congressional silence, no matter how "clanging," cannot override the words of the statute,'" id. at 29 (quoting Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 495 n. 13 (1985)),

here, where the Executive Branch's interpretation of the Election Day statutes is not reflective of their plain text, such silence is notable," id.

Accordingly, for the reasons stated above (and incorporated herein, id. at 27-30), the Ballot Receipt States plausibly allege this claim.

> *4.      § 7(b)*

§ 7(b) of the Executive Order provides:

> Consistent with 52 U.S.C. [§] 21001(b) and other applicable law, the Election Assistance Commission shall condition any available funding to a State on that State's compliance with the requirement in 52 U.S.C. [§] 21081(a)(6) that each State adopt uniform and nondiscriminatory standards within that State that define what constitutes a vote and what will be counted as a vote, including that, as prescribed in 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1, there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting, excluding ballots cast in accordance with 52 U.S.C. [§] 20301 *et seq.*, after which no additional votes may be cast.

Exec. Order No. 14248 § 7(b).

In their challenge to § 7(b), the States allege that § 7(b) is *ultra vires* because it conditions required federal funding on states' compliance with the ballot receipt deadline articulated in § 7(a). D. 1 ¶¶ 165-75.  Defendants move to dismiss on the ground that § 7(b) permissibly conditions funding on the adoption of nondiscriminatory standards.  D. 109 at 29-31.  As previously explained, D. 107 at 31-33, these arguments fail.  The States plausibly allege their challenge against § 7(b).  The First Circuit has recognized that "an agency acts *ultra vires* if it attaches conditions to formula grants that are unauthorized by statute."  Id. at 31 (citing City of Providence v. Barr, 954 F.3d 23, 45 (1st Cir. 2020)).  Here, "HAVA does not allow the EAC to condition states' funding upon their ballot receipt deadlines."  Id. at 32; see D. 1 ¶ 170; 52 U.S.C. § 21001(a); LULAC, 780 F. Supp. 3d at 164 (citing H.R. Rep. No. 107-730, at 71 (2002) (Conf. Rep.).  As both the DC Court and this Court have concluded, 52 U.S.C. § 21081(a)(6)'s requirement that

"[e]ach State shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State," 52 U.S.C. § 21081(a)(6); see 52 U.S.C. § 21003, does not support § 7(a) or § 7(b) because "'the reference to "uniform and nondiscriminatory standards" appears to refer to uniformity within each State, not among the several States.'"  D. 107 at 32 (citing LULAC, 780 F. Supp. 3d at 214-15). "In short, while the Defendants assert here that 'Congress itself' set its condition upon funding through § 21081(a)(6) 'as well as [through] the Election Day statutes,' those statutes do not support this contention, just as they do not empower the EAC to add additional conditions to funding," and the saving clause provides no shield from review.  Id. at 32-33 (internal citations omitted).

Accordingly, for the reasons stated above (and incorporated herein, D. 107 at 31-33), the States plausibly allege this claim.

### 5.    § 4(a)

In their challenge to § 4(a), the States allege that § 4(a) is *ultra vires* and violates the separation of powers by dictating EAC policy and unlawfully withholding federal funding from states unless they comply with the documentary proof of citizenship requirements under the Executive Order.  D. 1 ¶¶ 145-54.  Defendants move to dismiss on the ground that § 4(a) permissibly conditions funding on a state's compliance with HAVA.  D. 109 at 22-23.  Under 52 U.S.C. § 21003(a), the state's chief executive officer or designee must "certify[] that the State is in compliance with the requirements referred to in subsection (b)," which include "compliance with each of the laws described in section 21145," see 52 U.S.C. § 21003(b)(3), to be "eligible to receive a requirements payment," id. § 21003(a).  The laws with which states must certify compliance are (1) the Voting Rights Act of 1965, 52 U.S.C. § 10301 *et seq.*; (2) the Voting Accessibility for the Elderly and Handicapped Act, 52 U.S.C. § 20101 *et seq.*; (3) the UOCAVA,

52 U.S.C. § 20301 *et seq.*; (4) the NVRA; (5) the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*; and (6) the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* 52 U.S.C. § 21145(a). 52 U.S.C. § 21145(a). "States are not required to certify their compliance with any other law." LULAC, 780 F. Supp. 3d at 165.

The States have plausibly alleged their challenge against § 4(a). Defendants' argument that § 4(a) "only parrots the NVRA's requirement" by conditioning federal funding on states' acceptance and use of the Federal Form, D. 109 at 23, ignores the language of § 4(a) which adds to this condition "any requirement for documentary proof of United States citizenship adopted pursuant to section 2(a)(ii) of this order," Exec. Order No. 14248 § 4(a). As explained above, the States have plausibly alleged that a documentary proof of citizenship requirement is inconsistent with the NVRA. Further, as explained above, HAVA does not allow the EAC to condition states' funding upon their requirement of documentary proof of citizenship in their registration form. D. 1 ¶ 150. Thus, like § 7(b), see D. 107 at 31-32, § 4(a) also "appears to be in tension with HAVA," LULAC, 780 F. Supp. 3d at 215 (citing 52 U.S.C. §§ 21001–21003), as it purports to condition required federal funding on state's compliance with a documentary proof of citizenship requirement, which is not authorized by statute, see City of Providence, 954 F.3d at 45. And as § 2(a) "unambiguously requires the EAC to implement a documentary proof of citizenship requirement as part of the Federal Form," D. 107 at 20, § 4(a), which requires the EAC to condition statutorily mandated federal funding on states' compliance with § 2(a), cannot be interpreted through the lens of the saving clause, see City & Cnty. of San Francisco, 897 F.3d at 1240.

Accordingly, the States plausibly allege a claim as to § 4(a).

6.      *§ 2(d)*

In their § 2(d) challenge, the States allege that § 2(d) is *ultra vires* because it commandeers state and local voter registration agencies "in violation of fundamental State sovereignty" by requiring them to assess citizenship prior to providing the Federal Form.  D. 1 ¶ 49(b); see id. ¶¶ 9, 92.  Defendants move to dismiss on the ground that § 2(d) does not "violate state sovereignty because the Elections Clause expressly authorizes the federal government to override states' choices regarding the 'Times, Places and Manner' of federal elections."  D. 109 at 31-34.  Under the NVRA, voter registration agencies are required to distribute the Federal Form or an "equivalent" state form for voter registration, 52 U.S.C. § 20506(a)(1), (a)(4), (a)(6), but not to complete a pre-assessment of citizenship before doing so.  See D. 107 at 24.  As explained as to § 2(a), Defendants' argument that "the President acted within his authority," when directing the EAC to take action pursuant to § 2(d), D. 109 at 33, is unavailing.  "Neither the Constitution nor the NVRA . . . affords the President the power to conscript states . . . to carry out his Executive Order mandates, or to direct the outcome of the EAC's processes."  D. 107 at 24.  As "the President, therefore, has no authority to command agencies to 'assess citizenship prior to providing' the Federal Form to 'enrollees of public assistance programs,'" the States have plausibly alleged their challenge against § 2(d).  Id. at 25.  Additionally, "§ 2(d) cannot be more narrowly interpreted through the lens of the saving clause because its mandate to voter registration agencies to assess citizenship prior to providing the Federal Form is clear."  Id.

Accordingly, for the reasons stated above (and incorporated herein, id. at 24-25), the States plausibly allege this claim.

## V.    Conclusion

For the foregoing reasons, the Court DENIES the Executive Branch's motion to dismiss,

D. 109, under Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6).

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge
