## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA, *et al.*,

                          *Plaintiffs*,

      v.

DONALD J. TRUMP, *in his official capacity as President of the United States*, *et al.*,

                          *Defendants*.

Case No. 1:25-cv-10810 (DJC)

## <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT THEREOF</u>

BRETT A. SHUMATE
Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

JOSEPH E. BORSON
Assistant Director
Civil Division, Federal Programs Branch

/s/ *Marianne F. Kies*
MARIANNE F. KIES
CHRISTIAN DIBBLEE
Trial Attorneys
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005

NICOLE M. O'CONNOR
Assistant U.S. Attorney
U.S. Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
*Attorneys for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 1

LEGAL STANDARD ...................................................................................................... 4

ARGUMENT ................................................................................................................. 5

I.  Plaintiffs' Claims Are Not Justiciable. .................................................................. 5

    A. Section 2(a) ....................................................................................................... 7

    B. Section 3(d) ..................................................................................................... 10

    C. Section 4(a) ..................................................................................................... 11

    D. Section 7(a) ..................................................................................................... 11

II.  Plaintiffs Lack a Cause of Action. ..................................................................... 13

III.  Section 2(a) Is Not *Ultra Vires* ....................................................................... 15

    A. Section 2(a) does not violate the Constitution. .............................................. 15

    B. Section 2(a) does not violate the NVRA ....................................................... 17

IV.  Section 3(d) Is Not *Ultra Vires*. ..................................................................... 20

V.  Section 4(a) Is Not *Ultra Vires* ....................................................................... 23

VI.  Section 7(a) Is Not *Ultra Vires* ...................................................................... 24

VII. Section 7(b) Is Not *Ultra Vires*. ..................................................................... 30

VIII.The Challenged Sections Do Not Violate State Sovereignty ................................. 32

IX.  At a Minimum, the Court Should Reserve Ruling on the Pending Motions Until the First Circuit Resolves Defendants' Appeal of the Preliminary Injunction .................................... 35

CONCLUSION ............................................................................................................. 35

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(a)(2) ......................................... 37

CERTIFICATE OF SERVICE ......................................................................................... 38

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Lab'ys v. Gardner,*
 387 U.S. 136 (1967) ............................................................................................ 6

*Akebia Therapeutics, Inc. v. Azar,*
 2020 WL 5732331 (D. Mass. Sep. 24, 2020) ..................................................... 35

*Alt. Sys. Concepts, Inc. v. Synopsys, Inc.,*
 374 F.3d 23 (1st Cir. 2004) ................................................................................. 9

*Ameron, Inc. v. U.S. Army Corps of Eng'rs,*
 809 F.2d 979 (3d Cir. 1986) ............................................................................... 25

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242 (1986) ............................................................................................ 4

*Arizona v. Inter Tribal Council of Ariz., Inc.,*
 570 U.S. 1 (2013) ........................................................................................ *passim*

*Ass'n of Cmty. Orgs. for Reform Now v. Miller,*
 129 F.3d 833 (6th Cir. 1997) .............................................................................. 33

*Azar v. Allina Health Servs.,*
 587 U.S. 566 (2019) ............................................................................................ 31

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh,*
 295 F.3d 28 (D.C. Cir. 2002) ...................................................................... 12, 15

*Blum v. Holder,*
 744 F.3d 790 (1st Cir. 2014) ......................................................................... 6, 13

*Borges ex rel. S.M.B.W. v. Serrano–Isern,*
 605 F.3d 1 (1st Cir. 2010) ................................................................................... 5

*Bost v. Ill. State Bd. of Elections,*
 684 F. Supp. 3d 720 (N.D. Ill. 2023) ................................................................. 29

*Bowsher v. Synar,*
 478 U.S. 714 (1986) ............................................................................................ 25

*Brnovich v. Democratic Nat'l Comm.,*
 594 U.S. 647 (2021) ............................................................................................ 27

*Bruesewitz v. Wyeth LLC*,
   562 U.S. 223 (2011) ........................................................................... 19

*Bush v. Gore*,
   531 U.S. 98 (2000) ............................................................................. 28

*Carmona v. Toledo*,
   215 F.3d 124 (1st Cir. 2000) ............................................................... 4

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................. 4

*City of Arlington v. FCC*,
   569 U.S. 290 (2013) ..................................................................... 16, 17

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ....................................................................... 5, 13

*Commonwealth of Puerto Rico v. United States*,
   490 F.3d 50 (1st Cir. 2007) ........................................................... 13, 14

*Dobbs v. Jackson Women's Health Org.*,
   597 U.S. 215 (2022) ........................................................................... 28

*Donald J. Trump for President, Inc. v. Way*,
   492 F. Supp. 3d 354 (D.N.J. 2020) ..................................................... 29

*Dow v. United Bhd. of Carpenters & Joiners of Am.*,
   1 F.3d 56 (1st Cir. 1993) ................................................................. 1, 5

*Ernst & Young v. Depositors Econ. Prot. Corp.*,
   45 F.3d 530 (1st Cir. 1995) ........................................................ *passim*

*Foster v. Love*,
   522 U.S. 67 (1997) ..................................................................... *passim*

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ........................................................................... 14

*Gonzalez v. Arizona*,
   677 F.3d 383 (9th Cir. 2012) ....................................................... 32, 33

*Huggins v. Isenbarger*,
   798 F.2d 203 (7th Cir. 1986) ............................................................. 25

*Igartua de la Rosa v. United States*,
   842 F. Supp. 607 (D.P.R. 1994) ......................................................... 20

*Inmates of Suffolk Cnty. Jail v. Sheriff of Suffolk Cnty.*,
    952 F. Supp. 869 (D. Mass. 1997) ......................................................................... 19

*In re Murray Energy Corp.*,
    788 F.3d 330 (D.C. Cir. 2015) ................................................................................ 8

*Int'l Longshoremen's & Warehousemen's Union, Loc. 37 v. Boyd*,
    347 U.S. 222 (1954) ................................................................................................ 9

*Kelley v. Patrick*,
    2014 WL 2208278 (D. Mass. May 26, 2014) ......................................................... 35

*King v. St. Vincent's Hospital*,
    502 U.S. 215 (1991) .............................................................................................. 19

*Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healy*,
    844 F.3d 318 (1st Cir. 2016) ................................................................................. 10

*Landis v. N. Am. Co.*,
    299 U.S. 248 (1936) .............................................................................................. 35

*League of United Latin Am. Citizens v. Exec. Office of the President*,
    780 F. Supp. 3d 135 (D.D.C. 2025) .............................................................. *passim*

*League of United Latin Am. Citizens v. Exec. Office of the President*,
    --- F. Supp. 3d ---, 2025 WL 3042704 (D.D.C. Oct. 31, 2025) ............................... 8

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ....................................................................... 1, 18, 24

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................................ 5

*Marquis v. FDIC*,
    965 F.2d 1148 (1st Cir. 1992) ............................................................................... 35

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007) .............................................................................................. 13

*Miccosukee Tribe of Indians of Fla. v. S. Fla. Water Mgmt. Dist.*,
    559 F.3d 1191 (11th Cir. 2009) ............................................................................. 35

*Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*,
    385 F.3d 72 (1st Cir. 2004) .................................................................................. 35

*Murthy v. Missouri*,
    603 U.S. 43 (2024) .................................................................................................. 6

iv

*Myers v. United States*,
    272 U.S. 52 (1926) .......................................................................... 15

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022) ............................................................... 28, 31, 32

*Nuclear Regul. Comm'n v. Texas*,
    605 U.S. 665 (2025) ................................................................ 13, 14

*Nulankeyutmonen Nkihtaqmikon v. Impson*,
    503 F.3d 18 (1st Cir. 2007) ............................................................. 6

*Rapanos v. United States*,
    547 U.S. 715 (2006) ....................................................................... 29

*Reddy v. Foster*,
    845 F.3d 493 (1st Cir. 2017) ......................................................... 13

*Republican Nat'l Comm. v. Wetzel*,
    120 F.4th 200 (5th Cir. 2024) ................................................ *passim*

*Sánchez v. Alvarado*,
    101 F.3d 223 (1st Cir. 1996) ........................................................... 4

*Santiago–Ramos v. Centennial P.R. Wireless Corp.*,
    217 F.3d 46 (1st Cir. 2000) ............................................................. 4

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985) ....................................................................... 29

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020) ................................................................ 16, 34

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ......................................................................... 5

*Stromberg Metal Works, Inc. v. Press Mech., Inc.*,
    77 F.3d 928 (7th Cir. 1996) ........................................................... 19

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ......................................................................... 5

*Synar v. United States*,
    626 F. Supp. 1374 (D.D.C. 1986) .................................................. 25

*Tenn. Conf. of NAACP v. Lee*,
    139 F.4th 557 (6th Cir. 2025) ....................................................... 24

*Texas v. EEOC*,
   933 F.3d 433 (5th Cir. 2019) ..................................................................... 8

*Texas v. United States*,
   523 U.S. 296 (1998) ..................................................................... *passim*

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ..................................................................... 6, 11

*Trump v. New York*,
   592 U.S. 125 (2020) ..................................................................... 12

*Trump v. United States*,
   603 U.S. 593 (2024) ..................................................................... 12

*Trump v. Wilcox*,
   145 S. Ct. 1415 (2025) ..................................................................... 16

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016) ..................................................................... 6

*U.S. Term Limits, Inc. v. Thornton*,
   514 U.S. 779 (1995) ..................................................................... 33

*United States v. Alabama*,
   778 F.3d 926 (11th Cir. 2015) ..................................................................... 2, 21

*United States v. Alabama*,
   998 F. Supp. 2d 1283 (M.D. Ala. 2014) ..................................................................... 21

*United States v. Texas*,
   599 U.S. 670 (2023) ..................................................................... 11, 12

*Voting Integrity Project, Inc. v. Keisling*,
   259 F.3d 1169 (9th Cir. 2001) ..................................................................... 29

*Wash. State Grange v. Wash. State Republican Party*,
   552 U.S. 442 (2008) ..................................................................... 12

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ..................................................................... 35

*Wright v. Marjem Recovery, LLC*,
   2014 WL 4274528 (D. Mass. Aug. 27, 2014) ..................................................................... 19

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ..................................................................... 15

**Statutes**

2 U.S.C. § 7 ........................................................................................... *passim*

3 U.S.C. § 1 ........................................................................................... *passim*

5 U.S.C. § 553 ................................................................................................ 7

18 U.S.C. § 611 ............................................................................................. 21

18 U.S.C. § 1015 ........................................................................................... 21

52 U.S.C. §§ 21001–21003 ..................................................................... *passim*

52 U.S.C. § 21081 ................................................................................... *passim*

52 U.S.C. § 21145 ................................................................................... *passim*

Paperwork Reduction Act,
   44 U.S.C. §§ 3501–3521 ............................................................................ 2

Uniformed and Overseas Citizens Absentee Voting Act,
   52 U.S.C. §§ 20301, *et seq.* ............................................................... *passim*

National Voter Registration Act of 1993,
   52 U.S.C. § 20501, *et seq.* ................................................................. *passim*

Help America Vote Act of 2002,
   52 U.S.C. §§ 20901, *et seq.* ............................................................... *passim*

**Rules**

Fed. R. Civ. P. 56 ........................................................................................... 4

**Other Authorities**

U.S. Const. art. I .................................................................................... 32, 34

U.S. Const. art. II .................................................................................. *passim*

U.S. Const. art. III .......................................................................................... 5

Exec. Order No. 12,642, 53 Fed. Reg. 21,975 (June 8, 1988) ......................... 2

Exec. Order No. 13,338, 69 Fed. Reg. 26,751 (May 11, 2004) ..................... 15

Exec. Order No. 13,693, 80 Fed. Reg. 15,871 (Mar. 19, 2015) .................... 15

Exec. Order No. 14,248, 90 Fed. Reg. 14,005 (Mar. 25, 2025)...............................................*passim*

*The Dead Voter Rule*,
   73 Ala. L. Rev. 341 (2021).......................................................................................................... 26

## INTRODUCTION

"Brash conjecture, coupled with earnest hope that something concrete will eventually materialize, is insufficient to block summary judgment." *Dow v. United Bhd. of Carpenters & Joiners of Am.*, 1 F.3d 56, 58 (1st Cir. 1993). But conjecture is all that Plaintiffs have to offer as grounds for their pending challenges to the President's March 25, 2025, Executive Order that seeks to preserve the integrity of American elections. Plaintiffs lack standing to challenge many of the Executive Order provisions, and their claims are unripe, because it is undisputed that the purported harms they face from implementation of the Executive Order have not materialized and may never materialize. Even if there were jurisdiction, and there is not, Defendants are entitled to judgment as a matter of law because Plaintiffs lack a cause of action for their *ultra vires* claims. Finally, the challenged sections of the Executive Order do not violate any law—constitutional or statutory. Under Rule 56, Defendants are entitled to summary judgment.

## BACKGROUND[1]

The National Voter Registration Act of 1993 ("NVRA") requires States to "accept and use" a uniform federal form ("federal form") to register voters for federal elections. 52 U.S.C. § 20505(a)(1). Congress charged the U.S. Election Assistance Commission ("EAC"), 52 U.S.C. § 20921, created under the Help America Vote Act of 2002 ("HAVA"), Pub. L. No. 107-252, 116 Stat. 1666, 1726 (codified as amended at 52 U.S.C. §§ 20901 *et seq*.), "in consultation with the chief election officers of the States," with "develop[ing] a mail voter registration application form for elections for Federal office" and "promulgat[ing] regulations needed to carry out that task." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 5, 10 (D.C. Cir. 2016) (quotation omitted);

---

[1] As explained in Defendants' consent motion (ECF 159), which the Court granted (ECF 161), a separate statement of facts does not accompany this Motion because it presents discrete legal issues that do not depend on material facts.

52 U.S.C. § 20508(a)(2). Similarly, Congress charged the President's designee[2] in the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") with developing "an official post card form, containing both an absentee voter registration application and an absentee ballot application, for use by the States." 52 U.S.C. § 20301(b)(2). The Department of Defense's Federal Voting Assistance Program ("FVAP"), the entity responsible for administering UOCAVA as delegated by the Secretary of Defense,[3] must similarly follow the Paperwork Reduction Act's notice-and-comment rule-making process to revise the federal post card application ("FPCA").[4]

On March 25, 2025, President Trump issued Executive Order No. 14,248, entitled "*Preserving and Protecting the Integrity of American Elections*," 90 Fed. Reg. 14,005 (Mar. 25, 2025) ("Executive Order"; sections cited as "EO § n"). The Executive Order explains that "[f]ree, fair, and honest elections unmarred by fraud, errors, or suspicion are fundamental to maintaining our constitutional Republic. The right of American citizens to have their votes properly counted and tabulated, without illegal dilution, is vital to determining the rightful winner of an election." *Id.* § 1. "Under the Constitution, State governments must safeguard American elections in compliance with Federal laws that protect Americans' voting rights and guard against dilution by illegal voting, discrimination, fraud, and other forms of malfeasance and error." *Id.* President

---

[2] The President selected the Secretary of Defense as the UOCAVA presidential designee by Executive Order in 1988. *See* Exec. Order No. 12,642, 53 Fed. Reg. 21,975 (June 8, 1988), *reprinted as amended in* 52 U.S.C. § 20301.

[3] "The Secretary administers its responsibilities through The Federal Voting Assistance Program ('FVAP')." *United States v. Alabama*, 778 F.3d 926, 930 n.2 (11th Cir. 2015) (citing Federal Voting Assistance Program (FVAP), 32 C.F.R. § 233 (2014)).

[4] *See* 44 U.S.C. §§ 3501–3521; Proposed Collection, Comment Request (Federal Post Card Application (FPCA), Standard Form 76 (SF-76); OMB Control Number 0704-0503), Regulations.gov, https://www.regulations.gov/search?agencyIds=DOD&filter=%22SF-76%22 (listing FPCA-specific notice-and-comment dockets); Agency Information Collection Activities; Proposals, Submissions, and Approvals, Regulations.gov (posted on Feb. 28, 2017), https://www.regulations.gov/document/DOD-2017-OS-0008-0001 (example of information collection notice for FCPA revisions).

Trump declared that "[i]t is the policy of [his] Administration to enforce Federal law and to protect the integrity of our election process." *Id.*

To achieve that end, the Executive Order "enforce[s] the Federal prohibition on foreign nationals voting in Federal elections." *Id.* § 2. The Executive Order directs the EAC to "take appropriate action to require, in its national mail voter registration form issued under 52 U.S.C. [§] 20508," "documentary proof of United States citizenship consistent with 52 U.S.C. [§] 20508(b)(3)." *Id.* § 2(a)(i)(A). The Executive Order additionally states that "[t]he head of each Federal voter registration executive department or agency (agency) under the National Voter Registration Act, 52 U.S.C. [§] 20506(a), shall assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs." *Id.* § 2(d). The Executive Order also directs "[t]he Secretary of Defense" to "update the Federal Post Card Application, pursuant to [UOCAVA], to require . . . documentary proof of United States citizenship . . . [and] proof of eligibility to vote in elections in the State in which the voter is attempting to vote." *Id.* § 3(d). It further states that the EAC "shall, pursuant to 52 U.S.C. [§§] 21003(b)(3) and 21142(c) and consistent with applicable law," cease disbursing funds to states that do not comply with the laws set forth in 52 U.S.C. § 21145. *Id.* § 4(a). And it charges the Attorney General with enforcing the Election Day statutes, 2 U.S.C. § 7 and 3 U.S.C. § 1, which establish a day for federal elections, against states who do not require mail-in and absentee ballots to be received by Election Day and similarly instructs the EAC to withhold funds from states who do not adopt that interpretation, as required by 52 U.S.C. § 21081(a)(6). *Id.* § 7(a), (b).

On April 3, 2025, Plaintiffs, the States of Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Massachusetts, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Rhode Island, Vermont, and Wisconsin, filed a Complaint in this

Court challenging the sections described above—2(a), 2(d), 3(d), 4(a), 7(a), and 7(b). ECF 1 (Compl.). The Complaint has seven Counts, each premised on an *ultra vires*, separation-of-powers theory. *Id.* ¶¶ 113–83. Plaintiffs aver that "[n]o adequate remedy at law is available." *Id.* ¶ 112.

Plaintiffs subsequently sought a preliminary injunction of the challenged sections (except for section 4(a)), ECF 75 & 76, which the Court granted, ECF 107, 108.[5] Defendants then moved to dismiss, ECF 109, for lack of subject-matter jurisdiction and failure to state a claim. The Court denied the motion to dismiss. ECF 132. On December 11, 2025, the Parties filed a stipulation regarding section 2(d) of the EO, whereby Plaintiff States have agreed to dismiss their challenge to section 2(d) predicated on Defendants' interpretation that section 2(d) does not apply to them. *See* ECF 160.[6] Defendants timely file this motion for summary judgment. ECF 149, 150.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it carries "the potential to affect the outcome of the suit under the applicable law." *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000) (quoting *Sánchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)). "A party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law." *Carmona v. Toledo*, 215 F.3d 124, 132 (1st Cir. 2000); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant carries its burden, the nonmovant may not rest on "mere allegation[s]," *Anderson v. Liberty Lobby, Inc.*, 477

---

[5] The Court's preliminary injunction order is presently on appeal; appellate briefing will be complete in January 2026. *See* No. 25-1726 (1st Cir. appeal filed July 31, 2025).

[6] Although the Court has not yet granted the stipulation, during their meet-and-confer on the cross-motions for summary judgment, the Parties agreed not to brief section 2(d), on the expectation that the Court will grant the stipulation in due course.

U.S. 242, 256 (1986), but must provide specific admissible facts showing that there is a genuine

issue for trial, *Borges ex rel. S.M.B.W. v. Serrano–Isern*, 605 F.3d 1, 5 (1st Cir. 2010). Moreover,

summary judgment must be decided on the record as it stands, not on litigants' vision of what the

facts might someday reveal. "Brash conjecture, coupled with earnest hope that something concrete

will eventually materialize, is insufficient to block summary judgment." *Dow*, 1 F.3d at 58.

## ARGUMENT[7]

## I.    Plaintiffs' Claims Are Not Justiciable.

Article III restricts federal court jurisdiction to "Cases" and "Controversies." U.S. Const.

art. III, § 2, cl. 1. This limitation on "[t]he judicial Power of the United States" is fundamental to

the judiciary's role within the constitutional separation of powers. *Spokeo, Inc. v. Robins*, 578 U.S.

330, 337 (2016) (quoting U.S. Const. art. III, § 1). Two of the limitation's manifestations are the

justiciability doctrines of standing and ripeness, both of which are implicated here.

To establish Article III standing, a plaintiff must demonstrate that it (1) suffered an injury

in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely

to be redressed by a favorable judicial decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–

61 (1992). An injury in fact must be "concrete and particularized" and "actual or imminent," not

"conjectural" or "hypothetical." *Id.* (citation omitted). "An allegation of future injury may suffice"

only if "the threatened injury is 'certainly impending,' or [if] there is a 'substantial risk' that the

harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citing *Clapper v.*

*Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). But if the future injury is "too speculative for

---

[7] Defendants acknowledge that this Court—relying, in part, on another district court's analysis in *League of United Latin American Citizens v. Executive Office of the President* (*"LULAC v. Trump"*), 780 F. Supp. 3d 135 (D.D.C. 2025)—denied Defendants' motion to dismiss, which made arguments similar to many of those raised herein. *See* ECF 132. Defendants respectfully submit that this was error, and re-raise their arguments for, *inter alia*, preservation purposes.

Article III purposes" and "no prosecution is even close to impending," then there is no standing to sue. *Blum v. Holder*, 744 F.3d 790, 799 (1st Cir. 2014) (citation omitted). Standing requires a plaintiff to have a "personal stake" in the case, and to "be able to sufficiently answer the question: 'What's it to you?'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation omitted).

Each plaintiff must demonstrate its own Article III standing, as "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring). Finally, because "standing is not dispensed in gross," each plaintiff must demonstrate standing for each claim that it presses against each defendant, and for each form of relief that it seeks. *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion*, 594 U.S. at 431).

While standing seeks to keep federal courts out of disputes involving conjectural injuries, the ripeness doctrine seeks to prevent the adjudication of claims relating to "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted). The basic function of ripeness is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Plaintiffs bear the burden of demonstrating ripeness. *See Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 25 (1st Cir. 2007).

There are two prongs to the ripeness analysis: "fitness" and "hardship." *See Texas*, 523 U.S. at 300–01. These prongs are related but distinct: fitness "typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed," whereas hardship "typically turns upon whether

the challenged action creates a direct and immediate dilemma for the parties." *Ernst & Young v.*

*Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir. 1995) (citation omitted).

    A.     <u>Section 2(a)</u>

Plaintiffs have previously argued, and Defendants assume will likely again argue, that they

face "imminent and unavoidable fiscal injuries" because section 2(a) "unequivocally provide[s]

that documentary proof of citizenship *will* be imposed" (*e.g.*, ECF 113 at 3), such that compliance

will require them to "implement trainings, testing, coordination, implementation, and voter

education across multiple State agencies and databases" (*e.g.*, Compl. ¶¶ 13, 105). This claimed

harm, however, is predicated on a misconstruction of the Executive Order. Properly construed (in

accordance with its plain terms), section 2(a) does not give rise to standing or a ripe claim.

Section 2(a) of the Executive Order directs the EAC to "take appropriate action to require"

documentary proof of United States citizenship in its national mail voter registration form. This

directive is consistent with—and indeed, contemplates the exercise of—the rulemaking authority

permitted to the EAC by the NVRA, which allows the EAC to alter the federal form by

promulgating regulations through notice-and-comment rulemaking. *See* 52 U.S.C. § 20929; *Final*

*Rules: National Voter Registration Act of 1993*, 59 Fed. Reg. 32,311 (June 23, 1994). Before the

federal form can be altered, the EAC must, among other things, develop the change as a proposed

rule, which must be approved by the EAC; issue a notice of proposed rulemaking and solicit public

comments; consult with the chief election officers of the States pursuant to 52 U.S.C.

§ 20508(a)(2); consider revisions to the proposed rule based on public feedback—including from

Plaintiff States—and then revise the rule as needed. *See* 5 U.S.C. § 553. Only after that process is

completed may the EAC promulgate a final rule amending the federal form. *See id.* § 553(c).  At

that point, that final rule would presumably be subject to review under the APA.

As a matter of law, Plaintiffs' purported injury is not justiciable because it is based on a hypothetical outcome of a rulemaking process that has yet to occur. Just like plaintiffs in APA cases cannot challenge—and are not injured by—notices of proposed rulemakings for rules that do not yet exist, Plaintiffs here cannot challenge the initiation of a rulemaking process for fear of what the outcome of that process may eventually be.[8] Section 2(a) of the EO inflicts no imminent harm on Plaintiffs. As explained above, it simply directs the EAC to "take appropriate action"—i.e., to commence the rulemaking process—"to require . . . documentary proof of United States citizenship" on the federal form and instructs that if it determines such a requirement is necessary, then it is statutorily required to add it to the form. The EAC has not completed its rulemaking process or made any necessity determination, which, as explained, are still required before the EAC may add a documentary proof-of-citizenship ("DPOC") requirement to the federal form. Because that statutorily required process must still be followed, and because the outcome of that process is distant in time and uncertain in substance, section 2(a) inflicts no "certainly impending" injury on Plaintiffs. Indeed, it would be remarkable if Plaintiffs discovered a way to challenge the EO at this juncture, given how courts regularly dismiss challenges to NPRMs. *See, e.g.*, *In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015) ("We may review final agency rules. . . . But we do not have authority to review proposed rules." (internal citation omitted)). The EO is not even an NPRM—it *predates* an NPRM.

---

[8] That Plaintiffs bring only *ultra vires* claims implicitly concedes that section 2(a) is not final agency action under the APA and thus has not yet injured them. *See Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (noting that whether the challenged action "is a reviewable final agency action" "contextualizes the standing inquiry"). Indeed, in *LULAC*, the district court recently dismissed the plaintiffs' APA challenges to section 2(a) for failure to show "a final agency action implementing [it]." --- F. Supp. 3d ---, 2025 WL 3042704, at *1, *37 (D.D.C. Oct. 31, 2025). The district court in D.C. nonetheless erroneously permanently enjoined section 2(a) based on other legal theories; the government has until December 30, 2025, to file a notice of appeal from that judgment.

Nor does it matter that the EAC has sent a letter to the chief election officers of the States regarding how to implement section 2(a). *See* ECF 76-3 at 17–18 (ECF pagination). That letter is only the first step in the consultation process and does make the outcome of that process any more certain. The EO requires the commencement of a process; it does not dictate the process outcome. *See supra.* Further, to the extent Plaintiffs' claimed future harm rests on an oral representation made by defense counsel during an oral argument on a preliminary-injunction hearing in the District of Columbia regarding the meaning of section 2(a) (e.g., ECF 113 at 3), prior attorney statements cannot supersede the text of the Executive Order, which as explained, contains a qualified direction to "take appropriate action." EO § 2(a). In any case, neither the Court nor Defendants are bound to this representation as a matter of estoppel, because Defendants did not prevail on their position. *See Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004) (explaining that, "at a minimum," judicial estoppel does not attach unless the responsible party "succeeded in persuading a court to accept its prior position"). Nor would Defendants derive an "unfair advantage" if not estopped. *See id.* And, to be clear, Defendants have disclaimed that oral representation (*e.g.*, ECF 120 at 2–3 & n.1), and do so again now.

For similar reasons, Plaintiffs cannot establish that section 2(a) poses an "immediate dilemma" that is ripe for judicial intervention. *Ernst & Young*, 45 F.3d at 535; *see Texas*, 523 U.S. at 301 ("Here, as is often true, '[d]etermination of the scope . . . of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function.'" (quoting *Int'l Longshoremen's & Warehousemen's Union, Loc. 37 v. Boyd*, 347 U.S. 222, 224 (1954))). Because the EAC has not completed the process for considering whether to add a documentary-proof-of-citizenship requirement to the federal form pursuant to section 2(a), Plaintiffs' claims are not fit for

adjudication. Under such circumstances, Plaintiffs cannot establish that section 2(a) is "fit" for review because future events have not yet occurred and, indeed, they "may not occur as anticipated." *See Texas*, 523 U.S. at 300 (citation omitted). This lack of finality and definiteness counsels against judicial intervention. *See Ernst & Young*, 45 F.3d at 535. Moreover, the controversy lacks "sufficient immediacy and reality to warrant the issuance of" the judicial relief sought. *Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healy*, 844 F.3d 318, 326 (1st Cir. 2016) (citation omitted). Since a final rule does not exist, Plaintiffs do not yet know how they will be harmed—if at all. Absent harm, Plaintiff States' claims challenging section 2(a) are not justiciable.

     B.     <u>Section 3(d)</u>

Section 3(d) directs the Secretary of Defense to update the Federal Post Card Application pursuant to UOCAVA to require documentary proof of United States citizenship, "as defined by section 2(a)(ii) of th[e] order," and "proof of eligibility to vote in elections in the State in which the voter is attempting to vote." Plaintiffs concede that "what proof of eligibility might suffice, or how a UOCAVA voter might obtain such proof," has not yet been determined. ECF 76 at 13.

It is undisputed that the Secretary, via FVAP, has not yet updated the Federal Post Card Application. The FPCA available on the FVAP website as of the date of this filing is still the 01-2023 revision. FVAP, "Federal Post Card Application (FPCA)," https://www.fvap.gov/uploads/fvap/forms/fpca.pdf (last visited Dec. 12, 2025) ("Post Card Form"). It is further undisputed that the Executive Order does not establish a deadline for any such updates. How or when section 3(d) will be implemented is thus unsettled. Without knowing what is required to establish proof of eligibility to vote in elections in the state in which the voter is attempting to vote, which could vary among States, Plaintiffs (and the Court) can only speculate about whether the requirement would violate UOCAVA. This claim is not fit for judicial review

because it "involves uncertain and contingent events that may not occur as anticipated or may not occur at all." *Ernst & Young*, 45 F.3d at 536 (citation omitted).

    C.    <u>Section 4(a)</u>

Section 4(a) directs the EAC to take "all appropriate action" to "cease providing Federal funds to States that do not comply with . . . 52 U.S.C. [§] 21145," including the requirement to use the national mail voter registration form issued pursuant to 52 U.S.C. § 20508(a)(1) (the "federal form") and any concomitant requirement for documentary proof of citizenship adopted pursuant to section 2(a). Because Plaintiffs lack standing to challenge section 2(a), *see supra*, the same outcome is warranted with respect to their challenge to section 4(a), which is premised on requirements to implement updates to the federal form that have not yet occurred (and may never occur). Even if there were a cognizable injury, what "appropriate action" the EAC will take in the future under section 4(a) is entirely speculative. Such conjectural injury is not ripe for review.

    D.    <u>Section 7(a)</u>

Section 7(a) interprets 2 U.S.C. § 7 and 3 U.S.C. § 1 to require a national ballot receipt deadline and instructs the Attorney General to "take all necessary action" to enforce the statutes against States that violate them. What that action will be, how it will be enforced, and against whom is entirely speculative, and is not a basis for Article III standing or ripeness.

Section 7(a)'s instruction to the Attorney General is a matter of enforcement discretion that belongs to the Executive Branch. *See United States v. Texas*, 599 U.S. 670, 678 (2023) ("[T]he President 'shall take Care that the Laws be faithfully executed.'" (quoting U.S. Const. art. II, § 1, cl. 1, § 3)); *see also TransUnion LLC*, 594 U.S. at 429 (under Article II, the Executive Branch possesses authority to decide "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law."). The Attorney General acts as the President's "chief law

enforcement officer" who "provides vital assistance to [him] in the performance of [his] constitutional duty to preserve, protect, and defend the Constitution." *Trump v. United States*, 603 U.S. 593, 620 (2024) (citation omitted). Moreover, the Executive Branch's enforcement decisions are not subject to judicial review because "courts generally lack meaningful standards for assessing the propriety of enforcement choices." *Texas*, 599 U.S. at 679.

As an initial matter, the Attorney General has not implemented section 7(a), so any dispute about what she may do in the future, and whether that future action will violate Plaintiffs' legal rights, is necessarily speculative. In any event, because the Attorney General is to enforce these statutes "consistent with applicable law," as set forth in section 11 of the Executive Order, there is no risk of imminent harm, as the Plaintiff States allege. *See Trump v. New York*, 592 U.S. 125, 131 (2020); *see also LULAC*, 780 F. Supp. 3d at 213–14 ("[I]t is unclear on the present record whether Section 7(a) will lead imminently to any unlawful action" because the "Attorney General . . . must implement Section 7(a), as the Executive Order says, 'consistent with applicable law.'"). The Attorney General can lawfully enforce these statutes by, e.g., sending letters to the Plaintiff States encouraging compliance with the President's interpretation of 2 U.S.C. § 7 and 3 U.S.C. § 1.

In denying Defendants' motion to dismiss, this Court observed that the Attorney General has not "cabin[ed]" enforcement of section 7(a) to sending letters. ECF 132 at 12. But the "mere possibility" that the Attorney General "might make a legally suspect decision" in future enforcement decisions "does not justify an injunction." *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002). *If* the Attorney General were to bring an enforcement action against Plaintiffs, they could challenge her authority to do so and the EO's understanding of the Election Day statutes in that as-applied enforcement action. There is no basis *now* to enjoin speculative future enforcement action on a facial basis before it even commences. *Wash. State*

*Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008) (explaining that "[f]acial challenges are disfavored for several reasons"). Accordingly, Plaintiffs' challenge to section 7(a) fails to establish both standing and ripeness. *See LULAC*, 780 F. Supp. 3d at 213 (declining to preliminarily enjoin section 7(a) because the "Court 'cannot simply assume' that the Attorney General will disregard the 'requirement of lawful implementation'" (citation omitted)).

Defendants acknowledge that Plaintiffs need not expose themselves to liability before filing suit. ECF 132 at 12 (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007)). But they must still show that prosecution is "close to impending." *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) (quoting *Blum*, 744 F.3d at 799). Plaintiffs have not adduced any evidence that it is. Where the prospect of enforcement is at best a contingent action that "may not occur as anticipated" or even "may not occur at all," *Texas*, 523 U.S. at 300 (citation omitted), Plaintiffs' "conjectural fear that a government actor might in the future take some other and additional action detrimental" to them "does not . . . create standing," *Reddy*, 845 F.3d at 503 (quoting *Clapper*, 568 U.S. at 418). Certainly, it does not defeat summary judgment.

## II.    Plaintiffs Lack a Cause of Action.

Even if there were jurisdiction, Defendants are entitled to summary judgment because Plaintiffs lack a cause of action to bring their claims. *Ultra vires* review is unavailable "if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review, or if a statutory review scheme forecloses all other forms of judicial review." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (citation omitted); *accord Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 59 (1st Cir. 2007).

Plaintiffs here have a means of adequately challenging provisions of the Executive Order without resorting to nonstatutory review: the APA. That statute provides Plaintiffs with a

meaningful opportunity for judicial review against agencies implementing final agency action in response to presidential directives. Thanks to the APA, Plaintiffs' rights would not "be effectively lost absent judicial review." 490 F.3d at 60 (citation omitted). And the availability of the APA "at least implies that nonstatutory review is inappropriate." *Id*. This Court should not allow Plaintiffs' request for "ultra vires review" to make "an easy end-run around the limitations of . . . judicial-review statutes," like the APA, simply because Plaintiffs filed their complaint too early to use the "statutory avenue" that Congress provided. *Nuclear Regul. Comm'n*, 605 U.S. at 681–82.

Relying on *LULAC*, this Court found to the contrary when it denied Defendants' motion to dismiss. ECF 132 at 18–19. The Court declined to apply the Supreme Court's decision in *Nuclear Regulatory Commission*, or the First Circuit's in *Commonwealth of Puerto Rico*, because "the APA does not provide a cause of action to challenge an executive order" and "thus the States lack a meaningful and adequate opportunity for judicial review of the Executive Order under the APA." *Id*. at 19; *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). But the Executive Order is not self-executing—rather, it directs agencies to take future action. Under this circumstance, and contrary to the Court's conclusion, the APA *does* provide Plaintiffs with a "meaningful and adequate opportunity" to challenge the relevant EO sections (*Nuclear Regul. Comm'n*, 605 U.S. at 681), which apply to the agencies tasked with specific responsibilities under the Executive Order. Plaintiffs simply filed their Complaint too soon, before any such claim could have materialized. Plaintiffs' strategic decision to file early does not mean that the APA would not, if and when Plaintiffs actually have a ripe claim against an agency for taking some final action pursuant to the EO (or otherwise), provide Plaintiffs with opportunity for judicial review. *Nuclear Regul. Comm'n*, 605 U.S. at 681–82.[9]

---

[9] Recognizing the APA's applicability, plaintiffs in related cases (such as *LULAC* in D.D.C.) have—unlike Plaintiffs here—brought APA claims.

### III.    Section 2(a) Is Not *Ultra Vires*.

Plaintiffs claim that section 2(a) "violates the separation of powers and impermissibly arrogates to the Executive power that is reserved to Congress," Compl. ¶¶ 122, 134, because it "exceed[s] the President's Article II powers, unconstitutionally infringe[s] upon Congress's powers, and attempt[s] to amend federal legislation," namely the NVRA, "while bypassing Article I's Bicameralism, Presentment, and Elections Clauses," *id*. ¶¶ 120, 132. But the President neither exceeded his constitutional authority nor violated the NVRA in directing the EAC to "take appropriate action to require" documentary proof of citizenship on the federal form. EO § 2(a).

### A.    Section 2(a) does not violate the Constitution.

Article II, section 1 of the Constitution provides that "[t]he executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1, cl. 1. "[T]he President's power necessarily encompasses 'general administrative control of those executing the laws,' . . . throughout the Executive Branch of government, of which he is the head." *Allbaugh*, 295 F.3d at 32 (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)); *see Myers*, 272 U.S. at 135 (the President "may properly supervise and guide [agency officials'] construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone"). Therefore, the President may "direct that a congressional policy be executed in a manner prescribed by Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–88 (1952). Presidents of both parties have long directed agencies to exercise their authority to take regulatory actions without any suggestion of constitutional impropriety. *E.g*., Exec. Order No. 13,693, 80 Fed. Reg. 15,871 (Mar. 19, 2015); Exec. Order No. 13,338, 69 Fed. Reg. 26,751 (May 11, 2004).

Congress empowed the EAC to "prescribe such regulations as are necessary

to . . . develop a mail voter registration application form for elections for Federal office" "in consultation with the chief election officers of the States." 52 U.S.C. § 20508(a). The EAC must also submit various reports to Congress "assessing the impact of [the NVRA] on the administration of elections for Federal office . . . and . . . recommend[ing] . . . improvements." *Id*. § 20508(a)(3). The EAC exercises Executive power when it carries out these duties and is therefore subject to the administrative control of the President. It is thus undisputed that the EAC has the authority to update the federal form. Accordingly, under section 2(a) of the Executive Order, the President was well within his authority to direct the EAC to "take appropriate action to require, in its national mail voter registration form . . . documentary proof of United States citizenship." EO § 2(a)(i).

Plaintiffs allege that the EAC is "a multimember, bipartisan body composed of experts in elections and their administration," which "Congress established . . . as an 'independent entity.'" Compl. ¶ 116. The President's actions in section 2(a), they assert, "undermine[] the authority and independence of Congress." *Id*. ¶ 117. Simplified, then, their argument is the President lacks the power to direct multimember boards that exercise executive power. That argument is wrong, as the Supreme Court has recently noted. *See Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025). Because "[t]he entire 'executive Power' belongs to the President alone," when an agency, like the EAC "exercise[s] *any* executive power," it is subject to the President's supervisory authority. *Seila Law LLC v. CFPB*, 591 U.S. 197, 213, 216–17 (2020) (emphasis added); *see also id*. at 216 & n.2 (explaining that "[t]he Court's conclusion that the FTC did not exercise executive power has not withstood the test of time" and that "[i]t is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree" (citation omitted)); *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (even though the activities of administrative agencies "take 'legislative' and 'judicial' forms," "they are

exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power'" (quoting U.S. Const. art. II, § 1, cl. 1)).

In addition to challenging the President's authority to direct the EAC, Plaintiffs object to the way he exercised his authority to so direct. They assert that the "President cannot add a documentary proof of citizenship requirement to the Federal Form, because even the Commission could not impose that requirement." Compl. ¶ 12. "[O]nly the [EAC]," Plaintiffs allege, "can change the Federal Form, and then only 'in consultation' with the States, with the majority approval of its bipartisan Commissioners, and through reasoned decision-making subject to [the] Administrative Procedures Act." *Id*. But the Executive Order skirts none of these processes. Section 2(a)(i)(A) of the Executive Order states that "[w]ithin 30 days of the date of this order, the Election Assistance Commission shall take *appropriate action* to require, in its national mail voter registration form . . . documentary proof of United States citizenship." (emphasis added). Plaintiffs' apparent reading ignores the words "take appropriate action" and focuses only on "to require." But "to require" must be read in conjunction with "take appropriate action," and the appropriate action required here involves "consult[ing] with the chief election officers of the States," to "prescribe . . . regulations" to "develop a mail voter registration application form for elections for Federal office." 52 U.S.C. § 20508(a). The EO instructs the EAC to take these steps, which Plaintiffs recognize would satisfy applicable legal requirements. *See* Compl. ¶ 12. As already discussed, the EO's plain text shows that the outcome of EAC's process is not preordained.

B.    Section 2(a) does not violate the NVRA.

Plaintiffs assert that section 2(a) "violates the substantive provisions of the NVRA," because it "permits the Federal Form to 'require only such identifying information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant."

Compl. ¶ 127 (quoting 52 U.S.C. § 20508(b)(1)). And, they allege, "Congress has already decided that documentary proof of citizenship is not 'necessary' for identifying eligible voters" by specifying that "citizenship is proven through attestation" and prohibiting "any requirement for notarization or other formal authentication" in the NVRA. *Id*. ¶ 130 (quoting 52 U.S.C. § 20508(b)(2), (3)). But as explained, the President has the authority to direct the EAC to take all necessary action to amend the mail voter registration form, and the EAC's decision to amend the federal form to require documentary proof of citizenship—a decision that has not yet been made, and may not ever be made—would not violate the NVRA.

The NVRA charges the EAC with prescribing regulations to "develop a mail voter registration application form for elections." 52 U.S.C. § 20508(a). The form must "include a statement that . . . specifies each eligibility requirement (including citizenship)" and "contains an attestation that the applicant meets each such requirement." *Id*. § 20508(b)(2)(A)–(B). But the form "may require only such identifying information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration." *Id*. § 20508(b)(1). And it "may not include any requirement for notarization or other formal authentication." *Id*. § 20508(b)(3).

As the form's developer, the EAC determines what identifying information "is necessary" to assess an applicant's eligibility to vote. *Newby*, 838 F.3d at 10 ("It would be illogical for Congress to provide in section 20508(b)(1) that the consultant, rather than the developer, would determine 'necessity.'"); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 19 (2013). Congress's determination that the form must contain an attestation that the applicant meets the requirements to register to vote does not preclude the EAC from later determining that documentary proof of citizenship is necessary for state election officials to determine voter

eligibility. If the EAC made such a determination through notice-and-comment rulemaking, it could prescribe regulations to alter the form because by statute the EAC makes the determination of what information is necessary to enable election officials to assess an applicant's eligibility to register to vote and therefore what information must be included on the federal form. 52 U.S.C. § 20508(b)(1), (b)(2)(B). That Congress may have considered such a requirement and decided against including it at the time of the NVRA's passage (while not precluding it from being added in the future by appropriate agency action) has no bearing on whether the EAC may later add such a requirement. *Stromberg Metal Works, Inc. v. Press Mech., Inc.*, 77 F.3d 928, 931 (7th Cir. 1996) ("When text and legislative history disagree, the text controls."); *see also Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation.").

Moreover, adding a documentary proof requirement to the form would not run afoul of Congress's instruction that the form not include any requirement for notarization or formal authentication. "[F]ormal authentication" must be read in light of "notarization." *See Inmates of Suffolk Cnty. Jail v. Sheriff of Suffolk Cnty.*, 952 F. Supp. 869, 877 (D. Mass. 1997) ("Moreover, a general guideline of statutory interpretation is that statutory terms must be read . . . in relation to each other." (citing *King v. St. Vincent's Hospital*, 502 U.S. 215, 221 (1991))). Notarization requires a notary to "attest to the authenticity of . . . a signature," *Notarize*, Black's Law Dictionary (12th ed. 2024), for the purpose of "verifying that the person signing the document is who they claim to be," *see, e.g.*, *Wright v. Marjem Recovery, LLC*, 2014 WL 4274528, at *1 (D. Mass. Aug. 27, 2014). Formal authentication, therefore, must mean some requirement used to authenticate the applicant's identity. *See Authentication*, Black's Law Dictionary (12th ed. 2024) ("Broadly, the act of proving that something (as a document) is true or genuine."). The documentary proof of

citizenship would serve to substantiate an applicant's U.S. citizenship, not to verify his or her identify. Said in a slightly different context, a photocopy of a driver's license would be documentary proof of identification, even though it would not serve as *authentication* of that identification akin to notarization. The same principle holds for passports and citizenship. Any documentary proof of citizenship requirement therefore does not constitute a requirement for formal authentication. And—again—even if Plaintiffs believe it is, they will have an opportunity to make such an argument during forthcoming notice and comment rulemaking, and in an eventual challenge to a final agency action under the APA.

## IV.    Section 3(d) Is Not *Ultra Vires*.

Plaintiffs claim that "[b]y directing the Secretary of Defense to include requirements for the Federal Post Card Application not contained in federal law, [section 3(d)] attempts to amend, repeal, rescind, or circumvent duly enacted federal statutes" and the President has "exceed[ed]" his "Article II powers." Compl. ¶ 141. Specifically, Plaintiffs contend that section 3(d) "circumvent[s]" UOCAVA because "[n]owhere in [UOCAVA] is there a requirement that [the federal post card application] demand [DPOC] or proof of eligibility to vote in elections in the State in which the applicant is attempting to vote." *Id.* ¶¶ 140–41. But the President has the authority to direct the Secretary of Defense to "update the Federal Post Card Application" for the reasons explained above, and section 3(d) is consistent with UOCAVA's text and design.

UOCAVA "facilitate[s] absentee voting by United States citizens, both military and civilian, who are overseas." *Igartua de la Rosa v. United States*, 842 F. Supp. 607, 611 (D.P.R.) (citation omitted), *aff'd*, 32 F.3d 8 (1st Cir. 1994). Thus, the Secretary of Defense must, in consultation with State and local election officials, "prescribe an official post card form, containing both an absentee voter registration application and an absentee ballot application." 52 U.S.C.

§ 20301(b)(1), (2). Nothing in UOCAVA *limits* what kind of document requirements the Secretary of Defense may "prescribe" on the "official post card form." *Id.* § 20301(b)(2). And Congress has made clear itself that UOCAVA voters must be "qualified to vote" in their "place[s] of residence" or "the last place in which [they were] domiciled before leaving the United States." *See, e.g.*, *id.* § 20310(1), (5). Being "qualified to vote" necessarily requires U.S. citizenship under federal law. *Id.* § 20310(1), (5); 18 U.S.C. §§ 1015(f), 611 (unlawful for any alien to vote in Federal elections); *see United States v. Alabama*, 998 F. Supp. 2d 1283, 1290 (M.D. Ala. 2014) (it "is an obvious given" "that UOCAVA is aimed at only federal elections"), *aff'd*, 778 F.3d 926 (11th Cir. 2015). Section 3(d)'s directive that the Secretary of Defense update the FPCA to require "documentary proof of United States citizenship" and "proof of eligibility to vote in elections in the State in which the voter is attempting to vote" does not conflict with, and in fact aligns with, UOCAVA's requirements. Any contrary suggestion is incorrect, particularly because at least one State, Arizona, already requires documentary proof of citizenship with the FPCA to receive a full ballot for state elections. *See* Compl. ¶ 105 n.2. Clearly, as this example shows, the documentary proof of citizenship requirement is functional.

Title 52, section 20301(b)(7), which requires the Secretary of Defense to "prescribe a standard oath for use with any document under this chapter affirming that a material misstatement of fact in the completion of such a document may constitute grounds for a conviction for perjury," does not establish Plaintiffs' claim as a matter of law. That provision does not expressly relate to citizenship and does not implicitly forbid the Secretary from requiring DPOC under § 20301(b)(2). After all, under 52 U.S.C. § 20508, an applicant using the Federal Form must "attest[]" to citizenship "under penalty of perjury," but that does not preclude the EAC from adding a DPOC requirement to the Federal Form under appropriate circumstances. *See Arizona*, 570 U.S. at 19–

20. Similarly, UOCAVA's "standard oath" provision does not preclude the Secretary from adding a DPOC requirement to the post card form. UOCAVA instructs States to "use the standard oath" if a "State requires an oath or affirmation to accompany any document," 52 U.S.C. § 20302(a)(5), but that oath is not a substitute for proof of eligibility; it is a mechanism to hold applicants accountable for the veracity of *all* statements they make in required application documents.[10]

This Court's contrary conclusion at the pleading stage reads too much into the term "post card" in 52 U.S.C. § 20301(b)(2), construing those words to preclude a documentation requirement because a literal postcard would not allow it. *See* ECF 132 at 23–24 (citing ECF 107 at 21–24). Requiring a "post card" might place some limit on the form of the voter registration application, but it precludes a DPOC requirement only if there is no way to provide documentary proof of citizenship within the confines of a "post card form." There are no facts upon which this Court could rely to reach that conclusion. Indeed, the current "Federal Post Card Application" is not a traditional "postcard" at all, but a two-page 8 ½ x 11 form that explains that applicants can either "[r]emove the adhesive liner from the top and sides" of the form and "[f]old and seal tightly," or, in the alternative, they may "print[ out] the form, fold it and seal it in an envelope." Post Card Form at 2. If the Court's interpretation of § 20301(b)(2) were correct, then the current (and previous) post card form would have been inconsistent with the statute regardless of the EO.

Finally, a documentary citizenship requirement would not render the Federal Post Card Application unusable for its intended purpose, i.e., to facilitate absentee voting by United States citizens, both military and civilian, who are overseas. The Federal Post Card Application already contemplates the submission of additional information or documents in the case of Arizona,

---

[10] FVAP, *Interpretation of the Help America Vote Act of 2002: Based on the Requirements for U.S. Citizens Covered by the Uniformed and Overseas Citizens Absentee Voting Act*, at 14 (Aug. 2003), https://www.fvap.gov/uploads/FVAP/Policies/havamemo.pdf (stating the oath).

Vermont, and Puerto Rico.[11] And visual inspection of the current Application reveals that it is no longer a traditional postcard. Because U.S. citizenship and voter eligibility are already required for UOCAVA voters, and UOCAVA does not prohibit including a DPOC requirement on the FPCA, should the Court reach this issue, section 3(d)'s directive does not violate UOCAVA.

## V.    Section 4(a) Is Not *Ultra Vires*.

Plaintiffs contend that section 4(a) unlawfully "condition[s] federal funding to States on their acceptance of the Federal Form as unlawfully amended to require [DPOC]," Compl. ¶ 147, and that Congress has not "authorized the [EAC] to withhold funds" on that basis, *id*. ¶ 150. According to Plaintiffs, Congress has "specified the precise formula for calculating the grants that the Commission administers and the conditions for those funds," and once States meet those conditions, they are "statutorily entitled to those funds." *Id*.

The problem with Plaintiffs' argument is that the statutory sections cited in the EO provide for the condition it directs the EAC to apply. For a State to be "eligible to receive a requirements payment" under HAVA, 52 U.S.C. § 21003(a) requires the State's "chief executive officer . . . or designee . . .  [to] certify[] that the State is in compliance with the requirements referred to in subsection (b)," which include "compliance with each of the laws described in section 21145," *id*. § 21003(b)(3). The laws named in 52 U.S.C. § 21145 include the NVRA, among others. *Id*. § 21145(a). And the NVRA requires that States use the national mail voter registration form developed by the EAC. *See id*. § 20505(a)(1); *see also id*. § 20508(a)(1). Thus, to receive HAVA requirements payments, States must use the EAC's national mail voter registration form.

---

[11]    FPCA, Voter Registration and Absentee Ballot Request, https://www.fvap.gov/uploads/fvap/forms/fpca.pdf (specifying in section 6 that Puerto Rico and Vermont require more information, providing a link to additional state guidelines, and indicating that the form may be used to clarify voter information); *see also* Arizona, Voting Assistance Guide at Section 6, https://www.fvap.gov/guide/chapter2/arizona (requiring DPOC for a full ballot).

Section 4(a) simply parrots the NVRA's requirement: It directs the EAC to "cease providing Federal funds to States that do not comply with the Federal laws set forth in 52 U.S.C. [§] 21145, including the requirement in 52 U.S.C. [§] 20505(a)(1) that States accept and use the national mail voter registration form . . . , including any requirement for documentary proof of United States citizenship adopted pursuant to section 2(a)(ii)." The NVRA's command that states use the national mail voter registration form is not limited to the version of the federal form current at the date the NVRA was promulgated—it applies to all future iterations of that form developed by the EAC, including any version that requires DPOC. *See Newby*, 838 F.3d at 4 ("The NVRA directs each state to 'accept and use' a federally prescribed national mail voter registration form . . . ."); *Tenn. Conf. of NAACP v. Lee*, 139 F.4th 557, 559 (6th Cir. 2025) ("States must 'accept and use' a 'mail voter registration application form' that the [EAC] creates." (citing 52 U.S.C. §§ 20505(a)(1), 20508(a)(2))). By requiring states to certify compliance with the laws set forth in 52 U.S.C. § 21145, including the NVRA's requirement to use the federal form, Congress necessarily contemplated the possibility that states may not agree to the certification and that funding may be withheld on that basis. 52 U.S.C. § 21003(a) ("A State is eligible to receive a requirements payment for a fiscal year if . . . ."). Section 4(a) of the Executive Order lawfully directs the EAC to apply existing statutory funding conditions set forth by Congress in 52 U.S.C. § 21145.  Thus, the Court should grant summary judgment to Defendants on Count IV.

## VI.    Section 7(a) Is Not *Ultra Vires*.

Plaintiffs allege that "[t]he President has no legal authority to amend the Election Day statues [sic] to prohibit the counting of ballots validly cast under State law, nor to direct the Attorney General to enforce his erroneous interpretation of federal law against States." Compl. ¶ 159.  That is wrong. To begin, the EO does not alter the Election Day statutes—2 U.S.C. § 7 and

24

3 U.S.C. § 1. As the person responsible for taking care that the laws are properly executed, the President put forward his interpretation of those statutes. The Executive has interpreted the law for centuries—this is nothing new, and certainly nothing constitutionally objectionable. But, in any event, the President's interpretation of those laws accords with their text, purpose, and history, and he has the authority to interpret for the Executive Branch what they require.

Article II, section 3 of the Constitution charges the President with the duty to "take Care that the Laws be faithfully executed." "[A]n essential part of execution of the law is the interpretation of that law." *Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 809 F.2d 979, 990 (3d Cir. 1986). Functionally, "the executive cannot execute [a] law's command until he decides what that command is, and absent a determination by the courts the executive must find the law's command himself." *Id*. Thus, the President's duty under the take-care clause "often puts upon him the duty to interpret [the law] for the Executive Department." *Id*. (citation omitted); *see also Bowsher v. Synar*, 478 U.S. 714, 750 n.16 (1986) (Stevens, J., concurring) (explaining that "interpret[ing]" a "law enacted by Congress" is "a power normally committed initially to the Executive under the Constitution's prescription that he 'take Care that the Laws be faithfully executed'" (quoting U.S. Const. art. II, § 3; *Synar v. United States,* 626 F. Supp. 1374, 1400 (D.D.C. 1986))); *Huggins v. Isenbarger*, 798 F.2d 203, 208 (7th Cir. 1986) (Easterbrook, J., concurring) ("The Executive Branch of any government has the authority to interpret the law, if only to the extent necessary to decide how to execute that law."). Plaintiffs' attempt to elevate this commonplace reality to a violation of the separation of powers is unavailing.

The Election Day statutes establish a uniform, national Election Day for federal elections. 2 U.S.C. § 7; 3 U.S.C. § 1; *Foster v. Love*, 522 U.S. 67, 69 (1997). Title 2, section 7 provides that "[t]he Tuesday next after the 1st Monday in November, in every even numbered year, is

established as *the day for the election*, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter" (emphasis added). Moreover, "[t]he electors of President and Vice President shall be appointed, in each State, *on election day*." 3 U.S.C. § 1 (emphasis added). Congress enacted 3 U.S.C. § 1 and 2 U.S.C. § 7, in 1845 and 1872, when absentee voting was in its infancy. *Republican Nat'l Comm. v. Wetzel*, 120 F.4th 200, 204, 209 (5th Cir. 2024) ("Absentee voting began during the Civil War to secure the franchise of soldiers in the field."), *cert. granted sub nom. Watson v. Republican Nat'l Comm.*, ---S. Ct.---, 2025 WL 3131802 (U.S. Nov. 10, 2025); *Foster*, 522 U.S. at 69. The advent of commonplace no-excuse-absentee voting presents the question of what having a "day for the election" means for purposes of those statutes, including whether ballots must be received by that day. *See* David Horton, *The Dead Voter Rule*, 73 Ala. L. Rev. 341, 350 (2021).

The President answered that question by interpreting the Election Day statutes for Executive Branch officials. First, he instructed the Attorney General to "take all necessary action to enforce 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives." EO § 7(a). Then, in section 7(b), he directed the EAC to "condition any available funding to a State on that State's compliance with" 52 U.S.C. § 21081(a)(6)'s requirement "that each State adopt uniform and nondiscriminatory standards . . . including that, as prescribed in 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1, there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," except for UOCAVA voters. It was within the President's authority to interpret the Election Day statutes in a manner consistent with the statutes' text so that Executive Branch officials may carry out their commands.

The only on-point federal appellate opinion holds that the Election Day statutes require ballots to "be both *cast* by voters and *received* by state officials" on Election Day. *Wetzel*, 120 F.4th at 204. The term "election" in 2 U.S.C. § 7 has three "definitional elements": (1) official action, or one "involv[ing] an element of government action"; (2) finality, or "the polity's *final* choice of an office-holder"; and (3) consummation, or "when the last ballot is received and the ballot box is closed." *Id*. at 207–08. Continuing to receive ballots after Election Day means that the election is not final or consummated until after Election Day and therefore violates the Election Day statutes. *Id*. at 208–09, 215. Section 7(a) therefore does not "amend, repeal, rescind, or circumvent" 2 U.S.C. § 7. *E.g.*, Compl. ¶ 160.

History reveals that the term "'election' include[d] both ballot casting and ballot receipt." 120 F.4th at 209. These two concepts were not bifurcated until the Civil War to "secure the franchise of soldiers in the field." *Id*. Even then, soldiers voted by casting their ballots in ballot boxes that election officials brought to the battlefield or else sending a proxy to deposit their votes in the ballot box at the soldier's home precinct. *Id*. In other words, the act of voting concluded when the vote was received. *Id.* at 207 ("[A] ballot is cast when the State takes custody of it."). After that, states allowing civilian absentee voting still required votes to be received by Election Day. *Id*. at 210 (citing P. Orman Ray, *Absent-Voting Laws, 1917*, 12 Am. Pol. Sci. Rev. 251, 253 (1918)). By 1977, only two of 48 states allowing absentee voting counted ballots received after Election Day. *Id*.; *see also Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 670 (2021) ("[I]n 1982 States typically required nearly all voters to cast their ballots in person on election day and allowed only narrow and tightly defined categories of voters to cast absentee ballots."). And in January 2020, 14 states and the District of Columbia counted ballots postmarked by Election Day, whereas the other 36 states required receipt on or before that date. *Wetzel*, 120 F.4th at 211. This

history of absentee voting "says nothing about whether States can extend the election past the uniform, singular Election Day required by federal law"; rather, "the practice of absentee voting that arose during the Civil War demonstrates that the election concludes when all ballots are received." *Id.* "[L]ate-in-time outliers" have no bearing on "the original public meaning of the Election-Day statutes." *Id*. (citing *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 70 (2022); *Dobbs v. Jackson Women's Health Org*., 597 U.S. 215, 250–51 (2022)).

As to purpose, Congress enacted the Election Day statutes to prohibit early federal elections in some states, which were influencing election results in states voting later. *Foster*, 522 U.S. at 73. But permitting absentee ballots to be received after Election Day is equally discriminatory. After all, "[h]aving once granted the right to vote on equal terms, [a] State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–05 (2000). But states arbitrarily treat some people's votes differently when they permit absentee votes to be received after Election Day. If postmarks are unenforced, for example, absentee voters may have several extra days after Election Day to cast their votes.

Moreover, "[t]he postal service permits senders to recall mail," *Wetzel*, 120 F.4th at 208 (citing Domestic Mail Manual, §§ 507.5, 703.8; 39 C.F.R. § 111.1 and 39 C.F.R. § 211.2 (incorporating the Domestic Mail Manual by reference into the Postal Service Regulations)), which could permit "voters [to] change their votes after Election Day," *id.* Some states such as Illinois even provide for counting mail-in ballots lacking a postmark so long as they are "received by the election authority after the polls close on election day and before the close of the period for counting provisional ballots" and "the date inserted on the certification," after opening the ballot, "is election day or earlier." 10 Ill. Comp. Stat. Ann. 5/19-8(c).

Under that regime, it is possible to imagine that an un-postmarked ballot, delivered after

Election Day but before counting concluded, could be counted based on a person's fraudulent certification date, in which case "a candidate's electoral fate" would not be "sealed at midnight on Election Day." ECF 132 at 25 (quoting ECF 107 at 28). Congress intended the Election Day statutes to curb that type of behavior, which results in treating some votes differently. *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1173–74 (9th Cir. 2001) ("Whenever you provide that elections shall take place upon the same day, you do interpose a not inconsiderable check to frauds in elections, to double voting, to the transmission of voters from one State to another, and you do allow the people to vote for their Representatives undisturbed by considerations which they ought not to take at all into account." (quoting Cong. Globe, 42d Cong., 2d Sess. 618 (1872))). Permitting this behavior to continue by allowing ballots to be received after Election Day contradicts Congress's purpose.[12]

Contrary to the Court's conclusion, Congressional inaction does not rebut these arguments. *See* ECF 132 at 25. Indeed, Congressional inaction says very little, if anything, about congressional intent particularly where, as here, the words of the statute are plain. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495 n.13 (1985) ("[C]ongressional silence, no matter how 'clanging,' cannot override the words of the statute."); *Rapanos v. United States*, 547 U.S. 715, 749 (2006) (plurality op.) (noting the Court's "oft-expressed skepticism toward reading the tea leaves of congressional inaction"). Nor does it invalidate the President's interpretation of the Election Day statutes. Congress legislated against the backdrop of the historical understanding of what an "election" meant in 1845 and 1872. The President's interpretation does not contradict the statutes.

---

[12] This Court's reasons for concluding otherwise are without merit. *See* ECF 132 at 24–25. Another district court's conclusion in *Bost v. Illinois State Board of Elections* regarding the statutes is dicta because it came after the court held that the plaintiffs lacked standing. 684 F. Supp. 3d 720, 728–34, 736 (N.D. Ill. 2023), *aff'd*, 114 F.4th 634 (7th Cir. 2024). The other decision, *Donald J. Trump for President, Inc. v. Way*, was decided on a preliminary posture on the eve of an election. 492 F. Supp. 3d 354, 375 (D.N.J. 2020). As such, it has no persuasive force, especially compared to the unanimous court of appeals decision in *Wetzel*.

The President's interpretation that the Election Day statutes require ballots to be received by Election Day also does not violate the vertical separation of powers or state sovereignty. *See* Compl. ¶ 158. According to its Article I, section 4 authority to "alter" the "Times, Places and Manner of holding" federal elections, Congress preempted state law when it enacted the Election Day statutes. The President merely interpreted the text of Congress's command. *See Foster*, 522 U.S. at 71 ("For all of petitioners' invocations of state sovereignty, there is no colorable argument that § 7 goes beyond the ample limits of the Elections Clause's grant of authority to Congress.").

## VII.    Section 7(b) Is Not *Ultra Vires*.

Plaintiffs assert that Congress has "specified the precise formula for calculating the grants that the [EAC] administers and the conditions for those funds," Compl. ¶ 170 (citing 52 U.S.C. §§ 21001–21003, 21142(c)(1)), and that requiring the EAC to withhold funds on the grounds in section 7(b) "exceed[s] the President's Article II powers," *id.* ¶ 172. But section 7(b) does not say what Plaintiffs claim it says: it simply directs the EAC to condition state funds, "[c]onsistent with 52 U.S.C. [§] 21001(b) and other applicable law," on a state's compliance with an existing statutory requirement: to "adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State." 52 U.S.C. § 21081(a)(6). In other words, the President is directing the EAC to condition funding on compliance with applicable statutory requirements, subject to his interpretation of those requirements as discussed above.

Title 52, section 21001(a) provides that the EAC "shall make a requirements payment each year . . . to each State which meets the conditions described in section 21003." And § 21003 requires states to certify their compliance with the requirements in § 21003(b) to be "eligible to receive a requirements payment." *Id.* § 21003(a). One of those requirements includes filing a state

plan with the EAC that describes "[h]ow the State will use the requirements payment to meet the requirements of subchapter III," which includes § 21081(a)(6)'s directive to "adopt uniform and nondiscriminatory standards that define what constitutes a vote." *Id.* §§ 21003(b)(1)(A), 21004(a)(1), 21081(a)(6). A State's failure to meet that requirement renders the State "[in]eligible to receive a requirements payment." *See id.* § 21003(a).

Section 7(b) specifies that "what constitutes a vote and what will be counted as a vote" must "includ[e] that, as prescribed in 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1, there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting . . . after which no additional votes may be cast," except for UOCAVA votes. Requiring a uniform ballot receipt deadline of Election Day for all methods of voting ensures that a state's definition of what constitutes a vote is nondiscriminatory by not privileging absentee voters' ballots. *Supra* at 28–29. Thus, to comply with § 21081(a)(6)'s mandate, states must adopt a uniform ballot receipt deadline of Election Day. This condition does not usurp Congress's constitutional powers, because Congress itself set the condition in § 21081(a)(6) (as well as enacted the Election Day statutes).

In its decision denying Defendants' motion to dismiss, this Court determined that the reference to "uniform and nondiscriminatory standards" in § 21081(a)(6) "appears to refer to uniformity within each State, not among the several States." ECF 132 at 27 (quoting ECF 107 at 32). For support, this Court relied on *LULAC*, which in turn relied on a legislative report. *See* 780 F. Supp. 3d at 215. With respect, "legislative history is not the law," *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019) (citation omitted), and the *LULAC* court gave no other reason for this apparent conclusion.[13] Finally, as for Plaintiffs' allegation that the President cannot "dictate policy and actions of the [EAC] in a manner inconsistent with Congressional approval requirements,"

---

[13] Moreover, that determination was not central to the *LULAC* court's holding, which was that the plaintiffs lacked standing to challenge section 7(b). 780 F. Supp. 3d at 215–19.

Compl. ¶ 169, the EAC is an executive agency that the President may order to act within Congress's commands. *Supra* at 16–17.

### VIII. The Challenged Sections Do Not Violate State Sovereignty.

Finally, Plaintiffs allege that the challenged sections of the Executive Order "invade[] Plaintiff States' sovereignty and their powers to regulate federal elections by Presidential fiat and commandeer[] State election administrative personnel and process to implement a Presidential decree." Compl. ¶ 179. But the "Elections Clause establishes a unique relationship between the state and federal governments." *Gonzalez v. Arizona*, 677 F.3d 383, 390 (9th Cir. 2012) (en banc), *aff'd sub nom.*, *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013). As noted above, every directive in the Executive Order is tied to the President's execution of duly enacted federal laws, which the Constitution provides must control over the States' own.

Article I, section 4 of the Constitution provides that State governments may choose "[t]he Times, Places and Manner of holding" federal elections, unless "Congress . . . make[s] or alter[s] such Regulations." U.S. Const. art. I, § 4, cl. 1. The Clause, in other words, "invests the States with responsibility for the mechanics of congressional elections, . . . but only so far as Congress declines to preempt state legislative choices." *Foster*, 522 U.S. at 69. The Framers granted the federal government oversight over federal-election procedures to guard against potential state abuse. *Gonzalez*, 677 F.3d at 390 (explaining that "[n]othing can be more evident, than that an exclusive power of regulating elections for the national government, in the hands of the State legislatures, would leave the existence of the Union entirely at their mercy" (quoting The Federalist No. 59, at 168 (Alexander Hamilton) (Ron P. Fairfield ed., 2d ed.1981))). Additionally, "the Elections Clause requires states to implement Congress's superseding regulations without compensation from the federal government." *Id.* at 391. "Thus, unlike virtually all other provisions

of the Constitution, the Elections Clause gives Congress the power to 'conscript state agencies to carry out' federal mandates." *Id*. (citation omitted); *see also Foster*, 522 U.S. at 69; *Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d 833, 836 (6th Cir. 1997). The Elections Clause differs from the Supremacy Clause because it "affects only an area in which the states have no inherent or reserved power: the regulation of federal elections." *Gonzalez*, 677 F.3d at 392; *see also U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 805 (1995); *Arizona*, 570 U.S. at 13–14 (noting that the presumption against preemption does not apply to Elections Clause legislation).

As part of its Elections Clause authority, Congress established the EAC and charged it with "prescrib[ing] . . . regulations . . . necessary to . . . develop a mail voter registration application form for elections for Federal office." 52 U.S.C. § 20508(a). It enacted the NVRA and directed states to "designate agencies for the registration of voters in elections, for Federal office," including "Federal . . . offices." *Id*. § 20506(a)(1), (a)(3)(B)(ii). Congress further specified that voter registration agencies that are "office[s] that provide[] service or assistance in addition to conducting voter registration" shall distribute the federal voter registration form, "including a statement that . . . specifies each eligibility requirement (including citizenship)" and "contains an attestation that the applicant meets each . . . requirement," "with each application for [that] service." *Id*. § 20506(a)(6)(A)(i). Congress also set forth in UOCAVA the requirement that the President's designee "shall . . . prescribe an official post card form, containing both an absentee voter registration application and an absentee ballot application, for use by the States." *Id*. § 20301(b)(2). Congress further enacted the Election Day statutes, specifying a "day for the election," 2 U.S.C. § 7; 3 U.S.C. § 1, which historically meant ballots should be cast and received on that date, *Wetzel*, 120 F.4th at 209 ("History confirms that 'election' includes both ballot casting and ballot receipt."). And Congress conditioned requirements payments under HAVA on a state's

compliance with 52 U.S.C. § 21145 and § 21081(a)(6). *See supra* at 30–32.

Because the Constitution vests "[t]he entire 'executive Power'" in the "President alone," he properly oversees and controls those who execute the laws. *Seila Law*, 591 U.S. at 213. Accordingly, the President acted within his authority to direct executive officials in carrying out their statutory mandates. He had authority to direct the EAC to "take appropriate action to require" documentary proof of citizenship "in its national mail voter registration form," EO § 2(a); to direct "Federal voter registration executive department[s] or agenc[ies] . . . [to] assess citizenship prior to providing a Federal voter registration form to enrollees of public assistance programs," *id*. § 2(d); and the Secretary of Defense to "update the Federal Post Card Application . . . [to] require . . . documentary proof of United States citizenship," *id*. § 3(d). He also lawfully directed the EAC to condition HAVA requirements payments on a state's compliance with 52 U.S.C. § 21145 and § 21081(a)(6), EO §§ 4(a), 7(b), and the Attorney General to enforce the Election Day statutes, *id*. § 7(a). The President's Executive Order did not unlawfully commandeer Plaintiffs' personnel, infrastructure, and funds to implement a presidential decree.

To the extent Plaintiffs argue that the Executive Order "commandeers State election administrative personnel and processes" by requiring states to provide the federal form (updated or otherwise) to voter-registration applicants, Compl. ¶ 179, that argument would mean that the NVRA is itself unconstitutional, separate and apart from the Executive Order. *See* 52 U.S.C. §§ 20506, 20508; Compl. ¶ 6 (admitting that the NVRA requires states to provide the federal form to applicants). Whether Congress may constitutionally require states to provide the federal form does not depend on the form's content. Congress may preempt states' decisions regarding the times, places, and manner of holding federal elections. *See* U.S. Const. art. I, § 4, cl.

**IX.    At a Minimum, the Court Should Reserve Ruling on the Pending Motions Until the First Circuit Resolves Defendants' Appeal of the Preliminary Injunction.**

This Court has the "inherent power" to control its docket. *Kelley v. Patrick*, 2014 WL 2208278, at *1 (D. Mass. May 26, 2014); *see also Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 77 (1st Cir. 2004). Defendants' appeal of the Court's preliminary injunction in this case raises myriad, substantial issues—including this Court's subject-matter jurisdiction—that mirror issues raised in the parties' cross motions for summary judgment. Namely, the preliminary injunction standard will require the First Circuit to consider whether Plaintiffs are "likely to succeed on the merits." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The First Circuit's ruling is therefore "likely to have a substantial or controlling effect on the claims and issues in [this] case." *Miccosukee Tribe of Indians of Fla. v. S. Fla. Water Mgmt. Dist.*, 559 F.3d 1191, 1198 (11th Cir. 2009). Moreover, a reservation of ruling would not unduly prejudice any party or cause delay, as this Court's preliminary injunction order remains in effect and the First Circuit appeal (like the parties' cross-motions for summary judgment) will be fully briefed in January 2026. *See* No. 25-1726, Order of Nov. 24, 2025 (1st Cir.). Because there is good cause to reserve ruling on these motions, which the equities favor, and which will be reasonable in duration, the Court should reserve ruling on the parties' motions for summary judgment until Defendants' pending appeal is finally resolved. *Marquis v. FDIC*, 965 F.2d 1148, 1155 (1st Cir. 1992); *see also Akebia Therapeutics, Inc. v. Azar*, 2020 WL 5732331, at *3 (D. Mass. Sep. 24, 2020) ("in the interests of efficiency and judicial economy," exercising discretion to stay proceedings while denial of preliminary injunction is on appeal because "there is a significant chance that the First Circuit will opine on issues germane").

## CONCLUSION

Defendants are entitled to summary judgment.

Dated: December 12, 2025                    Respectfully submitted,

                                            BRETT A. SHUMATE
                                            Assistant Attorney General

                                            ERIC J. HAMILTON
                                            Deputy Assistant Attorney General
                                            Civil Division, Federal Programs Branch

                                            JOSEPH E. BORSON
                                            Assistant Director
                                            Civil Division, Federal Programs Branch

                                            */s/ Marianne F. Kies*
                                            MARIANNE F. KIES
                                            CHRISTIAN DIBBLEE
                                            Trial Attorneys
                                            Civil Division, Federal Programs Branch
                                            1100 L Street, NW
                                            Washington, DC 20005
                                            Marianne.F.Kies@usdoj.gov
                                            202-353-1819

                                            NICOLE M. O'CONNOR
                                            Assistant U.S. Attorney
                                            U.S. Attorney's Office
                                            John Joseph Moakley U.S. Courthouse
                                            1 Courthouse Way, Suite 9200
                                            Boston, MA 02210
                                            (617) 748-3112
                                            Nicole.O'Connor@usdoj.gov

                                            *Attorneys for Defendants*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(a)(2)**

I, Marianne F. Kies, hereby certify that the Parties complied with Local Rule 7.1(a)(2) by conferring over the cross-motions for summary judgment via videoconference on December 11, 2025.


Dated: December 12, 2025                    /s/ *Marianne F. Kies*
                                             MARIANNE F. KIES
                                             Trial Attorney
                                             *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I, Marianne F. Kies, hereby certify that I served a true copy of the above document upon all counsel of record via this court's electronic filing system and upon any non-registered participants via first class mail.

Dated: December 12, 2025                    /s/ *Marianne F. Kies*
                                                                 MARIANNE F. KIES
                                                                 Trial Attorney