**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

STATE OF CALIFORNIA; STATE OF
NEVADA; COMMONWEALTH OF
MASSACHUSETTS; STATE OF
ARIZONA; STATE OF COLORADO;
STATE OF CONNECTICUT; STATE OF
DELAWARE; STATE OF HAWAII;
STATE OF ILLINOIS; STATE OF
MAINE; STATE OF MARYLAND;
PEOPLE OF THE STATE OF
MICHIGAN; STATE OF MINNESOTA;
STATE OF NEW JERSEY; STATE OF
NEW MEXICO; STATE OF NEW YORK;
STATE OF RHODE ISLAND; STATE OF
VERMONT; STATE OF WISCONSIN,

          *Plaintiffs,*

v.

DONALD J. TRUMP, in his official
capacity as President of the United States;
PAMELA BONDI, in her official capacity
as Attorney General of the United States;
UNITED STATES ELECTION
ASSISTANCE COMMISSION; DONALD
L. PALMER, in his official capacity as
Chairman of the U.S. Election Assistance
Commission; THOMAS HICKS, in his
official capacity as Vice Chair of the U.S.
Election Assistance Commission;
CHRISTY McCORMICK and BENJAMIN
W. HOVLAND, in their official capacities
as Commissioners of the U.S. Election
Assistance Commission; PETE HEGSETH,
in his official capacity as Secretary of
Defense,

          *Defendants.*

No. 1:25-cv-10810-DJC

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................1

Background ................................................................................................2

    I.      Legal Background ................................................................................2

    II.    Undisputed Facts ................................................................................3

         A.     State and Federal Election Duties ............................................3

         B.     The Executive Order ................................................................4

    III.   Procedural Background ........................................................................5

Legal Standard ..........................................................................................5

Argument ....................................................................................................5

    I.      Plaintiff States Can Challenge the EO with Non-Statutory Ultra Vires Claims ....................................................................................6

    II.    The President Cannot Unilaterally Refashion Federal Voter Registration ....................................................................................7

         A.     Section 2(a) ..............................................................................8

              1.     The President's order violates the separation of powers ....................................................................8

              2.     Documentary proof of citizenship requirements violate the NVRA ....................................................10

         B.     Section 3(d)(i) ........................................................................11

    III.   The President Cannot Override State Ballot Receipt Laws .............13

         A.     Section 7(a) ............................................................................13

          B.     Section 7(b) ............................................................................17

    IV.   The Challenged Provisions of the EO Also Violate the Vertical Separation of Powers ....................................................................19

    V.    Plaintiff States' Claims Are Justiciable ..........................................20

         A.     Undisputed Facts Establish that Plaintiff States' Claims Challenging EO Sections 2(a) and 3(d)(i) Are Justiciable....20

         B.     Undisputed Facts Establish that Plaintiff States' Claims Challenging EO Sections 7(a) and 7(b) Are Justiciable .......22

    VI.   The Court Should Declare that the Challenged Provisions of the EO Are Unconstitutional ....................................................................24

    VII.  The Court Should Permanently Enjoin the Challenged EO Provisions ....................................................................................24

         A.     The Documentary Proof of Citizenship Provisions Would Cause Substantial Injuries that Are Not Compensable with Money Damages ....................................................................25

         B.     The Ballot Receipt Deadline Provisions Would Cause Substantial Injuries that Are Not Compensable with Money Damages....................................................................................27

## TABLE OF CONTENTS
### (continued)

**Page**

    C.    The Equities and the Public Interest Weigh in Favor of
Granting Injunctive Relief ......................................................28

  VIII.   The Scope of the Requested Injunction Is Proper...........................31

Conclusion ..............................................................................................34

# TABLE OF AUTHORITIES

Page

## CASES

*Abbott v. Perez*
    585 U.S. 579 (2018)...........................................................................27, 28

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*
    458 U.S. 592 (1982)...........................................................................26, 28

*Arizona v. Inter Tribal Council of Ariz., Inc.*
    570 U.S. 1 (2013)...........................................................................2, 3, 9, 15

*Ass'n of Am. Univs. v. U.S. Dep't of Defense*
    792 F. Supp. 3d 143 (D. Mass. 2025) ...........................................................30

*Bognet v. Sec'y Commonwealth of Pa.*
    980 F.3d 336 (3d Cir. 2020)...........................................................................14

*Bost v. Ill. State Bd. of Elections*
    684 F. Supp. 3d 720 (N.D. Ill. 2023) ..................................................14, 15

*Boumediene v. Bush*
    553 U.S. 723 (2008).............................................................................6

*Burroughs v. United States*
    290 U.S. 534 (1934)............................................................................2

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*
    631 F.3d 1072 (9th Cir. 2011) ..........................................................10

*Campanale & Sons, Inc. v. Evans*
    311 F.3d 109 (1st Cir. 2002) ............................................................10

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986)............................................................................5

*Chamber of Com. of U.S. v. Reich*
    74 F.3d 1322 (D.C. Cir. 1996) ........................................................6, 7

*Chef Time 1520 LLC v. Small Bus. Admin.*
    646 F. Supp. 3d 101 (D.D.C. 2022) .........................................26, 27, 28

*City & Cnty. of San Francisco v. Trump*
    897 F.3d 1225 (9th Cir. 2018) ..........................................................19

*City of Chicago v. Barr*
    961 F.3d 882 (7th Cir. 2020) ..........................................................19

## TABLE OF AUTHORITIES
### (continued)

**Page**

*City of Providence v. Barr*
    954 F.3d 23 (1st Cir. 2020)............................................................................17

*Clapper v. Amnesty Int'l, USA*
    568 U.S. 398 (2013)......................................................................................20

*Clinton v. City of New York*
    524 U.S. 417 (1998)................................................................................16, 19

*Collins v. Yellen*
    594 U.S. 220 (2021)........................................................................................6

*Comm. for Massachusetts Voter Identification Ballot Question v. Galvin*
    790 F. Supp. 3d 1 (D. Mass. 2025) .................................................................5

*CoxCom, Inc. v. Chaffee*
    536 F.3d 101 (1st Cir. 2008).........................................................................25

*Dem. Nat'l Comm. v. Wis. State Legislature*
    141 S. Ct. 28 (2020)......................................................................................22

*Dep't of Commerce v. New York*
    588 U.S. 752 (2019)................................................................................21, 32

*Doe v. Trump*
    766 F. Supp. 3d 266 (D. Mass. 2025) .............................................................6

*Doe v. Trump*
    157 F.4th 36 (1st Cir. 2025)................................................................. *passim*

*Does 1-6 v. Mills*
    16 F.4th 20 (1st Cir. 2021)............................................................................28

*Donald J. Trump for President, Inc. v. Way*
    492 F. Supp. 3d 354 (D.N.J. 2020) ..........................................................14, 15

*El Dia, Inc. v. Hernandez Colon*
    963 F.2d 488 (1st Cir. 1992).........................................................................24

*Ernst & Young v. Depositors Econ. Prot. Corp.*
    45 F.3d 530 (1st Cir. 1995)...........................................................................24

*FEC v. Democratic Senatorial Campaign Comm.*
    454 U.S. 27 (1981)..........................................................................................8

*Fish v. Kobach*
    840 F.3d 710 (10th Cir. 2016) ........................................................................7

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Fish v. Schwab*
    957 F.3d 1105 (10th Cir. 2020) ...................................................................31

*Foster v. Love*
    522 U.S. 67 (1997) .........................................................................2, 3, 14, 15

*Georgia v. Meadows*
    88 F.4th 1331 (11th Cir. 2023) .............................................................19, 20

*Gonzalez v. Arizona*
    677 F.3d 383 (9th Cir. 2012) .......................................................................15

*Harmon v. Thornburgh*
    878 F.2d 484 (D.C. Cir. 1989) .....................................................................32

*In re Aiken County*
    725 F.3d 255 (D.C. Cir. 2013) .....................................................................19

*Kansas v. United States*
    249 F.3d 1213 (10th Cir. 2001) ...................................................................27

*Katz v. Pershing, LLC*
    672 F.3d 64 (1st Cir. 2012)...........................................................................20

*Kobach v. U.S. Election Assistance Comm'n*
    772 F.3d 1183 (10th Cir. 2014) .....................................................................9

*League of United Latin Am. Citizens v. Exec. Office of the President*
    ___ F. Supp. 3d ___, 2025 WL 3042704  (D.D.C. Oct. 31, 2025) ....................... *passim*

*League of United Latin Am. Citizens v. Exec. Office of the President*
    780 F. Supp. 3d 135 (D.D.C. 2025).....................................................9, 18, 31

*League of Women Voters of the U.S. v. Newby*
    838 F.3d 1 (D.C. Cir. 2016) ...................................................................28, 29

*Louisiana v. Biden*
    55 F.4th 1017 (5th Cir. 2022) ................................................................25, 27

*Lujan v. Defenders of Wildlife*
    504 U.S. 555 (1992).......................................................................................10

*Maryland v. King*
    567 U.S. 1301 (2012).....................................................................................27

*Mass. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*
    2024 WL 2194260 (D. Mass. Apr. 16, 2024)...................................26, 27, 28

## TABLE OF AUTHORITIES
### (continued)

Page

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.*
  923 F.3d 209 (1st Cir. 2019) ........................................................................ 20, 21, 23, 24

*McInnis-Misenor v. Maine Med. Ctr.*
  319 F.3d 63 (1st Cir. 2003) ........................................................................................ 21

*Medellin v. Texas*
  552 U.S. 491 (2008) ........................................................................................ 5, 11, 13, 16

*Mi Familia Vota v. Fontes*
  129 F.4th 691 (9th Cir. 2025) ........................................................................................ 11

*Mi Familia Vota v. Fontes*
  719 F. Supp. 3d 929 (D. Ariz. 2024) ........................................................................... 31

*Murphy Co. v. Biden*
  65 F.4th 1122 (9th Cir. 2023) ................................................................................... 6, 7

*N.H. Lottery Comm'n v. Rosen*
  986 F.3d 38 (1st Cir. 2021) ........................................................................................ 22

*N.H. Right to Life Political Action Comm. v. Gardner*
  99 F.3d 8 (1st Cir. 1996) ........................................................................................... 22

*Nat'l TPS All. v. Noem*
  150 F.4th 1000 (9th Cir. 2025) ................................................................................... 32

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin*
  407 F. Supp. 2d 323 (D. Mass. 2005) ....................................................................... 30

*New York v. United States*
  505 U.S. 144 (1992) ................................................................................................... 32

*New York v. U.S. Dep't of Com.*
  351 F. Supp. 3d 502 (S.D.N.Y. 2019) ...................................................................... 32

*Newberry v. United States*
  256 U.S. 232 (1921) ................................................................................................... 14

*Nken v. Holder*
  556 U.S. 418 (2009) ................................................................................................... 28

*Pa. Democratic Party v. Boockvar*
  238 A.3d 345 (Pa. 2020) ............................................................................................ 14

*Purcell v. Gonzalez*
  549 U.S. 1 (2006) ....................................................................................... 26, 28, 30

## TABLE OF AUTHORITIES
### (continued)

Page

*Reddy v. Foster*
    845 F.3d 493 (1st Cir. 2017) ...................................................................................21, 22

*Republican Nat'l Comm. v. Wetzel*
    120 F.4th 200 (5th Cir. 2024) ........................................................................................16

*Republican Nat'l Comm. v. Wetzel*
    132 F.4th 775 (5th Cir. 2025) ........................................................................................16

*Rodriguez v. Robbins*
    715 F.3d 1127 (9th Cir. 2013) .......................................................................................30

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*
    102 F.3d 12 (1st Cir. 1996).......................................................................................23, 27

*Rudisill v. McDonough*
    601 U.S. 294 (2024).........................................................................................................11

*Ex parte Siebold*
    100 U.S. 371 (1879)......................................................................................................2, 15

*Smiley v. Holm*
    285 U.S. 355 (1932)............................................................................................................2

*Steffel v. Thompson*
    415 U.S. 452 (1974)..........................................................................................................24

*Susan B. Anthony List v. Driehaus*
    573 U.S. 149 (2014).....................................................................................................20, 22

*Trump v. CASA, Inc.*
    606 U.S. 831 (2025).............................................................................................31, 32, 34

*Trump v. Hawaii*
    585 U.S. 667 (2018)..........................................................................................................31

*Trump v. United States*
    603 U.S. 593 (2024)............................................................................................................2

*United States v. Abreu*
    106 F.4th 1 (1st Cir. 2024)...............................................................................................12

*United States v. Alabama*
    778 F.3d 926 (11th Cir. 2015) ................................................................................3, 7, 13

*United States v. Classic*
    313 U.S. 299 (1941)............................................................................................................2

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Washington v. Trump*
145 F.4th 1013 (9th Cir. 2025) ................................................................32

*Watson v. Republican Nat'l Comm.*
No. 24-1260, __ S. Ct. __, 2025 WL 3131802 (Nov. 10, 2025)..............16, 17

*Wise v. Circosta*
978 F.3d 93 (4th Cir. 2020) ....................................................................19

*Youngstown Sheet & Tube Co. v. Sawyer*
343 U.S. 579 (1952)..........................................................5, 6, 7, 19

CONSTITUTIONAL PROVISIONS

U.S. Const. art. I
§ 4, cl. 1 .......................................................................................2, 17
§ 7 ......................................................................................................2

U.S. Const. art. II ...................................................................................19
§ 1, cl. 2 ......................................................................................2, 17
§ 1, cl. 4 ......................................................................................2, 17
§ 3 ......................................................................................................2

Mich. Const. 1963, art. II
§ 4(1)(b) ...........................................................................................15

FEDERAL STATUTES

2 U.S.C.
§ 7 ....................................................................................................14

3 U.S.C.
§ 1 ....................................................................................................14
§ 21(1) ..............................................................................................14

5 U.S.C.
§ 553 ................................................................................................10

28 U.S.C.
§ 2201(a) ..........................................................................................24

52 U.S.C.
§ 20301(b)(1) ....................................................................................12
§ 20301(b)(2) ..........................................................................3, 12, 31
§ 20301(b)(7) ....................................................................................12
§ 20302(a)(5) ....................................................................................12

## TABLE OF AUTHORITIES
### (continued)

Page

§ 20302(i)(1) .................................................................................................12
§ 20303(b)(3) ................................................................................................15
§ 20304(b)(1) ................................................................................................15
§ 20501(b)(1) ................................................................................................29
§ 20503 ...........................................................................................................3
§ 20508 ...........................................................................................................3
§ 20508(a) ...................................................................................................3, 8
§ 20508(a)(2) ................................................................................................10
§ 20508(b) .....................................................................................................31
§ 20508(b)(1) ........................................................................................9, 10, 11
§ 20508(b)(2) ...........................................................................................9, 11
§ 20508(b)(3) ...........................................................................................9, 11
§ 20901 .....................................................................................................3, 17
§ 20901(a) .....................................................................................................17
§ 20901(c) .....................................................................................................17
§ 20901(d) .....................................................................................................17
§ 20903 .........................................................................................................17
§ 20903(a) .....................................................................................................17
§ 20904 .........................................................................................................17
§ 20904(c) .......................................................................................................3
§§ 20921-20923 .............................................................................................8
§ 20922(4) .......................................................................................................3
§ 20923(b)(2) ..................................................................................................8
§ 20923(b)(3)(A) .............................................................................................8
§ 20923(c)(1) ..................................................................................................8
§ 20928 ...........................................................................................................8
§ 21001 ...........................................................................................................3
§ 21001(a) .....................................................................................................17
§ 21002(a) .....................................................................................................17
§ 21002(c) .....................................................................................................17
§ 21003 .........................................................................................................17
§ 21004(a)(1) ................................................................................................18
§ 21081 ...........................................................................................................3
§ 21081(a)(6) ...........................................................................................18, 19
§ 21083 ...........................................................................................................3
§ 21083(b)(4)(A)(i) .........................................................................................9
§ 21085 .........................................................................................................18

Pub. L.
No. 84-296, § 204, 69 Stat. 584, 586-587 (1955) ......................................12
No. 103-31, § 9(a)(2), 107 Stat. 77, 87 (1993) ............................................8
No. 117-328, 136 Stat. 4459 (2022) ...........................................................16
No. 118-47, 138 Stat. 460, 549 (2024) .......................................................17
No. 119-4, 139 Stat. 9, 10-11, 26 (2025) ...................................................17

**TABLE OF AUTHORITIES**
(continued)

**Page**

Act of Jan. 23, 1845, ch. 1, 5 Stat. 721 ........................................................14

Act of Feb. 2, 1872, ch. 11, § 3, 17 Stat. 28 ...............................................14

**STATE STATUTES**

Ariz. Rev. Stat.
    § 16-550 ...................................................................................................15

Cal. Civ. Code
    § 1798.21 .................................................................................................33

Cal. Elec. Code
    § 2194(b) .................................................................................................33
    § 3019 ......................................................................................................15
    § 3020(b) ............................................................................................15, 28

Colo. Rev. Stat.
    § 1-7.5-107.3 ...........................................................................................15

Haw. Rev. Stat.
    § 11-106 ...................................................................................................15

10 Ill. Comp. Stat.
    5/18A-15 ..................................................................................................15
    5/19-8 ......................................................................................................15

Mass. Gen. Laws ch. 54
    § 93 .........................................................................................................15

Md. Elec. Law
    § 11-302 ...................................................................................................15
    § 11-302(c) ..............................................................................................15

Mich. Comp. Laws
    § 168.759a(18) .........................................................................................15
    § 168.766a ................................................................................................15

Minn. Stat.
    § 201.071 ...................................................................................................4

N.J. Stat. Ann.
    § 19:63-17 ................................................................................................15
    § 19:63-22(a) ...........................................................................................15

N.Y. Elec. Law
    § 8-412(1) ................................................................................................15

# TABLE OF AUTHORITIES
### (continued)

Page

§ 8-710(1) .................................................................................................15
§ 9-209 ......................................................................................................15

Nev. Rev. Stat.
§ 293.269921 ...........................................................................................28
§ 293.269921(1)(b) ..................................................................................15
§ 293.269921(2) .......................................................................................15
§ 293.269927 ...........................................................................................15

17 R.I. Gen. Laws
§ 17-20-16 ...............................................................................................15

## REGULATORY MATERIALS

11 C.F.R. § 9428.3(b) .....................................................................................31

22 C.F.R. § 53.2(b)(1) ..............................................................................13, 29

32 C.F.R. § 233.6(b) .......................................................................................32

Executive Order No. 14248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025) ................................... *passim*

Md. Code Regs. § 33.11.03.08(B)(4) ..............................................................15

N.M. Code R. § 1.10.12.16 ...............................................................................15

410 R.I. Code R. § 20-00-23.12 .......................................................................15

## COURT RULES

Fed. R. Civ. P.
Rule 56(a) ..................................................................................................5
Rule 56(c) ..................................................................................................5

## OTHER AUTHORITIES

*Authenticate*, Merriam-Webster Dictionary, https://perma.cc/38ZV-34P9 ..........................11

*Authentication*, Black's Law Dictionary (12th ed. 2024) ....................................11

EAC, Election Sec. Grant, https://perma.cc/8EMJ-9VA8 ....................................17

Federal Post Card Application, https://perma.cc/AWL3-SWWB ........................12

H.R. Rep. No. 103-66, 1993 WL 235764 (1993) ..........................................9, 11

H.R. Rep. No. 107-329, 2001 WL 1579545 (2001) ...........................................18

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

N. Webster, *An American Dictionary of the English Language* 433 (Charles
Goodrich & N. Porter eds. 1869) ...................................................................................14

*New Dictionary of the English Language* 649 (Charles Richardson, ed.
1846) ........................................................................................................................14

*Postcard*, Merriam-Webster Dictionary, https://perma.cc/A955-M3WQ ...........................12

# INTRODUCTION

After vigorous debate at the Founding, the Framers granted the power to regulate federal elections to the States and Congress.  This decision recognizes that States are best situated to conduct elections in their territory, and respects their interest in contests that determine their representation in the federal government.  It also vests power in the most representative branch of the federal government, Congress.  Critically, it prevents the President—a single partisan official—from setting the rules for the most sacred of our democratic traditions.

Nevertheless, on March 25, 2025, the President issued Executive Order No. 14248, *Preserving and Protecting the Integrity of American Elections* (EO).  The EO orders the United States Election Assistance Commission and the Secretary of Defense to implement onerous and unnecessary documentary proof of citizenship requirements on federal voter registration forms.  The EO likewise seeks to prohibit States from counting ballots that are timely cast but received shortly after Election Day in accordance with state laws.

Neither the Constitution nor federal statute grant the President the authority to impose these requirements.  To the contrary, the President's unilateral action runs directly counter to the Framers' careful allocation of power over federal elections.  The challenged provisions of the EO are not only ultra vires, but also highly disruptive and burdensome, forcing the Plaintiff States to set aside their state laws and sovereign interests to overhaul election administration.  Plaintiff States now move for partial summary judgment, declaratory relief, and a permanent injunction as to four provisions of the EO:  2(a), (3)(d)(i), 7(a), and 7(b).[1]  This Court appropriately preliminarily enjoined those provisions.  It should issue declaratory and permanent injunctive relief for the same reasons.

---

[1] Plaintiff States' Complaint also challenges Section 4(a), which orders the EAC to withhold funding from States that do not accept the Federal Form as modified "pursuant to section 2(a)(ii) of this order."  EO, § 4(a).  The permanent injunction of Section 2(a) sought by this Motion would obviate the need for relief as to Section 4(a).  Accordingly, Plaintiff States reserve their challenge to Section 4(a) to a later date, if necessary, should relief on Section 2(a) be denied.

# BACKGROUND

## I.   LEGAL BACKGROUND

States have primary authority to regulate federal elections under the U.S. Constitution.  *See* U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2, 4.  This constitutional grant of power authorizes States to "provide a complete code for [federal] elections, not only as to times and places, but in relation to notices, registration . . . [and] protection of voters," among other topics.  *Smiley v. Holm*, 285 U.S. 355, 366 (1932).  States "enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved."  *Id.*  In short, they are "given, and in fact exercise a wide discretion" in providing for fair and efficient elections.  *United States v. Classic*, 313 U.S. 299, 311 (1941).

The Elections Clause also grants Congress the power to "make or alter" regulations of congressional elections.  U.S. Const. art. I, § 4, cl. 1.  In this way, the Elections Clause "functions as 'a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices.'"  *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (*ITCA*) (quoting *Foster v. Love*, 522 U.S. 67, 69 (1997)); *see also Ex parte Siebold*, 100 U.S. 371, 384 (1879) (federal law preempts state election law only "so far as the conflict extends").  The Supreme Court has also construed the Electors Clause, art. II, § 1, cl. 2, as granting Congress a "limited" role in regulating presidential elections.  *Trump v. United States*, 603 U.S. 593, 627 (2024); *see also Burroughs v. United States*, 290 U.S. 534, 545 (1934).

The President, in contrast, has no independent constitutional powers related to elections.  The President's role in election legislation is confined to recommending measures to Congress, U.S. Const., art. II, § 3, and signing or vetoing bills, *id.*, art. I, § 7.  Once federal legislation is enacted, the President must "take care that the laws be faithfully executed."  *Id.*, art. II, § 3.

Congress has exercised its constitutional authority over federal elections in several ways relevant to this case.  Through the National Voter Registration Act (NVRA) and Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), Congress simplified voter registration for

federal elections by establishing uniform voter registration forms.  *ITCA*, 570 U.S. at 12; *United States v. Alabama*, 778 F.3d 926, 928 (11th Cir. 2015).  The NVRA established a federal mail voter registration form, or Federal Form, 52 U.S.C. § 20508, while UOCAVA established a similar form for use by absent military, their family, and overseas voters, the Post Card Form, *id.* § 20301(b)(2).  In 2002, Congress passed the Help America Vote Act (HAVA) to upgrade voting systems by setting standards for voting technology and by providing federal funding to the States for elections purposes.  *See id.* §§ 20901, 21001, 21081, 21083.  Finally, Congress has set the date for the general congressional and presidential elections through the Election Day statutes to reduce burdens on voters and protect voting from the distorting influence of disparate election dates.  *Foster*, 522 U.S at 73.

## II.  UNDISPUTED FACTS

### A.  State and Federal Election Duties

Plaintiff States and their subdivisions administer elections for federal office.  Plaintiffs' Statement of Undisputed Material Facts (PSUF), filed herewith, ¶ 1.  Among other tasks, Plaintiff States and their subdivisions are responsible for registering voters, providing ballots, tabulating votes, and certifying results in all elections for federal office.  *Id.* ¶ 2.  In line with their constitutional role, Plaintiff States each maintain legal codes governing elections, including provisions related to voter registration processes and ballot receipt deadlines.  Thirteen Plaintiff States (Ballot Receipt Plaintiffs) maintain laws that allow timely-cast ballots to be received or cured during a set period of days shortly after Election Day.[2]  *Id.* ¶¶ 29-30.

Defendant U.S. Election Assistance Commission (EAC) is responsible for promulgating the Federal Form and administering congressionally authorized formula grants to States.  *Id.* ¶¶ 9, 34; 52 U.S.C. §§ 20508(a), 20901, 20904(c), 20922(4), 21001.  Plaintiff States, other than Wisconsin and Minnesota, are required under the NVRA to accept and use the Federal Form to register eligible voters for federal elections.  PSUF ¶ 10; 52 U.S.C. § 20503.  Minnesota accepts

---

[2] Ballot curing is the process of resolving minor technical problems with submitted ballots, such as a missing signature, so a timely cast ballot can ultimately be counted.

the Federal Form pursuant to its state law. *Id.* ¶ 10 & n.2; Minn. Stat. § 201.071. The Federal Form requires applicants to swear or affirm their citizenship under penalty of perjury and threat of imprisonment and deportation. *Id.* ¶¶ 12-14. Defendant EAC has previously considered and rejected requests to require documentary proof of citizenship on the Federal Form. *Id.* ¶¶ 15-19.

The Secretary of Defense, as the President's designee under UOCAVA, is responsible for promulgating the Post Card Form for use by overseas and military voters. *Id.* ¶ 24. Plaintiff States are required to accept the Post Card Form as a valid voter registration form and absentee ballot application. *Id.* ¶ 25. Like the Federal Form, the Post Card Form requires applicants to swear under penalty of perjury that they are a U.S. citizen. *Id.* ¶ 28.

**B.    The Executive Order**

President Trump issued Executive Order No. 14248 on March 25, 2025. 90 Fed. Reg. 14005. The EO directs Defendants EAC, Attorney General Bondi, and Secretary of Defense Hegseth to take specified actions. PSUF ¶ 5. As relevant here, the EO mandates that the Federal Form and Post Card Form be updated to "require" documentary proof of citizenship (EO, §§ 2(a), 3(d)(i)), orders the Attorney General to "enforce" an announced presidential policy to "require that votes be cast and received by the election date established in law" (*id.*, §§ 1, 7(a)), and orders the EAC to withhold funding from States that do not adopt an Election Day ballot receipt deadline (*id.*, § 7(b)).

As the entities responsible for administering federal elections, Plaintiff States would be directly and significantly impacted by implementation of the EO's provisions. In brief, the EO's mandates will compel a significant diversion of Plaintiff States' resources, impose unrecoverable implementation and compliance costs, threaten loss of funding and enforcement harms, and injure the States' efforts to maintain the integrity of their elections, as well as their perception by the public as trustworthy stewards of federal elections. PSUF ¶¶ 37-49. States will not be the only ones harmed, however. Implementation of the challenged EO provisions will also result in foreseeable and avoidable disenfranchisement of eligible voters. *Id.* ¶¶ 50-66.

### III.  PROCEDURAL BACKGROUND

On April 3, 2025, Plaintiff States brought suit seeking declaratory and injunctive relief as to six of the EO's unconstitutional and illegal provisions—Sections 2(a), 2(d), 3(d), 4(a), 7(a), and 7(b)—and subsequently moved for preliminary injunctive relief as to all but Section 4(a). D. 1, 76.  The Court granted Plaintiff States' preliminary injunction motion on June 13, 2025. D. 107, 108.  Defendants filed a Motion to Dismiss that same day.  D. 109; *see also* D. 113, 120. The Court denied the motion in full on September 17, 2025.  D. 132.  The parties filed a stipulation to dismiss Plaintiff States' Section 2(d) claim without prejudice on December 11, 2025.  D. 160.

### LEGAL STANDARD

Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986); *Comm. for Massachusetts Voter Identification Ballot Question v. Galvin*, 790 F. Supp. 3d 1, 4 (D. Mass. 2025); *see also* Fed. R. Civ. P. 56(a).  A party may assert that a fact "cannot be or is genuinely disputed" by citing to documents, affidavits, or other materials, or showing that the cited materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support that fact."  Fed. R. Civ. P. 56(c).

### ARGUMENT

"The President's authority to act . . . 'must stem either from an act of Congress or from the Constitution itself.'"  *Medellin v. Texas*, 552 U.S. 491, 524 (2008) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) (*Youngstown*)).  Neither support the challenged provisions of the EO.  As described above, the Constitution does not grant the President any specific powers over elections.  *See League of United Latin Am. Citizens v. Exec. Off. of President*, ___ F. Supp. 3d ___, 2025 WL 3042704, at *4 (D.D.C. Oct. 31, 2025) (*LULAC II*) ("Executive regulatory authority over federal elections does not appear to have crossed the Framers' minds").  Likewise, none of the applicable federal election statutes—the NVRA,

HAVA, UOCAVA, and the Election Day statutes—empowers the President to issue the challenged EO provisions.  In fact, as to Sections 2(a), 3(d), and 7(b), Congress has expressly or implicitly foreclosed the President's mandates.  It is similarly impossible to reconcile the text and history of the Election Day statutes with Section 7(a).

Without constitutional or statutory authority, the President's power is "at its lowest ebb," as "he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter."  *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).  The Court can sustain the challenged provisions of the EO "only by disabling the Congress from acting upon the subject."  *Id.* at 637-638.  And it should scrutinize the challenged provisions "with caution, for what is at stake is the equilibrium established by our constitutional system."  *Id.* at 638.  Indeed, "the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker."  *Id.* at 587.  Declaratory and permanent injunctive relief are proper "to enforce separation-of-powers principles" where the President has transgressed these limitations on his authority.  *Boumediene v. Bush*, 553 U.S. 723, 743 (2008).

## I.    PLAINTIFF STATES CAN CHALLENGE THE EO WITH NON-STATUTORY ULTRA VIRES CLAIMS

This Court has properly held that Plaintiff States' "non-statutory *ultra vires* challenges against the Executive Order are valid causes of action."  D. 132 at 19.  There is no reason to deviate from this conclusion on summary judgment.

Courts are empowered to review action that exceeds the President's carefully circumscribed authority.  *See Youngstown*, 343 U.S. at 582, 585-589.  Specifically, federal courts can adjudicate equitable claims challenging the legality of an executive order by means of a non-statutory ultra vires cause of action.  D. 132 at 17-19; *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327-28, 1331-32 (D.C. Cir. 1996); *Murphy Co. v. Biden*, 65 F.4th 1122, 1128-31 (9th Cir. 2023); *Doe v. Trump*, 766 F. Supp. 3d 266, 277 (D. Mass. 2025), *aff'd* 157 F.4th 36 (1st Cir. 2025).  This authority is particularly well-established as to claims that are constitutional in nature.  *See LULAC II*, 2025 WL 3042704, at *24; *see also Collins v. Yellen*, 594 U.S. 220, 245

(2021) ("[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge.").

That is precisely the case here. Each of Plaintiff States' claims directly challenge a Presidential command made without statutory or constitutional basis. *See Youngstown*, 343 U.S. at 582, 585-589. Those claims are "not that the President failed to discharge statutory duties or strayed from procedures required by statute[s]." *LULAC II*, 2025 WL 3042704, at *25. Indeed, none of the statutes at issue here give the President discretion or any other role related to proof of citizenship on voter registration forms or mail ballot receipt deadlines.[3] Rather, Plaintiff States allege, based on the separation of powers doctrine, that the President's directives are "outside his constitutional powers and intrude[] into the domain of regulating federal election procedure, which the Elections Clause reserves for the States and Congress alone." *LULAC II*, 2025 WL 3042704, at *25; *see also* D. 1 at 39, ¶ 1. Plaintiff States are entitled to challenge—and this Court is empowered to review—these unlawful incursions.

## II. THE PRESIDENT CANNOT UNILATERALLY REFASHION FEDERAL VOTER REGISTRATION

Congress enacted the NVRA and UOCAVA to create uniform, accessible federal voter registration procedures meant to encourage and simplify voter registration. *See Fish v. Kobach*, 840 F.3d 710, 720-721 (10th Cir. 2016); *Alabama*, 778 F.3d at 928. Congress designed both statutes with considerable detail to guarantee that voter registration for federal elections remains accessible and administrable. Sections 2(a) and 3(d)(i) of the EO ignore these requirements in favor of the President's preferred policy, which would impose burdensome and unnecessary documentary proof of citizenship requirements on federal voter registration forms. Both provisions are ultra vires and unconstitutional.

---

[3] In fact, several of the statutes in which the President purports to ground his authority *prohibit* the specific action he seeks to take. *See infra* at §§ II.A.2, II.B., III.A, III.B. This, too, supports ultra vires causes of action. *Reich*, 74 F.3d at 1331-32; *Murphy Co.*, 65 F.4th at 1129-30.

### A.    Section 2(a)

Section 2(a) unconstitutionally exceeds the President's power.  The President has no authority to circumvent the NVRA and order the EAC to make specific changes to the Federal Form.  *See* D. 107 at 16; D. 132 at 21-23; *accord LULAC II*, 2025 WL 3042704, at *26.  Even if he had that authority, the NVRA prohibits the President's changes here.

### 1.    The President's order violates the separation of powers

Section 2(a) directs the EAC to alter the Federal Form to require documentary proof of citizenship, to adopt stringent standards limiting acceptable proof, and to mandate that state and local officials securely maintain related records.  *See* EO, § 2(a)(i)(A), (a)(i)(B), (a)(ii)(A)-(D).  Elsewhere, Defendants have confirmed that this provision "means what it says:  the EAC *must* add a documentary-proof-of-citizenship requirement to the Federal Form."  *LULAC II*, 2025 WL 3042704, at *30.  But the President cannot unilaterally order changes to the Federal Form, and his attempt to do so is incompatible with both the procedural requirements set forth by Congress and the bedrock constitutional principle of separation of powers.

To buffer the Federal Form from political tides, Congress designated an independent, bipartisan body to serve as its steward.  That responsibility initially belonged to the independent and bipartisan Federal Election Commission.  Pub. L. No. 103-31, § 9(a)(2), 107 Stat. 77, 87 (1993); *see FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981).  With HAVA, Congress transferred that responsibility to the newly created EAC, another "independent," multimember, bipartisan, and expert commission that can act only by a majority—and therefore bipartisan—vote.  52 U.S.C. §§ 20508(a), 20921-20923, 20928.[4]  The EAC's purview is exclusive; "Congress has never assigned any responsibility for the content of the Federal Form to the President or to any other individual in the Executive Branch with the power to act unilaterally."  *LULAC II*, 2025 WL 3042704, at *27.  Defendants' argument that the Vesting Clause gives the President unlimited authority to direct the EAC is "untethered from

---

[4] Congress required bipartisanship by prescribing that, for each pair of initial appointments, "not more than one" could be "affiliated with the same political party," *id.* § 20923(b)(2), and subjecting subsequent appointments to those same conditions, *id.* § 20923(b)(3)(A).  The EAC's chair and vice chair also "may not be affiliated with the same political party," *id.* § 20923(c)(1).

precedent and unsupported by even a maximalist view of 'the executive Power' under our Constitution." D. 107 at 18 (quoting *League of United Latin Am. Citizens v. Exec. Office of the President*, 780 F. Supp. 3d 135, 198 (D.D.C. 2025) (*LULAC I*)); *see also* D. 109 at 16.

To further safeguard the Federal Form's utility for its intended purpose, Congress imposed guardrails on its contents. The Form may "require *only*" information that "is *necessary* to enable" elections officials "to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1) (emphasis added). The EO's documentary proof of citizenship mandate does not meet this stringent standard. In fact, the congressional conference committee charged with crafting the NVRA concluded that requiring documentary proof of citizenship was "not necessary or consistent with the purposes of" the NVRA and could "effectively eliminate, or seriously interfere with, the mail registration program." H.R. Rep. No. 103-66, at 23, 1993 WL 235764 (1993); *see also Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1195 & n.7 (10th Cir. 2014) (summarizing legislative history). Congress's concern was well founded: many eligible voters lack ready access to documentary proof of citizenship. PSUF ¶¶ 50-51.

Federal law therefore requires applicants to establish citizenship by checkbox and "attestation" signed "under penalty of perjury." 52 U.S.C. §§ 20508(b)(2), 21083(b)(4)(A)(i). Otherwise, the Federal Form "may not include any requirement for notarization *or other formal authentication*." *Id.* § 20508(b)(3) (emphasis added). In recognition of these strict limitations and Congress's previous decision, the EAC has repeatedly rejected States' attempts to require documentary proof of citizenship with the Federal Form. *See Kobach*, 772 F.3d at 1189, 1196-98; *see also ITCA*, 570 U.S. at 6. In so finding, the EAC concluded that such a requirement would undermine the purposes of the NVRA by "hinder[ing] voter registration for Federal elections" and "thwart[ing] organized voter registration programs." PSUF ¶ 19.

Congress also specified that the EAC can only amend the Federal Form after input from stakeholders and meaningful deliberation. Before any amendment, the EAC must consult with the States' chief elections officials and undertake the Administrative Procedure Act's notice and

comment process.  52 U.S.C. § 20508(a)(2); 5 U.S.C. § 553.  The former is a logical prerequisite

to the determination that information "is necessary *to enable the appropriate State election*

*official* to assess the eligibility of the applicant and to administer voter registration and other

parts of the election process."  52 U.S.C. § 20508(b)(1) (emphasis added).  Where "Congress has

required consultation . . . we must presume that [it] will have a serious purpose that is likely to

produce tangible results." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 585 (1992) (Stevens, J.,

concurring); *see also* D. 107 at 17.  Put another way, this consultation requirement "must mean

something more than general participation . . . otherwise the consultation requirement would be

rendered nugatory." *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 118 (1st Cir. 2002); *see*

*also* D. 107 at 17; *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1086 (9th Cir.

2011) (finding that if Energy Policy Act provision directing agency to prepare a study "in

consultation with the affected States" merely meant inviting and considering public comments,

that would "render Congress's choice of language meaningless.").  Yet, as this Court observed,

Section 2(a)'s directive "flouts this procedure."  D. 132 at 23.

Section 2(a) usurps the authority that Congress granted to the independent EAC, disregards

Congress's and the EAC's previous conclusions as to what should be included on the Federal

Form, and preordains the outcome of what Congress meant to be a meaningful process for State

input and deliberation, even going so far as to specify what categories of documents constitute

sufficient proof of citizenship.  "[T]he President has no constitutional power over election

regulation that would support this unilateral exercise of authority."  *LULAC II*, 2025 WL

3042704, at *28.  The Court should grant Plaintiff States summary judgment on this claim.

### 2.    Documentary proof of citizenship requirements violate the NVRA

Section 2(a) is unconstitutional for a second reason:  it contradicts the NVRA.[5]  Congress

considered and rejected a documentary proof of citizenship requirement on the Federal Form,

---

[5] Due to Arizona's unique legal requirements, the State does not join the argument that the
NVRA prohibits a documentary proof of citizenship requirement on the Federal Form.

and went on to limit the contents of the Form to only "the information necessary" and to prohibit "any requirement for notarization or other formal authentication."  52 U.S.C. § 20508(b)(1), (3).

Congress deliberately chose to establish an applicant's citizenship by attestation, *id.* § 20508(b)(2), illustrating that documentary proof is "not legitimately necessary for registration," *Mi Familia Vota v. Fontes*, 129 F.4th 691, 719 (9th Cir. 2025) (explaining that "[t]he ordinary meaning of 'necessary' is 'essential'"); *see also* H.R. Conf. Rep. No. 103-66 at 23-24, 1993 WL 235764 (1993) (rejecting proposed amendment to allow States to require documentation of citizenship as "not necessary or consistent with the purposes of this Act").

Moreover, a prohibition on "authentication" is a prohibition on requiring "the act of proving something"—such as a claim of citizenship—"is true or genuine."  *Authentication*, Black's Law Dictionary (12th ed. 2024); *see also Authenticate*, Merriam-Webster Dictionary, https://perma.cc/38ZV-34P9 ("[T]o prove or serve to prove to be real, true, or genuine"). Defendants have argued that the reference to "notarization" must be limited to proving *identity*, and that this limitation modifies the phrase on "other formal authentication."  D. 109 at 18-19. Both propositions are illogical.  Notarization can serve other purposes—e.g., that a person is aware of what they are signing.  And artificially limiting the meaning of "formal authentication" is inappropriate where the "differences in language [in the statute] convey differences in meaning."  *See Rudisill v. McDonough*, 601 U.S. 294, 308 (2024).

Section 2(a) ignores and purports to supersede these statutory requirements.  The President has no power to issue such an order.  *See Medellin*, 552 U.S. at 525.

## B.    Section 3(d)(i)

Section 3(d)(i) orders that applicants be required to provide documentary proof of citizenship with the Post Card Form, the voter registration form for military and overseas voters.[6] As reflected in this Court's prior rulings, that mandate is impossible to harmonize with the text and purpose of UOCAVA.  *See* D. 107 at 21-24; D. 132 at 23-24.

---

[6] Plaintiff States move for summary judgment as to Section 3(d)(i), which unmistakably and directly mandates the implementation of a documentary proof requirement that is contrary to UOCAVA.  Plaintiff States reserve their right to later renew their challenge to Section 3(d)(ii).

Congress's design for the Post Card Form precludes a documentary proof of citizenship requirement.  A predecessor to UOCAVA, the Federal Voting Assistance Act of 1955, required that overseas absentee ballot applications take the "form of [a] post card," and went so far as to prescribe its size and contents.  Pub. L. No. 84-296, § 204, 69 Stat. 584, 586-587 (1955).  UOCAVA did not carry forward the specific size and content requirements from that statute, but Congress retained the essential requirement that the application remain in "post card form."  52 U.S.C. § 20301(b)(2).  By so requiring, Congress prevented any mandate that applicants append additional documentation, as post cards are sent without envelopes.  *See id.*; *Postcard*, Merriam-Webster Dictionary, https://perma.cc/A955-M3WQ ("[A] card . . . for mailing without an envelope and to which the sender must affix a stamp."); *United States v. Abreu*, 106 F.4th 1, 12 (1st Cir. 2024) (statutes interpreted "based on their plain and ordinary meaning").  The current Post Card Form meets this condition, taking the form of a double-sided piece of paper that includes prepaid postage and can be folded on a dotted line into a post card and mailed without an envelope.  *See* PSUF ¶ 26; Federal Post Card Application, https://perma.cc/AWL3-SWWB.

Having foreclosed a documentary proof of citizenship requirement, Congress instead required the Post Card Form itself to verify applicant eligibility to vote in federal elections, including citizenship.  Like the Federal Form, the Post Card Form requires applicants to attest to their citizenship on the form with a "standard oath," signed under penalty of perjury, that information entered on the Form is accurate.  52 U.S.C. § 20301(b)(7).  This provision reflects Congress's judgment, mirrored in the NVRA, that attestation constitutes sufficient proof of an applicant's citizenship.  Indeed, the "standard oath" requirement preempts state laws that "require[] an oath or affirmation" from overseas voters.  *Id.* § 20302(a)(5).  Congress likewise prohibited States from rejecting a Post Card Form for lack of notarization, among other reasons, *id.* § 20302(i)(1), and required the official responsible for implementing UOCAVA to "consult State and local election officials in carrying out" the law, *id.* § 20301(b)(1).  Both requirements further emphasize Congress's intention to avoid the "procedural roadblocks" that had previously

deprived overseas voters of their right to the franchise.  *Alabama*, 778 F.3d at 928.  The President cannot require something more than the "standard oath" that Congress designated.

Both decisions—to require the application be in post card form and to use a standard oath to establish applicant eligibility—reflect Congress's effort to offer military and overseas voters meaningful access to the franchise.  Section 3(d)(i) eviscerates this careful design by adding significant new hurdles for those voters.  Common military identification does not indicate citizenship, and some members of the armed forces do not bring citizenship documentation on certain deployments.  PSUF ¶¶ 57-60; *see also* 22 C.F.R. § 53.2(b)(1) (exempting some military members from needing a passport overseas).  And even when military or overseas voters do have documentary proof of citizenship, Section 3(d)(i)'s requirement that they submit such documentation would still pose an additional burden, since they would have to find copiers, scanners, fax machines, computers, and/or envelopes to submit those documents with their applications, and entrust their most confidential personal documents to international mail.  The President has no authority to impose such a requirement, and the Court should grant the Plaintiff States summary judgment on this claim.  *See Medellin*, 552 U.S. at 525.

## III.   THE PRESIDENT CANNOT OVERRIDE STATE BALLOT RECEIPT LAWS

The President's attempt to unilaterally override States' ballot receipt laws fares no better.  Nowhere has Congress required what the President now mandates.  To the contrary, Congress has long tolerated Ballot Receipt Plaintiffs' varying ballot receipt deadlines and has never conditioned election funding on their amendment.  As this Court has found, the President has no authority to impose these novel requirements.  *See* D. 107 at 27-33; D. 132 at 24-27.

### A.     Section 7(a)

Section 7(a) orders the Attorney General to "take all necessary action to enforce" the Election Day statutes against States that "includ[e] absentee or mail-in ballots received after Election Day in the final tabulation of votes" for federal office.  As a matter of law, the Election Day statutes do not impose a ballot receipt deadline.  Nor does the President's order find support

in the Constitution.  This attempt to legislate by presidential fiat invades the province of States and Congress to enact laws governing the conduct of federal elections.

The federal Election Day statutes set the "day for the election" for federal office as the Tuesday next after the first Monday in November in applicable years.  2 U.S.C. § 7; 3 U.S.C. §§ 1, 21(1).  As this Court and others have recognized, the statutes contain no deadline for elections officials to receive ballots.  D. 107 at 28 ("[T]he text of the Election Day statutes require only that all votes are cast by Election Day, not that they are received by that date."); D. 132 at 24 (same); *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 372 (D.N.J. 2020) ("the Federal Election Day Statutes are silent on methods of determining the timeliness of ballots"); *Bost v. Ill. State Bd. of Elections*, 684 F. Supp. 3d 720, 736-737 (N.D. Ill. 2023) (holding that an Illinois statute requiring timely cast ballots to be received after Election Day was "facially compatible" with the Election Day statutes), *aff'd on other grounds*, 114 F.4th 634 (7th Cir. 2024), *cert. granted*, 145 S. Ct. 2751 (2025).[7]

This conclusion follows from the plain text of the Election Day statutes.  Each statute simply sets the date for the "election."  2 U.S.C. § 7; 3 U.S.C. §§ 1, 21(1).  At the time of their original enactment in 1845 and 1872,[8] "election" meant the "act of choosing a person to fill an office."  *Foster*, 522 U.S. at 71 (quoting N. Webster, *An American Dictionary of the English Language* 433 (Charles Goodrich & N. Porter eds. 1869)); *see also New Dictionary of the English Language* 649 (Charles Richardson, ed. 1846) (defining "elect" as "choose or pick out"). Case law has long recognized this commonsense meaning.  *Newberry v. United States*, 256 U.S. 232, 250 (1921) (since ratification, election has meant "final choice of an officer by the duly qualified electors").  That act of choosing is completed when voters cast their ballots and "a candidate's 'electoral fate is sealed.'"  D. 107 at 28 (quoting *Bost*, 684 F. Supp. 3d at 733-734).

---

[7] *See also Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 368 & n.23 (Pa. 2020); *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 354 (3d Cir. 2020), *cert. granted*, *vacated as moot sub nom.*, *Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021).

[8] Act of Jan. 23, 1845, ch. 1, 5 Stat. 721; Act of Feb. 2, 1872, ch. 11, § 3, 17 Stat. 28.

Because the Election Day statutes do not address ballot receipt deadlines or any of the other mechanical steps that must be completed before results are certified, they do not preempt state law allowing ballots received or cured after Election Day to be counted. *Way*, 492 F. Supp. 3d at 372; *Bost*, 684 F. Supp. 3d at 736-737. Congress's power supersedes state laws only "'so far as it is exercised, and no farther.'" *ITCA*, 570 U.S. at 9 (quoting *Ex parte Siebold*, 100 U.S. at 392). Where state and federal election laws can "operate harmoniously in a single procedural scheme," the state laws remain valid and binding. *Gonzalez v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012), *aff'd sub nom.*, *ITCA*, 570 U.S. 1.

Ballot Receipt Plaintiffs' laws easily pass this test. While the Election Day statutes set the day by which voters must make their "final act of selection," *Foster*, 522 U.S. at 72, Ballot Receipt Plaintiffs' state laws allow ballots timely cast by mail—in other words, ballots where the voter's final act of selection was completed by Election Day—to be counted so long as they meet other state law criteria, such as receipt within a defined period of days, or postmarking and other verification of timeliness.[9] Similarly, Ballot Receipt Plaintiffs' state laws allowing voters to cure technical ballot errors after Election Day are consistent with the federal Election Day statutes because only timely-cast ballots may be cured.[10]

Congress has explicitly accommodated varying state ballot receipt deadlines. UOCAVA expressly incorporates state law ballot receipt deadlines as the deadlines that apply to absentee UOCAVA ballots. 52 U.S.C. § 20303(b)(3) (providing that UOCAVA ballot must be "received by the appropriate State election official not later than the deadline for receipt of the State absentee ballot under State law" to be counted); *see also id.* § 20304(b)(1) (directing the President's designee to "implement procedures that facilitate the delivery of marked absentee

---

[9] Cal. Elec. Code § 3020(b); 10 Ill. Comp. Stat. 5/19-8, 5/18A-15; Mass. Gen. Laws ch. 54, § 93; Md. Elec. Law, § 11-302(c); Md. Code Regs. § 33.11.03.08(B)(4); Mich. Const. 1963, art. II, § 4(1)(b); Mich. Comp. Laws § 168.759a(18); Nev. Rev. Stat. § 293.269921(1)(b), (2); N.J. Stat. Ann. § 19:63-22(a); N.Y. Elec. Law §§ 8-412(1), 8-710(1); 17 R.I. Gen. Laws § 17-20-16.

[10] Ariz. Rev. Stat. § 16-550; Cal. Elec. Code § 3019; Colo. Rev. Stat. § 1-7.5-107.3; Haw. Rev. Stat. § 11-106; 10 Ill. Comp. Stat. 5/19-8; Md. Elec. Law § 11-302; Mich. Comp. Laws § 168.766a; Nev. Rev. Stat. § 293.269927; N.J. Stat. Ann. § 19:63-17; N.M. Code R. § 1.10.12.16; N.Y. Elec. Law § 9-209; 410 Code R. § 20-00-23.12.

ballots . . . not later than the date by which an absentee ballot must be received in order to be counted in the election").  Congress's accommodation of diverse state ballot receipt deadlines confirms that the Election Day statutes do not reach the issue.  D. 107 at 28-29.  Tellingly, when Congress defined "election day" with respect to the presidential election in legislation enacted in 2022, it did not prohibit ballot receipt or curing deadlines that post-date Election Day.  *See* Electoral Count Reform and Presidential Transition Improvement Act, Pub. L. No. 117-328, 136 Stat. 4459 (2022); *see* D. 107 at 29 ("[H]ere, where the Executive Branch's interpretation of the Election Day statutes is not reflective of their plain text, such silence is notable.").

Against the weight of the textual and historical evidence, the EO stakes its Election Day ballot receipt deadline on a single outlier decision, *Republican Nat'l Comm. v. Wetzel*, 120 F.4th 200, 207 (5th Cir. 2024).  *See* EO, § 1.  The Supreme Court recently granted certiorari to review that decision.  *Watson v. Republican Nat'l Comm.*, No. 24-1260, __ S. Ct. __, 2025 WL 3131802 (Nov. 10, 2025).  The *Wetzel* decision is deeply flawed for all the reasons set out in the dissent from rehearing en banc authored by Judge Graves, 132 F.4th 775 (5th Cir. 2025), previously briefed by Plaintiff States, D. 96 at 15-17, and acknowledged by this Court, D. 107 at 27-28; D. 132 at 25.  In short, *Wetzel* disregards the plain meaning of the term "election" in favor of a fabricated three-part definition unsupported by case law, applies that definition in illogical ways that ignore the realities of election administration, and misconstrues both the history and law of ballot receipt rules.  *See* 132 F.4th at 781-787 (5th Cir. 2025) (Graves, J., dissenting from denial of rehearing en banc); Petition for Writ of Certiorari, *Watson v. Republican Nat'l Comm.* (filed June 10, 2025) (No. 24-1260); D. 96 at 15-17.  Nothing in *Wetzel* offers a sound basis for conjuring a ballot receipt deadline from statutes that are silent on the matter.  *See* D. 91 at 21 (conceding that "Congress has not spoken to the issue").

Nor does the President possess constitutional authority to impose by fiat an election rule that is absent from statute—much less to preempt contrary state law.  *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."); *Medellin*, 552 U.S. at 530 (President had no

power to establish "binding rules of decision that preempt contrary state law" by memorandum). By purporting to overwrite valid state law governing ballot receipt and cure deadlines, Section 7(a) invades the States' power under the Elections and Electors Clauses. *See* U.S. Const., art. I, § 4, cl. 1; U.S. Const. art. II, § 1, cl. 2, 4.

Because Section 7(a) finds no support in federal statute or the Constitution, the Court should grant summary judgment to Ballot Receipt Plaintiffs on their challenge to that provision.

### B.    Section 7(b)

Summary judgment is also proper on Ballot Receipt Plaintiffs' challenge to Section 7(b), which orders the EAC to "condition any available funding to a State on that State's compliance" with a "ballot receipt deadline of Election Day for all methods of voting, excluding ballots cast in accordance with [UOCAVA]." As this Court previously recognized, this provision unlawfully imposes extra-statutory conditions on the congressionally authorized grants administered by the EAC—none of which require States to comply with the President's preferred ballot deadline. D. 107 at 31-33; D. 132 at 26-27. The EO's attempt to unilaterally transform statutory funding programs into a cudgel against States violates the separation of powers and is ultra vires.

"[A]n agency acts *ultra vires* if it attaches conditions to formula grants that are unauthorized by statute." D. 107 at 31 (citing *City of Providence v. Barr*, 954 F.3d 23, 45 (1st Cir. 2020)). The statutes governing EAC's funding streams require the EAC to: (1) make payments, 52 U.S.C §§ 20901(a), 20903(a), 21001(a); (2) set the distribution formula based on a minimum payment amount and state voting age population, *id*. § 20901(d), 21002(a), (c); and (3) list the certifications necessary to receive funds, *id*. 20901(c), 21003.[11] The EAC has no authority to impose new or different conditions on this funding. *Barr*, 954 F.3d at 31.

Defendants have attempted to salvage Section 7(b) by arguing that the provision enforces HAVA requirements linked to federal funding, but this claim is based on two false premises.

---

[11] Election security grant funding is administered under the statutory authority for improvement grants. *See, e.g.*, Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 549 (2024) (citing HAVA sections 101, 103, and 104, *i.e.*, 52 U.S.C. §§ 20901, 20903, 20904); Pub. L. No. 119-4, 139 Stat. 9, 10-11, 26 (2025) (appropriating $15 million for election security grants); *see also* EAC, Election Sec. Grant, https://perma.cc/8EMJ-9VA8.

First, Defendants suggest that the EAC has the power to withhold funding based on a statutory provision related to "requirements" funding—which is only one of the three statutory funding streams administered by the EAC—mandating that States file a "plan" addressing, among other things, "how the State will use requirements payments" to meet HAVA's requirements. 52 U.S.C. § 21004(a)(1), *quoted in* D. 109 at 30. But the requirement to submit a plan is far from a certification of compliance with each and every HAVA requirement. It does not authorize the EAC to withhold requirements funding because of alleged HAVA violations related to requirements not at issue in a State's plan. *See id.* And Defendants point to no provisions allowing the EAC to withhold funding in other programs, including Election Security Grants.

Even if the EAC did have the statutory authority to withhold funding due to an alleged HAVA violation, no such violation exists here. Defendants have attempted to anchor Section 7(b)'s ballot receipt deadline in HAVA's requirement that each State "adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State." 52 U.S.C. § 21081(a)(6) *cited in* EO, § 7(a). This argument is unmoored from HAVA's text and legislative history.

52 U.S.C. § 21081(a)(6) was meant to resolve discrepancies in county ballot processing within each State, motivated by the aftermath of Florida's 2000 Presidential Election in particular. *See* H.R. Rep. 107-329, at 39, 2001 WL 1579545 (2001). The provision requires States to set rules "for each category of voting system," a statutorily defined term focused on the *technology* used for voting and tabulation, to ensure consistency in interpreting ballots. *See* 52 § 21081(a)(6), (b); H.R. Rep. 107-329, at 39, 2001 WL 1579545 (2001) ("Similarly marked ballots should not be discarded in one jurisdiction, but counted in another."). Even if this requirement applied to ballot receipt deadlines, it plainly refers to "'uniformity within each State, not among the several States.'" D. 107 at 32 (quoting *LULAC I*, 780 F. Supp. 3d at 214-15). The statutory text makes this plain by vesting *States* with the responsibility to define valid votes, an approach that is necessarily incompatible with a uniform federal standard. 52 U.S.C. § 21081(a)(6); *id.* § 21085 ("The specific choices on the methods of complying with the

requirements of this subchapter"—including Section 21081(a)(6)—"shall be left to the discretion of the State."). And Ballot Receipt Plaintiffs' ballot receipt and curing deadlines *are* "uniform and nondiscriminatory" by any definition: "*everyone* must cast their ballot on or before Election Day, and the ballot will be counted for *everyon*e as long as it is received" within the statutory window. *Wise v. Circosta*, 978 F.3d 93, 100 (4th Cir. 2020). Far from "applying different rules to different voters," all voters "must cast their ballots on or before Election Day." *Id.* at 101.

Nor can the President's Article II powers justify his command that the EAC act beyond its statutory authority to punish States that do not adhere to his preferred ballot receipt deadline. "[W]hen it comes to spending, the President has none of 'his own constitutional powers' to 'rely' upon." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1233-34 (9th Cir. 2018) (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). The President's order that the EAC must "refuse to disperse the federal grants in question without congressional authorization" thus violates the separation of powers. *Id.* at 1231, *cited in* D. 107 at 31; *accord City of Chicago v. Barr*, 961 F.3d 882, 931 (7th Cir. 2020) (the Executive Branch's imposition of extra-statutory conditions on funding was "an abrogation of the legislative process" that violated the separation of powers); *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.).

Since Section 7(b) lacks a basis in either statute or the Constitution, the Court should maintain its prior holdings and grant summary judgment to Ballot Receipt Plaintiffs. *See* D. 107 at 31-33; D. 132 at 26-27.

## IV.  THE CHALLENGED PROVISIONS OF THE EO ALSO VIOLATE THE VERTICAL SEPARATION OF POWERS

"State governments are neither regional offices nor administrative agencies of the Federal Government." *New York v. United States*, 505 U.S. 144, 188 (1992). The President has no constitutional authority to "interfere[] with state election procedures based solely on the federal executive's own initiative." *Georgia v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023). Yet the challenged provisions of the EO require Plaintiff States to implement new requirements and procedures that go beyond those set by Congress. Sections 2(a) and 3(d)(i) require the States to

19

implement a documentary proof of citizenship requirement on voter registration forms, which would necessarily require States to alter election administration infrastructure and procedures. *See infra* § VII.A.  Sections 7(a) and 7(b) set out to coerce States to alter validly enacted laws governing ballot receipt and curing through enforcement and funding threats.  *See infra* § VII.B. These provisions violate the vertical separation of powers.  *See Meadows*, 88 F.4th at 1347.

## V.    PLAINTIFF STATES' CLAIMS ARE JUSTICIABLE

EO provisions 2(a), 3(d)(i), 7(a), and 7(b) threaten serious injury to Plaintiff States. Plaintiff States have demonstrated, through undisputed facts, that they have proper standing to bring their claims challenging these provisions and that these claims are ripe for review.

### A.    Undisputed Facts Establish that Plaintiff States' Claims Challenging EO Sections 2(a) and 3(d)(i) Are Justiciable

An "actual or imminent" injury is sufficient to confer standing and is ripe for redress. *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 409 (2013).  Where the alleged injury has yet to occur, the imminence requirement is met "if the threatened injury is 'certainly impending' or there is a 'substantial risk' that the harm will occur."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (*SBA List*) (citation omitted).  Imminently threatened fiscal injury—even "a relatively small economic loss"—is sufficient to confer federal court jurisdiction.  *Katz v. Pershing, LLC*, 672 F.3d 64, 76 (1st Cir. 2012) (citation omitted).  The economic injury need not be direct, so long as the causal chain links that injury to the challenged federal action. *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 923 F.3d 209, 221-227 (1st Cir. 2019) (standing satisfied by "likely chain of events" resulting in imminent fiscal injury to State).  A State need not wait for an actual injury to occur before filing suit.  *Id.* at 222.

Plaintiff States have demonstrated through undisputed facts that substantial and imminent economic harms flow directly from Sections 2(a) and 3(d)(i).  Imposing documentary proof of citizenship on the Federal Form and Post Card Form will result in considerable implementation costs for the States, diverting finite time and resources away from other critical priorities.  PSUF ¶¶ 37-40, 41-44; Wlaschin (NV) Decl. ¶¶ 16, 19 (implementing required changes would demand

significant staff time and disrupt "critical tasks to be completed in preparation for the 2026 election cycle"). As this Court has recognized, the Plaintiff States' necessary reaction to Sections 2(a) and 3(d)(i)—including updating voter registration databases, issuing guidance, conducting training, and funding public education campaigns—gives rise to imminently threatened economic injury and confers jurisdiction. D. 107 at 15-16 (citing *Dep't of Commerce v. New York*, 588 U.S. 752, 766-767 (2019); *Massachusetts*, 923 F.3d at 222-227); D. 132 at 7-9.

Defendants have previously argued that any harm to Plaintiff States from Sections 2(a) and 3(d)(i) is speculative because those provisions only require the beginning of a process that may later lead to requiring documentary proof of citizenship. *See, e.g.*, D. 109 at 8-9. But there is no uncertainty about what the EO commands: Section 2(a) states that the EAC "shall take appropriate action to require" documentary proof of citizenship, and Section 3(d)(i) states that the Secretary of Defense "shall update [the Federal Post Card Form] to require" documentary proof of citizenship. These provisions unequivocally mandate that documentary proof of citizenship be imposed.[12] D. 107 at 15, 21; D. 132 at 9-10; *LULAC II*, 2025 WL 3042704, at *20. Accordingly, if Section 2(a) and 3(d)(i) are not permanently enjoined, Plaintiff States will be forced to assume the substantial economic burdens of planning for and implementing those requirements. PSUF ¶¶ 37-40, 41-44. Plaintiff States have therefore demonstrated imminent and unavoidable fiscal injuries that confer standing. *Massachusetts*, 923 F.3d at 222-227.

Plaintiff States' claims are ripe for similar reasons. Ripeness "turns upon whether the challenged action creates a 'direct and immediate' dilemma for the parties." *McInnis-Misenor v. Maine Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003) (citation omitted). A matter is ripe where a delay in adjudication would harm the plaintiff. *Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017). Plaintiff States have demonstrated through undisputed facts the significant injuries

---

[12] The Court need look no further than the language of the EO to reach this conclusion. If any doubt remains, the evidence before the Court confirms that the EAC shared this understanding. *See* PSUF ¶¶ 20-22 (EAC indicated it would implement EO and sent letter describing 2(a) in mandatory terms). The Court has also recognized that Defendants previously conceded as much, representing to the *LULAC* court "that the administrative process prior to implementation will address only technical details." D. 107 at 15; *see also id.* at 18; D. 132 at 9-10. Both facts are consistent with Section 2(a)'s language and should inform its interpretation.

flowing from the inevitable imposition of documentary proof of citizenship requirements. PSUF ¶¶ 37-40, 41-44. These injuries would create a direct and immediate dilemma for the Plaintiff States by "forc[ing] a diversion of state resources" and "cast[ing] uncertainty upon the 'massive coordinated effort' necessary to run state elections." D. 107 at 21 (quoting *Dem. Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring)); D. 132 at 9-10. Delay in adjudication will only exacerbate these injuries.

**B. Undisputed Facts Establish that Plaintiff States' Claims Challenging EO Sections 7(a) and 7(b) Are Justiciable**

By commanding the Attorney General to take enforcement actions against States that do not comply with the President's preferred ballot receipt deadline, Section 7(a) raises an imminent risk of enforcement against States that allow timely cast ballots to be received or cured shortly after Election Day. Additionally, Section 7(b) puts States' funding at risk by ordering the EAC to condition available funding on States renouncing such state laws. These imminent harms establish standing and ripeness for Ballot Receipt Plaintiffs' challenges to Sections 7(a) and 7(b).

Where enforcement is threatened, a plaintiff need not expose themselves to enforcement before bringing a claim. *Reddy*, 845 F.3d at 500. "[A] credible threat" of enforcement "itself works an injury that is sufficient to confer standing, even if there is no history of past enforcement." *N.H. Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996). A credible threat exists where enforcement is "certainly impending" or there is a "substantial risk" that it will occur. *Reddy*, 845 F.3d at 500 (citing *SBA List*, 573 U.S. at 158). Ripeness turns on the same showing. *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 52-53 (1st Cir. 2021).

The Ballot Receipt Plaintiffs have demonstrated that they face a "substantial risk" of impending enforcement and loss of funding. For these States, the EO's new deadline currently conflicts with their state laws that extend ballot receipt deadlines beyond Election Day, and may also conflict with state laws permitting voters to cure ballot errors after Election Day. *See* PSUF ¶¶ 29-30. Section 7(a) plainly commands the Attorney General to target such States with "all

necessary" enforcement action, requiring escalating enforcement actions until the Attorney General obtains compliance. As this Court has recognized, Defendants have openly "suggested that the Attorney General can take '[a]ny number of actions' . . . to enforce this section." D. 107 at 26 (quoting D. 76-2 at 10); D. 132 at 12.

Enforcement actions against the Ballot Receipt States would impose myriad injuries. For example, it would cost them the time and resources necessary to defend against those actions and to educate the public regarding the effect of those actions on state elections. PSUF ¶ 45; *Massachusetts*, 923 F.3d at 222-227 (standing satisfied by threat of fiscal injury to the State). Enforcement would also leave a stain on the State and its officials' reputation for administering elections. PSUF ¶ 50; *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) (recognizing that "injury to goodwill and reputation" can satisfy the more demanding irreparable harm standard).

In fact, state legislative records demonstrate that the U.S. Department of Justice has threatened litigation against a State for accepting ballots postmarked by Election Day but received afterward. On October 28, 2025, Ohio Secretary of State Frank LaRose testified to the Ohio State Senate General Government Committee that "the Department of Justice contacted me, along with Ohio's attorney general, to identify what they consider to be a conflict between state and federal law as to the deadline by which absentee ballots must be returned by mail. . . . My staff spoke with attorneys for the Department of Justice, who indicated that federal litigation was being considered to address this discrepancy." Bellows Decl. ¶ 6, Ex. E. LaRose continued, "[i]n a September 29, 2025 letter to [Ohio] Attorney General Dave Yost, Assistant Attorney General Harmeet Dillon [sic] . . . 'implores Ohio to take immediate action . . . to comply with federal law, and *avoid costly litigation in federal court*.'" *Id.* (quoting letter from Dhillon) (emphasis added). This only bolsters what is already an imminent threat of enforcement.

Defendants' previous arguments on this score fail. Perhaps most importantly, the EO does not contemplate the Attorney General merely "sending letters to the Plaintiff States encouraging compliance with the President's interpretation," as its plain language requires her to "enforce"

the ballot receipt deadline.  *Compare* D. 109 at 12 *and* EO, § 7(a).  Nor have Defendants committed to limiting their efforts to letters.  *See* D. 107 at 26; D. 132 at 12.

Section 7(b) is just as direct as Section 7(a), providing that the EAC "shall" condition funding on compliance with a presidential directive that conflicts with Ballot Receipt Plaintiffs' existing state laws.  *See* PSUF ¶¶ 29-30.  There is no question that this provision threatens an imminent fiscal injury to Ballot Receipt States, making their challenge justiciable.  *See Massachusetts*, 923 F.3d at 222-227; *see also* D. 107 at 31-33; D. 132 at 26-27.

## VI.  THE COURT SHOULD DECLARE THAT THE CHALLENGED PROVISIONS OF THE EO ARE UNCONSTITUTIONAL

Under the Declaratory Judgment Act, the Court "may declare the rights and other legal relations of any interested party seeking such declaration" in any "case of actual controversy with [the Court's] jurisdiction."  28 U.S.C. § 2201(a).  The Act serves the "valuable purpose" of "enabl[ing] litigants to clarify legal rights and obligations before acting upon them." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 534 (1st Cir. 1995).  By its very nature and under the Act's terms, declaratory relief is discretionary.  *El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 493 (1st Cir. 1992).  A decision to award such relief is distinct from the determination of whether an injunction is warranted.  *Steffel v. Thompson*, 415 U.S. 452, 468-469 (1974).

Here, each of the EO's challenged provisions are ultra vires and unconstitutional, violating both the separation of powers and the Plaintiff States' constitutional authority over elections. Declaratory relief as to each claim is warranted and necessary to remove any uncertainty that the President and other named Defendants are constitutionally prohibited from unilaterally interfering with the States' authority to administer and regulate federal elections.

## VII.  THE COURT SHOULD PERMANENTLY ENJOIN THE CHALLENGED EO PROVISIONS

The Court should permanently enjoin the implementation of Sections 2(a), 3(d)(i), 7(a), and 7(b).  Plaintiffs seeking a permanent injunction must "satisfy a four-factor test:  (1) that [plaintiff] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of

hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *CoxCom, Inc. v. Chaffee*, 536 F.3d 101, 112 (1st Cir. 2008) (quotations omitted).

To satisfy the first two factors at the permanent injunction stage, Plaintiff States need to show only a "substantial injury that is not accurately measurable or adequately compensable by money damages." *Id*. This Court already found in its preliminary injunction order that Plaintiff States have made that showing, and there is no reason to find differently now. *See* D. 107 at 33-40. The balance of hardships and public interest factors, considered together, also tip sharply in favor of an injunction for all the reasons already found by this Court. *See id.* at 41-42.

### A.   The Documentary Proof of Citizenship Provisions Would Cause Substantial Injuries that Are Not Compensable with Money Damages

Implementation of Sections 2(a) and 3(d)(i) would force the Plaintiff States to expend scarce resources to administer the new requirements and educate the public. *Doe*, 157 F.4th at 79 (administrative costs constituted irreparable harm). These harms would be exacerbated as Plaintiff States would have to divert resources from other important election priorities to carry out the new mandates. *See Louisiana v. Biden*, 55 F.4th 1017, 1033-34 (5th Cir. 2022) (diversion of resources constituted irreparable harm). Neither the direct compliance costs nor the collateral harm to state election administration can be remedied at law.

As this Court has recognized, the documentary proof of citizenship requirements would upend Plaintiff States' voter registration systems. D. 107 at 33. Plaintiff States would need to program, test, and implement an updated version of their voter registration databases to account for these requirements, to say nothing of updates to other election technology. PSUF ¶¶ 38, 43; Lean (CA) Decl. ¶ 16 (past changes to voter registration database "have taken up to a year or longer to implement and have cost over $1 million."). And they would need to develop guidance and training materials on subjects like what forms of proof are permissible, how to distinguish legitimate and illegitimate forms of proof, and how to follow up with would-be voters who fail to provide a proper form of proof. PSUF ¶¶ 39, 42; Lean (CA) Decl. ¶ 23 (explaining that "[a]n

analogous high-profile statewide education campaign in 2020 educating Californians about all statewide vote-by-mail cost more than $15 million.").

Plaintiff States would also need to undertake a burdensome education campaign to inform the voting public about the new requirement.  This statewide outreach would also need to educate voters about which forms of proof of citizenship are accepted.  PSUF ¶ 69.  Even Arizona, a state that already requires documentary proof of citizenship to register to vote in state elections, would need to conduct a full-scale education campaign because the forms of proof that Arizona accepts differ from the forms required by the EO.  Fontes (AZ) Decl. ¶¶ 16, 27-28.

There is no adequate remedy at law for these harms.  No cause of action provides money damages to compensate Plaintiff States for the costs of complying with and implementing the EO's unconstitutional provisions, including the costs of transforming their voter registration systems, conducting massive educational and training campaigns, and resolving inevitable voter registration issues.  *Doe*, 157 F.4th at 79 (affirming irreparable harm finding based on "unrecoverable costs" States would spend modifying systems, processes, and guidance in response to challenged executive order).  And Defendants possess sovereign immunity from money damages in any event.  *Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 115-116 (D.D.C. 2022) (collecting cases); *accord Mass. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 2024 WL 2194260, at *7 (D. Mass. Apr. 16, 2024), *rev'd on other grounds sub nom.*, *Mass. Lobstermen's Ass'n v. Menashes*, 127 F.4th 398 (1st Cir. 2025).

The documentary proof of citizenship requirements will also harm Plaintiff States' sovereign interests in conducting their elections in accordance with their state laws by diverting time, attention, and money from Plaintiff States' preexisting election initiatives. PSUF ¶¶ 40, 44.  Acting on their constitutional prerogative, the legislatures in each Plaintiff State have adopted codes governing the conduct of elections based on each legislative body's assessment of the best means to safeguard the integrity of the electoral process.  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982) ("[C]reat[ing] and enforc[ing] a legal code" part of States' "sovereign power"); *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (States

have "compelling interest in preserving the integrity of [their] election process[es]").  The EO's new requirements will divert critical resources away from implementing other aspects of state law intended to facilitate and protect elections.  *See Louisiana*, 55 F.4th at 1033-34; *see also Abbott v. Perez*, 585 U.S. 579, 603 n.17 (2018) ("[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State.") (citing *Maryland v. King*, 567 U.S. 1301 (2012)). Injuries where "sovereign interests and public policies [are] at stake" are irreparable.  *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001); D. 107 at 38-39.

### B.    The Ballot Receipt Deadline Provisions Would Cause Substantial Injuries that Are Not Compensable with Money Damages

Sections 7(a) and 7(b) would inflict similar irreparable injuries.  D. 107 at 35-36.

If the EO is not enjoined, Ballot Receipt Plaintiffs may be subject to litigation brought by the Attorney General under Section 7(a) for conducting elections in accordance with their state laws.  A lawsuit brought by the federal government charging that the State counts unlawfully cast ballots will inevitably damage the public's trust in Ballot Receipt Plaintiffs' stewardship of elections.  PSUF ¶ 46; Lean (CA) Decl. ¶ 46 ("Legal proceedings challenging California's lawful administration of elections could unfairly undermine . . . public trust.").  This serious reputational harm constitutes irreparable injury.  *See Ross-Simons of Warwick*, 102 F.3d at 20. Additionally, Ballot Receipt Plaintiffs would be forced to shoulder the costs of defending the litigation and educating the public regarding the status of voting rules.[13]  PSUF ¶ 45; *Doe*, 157 F.4th at 79 (unrecoverable costs imposed on States constitute irreparable injury).  Moreover, given the limited resources and finite schedule to administer elections, these costs would necessarily detract from other important election administration work.  *Abbott*, 585 U.S. at 603 n.17.  No damages action against the federal government is available to Ballot Receipt Plaintiffs to remedy these harms. *Chef Time*, 646 F. Supp. 3d at 115-16; *Mass. Lobstermen's Ass'n*, 2024 WL 2194260, at *7.

---

[13] If Ballot Receipt Plaintiffs were ordered to change their state laws to conform to the President's preferred policy, implementing those changes would also impose unrecoverable costs.  PSUF ¶ 45.

The ballot receipt deadline provisions also inflict a distinct injury to the Ballot Receipt States' "sovereign power . . . to create and enforce a legal code," *Alfred L. Snapp*, 458 U.S. at 601, which they have exercised by enacting statutes that allow ballots to be counted after Election Day if they were timely cast, and permit elections officials to continue curing ballots after Election Day. *See, e.g.*, Cal. Elec. Code § 3020(b); Nev. Rev. Stat. § 293.269921. The EO seeks to force the Ballot Receipt States to abandon those duly enacted plans and instead enforce the President's policy preference. That is irreparable harm. *Abbott*, 585 U.S. at 603 n.17.

Section 7(b) further threatens to revoke HAVA funding that Ballot Receipt Plaintiffs rely on for election administration. PSUF ¶ 47; D. 107 at 37. Deprivation of those funds would not be compensable by any action at law. *See Chef Time*, 646 F. Supp. 3d at 115-16; *Mass. Lobstermen's Ass'n*, 2024 WL 2194260, at *7. Loss of such funding amid a tightly coordinated election cycle calendar will harm Ballot Receipt Plaintiffs' ability to pay for critical election security and infrastructure, damaging their capacity to safely and securely administer federal elections. PSUF ¶ 49; Barber (NJ) Decl. ¶ 39 (loss of federal funds would cause "significant disruption"); Dorsey (MD) Decl. ¶ 87 (loss of HAVA funding would eliminate salaries for "several mission critical positions"); *Abbott*, 585 U.S. at 603 n.17.

### C.     The Equities and the Public Interest Weigh in Favor of Granting Injunctive Relief

The last two permanent injunction factors—balancing the equities and public interest— "merge when the [g]overnment is the opposing party." *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Several critical public policy considerations support injunctive relief.

First, an injunction furthers the public's "strong interest in exercising the fundamental political right to vote." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Purcell*, 549 U.S. at 4). The public interest "favors permitting as many qualified voters to vote as possible." *Id.* But the EO will disenfranchise eligible voters by creating

barriers to registering to vote and narrowing mail ballot receipt and curing deadlines that would have allowed otherwise timely ballots to be counted.

There is no question that the EO's documentary proof of citizenship requirements would disenfranchise eligible voters. Experience demonstrates that imposing documentary proof of citizenship requirements is a barrier for otherwise eligible voters. PSUF ¶¶ 50-51. Many lack the necessary documents. PSUF ¶¶ 53-60. College students, for example, may not have the necessary proof at hand to register before an upcoming election. Fontes (AZ) Decl. ¶ 30. If an eligible voter does not have proof of citizenship immediately available, acquiring it can be expensive and time-consuming. *See, e.g.*, PSUF ¶¶ 54-55. And some voters will simply be confused by the process and either fail to successfully register or determine that it is not worth the effort. *LULAC II*, 2025 WL 3042704, at *33; PSUF ¶¶ 61-62.

Military servicemembers are also at risk. Some do not need passports when deployed and will not have access to documentary proof of citizenship, especially when they are deployed in conflict zones. PSUF ¶¶ 57-60; Sanborn Decl. ¶ 9 ("some members of the armed forces deploy without any of the proof of citizenship listed in . . . the Executive Order with some frequency."); *see also* 22 C.F.R. § 53.2(b)(1). Although Section 2(a)(ii)(C) tries to mitigate this problem by allowing "an official military identification card that indicates the applicant is a citizen of the United States" as a form of proof, standard military identification does not indicate citizenship. PSUF ¶¶ 57-60. As a result, the EO places an intolerable burden on servicemembers who are risking their lives to protect our rights, including the right to vote. *See* Sanborn Decl. ¶¶ 8-11.

The NVRA's text reinforces this conclusion. In enacting the NVRA, Congress "declared [it] to be [in] the public interest" to "[i]ncreas[e] the number of eligible citizens who register to vote in elections for Federal office." *LULAC II*, 2025 WL 3042704, at *35 (some brackets in original) (quoting *Newby*, 838 F.3d at 13); *see also* 52 U.S.C. § 20501(b)(1). It follows that preventing the documentary proof of citizenship provisions from reducing the number of eligible citizens who register to vote advances that congressionally recognized interest.

The same is true of the EO's ballot receipt provisions, which unlawfully interfere with Ballot Receipt Plaintiffs' considered choice to enact voter-protective laws.  Mail delays can cause otherwise timely-cast ballots to arrive shortly after Election Day through no fault of a voter.  PSUF ¶ 63.  Ballot Receipt Plaintiffs have reasonably exercised their discretion to mitigate inadvertent disenfranchisement through their existing laws, but the EO seeks to force them to abandon those rules.  Military voters and rural voters, whose ballots take longer to come through the mail, are especially at risk of disenfranchisement due to these changed rules.  *Id.* ¶ 64.  Elderly and disabled voters would also be disproportionately harmed by a change in curing rules, since they are more likely both to rely on curing procedures and to face difficulty traveling to an elections office.  *Id.* ¶¶ 65-66.  An attack by the federal government on States' ability to perform ballot receipt and curing after Election Day will damage the right to vote.  Enjoining the challenged provisions will help protect that right.

Second, "the public has an important interest in making sure government agencies follow the law."  *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005).  Plaintiff States have shown that the EO is unlawful.  *See supra* §§ II, III.  The public interest supports enjoining the EO and precluding unlawful federal action.

Third, an injunction is in the public interest because it would safeguard trust in Plaintiff States' electoral processes.  "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy."  *Purcell*, 549 U.S. at 4.  The enforcement actions required by Section 7(a) would unfairly erode voters' trust in the Ballot Receipt Plaintiffs' administration of elections, harming the public interest.  PSUF ¶ 46.

Defendants can point to no meaningful interests weighing against injunctive relief.  "There is generally no public interest in the perpetuation of unlawful agency action."  *Ass'n of Am. Univs. v. U.S. Dep't of Defense*, 792 F. Supp. 3d 143, 181 (D. Mass. 2025); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (explaining that the government "cannot suffer harm from an injunction that merely ends an unlawful practice").  And even if the challenged provisions of the EO were somehow lawful, this Court has already found that "there is little

evidence in the record suggesting [they] would accomplish" their purported goal of increasing confidence in the electoral system.  D. 107 at 41.  Nothing has changed since the Court made that finding.  There is still no evidence, for example, that any appreciable number of noncitizens attempt to vote.  To the contrary, it has been repeatedly demonstrated that fraudulent voting, the EO's purported target, is "quite rare."  *See Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 967 (D. Ariz. 2024), *aff'd in part, vacated in part, remanded* 129 F.4th 691 (9th Cir. 2025); *see also Fish v. Schwab*, 957 F.3d 1105, 1142 (10th Cir. 2020) (affirming that, after a trial on the merits, plaintiff failed to show "that substantial numbers of noncitizens successfully registered to vote" with current procedures); PSUF ¶ 52.  Nor is there any evidence that ballots cast by Election Day and received or cured shortly thereafter compromise election integrity in any way.  The record is devoid of evidence suggesting that the public interest is advanced by the challenged provisions.

## VIII. The Scope of the Requested Injunction Is Proper

Plaintiff States request an injunction of Sections 7(a) and 7(b) only as to Ballot Receipt Plaintiffs.  Plaintiff States also request that the EAC and the Secretary of the Defense be enjoined from implementing Sections 2(a) and 3(d)(i) at all, in order to "provide complete relief to each plaintiff with standing to sue."  *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025).

The only adequate and appropriate remedy is an injunction barring Defendants from implementing Sections 2(a) and 3(d)(i).  As this Court noted at the preliminary injunction stage, that relief is neither "nationwide" nor "universal."  D. 107 at 43 n.20.  It is rather a remedy "tailored to the irreparable harm that Plaintiffs" would suffer absent an injunction.  *Id.* (quoting *LULAC I*, 780 F. Supp. 3d at 221).  To the extent the injunction confers benefits or advantages on nonparties, it "do[es] so only incidentally."  *See CASA*, 606 U.S. at 851; *see also Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring).  This is true for two reasons.

First, the "national uniformity" of the forms is "central to Congress's design."  *LULAC I*, 780 F. Supp. 3d at 222.  The applicable statutes contemplate only *one* Federal Form and *one* Post Card Form.  52 U.S.C. § 20508(b) (referring to "the mail voter registration form" in the singular); *id.* § 20301(b)(2) (referring to "an official post card form," also in the singular).  In line with that

mandate, the regulations implementing each form make clear that the state-by-state instructions provided with the forms are limited to state-specific requirements—not for purported *federal* requirements that apply in only a patchwork of States.  11 C.F.R. § 9428.3(b) (allowing instructions on the Federal Form for "*the state's* specific voter eligibility and registration requirements," (emphasis added)); 32 C.F.R. § 233.6(b) (allowing "the *State-specific instructions* from the Voting Assistance Guide" for the Post Card Form (emphasis added)).  An injunction therefore cannot be limited to Plaintiff States consistent with the governing statutes because the Court would be replacing the statutorily-required "single binary determination" for the format of the Federal Form "with a judicially created patchwork." *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1028 (9th Cir. 2025).  Put another way, Plaintiff States' challenges to Sections 2(a) and 3(d) "do not involve the case-by-case enforcement of a particular policy" but instead "concern a single decision about a single [requirement], to be used on a single [form] throughout the nation." *New York v. U.S. Dep't of Com.*, 351 F. Supp. 3d 502, 677 (S.D.N.Y 2019), *aff'd in part, rev'd in part on other grounds*, 588 U.S. 752 (2019).  An injunction applying only in some States would require the Court to "draw[] a line which" the statutes themselves have "never drawn." *Harmon v. Thornburgh*, 878 F.2d 484, 495 (D.C. Cir. 1989).

Second, enjoining the Defendants from implementing Sections 2(a) and 3(d)(i) only in the Plaintiff States would not "offer complete relief to the plaintiffs before the court." *CASA*, 606 U.S. at 852 (emphasis omitted).  As the Supreme Court acknowledged in *CASA*, "[t]he complete-relief inquiry" can be "complicated" for States, and a broader injunction may be necessary "to provide the States *themselves* with complete relief." *Id.* at 853.  Two Circuit Courts—including the First Circuit—have likewise held post-*CASA* that the injuries suffered by State plaintiffs foreclose narrowing injunctive relief only to those States under certain circumstances. *See Doe*, 157 F.4th at 82 (affirming broad injunction where "a narrower injunction would leave unremedied 'administrative and financial harm'" to the plaintiff States); *Washington v. Trump*, 145 F.4th 1013, 1038-39 (9th Cir. 2025) ("[T]he district court did not abuse its discretion in issuing a universal injunction in order to give the States complete relief.").

The same is true here.  Narrowing an injunction of Sections 2(a) and 3(d)(i) to Plaintiff States would leave unremedied myriad harms to the States themselves.  If Defendants are allowed to impose documentary proof of citizenship requirements on the Federal Form and Post Card Form in non-Plaintiff States, the resulting patchwork of requirements will inevitably lead to voter confusion and serious "administrative and financial harm[]" to the Plaintiff States.  *Doe*, 157 F.4th at 82.  Plaintiff States will be required to undertake education campaigns for the voting public, including citizens moving from other States and citizens who may have heard reports about other States' rules, as well as trainings for state and local elections officials.  PSUF ¶ 69; *see also id.* ¶¶ 37, 42.  And some voters seeking to register in Plaintiff States will be confused as to what requirements apply, potentially deterring eligible voters from registering or updating their registration when they move.  *Id.* ¶ 67.  These consequences will frustrate Plaintiff States' administration of their elections and introduce unrecoverable costs.  *Id.* ¶¶ 70.

Moreover, some voters will mistakenly submit documentary proof of citizenship in Plaintiff States even if it is not required.  *Id.* ¶ 68.  Plaintiff States will need to develop procedures and guidance for state and local elections officials to ensure that such sensitive personal documents are appropriately handled in compliance with federal and state laws.  *Id.* ¶ 70.  For example, California law requires an agency to "establish appropriate and reasonable administrative, technical, and physical safeguards" to ensure "the security and confidentiality of" records with personally identifying information, Cal. Civ. Code § 1798.21, and prohibits the Secretary of State from disclosing certain sensitive personal information to any person, Cal. Elec. Code § 2194(b).  Developing such procedures to safeguard the influx of citizenship documents will cost Plaintiff States time and money, preventing them from devoting those resources to other important elections initiatives.  PSUF ¶ 70; *see also id.* ¶¶ 40, 44.  Thus, even if not required to collect documentary proof of citizenship, Plaintiff States will need to shoulder significant administrative and financial burdens to address the implementation of the requirement in non-Plaintiff States.  If Sections 2(a) and 3(d)(i) are implemented anywhere, Plaintiff States will inevitably face irreparable harms.  *See Doe*, 157 F.4th at 79 (affirming irreparable harm finding

33

based on "unrecoverable costs" States would spend modifying systems, processes, and guidance in response to challenged Executive Order).

To maintain the uniformity of voter registration forms, as Congress intended, and award complete relief from these harms, there is "only one feasible option"—enjoining the implementation of Sections 2(a) and 3(d)(i) in their entirety.  *See LULAC II*, 2025 WL 3042704, at *36 (quoting *CASA*, 606 U.S. at 851-852).

## CONCLUSION

Plaintiff States respectfully request that the Court grant Plaintiffs' motion.

December 12, 2025                    Respectfully submitted,

**ROB BONTA**
Attorney General of California

 /s/ *Anne P. Bellows*
  Anne P. Bellows*
     Deputy Attorney General
  Thomas S. Patterson*
     Senior Assistant Attorney General
  Michael S. Cohen*
  Malcolm A. Brudigam*
  Kevin L. Quade*
  Lisa C. Ehrlich*
  Nicholas R. Green (BBO No 698510)
     Deputy Attorneys General
Office of the California Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3847
Anne.Bellows@doj.ca.gov
*Counsel for the State of California*
 *\*Admitted pro hac vice*

*(additional counsel on following pages)*

**AARON D. FORD**
Attorney General of Nevada

By: */s/ Heidi Parry Stern*
Heidi Parry Stern*
    Solicitor General
Craig Newby*
    First Assistant Attorney General
Kiel B. Ireland
    Chief of Special Litigation
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-9246
hstern@ag.nv.gov
*Counsel for the State of Nevada*


**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ M. Patrick Moore*
M. Patrick Moore (BBO No. 670323)
    First Assistant Attorney General
Anne Sterman (BBO No. 650426)
    Chief, Government Bureau
Phoebe Fischer-Groban (BBO No. 687068)
    Deputy Chief, Constitutional & Administrative Law Division
Chris Pappavaselio (BBO No. 713519)
    Assistant Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2495
Pat.Moore@mass.gov
*Counsel for the Commonwealth of Massachusetts*


**KRISTIN K. MAYES**
Attorney General of the State of Arizona

By: */s/ Joshua M. Whitaker*
Joshua M. Whitaker*
Karen J. Hartman-Tellez*
Kara Karlson*
    Assistant Attorneys General
2005 North Central Ave.
Phoenix, AZ 85004
(602) 542-7738
Joshua.Whitaker@azag.gov
*Counsel for the State of Arizona*

**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ Shannon Stevenson*
Shannon Stevenson*
    Solicitor General
Peter Baumann*
    Senior Assistant Attorney General
1300 Broadway
Denver, Colorado 80203
(720) 508-6400
shannon.stevenson@coag.gov
*Counsel for the State of Colorado*


**WILLIAM TONG**
Attorney General for the State of Connecticut

*/s/  Maura Murphy*
Maura Murphy*
    Deputy Associate Attorney General
Hartford, CT 06106
(860) 808-5020
Maura.Murphy@ct.gov
*Counsel for the State of Connecticut*


**KATHLEEN JENNINGS**
Attorney General of Delaware

By: */s/ Maryanne T. Donaghy*
Maryanne T. Donaghy*
    Deputy Attorney General
Vanessa L. Kassab
    Deputy Attorney General
Ian R. Liston
    Director of Impact Litigation
820 N. French Street
Wilmington, DE 19801
(302) 683-8843
maryanne.donaghy@delaware.gov
*Counsel for the State of Delaware*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ David D. Day*
David D. Day*
    Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes*
    Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
 david.d.day@hawaii.gov
*Counsel for the State of Hawaiʻi*


**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Vikas Didwania*
Vikas Didwania*
    Complex Litigation Counsel
Elizabeth B. Scott*
    Assistant Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-3316
Vikas.Didwania@ilag.gov
*Counsel for the State of Illinois*


**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Jonathan R. Bolton*
Jonathan R. Bolton*
    Assistant Attorney General
6 State House Station
Augusta, ME  04333-0006
(207) 626-8800
Jonathan.Bolton@maine.gov
*Counsel for the State of Maine*


**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Adam D. Kirschner*
Adam D. Kirschner*
    Senior Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-6424
akirschner@oag.state.md.us
*Counsel for the State of Maryland*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Erik Grill*
Erik Grill*
Heather S. Meingast*
    Assistant Attorneys General
525 W. Ottawa, 5th Floor
P.O. Box 30736
Lansing, MI 48909
(517) 335-7659
grille@michigan.gov
*Counsel for the People of the State of Michigan*


**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Peter J. Farrell*
Peter J. Farrell*
    Deputy Solicitor General
Angela Behrens*
    Assistant Attorney General
445 Minnesota Street, Suite 600
St. Paul, MN 55101
(651) 757-1424
Peter.Farrell@ag.state.mn.us
*Counsel for the State of Minnesota*


**MATTHEW J. PLATKIN**
Attorney General Of New Jersey

By: */s/ Meghan K. Musso*
Meghan K. Musso*
Jonathan Mangel*
    Deputy Attorneys General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5276
meghan.musso@law.njoag.gov
*Counsel for the State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ James W. Grayson*
James W. Grayson*
    Chief Deputy Attorney General
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
jgrayson@nmdoj.gov
*Counsel for the State of New Mexico*


**LETITIA JAMES**
Attorney General of New York

By: */s/ Colleen K. Faherty*
Colleen K. Faherty*
    Special Trial Counsel
28 Liberty Street
New York, NY 10005
(212) 416-6046
Colleen.Faherty@ag.ny.gov
*Counsel for the State of New York*


**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ James J. Arguin*
James J. Arguin (BBO No. 557350)
    Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400, Ext. 2078
jarguin@riag.ri.gov
*Counsel for the State of Rhode Island*


**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane*
    Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov
*Counsel for the State of Vermont*

**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: */s/ Charlotte Gibson*
Charlotte Gibson*
    Assistant Attorney General
P.O. Box 7857
Madison, WI 53707-7857
(608) 287-4713
GibsonCJ@DOJ.STATE.WI.US
*Counsel for the State of Wisconsin*

*Admitted pro hac vice*

<u>**CERTIFICATE OF SERVICE**</u>

    I, Anne P. Bellows, hereby certify that I served a true copy of the above document upon all counsel of record via this Court's electronic filing system.

Dated:  December 12, 2025             */s/ Anne P. Bellows*

                                       Anne P. Bellows
                                       Deputy Attorney General
                                       *Counsel for the State of California*