IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN,<br><br>*Plaintiffs,*<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense,<br><br>*Defendants.* | Case No. 1:25-cv-10810-DJC |

**DECLARATION OF MARK WLASCHIN**

I, Mark Wlaschin, declare as follows:

1. I am a resident of the State of Nevada. I am over the age of 18 and have personal knowledge of all the facts stated herein, except those matters stated upon information and belief;

1

as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Deputy Secretary of State for Elections in Nevada. I work for the Nevada Secretary of State ("Nevada SOS") and support him in his official capacity as the Chief Officer of Elections for the State of Nevada. In my role, I assist him in the execution and enforcement of all state and federal laws relating to elections.

3. I have served as the Deputy Secretary of State for Elections for more than five years (since October 2020). I have worked at the Nevada SOS for six years, previously serving as the Deputy Secretary of State for Operations from October 2019 to October 2020. Prior to working for the Nevada SOS, I served over 20 years in the United States Marine Corps. I earned a BA in History from the University of South Carolina, an MBA in Strategic Leadership from New England College, and I am certified as a Project Management Professional.

4. Nevada and its subdivisions are responsible for administering federal elections in Nevada. This responsibility encompasses registering voters, distributing ballots, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks.

5. In the November 2024 general election, 1,487,887 ballots containing votes for federal office were cast in Nevada.

6. The Nevada SOS is the State's Chief Officer of Elections, responsible for executing and enforcing all state and federal law relating to elections within the State. *See* Nev. Rev. Stat. § 293.124. The Elections Division is responsible for implementing the Nevada SOS's responsibilities with regard to elections, including enforcing laws and providing technical information to the public and other parties. *See* Election Procedures Manual, Chapter 2: Administration of Elections (Jan. 2025), https://tinyurl.com/mryvwrb3.

7.       In my role as Deputy Secretary of State, I am responsible for overseeing the Secretary of State's Elections Division, and thus I am responsible for the team of election officials who ensure the correct and legal administration of election processes in the state and enforcement of state and federal election laws and procedures, including compliance with the National Voter Registration Act, 52. U.S.C. §§ 20501 *et. seq*. ("NVRA"). In my role, I develop binding election-related regulations on a biannual basis and routinely provide non-binding guidance to election officials across the state. I also oversee implementation of election administration-related projects, processes, training, and public communications materials.

8.       I am familiar with the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO"). If implemented, Sections 2(a), 2(d), 3(d), 7(a), and 7(b) of the EO will cause substantial harm, confusion, and disruption in Nevada election administration and impose unrecoverable costs on Nevada.

9.       It is my understanding that Section 2(a) of the EO directs the Election Assistance Commission ("EAC") to amend the federal form, as provided by the NVRA (52 U.S.C. § 20508), to require "documentary proof of United States citizenship" ("DPOC"). It also requires state and local officials to "record . . . the form and type" of DPOC presented, including recording specific information about the document. E.O. § 2(a)(i)–(ii). It also outlines a limited number of specific documents that constitute DPOC, including several document types that are not issued to Nevadans, such as Real IDs that reflect citizenship. This list does not include birth certificates. The EO purports to require these changes to be made by April 24, 2025. *Id.* Given this directive, in combination with the NVRA's requirements surrounding the use of the federal form, election officials statewide need to be prepared to accept and process a significantly different federal form.

3

10. On April 11, 2025, EAC Executive Director Brianna Schletz sent a letter to my office regarding implementation of EO Section 2(a).

11. On October 20, 2025, my office submitted a comment to the EAC opposing requiring DPOC on the federal form. Comment from Nevada SOS, Michigan Secretary of State, regulations.gov (Oct. 21, 2025), https://tinyurl.com/3eezf46w. As the comment explained, a DPOC requirement would violate the NVRA and would also impose enormous burdens on state election officials for virtually zero benefit.

12. Implementing Section 2(a) pursuant to the EO, instead of pursuant to notice and comment, would deprive my office of its right to have its comment duly considered by the EAC, as required by the NVRA, 52 U.S.C. § 20508(a)(1), (2).

13. If implemented, Section 2(a) would require immediate action from me and my team to implement and to coordinate with other state and local agencies across Nevada. Our efforts to address the mandated changes and impacts of the EO will divert time and attention from other critical election preparations. We are constantly preparing for the next election—there is no off-cycle for election administrators. While voters primarily experience our work directly at most a few times per year—during a period for in-person early voting or when they receive and cast their mail ballot—we are working year-round, every year, to collaborate closely with the county and city election officials to conduct voter registration list maintenance pursuant to state and federal law; discuss the election cycle with county and city election officials so as to capture and address their lessons learned from the previous elections cycle; inform the public about elections processes and procedures, cyber- and physical- security measures, and other ongoing enhancements; review and refine training plans and classes for state, county, and city election officials in preparation for our annual training conference; review and revise elections

4

regulations spanning nine chapters of state law; review vendor contracts and, when necessary, submit requests for proposal and initiate the procurement process pursuant to the State Administrative Manual and other State purchasing requirements to ensure that the Nevada electorate is provided the best possible services and support throughout the electoral process; review and refine the voter experience relating to online applications, forms and templates, and other public-facing tools to ensure Americans with Disabilities Act compliance and to increase accessibility for voters; and support the biennial legislative session by reviewing, on average, more than 50 elections-related proposed bill draft requests and providing fiscal, operational, and technical feedback relating to the possible implementation of each bill. Right now, we are preparing for the 2026 election cycle, where the first candidate filings will occur here in Nevada in January 2026—a few weeks from now. In other words, with only our current work, my staff and I are fully occupied in preparing for our next election. Introducing additional requirements means that we must deprioritize those critical election tasks.

14.     Implementation of the DPOC requirement mandated by Section 2(a) would require significant changes to Nevada's voter registration database. *See* 52 U.S.C. § 21083(a). For instance, to integrate Section 2(a)'s requirements for including DPOC on the Federal Form and recording the document provided, the Nevada SOS will need to modify the statewide voter database to include fields for the new information. All required information on a voter registration application form must be recorded in an independent field to ensure that the application has been correctly processed, to create a record showing that the applicant met all the requirements for registration, and to allow oversight by state officials. This is required by Nev. Rev. Stat. § 293.675 which establishes the requirement in state law for a centralized database for voter registrations. It demands, in part, that local elections officials be able to "[e]lectronically

5

enter into the database . . . all information related to voter preregistration and registration obtained by the county or city clerk at the time the information is provided to the county or city clerk."

15. These changes would encompass all of the new fields required by the updated federal voter registration form, including the type of DPOC, the date of issuance, expiration date (if applicable), office that issued it, and any other auditing or reporting requirements that may be identified by the federal government or Elections Assistance Commission ("EAC") in relation to the implementation of this change.

16. Nevada would incur significant costs to make these updates. It is estimated that the costs to rapidly implement these changes would exceed $150,000. This is based on the Nevada SOS's database vendor's previously estimated costs for similar modifications. The vendor implements an "Agile-model" of software development. Under this model, the vendor would gather operational and technical requirements in collaboration with staff from the Nevada SOS's Elections Division before conducting development, testing by both vendor and Nevada SOS staff, and ultimately releasing the new code. This cycle is one "sprint" at an estimated cost of approximately $28,000 per "sprint." It is expected that an estimated four "sprints" would be necessary to implement the changes the EO requires, as well as the expected reporting and auditing requirements to ensure compliance. As this change would be both time-sensitive and unplanned, it would need to be prioritized above other "sprints" that have been previously planned to address bugs and enhancement items in the vendor's system, increasing risk prior to the start of the 2026 election cycle. This work would divert the focus of 24 members of my staff (including both contractors and Nevada SOS full-time employees).

17. If Section 2(a) were implemented, my team would also need to design new procedures to administer the DPOC requirement, develop training materials and guidance documents for use by state and local election officials, and implement the changes. This is yet another aspect of the EO's implementation that will necessarily divert seven staff members from other important election administration tasks.

18. The Federal Form is currently used and accepted in Nevada. It is widely available and well known to state and local election officials. The EO's directive to include a new DPOC requirement on the Federal Form, as well as the requirement that state and local election officials record the type of DPOC presented, will require substantial education and coordination with state and local election officials on topics like (1) the new requirements and the documents that suffice, (2) how to implement the EO's commands regarding memorializing DPOC, (3) security procedures to protect the sensitive personal information contained in the documents submitted and required by the EO, and (4) the need to stop using the old form.

19. My office will be responsible for producing training materials and communications for a variety of different constituencies related to voter registration, including county and city election officials, voter registration agencies, and nongovernmental organizations. This will take a variety of forms, including PowerPoint presentations, uploading new materials and videos to the online learning portal, and producing reference documents and guidance such as checklists and frequently asked questions guides. The seven staff members who would be responsible for developing these are currently assigned to other critical tasks to be completed in preparation for the 2026 election cycle. The projects that would be disrupted include the review of existing guidance for local elections officials, refinement of templates for

reporting voter turnout and other such reports, and the development of voter education and outreach documents.

20. Along the same lines, the DPOC requirement will create a need for a wide-ranging public education campaign to ensure that eligible voters are aware of the new registration requirements. This type of urgent statewide voter education and outreach program would take more than seven staff, plus the Secretary of State himself, and would cost approximately $1 million dollars. This campaign would include in-person visits across the State to talk to voters and contracts to purchase informational materials and ads in newspapers and on social media, radio, and TV to help explain the requirements and timelines.

21. If Section 2(a) is implemented, we will also need to change our website and external-facing resources with updated and correct information regarding the documentation required to register to vote with the Federal Form. And we will need to coordinate with other state and local agencies offering the Federal Form to ensure they make these changes as well.

22. Apart from the time and monetary costs its implementation would impose on Nevada, Section 2(a) also risks voter disenfranchisement. If the Federal Form is amended to require DPOC, citizens who lack DPOC, but are otherwise eligible to vote, will not be able to register to vote through the Federal Form.

23. In my experience administering elections, otherwise eligible voters sometimes have trouble producing documentary proof of eligibility and may be deterred by these requirements. Numerous Nevadans will not have an easily accessible form of acceptable documentary proof of citizenship as Nevada's driver's licenses and other forms of ID issued by the DMV do not show citizenship. Additionally, passports are expensive and not owned by every citizen; the student population of the universities and colleges across the state might not have

such documentation at the campus with them; and military IDs possessed by active duty and retired servicemembers generally do not show citizenship either. As such, a significant portion of the Nevada electorate would likely be unable to provide the required documentation.

24. The DPOC requirement could itself make it more difficult to obtain DPOC. A sudden spike in the demand for passports, or other acceptable forms of DPOC from qualified electors could cause extensive waits, which would likely cause many eligible electors to simply not register.

25. Based on my experience administering elections, I know that changing the Federal Form to require DPOC will cause confusion. Some citizens will not realize that there is a new DPOC requirement that has been added since the last time they registered. Some citizens will misunderstand what documents do or do not qualify as DPOC under Section 2(a). And some citizens will determine that the added requirement makes registering too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters successfully register to vote.

26. It is my understanding that Section 2(d) of the EO requires "[t]he head of each Federal voter registration executive department or agency" under Section 20506(a) of the NVRA to "assess citizenship" before providing a federal voter registration form to enrollees of public assistance programs. *See* EO § 2(d). This section of the EO is ambiguous, but it potentially encompasses a wide range of state and local offices that provide services to low-income and disabled residents. In other words, the EO potentially requires state voter registration agencies to "assess citizenship" before they may even offer a federal voter registration form to a potential registrant. It is unclear what kind of "assessment" the EO contemplates, but I am unaware of any federal legal requirement for an assessment of citizenship before a form is provided. *Id.*

27. Nevada has designated as voter registration agencies under the NVRA the following state and local agencies that serve enrollees of public assistance: Nevada Department of Health and Human Services; Division of Welfare & Supporting Services; Child Care and Development Fund; Energy Assistance Program; Medicaid, including MAABD; Supplemental Nutrition Assistance Program; Temporary Assistance to Needy Families; Division of Public and Behavioral Health; Mental Health Agencies; Developmental Services; Women, Infant & Children; Community Services Branch; Behavioral and Clinical Services Branch; Aging & Disabilities Services Division; Personal Assistance Services; Community Service Options for the Elderly; Homemaker Program; Independent Living; Traumatic Brain Injury; Nevada Department of Employment, Training and Rehabilitation—Rehabilitation Division; Nevada Department of Motor Vehicles; Offices of the City and County Clerks; and United States Armed Forces Recruitment Offices. *See* 52 U.S.C. § 20506(a); Nev. Rev. Stat. § 293.504.

28. Nevada has not designated any federal agencies to act as NVRA voter registration agencies.

29. If these voter registration agencies were required to "assess citizenship" prior to providing voter registration forms, my office would need to develop guidance and training materials and coordinate with the designated agencies to ensure that this citizenship assessment is carried out in a lawful, accurate, and nondiscriminatory manner and that proper records are kept. These training materials would be substantially different from the other training materials the Nevada SOS has created for voting registration agencies and as it would be an entirely foreign concept, it would require extensive follow-up to ensure compliance across numerous agencies across the State using the same limited staff who are already focused on preparing for and administering the 2026 election cycle, further pulling them from their duties.

30.   It is my understanding that Section 3(d)(i) of the EO requires the Secretary of Defense to "update" the federal post card application ("Post Card Form") pursuant to the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") to require DPOC as described in Section 2(a) of the EO. EO § 3(d)(i).

31.   The mandated changes to voting pursuant to UOCAVA will create substantial administrative burdens on state and local election officials. As required by federal law, Nevada accepts the Post Card Form as a valid voter registration form and request for an absentee ballot. *See* 52 U.S.C. § 20302(a)(4).

32.   Accordingly, if a DPOC requirement is added to that form, Nevada election officials will be required to administer that requirement. Administering the new requirement will necessarily entail additional costs for Nevada and local election officials.

33.   Nevada receives approximately 11,000 Post Card Forms each year.

34.   Administering a DPOC requirement for the Post Card Form will require Nevada to update its statewide voter registration database to include additional fields related to DPOC and integrate those fields into existing database functions. *See* 52 U.S.C. § 21083(a). As described above, all required information on a voter registration application form must be recorded in the voter registration database to ensure that the application has been correctly processed, to create a record showing that the applicant met all the requirements for registration, and to allow oversight by state officials as required by Nev. Rev. Stat. § 293.675. As described above, such an update to the database and related election technology will be both time consuming for the Nevada SOS staff and costly in financial terms.

35.   In addition, the EO's changes to UOCAVA will require the Nevada SOS—as the as the agency charged with overseeing compliance with UOCAVA—to expend resources

estimated at approximately $1 million to educate state and local election officials on the new requirements and to ensure their continued compliance with their obligations moving forward. As with Section 2(a), the Nevada SOS will need to carry out extensive education and coordination with state and local election officials on topics like the new requirements and the documents that suffice, and security procedures to protect the sensitive personal information contained in the documents submitted and required by the EO, including storage and/or disposal of the physical DPOC submitted with the Post Card Form.

36. Each of these tasks and costs will divert scarce resources from other important election administration tasks, as described above.

37. Apart from the costs its implementation would impose on Nevada, Section 3(d)(i) also risks voter disenfranchisement. If the Post Card Form is amended to require DPOC, members of the military and overseas citizens who lack DPOC, but are otherwise eligible to vote, will not be able to register through the Post Card Form.

38. As discussed above, in my experience administering elections, otherwise eligible voters sometimes have trouble producing documentary proof of eligibility and may be deterred by these requirements. These difficulties are magnified for overseas and military voters because they do not necessarily go overseas with the appropriate documentation. For example, during my 20+ year career with the United States Marine Corps, I routinely deployed overseas to countries without a passport; simply traveling on official military orders and relying on a Status of Forces Agreement status. Additionally, the ability to make copies of documents can be limited depending on where the voter is located. For overseas and military voters in similar situations, they would be unable to produce the required documentation and would be effectively disenfranchised.

39. I understand that Defendants in this case have argued that they should be able to partially implement DPOC on the Federal Form and Post Card Form by inserting it into state-specific instructions for States other than Plaintiff States.

40. This proposal is highly likely to cause confusion among voters seeking to register in Nevada and carries a high risk of deterring eligible voters from registering or updating their registration when they move. As a result, if this proposal is implemented, the Nevada SOS will be required to mount a public education campaign to ensure that eligible voters are not deterred from registering in Nevada. This campaign will also need to prevent confusion among the tens of thousands citizens who register to vote in Nevada each year after moving from other States. And it would also involve educating state and local election officials, both to allay any confusion regarding the requirements and to allow those officials to properly answer inquiries from the public. I expect that such a campaign would require extensive outreach including in-person visits across the state to talk to voters and contracts to purchase informational materials and ads on social media, newspaper, radio, and TV to help explain the requirements and would entail costs included in the $1 million dollar estimate.

41. If this proposal is implemented, it is foreseeable that some voters will not register to vote because they mistakenly believe DPOC is required in Nevada.

42. Additionally, if this proposal is implemented, it is foreseeable that some voters will mistakenly submit DPOC when it is not required. Accordingly, the Nevada SOS will need to develop procedures and guidance for election officials to ensure that such sensitive personal documents are appropriately handled in compliance with any federal or state privacy laws.

43. These efforts to manage the confusion resulting from partial implementation of a DPOC requirement on the Federal Form or Post Card Form would divert scarce time and resources from other pressing election administration tasks, as described above.

44. It is my understanding that Section 7(a) of the EO requires the Attorney General to "take all necessary action" to enforce the federal Election Day statutes "against States that violate these provisions," including by counting absentee or mail-in ballots received after Election Day in the final tabulation of the vote for federal offices. EO § 7(a).

45. Nevada law requires that mail ballots be sent to all registered voters. Nev. Rev. Stat. § 293.269913(1). Ballots returned by mail are counted if they are postmarked on or before election day and they are received no later than 5:00 PM on the fourth day following election day. *Id.* § 293.269921(1)(b). If the postmark date can't be determined, a mail ballot is deemed to have been postmarked on or before election day if it was received no later than 5:00 PM on the third day following election day. *Id.* 293.269921(2).

46. Nevada will continue administering federal elections in Nevada in accordance with these provisions unless there is either a change in state law or a binding court ruling requiring such a change.

47. I understand that if Section 7(a) goes into effect, the Attorney General may bring a civil lawsuit or criminal prosecution to enforce the President's interpretation of the federal Election Day statutes. I understand that such enforcement actions would allege that Nevada election officials are violating federal law by counting ballots that are timely cast under state law but which are received or cured after Election Day.

48. If the Attorney General initiates any such enforcement actions, the Nevada SOS would be required to divert significant resources not only to defend the lawsuit but also to

educate the public about the status of election rules, with the aim of minimizing voter confusion to the extent possible. Instead of assisting with the administration of the 2026 election cycle, I would instead need to assist with litigation and help our communications team to explain to the press and public about how Nevada's elections officials are not committing crimes in the execution of their statutory duties.

49. Any such legal proceedings would have severe and adverse consequences for the public's trust in Nevada's administration of federal elections. As seen following the 2020 and 2022 election cycles, litigation relating to the conduct of the election rapidly erodes public trust. When this happened after the 2020 election cycle, it led to threats against elections officials, a massive exodus of individuals from the profession, and a tremendous increase in the risk to future election cycles that has taken almost 5 years to mitigate through extensive efforts.

50. If Nevada were ordered to adopt an election-day ballot receipt deadline, implementing such a significant change in election rules would be burdensome and resource-intensive for my office. As with other parts of the EO, the Nevada SOS will be required to provide state and local election officials with training and supervision to ensure that votes are received and tabulated consistent with the EO's requirements. At the same time, the Nevada SOS will be required to offer additional public information and educational resources to familiarize voters with the new ballot deadline rule, with the goal of minimizing the number of ballots that are disqualified. This will require a substantial investment as it will require helping the public unlearn the voting rules that have governed for years.

51. As to voting, a significant portion of eligible voters in Nevada will be affected if the EO's directive for Attorney General enforcement against states that allow the counting of timely cast ballots received after Election Day is permitted to take effect. In Nevada, 669,334

voters used mail-in or absentee ballots to cast their votes in 2024, which represented 45% of all ballots cast in that election.

52. A new rule disqualifying ballots that are postmarked by election day but arrive afterwards is likely to disproportionately harm voters that have greater difficulty in accessing mail service, including elderly voters, voters with disabilities, and voters in rural areas. Nevada has many counties that are very remote, and in which mail ballots are heavily used. For example, nearly two-thirds of Douglas County's votes were cast by mail ballot. These counties have inconsistent mail delivery and pick up that already causes issues with ballot delivery.

53. In the 2024 general election, over 11,000 timely cast ballots arrived after Election Day but within the time-period allowed by Nevada statute.

54. A new rule eliminating the post-election day curing period would disproportionately harm elderly voters and voters with disabilities, who are more likely to need to cure ballots and may have more difficulty traveling to election offices to complete curing procedures.

55. It is also my understanding that Section 7(b) of the EO directs the EAC to "condition any available funding to a State on that State's compliance with" federal law that requires States to adopt "uniform and nondiscriminatory standards" for what constitutes a valid and countable vote, including that "there be a uniform and nondiscriminatory ballot receipt deadline of election day for all methods of voting," excluding ballots received after election day from tabulation. EO § 7(b).

56. Nevada has received over $36 million of federal funding pursuant to the Help Americans Vote Act. This funding is used to help facilitate the administration of elections at the state and local level.

57.     Loss of this funding due to the EO would cause financial harm to Nevada and adversely impact Nevada's ability to safely and securely administer federal elections.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December __10__, 2025, at Carson City, Nevada


*Mark Wlaschin*
Mark Wlaschin
Deputy Secretary of State for Elections
Nevada Secretary of State