**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEVADA; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN,<br><br>*Plaintiffs,*<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, in her official capacity as Attorney General of the United States; UNITED STATES ELECTION ASSISTANCE COMMISSION; DONALD L. PALMER, in his official capacity as Chairman of the U.S. Election Assistance Commission; THOMAS HICKS, in his official capacity as Vice Chair of the U.S. Election Assistance Commission; CHRISTY McCORMICK and BENJAMIN W. HOVLAND, in their official capacities as Commissioners of the U.S. Election Assistance Commission; PETE HEGSETH, in his official capacity as Secretary of Defense,<br><br>*Defendants.* | Case No. 1:25-cv-10810-DJC |

**DECLARATION OF ROB ROCK**

I, Robert B. Rock, declare as follows:

1. I am a resident of the State of Rhode Island. I am over the age of 18 and have personal knowledge of all the facts stated herein, except those matters stated upon information

1

and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Deputy Secretary of State/Director of Administration for the State of Rhode Island. I work for Secretary of State Gregg M. Amore and support him in his official capacity as the Chief State Election Official for the State of Rhode Island. In my role, I assist Secretary Amore in the execution and enforcement of all state and federal laws relating to elections.

3. I have served as the Deputy Secretary of State/Director of Administration for the RI Department of State for two years and eleven months. Prior to serving in this capacity, I was the state Elections Director from 2015-2023. I have undergraduate (Political Science) and Master's (Public Administration) degrees from the University of Rhode Island.

4. The Secretary of State is Rhode Island's third ranking elected official, following the Governor and Lt. Governor. State law gives the Secretary of State many different duties. As Rhode Island's chief state election official, the Secretary of State oversees the state's voter registration system, certifies candidates, prepares ballots, oversees voter outreach and education, and administers oaths of office. The Secretary of State also works with companies registered to do business in Rhode Island and regulates lobbying activity in the Executive and Legislative branches of government. The Secretary of State also must sign all laws and other official acts, such as issuing bonds, to make them official. Additionally, the Secretary of State processes, preserves, and gives public access to hundreds of thousands of historic documents and public records.

5. The Secretary of State is Rhode Island's chief state election official responsible for executing and enforcing all state and federal laws relating to elections within the state. *See*

2

R.I. Gen. Laws § 17-6-1 (general powers), § 17-6-1.3 (designated chief elections official). The Department of State's Elections Division is responsible for implementing the Secretary of State's responsibilities regarding elections, including enforcing laws and providing technical information to the public and other parties. In Rhode Island, elections administration is a collaboration among the Secretary of State's Elections Division, the State Board of Elections, and local cities and towns (local boards of canvassers). Among other things, these elections officials coordinate responsibilities for voter registration, balloting, tabulating votes, and certifying results in all elections for federal office.

6. In my role as Deputy Secretary of State/Director of Administration and in conjunction with the State Board of Elections, I am responsible for overseeing the administration of elections in Rhode Island, including overseeing the state's voter registration system, training local election officials on elections administration, maintaining the online voter registration and mail ballot application portals, certifying state and federal candidates, preparing ballots, preparing and sending mail ballots to voters, preparing election calendars, providing candidate and voter information guides, implementing a statewide elections education campaign, and providing voter identification cards. I have personally overseen these responsibilities since February 2015 and, therefore, have substantial first-hand knowledge of administering elections in Rhode Island, including voter registration requirements and the statewide voter registration system.

7. In the November 2024 general election, 517,231 ballots containing votes for federal office were cast in Rhode Island.

8. I am familiar with the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO"). If implemented,

3

Sections 2(a), 2(d), 3(d), 7(a), and 7(b) of the EO will cause substantial harm, confusion, and disruption in Rhode Island election administration and impose unrecoverable costs on Rhode Island.

9. It is my understanding that Section 2(a) of the EO directs the Election Assistance Commission ("EAC") to amend the national mail voter registration form ("Federal Form"), as provided by the National Voter Registration Act ("NVRA"), to require applicants to provide "documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It outlines a limited number of specific documents that constitute acceptable DPOC, including several document types, like the REAL ID with proof of citizenship, that are not issued to Rhode Island residents. The EO also requires state and local officials to "record . . . the type" of DPOC presented at the time of voter registration, including recording specific information about the document. *Id.* § 2(a)(i)(B). The EO directs the EAC to "take appropriate action" within 30 days (i.e., by April 24, 2025) to impose these changes. *Id.* § 2(a)(i).

10. On April 4, 2025, I attended a call organized by the National Association of State Election Directors with the EAC's Chair Don Palmer and EAC General Counsel Camden Kelliher. On that call, Palmer and Kelliher informed state election officials that the EAC would follow the policies and processes that govern their administration of the Federal Form.

11. On April 11, 2025, EAC Executive Director Brianna Schletz sent a letter to my office regarding implementation of EO Section 2(a).

12. If the EAC implements Section 2(a), my office will lose an essential opportunity to provide input on why requiring DPOC on the Federal Form is a bad idea—and to have that input receive due consideration, as required under the National Voter Registration Act. *See* 52 U.S.C. § 20508(a)(1), (a)(2).

13. My office strongly opposes requiring Federal Form applicants to submit DPOC because it would disrupt upcoming federal elections, require a substantial expenditure of state resources to comply, and potentially disenfranchise otherwise eligible voters.

14. If implemented, Section 2(a) would require immediate action from me and my team to implement and to coordinate with other state and local elections officials across Rhode Island. The provisions of the EO, including Section 2(a), require immediate action from me and my team in the Elections Division to educate voters across Rhode Island. Our efforts to address the directed changes and impacts of the EO will divert time, money, and attention from other critical election preparation. Despite being less than seven months away from candidates filing for the 2026 election cycle, our team is involved in election preparations such as voter list maintenance activity, a training and certification program for our local election officials, and lobbying for legislation that would improve the conduct of elections in Rhode Island. There are also several special elections that state and local election officials are currently administering.

15. In fact, shortly after the EO was issued, I immediately undertook steps to ensure that all Rhode Island election officials were well versed in the contents of the EO. These measures included briefings for office staff, including the Secretary of State, on the EO; ensuring distribution of the EO to all state and local elections officials; and preparing press releases and fielding questions from the public on the EO's new requirements.

16. The EO raises various questions related to implementation, ranging from big-picture considerations to granular issues. Specific concerns center around how cities and towns would handle the new voter registration requirements, how our military and overseas citizens would comply with the new mandates, and how to combat the clear disenfranchisement of eligible Rhode Island voters.

17. Implementation of the EO would require significant changes to Rhode Island's voter registration system. *See* 52 U.S.C. § 21083(a). For instance, to integrate Section 2(a)'s requirements for DPOC on the Federal Form and record the document type into the statewide voter registration system will require modifying the database to include fields for recording the new information. These modifications must be done carefully and must not be rushed. Updating complex systems risk unintended consequences because even minor changes have a ripple effect throughout the system. Additionally, updates to the system will be expensive which makes this EO an unfunded mandate on state and local election officials.

18. While my team oversees the voter registration system changes discussed above, we must concurrently develop training materials and guidance documents for use by state and local election officials as soon as possible. This is yet another aspect of the EO's implementation that will divert resources to accomplish the EO's directives on the purported timeline. The State Board of Elections would also be required to redo all the poll worker training materials and modify their training procedures to comply with the EO. Necessary updates come with significant costs.

19. The Federal Form is currently used and accepted in Rhode Island. It is widely available and well-known to local elections officials the EO's directive to include a new DPOC requirement on the Federal Form, as well as the requirement that state and local election officials record the type of DPOC presented, will require substantial education on topics like (1) the new requirements and the documents that suffice, (2) how to implement the EO's commands regarding memorializing DPOC, and (3) ceasing use of the old form. Most notably, this EO will require a major revision to our online voter registration portal.

20. A separate impact of the EO's directive concerns the need for a wide-ranging, costly public education campaign to ensure that eligible voters are aware of the new registration requirements. To begin the process of educating the public, we will need to change our website and external-facing resources with updated and corrected information regarding the documentation required to register to vote with the Federal Form., To ensure voters are educated on the new processes, our office will engage in a statewide campaign in which significant resources will be dedicated. Such a campaign is likely to include visiting senior and community centers, high schools, colleges, community events, parades, nursing homes, assisted living facilities and many more to educate voters about the drastic changes in the EO. Additionally, our office spent $83,000 to ensure voters had relevant elections information ahead of the 2024 election. I expect outreach to cost significantly more regarding this EO.

21. This public education campaign, which we will need to run at least through the conclusion of the 2026 midterm election, and perhaps thereafter, will likely cost hundreds of thousands of dollars. Due to state budget constraints, the forced reliance on federal grant money means other important aspects of elections administration like cybersecurity improvements and voting equipment upgrades will be in jeopardy.

22. Since the EO was announced, we have received several inquiries from the public confused about the new registration requirements. Responding to these requests has required the Office to develop talking points and devote staffing to respond to these inquiries.

23. Apart from the costs associated with the massive public education campaign required to reach eligible voters to inform them of changes to the registration process and the other state costs identified above, the directives in the EO also risk voter disenfranchisement. The most common way to prove citizenship is by producing a US passport or a birth certificate.

According to Massachusetts Institute of Technology (MIT) professor Charles Stewart, 40% of Rhode Island residents do not have a passport. To obtain one, it can cost up to $165, not to mention the time and effort required. Additionally, people who have changed their name (whether because of marriage or another reason) do not have a birth certificate that has their current information on it. As an example, to obtain a certified vital record birth certificate from the City of Providence, it costs $22. Hundreds of thousands of Rhode Island voters will potentially be disenfranchised or forced to spend money to register to vote or change their voter information.

24. Based on my experience administering elections, I know that changing the Federal Form to require DPOC will cause confusion. Some citizens will not realize that there is a new DPOC requirement that has been added since the last time they registered. Some citizens will misunderstand what documents do or do not qualify as DPOC under Section 2(a). And some citizens will determine that the added requirement makes registering too confusing to be worthwhile. The result of this confusion will be that fewer eligible voters successfully register to vote.

25. The risk of voter disenfranchisement is far outweighed by the lack of evidence of any widespread voter fraud in Rhode Island. In 2020 over 521,000 people cast a ballot and only three people were prosecuted for voter fraud. None of those cases involved non-citizen voting. Rather, in each of the three cases, the voters cast ballots in Rhode Island and in another state. Those three prosecutions represent .0000057% of the total votes case in that election..

26. It is my understanding that Section 2(d) of the EO requires "[t]he head of each Federal voter registration executive department or agency" under Section 20506(a) of the NVRA to "assess citizenship" before providing a federal voter registration form to enrollees of public

8

assistance programs. *See* EO § 2(d). This section of the EO is ambiguous, but potentially encompasses a wide range of state and local offices that provide services to low-income and disabled residents. In other words, the EO potentially requires state voter registration agencies to "assess citizenship" before they may even offer a federal voter registration form to a potential registrant. It is unclear what kind of "assessment" the EO contemplates, but I am unaware of any federal legal requirement for an assessment of citizenship before a form is provided. *Id.*

27. Because Section 2(d) of the EO may require designated state voter registration agencies to "assess citizenship" before providing applicants for public assistance benefits a federal voter registration form, the EO may require substantial coordination among the Secretary of State, the State Board of Elections, and state voter registration agencies like the Division of Motor Vehicles. There are currently six state offices or agencies designated as voter registration agencies in Rhode Island pursuant to the NVRA. *See* 52 U.S.C. § 20506; R.I. Gen. Laws § 17-9.1-7 (registration at DMV), § 17-9.1-8 (permitting registration at other designated places). The State Board of Elections oversees voter registration at state agencies. Their office will be responsible for ensuring that those agencies comply with the EO and affected rules, regulations, and procedures which will draw their attention away from other important elections administration tasks such as improvements to poll worker training and assessments of the state's current voting equipment. The Board is also currently overseeing several special elections.

28. If these voter registration agencies were required to "assess citizenship" prior to providing voter registration forms, each agency would need to develop guidance and training materials, and coordinate with the State Bord of Elections to ensure that this citizenship assessment is carried out in a lawful, accurate, and nondiscriminatory manner and that proper record-keeping is undertaken.

29. It is my understanding that Section 3(d)(i) of the EO requires the Secretary of Defense to "update" the federal post card application (Post Card Form) pursuant to the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") to require DPOC as described in Section 2(a) of the EO. EO, § 3(d)(i).

30. The mandated changes to voting pursuant to UOCAVA will create substantial administrative burdens on state and local elections officials. As required by federal law, Rhode Island accepts the Post Card Form as a valid voter registration form and request for an absentee ballot. *See* 52 U.S.C. § 20302(a)(4).

31. Administering a DPOC requirement for the Post Card Form will require Rhode Island to update its statewide voter registration system to include additional fields related to documentary proof of citizenship and integrate those fields into existing database functions. *See* 52 U.S.C. § 21083(a). As described above, all required information on a voter registration application form must be recorded in the voter registration system to ensure that the application has been correctly processed, to create a record showing that the applicant met all the requirements for registration, and to allow oversight by state officials. As described above, such an update to the system and related election technology will be costly in financial terms.

32. In addition, the EO's changes to the Post Card Forms will require state and local elections officials charged with overseeing compliance with UOCAVA—to expend additional resources to educate elections officials on the new requirements and to ensure their continued compliance with their obligations moving forward. As with Section 2(a), the Secretary of State and State Board of Elections will need to carry out extensive education and coordination with state and local elections officials on topics like the new requirements and the documents that suffice, and security procedures to protect the sensitive personal information contained in the

documents submitted and required by the EO, including storage and/or disposal of the physical DPOC submitted with the Post Card Form.

33. Furthermore, if a DPOC requirement is added to the UOCAVA form, Rhode Island election officials will be required to expend resources to educate military and overseas voters on the new requirements and to do everything we can to ensure their ballot will be received in time and that they will not be disenfranchised. We will utilize resources updating our educational materials, mail ballot instructions, and online content. These resources will take away from other important elections administration work like securing our systems.

34. The EO's changes to UOCAVA also disrupt my team's ongoing work to prepare for upcoming elections. We are less than 7 months away from the start of the candidate filing period for the 2026 midterm elections. I have obligations to Rhode Islanders to prepare for those elections and work on behalf of their interests, but that work would be sidetracked if I must oversee Rhode Island's response to EO, § 3d's new requirements.

35. Apart from the costs its implementation would impose on the State, Section 3(d)(i) also risks voter disenfranchisement. If the Post Card Form is amended to require documentary proof of citizenship, members of the military and overseas citizens who lack documentary proof of citizenship, but are otherwise eligible to vote, will not be able to register to vote through the Post Card Form.

36. As discussed above, in my experience administering elections, otherwise eligible voters sometimes have trouble producing documentary proof of eligibility and may be deterred by these requirements. These difficulties are magnified for overseas and military voters because of their lack of ready access to documents like birth certificates or marriage certificates etc. while stationed or living in places far from home.

37. I understand that Defendants in this case have argued that they should be able to partially implement DPOC on the Federal Form and Post Card Form by inserting it into state-specific instructions for States other than Plaintiff States.

38. This proposal is highly likely to cause confusion among voters seeking to register in Rhode Island and carries a high risk of deterring eligible voters from registering or updating their registration when they move.  As a result, if this proposal is implemented, Rhode Island will be required to mount a costly public education campaign to ensure that eligible voters are not deterred from registering in Rhode Island.  This would also include an education campaign for state and local election officials, both to allay any confusion regarding the requirements and to allow those officials to properly answer inquiries from the public.  I expect that such a campaign would include direct contact with UOCAVA voters via email, delivery mail, and phone and would cost thousands of dollars along with staff time and resources.

39. If this proposal is implemented, it is foreseeable that some voters will not register to vote because they mistakenly believe documentary proof of citizenship is required.

40. Additionally, if this proposal is implemented, it is foreseeable that some voters will mistakenly submit documentary proof of citizenship when it is not required.  Accordingly, my office would need to develop procedures and guidance for election officials to ensure that such sensitive personal documents are appropriately handled in compliance with any federal or state privacy laws.

41. These efforts to manage the confusion resulting from partial implementation of a DPOC requirement on the Federal Form or Post Card Form would, as already explained, divert scarce time and resources from other pressing election administration tasks.

42. It is my understanding that Section 7(a) of the EO requires the Attorney General to "take all necessary action" to enforce the federal Election Day statutes "against States that violate these provisions," including by counting absentee or mail-in ballots received after Election Day in the final tabulation of the vote for federal offices. EO, § 7(a).

43. If implemented, Section 7(a) of the EO would have adverse impacts on voting in Rhode Island. Although R.I. Gen. Laws § 17-20-16 generally requires that ballots must be received by 8 p.m. on Election Day, the Rhode Island General Assembly provided an exception for ballots cast by uniformed and overseas citizens pursuant to UOCAVA, which may be counted if received by 4 p.m. on the seventh day following an election or the third day following a primary. R.I. Gen. Laws § 17-20-16; § 17-20-6.1. Due to the various locations around the world that our military and overseas voters are stationed or live, the mail service is oftentimes inadequate, at best. Providing the extra seven days for an election and extra three days for a primary allows those who are fighting for our country more time for mail services to deliver their ballots to the proper election officials.

44. This EO will undoubtedly prevent some of our military personnel from casting their ballots in a timely fashion. They will be disenfranchised if the EO's directive for Attorney General enforcement against states that permit the counting of timely cast ballots received after Election Day is permitted to take effect. In Rhode Island, 3,564 voters utilized the UOCAVA mail ballot process to cast their votes in the 2024 federal elections. Under state law, such ballots can be counted in the tabulation of votes if cast on or before Election Day, even if the mail ballot is received by state election officials within 7 days after Election Day. In the 2024 general election, 34 UOCAVA mail ballots were mailed by voters before but received after Election

Day. Under the EO, these votes would be excluded from the final count, even though timely received under state law.

45. Additionally, to properly administer elections in accordance with the EO's Election Day rule, and to minimize the number of voters whose ballots will be disregarded for being received after Election Day, Rhode Island will be required to devote additional resources to address the EO's Election Day provisions. As with other parts of the EO, Rhode Island will be required to change processes to ensure that votes are received and tabulated consistent with the EO's requirements. At the same time, Rhode Island will be required to offer additional public information and educational resources to provide voters with awareness and familiarity with the new ballot deadline rule.

46. Rhode Island law also allows voters who cast ballots on or before Election Day to cure technical errors within seven days after an election and within three days after a primary, allowing their ballots to ultimately be counted. *See* 410 R.I. Code of Regulations § 20-00-23.12. Over 100 voters were contacted about curing their mail ballot in the 2024 general election.

47. Rhode Island will continue administering federal elections in Rhode Island in accordance with these state law provisions unless there is either a change in state law or a binding court ruling requiring such a change.

48. I understand that if Section 7(a) goes into effect, the Attorney General may bring a civil lawsuit or criminal prosecution to enforce the President's interpretation of the federal Election Day statutes. I understand that such enforcement actions would allege that Rhode Island election officials are violating federal law by counting ballots that are timely cast under state law but which are received or cured after Election Day.

49. Should the Attorney General initiate any such enforcement actions, Rhode Island would be required to divert significant resources not only to defend the lawsuit but to educate the public about the status of election rules, with the aim of minimizing voter confusion to the extent possible.

50. Any such legal proceedings would have severe and adverse consequences for the public's trust in Rhode Island's administration of federal elections. In recent years, elections administration has too often been the target of unfounded and misleading allegations that misrepresent the integrity of the process. Voters' opinions of elections are affected by false allegations of impropriety.

51. If Rhode Island was ordered to adopt a ballot receipt deadline of Election Day, my office will be required to offer additional public information and educational resources to familiarize voters with the new ballot deadline rule, with the goal of minimizing the number of ballots that are disqualified.

52. A new rule disqualifying ballots that arrive on or before Election Day but are cured afterwards is likely to disproportionately harm voters that have greater difficulty in accessing mail service, including elderly voters and voters with disabilities. In my experience, elderly voters and voters with disabilities are more likely to need to cure ballots and may have more difficulty traveling to election offices to complete curing.

53. It is also my understanding that Section 7(b) of the EO directs the EAC to "condition any available funding to a State on that State's compliance with" federal law that requires States to adopt "uniform and nondiscriminatory standards" for what constitutes a valid and countable vote, including that "there be a uniform and nondiscriminatory ballot receipt

deadline of Election Day for all methods of voting," excluding ballots received after Election Day from tabulation. EO, § 7(b).

54. Thus, if Rhode Island law were deemed noncompliant with the Election Day rule outlined in Section 7 of the EO, Section 7(b) threatens Rhode Island with the loss of substantial federal elections funding that could adversely affect the state's ability to conduct functional elections. Since 2018, Rhode Island has received $9.2 million of federal funding pursuant to the Help America Vote Act ("HAVA"). This funding is used to help facilitate the administration of elections at the state and local levels. In the last six years, we have provided security grants to the cities and towns, built a new voter registration system, purchased state-of-the-art voting equipment, and procured cybersecurity training for the state's election officials all with federal funds. Additionally, through September 30, 2022, Rhode Island received over $13 million of federal funding pursuant to HAVA section 251 grants, which were used to buy new voting equipment and keep up with federal laws related to accessible voting units.

55. The loss of funding threatened in Section 7(b) would adversely impact Rhode Island's ability to safely and efficiently conduct elections. Technological improvements, law changes, and directives from federal and state leaders, though often well-intended, create challenges for election officials. Federal funds have been instrumental in making elections administration better in Rhode Island. The loss of federal funds would have a significant negative impact on how elections are administered in Rhode Island.

I declare under penalty of perjury that the foregoing is true and correct.

       Executed on December 8, 2025, at Providence, Rhode Island.



_____
Robert B. Rock
Deputy Secretary of State/Director of Administration
Rhode Island Department of State