## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA; STATE OF
NEVADA; COMMONWEALTH OF
MASSACHUSETTS; STATE OF ARIZONA;
STATE OF COLORADO; STATE OF
CONNECTICUT; STATE OF DELAWARE;
STATE OF HAWAII; STATE OF ILLINOIS;
STATE OF MAINE; STATE OF
MARYLAND; PEOPLE OF THE STATE OF
MICHIGAN; STATE OF MINNESOTA;
STATE OF NEW JERSEY; STATE OF NEW
MEXICO; STATE OF NEW YORK; STATE
OF RHODE ISLAND; STATE OF
VERMONT; STATE OF WISCONSIN,

Case No. 1:25-cv-10810-DJC

     *Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity
as President of the United States; PAMELA
BONDI, in her official capacity as Attorney
General of the United States; UNITED
STATES ELECTION ASSISTANCE
COMMISSION; DONALD L. PALMER, in
his official capacity as Chairman of the U.S.
Election Assistance Commission; THOMAS
HICKS, in his official capacity as Vice Chair
of the U.S. Election Assistance Commission;
CHRISTY McCORMICK and BENJAMIN W.
HOVLAND, in their official capacities as
Commissioners of the U.S. Election Assistance
Commission; PETE HEGSETH, in his official
capacity as Secretary of Defense,

     *Defendants.*

## <u>DECLARATION OF DEAN C. LOGAN</u>

I, Dean C. Logan, declare as follows:

1.   I am a resident of the State of California. I am over the age of 18 and have

personal knowledge of all the facts stated herein, except those matters stated upon information

and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

**Introduction and Background**

2.      I am the Registrar-Recorder/County Clerk ("RR/CC") for the County of Los Angeles ("County") in the State of California ("State"). In my role, I oversee the County's voter registration process and voter file maintenance, and administer all federal, state, local and special elections conducted in the County, in addition to verification and certification of initiative, referenda and recall petitions, real property document recording; maintenance and custody of vital records of births, deaths and marriages; and other related programs.

3.      I have served as Los Angeles County Registrar-Recorder/County Clerk for more than 16 years. I have more than 25 years of experience in election administration, records management, and public service. Prior to moving to Southern California, I served as the director of records, elections, and licensing services for King County, Washington; as state elections director for the Washington Secretary of State; and as the elected county clerk and chief deputy county auditor in Kitsap County, Washington. I serve on the Standards Board for the United States Election Assistance Commission ("EAC"), on the Board of Directors (past President) for the California Association of Clerks and Election Officials ("CACEO"), and on advisory bodies for the MIT Election Data Science Lab, the Auburn University Graduate Certificate in Elections Administration program, and the Electoral Psychology Observatory at the London School of Economics and Political Science. Additionally, I serve on the California Secretary of State's Language Accessibility Advisory Committee, and as President of the County Recorders' Association of California. I am an instructor for the MPA program at California State University, Northridge. I hold a degree in organizational leadership from Azusa Pacific University and an

executive MPA from the Evans School of Public Policy and Governance at the University of Washington, and I am a Certified Elections and Registration Administrator through Auburn University and the Election Center (National Association of Election Officials).

4.     The Los Angeles County Registrar-Recorder/County Clerk serves as the ex-officio Supervisor of Elections for the County and is one of 58 county elections officials in the State working together with the State's chief elections officer, the Secretary of State, to register voters, maintain voter registration records, administer elections and certify election results, among other things. *See e.g*., National Voter Registration Act of 1993, 52 U.S.C. Section 20501 et seq., Cal. Elec. Code Sections 2162, 2168, 2170, 2187, 2188, 2193, 2194, 2201, 2206, 2211.5, 2212, 2214, 2225, 2226, 2404, 2405, 2407, 2501,2550, 2600, 3019.7, 3025, ,3026, 3101, 4005 et seq., 8020.5, 8025, 8026, 8070, 8081, 8082, 8083, 8100, 8105, 8106, 8120, 8123, 8124, 8125, 8148, 8228. At the County level, the RR/CC is responsible for registering voters, maintaining voter files, and conducting federal, state, local and special elections in the County. This includes the development, purchase, licensing, contracting, use and maintenance of equipment and materials used to facilitate the modern, accessible and secure administration of elections, including the devices used to check voters in when voting in-person - Electronic Pollbooks ("ePollbooks"); the devices voters use for marking and submitting official ballots when voting in-person - Ballot Marking Devices ("BMD"); the equipment and processes used to issue and process vote by mail ballots; the programs and processes used for ballot layout, and modernized systems for scanning ballot images, recognizing and interpreting votes, tabulating vote totals and producing election results - Tally Systems. Los Angeles County is unique among all jurisdictions in having developed the first and only publicly-designed and publicly-owned voting system, Voting Solutions for All People ("VSAP"). The RR/CC facilitates the administration and

certification of elections for approximately 200 school districts, cities and special districts in addition to all state and federal executive, legislative, and judicial elections held within Los Angeles County. There are approximately 5.8 million registered voters, as well as 5,000 voting precincts established for countywide elections. The County is the largest and most complex electoral jurisdiction in the country, with 88 cities, over 100 school and community college districts, 55 general and special districts, approximately 140 unincorporated areas, and provides voting materials in 19 languages under provisions of the Federal Voting Rights Act and the California Elections Code.

5.      As Los Angeles County Registrar-Recorder/County Clerk, I oversee Los Angeles County's voter registration process, voter file maintenance, and federal, state, local and special election administration.

6.      I reviewed the Executive Order published on March 25, 2025, entitled "Preserving and Protecting the Integrity of American Elections" (the "EO") including Sections 2(a), 2(d), 3(d), 7(a), and 7(b).

7.      It is my understanding that Section 2(a) of the EO directs the Election Assistance Commission to amend the national mail voter registration form ("Federal Form"), as provided by the National Voter Registration Act ("NVRA"), to require applicants to provide "documentary proof of United States citizenship" ("DPOC"). *See* EO, § 2(a)(i)(A). It outlines a limited number of specific documents that constitute acceptable DPOC. *Id.* § 2(a)(ii). The EO also requires state and local officials to "record . . . the type" of DPOC presented at the time of voter registration, including recording specific information about the document. *Id.* § 2(a)(i)(B). The EO directs the EAC to "take appropriate action" within 30 days (i.e., by April 24, 2025) to impose these changes. *Id.* § 2(a)(i).

**Potential Impacts of Executive Order Section 2(a)**

8.      Based on my review of the EO, the EO would require significant changes to the State's voter registration database, and Los Angeles County's Election Management System ("EMS").

9.      **Increased Costs to Taxpayers.** To integrate Section 2(a)'s requirements for DPOC on the Federal Form and record the DPOC type into the County's EMS, RR/CC would have to determine what document or combination of documents are acceptable and responsive to multiple user scenarios (naturalized citizens; U.S.-born citizens; people who have to change their names, have moved, want to change their party preference, or register their language need). We anticipate this would involve design for workflow integration, database schema changes and user interface changes to build a new process that can receive and retain new data including potentially the type of DPOC provided, the identifying number, the date of document(s) issuance and expiration, and an image of the document(s). RR/CC also anticipates the need to engage County resources and contractors to write or re-write code, test, and deploy new fields to record the DPOC information in the EMS. To comply with the EO, RR/CC anticipates needing to design, test and purchase new equipment (scanners or other image capture devices) to collect images when people come to register in person at the RR/CC Headquarters, satellite sites, or one of over 600 Vote Centers throughout the County during elections. Furthermore, RR/CC would need to create public-facing forms, instructions, and educational materials, each translated into the 18 languages mandated by federal and state laws.

10.      To be able to assist the thousands of new registrants each year in person, RR/CC estimates needing to hire and train hundreds of new permanent and temporary workers and expand physical capacity to respond to the increased volume of in-person registrants and extra

work associated with keying in data, learning what documents or combination of documents are permitted to establish DPOC, reviewing documents, and scanning the DPOC documents. Because the EO is silent on what process voters will need to follow if registering online or by mail, RR/CC may have to create a supplementary process to receive DPOC for these registrants, which would entail establishing a system for matching the information collected from online and mail registrations with subsequently submitted documents. Whether supplemental DPOC could be submitted as copies online or by mail, or would need to be submitted in-person, these new processes would require building new infrastructure and hiring and training new staff to receive and match the documents with registration. A critical task would be to carry out an education campaign to help eligible voters navigate the altered registration process that likely will involve longer wait times and lines, additional documentary requirements, and potentially multiple, in-person visits. In total, RR/CC preliminarily estimates these costs to be $30 million.

11.    Change of this magnitude requires multiple years of planning and careful execution. Attempting to implement the DPOC requirement mandated by Section 2(a) on an accelerated timeframe would create significant risk of administrative error, false positive data matching, and under-resourcing other critical elements of election administration and security. Moreover, there is a significant likelihood of a drop in eligible voter participation, higher registration data error rates, and non-compliance with conflicting federal and state laws, and additional costs to taxpayers.

12.    **Risk of Disenfranchisement**. Apart from the costs associated with the massive public education campaign required to reach eligible voters to inform them of changes to the registration process and the other state costs identified above, the directives in the EO also pose a high risk of voter disenfranchisement. In Kansas, which implemented a law that required DPOC,

federal courts found that over 30,000 U.S. citizens otherwise eligible to vote, were unconstitutionally blocked from registering to vote because of the documentation requirements and ordered the suspension of the law. Using the Kansas rate of denial (12% of new registrants unconstitutionally disenfranchised), this EO could result in over 40,000 U.S. citizens blocked from registering to vote in Los Angeles County in any given year.

**Potential Impacts of Executive Order Section 2(d)**

13.    It is my understanding that Section 2(d) of the EO requires "[t]he head of each federal voter registration executive department or agency" under Section 20506(a) of the NVRA to "assess citizenship" before providing a federal voter registration form to enrollees of public assistance programs. *See* EO § 2(d). This section of the EO is ambiguous but potentially encompasses a wide range of state and local offices that provide services to low-income and disabled residents. In other words, the EO potentially requires state voter registration agencies to immediately begin assessing for citizenship before they may even offer a federal voter registration form to a potential registrant. It is unclear what kind of "assessment" the EO contemplates and whether retention of the DPOC documents, electronic data associated with the DPOC, or images or physical copies of the DPOC would be required by the agency or the elections official. I am not aware of any federal legal requirement, guidance, or uniform practice for an assessment of citizenship before a registration application is provided. This provision purports to take effect immediately. *Id.*

14.    Because Section 2(d) of the EO may require designated state voter registration agencies to "assess citizenship" before providing applicants for public assistance benefits a voter registration application, the EO may require substantial coordination between Los Angeles County and County and State voter registration agencies. In the County, the offices or agencies

that engage in voter registration include the 88 cities in the county; libraries; the Sheriff's Department; schools, community colleges and universities; parks and recreation; Department of Social Services; Probation; and others, pursuant to the NVRA. *See* 52 U.S.C. § 20506. Los Angeles County RR/CC anticipates needing to research, identify, and develop new guidelines, training, and a deployment plan in collaboration with these local entities and agencies to implement changes within a short period of time. Because of the restrictions prescribed by Section 6 of the EO, prohibiting non-citizens from participating in the administration of federal elections, these changes may also necessitate system-wide protocols for verifying the citizenship status of every individual who assists in the administration of the elections, including registering people to vote, providing facilities to serve as voting locations, and providing staff and volunteers to serve as election workers. These changes will require a significant investment of time and resources, given the significant policy and protocol changes, the thousands of people affected, and the challenges associated with implementing any changes necessary at state voter registration agencies on a short timeline, and absent established guidelines and uniform practices, especially because Section 2(d) purports to be in effect immediately.

**<u>Potential Impacts of Executive Order Section 3(d)</u>**

15.     It is my understanding that Section 3(d) of the EO requires the Secretary of Defense to "update" the Federal Post Card Application pursuant to the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA") to require (1) DPOC as described in Section 2(a) of the EO, and (2) proof of eligibility to vote in elections in the state in which the voter is attempting to vote. It appears that these changes to the UOCAVA voting process could take place at any time. *See* EO, § 3(d).

16.     The mandated changes to voting pursuant to UOCAVA will create substantial administrative burdens on Los Angeles County RR/CC. The Federal Voting Assistance Program (FVAP) process is designed to allow registration by members of the military, their families, and Americans living abroad who cannot register to vote in-person while in their county of domicile. Depending on how the EO is implemented, it is possible that UOCAVA voters will not be allowed to register to vote at all, particularly if there is a requirement that they present DPOC in person in Los Angeles County. If the EO is implemented to allow individuals to upload an image or send a copy of their DPOC along with the completed Federal Post Card (voter registration) application (FPCA), RR/CC staff would need to review, determine the sufficiency, scan and upload an image(s) of the provided DPOC. As with other parts of the EO, additional staff, training and resources would be required. In addition, if the DPOC provided was determined not to be sufficient, additional staff time is expected to communicate with the individual to assist in curing the deficiency, if possible. In 2024, the County received over 14,000 FPCA voter registration applications from UOCAVA voters via fax, emails, and mail.

**Potential Impacts of Executive Order Sections 7(a) and 7(b)**

17.     It is my understanding that Section 7(a) of the EO requires the Attorney General to "take all necessary action" to enforce the federal Election Day statutes "against States that violate these provisions," including by counting absentee or mail-in ballots received after Election Day in the final tabulation of the vote for federal offices.

18.     It is also my understanding that Section 7(b) of the EO directs the EAC to "condition any available funding to a State on that State's compliance with" federal law that requires states to adopt "uniform and nondiscriminatory standards" for what constitutes a valid and countable vote, including that "there be a uniform and nondiscriminatory ballot receipt

deadline of Election Day for all methods of voting" - but excluding ballots cast pursuant to the UOCAVA - "after which no additional votes may be cast."

19.    Sections 7(a) and 7(b) of the EO could have substantial and adverse impacts on voting in Los Angeles County, as well as on the County's ability to adequately administer elections. First, the two sections present seemingly conflicting language, making it impossible for RR/CC to comply.  Section 7(a) appears to require the Attorney General to take all action necessary to enforce states from counting any ballots that are received by mail after Election Day. Section 7(b) appears to require the EAC to condition funding to states based on their creation of rules for enforcing Election Day receipt as the standard for what ballots are tabulated — with one exception, for Uniformed and Overseas Voters.  If RR/CC disqualifies all ballots received by mail after Election Day, in accordance with Section 7(a), RR/CC risks violating UOCAVA and state laws, and, based on the EO's language, RR/CC also risks denial of federal funding. Conversely, if RR/CC counts the ballots of Uniformed and Overseas voters cast on or before Election Day, but arriving after, RR/CC risks prosecution by the Attorney General under Section 7(a).

20.    Further, Section 7(b) of the EO could potentially create two standards for handling ballots: UOCAVA ballots received by mail after Election Day, cast on or before Election Day could be counted; and those received under the same conditions from all other voters would not be counted.

21.    In Los Angeles County, conservative estimates are that as many as 70,000-100,000 voters who cast ballots on or before Election Day could have their ballots disqualified from being counted because of the EO's ballot receipt requirements, which conflict with existing provisions of the California Elections Code and voting practices in the State of California that

have existed for decades. Data shows that impacted voters are representative of the range and distribution of voter demographics in the County's voter population, including age, geographic location, and political party preference.

22.     The County will be required to devote significant additional resources to a voter education campaign to properly administer elections in accordance with the EO's changes to ballot receipt deadlines and potential elimination of certain voting options. As with other parts of the EO, the County will be required to provide staff and election workers with training and supervision to ensure that votes are received and tabulated consistent with the EO's requirements.

**Potential Impacts of the Executive Order Generally**

23.     The EO's commands therefore will almost certainly disrupt RR/CC's ongoing work to prepare for upcoming elections. The start of the candidate filing periods for the 2026 midterm elections begins in December 2025. I have obligations to Los Angeles County's 5.8 million registered voters and its electoral districts/jurisdictions to prepare for those elections and work on behalf of their interests to ensure the administration of safe and fair elections but that work would potentially be disrupted as conflicting directives in federal and state law and the directives in the EO are being resolved.

24.     To minimize disenfranchisement of eligible voters unable to register to vote because of new DPOC requirements, confusion related to ballot deadlines, and other changes promulgated by the EO, the County will need to mount a large-scale public information and educational campaign. Based on past experience, a voter education campaign designed to help County residents navigate significant election process changes is estimated to require a minimum investment of $20,000,000 for media and outreach. These resources would be used to educate an

estimated 6 million registered and eligible voters about the election law changes and new processes to ensure minimal confusion and avoid disenfranchisement. Resources and activities that have been previously effective at encouraging voter participation and education would be diverted to complying with these new requirements. The cost and effort of such a large-scale campaign is compounded by the fact that there is no lead time for the media campaign and voter outreach; typically, a Countywide media and outreach campaign of the EO's magnitude would require years in lead time to effectively plan and implement; compliance in time for the 2026 Elections would not be possible.

25.     **Risk of Disenfranchisement**. As to voting, a significant portion of eligible voters in the County are anticipated to be adversely affected if the EO's directive for Attorney General enforcement against states that permit the counting of timely cast ballots received after Election Day is permitted to take effect. In Los Angeles County, 2,732,752 voters utilized mail-in or absentee ballots to cast their votes in the 2024 General Election. In the recent Statewide Special Election held on November 4, 2025, 2,133,737 voters utilized mail-in or absentee ballots to cast their votes. Under state law, ballots that are cast on or before Election Day may be counted in the tabulation of votes and Vote By Mail ballots must be post-marked on or before Election Day to be counted. State law allows Vote By Mail ballots that are appropriately post-marked to arrive within 7 days of Election Day at county election offices and be counted if all requirements are met. (Cal. Elec. Code § 3020). Based on our 2024 General Election experience, approximately 130,000 voters could have been disenfranchised by provisions of the EO, if their ballots were disqualified because they arrive after Election Day. For the recent 2025 Statewide Special Election, we estimate approximately 89,000 voters could have been disenfranchised by those same provisions.

26.     California law also allows voters who cast ballots on or before Election Day to cure technical errors within the canvassing period after Election Day, allowing their ballots to ultimately be counted. (Cal. Elec. Code § 3019). It is not clear whether the EO prohibits tabulating ballots cured after Election Day, or if doing so would be a basis for an enforcement action or the loss of funding against the County or State under Sections 7(a) and 7(b).

27.     **Potential Costs to Taxpayers.** In addition, to the extent California law does not currently comply with the Election Day ballot receipt rule outlined in Section 7 of the EO, the County risks a loss of federal elections funding that is integral to the County's ability to conduct elections. The County has previously received $7,085,920.49 of federal funding pursuant to HAVA.

28.     The funding threatened in Section 7(b) is critical to Los Angeles County's ability to conduct elections safely, accessibly and securely. For instance, LA County utilizes grants of HAVA funding to make voting locations, including the path of travel, entrances, exits, and voting areas of each polling facility, physically accessible to individuals with the full range of disabilities to enhance their access to and participation in elections for Federal and State office. LA County additionally uses federal grants to ensure the entire voting experience, including the design of ballots and ballot marking devices, provide the same opportunity for access, privacy and independence to individuals with the full range of disabilities as for other voters. These funds would also support acquisition or deployment of a remote accessible vote by mail system, which allows voters with disabilities to receive a blank ballot to mark electronically, print, and then cast by returning the printed ballot to the elections office. The funds also would cover the development, production, translation, and transcription into Braille of manuals, programs, posters, brochures, and other printed materials for training of election workers or Vote Center

leads; formatting and re-printing materials into "large-type"; and the acquisition of items such as accessible voting tables, handrails, and magnifying glasses for voters with a range of disability accommodations. These funds are necessary to improve accessibility in accordance with the Americans with Disabilities Act.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 12, 2025, at Norwalk, California.

Dean C. Logan
Registrar-Recorder/County Clerk
Los Angeles County

HOA.105689087.1

14