## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA, *et al.*,

    *Plaintiffs*,

    v.

DONALD J. TRUMP, *et al.*,

    *Defendants*.

Case No.: 1:25-cv-10810-DJC

### [PROPOSED] BRIEF OF *AMICI CURIAE* LOCAL ELECTION OFFICIALS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Jonathan B. Miller (BBO #663012)
Michael Adame*
Shannon Eddy*
Public Rights Project
490 43rd Street, #115
Oakland, CA 94609

*Admitted pro hac vice*

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

STATEMENT OF INTEREST ................................................................. 1

SUMMARY OF ARGUMENT ............................................................... 1

ARGUMENT ........................................................................................ 3

I.     THE EXECUTIVE ORDER'S DOCUMENTARY PROOF OF CITIZENSHIP REQUIREMENTS ARE UNLAWFUL, IMPRACTICAL, AND DISENFRANCHISING ....................................... 3

    A.   Sections 2(a) and 3(d) would disenfranchise voters ............................ 4

    B.   Sections 2(a) and 3(d) would cause significant disruption to local election administration ................................................. 7

    C.   Sections 2(a) and 3(d) create an unfunded requirement that local election officials collect and store sensitive data ...................... 11

    D.   Noncitizen voting is very rare ......................................... 14

II.    THE EXECUTIVE ORDER'S IMPROPER ATTEMPT TO OVERRIDE STATE BALLOT RECEIPT DEADLINES WOULD LEAD TO VOTER DISENFRANCHISEMENT, CAUSE ADMINISTRATIVE CONFUSION, AND PLACE BURDENS ON LOCAL ELECTION OFFICIALS .......................................... 15

    A.   Section 7 would lead to voter confusion and disenfranchisement ............................................................ 16

    B.   Section 7 creates administrative burdens and confusion ................... 17

CONCLUSION ................................................................................... 18

Appendix A—List of *Amicus Curiae* ................................................. 20

# TABLE OF AUTHORITIES

**CASES**

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
   570 U.S. 1 (2013) ...............................................................................5

*Democratic Nat'l Comm. v. Wis. State Legislature*,
   141 S. Ct. 28 (2020) ..........................................................................1

*Does 1–6 v. Mills*,
   16 F.4th 20 (1st Cir. 2021) ...............................................................2

*Fish v. Schwab*,
   957 F.3d 1105 (10th Cir. 2020)...................................................5, 14

*Kobach v. U.S. Election Assistance Comm'n*,
   772 F.3d 1183 (10th Cir. 2014) ........................................................5

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
   No. 25-cv-0946, 2025 WL 3042704 (D.D.C. Oct. 31, 2025).......................4, 5

*McInnis-Misenor v. Me. Med. Ctr.*,
   319 F.3d 63 (1st Cir. 2003) .........................................................3, 18

*Mi Familia Vota v. Fontes*,
   719 F. Supp. 3d 929 (D. Ariz. 2024).............................................14, 15

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ...................................................................3, 18

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ..........................................................................2

*United States v. Alabama*,
   778 F.3d 926 (11th Cir. 2015).........................................................4

**STATUTES**

2 U.S.C. § 7....................................................................................15

3 U.S.C. § 1....................................................................................15

52 U.S.C. § 20301(a) ........................................................................3

52 U.S.C. § 20301(b) .....................................................................3, 7

52 U.S.C. § 20302(a) ........................................................................3

52 U.S.C. § 20303(b) ........................................................................................................15

52 U.S.C. § 20501(a) .......................................................................................................1, 4

52 U.S.C. § 20501(b) .......................................................................................................4, 5

52 U.S.C. § 20505(a) ...........................................................................................................3

52 U.S.C. § 20508(b) ...................................................................................................3, 5, 7

2025 N.H. Laws Ch. 277:3 ..................................................................................................6

2025 N.H. Laws Ch. 277:5 ..................................................................................................6

H.B. 1569, 2024 Gen. Court, Reg. Sess. (N.H. 2024) ........................................................5

H.B. 464, 2025 Gen. Court, Reg. Sess. (N.H. 2025) ..........................................................6

N.H. Rev. Stat. Ann. § 654:7 ...............................................................................................5

Or. Rev. Stat. § 247.292 .....................................................................................................14

Or. Rev. Stat. § 247.555 .....................................................................................................14

Or. Rev. Stat. § 247.563 .....................................................................................................14

Or. Rev. Stat. § 247.570 .....................................................................................................14

Wash. Rev. Code §§ 29A.08.810–.850 ..............................................................................15

**CONSTITUTIONAL PROVISIONS**

25 Pa. Cons. Stat. § 1329 ..................................................................................................14

Cal. Const. art. XX, § 3 ........................................................................................................1

Mich. Const. art. XI, § 1 .......................................................................................................1

N.M. Const. art. XX, § 1 .......................................................................................................1

**EXECUTIVE ORDERS**

Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025)...................... passim

## OTHER AUTHORITIES

Am. Bar Ass'n, *U.S. courts prepare for increase in election lawsuits* (Oct. 28, 2024)........................................................................................18

Billy Kauffman, *PennDOT DLC workers overwhelmed and overworked by REAL ID demand*, AFSCME13 (July 7, 2025) ...........................10

Brianna Lennon & Eric Fey, *Navigating New Proof of Citizenship Requirements with New Hampshire's Tina Guilford*, KBIA (Apr. 30, 2025)...................................................................................6, 7, 9

Bryn Dippold, *Middletown cyberattack: Some staff emails back up, city spends $295k on tech upgrades*, Journal-News (Sept. 17, 2025)....................13

Cal. Sec'y of State, *VoteCal*, https://perma.cc/59UQ-JY8U ................................12

City of Madison, *Celebrate National Voter Registration Day!* (Sept. 16, 2024).............................................................................................7

Council of State Gov'ts, *Access to and Usage of Faxing by Military and Overseas Voters* 23 (July 2022) ........................................................12

Ctr. for Internet Sec., *Data Management Policy Template: CIS Critical Security Controls v8.1* (Aug. 2025)..................................................13

Donald F. Norris & Laura K. Mateczun, *Managing cybersecurity in local governments: 2022*, 2025 J. of Cybersecurity Educ., Rsch. & Prac. 1 (2025) ....................................................................................13

Emilia Wisniewski, *Almost two dozen Concord residents were turned away at the polls because of new voter registration guidelines*, Concord Monitor (Nov. 6, 2025) ..............................................................6

Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* 6 (Oct. 2016).........................................................................13

Frank LaRose, Ohio Sec'y of State, *Substitute Senate Bill 153 Proponent Testimony* (Oct. 28, 2025) ...............................................................18

*Georgia citizenship audit finds few noncitizens on voter rolls*, Associated Press (Oct. 23, 2024) ..............................................................15

Holly Ramer, Michael Casey & Christina A. Cassidy, *New Hampshire town elections offer a preview of citizenship voting rules being considered nationwide*, Associated Press (Mar. 25, 2025) .................................6

Jessica Huseman, *Two secretaries of state unpack the lessons of proof-of-citizenship laws for voting*, Votebeat (May 19, 2025) .........................................8

Letter from Nat'l Ass'n of Sec'ys of State & Nat'l Ass'n of State Election Dirs. to Postmaster Gen. Louis DeJoy (Sept. 11, 2024)..................................17

Miriam Seifter & Adam Sopko, *Election-Litigation Data: 2018, 2020, 2022 State and Federal Court Filings*, State Democracy Rsch. Initiative (Mar. 21, 2023)..................................................................................................18

Nat'l Conf. of State Legislatures, *Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots* (May 12, 2025).......................................16

Nikki DeMentri & Tom Gardiner, *On final day of mail ballot voting on demand in Pennsylvania, Bucks County voters face long lines*, CBS News (Oct. 30, 2024) ...................................................................................10

Shea Johnson, *Pierce County library was hit by a data breach. What was in the stolen files*, The News Tribune (Sept. 9, 2025) .......................................13

Steve Simon, Minn. Sec'y of State, *ICYMI: Secretary Simon Remarks on Federal Support for Election Security* (Mar. 4, 2025) .......................................14

Trishna Begam, *Center for Internet Security facing federal funding cuts*, ABC News10 (Apr. 22, 2025)...........................................................................14

U.S. Dep't of State, *Citizenship Evidence*, https://perma.cc/EP66-2AGC ............10

U.S. Election Assistance Comm'n, *Mem. of Decision Concerning State Requests to Include Additional Proof-of-Citizenship Instructions on the National Mail Voter Registration Form* (Jan. 17, 2014) .....................................6

Wayne Schutsky, *Arizona counties are contacting 200,000 voters who haven't provided proof of citizenship*, KJZZ Phoenix (Apr. 2, 2025)...............11

## STATEMENT OF INTEREST

*Amici* are local election officials from 30 jurisdictions across the country and sign this brief in their individual capacities in support of Plaintiffs' Motion for Partial Summary Judgment, Dkt. No. 167, concerning the executive order entitled, "Preserving and Protecting the Integrity of American Elections." Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025) ("EO," or "Executive Order").[1] Like state-level election officials, *amici* are responsible for administering local, state, and federal elections in their respective jurisdictions. Upon taking office, many *amici* swore to uphold or defend the United States Constitution,[2] and many are duty-bound under the National Voter Registration Act ("NVRA") to "promote the exercise of that right." 52 U.S.C. § 20501(a)(2). All are committed to administering free and fair elections for their residents. They filed an *amici curiae* brief in support of Plaintiffs' motion for preliminary injunction in this case and write again to highlight harmful impacts of the EO, support the Plaintiffs' Motion for Partial Summary Judgment, and oppose Defendants' Motion for Summary Judgment.

## SUMMARY OF ARGUMENT

"[R]unning a statewide election is a complicated endeavor" requiring "thousands of state and local officials and volunteers" to "participate in a massive coordinated effort . . . ." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay). The EO's one-size-fits-all directives purport to override

---

[1] No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparation or submission of this brief. A list of all *amici* is attached at Appendix A.

[2] *See, e.g.*, Cal. Const. art. XX, § 3 (". . . all public officers and employees . . . swear (or affirm) [to] support and defend the Constitution of the United States . . . ."); Mich. Const. art. XI, § 1 ("All officers . . . [swear to] support the Constitution of the United States . . . ."); N.M. Const. art. XX, § 1 ("Every person elected or appointed to any office shall . . . take and subscribe to an oath or affirmation that he will support the constitution of the United States . . . .").

1

legislation enacted at both the state and federal levels to facilitate that effort with no basis. The directives, if implemented, would severely disrupt carefully considered election administration processes that were developed to promote Americans' access to voting rights and enable election officials to meet the needs of their electorate.

The EO contradicts Congressional authority when it instructs the U.S. Election Assistance Commission ("EAC") to require voters to present documentary proof of citizenship ("DPOC") to register to vote using the National Mail Voter Registration Form ("Federal Form"), EO § 2(a), and similarly instructs the Secretary of Defense to "update" the Federal Post Card Application ("Post Card") to require DPOC. EO § 3(d). These requirements would compromise state and local election administration resources that are already stretched thin and disenfranchise voters by adding burdensome steps to registration processes. The EO also attempts to override laws in states that accept mail ballots that arrive after Election Day by directing the Attorney General to enforce the administration's novel interpretation of the law. EO § 7(a). If implemented, this change would also cause voter disenfranchisement and increase election administration workloads by forcing the change without funding and without coherence with existing state statutory schemes governing elections.

This Court appropriately issued a preliminary injunction against these sections of the EO, *see* Mem. & Order Granting Mot. for Prelim. Inj. ("PI Order"), Dkt. No. 107, at 43–44, and for good reason. All of these harms to state and local election officials and voters are real, and they are costly. They burden the "public interest," an element supporting the decision to grant a permanent injunction. *Does 1–6 v. Mills*, 16 F.4th 20, 29 (1st Cir. 2021). As part of satisfying their standing requirements, Plaintiffs have shown that the injuries are "actual or imminent," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021), and surpass the requirement that those

harms be "certainly impending or [that] there is a substantial risk that the harm[s] will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation modified). Likewise, the claims are ripe because these harms are "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003) (citing *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 506 (1972)). Indeed, the harms are already occurring. Confused voters are already calling election officials with questions and concerns about the subjects of the EO, local election officials are already consulting with lawyers and reviewing their budgets, and the Department of Justice ("DOJ") is threatening to bring costly litigation.

## ARGUMENT

## I. THE EXECUTIVE ORDER'S DOCUMENTARY PROOF OF CITIZENSHIP REQUIREMENTS ARE UNLAWFUL, IMPRACTICAL, AND DISENFRANCHISING

The EO directs the EAC and the Secretary of Defense to take action to require DPOC to register to vote using both the Federal Form, prescribed by the NVRA, 52 U.S.C. §§ 20505(a)(1), 20508(b), and the Post Card, mandated by the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 52 U.S.C. §§ 20301(a)-(b)(2), 20302(a)(4). The EO defines sufficient DPOC with a specific list and requires state or local officials who process Federal Forms to record information about each registrant's DPOC "while taking appropriate measures to ensure information security." EO § 2(a)(i)(B).

These changes, if implemented, would cause widespread disruption to elections nationwide, both disenfranchising voters and burdening election administrators with significant work. The "substantial risk" of these harms, *Susan B. Anthony List*, 573 U.S. at 158, and the "sufficient immediacy" of the issue, *McInnis-Misenor*, 319 F.3d at 70, are supported by the record, by the examples of states that have implemented some form of DPOC requirements such as

3

Arizona and New Hampshire, and by the many combined decades of election administration experience that *amici* share. *See, e.g.*, Fontes Decl. ¶ 26, Dkt. No. 169-3 (detailing decades-long costs of implementing Arizona's DPOC requirement).

The President cannot order these disruptive and costly changes, and this Court properly found that the Plaintiffs were likely to succeed in their challenges to §§ 2(a) and 3(d). PI Order at 3; *accord League of United Latin Am. Citizens v. Exec. Off. of the President* ("*LULAC II*"), No. 25-cv-0946, 2025 WL 3042704, at *38 (D.D.C. Oct. 31, 2025) (permanently enjoining the EAC, its Commissioners, and its Executive Director, from implementing § 2(a)). Congress has already considered, and rejected, the prospect of adding proof of citizenship requirements to the voter registration process, as has the EAC.

### A.    Sections 2(a) and 3(d) would disenfranchise voters.

Implementation of the EO's proposed DPOC requirements would make it harder for *amici*'s voters to register to vote in contravention of the purposes of the statutes establishing the Federal Form and the Post Card. 52 U.S.C. § 20501(b); *United States v. Alabama*, 778 F.3d 926, 928 (11th Cir. 2015) (noting that in passing UOCAVA, "Congress unequivocally committed to eliminating procedural roadblocks, which historically prevented thousands of service members from sharing in the most basic of democratic rights"). It would require voter registration applicants who do not have official copies of DPOC at home to overcome multiple administrative hurdles to obtain it in advance of registration deadlines, straining scarce local government resources and rendering ineffective *amici*'s efforts to fulfill their duties to make registration accessible to all eligible voters. *See* 52 U.S.C. § 20501(a); *see also LULAC II*, 2025 WL 3042704, at *34–35.

Congress passed the NVRA to "*increase* the number of eligible citizens who register to vote in elections for Federal office . . . [and] make it possible for Federal, State, and local

governments to implement this chapter in a manner that *enhances* the participation of eligible citizens as voters . . . ." 52 U.S.C. § 20501(b)(1)-(2) (emphasis added). The Federal Form is intended to support the NVRA's purpose: "the Federal Form guarantees that a *simple* means of registering to vote in federal elections will be available." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 12 (2013) (emphasis added). And as part of keeping the Form "simple," Congress determined that the Form may evaluate citizenship by including an attestation from the voter that they are eligible to vote, 52 U.S.C. § 20508(b)(2)–(3), rather than by reviewing, copying, and mailing documentation. *See Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1195 n.7 (10th Cir. 2014) ("Both houses of Congress debated and voted on the specific question of whether to permit states to require [DPOC] in connection with the Federal Form, and ultimately rejected such a proposal."); *accord LULAC II*, 2025 WL 3042704, at *27.

When states attempt to implement a DPOC requirement, disenfranchisement occurs. That track record shows that it is not mere speculation to argue that Sections 2(a) and 3(d) would disenfranchise *amici*'s voters. For example, over 30,000 new voter registrants' applications were cancelled or suspended for failure to provide DPOC when Kansas attempted to impose a DPOC requirement. *Fish v. Schwab*, 957 F.3d 1105, 1128 (10th Cir. 2020). Most recently, New Hampshire, which is not subject to the NVRA due to its laws offering same-day voting registration, N.H. Rev. Stat. Ann. § 654:7, adopted its own DPOC requirement. *See* H.B. 1569, 2024 Gen. Court, Reg. Sess. (N.H. 2024). According to local election officials, implementation has been

"difficult."[3] Following voter disenfranchisement in local elections early in 2025,[4] the state attempted to amend its DPOC regime, allowing registrants to present proof that they are or were previously registered in another New Hampshire ward instead of presenting DPOC, H.B. 464, 2025 Gen. Court, Reg. Sess. (N.H. 2025), 2025 N.H. Laws Ch. 277:3, and providing election officials with access to state vital records to help voters obtain DPOC. *Id.*, Ch. 277:5. Nonetheless, even with these statutory changes, several voters were *still* turned away from the polls in the General Election.[5] If a nationwide DPOC requirement were to be implemented without regard for individual state statutory schemes, it would result in significant disenfranchisement across the country.

Local efforts to increase voter registrations would also be harmed.[6] As *amici* pointed out in their preliminary injunction briefing, some *amici* run voter registration drives in the community to meet eligible voters where they are, from community events to pizza shops—an effort that would

---

[3] Brianna Lennon & Eric Fey, *Navigating New Proof of Citizenship Requirements with New Hampshire's Tina Guilford*, KBIA (Apr. 30, 2025), https://perma.cc/KA7B-VQMX (transcribing a local election official's comments that administering elections under New Hampshire's new DPOC requirement "has been difficult . . .").

[4] Multiple people attempting to register and vote in a lower-turnout local election in March of 2025 had to be turned away, including one who did not have documentation from her first marriage in the 1970s, while at least one other voter who had changed her name in marriage had to make three trips to her polling place because of confusion over the identification requirements related to her name change. Holly Ramer, Michael Casey & Christina A. Cassidy, *New Hampshire town elections offer a preview of citizenship voting rules being considered nationwide*, Associated Press (Mar. 25, 2025), https://perma.cc/6SKV-86X2.

[5] Emilia Wisniewski, *Almost two dozen Concord residents were turned away at the polls because of new voter registration guidelines*, Concord Monitor (Nov. 6, 2025), https://perma.cc/AQU3-ZWWA.

[6] U.S. Election Assistance Comm'n, *Mem. of Decision Concerning State Requests to Include Additional Proof-of-Citizenship Instructions on the National Mail Voter Registration Form*, No. 2013-0004, 43 (Jan. 17, 2014), https://perma.cc/AR5Q-SR8C (finding that requiring DPOC could "discourage the conduct of organized voter registration programs, undermining one of the statutory purposes of the Federal Form.").

be stymied by DPOC requirements.[7] New Hampshire's experience implementing a DPOC requirement has proven those concerns to be more than conjecture. There, a local election official dealing with her state's DPOC requirement reported that the same physical office that registers vehicles and issues other state licenses also offers voter registration.[8] New residents who recently moved to the state would visit the office to register their car, a top-of-mind task upon moving, and then used to be able to simply move to another window to register to vote in the same trip.[9] That is no longer possible.[10] As it turns out, just like most people do not bring their passports or birth certificates to pick up their pizza, they also do not bring them to register their car.

**B.    Sections 2(a) and 3(d) would cause significant disruption to local election administration.**

Local elections offices would face extensive administrative challenges if the EAC were to follow the EO's directive to require DPOC on the Federal Form and Post Card, contrary to their enabling statutes. The NVRA requires only an attestation that the applicant is eligible, 52 U.S.C. § 20508(b)(2)(B), and prohibits "notarization or other formal authentication," *id*. § 20508(b)(3). As for the Post Card, as this Court has recognized, PI Order at 22, UOCAVA mandates that the form be available as a "post card," 52 U.S.C. § 20301(b)(2), which by nature precludes attachments. The directive to review and record DPOC would cost significant staff time and

---

[7] For example, one of *amici's* elections office in Madison, Wisconsin held National Voter Registration Day events at food pantries, pizza shops, libraries, and churches. *See* City of Madison, *Celebrate National Voter Registration Day!* (Sept. 16, 2024), https://perma.cc/X47B-X3MJ. Montgomery County, Pennsylvania invested in a voter services van to reach voters where they are—for example, at a town's "First Friday" community event and at a shopping mall. Montgomery County, *Mobile Voter Services Satellite Office Outreach*, (May 2, 2025), https://perma.cc/2BJV-VLTS; Montgomery County, *Mobile Voter Services Satellite Office Outreach*, (May 8, 2025), https://perma.cc/J6GW-9HGL.

[8] Lennon & Fey, *supra* note 3.

[9] *Id*.

[10] *Id*.

resources, already strained in many local elections offices.

DPOC review would require additional policy development and training for staff, followed by creation and dissemination of voter education materials. These burdens would fall on election officials. State election officials would have to develop guidance to local election officials, who would in turn have to review it, create their own policies, and train their own staff. For instance, the Los Angeles County Registrar-Recorder/County Clerk explained that her office would have to "hire and train hundreds of new permanent and temporary workers" and could have to create "supplementary process[es]" to account for submissions of DPOC by mail or online. Logan Decl. ¶ 10, Dkt. No. 169-18. And Arizona Secretary of State Adrian Fontes noted that while the EO would require his office to develop new guidance for local election officials to review, local election officials have already attended required trainings for the 2026 and 2027 elections. Fontes Decl. ¶ 25. *Amici* and state election officials would have to dedicate time and resources to answering calls from concerned voters and provide them with extra assistance, and indeed they already are. *See, e.g.*, Linnell Decl. ¶ 19, Dkt. No. 169-12 (noting that the Minnesota Secretary of State's Office started receiving and responding to calls from confused voters about DPOC after the EO was issued); Rock Decl. ¶ 22, Dkt. No. 169-16 (same in Rhode Island).[11] Proactive educational outreach would vary by jurisdiction depending on resources and voter needs, but could include updating website and social media materials, buying ad space on various media platforms, sending mailers, and translating all such outreach materials into languages sufficient to reach all voters in the community.

---

[11] The Secretaries of State of New Hampshire and Arizona, states with DPOC requirements, have also both acknowledged increased burdens on voters election administrators, including increased need for voter education, resulting from DPOC requirements. *See* Jessica Huseman, *Two secretaries of state unpack the lessons of proof-of-citizenship laws for voting*, Votebeat (May 19, 2025), https://perma.cc/6FQL-VJUT.

Additionally, DPOC review would require more staff time to process each Federal Form and Post Card in states where local officials would be responsible for such review.[12] Reviewing citizenship documentation is not a matter of a mere glance at a document familiar to a clerk, such as the clerk's own state driver's license. Instead, depending on the DPOC available to an applicant, it could require review of multiple documents of varying familiarity to the reviewer to satisfy the EO's category of photo ID "otherwise accompanied by proof of United States Citizenship." EO § 2(a)(ii)(D). Where the voter has changed their name through marriage or divorce, for example, election officials would be responsible for examining—and, for Federal Form applications, recording—multiple forms of documentation. If the birth certificate did not match the name on photo ID for someone who changed their name in marriage, local election offices would be responsible for connecting the dots by reviewing and recording a photo ID, birth certificate, *and* marriage license, which would require training and extra review time.[13] There are also more complex DPOC scenarios that could take even more time to review.[14]

---

[12] Michigan election clerk Cindy Berry and the Michigan State Republican Party filed an *amicus curiae* brief in support of the Defendants' Motion to Dismiss that, among other things, contended that additional document review might not cause additional election administration burdens at all. *See* Br. of Amici Curiae Michigan Republican Party & Cindy Berry, Dkt. No. 122 at 8. *Amici*, local election officials from 30 jurisdictions, disagree based on their experiences and expertise. The brief of the Michigan Republican Party and election clerk Cindy Berry also mischaracterizes the *amici* local election officials who sign this brief as "Democratic Election Officials," but while some *amici* serve in elected positions, others do not, and all sign as individuals with election administration experience, not as political party representatives.

[13] *See* Lennon & Fey, *supra* note 3 (transcribing a local election official who administers elections under New Hampshire's new DPOC requirement as explaining, "But citizenship is where it's hard . . . [L]ocal election authorities, at least in our case, are not experts on validating the validity of a birth certificate or a marriage license or something like that.")

[14] The U.S. State Department's website explaining citizenship verification for passports previews what more complicated cases could entail. It delineates multiple classes of evidence that applicants must depend on where they were born, including translation requirements if some documents came from another country and a particularly long list of documents required for certain naturalized citizens. U.S. Dep't of State, *Citizenship Evidence*, https://perma.cc/EP66-2AGC.

This extra review, including for name changes and more complicated cases, is simply not possible with current staff, space, and infrastructure in many jurisdictions.[15] If every voter registration application took just a few more minutes to process, local election offices could be overwhelmed by lines of voters, especially as deadlines approach and create service bottlenecks.[16] This is not conjecture but a realistic expectation based on *amici*'s broad election experiences, analogous circumstances, and documented impacts in states with DPOC requirements. In a recent analogous circumstance, for example, as the deadline requiring REAL ID to fly domestically approached, processing offices were overwhelmed with appointments that forced administrators reviewing documents to work long overtime shifts.[17] In larger local elections jurisdictions, implementing DPOC review could cost millions. Logan Decl. ¶ 10 (estimating that the changes would cost $30 million in Los Angeles, California). And any large-scale data collection will come with complications that extend costs over time—for example, in Arizona, where state law has required some form of proof of citizenship in state and local elections for over 20 years, county recorders are still grappling with paperwork challenges as they spend a taxing amount of time following up with voter registration applicants who did not submit such documentation in initial

---

[15] *See* Logan Decl. ¶ 10 (The Los Angeles Registrar-Recorder/County Clerk would have to hire new workers "and expand physical capacity to respond to the increased volume in-person registrants and extra work associated with keying in data, learning what document or combination of documents are permitted to establish DPOC, reviewing documents, and scanning DPOC documents.")

[16] Local election officials have seen these bottlenecks in election administration as voting-related deadlines approach. *See* Nikki DeMentri & Tom Gardiner, *On final day of mail ballot voting on demand in Pennsylvania, Bucks County voters face long lines*, CBS News (Oct. 30, 2024), https://perma.cc/ZM9Z-LR7B.

[17] *See* Billy Kauffman, *PennDOT DLC workers overwhelmed and overworked by REAL ID demand*, AFSCME13 (July 7, 2025), https://perma.cc/8JN8-GRQM (noting that Pennsylvania's Department of Transportation employees were forced into "mandatory overtime" to respond to REAL ID applications, working "10-12 hour days with no breaks").

applications. *See* Fontes Decl. ¶ 26.[18]

### C.    Sections 2(a) and 3(d) create an unfunded requirement that local election officials collect and store sensitive data.

The EO requires state and local officials to record sensitive information about voters' DPOC provided through the Federal Form, including any "unique identification number associated with the document," while also "taking appropriate measures to ensure information security." EO § 2(a)(i)(B). The EO's directive that the Secretary of Defense amend the Post Card to require DPOC likewise requires election officials to take possession of the DPOC. EO § 3(d). Because most local election offices are not currently in the business of processing and storing voters' citizenship documentation or personally identifiable information ("PII") like full social security numbers, this directive creates an unfunded requirement for election officials to collect and store sensitive data—a costly endeavor that could require building new databases and increasing cybersecurity.

To be clear, both Sections 2(a) *and* 3(d) of the EO create data and privacy costs for the state and local governments handling them, even though only Section 2(a) makes the requirement explicit. *See* EO § 2(a)(i)(B). This is because to review DPOC submitted with either the Federal Form or the Post Card, election offices must receive a copy of that DPOC, which would contain PII on its face. Therefore, DPOC would at least temporarily be stored as a hard copy or digital copy, including in election offices' hard drives or recipients' email inboxes, since many *amici*

---

[18] *See also* Wayne Schutsky, *Arizona counties are contacting 200,000 voters who haven't provided proof of citizenship*, KJZZ Phoenix (Apr. 2, 2025), https://perma.cc/HY65-J5VV. Election officials are reaching out to an estimated 200,000 voters to resolve these issues; one official said she is handling outreach in batches "to give my small staff the ability to keep up with the influx of calls and responses." *Id.*

accept those forms via email or secure websites.[19] Even temporary storage creates data privacy and security obligations, including developing and implementing policies to dispose of PII.

The process of creating data infrastructure that could store the anticipated volume of DPOC could be enormous. It would require analyzing offices' present data processing capabilities against new needs, including compatibility with state-level databases[20]; determining how to accommodate new fields, including complex entries like Section 2(a)(ii)(D)'s photo identification "accompanied by proof of United States citizenship"; reviewing state data privacy laws to determine whether there are mandated storage requirements; building out infrastructure to accommodate these changes; testing processes; and training staff to use the new systems. All of these steps are costly. In Cook County, Illinois, for example, an updated computer system capable of processing DPOC would cost an estimated $900,000. Michalowski Decl. ¶ 7, Dkt. No. 169-19. Depending on how offices store data, recording DPOC could also require additional staff time when producing information responsive to public records requests, as local election offices would need to redact PII from such productions.

Storing sensitive PII like the social security numbers on the face of some DPOC would likely require investment in additional cybersecurity resources. Best data practices around PII begin with limiting the amount of PII collected in the first place.[21] If forced to collect it, local

---

[19] *See* Council of State Gov'ts, *Access to and Usage of Faxing by Military and Overseas Voters* 23 (July 2022), https://perma.cc/4PPN-SEYU.

[20] For example, in California, counties have their own election management systems and would have to devote resources to ensuring that those systems are compatible with the statewide "VoteCal" system when it comes to DPOC records. *See* Cal. Sec'y of State, *VoteCal*, https://perma.cc/59UQ-JY8U (explaining that county election management systems are "fed into" VoteCal).

[21] *See, e.g.*, Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* 6 (Oct. 2016), https://perma.cc/CM6J-GKM8 ("If you don't have a legitimate business need for sensitive personal identifying information, don't keep it. In fact, don't even collect it.").

elections offices would have to devote time to determining what controls to develop on the data throughout its lifecycle, from acquisition to protection and from handling to disposal.[22] Local governments already face "seemingly unrelenting" cybersecurity attacks, including ransomware attacks,[23] and a new nationwide mandate that local governments store this PII would make them more attractive targets for bad actors who profit from selling sensitive data like social security numbers to fraudsters or holding it for ransom. Such data breaches are extremely costly for local governments.[24]

Critically, at the same time as the EO attempts to create this unfunded data security mandate, the federal government has actually *reduced* cybersecurity resources to support local governments. For instance, the Department of Government Efficiency cut funding to the Center for Internet Security, which had been designated by the federal government to run the Elections Infrastructure Information Sharing and Analysis Center ("EI-ISAC"), a program that provides

---

[22] The Center for Internet Security, a nonprofit organization that serves as a trusted partner of states and local governments in their efforts to protect their networks and data, issues cybersecurity best practices in their CIS Controls publication. *See, e.g.*, Ctr. for Internet Sec., *Data Management Policy Template: CIS Critical Security Controls v8.1* at 6 (Aug. 2025), https://perma.cc/NQ25-NB9Z.

[23] Donald F. Norris & Laura K. Mateczun, *Managing cybersecurity in local governments: 2022*, 2025 J. of Cybersecurity Educ., Rsch. & Prac. 1, 10 (2025). https://perma.cc/2CJ9-KD6Y.

[24] For example, when hackers stole just names and addresses from a data breach of the Pierce County, Washington public library, the library covered the costs of free credit monitoring and identity protection services and has also been sued by patrons who had their data stolen. *See* Shea Johnson, *Pierce County library was hit by a data breach. What was in the stolen files*, The News Tribune (Sept. 9, 2025), https://perma.cc/3Z4N-JEJW. Similarly, Middletown, Ohio suffered a cyberattack that took down some town IT systems for months and led to $295,000 in additional cybersecurity spending. *See* Bryn Dippold, *Middletown cyberattack: Some staff emails back up, city spends $295k on tech upgrades*, Journal-News (Sept. 17, 2025), https://perma.cc/747E-U6TS.

resources and services to local election offices to combat cybersecurity threats.[25] Many *amici* have relied on that program's no-cost and low-cost cybersecurity defense software and security operations center, among other services that local election offices cannot fund on their own.[26]

**D.     Noncitizen voting is very rare.**

The burdens of the EO's DPOC requirements have been justified in the name of ensuring that noncitizens do not vote, an occurrence that is exceedingly rare. *See, e.g.*, *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 967 (D. Ariz. 2024) (finding that in Arizona, attempts to vote by noncitizens were "quite rare"), *aff'd in part and vacated in part on other grounds*, 129 F.4th 691 (9th Cir. 2025); *Fish*, 957 F.3d at 1142 (determining that plaintiff had not shown a substantial amount of noncitizen voter registrations when only 39 noncitizens had made it onto Kansas voter rolls between 1999-2013 and "administrative anomalies could account for the presence of many—or perhaps even most" of those 39) (citation modified)).

State and local governments already have myriad methods at their disposal to maintain accurate voting lists without impeding local election administration or disenfranchising voters. In some states, for instance, county officials are responsible for regularly updating voter registration records. *See, e.g.*, Or. Rev. Stat. §§ 247.292, 247.555, 247.563, 247.570. Some *amici* are also responsible for overseeing voter challenges under state law, whereby individual voters' eligibility may be challenged by local authorities or members of the public who have reason to believe that a registered voter is not eligible to vote in that jurisdiction. *See, e.g.*, 25 Pa. Cons. Stat. § 1329;

---

[25] *See* Trishna Begam, *Center for Internet Security facing federal funding cuts*, ABC News10 (Apr. 22, 2025), https://perma.cc/6PXQ-493E. According to Albany County's Chief Information Officer, "The loss of programs like . . . EI-ISAC will certainly impact our nation's collective ability to quickly detect cyber threats and remediate them." *Id.*

[26] *See* Steve Simon, Minn. Sec'y of State, *ICYMI: Secretary Simon Remarks on Federal Support for Election Security* (Mar. 4, 2025), https://perma.cc/VYV3-B4LV.

Wash. Rev. Code §§ 29A.08.810–.850.

Moreover, the federal government and state governments already investigate voter fraud, although targeted efforts to identify noncitizen voters using that power have been largely fruitless. From 2002 to 2005, the U.S. Attorney General conducted such an investigation and ultimately indicted only 15 people for noncitizen voting, out of 200 million total votes that had been cast in federal elections during that period. *See Mi Familia Vota*, 719 F. Supp. 3d at 966. Recently, Georgia reviewed its voter rolls to identify noncitizens and found only 20 registered noncitizens (just nine of whom had ever voted) out of a pool of 8.2 million total registered voters.[27]

Accordingly, the substantial burdens of the EO's DPOC requirements—risking mass disenfranchisement of eligible voters, overwhelming local election offices, and creating unfunded responsibilities of data collection and storage—cannot be justified by the very rare occurrence of noncitizen voting, for which there are numerous valid enforcement methods.

## II.    THE EXECUTIVE ORDER'S IMPROPER ATTEMPT TO OVERRIDE STATE BALLOT RECEIPT DEADLINES WOULD LEAD TO VOTER DISENFRANCHISEMENT, CAUSE ADMINISTRATIVE CONFUSION, AND PLACE BURDENS ON LOCAL ELECTION OFFICIALS

The EO further attempts to improperly override state laws that establish mail-ballot and absentee ballot receipt deadlines after Election Day. Section 7(a) directs the Attorney General to "enforce" the EO's position that federal law prohibits the counting of mail-in and absentee ballots that arrive after Election Day, EO § 7(a), notwithstanding the fact that the federal Election Day statutes are silent on mail ballot receipt deadlines, *see* 2 U.S.C. § 7 and 3 U.S.C. § 1, and other federal statutes acknowledge the validity of state ballot receipt deadlines, *see*, *e.g.*, 52 U.S.C. § 20303(b)(3) (noting that a UOCAVA ballot should not be counted when the same voter submitted

---

[27] *Georgia citizenship audit finds few noncitizens on voter rolls*, Associated Press (Oct. 23, 2024), https://perma.cc/43CL-QC4L.

a state absentee ballot that is "received by the appropriate State election official not later than the deadline for receipt of the State absentee ballot *under State law*" (emphasis added)).

The EO may not override state law in the states—including some of *amici*'s[28]—that accept certain mail-in or absentee ballots after Election Day if those ballots are postmarked on or before Election Day. Accordingly, this Court properly enjoined the Attorney General from taking civil or criminal enforcement action to enforce Section 7(a) against the Plaintiff states that accept mail ballots after Election Day. PI Order at 30. Unlawful efforts to "enforce" the administration's position would result in administrative burdens and voter disenfranchisement, harming the public interest, if the preliminary injunction is not made permanent.

### A.    Section 7 would lead to voter confusion and disenfranchisement.

Federal enforcement efforts under Section 7(a) would result in confusion for *amici*'s voters in states that allow mail ballots to arrive after Election Day. In those states, voters are accustomed to the states' valid post-Election Day deadlines, and *amici* and state election officials in those states have devoted resources to educating the public about these deadlines over the years. Those *amici* and state election officials would have to devote significant resources to voter outreach and education about any Section 7(a) enforcement actions. *See, e.g.*, Michalowski Decl. ¶ 13; Rock Decl. ¶ 51. That outreach could include regular updates about the status of the litigation, especially as election deadlines approach, and could get expensive. *See* Part I.B, *supra* (discussing voter communication and outreach methods).

Even if voters were aware of the EO's purported ballot receipt deadline, they could still be

---

[28] Nat'l Conf. of State Legislatures, *Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots* (May 12, 2025), https://perma.cc/JZ9D-R2R2.

at risk of disenfranchisement if it were "enforced" through litigation—through no fault of their own—given documented delays in mail pick-up and drop-off. State and local election officials across the political spectrum have repeatedly noted that absentee and mail ballots, especially when mailed through the United States Postal Service, may be subject to delayed processing and delivery.[29] Some *amici* have experienced these delays directly and understand that they can result in inadvertent disenfranchisement. Having considered these problems, many state legislatures have responded by creating ballot receipt deadlines that protect voters and their access to the franchise.

**B.    Section 7 creates administrative burdens and confusion.**

Section 7 enforcement actions would be costly and confusing for local election officials. They would need to seek counsel to advise them on any litigation against their state and how it might interfere with other aspects of state election law that depend on ballot deadlines. For example, election officials in states where voters are able to "cure" mail-in ballots that contain technical errors are concerned that those post-Election Day cure periods that are required under state law could also be challenged under Section 7, disrupting valid state ballot hearings that enable voters to protect their right to vote. *See, e.g.*, Rock Decl. ¶ 52.

And of course, litigation itself is costly. Apart from the expense of legal counsel, it draws election officials away from other important duties. Indeed, Defendants are aware of the burdens of litigation directed at election officials. In a state legislative hearing about changing the Ohio mail-in ballot deadline to reject mail-in ballots that arrive after Election Day, Ohio Secretary of State Frank LaRose testified that DOJ sent him a letter "implor[ing] Ohio to take immediate action

---

[29] *See, e.g.*, Letter from Nat'l Ass'n of Sec'ys of State & Nat'l Ass'n of State Election Dirs. to Postmaster Gen. Louis DeJoy (Sept. 11, 2024), https://perma.cc/DL6Y-7GZC.

(legislative or otherwise) to comply with federal law, and *avoid costly litigation in federal court*."[30] This letter underscores the "immediacy" of this harm, *McInnis-Misenor*, 319 F. 3d at 70, as well as the "substantial risk" that the threatened injuries will occur if not enjoined, *Susan B. Anthony List*, 573 U.S. at 158. By adding to the increase in litigation against election officials in recent years,[31] these lawsuits would only add more confusion and costs to election administration, to the detriment of the public interest.[32]

## CONCLUSION

The EO, which constitutes an unlawful overreach by the executive branch, would disenfranchise voters and disrupt local election administration if not permanently enjoined. The harmful effects are real and they are imminent. *Amici* respectfully request that the Court grant Plaintiffs' Motion for Partial Summary Judgment and that the above-referenced sections of the EO be declared invalid and permanently enjoined. Doing so would prevent both the loss of significant state and local resources and large-scale disenfranchisement that will otherwise occur because of this unlawful order.

---

[30] Frank LaRose, Ohio Sec'y of State, *Substitute Senate Bill 153 Proponent Testimony* (Oct. 28, 2025), https://perma.cc/2L86-GHD3 (emphasis added).

[31] *See* Miriam Seifter & Adam Sopko, *Election-Litigation Data: 2018, 2020, 2022 State and Federal Court Filings*, State Democracy Rsch. Initiative (Mar. 21, 2023), https://perma.cc/QT7V-69BB; Am. Bar Ass'n, *U.S. courts prepare for increase in election lawsuits* (Oct. 28, 2024), https://perma.cc/6GHZ-2RCU.

[32] Indeed, many *amici* are already spending time attempting to understand the implications of such litigation, and some *amici* wonder whether such a lawsuit could result in separate federal and state elections processes, an overwhelming outcome that could potentially amount to the equivalent of running two elections at once.

Dated: December 19, 2025

Respectfully submitted,

/s/ Jonathan B. Miller
Jonathan B. Miller (BBO #663012)
Michael Adame*
Shannon Eddy*
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Phone: (510) 738-6788
jon@publicrightsproject.org
michael@publicrightsproject.org
shannon@publicrightsproject.org

* Admitted pro hac vice

Counsel for Amici Curiae

**Appendix A—List of *Amicus Curiae* Local Election Officials,
joining in their Individual Capacities**


Jim Allen
*Director of Elections, Delaware County, Pennsylvania*


Lisa Brown
*Clerk and Register of Deeds, Oakland County, Michigan*


Barb Byrum
*Clerk, Ingham County, Michigan*


Mark Church
*Chief Elections Officer & Assessor-County Clerk-Recorder,
San Mateo County, California*


Katharine Clark
*Clerk, Santa Fe County, New Mexico*


Domonique Clemons
*County Clerk and Register of Deeds, Genesee County, Michigan*


Kristin Connelly
*Clerk-Recorder and Registrar of Voters, Contra Costa County, California*


Lisa Deeley
*Commissioner and Vice Chair, Philadelphia City, Pennsylvania*


Jilline Dobratz
*Clerk, City of West Bend, Wisconsin*


Diane Ellis-Marseglia
*Commissioner and Vice-Chair, Bucks County, Pennsylvania*


Diana Fuentes
*Clerk, City of San Diego, California*


Cathy Garrett
*Clerk, Wayne County, Michigan*


20

Michael Haas
*Interim Clerk, City of Madison, Wisconsin*

Bob Harvie
*Commissioner and Chair, Bucks County, Pennsylvania*

Celia Israel
*Tax Assessor-Collector, Travis County, Texas*

Lisa Lawitzke
*Clerk, Bellevue Township, Michigan*

Nick Lima
*Registrar and Director of Elections, City of Cranston, Rhode Island*

Dyana Limon-Mercado
*Clerk, Travis County, Texas*

Jo Ellen Litz
*Commissioner, Lebanon County, Pennsylvania*

Paul Lopez
*Clerk and Recorder, City and County of Denver, Colorado*

Neil Makhija
*Commissioner and Chairman of the Board of Elections, Montgomery County, Pennsylvania*

Kirk McDonough
*Chairperson, City of Cranston Board of Canvassers, Rhode Island*

Rocky Raffle
*Board of Elections Member and Chairperson, Athens-Clarke County, Georgia*

Dante Santoni
*Commissioner, Berks County, Pennsylvania*

Dawn Marie Sass
*Clerk and Deputy Treasurer, City of Exeter Clerk, Wisconsin*

Michael Siegrist
*Clerk, Canton Township, Michigan*

Aubrey Sonderegger
*Recorder, Coconino County, Arizona*

David R. Voye
*Elections Division Manager, Allegheny County, Pennsylvania*

Baoky Vu
*Former Vice Chair, DeKalb County Board of Elections, Georgia*

Braxton White
*Commissioner, Clarion County, Pennsylvania*

Jamila Winder
*Commissioner, Montgomery County, Pennsylvania*

Julie Wise
*Director of Elections, King County, Washington*

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that a copy of the foregoing was this day served on all counsel via the court's electronic service system.

*/s/ Jonathan B. Miller*
Jonathan B. Miller (BBO#663012)
Public Rights Project

Dated: December 19, 2025