# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA, *et al.*,

                    *Plaintiffs*,

     v.

DONALD J. TRUMP, *in his official capacity as President of the United States*, *et al.*,

                    *Defendants*.

Case No. 1:25-cv-10810 (DJC)

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

BRETT A. SHUMATE
Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

JOSEPH E. BORSON
Assistant Director
Civil Division, Federal Programs Branch

/s/ *Christian Dibblee*
CHRISTIAN DIBBLEE
MARIANNE F. KIES
Trial Attorneys
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005

NICOLE M. O'CONNOR
Assistant U.S. Attorney
U.S. Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
*Attorneys for Defendants*

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.      Plaintiffs Lack a Cause of Action .................................................................... 2

II.     Section 2(a) Is Lawful, And Plaintiffs' Claims Against It Are Not Justiciable ................. 4

        A.      The Claims Challenging Section 2(a) Are Not Justiciable ...................................... 4

        B.      Section 2(a) Is Not *Ultra Vires* ............................................................... 7

III.    Section 3(d) Is Lawful, And The Claims Challenging It Are Not Justiciable ................. 10

        A.      The Claims Challenging Section 3(d) Are Not Justiciable. .................................. 10

        B.      Section 3(d) Is Consistent With UOCAVA ..................................................... 11

IV.     Section 7(a) Is Lawful And The Claims Challenging It Are Not Justiciable. ................. 13

        A.      The Claims Challenging Section 7(a) Are Not Justiciable. ................................ 13

        B.      Section 7(a) Is Not *Ultra Vires* ............................................................. 15

V.      Section 7(b) Is Not *Ultra Vires* ..................................................................... 19

VI.     The Challenged Sections Do Not Violate State Sovereignty .......................................... 21

VII.    Plaintiffs Are Not Entitled To A Permanent Injunction .................................................. 22

        A.      Plaintiffs Fail To Show Irreparable Injury ............................................................ 22

        B.      The Equities And The Public Interest Do Not Favor An Injunction ................... 24

VIII.   The Requested Injunction Is Overbroad As To Sections 2(a) And 3(d)(i) ...................... 24

CONCLUSION .................................................................................................................... 26

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbott v. Perez*,
   585 U.S. 579 (2018) ............................................................................. 23

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
   570 U.S. 205 (2013) ............................................................................. 23

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
   570 U.S. 1 (2013) ................................................................................... 7

*Biden v. Texas*,
   597 U.S. 785 (2022) ............................................................................... 8

*Bognet v. Sec'y Commw. of Pa.*,
   980 F.3d 336 (3d Cir. 2020) ................................................................ 18

*Bost v. Ill. State Bd. of Elections*,
   — S. Ct. —, 2026 WL 96707 (U.S. Jan. 14, 2026) .............................. 18

*Bost v. Ill. State Bd. of Elections*,
   684 F. Supp. 3d 720 (N.D. Ill. 2023) .................................................. 18

*Cabi v. Bos. Children's Hosp.*,
   161 F. Supp. 3d 136 (D. Mass. 2016) ................................................... 3

*Cal. Wilderness Coal. v. Dep't of Energy*,
   631 F.3d 1072 (9th Cir. 2011) ............................................................... 9

*Campanale & Sons, Inc. v. Evans*,
   311 F.3d 109 (1st Cir. 2002) ................................................................. 9

*Caroline T. v. Hudson Sch. Dist.*,
   915 F.2d 752 (1st Cir. 1990) ............................................................... 22

*City of Arlington v. FCC*,
   569 U.S. 290 (2013) ............................................................................... 7

*City of Erie v. Pap's A.M.*,
   529 U.S. 277 (2000) ............................................................................... 6

*City of Fall River v. Federal Energy Regul. Comm'n*,
   507 F.3d 1 (1st Cir. 2007) ............................................. 6, 7, 11, 22, 23

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ............................................................................................ 5

*Crawford v. Marion Cnty. Election Bd.*,
   553 U.S. 181 (2008) .......................................................................................... 13

*Doe v. Trump*,
   157 F.4th 36 (1st Cir. 2025) .............................................................................. 26

*Does 1-6 v. Mills*,
   16 F.4th 20 (1st Cir. 2021) ................................................................................ 22

*Donald J. Trump for President, Inc. v. Way*,
   492 F. Supp. 3d 354 (D.N.J. 2020) .................................................................. 18

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) .......................................................................................... 22

*Elec. Priv. Info. Ctr. v. FAA*,
   821 F.3d 39 (D.C. Cir. 2016) ............................................................................. 6

*Ernst & Young v. Depositors Econ. Prot. Corp.*,
   45 F.3d 530 (1st Cir. 1995) ............................................................................... 11

*Fischer v. United States*,
   603 U.S. 480 (2024) .......................................................................................... 10

*Foster v. Love*,
   522 U.S. 67 (1997) ................................................................................ 15, 16, 18

*Glob. NAPs, Inc. v. Verizon New England, Inc.*,
   706 F.3d 8 (1st Cir. 2013) ................................................................................. 22

*Gonzalez v. Arizona*,
   677 F.3d 383 (9th Cir. 2012) ............................................................................ 21

*League of United Latin Am. Citizens v. Exec. Off. of President*,
   — F. Supp. 3d —, 2025 WL 3042704 (D.D.C. Oct. 31, 2025) ........................... 4

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ................................................................................ 8

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
   591 U.S. 657 (2020) ............................................................................................ 8

*Mi Familia Vota v. Fontes*,
  129 F.4th 691 (9th Cir. 2025) ............................................................................. 9

*Minerals Separation, Ltd. v. Butte & Superior Mining Co.*,
  250 U.S. 336 (1919) ........................................................................................... 6

*Narragansett Indian Tribe v. Guilbert*,
  934 F.2d 4 (1st Cir. 1991) ................................................................................ 23

*Nuclear Regul. Comm'n v. Texas*,
  605 U.S. 665 (2025) ....................................................................................... 2, 3

*Pennsylvania Democratic Party v. Boockvar*,
  238 A.3d 345 (Pa. 2020) .................................................................................. 18

*Puerto Rico v. United States*,
  490 F.3d 50 (1st Cir. 2007) ............................................................................ 2, 3

*Reddy v. Foster*,
  845 F.3d 493 (1st Cir. 2017) ...................................................................... 11, 14

*Republican Nat'l Comm. v. Wetzel*,
  120 F.4th 200 (5th Cir. 2024) ............................................................... 15, 16, 17

*Republican Nat'l Comm. v. Wetzel*,
  132 F.4th 775 (5th Cir. 2025) .......................................................................... 18

*Roman Cath. Bishop of Springfield v. City of Springfield*,
  724 F.3d 78 (1st Cir. 2013) ............................................................................... 6

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
  591 U.S. 197 (2020) ........................................................................................... 7

*Somerville Pub. Schs. v. McMahon*,
  139 F.4th 63 (1st Cir. 2025) ............................................................................ 24

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ......................................................................... 1, 24, 25, 26

*Washington v. Trump*,
  145 F.4th 1013 (9th Cir. 2025) ........................................................................ 26

*Washington v. Trump*,
  — F. Supp. 3d. —, 2026 WL 73866 (W.D. Wash. Jan. 9, 2026) ......................... 4, 14

*Watson v. Republican Nat'l Comm.*,
  2025 WL 3131802 (U.S. Nov. 10, 2025) .................................................. 15, 17

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ............................................................................... 20, 21

**Statutes**

2 U.S.C. § 7 .............................................................................................. 15, 16, 17

3 U.S.C. § 1 ................................................................................................... 15

3 U.S.C. § 21(1) ............................................................................................ 17

5 U.S.C. § 706(2) ............................................................................................ 3

52 U.S.C. § 20301(b) ................................................................................. 11, 12

52 U.S.C. § 20508(a) ..................................................................................... 4, 7

52 U.S.C. § 20508(b) ............................................................... 5, 7, 8, 9, 10, 11

52 U.S.C. § 20901(b) ...................................................................................... 20

52 U.S.C. § 20901(c) ...................................................................................... 20

52 U.S.C. § 21003(a) ...................................................................................... 19

52 U.S.C. § 21003(b) ...................................................................................... 19

52 U.S.C. § 21004(a) ...................................................................................... 19

52 U.S.C. § 21081(a) ............................................................................. 19, 20, 21

52 U.S.C. § 21085 .......................................................................................... 21

Consolidated Appropriations Act, 2018,
  Pub. L. No. 115-141, 132 Stat. 348 (2018) ............................................... 20

Electoral Count Refort Act of 2022,
  Pub. L. No. 117-328, 136 Stat. 4459 (2022) ............................................. 17

**Constitutional Provisions**

U.S. Const. art. II ........................................................................................ 7, 19

U.S. Const. art. VI .......................................................................................... 23

**Regulations**

11 C.F.R. § 9428.3 ........................................................................................ 25

32 C.F.R. § 233.6 ......................................................................................... 25

**Other Authorities**

EAC, *101 Election Improvement* (Dec. 23, 2025),
    https://perma.cc/VSB7-YZFY ................................................................ 20

EAC, *Register to Vote In Your State By Using This Postcard Form and Guide*,
    https://perma.cc/MN4E-EGZH ......................................................... 24, 25

Exec. Order No. 14,248, 90 Fed. Reg. 14,005 (Mar. 25, 2025)................. 1, 2, 4, 8, 10, 13, 14, 19

*Notarize*, Black's Law Dictionary (12th ed. 2024)...................................... 10

*Postcard*, Am. Heritage Dictionary (5th ed. 2022).................................... 12

*Postcard*, Oxford English Dictionary ......................................................... 12

*Postcard*, Webster's New World College Dictionary (4th ed. 2022)............ 12

## INTRODUCTION

Through Executive Order No. 14,248, "Preserving and Protecting the Integrity of American Elections," the President has endeavored to enforce federal statutory mandates regarding the conduct of elections. 90 Fed. Reg. 14,005 (March 25, 2025) (EO). Plaintiffs' opposition to the President's efforts derives from a misconstruction of the EO's terms and the future agency actions that it contemplates. Because Plaintiffs' supposed future harms are predicated on that misconstruction, Plaintiffs' asserted bases for subject matter jurisdiction fail. Plaintiffs also ignore recent precedent from the Supreme Court foreclosing their *ultra vires* claims because the Administrative Procedure Act (APA) provides an opportunity for meaningful review once the agency actions contemplated by the EO are complete.

Plaintiffs fare no better on the merits. They attempt to elevate the President's lawful command to subordinate officials to enforce statutory mandates consistent with applicable law to a violation of the Constitution. These arguments misunderstand the Executive power afforded to the President under Article II and the relevant statutes that the challenged sections of the EO enforce. Because their claims lack merit, Plaintiffs are not entitled to the permanent injunctive relief requested in their Motion for Partial Summary Judgment. But even if they could succeed on the merits, Plaintiffs fail to meet the equitable factors justifying permanent injunctive relief.

For those reasons, the Court should deny Plaintiffs' Motion and grant Defendants' Motion for Summary Judgment. *See* ECF No. 166 (Defs. Mot.). To the extent the Court disagrees and decides to issue injunctive relief against Defendants, the Supreme Court's recent decision in *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025), forecloses Plaintiffs' requested nationwide injunction as to sections 2(a) and 3(d) of the EO. This Court can and should grant a narrower injunction that gives relief only to the States that have joined this lawsuit.

# ARGUMENT[1,2]

## I.    Plaintiffs Lack a Cause of Action.

Plaintiffs assert that this Court can "adjudicate equitable claims challenging the legality of an executive order by means of a non-statutory ultra vires cause of action."  Mem. of Law in Support of Pls.' Mot. for Partial Summ. J., ECF No. 168 (Pls. Mot.) at 6.  But as the Supreme Court has recently made clear, non-statutory *ultra vires* review is unavailable "if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review, or if a statutory review scheme forecloses all other forms of judicial review."  *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (citation omitted).  Here the APA provides just such an adequate alternative scheme.

On its face, the EO is not self-executing—rather, it directs agencies to take future action "consistent with applicable law and subject to the availability of appropriations."  EO § 11(b); *see also, e.g.*, *id.* § 2(a)(i) (directing the Election Assistance Commission to "take appropriate action"). The APA provides Plaintiffs with a meaningful opportunity for judicial review of any final agency action taken in response to the EO.  In other words, following implementation of the EO, Plaintiffs will have a "meaningful and adequate opportunity" to challenge it.  *Nuclear Regul. Comm'n*, 605 U.S. at 681; *see also Puerto Rico v. United States*, 490 F.3d 50, 59–60 (1st Cir. 2007) (APA provided "a means of vindicating" plaintiff's rights, including its "sovereign interest" as a territory,

---

[1] Defendants again acknowledge that this Court denied their motion to dismiss, which made arguments similar to those raised in Defendants' motion and in this opposition brief.  *See* ECF No. 132.  Defendants also acknowledge this Court's holding that Plaintiffs are entitled to preliminary injunctive relief.  *See* ECF No. 107.  As in their motion for summary judgment, Defendants respectfully submit that these decisions were error and re-raise many of the same arguments for, *inter alia*, preservation purposes.  *See* Defs. Mot. 5 n.7.

[2] Defendants have moved for summary judgment as to section 4(a).  *See* Defs. Mot. 11, 23–24. Plaintiffs do not move for summary judgment on that section.  *See* ECF No. 168 at 1 n.1. Accordingly, this opposition brief does not discuss section 4(a), and Defendants rely on the arguments in their opening brief as to that section.

during review of agency action).  The availability of APA review "at least implies that nonstatutory review is inappropriate."  *Puerto Rico*, 490 F.3d at 60.[3]  The fact that Plaintiffs filed their Complaint too soon for review under the APA is not grounds for them to make "an easy end-run" around the statute's limitations.  *Nuclear Regul. Comm'n*, 605 U.S. at 681–82.

Plaintiffs apparently think they have a nonstatutory cause of action because their claims, "based on the separation of powers doctrine," are constitutional in nature.  Pls. Mot. 7.  This argument conflates the concept of "nonstatutory" review with review of purported constitutional violations.  Nonstatutory *ultra vires* review simply refers to an implied cause of action not specifically authorized by statute.  But Plaintiffs' Complaint alleges *statutory*—not constitutional—violations.[4]  Indeed, the Complaint is predicated on Plaintiffs' theory that the Executive Order "attempts to amend, repeal, rescind, or circumvent *duly enacted federal statutes*." ECF No. 1 (Compl.) ¶¶ 132, 141, 151, 160, 172 (emphasis added).  Several claims aver that the challenged EO sections violate specific statutes, like the National Voter Registration Act (NVRA) and the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA).  *See, e.g.*, *id.* ¶ 127 ("The Election EO violates the substantive provisions of the NVRA[.]"); *id.* ¶ 140 ("Congress has never authorized the Election EO's additional requirements for the 'official post card form' prescribed by the Secretary of Defense under UOCAVA[.]").  Plaintiffs' motion advances those statutory arguments.  *See, e.g.*, Pls. Mot. 10 ("Documentary proof of citizenship requirements

---

[3] In their briefing, Plaintiffs argue that they are challenging only "a Presidential command."  Pls. Mot. 7.  But their own Complaint, which governs, says otherwise.  *See* Compl., Prayer for Relief ¶ 2 (seeking injunctive relief against "implement[ation] or enforc[ement]" of the challenged sections); *see also Cabi v. Bos. Children's Hosp.*, 161 F. Supp. 3d 136, 159 n.4 (D. Mass. 2016) ("Plaintiffs are limited to the claims that are raised in the complaint.").

[4] The APA itself provides a cause of action when a plaintiff wishes to challenge final agency actions as "contrary to constitutional right."  5 U.S.C. § 706(2)(B).  So even if Plaintiffs' claims are constitutional, not statutory, the APA still provides adequate judicial review once the agencies take final action under each challenged section.  Plaintiffs do not have a cause of action until then.

3

violate the NVRA."); *id.* at 11 (arguing that section 3(d)(i) "is impossible to harmonize with the text and purpose of UOCAVA").

## II.    Section 2(a) Is Lawful, And Plaintiffs' Claims Against It Are Not Justiciable.

Even if Plaintiffs had a cause of action, and they do not, their claims fail on the merits and for lack of subject matter jurisdiction.

### A.    The Claims Challenging Section 2(a) Are Not Justiciable.

Section 2(a)(i) directs the Election Assistance Commission (EAC) to "take appropriate action to require" documentary proof of U.S. citizenship in its national mail voter registration form, referred to herein as the Federal Form.  EO § 2(a)(i).  Plaintiffs claim that this section will cause "substantial and imminent economic harms" from the imposition of a documentary proof of citizenship (DPOC) requirement.  Pls. Mot. 20.

It is too early to say that the EAC will impose such a requirement, and any assertion of imminent injury assuming otherwise is too speculative to support standing.  Section 2(a) does not tell the EAC that it "*must* add a documentary-proof-of-citizenship requirement to the Federal Form."  *Id.* at 8 (citation omitted); *contra Washington v. Trump*, — F. Supp. 3d. —, 2026 WL 73866, at *13 (W.D. Wash. Jan. 9, 2026).  Rather, section 2(a) instructs the EAC to take "appropriate action to require" DPOC.[5]  EO § 2(a)(i).  One "appropriate action" is to "consult[] with the chief election officers of the States," as required by law.  52 U.S.C. § 20508(a).  The EAC has already begun that consultation process.  *See* Decl. of Jana M. Lean, Ex. A, ECF No. 169-1

---

[5] Plaintiffs assert that Defendants have made contrary representations "[e]lsewhere," specifically in a similar case in the District of Columbia.  *See* Pls. Mot. 8 (quoting *League of United Latin Am. Citizens v. Exec. Off. of President*, — F. Supp. 3d —, 2025 WL 3042704, at *30 (D.D.C. Oct. 31, 2025) *appeal filed*, Nos. 25-5476, 25-5478 (D.C. Cir. Dec. 31, 2025)).  That prior attorney statement, made during a preliminary-injunction hearing in a different district, does not bind this Court or Defendants for the reasons explained in Defendants' motion for summary judgment and below.  *See infra* at 5–6; Defs. Mot. 9.

(letter from the EAC to "Chief Election Officials"); Pl. States' Separate Stmt. of Undisputed Material Facts ¶ 21, ECF No. 168-1 (PSUF) (affirming receipt of similar letter by nearly all Plaintiffs).

*If*, after consulting with the States, the EAC determines that a DPOC requirement is "necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process," 52 U.S.C. § 20508(b)(1), *then* the EAC must add that requirement to the Federal Form.  (That action will then be subject to independent legal challenge under the APA.)  The EAC has not yet decided to amend the Federal Form in that way, and the EAC might ultimately never make that decision.  In other words, section 2(a) directs only the start of a process and recognizes that, if the EAC determines a DPOC requirement is necessary, then the EAC is statutorily required to add that requirement to the Form.  Because Plaintiffs can only speculate about the result of the EAC's rulemaking process, any assertions of future injury based on a particular outcome are "too speculative" to support Article III standing.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013).

The EAC's letter to state election officials (on which Plaintiffs rely) underscores that the outcome of the EAC's rulemaking process is not preordained and thus that any future injury remains speculative and an inadequate basis for standing.  *Contra* Pls. Mot. 21 n.12.  The letter states that the EAC "is seeking consultation on how states would propose to implement Section 2 of EO 14248, *if required*."  ECF No. 169-1 at 21 (emphasis added) (ECF pagination).  The letter further states that the EAC "will consider responses in any amendments to the national mail voter registration form or EAC implementing regulations."  *Id.*  The import is clear—the EAC is not committing to any particular outcome of the process.  And to the extent Plaintiffs (or the Court)

rely to the contrary on representations made in another case, *see* Pls. Mot. 21 n.12, there is no persuasive rationale for concluding that the statements of a single government lawyer in the heat of a hearing in a preliminary posture can forever lock into place and bind the President's understanding of his own Executive Order.  The Court should not freeze the Government's understanding of section 2(a) "on the basis of counsel's initial footfault."  *City of Erie v. Pap's A.M.*, 529 U.S. 277, 309 n.5 (2000) (Scalia, J., concurring); *see also Minerals Separation, Ltd. v. Butte & Superior Mining Co.*, 250 U.S. 336, 352 (1919) ("[P]arties should not be held rigidly to statements made by their counsel in the stress of argument.").

Plaintiffs' claims against section 2(a) also are not ripe for many of the same reasons.  As discussed above, there is no "inevitable imposition of documentary proof of citizenship requirements" by the EAC.  Pls. Mot. 22.  The rulemaking process required to alter the Federal Form is ongoing and, at this stage, the EAC has not even issued a proposed rule.  *See Elec. Priv. Info. Ctr. v. FAA*, 821 F.3d 39, 44 (D.C. Cir. 2016) (courts "do not have authority to review proposed agency rules" (citation omitted)).  Thus, any imposition of a DPOC requirement is not an immediate dilemma.  *See* Defs. Mot. 9–10.  And if this Court disagrees, prudential considerations underlying the ripeness doctrine encourage judicial restraint when "elements of the case are uncertain."  *Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89 (1st Cir. 2013).  The exact details of any EAC rulemaking are yet to be determined.  The Court should wait to involve itself until the context is "sufficiently concrete to allow for focus and intelligent

analysis" of any changes to the Federal Form. *City of Fall River v. Fed. Energy Regul. Comm'n*, 507 F.3d 1, 6 (1st Cir. 2007) (citation omitted).

      B.      <u>Section 2(a) Is Not *Ultra Vires*</u>.

Section 2(a) also does not violate the law. In arguing that it does, Plaintiffs underscore that the Election Assistance Commission (EAC) is "an independent, bipartisan body" with an "exclusive" purview. Pls. Mot. 8. But the EAC *exercises Executive power* when it carries out the duties Congress has delegated to it, including development of "such regulations as are necessary" for "a mail voter registration application form for elections for Federal office." 52 U.S.C. § 20508(a); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 19 (2013) (describing EAC as vested with "discretionary executive authority"). Indeed, because the EAC "make[s] rules" regarding the content of the Federal Form, it exercises a power that the Supreme Court has said "*must be* [part] of—the 'executive Power.'" *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (quoting U.S. Const. art. II, § 1, cl. 1). And because all Executive power belongs to "the President alone," the EAC's exercise of that power is subject to his supervisory authority. *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 213 (2020).

Nor does section 2(a) "usurp[]" congressional or EAC authority by "preordain[ing] the outcome" of the future process under the NVRA. Pls. Mot. 10. As discussed above, section 2(a) directs only the start of a statutorily required process and recognizes that, if the EAC determines a DPOC requirement is necessary, then the EAC is statutorily required to add that requirement to the Form. *See supra* at 4–5. Section 2(a) is thus entirely consistent with 52 U.S.C. § 20508(b)(1), which likewise requires the EAC to find that the DPOC requirement is "necessary" before adding it to the Form. This understanding is reinforced by section 11(b), which directs that the EO "shall

be implemented consistent with applicable law." EO § 11(b). It cannot be unlawful for a President to direct subordinate executive officers to carry out his policies consistent with all applicable law.

Plaintiffs argue that Congress and the EAC have previously rejected efforts to add a DPOC requirement to the Federal Form. *See* Pls. Mot. 9; PSUF ¶¶ 16–19. Contrary to Plaintiffs' view, the EAC's prior decisions do not preclude a different decision today. *See Biden v. Texas*, 597 U.S. 785, 812 (2022) (affirming that an agency "is entitled to" re-evaluate priorities (citation omitted)); *see also* Defs.' Responses to Pl. States' Separate Stmt. of Undisputed Material Facts ¶¶ 15–19 (responding that past actions by EAC are immaterial). Congress authorized the EAC to determine what information is necessary to enable election officials to assess an applicant's eligibility to register to vote and, therefore, what information must be included on the Federal Form. *See* 52 U.S.C. § 20508(b)(1), (b)(2)(B). So long as Congress did not preclude adding a DPOC requirement (and it did not), the EAC is free to determine that one is necessary and should be added to the Form. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 10 (D.C. Cir. 2016) (affirming that the EAC determines necessity).

Plaintiffs also charge that section 2(a) "flouts" the "meaningful process for State input and deliberation." Pls. Mot. 10 (citation omitted). Again, this argument assumes incorrectly that section 2(a) mandates a DPOC requirement. As explained above, it does not. But even if it did, that does not mean the consultation directed by section 2(a) contradicts the consultation required by the NVRA. Just as the APA contains no "open-mindedness test" requiring agencies to have a "flexible and open-minded attitude" during a notice-and-comment period, the NVRA does not require the EAC to undertake the required consultation without notions of how that consultation will end. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 685 (2020) (citation omitted).

The decision in *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109 (1st Cir. 2002), does not suggest otherwise. There, one law required the agency to make environmental impact statements available to the public, and another law required the agency to consult specifically with regional fishing councils before issuing regulations about fishing in a particular area. *See id.* at 112–13, 118. The First Circuit held that the agency could not fulfill the latter, more specific consultation requirement through correspondence with the councils about the environmental impact statement, which was available to the entire public. Instead, because the fishing councils' correspondence about the environmental impact statement "did not differ from [the agency's] correspondence with the general public," the agency needed to do more to meet its obligation to consult specially with the fishing councils. *Id.* at 118. Here, in contrast, the EAC has specifically sought out the opinions of State election officials and has not combined that process with one advertised towards the general public, as the agency did in *Evans*. And the EAC began consultations with State officials before taking any action, unlike the agency in *California Wilderness Coalition v. Department of Energy*, 631 F.3d 1072, 1086 & n.7 (9th Cir. 2011).

Plaintiffs' statutory arguments are also unavailing. Separately requiring individuals to attest that they meet each prerequisite for eligibility—as 52 U.S.C. § 20508(b)(2)(B) requires—does not preclude the EAC from determining that DPOC is also necessary and must be added to the Form. Plaintiffs rely on *Mi Familia Vota v. Fontes*, but that case involved whether *Arizona* could require DPOC from state-form applicants registering for only federal elections. 129 F.4th 691, 719 (9th Cir. 2025). It has no bearing here when the EAC—the entity charged with altering the Federal Form—is determining what requirements are necessary.

Finally, Congress's prohibition of "any requirement for notarization or other formal authentication" does not foreclose a DPOC requirement. 52 U.S.C. § 20508(b)(3). A notarization

requirement, which the statute prohibits, would require the voter to attest before a third party "to the authenticity of . . . a signature." *Notarize*, Black's Law Dictionary (12 ed. 2024). Documentary proof of citizenship fulfills an entirely different purpose—attesting to a person's eligibility to register to vote. "[O]ther formal authentication" should be interpreted to foreclose requirements that fulfill the same purpose as notarization, *i.e.*, requirements that would force a voter to attest to their identity, not their citizenship. 52 U.S.C. § 20508(b)(3). Any other reading would defeat "the common sense intuition that Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it." *Fischer v. United States*, 603 U.S. 480, 487 (2024).

In sum, section 2(a) is not unconstitutional, nor does it violate the NVRA. The Court should grant Defendants summary judgment on claims related to section 2(a).

**III.    Section 3(d) Is Lawful, And The Claims Challenging It Are Not Justiciable.**

A.    The Claims Challenging Section 3(d) Are Not Justiciable.[6]

Section 3(d) directs the Secretary of Defense to update the Federal Post Card Application (FPCA) pursuant to UOCAVA to require documentary proof of United States citizenship "as defined by [EO] section 2(a)(ii)," and "proof of eligibility to vote in elections in the State in which the voter is attempting to vote." EO § 3(d).

Plaintiffs' claims challenging section 3(d) are not justiciable for many of the same reasons as the claims challenging section 2(a). It is undisputed that the Secretary of Defense has taken no action to update the FPCA and that the EO lacks any deadline for him to do so. Similarly, there are no facts in the record to suggest what "proof of eligibility" might suffice for purposes of

---

[6] Although Plaintiffs' Complaint challenges all parts of section 3(d), *see* Compl. ¶¶ 136–44, Plaintiffs have not moved for summary judgment as to section 3(d)(ii), *see* Pls. Mot. 11 n.6. Nonetheless, their challenge to section 3(d)(ii) is not justiciable for the same reasons as their challenge to 3(d)(i).

3(d)(ii).  Thus, it remains to be seen how the Secretary will implement section 3(d) and whether he can do so consistent with any statutory limitations.

The assertions of injury from Plaintiffs thus are unduly speculative.  Plaintiffs cannot assert that the changes allegedly required by section 3(d) are "certainly impending" when they don't know when the Secretary will take any actions pursuant to the section.  *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) (citation omitted).  And given that the exact manner of implementation by the Secretary remains unknown at this time, Plaintiffs' assertions of various injuries rest on "uncertain and contingent events that may not occur as anticipated."  *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 536 (1st Cir. 1995) (citation omitted).  They are thus too speculative to support standing.

Moreover, as with section 2(a), the Court should wait to involve itself until the Secretary takes some action that is "sufficiently concrete to allow for focus and intelligent analysis" of any changes to the FPCA.  *City of Fall River*, 507 F.3d at 6 (citation omitted).

B.    Section 3(d) Is Consistent With UOCAVA.

On its face, UOCAVA does not prohibit the Secretary of Defense from requiring DPOC as part of the FPCA.  Although the Secretary must "consult State and local election officials" before doing so, 52 U.S.C. § 20301(b)(1), the statute does not require him to find that the change is "necessary."  *Compare id.* § 20508(b) (regarding the Federal Form).

Plaintiffs read too much into the "standard oath" required by 52 U.S.C. § 20301(b)(7), which directs the Secretary to "prescribe a standard oath for use with any document under this chapter affirming that a material misstatement of fact in the completion of such a document may constitute grounds for a conviction for perjury."  *Id.* § 20301(b)(7).  *See* Defs. Mot. 21–22; *contra* Pls. Mot. 12.  That provision does not explicitly relate to citizenship, nor does it implicitly forbid

11

the Secretary from requiring DPOC. Rather, the oath is a mechanism to hold applicants accountable for the truthfulness of all statements made in their applications. Accountability is not the same as proof of eligibility, so Plaintiffs cannot say that requiring the former precludes requiring the latter.

Congress's instruction that the application be in "post card form" also does not preclude a DPOC requirement. 52 U.S.C. § 20301(b)(2); *see* Defs. Mot. 22. There is no evidence in the record to support Plaintiffs' view that a voter cannot provide DPOC within the confines of a "post card form." Drawn to its conclusion, Plaintiffs' theory would require a holding that the *current* FPCA, which is larger and lengthier than a traditional post card, violates UOCAVA. *See* Defs. Mot. 22. Plaintiffs assert in response that the current Application is a post card because it can be "mailed without an envelope" and does not require additional postage. Pls. Mot. 12. Plaintiffs' sole source for these supposedly universal characteristics of a post card is one dictionary definition. *See id.* (citing Merriam-Webster Dictionary). Other dictionaries mention more conditions— notably, that the message on a post card be "short." *See Postcard*, Am. Heritage Dictionary (5th ed. 2022), https://perma.cc/QC9N-HLF3; *Postcard*, Webster's New World College Dictionary (4th ed. 2022).[7] One would be hard pressed to describe the information contained on the current Application as "short" considering the many fields that must be filled out.

Lastly, Plaintiffs' arguments based on congressional purpose fail. *See* Pls. Mot. 13. UOCAVA protects individuals who are already abroad, meaning they most likely have a passport or other identifying document that allows travel outside the United States. It is not unduly burdensome or improper to ask an individual to photocopy a document that he or she would be

---

[7] Another dictionary also defines a post card as "marked to show that postage has been prepaid," *Postcard*, Oxford English Dictionary, https://perma.cc/965Z-QT7D, directly contradicting Plaintiffs' dictionary definition that a post card is something "to which the sender must affix a stamp," Pls. Mot. 12.

expected to have already.  As for Plaintiffs' assertion that some servicemembers are not required to, and consequently may "not bring citizenship documentation on certain deployments," *id.*; *see also* ECF No. 169-20 ¶¶ 9–11, that statement is overbroad.  A servicemember may be required to carry a passport for several reasons, including a requirement in the Status of Forces Agreement between the United States and the host nation to which the servicemember is deployed, the servicemember's particular duties or assignment, or to conduct essential foreign transactions like renting a vehicle, executing a residential lease, or opening a local bank account.  *See* Ex. 1, Decl. of James E. Vaz ¶ 7.  Plaintiffs rely on a declaration from a former Marine relaying his anecdotal observations about when servicemembers carry citizenship documents.  *See* Decl. of Garrett Sanborn ¶¶ 9–11, ECF No. 169-20.  That "single affidavit," however, "gives no indication of how common" it is for servicemembers not to carry citizenship documents while deployed such that adding DPOC to the FPCA violates UOCAVA.  *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 202 (2008) (Stevens, J.) (rejecting that election statute excessively burdened indigent or religious voters when only one affidavit was proffered).

## IV.    Section 7(a) Is Lawful And The Claims Challenging It Are Not Justiciable.

### A.    The Claims Challenging Section 7(a) Are Not Justiciable.

Section 7(a) directs the Attorney General to "take all necessary action to enforce 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1 against States that violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives."  EO § 7(a).

Plaintiffs' challenge to section 7(a) is not justiciable for the simple reason that the actions the Attorney General will take and how she will enforce that provision are entirely speculative.  As

this Court has acknowledged, the Attorney General can undertake multiple lawful actions to enforce section 7(a) that fall short of lawsuits. *See* ECF No. 107 at 30. Yet Plaintiffs assert injuries from only "a civil lawsuit or criminal prosecution," PSUF ¶¶ 45–46, including a purported "stain on the State" from those suits, Pls. Mot. 23. The Attorney General has not yet initiated any such lawsuits or prosecutions, and any assumption that she will do so is necessarily speculative, particularly given that she can enforce section 7(a) in other, plainly lawful ways. This interpretation is again bolstered by section 11(b)'s instruction to act "consistent with applicable law." EO § 11(b). Because section 7(a) can harm Plaintiffs only to the extent that the Attorney General takes actions to enforce it, any harms stemming from that section depend on her enforcement discretion and do not "stem from the Executive Order's alleged misapplication of the federal election day statutes itself." *Washington*, 2026 WL 73866, at *18 (citation modified).

Even if section 7(a) did require lawsuits, however, there is no evidence that those lawsuits are "certainly impending" as to Plaintiffs and thus sufficiently imminent to justify prospective relief. *Reddy*, 845 F.3d at 500 (citation omitted). Section 7(a) contains no deadline for the Attorney General's enforcement actions, so when a lawsuit will occur is entirely unknown at this point. Recent testimony from the Ohio Secretary of State does not suggest otherwise. *See* Pls. Mot. 23. The Department of Justice simply contacted the State of Ohio to urge it to change its ballot receipt deadline to comply with the Department's interpretation of the Election Day statutes and transmitted a letter to the State of Ohio, which Assistant Attorney General Harmeet Dhillon had signed. *See* Ex. 2. Plaintiffs do not argue, and there is no suggestion or evidence, that the Department has filed any criminal or civil enforcement actions against any states, including Ohio. And even if enforcement actions were likely enough to support standing, only Ohio would have

that standing, not other States (like Plaintiffs) against whom such an enforcement action would remain speculative.

The challenge to section 7(a) also is not ripe for similar reasons.  The record does not reflect that Plaintiffs are currently subject to *any* enforcement actions by the Attorney General, lawsuits or otherwise.  And because there are lawful ways to implement section 7(a), this Court should wait to resolve Plaintiffs' challenges until the Attorney General acts under section 7(a), if that ever happens.

B.    Section 7(a) Is Not *Ultra Vires.*

Plaintiffs assert that section 7 is *ultra vires* and violates the separation of powers because "the Election Day statutes do not impose a ballot receipt deadline," that Congress knew that States accepted mail-in ballots after Election Day and "explicitly accommodated" those varying deadlines, and that other courts have recognized that the Election Day statutes "do not preempt state law allowing ballots received or cured after Election Day to be counted."  Pls. Mot. 13–17.  Plaintiffs are wrong.

The Election Day statutes set forth a uniform ballot receipt deadline, and the President has the authority to execute those statutes.  Specifically, 2 U.S.C. § 7 and 3 U.S.C. § 1 "mandate[] holding all elections for Congress and the Presidency on a single day throughout the Union." *Foster v. Love*, 522 U.S. 67, 70 (1997).  The only federal court of appeals to have considered what it means to set a "day for the election," 2 U.S.C. § 7, held that "[r]eceipt of the last ballot . . . constitutes consummation of the election," which "must occur on Election Day." *Republican Nat'l Comm. v. Wetzel*, 120 F.4th 200, 209 (5th Cir. 2024) (emphasis omitted), *cert granted sub. nom. Watson v. Republican Nat'l Comm.*, — S. Ct. —, 2025 WL 3131802 (U.S. Nov. 10, 2025).

In *Wetzel*, a unanimous panel of the Fifth Circuit reasoned that the Supreme Court's decision in *Foster* understood the text of the Election Day statutes—particularly the words "the day for the election"—to entail three elements: "(1) official action, (2) finality, and (3) consummation." *Id.* at 206–07 (quoting 2 U.S.C. § 7); *see Foster*, 522 U.S. at 71 ("When the federal statutes speak of 'the election' of a Senator or Representative, they plainly refer to the combined actions of voters and officials meant to make a final selection of an officeholder" and the statutes "establish[] a particular day as 'the day' on which these actions must take place."); *id.* at 72 n.4 (federal election "may not be consummated prior to federal election day"). The "official action" required by the Election Day means that "a ballot is 'cast' when the State takes custody of it." *Wetzel*, 120 F.4th at 207.

The "finality" required by the Election Day statutes requires "final ballots" to be "received." *Id.* Under state regulations, however, an absentee ballot "is 'final' when accepted by [State] election officials," *id.* at 208, not merely when the voter submits in the mail. For this reason, the Election Day statutes preempt the various state laws cited by Plaintiffs that allow counting and curing of votes received after Election Day. *See* Pls. Mot. 15 & nn.9–10. As for "consummation," the Election Day statutes require "the proverbial ballot box [to be] closed" on the day specified in the statute, at which point "officials know there are X ballots to count" because no further ballots can be received. *Wetzel*, 120 F.4th at 209. Although "counting ballots" may continue after Election Day, because "it can take additional time to tabulate the election results," the "[r]eceipt of the last ballot, by contrast, constitutes consummation of the election, and it must occur on Election Day." *Id.* at 208–09 (emphasis omitted). Thus, the Election Day statutes set forth a uniform ballot receipt deadline for all votes—including mail-in or absentee votes—for federal elections.

Plaintiffs argue that Congress has been aware of "varying state ballot receipt deadlines" and has "expressly incorporate[d]" those in UOCAVA.  Pls. Mot. 15.  True enough, UOCAVA permits post-Election Day balloting, but that shows only that "Congress knew how to authorize post-Election Day voting when it wanted to do so."  *Wetzel*, 120 F.4th at 212.  The narrow exception in UOCAVA "does not impliedly repeal all of the other federal laws that impose a singular, uniform Election Day for every other voter in America."  *Id.*  The same is true for "other Election Day exceptions" in the law, such as congressional elections in the event of a vacancy and authorization for run-off elections.  *Id.* at 213.

The Electoral Count Reform and Presidential Transition Improvement Act of 2022, cited by Plaintiffs (at 16), recognizes one such exception.  There, Congress defined "election day" as "the Tuesday next after the first Monday in November" *except* when a "State modifies the period of voting, as necessitated by force majeure events."  Electoral Count Reform Act of 2022, Pub. L. No. 117-328, Div. P, § 102(b)(1), 136 Stat. 4459, 5234.  In other words, Congress simply acknowledged existing law allowing States to modify the voting period to account for force majeure events.  *See* 3 U.S.C. § 21(1).  Like the other exceptions to Election Day voting, the force-majeure exception shows that "[w]here Congress wants to make exceptions to the federal Election Day statutes, it has done so," not that Congress has "abrogate[d] the uniform Election Day in other, non-excepted circumstances."  *Wetzel*, 120 F.4th at 213.

Plaintiffs attempt to distinguish *Wetzel* as an "outlier" that runs "[a]gainst the weight of the textual and historical evidence."  Pls. Mot. 16.  But *Wetzel* is the only federal court of appeals to have considered what it means for ballot-receipt deadlines to set a "day for the election," 2 U.S.C. § 7.  And although the Supreme Court has recently granted certiorari to review *Wetzel*, *see Watson*, 2025 WL 3131802, at *1, that fact alone does not impliedly undermine *Wetzel*'s reasoning or

17

provide reason for this Court to doubt it. Plaintiffs also cite Judge Graves's dissent from rehearing en banc as setting out various reasons why *Wetzel* is wrong. *See* Pls. Mot. 16. But that opinion mischaracterizes the original panel decision, as Judge Oldham explained in his own separate opinion. *See Republican Nat'l Comm. v. Wetzel*, 132 F.4th 775, 778–79 (5th Cir. 2025) (mem.) (Oldham, J., concurring in denial of rehearing en banc). *Wetzel* remains the best authority on the meaning of the Election Day statutes, and this Court should follow it.

None of the other authorities cited by Plaintiffs are nearly as persuasive as *Wetzel*. *Foster v. Love*, 522 U.S. 67 (1997), did not even consider when ballots must be received under the Election Day statutes. Rather, the Supreme Court acknowledged that "there is room for argument about just what may constitute the final act of selection within the meaning of the law," and declined to resolve that question because the case (which addressed when the proceedings of an "election" should start, and not when they would end) did not squarely present it. *Id.* at 72. *Bost v. Illinois State Board of Elections*, 684 F. Supp. 3d 720, 728–34, 736 (N.D. Ill. 2023) reached the question only after holding that the plaintiffs lacked standing, meaning that court's statutory conclusion is dicta.[8] *See* Defs. Mot. 29 n.12. And even that standing decision has been recently reversed by the Supreme Court. *See Bost v. Ill. State Bd. of Elections*, — S. Ct. —, 2026 WL 96707 (U.S. Jan. 14, 2026). As for *Donald J. Trump for President, Inc. v. Way*, that case was decided in the context of a preliminary injunction motion on the eve of an election. 492 F. Supp. 3d 354, 375–76 (D.N.J. 2020). It has no precedential force here. *See* Defs. Mot. 29 n.12.

---

[8] *Bognet v. Sec'y Commw. of Pa.*, 980 F.3d 336, 354 (3d Cir. 2020), *vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021) (mem.), cited by Plaintiffs (at 14 n.7), similarly did not reach the merits. Plaintiffs also cite *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020), but that case turned on state constitutional law, *id.* at 371–72, and the federal statutory argument was not squarely presented, *id.* at 368 & n.23.

Plaintiffs close their section 7(a) arguments by challenging the President's authority to, they say, "impose by fiat an election rule that is absent from statute."  Pls. Mot. 16.  But as discussed above, the Election Day statutes *do* include a uniform ballot receipt deadline—one imposed by Congress.  The Executive Order ensures proper execution of that deadline consistent with the Take Care Clause.  *See* U.S. Const. art. II, § 3.  And as explained already by Defendants, the President has the authority and ability to interpret laws for the Executive Branch—this commonplace reality is not a violation of the separation of powers.  *See* Defs. Mot. 25.

## V.    **Section 7(b) Is Not *Ultra Vires*.**

Section 7(b) directs the EAC to condition funds to States, "[c]onsistent with 52 U.S.C. [§] 21001(b) and other applicable law," EO § 7(b), on a State's compliance with the requirement that all States "adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote," 52 U.S.C. § 21081(a)(6).  Section 7(b) specifies that "what constitutes a vote and what will be counted as a vote" must "includ[e] that, as prescribed in 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1, there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," except for UOCAVA votes.  EO § 7(b).  Plaintiffs argue that the EAC has no ability to condition funds on this statutory requirement and that, even if it could, Plaintiffs have adopted uniform and nondiscriminatory standards.  Pls. Mot. 17–19.

Plaintiffs are wrong.  The EO simply directs the EAC to enforce existing conditions on federal funds.  As to requirements payments under the Help America Vote Act (HAVA), States are "eligible to receive a requirements payment" only if they have "filed with the [EAC] a State plan," the content of which is directed by HAVA.  52 U.S.C. § 21003(a), (b)(1).  One required component of any plan is a description of "[h]ow the State will use the requirements payment to meet the requirements of subchapter III."  *Id.* § 21004(a)(1).  Subchapter III, in turn, includes

§ 21081, which contains the requirement that the States adopt uniform and nondiscriminatory deadlines. *See id.* § 21081(a)(6). The requirement to submit a plan might not be "a certification of compliance with each and every HAVA requirement," Pls. Mot. 18, but it does require the submitting State to say how it will comply with § 21081(a)(6). Failure to do so is a basis for withholding HAVA requirements payments. The EO therefore does not add conditions to HAVA—it simply enforces existing conditions specified by Congress for those requirements payments.

The same is true for Election Security Grants. *Contra* Pl. Mot. 18. Those grants are authorized by 52 U.S.C. § 20901(b), which requires States to carry out specified activities, including election security. *See also* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, tit. V, 132 Stat. 348, 562 (appropriating funds for election security "as authorized by sections 101, 103, and 104 of [HAVA]"). "In order to receive a payment under [that] program," a State must certify that "the proposed use of the funds are not inconsistent with the requirements of subchapter III." 52 U.S.C. § 20901(c)(2). So if a State has not adopted the uniform and nondiscriminatory deadline as required by subchapter III, the EAC can withhold funding on that basis.[9]

Plaintiffs' arguments about presidential authority and section 7(b), *see* Pls. Mot. 19, are thus unavailing. The President can, consistent with his authority, "direct that a congressional

---

[9] Plaintiffs assert that the EAC administers "three statutory funding streams," but discusses by name only the HAVA requirements payments and Election Security grants. Pls. Mot. 18. Defendants do not know what third stream Plaintiffs imply is affected by section 7(b). To the extent Plaintiffs intended to refer to general election improvement payments under section 101 of HAVA, *see, e.g.*, Compl. ¶ 100—as opposed to Election Security Grants authorized under the same section—the EAC has not made such payments since 2003. *See* EAC, *101 Election Improvement* (Dec. 23, 2025), https://perma.cc/VSB7-YZFY. Regardless, States applying for such payments under section 101 still would need to certify that the funds are consistent with the uniformity requirement found in subchapter III.

policy be executed in a manner prescribed by Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–88 (1952). By directing the EAC to enforce funding conditions based on compliance with the uniformity requirement, section 7(b) constitutes a lawful command that an executive agency follow the law as Congress prescribed it.

Plaintiffs say that even if the uniformity requirement applies to ballot receipt deadlines, that requirement "plainly refers to uniformity within each State, not among the several States," Pls. Mot. 18 (citation omitted), and that Plaintiffs' various laws setting different ballot receipt and curing deadlines are uniform "by any definition," *id.* at 19. But as Defendants explained, Plaintiffs have failed to demonstrate that § 21081(a)(6) "plainly refers to uniformity within each State, not among the several States." *Id.* at 18 (citation omitted); *see* Defs. Mot. 31. Moreover, that 52 U.S.C. § 21085 leaves to States the "methods of complying with the requirements" of subchapter III does not somehow allow States to violate the uniformity requirement that Congress established. 52 U.S.C. § 21085. As for Plaintiffs' statement that their deadlines are "uniform and nondiscriminatory by any definition," they are simply mistaken. Pls. Mot. 19 (citation omitted). Laws which permit absentee ballots to arrive after Election Day and be counted—as Plaintiffs' laws do, *see id.* at 15 & n.9—clearly privilege absentee voters' ballots over ballots, which must be received on Election Day. *See* Defs. Mot. 28.

## VI.    The Challenged Sections Do Not Violate State Sovereignty.

Plaintiffs are wrong that the EO commandeers state election procedures or otherwise violates the vertical separation of powers. *Contra* Pls. Mot. 19–20. As described at length in Defendants' motion, "the Elections Clause gives Congress the power to conscript state agencies to carry out federal mandates." Defs. Mot. 32–33 (quoting *Gonzalez v. Arizona*, 677 F.3d 383,

391 (9th Cir. 2012) (en banc)).  The President lawfully directed subordinate executive officials at the EAC to carry out those statutory mandates.  *See supra* at 7–8, 15, 20–21; Defs. Mot. 34.

## VII.    Plaintiffs Are Not Entitled To A Permanent Injunction.

To obtain permanent injunctive relief, Plaintiffs "must show actual success on the merits." *Caroline T. v. Hudson Sch. Dist.*, 915 F.2d 752, 755 (1st Cir. 1990) (citation omitted).  Plaintiffs also must show "(1) that [they] ha[ve] suffered—or, as here, will suffer—an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the [parties], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Glob. NAPs, Inc. v. Verizon New England, Inc.*, 706 F.3d 8, 13 (1st Cir. 2013) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).  The last two factors merge when, as here, the Government is the opposing party.  *See Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021).

For all the reasons given above, Plaintiffs have not shown success on the merits of their claims and thus are not entitled to permanent injunctive relief.  They also have not met the other equitable factors, as discussed below.

### A.    Plaintiffs Fail To Show Irreparable Injury.

Plaintiffs assert a host of supposedly irreparable injuries, including needing to update voter registration systems, Pls. Mot. 25, developing "guidance and training materials" on the new documentary proof of citizenship requirement, *id.*, organizing an "education campaign" about that requirement, *id.* at 26 (citation omitted), and establishing a similar education campaign "regarding the status of voting rules" as amended by section 7(a), *id.* at 27.  Plaintiffs also say they will suffer "serious reputational harm" due to lawsuits brought by the Government under section 7(a), "charging that the State counts unlawfully cast ballots."  *Id.*

22

These are not irreparable injuries.  For one thing, imposition of a DPOC requirement is not guaranteed until the EAC and the Secretary of Defense take action, nor can the costs of those actions be determined or even estimated until the precise contours of any DPOC requirement is established.  *See supra* at 4–7.  In the same vein, lawsuits by the Attorney General to enforce section 7(a) have not yet occurred and are not guaranteed to occur.  *See supra* at 13–15.  Thus, Plaintiffs' assertions that those actions will cause various injuries are speculative, and "[s]peculative injury does not constitute a showing of irreparable harm." *Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 6–7 (1st Cir. 1991) (citation omitted).

Plaintiffs also cite a supposed impairment of their "sovereign interests" and their "sovereign power" to conduct elections according to their own state codes.  Pls. Mot. 26, 28 (citation omitted).  Sovereign interests of this kind can create irreparable injury, *see, e.g.*, *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018), but Plaintiffs misstate the effects on their interests.  The EO does not direct Plaintiffs to undermine "the integrity of the electoral process," Pls. Mot. 26, or to "enforce the President's policy preference," *id.* at 28.  Rather, it directs Plaintiffs to enforce statutory mandates as set forth by Congress.  *See supra*.  The EO therefore does not impair Plaintiffs' sovereign interests any more than a duly enacted federal law that supersedes every State's interest in its own laws.  *See* U.S. Const. art VI, cl. 2 ("[T]he Laws of the United States . . . shall be the supreme Law of the Land[.]").

Lastly, Plaintiffs assert that section 7(b) imposes irreparable injury by "revok[ing] HAVA funding that [they] rely on for election administration."  Pls. Mot. 28.  Any injury, however, would flow from Plaintiffs' choices not to accept those funds.  It is always the case that "if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).  A voluntary choice not to

abide by HAVA's condition—as reaffirmed in section 7(b)—and therefore to lose HAVA funds creates an economic harm not attributable to the federal government.

      B.      <u>The Equities And The Public Interest Do Not Favor An Injunction.</u>

Plaintiffs cite myriad "public policy considerations" that they say support permanent injunctive relief. Pls. Mot. 28–31. But as the First Circuit has recognized, the Government's "inability to effectuate statutes enacted by representatives of the people" constitutes an injury to the Government and to the people who elected those representatives. *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 74 (1st Cir. 2025) (citation modified). As explained above and in Defendants' motion, the EO effectuates the mandates laid out by Congress in various statutes. The public interest therefore counsels against blocking the EO's lawful directive that the Executive Branch follow the law. *See CASA*, 606 U.S. at 861 ("[A]ny time [the Government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (citation omitted)).

## VIII.   The Requested Injunction Is Overbroad As To Sections 2(a) And 3(d)(i).

Plaintiffs ask for an injunction that would enjoin the EAC and the Secretary of Defense "from implementing Sections 2(a) and 3(d)(i) at all." Pls. Mot. 31. In other words, Plaintiffs want to prohibit the EAC and Secretary from amending *any* of the 50 State-specific instructions on the Federal Form or the FPCA to include a documentary proof of citizenship requirement, even though this litigation was brought by only 19 States. *See* EAC, *Register to Vote In Your State By Using This Postcard Form and Guide*, https://perma.cc/MN4E-EGZH (including instructions for each of the 50 States and the District of Columbia)

That injunction would be inconsistent with *CASA*, which affirmed the "general rule" that "an injunction [can]not bind one who was not a party to the cause," and that courts should "rebuff[] requests for relief that extend[] beyond the parties." 606 U.S. at 842–43 (citation omitted); *see id.*

at 844 (noting "the party-specific principles that permeate our understanding of equity"); *id.* at 851

("the complete-relief principle" does not "justif[y] the award of relief to nonparties"). The Court

thus should not grant injunctive relief to States that chose not to join this litigation unless that

indivisible relief is "all but impossible." *Id.* at 852 n.12.

But party-specific relief is possible here. Regulations governing the Federal Form and the

FPCA expressly require them to include any State-specific instructions. *See* 11 C.F.R.

§ 9428.3(a)-(b); 32 C.F.R. § 233.6(b)(1)(iv)(D); *see also* EAC, *Register to Vote In Your State By*

*Using This Postcard Form and Guide*, https://perma.cc/MN4E-EGZH (including instructions for

each of the 50 States and the District of Columbia). In other words, the regulations do not

contemplate a "single binary determination," as Plaintiffs suggest. Pls. Mot. 32 (citation omitted).

Instead, they acknowledge that the Form and FPCA will be different depending on the State. That

fact alone rebuffs Plaintiffs' concerns about national uniformity. *See id.* at 31. The Court could,

then, consistent with the regulations, prohibit the EAC and Secretary of Defense from adding a

DPOC requirement to the State-specific instructions for the 19 Plaintiff States without prohibiting

the addition of such a requirement in the instructions for the remaining States that chose not to join

this lawsuit. That injunction would respect *CASA*'s admonition that courts can offer at most

"complete relief *to the parties before the court*." 606 U.S. at 852.

Plaintiffs also argue that they will suffer significant "administrative and financial harms"

from a partial injunction such that enjoining all States is necessary. Pls. Mot. 32–33. According

to Plaintiffs, they will need to plan for contingencies that will result when voters try to register to

vote after previously living in States that (assuming the Court grants the narrower injunction

requested by Defendants) require documentary proof of citizenship. Those contingencies will

supposedly beget voter confusion and require Plaintiffs to establish procedures for how to properly

dispose of those voters' personal documents and to train election officials on how to address those out-of-state registrants.  *See id.*

These projected harms are overstated given the State-specific instructions accompanying both the Federal Form and the FPCA.  Voters registering for the first time in Plaintiff States can follow those instructions that, under a narrow injunction, will not require documentary proof of citizenship.  It is unreasonable to forecast that new registrants will simply disregard those instructions in such a number or manner that Plaintiffs must create new procedures for their mistakenly submitted proof of citizenship or that Plaintiffs must develop large-scale education efforts targeted at those particular voters.  Nor would Plaintiffs be required to take on those administrative burdens, unlike the legally required burdens in *Washington v. Trump*, 145 F.4th 1013, 1038 (9th Cir. 2025), ("The States are required by federal law to verify the actual citizenship status of individuals for the programs that they operate."), *petition for cert. filed*, No. 25-364 (U.S. Sep. 29, 2025).[10]

In sum, if Plaintiffs are entitled to injunctive relief (and they are not), *CASA* requires that injunction to give them and only them relief.  This Court can fashion such relief by enjoining the inclusion of DPOC in the Federal Form and FPCA instructions for each Plaintiff without freezing the State-specific instructions for the States that chose not to join this lawsuit.

## CONCLUSION

Defendants are entitled to summary judgment.  The Court should grant their motion for summary judgment and deny Plaintiffs' Motion for Partial Summary Judgment.

---

[10] The First Circuit's affirmance of a nationwide injunction in *Doe v. Trump*, 157 F.4th 36 (1st Cir. 2025), is also unpersuasive.  There, the court rested its affirmance on the Government's failure to "flesh[] out how any narrower injunction would work."  *Id.* at 82 (citation omitted).  Here and in contrast, Defendants have suggested why a narrower injunction is not only feasible, but also would provide complete relief to Plaintiffs, should they prevail.

Dated: January 20, 2026                          Respectfully submitted,

                                                 BRETT A. SHUMATE
                                                 Assistant Attorney General

                                                 ERIC J. HAMILTON
                                                 Deputy Assistant Attorney General
                                                 Civil Division, Federal Programs Branch

                                                 JOSEPH E. BORSON
                                                 Assistant Director
                                                 Civil Division, Federal Programs Branch

                                                 */s/ Christian Dibblee*
                                                 CHRISTIAN DIBBLEE
                                                 MARIANNE F. KIES
                                                 Trial Attorneys
                                                 Civil Division, Federal Programs Branch
                                                 1100 L Street, NW
                                                 Washington, DC 20005
                                                 Christian.r.dibblee@usdoj.gov
                                                 202-353-5980

                                                 NICOLE M. O'CONNOR
                                                 Assistant U.S. Attorney
                                                 U.S. Attorney's Office
                                                 John Joseph Moakley U.S. Courthouse
                                                 1 Courthouse Way, Suite 9200
                                                 Boston, MA 02210
                                                 (617) 748-3112
                                                 Nicole.O'Connor@usdoj.gov

                                                 *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Christian Dibblee, hereby certify that I served a true copy of the above document upon all counsel of record via this court's electronic filing system and upon any non-registered participants via first class mail.

Dated: January 20, 2026                          /s/ *Christian Dibblee*
                                                 CHRISTIAN DIBBLEE
                                                 Trial Attorney

28