## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA; STATE OF
NEVADA; COMMONWEALTH OF
MASSACHUSETTS; STATE OF
ARIZONA; STATE OF COLORADO;
STATE OF CONNECTICUT; STATE OF
DELAWARE; STATE OF HAWAII;
STATE OF ILLINOIS; STATE OF
MAINE; STATE OF MARYLAND;
PEOPLE OF THE STATE OF
MICHIGAN; STATE OF MINNESOTA;
STATE OF NEW JERSEY; STATE OF
NEW MEXICO; STATE OF NEW YORK;
STATE OF RHODE ISLAND; STATE OF
VERMONT; STATE OF WISCONSIN,

                  *Plaintiffs,*

v.

DONALD J. TRUMP, in his official
capacity as President of the United States;
PAMELA BONDI, in her official capacity
as Attorney General of the United States;
UNITED STATES ELECTION
ASSISTANCE COMMISSION; DONALD
L. PALMER, in his official capacity as
Chairman of the U.S. Election Assistance
Commission; THOMAS HICKS, in his
official capacity as Vice Chair of the U.S.
Election Assistance Commission;
CHRISTY McCORMICK and BENJAMIN
W. HOVLAND, in their official capacities
as Commissioners of the U.S. Election
Assistance Commission; PETE HEGSETH,
in his official capacity as Secretary of
Defense,

                  *Defendants.*

No. 1:25-cv-10810-DJC

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

**Page**

Introduction ................................................................................................................. 1

Argument ..................................................................................................................... 1

    I.      Plaintiff States' Claims Are Justiciable ....................................................... 1

           A.      The EO's Mandatory Changes to Federal Voter Registration
                      Forms Result in Direct, Imminent, and Substantial Harm to
                      Plaintiff States ................................................................................ 2

           B.      The EO Threatens States with Enforcement Actions Based on
                      Existing State Laws ......................................................................... 5

    II.     The EO Is Judicially Reviewable ................................................................ 8

    III.    The President Has No Authority to Refashion Voter Registration ............... 10

           A.      Section 2(a) ................................................................................... 11

                1.      The President's mandate that the Federal Form require
                          documentary proof of citizenship violates the separation of
                          powers .................................................................................. 11

                2.      The President's documentary proof of citizenship
                          requirement violates the NVRA ........................................... 14

            B.      Section 3(d) ................................................................................... 16

            C.      Section 4(a) ................................................................................... 18

    IV.    The President Lacks Authority to Override State Ballot Receipt Laws ....... 19

           A.      Section 7(a) ................................................................................... 19

                  1.      Neither Defendants nor *Wetzel* offer a sound basis for
                          departing from the plain meaning of the Election Day
                          statutes ................................................................................. 20

                2.      The historical record confirms that the Election Day
                          statutes do not preempt state law ballot receipt
                          deadlines .............................................................................. 24

            B.      Section 7(b) ................................................................................... 27

    V.     The Challenged Provisions of the EO Are Also Unconstitutional
           Because They Violate the Vertical Separation of Powers ........................... 28

    VI.    The Court Should Resolve This Case Without Delay to Clarify the
           States' Obligations as to Upcoming Elections ........................................... 29

Conclusion ................................................................................................................. 30

## TABLE OF AUTHORITIES

Page

C<small>ASES</small>

*Abbott v. Perez*
  585 U.S. 579 (2018)...............................................................................7, 29

*Akizaki v. Fong*
  51 Haw. 354 (1969) ..................................................................................25

*Am. Forest Res. Council v. United States*
  77 F.4th 787 (D.C. Cir. 2023)..................................................................10

*Arizona v. Inter Tribal Council of Ariz., Inc.*
  570 U.S. 1 (2013).................................................................................1, 29

*Associated Builders & Contractors Fla. E. Coast Chapter v. Miami-Dade Cnty.*
  594 F.3d 1321 (11th Cir. 2010) ...............................................................30

*Borges v. Serrano-Isern*
  605 F.3d 1 (1st Cir. 2010).........................................................................22

*Bost v. Ill. State Bd. of Elections*
  607 U.S. ___, 2026 WL 96707 (Jan. 14, 2026)  .................................. *passim*

*Bruesewitz v. Wyeth, LLC*
  562 U.S. 223 (2011)..................................................................................15

*Building & Construction Trades Department v. Allbaugh*
  295 F.3d 28 (D.C. Cir. 2002) ...............................................................6, 13

*Bush v. Gore*
  531 U.S. 98 (2000)....................................................................................23

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*
  631 F.3d 1072 (9th Cir. 2011) ...........................................................12, 17

*Campanale & Sons, Inc. v. Evans*
  311 F.3d 109 (1st Cir. 2002)....................................................................12

*Chamber of Com. of U.S. v. Reich*
  74 F.3d 1322 (D.C. Cir. 1996)..............................................................8, 10

*City of Arlington v. FCC*
  569 U.S. 290 (2013).............................................................................19, 28

*City of Chicago v. Barr*
  961 F.3d 882 (7th Cir. 2020) ...................................................................28

## TABLE OF AUTHORITIES
### (continued)

**Page**

*City of Providence v. Barr*
    954 F.3d 23 (1st Cir. 2020) ..................................................................19, 28

*Clapper v. Amnesty Int'l USA*
    568 U.S. 398 (2013) ......................................................................................2

*Cothran v. Town Council of Los Gatos*
    209 Cal. App. 2d 647 (1962) .....................................................................25

*CTS Corp. v. Waldburger*
    573 U.S. 1 (2014) ........................................................................................27

*Dalton v. Specter*
    511 U.S. 462 (1994) ....................................................................................10

*Dep't of Com. v. New York*
    588 U.S. 752 (2019) ......................................................................................4

*Dem. Nat'l Comm. v. Wisc. State Legislature*
    141 S. Ct. 28 (2020) ....................................................................................30

*Elliot v. Hogan*
    315 S.W.2d 840 (Mo. App. 1958) .............................................................25

*Ernst & Young v. Depositors Econ. Prot. Corp.*
    45 F.3d 530 (1st Cir. 1995) .......................................................................4, 5

*Fish v. Kobach*
    840 F.3d 710 (10th Cir. 2016) ...................................................................10

*Foster v. Love*
    522 U.S. 67 (1997) ...................................................................................20, 21

*Franklin v. Massachusetts*
    505 U.S. 788 (1992) ...................................................................................8, 9

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*
    561 U.S. 477 (2010) ......................................................................................9

*Georgia v. Meadows*
    88 F.4th 1331 (11th Cir. 2023) ..................................................................29

*Hammond v. Hickel*
    588 P.2d 256 (Alaska 1978) .......................................................................25

*Inmates of Suffolk Cnty. Jail v. Sheriff of Suffolk Cnty.*
    952 F. Supp. 869 (D. Mass. 1997) .............................................................16

### TABLE OF AUTHORITIES
(continued)

Page

*Katz v. Pershing, LLC*
   672 F.3d 64 (1st Cir. 2012) ...................................................................................2

*Kim v. Bd. of Educ. of Howard Cnty.*
   641 F. Supp. 3d 223 (D. Md. 2022) ....................................................................23

*Kobach v. U.S. Election Assistance Comm'n*
   772 F.3d 1183 (10th Cir. 2014) ..........................................................................12

*Lamb v. Hammond*
   518 A.2d 1057 (Md. 1987) ..................................................................................25

*Landis v. N. Am. Co.*
   299 U.S. 248 (1936) ............................................................................................30

*League of United Latin Am. Citizens v. Exec. Office of the President*
   __ F. Supp. 3d __, 2025 WL 3042704 (D.D.C. Oct. 31, 2025) ........................3, 4, 9, 11

*League of United Latin Am. Citizens v. Exec. Office of the President*
   780 F. Supp. 3d 135 (D.D.C. 2025) .......................................................... *passim*

*League of Women Voters of U.S. v. Newby*
   838 F.3d 1 (D.C. Cir. 2016) ................................................................................14

*Loper Bright Enter. v. Raimondo*
   603 U.S. 369 (2024) ............................................................................................19

*Lujan v. Defenders of Wildlife*
   504 U.S. 555 (1992) ............................................................................................12

*Lyman v. Baker*
   954 F.3d 351 (1st Cir. 2020) ...............................................................................23

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.*
   923 F.3d 209 (1st Cir. 2019) ........................................................................2, 4, 7

*Mayor of Baltimore v. Azar*
   973 F.3d 258 (4th Cir. 2020) ..............................................................................30

*McInnis-Misenor v. Me. Med. Ctr.*
   319 F.3d 63 (1st Cir. 2003) ...................................................................................5

*Medellin v. Texas*
   552 U.S. 491 (2008) ............................................................................................29

*Mi Familia Vota v. Fontes*
   111 F.4th 976 (9th Cir. 2024) .............................................................................30

## TABLE OF AUTHORITIES
### (continued)

Page

*Mi Familia Vota v. Fontes*
   129 F.4th 691 (9th Cir. 2025) ....................................................................14

*Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*
   385 F.3d 72 (1st Cir. 2004)........................................................................30

*Millsaps v. Thompson*
   259 F.3d 535 (6th Cir. 2001) .....................................................................22

*Morrison v. Olson*
   487 U.S. 654 (1988)...................................................................................13

*Murphy Co. v. Biden*
   65 F.4th 1122 (9th Cir. 2023) ................................................................8, 10

*Myers v. United States*
   272 U.S. 52 (1926).....................................................................................13

*N.H. Lottery Comm'n v. Rosen*
   986 F.3d 38 (1st Cir. 2021).......................................................................5, 7

*New York v. McMahon*
   784 F. Supp. 3d 311 (D. Mass. 2025) .....................................................9, 10

*New York v. Trump*
   133 F.4th 51 (1st Cir. 2025).........................................................................4

*New York v. United States*
   505 U.S. 144 (1992)...................................................................................29

*Nuclear Regul. Comm'n v. Texas*
   605 U.S. 665 (2025)...................................................................................10

*Printz v. United States*
   521 U.S. 898 (1997).....................................................................................3

*Puerto Rico v. United States*
   490 F.3d 50 (1st Cir. 2007).......................................................................10

*Purcell v. Gonzalez*
   549 U.S. 1 (2006)...................................................................................5, 30

*Quintana-Dieppa v. Dep't of Army*
   130 F.4th 1 (1st Cir. 2025).........................................................................22

*Reddy v. Foster*
   845 F.3d 493 (1st Cir. 2017).................................................................5, 7, 21

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Republican Nat'l Comm. v. Wetzel*
120 F.4th 200 (5th Cir. 2024) .......................................................................20, 21, 22, 24

*Republican Nat'l Comm. v. Wetzel*
132 F.4th 775 (5th Cir. 2025) ...............................................................................21, 22, 24

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*
102 F.3d 12 (1st Cir. 1996)...........................................................................................8

*Rudisill v. McDonough*
601 U.S. 294 (2024)....................................................................................................15

*Seila Law LLC v. Consumer Fin. Prot. Bureau*
591 U.S. 197 (2020).................................................................................................1, 13

*Stromberg Metal Works, Inc. v. PressMech., Inc.*
77 F.3d 928 (7th Cir. 1996) .....................................................................................14, 15

*Su v. Ascent Constr., Inc.*
104 F.4th 1240 (10th Cir. 2024) ...................................................................................30

*Summit Inv. & Dev. Corp. v. Leroux*
69 F.3d 608 (1st Cir. 1995)..........................................................................................20

*Susan B. Anthony List v. Driehaus*
573 U.S. 149 (2014).................................................................................................2, 5, 7

*Texas v. United States*
523 U.S. 296 (1998)......................................................................................................4

*Trump for President, Inc. v. Way*
492 F. Supp. 3d 354 (D.N.J. 2020) ...............................................................................23

*Trump v. Wilcox*
145 S. Ct. 1415 (2025)................................................................................................13

*United States v. Alabama*
778 F.3d 926 (11th Cir. 2015) ...........................................................................11, 16, 18

*United States v. Alabama*
998 F. Supp. 2d 1283 (M.D. Ala. 2014) .......................................................................16

*United States v. California*
Case No. 2:25-cv-10999 (C.D. Cal., filed Nov. 17, 2025) .............................................7

*United States v. Illinois*
Case No. 3:25-cv-01691 (S.D. Ill., filed Sept. 2, 2025)..................................................7

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Voting Integrity Project, Inc. v. Keisling*
  259 F.3d 1169 (9th Cir. 2001) ....................................................................26

*Washington v. Trump*
  __ F. Supp. 3d ___, 2026 WL 73866 (W.D. Wa. Jan. 9, 2026) ............................ *passim*

*Watson v. Republican Nat'l Comm.*
  No. 24-1260, __ S. Ct. __, 2025 WL 3131802 (Nov. 10, 2025)....................................21

*Wise v. Circosta*
  978 F.3d 93 (4th Cir. 2020) ......................................................................23

*Wright v. Marjem Recovery, LLC*
  2014 WL 4274528 (D. Mass. Aug. 27, 2014) ............................................15

*Youngstown Sheet & Tube Co. v. Sawyer*
  343 U.S. 579 (1952) .................................................................................9

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I
  § 4, cl. 1 .........................................................................................3, 24, 29

U.S. Const. art. II ...........................................................................9, 12, 13
  § 1, cl. 2 .............................................................................................3, 29
  § 1, cl. 4 .............................................................................................3, 29

U.S. Const. art. III ........................................................................................8

## FEDERAL STATUTES

2 U.S.C. § 7.................................................................................... *passim*

3 U.S.C.
  § 1...............................................................................................6, 9, 19, 20
  § 21(1) ...............................................................................................20

**TABLE OF AUTHORITIES**
(continued)

Page

52 U.S.C.

§ 10502(d) ........................................................................................26
§ 10502(g) ........................................................................................26
§ 20301 ..............................................................................................9
§ 20301(b)(1) ...................................................................................17
§ 20301(b)(2) .............................................................................17, 18
§ 20301(b)(7) ...................................................................................17
§ 20303(b)(3) .............................................................................20, 26
§ 20304(b)(1) .............................................................................20, 26
§ 20501(a)(3) ...................................................................................16
§ 20501(b) ........................................................................................16
§ 20505(a)(1) ...................................................................................11
§ 20505(b) ........................................................................................16
§ 20508(a) ...................................................................................9, 11
§ 20508(a)(1) ...................................................................................11
§ 20508(a)(2) ...................................................................................11
§ 20508(b) ........................................................................................11
§ 20508(b)(1) .........................................................................12, 14, 15
§ 20508(b)(2) .............................................................................14, 15
§ 20508(b)(3) .............................................................................14, 15
§§ 20901-20904 ..............................................................................27
§§ 20921-20923 ..............................................................................11
§ 20928 ............................................................................................11
§§ 21001-21003 .........................................................................19, 27
§ 21003(a)(1) ...................................................................................27
§ 21003(b)(1) ...................................................................................27
§ 21003(b)(3) ...................................................................................27
§ 21004 ............................................................................................27
§ 21081(a)(6) .............................................................................27, 28
§ 21085 ............................................................................................28

78 Cong. Ch. 277, 58 Stat. 136 § 311(b)(3) (1944) ....................25, 26

Pub. L.

No. 91-285, § 6, 84 Stat. 314 (1970) ........................................25, 26
No. 99-410, § 103(b)(3), 100 Stat. 924 (1986) .................................26
No. 111-84, §§ 575-582, 123 Stat. 2190 (2009) ..............................26
No. 111-84, § 580(a), 123 Stat. 2190 (2009) ...................................26
No. 117-328, § 102, 136 Stat. 4459 (2022) ......................................27
No. 119-4, 139 Stat. 9 (2025) ...........................................................27

Administrative Procedure Act ....................................................8, 10

**STATE STATUTES**

Cal. Elec. Code § 5392 ......................................................................25

viii

**TABLE OF AUTHORITIES**
(continued)

<strong>Page</strong>

Cal. Pol. Code § 1360 (Deering 1923)....................................................................25

10 Ill. Comp. Stat. Ann. 5/19-8(c) ......................................................................22

Kan. Stat. § 25-1106 (1935).................................................................................25

1933 Mo. Laws 218 ................................................................................................25

R.I. Gen. Laws ch. 319, § 6 (1938)......................................................................25

1933 Wash. Extraordinary Sess. Laws 99, 102, 103, Ch. 41
   § 3..........................................................................................................................25
   § 5..........................................................................................................................25

**REGULATORY MATERIALS**

Executive Order No. 14248, *Preserving and Protecting the Integrity of
   American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025) .................................... *passim*

Domestic Mail Manual § 507.5 (Package Intercept),
   https://perma.cc/NEQ4-VP46 ...............................................................................22

USPS Postmarking Guidelines, https://perma.cc/GHF4-WAME.........................22

**OTHER AUTHORITIES**

*Authenticate*, Merriam-Webster Dictionary, https://perma.cc/38ZV-34P9 .........................15

*Authentication*, Black's Law Dictionary (12th ed. 2024) .....................................15

*Enforce*, The American Heritage Dictionary of the English Language (5th
   ed. 2016), https://perma.cc/67RS-LPRJ.............................................................6

Hearing on H.R. 3436 Before the H. Comm. On Election of President, Vice
   President, & Representatives in Congress, 78th Cong. 100 (Oct. 26,
   1943) ......................................................................................................................25

H.R. Rep. No. 99-765, 1986 WL 31902 (1986) .................................................26

H.R. Conf. Rep. No. 103-66, 1993 WL 235764 (1993) ..................................12, 14

N. Webster, *An American Dictionary of the English Language* 433 (C.
   Goodrich & N. Porter eds. 1869) .........................................................................21

*Notarize*, Black's Law Dictionary (12th ed. 2024)..............................................15

P. Orman Ray, *Absent-voting Legislation, 1924-1925*, 20 Am. Pol. Sci. Rev.
   347 (1926)..............................................................................................................24

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Paul G. Steinbicker, *Absentee Voting in the United States*, 32 Am. Pol. Sci.
Rev. 898 (1938) ................................................................................................25

*Postcard*, Merriam-Webster Dictionary, https://perma.cc/A955-M3WQ ..........................17

Safeguard American Voter Eligibility Act,
H.R. 22, 119th Congress (2025-2026) ...........................................................12

Safeguard American Voter Eligibility Act,
H.R. 8281, 118th Congress (2023-2024) ........................................................12

## INTRODUCTION

Defendants' Motion for Summary Judgment presents the same flawed arguments already rejected by this Court at the preliminary injunction and motion to dismiss stages, and by other courts in parallel challenges to Executive Order No. 14248 (EO). With no evidentiary support, Defendants contest the justiciability of this case despite Plaintiff States' ample and uncontroverted evidence of imminent and irreparable harm. On the merits, Defendants cast the EO as merely advisory despite its unambiguous commands, all the while asserting that the Executive Branch enjoys unprecedented power. Not only do Defendants' arguments misconstrue the EO and federal statutes, but they fail to reconcile EO Sections 2(a), 3(d), 4(a), 7(a), and 7(b) with basic constitutional principles. The Framers intentionally divided constitutional authority as a "structural protection[] against abuse of power," and in so doing granted authority over elections to the States and Congress—not the President. *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020); *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (*ITCA*). The challenged provisions of the EO disregard congressional acts and state sovereignty to reshape elections according to the President's policy whims.

For the reasons presented below and in Plaintiff States' own Motion for Partial Summary Judgment, this Court should deny Defendants' motion. Plaintiff States also respectfully request that the Court deny Defendants' request to hold these cross-motions in abeyance, as a timely ruling would best avoid disruption to the administration of upcoming elections.

## ARGUMENT

### I.    PLAINTIFF STATES' CLAIMS ARE JUSTICIABLE

In arguing for summary judgment, Defendants maintain that Plaintiff States have failed to plead justiciable claims. D. 166 at 5-13. This Court has already found otherwise, and the Western District of Washington has recently concurred as to similar claims brought by state plaintiffs in that litigation. *See* D. 107 at 14-16, 20-21, 25-27; D. 132 at 8-12; *Washington v. Trump*, __ F. Supp. 3d ___, 2026 WL 73866, at *12-14, *15, *17-20 (W.D. Wa. Jan. 9, 2026) (finding that States had "adequately alleged and proved standing and ripeness" as to claims

challenging EO Sections 2(a), 3(d), 4(a), 7(a), and 7(b)).  Defendants' latest filing provides no reason to change course.

### A.    The EO's Mandatory Changes to Federal Voter Registration Forms Result in Direct, Imminent, and Substantial Harm to Plaintiff States

As to Plaintiff States' claims against Sections 2(a) and 3(d) of the EO—provisions that mandate a documentary proof of citizenship requirement on the Federal Form and Post Card Form—Defendants again contend that Plaintiff States have not established an imminently threatened injury that confers standing and demonstrates ripeness.  D. 166 at 7-11.  They relatedly argue that the challenge to Section 4(a), which would require States to either accept the Federal Form with an unlawful citizenship documentation requirement or lose all EAC-administered funding, is non-justiciable because amendments to the Federal Form under Section 2(a) have not yet occurred.  D. 166 at 11.[1]

As explained in Plaintiff States' cross-motion, either an actual or imminent injury can support standing and establish ripeness.  D. 168 at 20 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).  Imminence is shown where "the threatened injury is 'certainly impending' or there is a 'substantial risk' that the harm will occur."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (*SBA List*) (citation omitted).  And imminently threatened fiscal injury—even "a relatively small economic loss"—is sufficient to confer federal court jurisdiction.  *Katz v. Pershing, LLC*, 672 F.3d 64, 76 (1st Cir. 2012) (citation omitted); *see also Bost v. Ill. State Bd. of Elections*, 607 U.S. ___ , 2026 WL 96707, at *5 (2026) (costs incurred "to mitigate or avoid a substantial risk of . . . harm" confer standing) (quotations omitted).  The economic injury need not be direct, so long as the causal chain links that injury to the challenged federal action.  *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 923 F.3d 209, 221-227 (1st Cir. 2019) (standing satisfied by "likely chain of events" resulting in imminent fiscal injury to State).  Here, as this Court has repeatedly held, the President's attempt to mandate a

---

[1] Plaintiff States have not moved for summary judgment on their claim against Section 4(a) of the EO because a grant of permanent injunctive relief prohibiting implementation of Section 2(a) of the EO would effectively negate Section 4(a)'s unlawful commands.  The Court should nevertheless deny Defendants' motion as to this claim for the reasons set forth below.

citizenship documentation requirement on federal voter registration forms causes substantial and imminently threatened injuries to Plaintiff States.  D. 168-1, ¶¶ 37-44; *see also* D. 107 at 14-16, 20-21; D. 132 at 7-11; *Washington*, 2026 WL 73866, at *12-15 (States' time and costs to implement Sections 2(a) and 3(d) establish standing).  Indeed, because the EO's mandates seek to conscript state election administrative resources to implement presidential mandates unsupported by statute, they injure States' constitutional and sovereign interests.  *See* U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2, 4; *Printz v. United States*, 521 U.S. 898, 932-933 (1997).

Defendants insist that allegations of impending harm "misconstru[e]" the EO.  D. 166 at 7. They characterize the EO as simply requiring commencement of a process for officials to consider imposing documentation requirements, arguing that the EO "does not dictate the process outcome."  *See* D. 166 at 7-10, 17.  This characterization cannot be squared with the EO's plain language.  Section 2(a) states unequivocally that the EAC "shall take appropriate action to require" documentary proof of citizenship.  It makes no express reference to statutory procedures and goes so far as to specify precisely what types of documentation constitute sufficient proof of citizenship.  EO, § 2(a)(ii).  And Defendants themselves previously treated Section 2(a) as mandatory, as illustrated in a letter that the EAC sent the States' chief election officers stating that Section 2(a) "instructs" that documentary proof of citizenship "be required" on the Federal Form.  D. 169-1, Ex. A.  Likewise, Section 3(d) states that the Secretary of Defense "shall update [the Post Card Form] to require" documentary proof of citizenship, as specified under Section 2(a)(ii), and proof of eligibility to vote in the relevant State.

Courts have therefore consistently rejected Defendants' position, finding that the EO explicitly requires adding a documentary proof of citizenship requirement to federal voter registration forms.  *See* D. 107 at 15, 21; *see also League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 185 (D.D.C. 2025) (*LULAC I*); *League of United Latin Am. Citizens v. Exec. Off. of the President*, __ F. Supp. 3d __, 2025 WL 3042704, at *19-20 (D.D.C. Oct. 31, 2025) (*LULAC II*), *appeal docketed*, No. 25-5476 (D.C. Cir. Dec. 31, 2025); *Washington*, 2026 WL 73866, at *13, *15.  As the *LULAC II* court explained, "there is no

mystery about what Section 2(a) purports to require or whether Section 2(a) purports to require it." *LULAC II*, 2025 WL 3042704, at *20. Section 3(d)(i) is equally mandatory. Likewise, the directive in Section 3(d)(ii) to add proof of voter eligibility requirements to the Post Card Form is "not speculative or discretionary." *Washington*, 2026 WL 73866, at *15 (citing D. 107 at 21). Absent a permanent injunction, these mandates will force Plaintiff States to incur substantial and unrecoverable costs to plan for and implement documentary proof of citizenship requirements. *See* D. 168-1, ¶¶ 37-40, 41-44. Such imminently threatened injuries establish standing. *See Massachusetts*, 923 F.3d at 222-227; *Washington*, 2026 WL 73866, at *12-15.[2]

Defendants' arguments on ripeness fail for the same reason. Consistent with earlier contentions rejected by this Court, Defendants claim that challenges to Sections 2(a), 3(d), and 4(a) are unfit for adjudication because the injurious effects of these provisions turn on future events that have not yet occurred and may not occur as anticipated. D. 166 at 10-11 (citing *Texas v. United States*, 523 U.S. 296, 300 (1998); *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir. 1995)). But, again, there is no doubt about what the EO requires. The challenged provisions directly order officials—in mandatory terms—to amend federal voter registration forms to require documentary proof of citizenship and, in the case of the Post Card Form, proof of eligibility to vote in the relevant State. EO, §§ 2(a), 3(d). Indeed, Section 4(a) of the EO assumes that the Federal Form will include a documentary proof requirement by ordering the EAC to coerce States to accept this change by withholding funding. Even if the EAC and Secretary of Defense may go through some process on the way to amending federal registration forms, the plain language of the EO has already dictated the

---

[2] As this Court previously noted, Defendants' counsel affirmed during a hearing in *LULAC* that documentary proof of citizenship would be imposed pursuant to Section 2(a) and "that the administrative process prior to implementation will address only technical details." D. 107 at 15 (citing D. 76-2 at 5-9). Defendants disclaim that representation and argue that they are not bound by it as a matter of estoppel. D. 166 at 9. Regardless, the earlier assertion only reinforces what is already obvious from the EO's mandatory language. Courts are "'not required to exhibit a naiveté from which ordinary citizens are free.'" *New York v. Trump*, 133 F.4th 51, 69 (1st Cir. 2025) (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019)).

outcome. *See Washington*, 2026 WL 73866, at *19 (rejecting argument that Sections 2(a), 3(d), and 4(a) impose only "hypothetical" harm and deeming States' challenges ripe for adjudication).

Absent injunctive relief, Plaintiff States would have to expend and divert resources to prepare for implementation of Sections 2(a) and 3(d) and ensure that upcoming federal elections are properly administered. This "immediate dilemma" is ripe for judicial review. *McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003); *Ernst & Young*, 45 F.3d at 535. That review must come now, since limits on court-ordered relief close in time to an election may leave Plaintiff States with no meaningful opportunity to secure relief later. *See Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (*per curiam*); *see also Bost*, 2026 WL 96707, at *4.

## B. The EO Threatens States with Enforcement Actions Based on Existing State Laws

Defendants also contest the justiciability of Ballot Receipt Plaintiffs' challenge to Section 7(a), which requires the Attorney General to "take all necessary action" to enforce the President's errant interpretation of the Election Day statutes against States that count timely cast ballots received or cured shortly after Election Day. D. 166 at 11-13.[3] This Court has twice rejected Defendants' arguments and should do so again. *See* D. 107 at 26-27; D. 132 at 11-12; *see also Washington*, 2026 WL 73866, at *17-18, *20 (challenge to Section 7(a) justiciable).

As detailed in Plaintiff States' cross-motion, in instances where government enforcement is threatened, a plaintiff need not expose themselves to enforcement before bringing a claim. D. 168 at 22; *see Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017). Rather, standing is established by a "credible threat" of enforcement, which is found where enforcement is "certainly impending" or there is a "substantial risk" that it will occur. *Reddy*, 845 F.3d at 500 (citing *SBA List*, 573 U.S. at 158). Ripeness in the pre-enforcement context turns on the same showing. *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 52-53 (1st Cir. 2021).

Defendants reiterate their argument that the Attorney General has yet to implement Section 7(a), meaning "any dispute about what she may do in the future, and whether that future action

---

[3] Ballot Receipt Plaintiffs are those Plaintiff States that allow ballots cast by Election Day to be either received or cured in a short period of time afterward. D. 168-1, ¶¶ 29, 30.

will violate Plaintiffs' legal rights, is necessarily speculative."  D. 166 at 12; *see* D. 109 at 11-12.
They suggest that Section 7(a) may be implemented without subjecting Ballot Receipt Plaintiffs
to injurious enforcement action, proposing that the Attorney General might "send[] letters to
Plaintiff States encouraging compliance with the President's interpretation of 2 U.S.C. § 7 and 3
U.S.C. § 1."  D. 166 at 12.  But this Court has repeatedly rejected this assertion, noting that "'the
government has not indicated that the Attorney General will cabin enforcement of § 7(a) merely
to sending letters.'"  D. 132 at 12 (quoting D. 107 at 26).  This remains true; Defendants have
proffered no testimony from the Attorney General disavowing litigation as an enforcement tool.
Nor could she.  The EO explicitly requires the Attorney General to "take all necessary action to
enforce" Section 7(a).  Should a compliance letter fail to spur changes to state law, the Attorney
General has no choice but "to enforce" Section 7(a).  *See Enforce*, The American Heritage
Dictionary of the English Language (5th ed. 2016) ("To compel observance of or obedience
to."), https://perma.cc/67RS-LPRJ.

　　　Since Ballot Receipt Plaintiffs each intend to administer upcoming federal elections
consistent with their existing laws, they face an unquestionable threat of enforcement.  D. 168-1,
¶ 31; *Washington*, 2026 WL 73866, at *20 ("§ 7 contains mandatory language that requires the
Attorney General and the EAC to act against Plaintiffs so long as they maintain their current
ballot-receipt deadlines").  The threat of suit is particularly disruptive here, where it could
unfairly cast doubt on election rules in the months leading up to an election.  *See Bost*, 2026 WL
96707, at *4 (election-related litigation "shortly before election day—or worse, after" could have
"dire" consequences).  Delaying adjudication of this well-defined legal dispute until the Attorney
General initiates enforcement proceedings would dramatically increase the risk of disruption as
upcoming elections approach.  *See id.*

　　　This case is nothing like *Building & Construction Trades Department v. Allbaugh*, 295
F.3d 28 (D.C. Cir. 2002), where the Executive Order provided general guidance to *all* federal
agencies and entities receiving federal assistance for construction projects and was subordinate to
the applicable governing statutes.  *Id.* at 29; *see also* D. 166 at 12.  Section 7(a), by contrast, is

targeted, clear, and mandatory.  Moreover, as Defendants apparently acknowledge, Ballot

Receipt Plaintiffs need not subject themselves to enforcement before bringing suit.  D. 166 at 13;

*see N.H. Lottery Comm'n*, 986 F.3d at 50-53 (claim was justiciable where federal government's

interpretation of federal law forced the state to "operate under a dangling sword of indictment").

Experience demonstrates that the threat of enforcement under Section 7(a) is far from

speculative.  In recent months, the U.S. Department of Justice has repeatedly sued States on

theories of preemption under the Supremacy Clause.  *See, e.g.*, *United States v. California*, Case

No. 2:25-cv-10999 (C.D. Cal., filed Nov. 17, 2025); *United States v. Illinois*, Case No. 3:25-cv-

01691 (S.D. Ill., filed Sept. 2, 2025).  As explained in Plaintiff States's cross-motion, the State of

Ohio, which is not covered by the Court's preliminary injunction, recently received direct and

explicit threats of litigation from the Department based on Ohio's ballot receipt deadline.  *See*

D. 168 at 23; *see also* D. 170, ¶ 6 & D. 170-5.  These tangible threats reinforce what is obvious

from the EO's plain language—Section 7(a) poses a "substantial risk" of enforcement action

brought by the Attorney General against Ballot Receipt Plaintiffs.  *SBA List*, 573 U.S. at 158-

159; *Reddy*, 845 F.3d at 500; *Washington,* 2026 WL 73866, at *18, *20.

Section 7(a)'s imminently threatened enforcement imposes myriad injuries on Ballot

Receipt Plaintiffs.  Defending against enforcement litigation by the Attorney General would cost

the States significant time, trouble, and expenses.  D. 168-1, ¶ 45.  Moreover, the threatened

enforcement would injure Ballot Receipt Plaintiffs' sovereign and constitutionally protected

authority to enforce their own election laws within their jurisdiction.  *See Abbott v. Perez*, 585

U.S. 579, 602 n.17 (2018).  Any court order altering state ballot deadlines would require Ballot

Receipt Plaintiffs to expend resources preparing to implement such a change, including massive

public education campaigns to ensure that voters are well informed and able to have their ballots

counted under new rules.  D. 168-1, ¶ 45; *see also Massachusetts*, 923 F.3d at 222-227

(recognizing standing based on threat of fiscal injury); *Washington*, 2026 WL 73866, at *18

(recognizing "financial harm" to States from Section 7(a)).  Finally, enforcement proceedings

under Section 7(a) would cause irreparable damage to Ballot Receipt Plaintiffs' reputation as

election administrators, leading some voters to question the legitimacy of federal elections in their State. D. 168-1, ¶ 46; *see also Bost*, 2026 WL 96707, at *4 (recognizing that reputational harms are "classic Article III injuries" and finding political candidate standing based on loss of public confidence in election integrity); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) (damage to "goodwill and reputation" can constitute irreparable injury).

## II.    THE EO IS JUDICIALLY REVIEWABLE

Defendants mistakenly contend that Plaintiff States cannot challenge the EO through non-statutory ultra vires claims. D. 166 at 22-23. According to Defendants, Plaintiff States may only seek judicial review through the Administrative Procedure Act (APA) after the relevant agencies act in response to the EO. *Id.* at 23. Defendants' arguments do not differ from those already rejected by this Court in its order denying Defendants' Motion to Dismiss. *See* D. 132 at 17-19; *accord Washington*, 2026 WL 73866, at *22 ("Plaintiffs have an equitable cause of action to support their separation-of-powers challenges to EO §§ 2(a), 3(d), 4(a) . . . 7(a), and 7(b)[.]"). The Court should reject them again.

Defendants wrongly assert that the EO is not self-executing—that the agencies directed by the President in the EO must act before Plaintiff States can sue. But that characterization of the EO is at odds with its text, which orders the EAC, Secretary of Defense, and Attorney General to execute the EO's dictates. EO, §§ 2(a), 3(d), 7(a), 7(b); *see supra*, § I. It is these directives—not future action—that Plaintiff States challenge in this lawsuit. The APA does not provide a cause of action to challenge an Executive Order. D. 132 at 18; *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *see also Washington*, 2026 WL 73866, at *22 ("[T]here is no statutory review scheme that would provide Plaintiffs with a 'meaningful and adequate opportunity for judicial review[.]'") (citation omitted). Defendants' argument that Plaintiff States have APA claims available to them is therefore unavailing.[4]

---

[4] A court's assessment of the merits of the claim has no bearing on whether it can be reviewed in the first place. *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1330 (D.C. Cir. 1996) ("[I]t is important carefully to distinguish between the government's argument on the merits and its non-reviewability claim."); *accord Murphy Co. v. Biden*, 65 F.4th 1122, 1131 n.1 (9th Cir. 2023).

This Court's prior ruling that presidential acts are subject to judicial review is strongly supported.  *See* D. 168 at 6-7.  It is well established that presidential actions and orders may "be reviewed for constitutionality."  *Franklin*, 505 U.S. at 801; *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *LULAC II*, 2025 WL 3042704, at *24. Plaintiff States' claims each assert a violation of the vertical or horizontal separation of powers. D. 168 at 5-6, 8-10, 13-14, 16-17, 19-20.  Defendants implicitly agree that this case turns on constitutional powers, pointing to the Article II Vesting Clause and Take Care Clause to argue that the President has not exceeded his constitutional authority under these provisions.  *See, e.g.*, D. 166 at 15, 25.  Additionally, the statutes invoked in the EO—the NVRA, UOCAVA, and Election Day statutes—assign no direct role to the President relevant to the EO's mandates.  *See* 52 U.S.C. § 20508(a); 52 U.S.C. § 20301; 2 U.S.C. § 7; 3 U.S.C. § 1.  That the EO is unsupported by and even contravenes those statutes only further confirms the President's lack of constitutional power in this area of law.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) (presidential power is "at its lowest ebb" when the President "takes measures incompatible with the expressed or implied will of Congress").

The crux of Plaintiff States' claims is that Sections 2(a), 3(d), 4(a), 7(a), and 7(b) "lie[] outside [the President's] constitutional powers and intrude[] into the domain of regulating federal election procedure, which the Elections Clause reserves for the States and Congress alone." *LULAC II*, 2025 WL 3042704, at *25; *accord Washington*, 2026 WL 73866, at *22 (finding that States' separation of powers claims against EO "are constitutional" and "fall squarely within the scope of the non-statutory, equitable cause of action caselaw"); *New York v. McMahon*, 784 F. Supp. 3d 311, 349-350 (D. Mass. 2025) (finding that plaintiff states' claims that the President lacked authority to shut down the Department of Education were constitutional despite federal government's attempt to characterize the challenge as a statutory violation of the Department of Education Organization Act), *appeal dismissed*, No. 25-1495, 2025 WL 3451815 (1st Cir. Sept. 15, 2025).  In short, this dispute is about constitutional authority.

Moreover, Plaintiff States' claims are valid even if this Court construes any of them as

alleging that the President has exceeded statutory authority.  *See New York*, 784 F. Supp. 3d at 352 ("[A] claim alleging that the President acted in excess of his statutory authority is judicially reviewable even absent an applicable statutory review provision." (quoting *Am. Forest Res. Council v. United States*, 77 F.4th 787, 796 (D.C. Cir. 2023))).  Although claims challenging presidential action as contrary to statute are unreviewable when a statute assigns discretion to the President, *Dalton v. Specter*, 511 U.S. 462, 477 (1994), "some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA," *id.* at 474; *see also Am. Forest Res. Council*, 77 F.4th at 797 (explaining that "*Dalton* has no force where . . . 'the claim instead is that the presidential action . . . independently violates [another statute]'") (citation omitted).  A claim that presidential action is inconsistent with a federal statute delegating no such authority to the President is judicially reviewable.  *See Reich*, 74 F.3d at 1332; *accord Murphy*, 65 F.4th at 1130.  Here, Plaintiff States' claims assert that the President's directives are inconsistent with the NVRA, UOCAVA, and Election Day statutes, none of which delegate relevant authority to the President.  D. 168 at 10-14.  Plaintiff States' claims are thus reviewable even if arguably statutory in nature.  *See Reich*, 74 F.3d at 1330.

Finally, *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665 (2025) and *Puerto Rico v. United States*, 490 F.3d 50 (1st Cir. 2007) do not support Defendants' position.  *See* D. 166 at 14.  This Court has correctly concluded that those cases are inapposite and "do[] not disturb [the] conclusion" that "nonstatutory *ultra vires* challenges against the [EO] are valid causes of action." D. 132 at 19.  Both cases involved challenges to agency action that allegedly exceeded statutory authority where judicial review was explicitly addressed by statute.  *See Texas*, 605 U.S. at 668-669; *Puerto Rico*, 490 F.3d at 54.  In contrast, this case challenges the EO as exceeding presidential authority where no relevant statute addresses judicial review.  D. 132 at 19-20; *accord Washington*, 2026 WL 73866, at *22.

## III.    THE PRESIDENT HAS NO AUTHORITY TO REFASHION VOTER REGISTRATION

The NVRA and UOCAVA were meant to encourage and simplify voter registration by creating uniform and accessible federal registration procedures.  *See Fish v. Kobach*, 840 F.3d

710, 720-721 (10th Cir. 2016); *United States v. Alabama*, 778 F.3d 926, 928 (11th Cir. 2015). The statutes clearly and purposefully detail the registration process to ensure it remains accessible. In direct contravention of these statutes, Sections 2(a) and 3(d) mandate the imposition of unnecessary and burdensome documentary proof requirements on federal voter registration forms. These EO provisions are unconstitutional and ultra vires, and nothing Defendants raise establishes otherwise.

### A.    Section 2(a)

Defendants contend that "the President neither exceeded his constitutional authority nor violated the NVRA" in issuing Section 2(a). D. 166 at 15. They are mistaken. The President has no authority to circumvent the NVRA and require specific changes to the Federal Form. D. 107 at 16; D. 132 at 21-23; *accord LULAC II*, 2025 WL 2042704, at *26; *Washington*, 2026 WL 73866, at *26-27. And the NVRA itself prohibits the President's documentary proof of citizenship requirement.

#### 1.    The President's mandate that the Federal Form require documentary proof of citizenship violates the separation of powers

"[N]either the Constitution nor the NVRA grants the President the authority to direct the EAC to change the content of the Federal Form." D. 107 at 16 (quoting *LULAC I*, 780 F. Supp. 3d at 194). The Elections Clause assigns power to regulate elections to the States, and "only Congress has the power to adjust state election rules." *Id.* Congress carefully set out all aspects of the Federal Form in the NVRA. 52 U.S.C. §§ 20505(a)(1), 20508(a)-(b). With the enactment of HAVA, Congress made the deliberate choice to delegate the power to revise the Form solely to a bipartisan, independent commission that can act only by a majority (and therefore bipartisan) vote. *See id.* §§ 20505(a)(1), 20508(a), 20921-20923, 20928; *see also* D. 168 at 8 & n.4. By statute, this bipartisan, independent commission must consult state elections officials in developing the Federal Form and prescribing related regulations. 52 U.S.C. § 20508(a)(1)-(2).

Section 2(a) flouts these requirements by usurping the authority that Congress granted to the independent EAC and preordaining the outcome of what Congress meant to be a meaningful

process for State input and joint State-federal deliberation.  *See* D. 168 at 8-10.  Section 2(a) is

thus "contrary to the manifest will of Congress, as expressed in the text, structure, and context of

the NVRA and HAVA."  D. 107 at 17 (quoting *LULAC I*, 780 F. Supp. 3d at 195); *accord*

*Washington*, 2026 WL 73866, at *26-27.  Notably, both Congress and the EAC have previously

expressed that documentary proof of citizenship is not "necessary" to confirm citizenship on the

Federal Form.[5]  *See* H.R. Conf. Rep. No. 103-66 at 23-24, 1993 WL 235764, at *23 (1993)

(documentary proof of citizenship "not necessary or consistent with the purposes of" the

NVRA); *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1189, 1196-1198 (10th

Cir. 2014); D. 168-1, ¶¶ 15-19.

   Defendants claim that Section 2(a) is consistent with the applicable statutes because it

commands the EAC to "take appropriate action to require" documentary proof of citizenship.

*See* D. 166 at 17.  But, as explained above, this argument cannot be reconciled with the

mandatory and specific language of Section 2(a) and Defendants' own actions in response to the

EO.  *See supra*, § I(A).  Section 2(a) does not task the EAC with determining whether

documentary proof of citizenship on the Federal Form is "necessary to enable the appropriate

State election official" to assess voter eligibility and administer election processes.  52 U.S.C.

§ 20508(b)(1).  Instead, it "preordain[s] the outcome" of the EAC's "required procedures,"

"render[ing] them meaningless" in contravention of statutory requirements.  D. 107 at 18 (citing

*LULAC I*, 780 F. Supp. 3d at 198-200 (concluding same)); *see also* D. 168 at 9-10 (citing *Lujan*

*v. Defenders of Wildlife*, 504 U.S. 555, 585 (1992) (Stevens, J., concurring); *Campanale & Sons,*

*Inc. v. Evans*, 311 F.3d 109, 117-118 (1st Cir. 2002); *Cal. Wilderness Coal. v. U.S. Dep't of*

*Energy*, 631 F.3d 1072, 1085-1088 (9th Cir. 2011)).

   Defendants also argue that the Article II Vesting Clause gives the President unlimited

authority to direct the EAC because the EAC exercises "executive power" and is thus "subject to

---

[5] Section 2(a) attempts to bypass unsuccessful legislative efforts in Congress to amend the NVRA to require documentary proof of citizenship on federal voter registration forms. *See* Safeguard American Voter Eligibility Act, H.R. 8281, 118th Congress (2023-2024); Safeguard American Voter Eligibility Act, H.R. 22, 119th Congress (2025-2026).

the President's supervisory authority." D. 166 at 16. This Court has correctly rejected this position as "untethered from precedent and unsupported by even a maximalist view of 'the executive Power' under our Constitution." D. 107 at 18 (quoting *LULAC I*, 780 F. Supp. 3d at 198); *accord Washington*, 2026 WL 73866, at *27. The President's Vesting Clause authority "is not absolute and restrictions upon that authority that do 'not unduly interfere with the functioning of the Executive branch' are upheld." D. 107 at 18 (quoting *Seila Law LLC*, 591 U.S. at 217). That the EAC is required to follow congressionally mandated requirements in amending the Federal Form "presents no impediment to 'the President's ability to perform his constitutional duty,'" *LULAC I*, 780 F. Supp. 3d at 198 (quoting *Morrison v. Olson*, 487 U.S. 654, 691 (1988)), particularly because "the President has no constitutional duty to prescribe the content of election regulations," D. 107 at 18 (quoting *LULAC I*, 780 F. Supp. 3d at 198). If Article II gave the President unlimited authority to ignore statutory requirements, as Defendants apparently contend, it would gravely undermine the Constitution's balance between state, congressional, and executive authority.

Defendants' citations do not undercut this Court's prior conclusion. *See* D. 166 at 15-17. In *Allbaugh*, the court recognized that the guidance contained in the Executive Order at issue was subordinate to the statutes that governed agencies' project administration. *See Allbaugh*, 295 F.3d at 33. *Myers v. United States*, 272 U.S. 52 (1926), *Seila Law, LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020), and *Trump v. Wilcox*, 145 S. Ct. 1415 (2025) are also inapposite because, unlike those cases, this case does not address the President's removal power. *Washington*, 2026 WL 73866, at *27 & n.61 (distinguishing removal cases). Instead, the President has ordered the EAC to reach a particular, predetermined outcome, contrary to the statutory processes that Congress mandated for changing the Federal Form. Defendants still have not cited any case that supports such a power.

13

**2.    The President's documentary proof of citizenship requirement violates the NVRA**

Section 2(a) is ultra vires for the foregoing reasons alone.  But even if the President could order the EAC to alter the Federal Form, the EO's changes violate the NVRA.[6]  In the NVRA, Congress required individuals to establish citizenship by checkbox and attestation, permitted the EAC to require on the Federal Form only that additional information which is "necessary" to assess voter eligibility and administer election processes, and prohibited any "other formal authentication."  52 U.S.C. § 20508(b)(1)-(3); *see* H.R. Conf. Rep. No. 103-66 at 23-24, 1993 WL 235764, at *23 (1993) (documentary proof of citizenship "not necessary or consistent with the purposes of" the NVRA).  As Plaintiff States have shown, these limitations forbid a documentary proof of citizenship requirement on the Federal Form.  D. 113 at 10-11; D. 168 at 10-11; *see also Washington*, 2026 WL 73866, at *26 n.58 (expressing "doubt" that "the EAC can, consistent with the NVRA, update the Federal Form to include DPOC").

Defendants argue that 52 U.S.C. § 20508(b)(1) allows the EAC to "determine[] what identifying information 'is necessary' to assess an applicant's eligibility to vote" and should be included on the Federal Form.  D. 166 at 18-19.  But the statute constrains the EAC's discretion; that information must be "necessary."  52 U.S.C. § 20508(b)(1).  The "ordinary meaning of 'necessary' is 'essential.'"  *Mi Familia Vota v. Fontes*, 129 F.4th 691, 719 (9th Cir. 2025).  Documentary proof of citizenship "is not 'essential' because the checkbox requirement already gives proof of citizenship."  *Id.*  Thus, the NVRA "does not permit its inclusion."  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 11 (D.C. Cir. 2016).

Reading "necessary" in light of Congress's decision *not* to authorize States to include a documentary proof of citizenship requirement on state forms supports this conclusion.  *See* H.R. Conf. Rep. No. 103-66 at 23-24, 1993 WL 235764, at *23 (1993).  While statutory text controls "[w]hen text and legislative history disagree," D. 166 at 19 (quoting *Stromberg Metal Works, Inc. v. PressMech., Inc.*, 77 F.3d 928, 931 (7th Cir. 1996)), there is no disagreement here.

---

[6] Due to Arizona's unique legal requirements, the State does not join the argument that the NVRA prohibits a documentary proof of citizenship requirement on the Federal Form.

Congress's clear rejection of a documentary proof of citizenship requirement aligns with the NVRA's attestation requirement on the Federal Form and limitations on additional information. 52 U.S.C. § 20508(b)(1)-(3).  Unlike *Stromberg*, where some legislative history indicated a narrower reading of the statute at issue that conflicted with the statute's text, 77 F.3d at 931, here the legislative history supports and aligns with the statutory text.  Defendants also cite *Bruesewitz v. Wyeth, LLC*, 562 U.S. 223, 241-242 (2011), but the passage Defendants quote concerns *post*-enactment legislative history and is therefore inapposite.  *See* D. 166 at 19.

Defendants next attempt to sidestep the NVRA's prohibition on "any requirement for notarization or other formal authentication" by arguing that the prohibition applies only to authentication of *identity*.  D. 166 at 19-20.  They claim that notarization is solely the process of proving identity, and that the prohibition on "notarization" must modify the prohibition on "other formal authentication," such that authentication should be read solely as "authentication of . . . identification akin to notarization."  *Id.*

This argument fails at multiple levels.  First, Defendants paint an improperly narrow view of the term "notarize."  Their truncated citation to Black's Law Dictionary, D. 166 at 19, obscures that "notarize" can refer to the authenticity of a "mark" or other piece of information, not just identity.  *Notarize*, Black's Law Dictionary (12th ed. 2024).  Even the unpublished case Defendants cite recognizes that notarization can serve other purposes besides establishing identity, such as showing "that [a person] *understand*[*s*] the document they are signing."  *Wright v. Marjem Recovery, LLC*, 2014 WL 4274528, at *1 (D. Mass. Aug. 27, 2014) (emphasis added). Second, there is no reason to read the prohibition on notarization as limiting the prohibition on formal authentication, rather than as separate prohibitions—especially because "differences in language [in the statute] convey differences in meaning."  *See Rudisill v. McDonough*, 601 U.S. 294, 308 (2024).  A better reading of the statute is that "notarization" refers to the process of having a notary attest to something, while "other formal authentication" means what it plainly says:  a prohibition on "the act of proving something"—here, a claim of citizenship—"is true or genuine."  *Authentication*, Black's Law Dictionary (12th ed. 2024); *see also Authenticate*,

Merriam-Webster Dictionary, https://perma.cc/38ZV-34P9 ("to prove or serve to prove to be real, true, or genuine").  This reading aligns well with the legislative intent behind the NVRA, which was to remove barriers to registration and voting.  *See* 52 U.S.C. §§ 20501(a)(3), (b), 20505(b); *Inmates of Suffolk Cnty. Jail v. Sheriff of Suffolk Cnty.*, 952 F. Supp. 869, 877 (D. Mass. 1997) ("statutory terms must be read in the context of the entire act and in relation to each other").  Proper reading of the NVRA provides no support for a distinction between proving identity and proving citizenship, and the statute prohibits "formal authentication" of either.

### B.    Section 3(d)

Defendants next contend that Section 3(d) of the EO, which directs the Secretary of Defense to impose requirements for documentary proof of citizenship and proof of state voter eligibility on UOCAVA's Post Card Form, is not ultra vires.  D. 166 at 20-23.  They argue that the President has authority to direct the actions of the Secretary of Defense, and that such requirements are "consistent with UOCAVA's text and design."  D. 166 at 20.  Here again, however, the Court has previously considered and rejected Defendants' arguments.  *See* D. 107 at 21-24; D. 132 at 23-24; *see also Washington*, 2026 WL 73866, at *28 (finding Section 3(d) unconstitutional).  Nothing in their motion compels a different outcome.

As this Court has recognized, UOCAVA advances Congress's commitment to protecting the voting rights of military members and citizens living overseas by eliminating procedural roadblocks to registration and voting.  D. 107 at 21 (citing *Alabama*, 778 F.3d at 928; *United States v. Alabama*, 998 F. Supp. 2d 1283, 1286 (M.D. Ala. 2014)).  To that end, Congress permitted UOCAVA voters to register using a streamlined, single-page post card application, and to demonstrate their eligibility to vote through a standard oath made on the application and submitted under penalty of perjury.  *See* D. 168 at 12-13.  Section 3(d) of the EO attempts to unilaterally impose proof requirements that run contrary to both the letter and spirit of UOCAVA, violating the constitutional separation of powers.  Both Section 3(d)(i) and 3(d)(ii) seem to require that applicants append additional documentation to the Post Card Form; the former by requiring "documentary proof," and the latter by requiring the Secretary of Defense to

"update" the form with proof of eligibility even though the current form already includes an attestation of state voter eligibility. D. 170, ¶ 5 & D. 170-4. Section 3(d) also circumvents the statutory requirement that the President's UOCAVA designee consult with state elections officials in promulgating the Post Card Form, 52 U.S.C. § 20301(b)(1)-(2), rendering the consultation requirement "meaningless," *Cal. Wilderness Coal.*, 631 F.3d at 1086.[7]

Defendants reiterate various arguments that remain unavailing. For instance, they claim that the Post Card Form's standard oath "is not a substitute for proof of eligibility," but rather a mechanism that simply ensures the veracity of all statements made on the application. D. 166 at 22. But this argument disproves their point. In subjecting UOCAVA applicants to perjury liability for false statements on their application, the standard oath necessarily encompasses the applicant's required affirmation of citizenship. 52 U.S.C. § 20301(b)(7). Likewise, it establishes the applicant's eligibility to vote in state elections. D. 170, ¶ 5 & D. 170-4 (requiring attestation that application is "eligible to vote in the requested jurisdiction"). That the standard oath covers other information provided on the application does not undermine its utility for ensuring the veracity of the applicant's citizenship and eligibility to vote. To the contrary, like the Federal Form's attestation requirement, the standard oath constitutes the Post Card Form's prescribed proof-of-eligibility mechanism. Indeed, that Congress expressly preempted alternative state-imposed oath or affirmation requirements strongly evidences Congress's intent that the standard oath be the exclusive avenue for proving an applicant's citizenship and eligibility to vote.

Defendants also dispute the significance of Congress's mandate that the UOCAVA application be a "post card" —i.e., sent without an envelope with no documents appended. D. 166 at 22; *see also* D. 168 at 12 (citing *Postcard*, Merriam-Webster Dictionary, https://perma.cc/A955-M3WQ); 52 U.S.C. § 20301(b)(2). Attempting to downplay the statutory

---

[7] While Plaintiff States did not seek summary judgment and relief related to Section 3(d)(ii) in their cross-motion, they oppose Defendants' request for summary judgment as to this provision. As described here, a presidential directive that the Post Card Form be updated to require additional "proof of eligibility to vote" in the relevant State is contrary to UOCAVA because it circumvents the statute's consultation process, seems to expand the application beyond a post card, and undermines Congress's intent that the standard oath be used to prove eligibility. *See* 52 U.S.C. § 20301(b)(1), (2), (7).

requirement, Defendants claim that the current application is not a "traditional 'post card' at all."

D. 166 at 22.  But the current form is designed to be mailed as a post card, without an envelope.

D. 168-1, ¶ 26; D. 170, ¶ 5 & D. 170-4.  And, in any event, it is the statutory text, not existing

practice, that controls.[8]  Any additional documentation requirements would violate the statute by

requiring *all* UOCAVA applicants to submit their registration using an envelope, contrary to

Congress' mandate that the application be contained in a post card.  *See* 52 U.S.C. § 20301(b)(2).

Defendants' motion does not grapple with the dissonance between Congress's

unambiguous intention to remove "procedural roadblocks" in overseas voter registration,

*Alabama*, 778 F.3d at 928, and the obstructive practical effects of the documentation

requirements mandated in Section 3(d).  As the Court has recognized, "many United States

citizens who are otherwise eligible to vote lack access to the citizenship documents the Executive

Order requires and cannot easily obtain them."  D. 107 at 23.  Moreover, in the context of

citizens registering from overseas, a documentation requirement creates additional burdens,

including the logistical need to duplicate the necessary documents in a foreign country, as well as

entrust sensitive documentation to international mail.  *See* D. 168 at 13.  In that sense, the EO not

only conflicts with Congress's requirement for a post card application, but also the broader intent

behind UOCAVA to enhance voting accessibility for citizens overseas.  This unilateral upsetting

of Congress's careful design violates the constitutional separation of powers.

## C.    Section 4(a)

Defendants argue that Plaintiff States fail to state a claim against Section 4(a) because the

EO "simply parrots the NVRA's requirement" making acceptance and use of the Federal Form a

funding condition.  D. 166 at 23-24.  But, as this Court previously observed, that claim "ignores

---

[8] As in prior filings, Defendants make the related point that Arizona requires documentary proof of citizenship when an applicant uses the Federal Post Card Form to register for state elections. D. 166 at 21.  They further note that UOCAVA applicants seeking to vote in Vermont or Puerto Rico are subject to additional information requirements.  *Id.* at 22-23.  As to Arizona, the additional documentation only affects a voter's ability to participate in *state* elections.  As to Vermont and Puerto Rico, the additional information requested is designed to be written into a box provided on the application and does not hinder the ability of the applicant to submit their registration in a post-card style mailing.  D. 170, ¶ 5 & D. 170-4.

the language of § 4(a) which adds to this condition 'any requirement for documentary proof of United States citizenship adopted pursuant to section 2(a)(ii) of this order.'"  D. 132 at 28 (quoting EO, § 4(a)); *accord Washington*, 2026 WL 73866, at *28-29.  In other words, Section 4(a) conditions funds on States' acceptance and use of the Federal Form *as unlawfully amended under Section 2(a)*.

No statute supports Section 4(a)'s new funding condition; neither HAVA nor any other statute contemplates this additional requirement.  Congress set out the precise formula for each State's award of funds, and the specific conditions States must meet to be eligible.  52 U.S.C. §§ 21001-21003.  Congress provided no role for the President in the award of funding, nor for additional conditions on the funding.  The President lacks authority to require the EAC to withhold statutorily appropriated funds for States' failure to accede to the unconstitutional directive in Section 2(a).  *See City of Providence v. Barr*, 954 F.3d 23, 45 (1st Cir. 2020) (agency cannot impose conditions on statutory funding beyond statutory language); *City of Arlington v. FCC*, 569 U.S. 290, 297-298 (2013) (agency may only exercise authority conferred by statute); *Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 412 (2024) (same); *Washington*, 2026 WL 73866, at *28-29 (finding Section 4(a) unconstitutional).

## IV.    THE PRESIDENT LACKS AUTHORITY TO OVERRIDE STATE BALLOT RECEIPT LAWS

Defendants equally fail to justify the President's attempt to impose a uniform ballot receipt deadline of Election Day through Section 7 of the Executive Order.  Consistent with their authority under the Elections and Electors Clauses, Ballot Receipt Plaintiffs have enacted voter-protective laws allowing mail ballots that are timely cast by Election Day to be counted if they are received or cured within a short period following Election Day.  D. 168-1, ¶¶ 29-30.  These laws are consistent with the Election Day statutes (2 U.S.C. § 7 and 3 U.S.C. § 1) and other relevant federal laws.  The President lacks authority to unilaterally decree otherwise.

### A.    Section 7(a)

Section 7(a) directs the Attorney General to "take all necessary action to enforce" the Election Day statutes "against States" that "include[e] absentee or mail-in ballots received after

Election Day in the final tabulation of votes" in federal elections.  EO, § 7(a).  This command is unsupported by statute and impermissibly encroaches upon the constitutional power of Congress and the States to set rules governing the "Manner" of holding federal elections.  *See Washington*, 2026 WL 73866, at \*32-36.  Because the EO's "national ballot-receipt deadline of Election Day is unlawful . . . the President lacks any constitutional or statutory authority to direct the Attorney General to 'enforce' said deadline against states[.]"  *Id.* at \*36.

As Plaintiff States explained in their cross-motion, the plain language of the Election Day statutes requires only that voters make their final choice by Election Day.  D. 168 at 14-15; *see also* 2 U.S.C. § 7; 3 U.S.C. §§ 1, 21(1); *Foster v. Love*, 522 U.S. 67, 71 (1997) ("election" refers to "'[t]he act of choosing'" or "final selection" of candidates) (citations omitted); D. 107 at 28; *Washington*, 2026 WL 73866, at \*32 ("Neither statute includes the words 'ballot,' 'deadline,' 'receipt,' or any other term that could be fairly 'interpreted' to create a ballot-receipt deadline."). UOCAVA provisions incorporating state law ballot receipt deadlines further confirm that States retain discretion to set "the date by which an absentee ballot must be received in order to be counted in the election."  52 USC § 20304(b)(1); *see also id.* § 20303(b)(3); D. 168 at 15-16; D. 107 at 28 ("UOCAVA acknowledges the variances in state ballot receipt deadlines").  The plain meaning of these statutes alone supports judgment for Ballot Receipt Plaintiffs on their challenge to Section 7(a).  *See Summit Inv. & Dev. Corp. v. Leroux*, 69 F.3d 608, 610 (1st Cir. 1995) ("The 'plain meaning' of statutory language controls its construction.") (citation omitted). Defendants' legal and historical arguments to the contrary are both unavailing.

### 1. Neither Defendants nor *Wetzel* offer a sound basis for departing from the plain meaning of the Election Day statutes

Defendants offer no cogent reading of the *actual text* of the Election Day statutes to support the EO's assertion that those statutes set a deadline for elections officials to receive mail ballots.  Rather, for that conclusion, Defendants rely primarily on a single, poorly reasoned

decision: *Republican Nat'l Comm. v. Wetzel*, 120 F.4th 200 (5th Cir. 2024).[9]  D. 166 at 27-28.
But *Wetzel* does not withstand scrutiny.

*Wetzel*'s errors begin with the three-factor framework it adopts to analyze the term
"election."  *See* 120 F.4th at 207.  To derive this framework, *Wetzel* plucks three phrases—
"(1) official action, (2) finality, and (3) consummation"—from the Supreme Court case *Foster v.
Love* and denominates them "definitional elements."  *Id.*  But *Foster* nowhere identifies these
three terms as definitional elements, nor analyzes them as distinct concepts.[10]  *See* 522 U.S. at
71-73; *Washington*, 2026 WL 73866, at *32-33 (criticizing *Wetzel*'s test as lacking a basis in
either the statutory text or in *Foster*).  Rather, *Foster* focused on the "final selection of an
officeholder" or "final act of selection" as the dispositive consideration in determining whether a
Louisiana law allowing federal congressional representatives to be chosen weeks before Election
Day violated federal statute.  *Id.* at 71-72.  *Foster*'s focus on the act of "selection" aligns with the
definition of "election" contemporary to the passage of the Election Day statutes.[11]  *See id.* at 71
(citing N. Webster, *An American Dictionary of the English Language* 433 (C. Goodrich & N.
Porter eds. 1869) (defining election as "[t]he act of choosing a person to fill an office."); *see also*
D. 176 at 16 ("the touchstone of voter choice underlies all federal election day provisions").

*Wetzel*'s application of its three-factor test suffers from equally flawed reasoning.  *See*
*Washington*, 2026 WL 736866, at *33.  For example, *Wetzel* suggests that officials' passive
receipt of ballots is necessary to satisfy the "official action" factor, but ignores the official action
embodied in the law setting a deadline to mail a ballot.  *See* 120 F.4th at 207.  Similarly, *Wetzel*
contends that the "finality" factor must refer to overall election results rather than individuals'

---

[9] *Cert. granted sub nom. Watson v. Republican Nat'l Comm.*, No. 24-1260, __ S. Ct. __, 2025
WL 3131802 (Nov. 10, 2025).

[10] *Foster* disavowed any attempt to "isolat[e] precisely what acts a State must cause to be done
on the federal election day (and not before it) in order to satisfy the statute."  522 U.S. at 72.

[11] *Wetzel*, in contrast, discards dictionary definitions as unhelpful because they "make no
mention of deadlines or ballot receipt."  120 F.4th at 206 & n.5 (collecting historical dictionary
definitions all centering on the choice or selection of candidates).  As Judge Graves aptly
observed, "this sounds like an answer in search of a question."  132 F.4th at 781 (Graves, J.,
dissenting from denial of rehearing en banc).

ballot choices, but it cannot follow that premise to its logical endpoint since ballots cannot all be counted on Election Day. *See id.*; *cf. Wetzel*, 132 F.4th at 783 (Graves, J., dissenting from denial of rehearing en banc). *Wetzel* thus pivots to declare the receipt of ballots as the moment of "finality." *See* 120 F.4th at 207. This declaration is both unconvincing and arbitrary. *Millsaps v. Thompson*, 259 F.3d 535, 546 (6th Cir. 2001) (a focus on ballot receipt "presents an unnatural and stilted conception" of the election process). *Wetzel* repeats the error in its analysis of the "consummation" factor by categorizing counting ballots as an "administrative action[]" that can occur after Election Day, while unconvincingly declaring that "[r]eceipt of the last ballot, by contrast, constitutes consummation of the election." 120 F.4th at 209 (emphasis in original).

    *Wetzel* also argues that voters could use mail recall procedures to "change their votes after Election Day," 120 F.4th at 208, and Defendants uncritically repeat that argument before this Court, D. 166 at 28. But even accepting the extravagantly speculative premise that a voter could succeed *both* in recalling their ballot[12] *and* in remarking and remailing it with presumably spoiled materials, such a changed ballot would receive a disqualifying postmark because it would be sent after Election Day. *See* USPS Postmarking Guidelines, https://perma.cc/GHF4-WAME ("[I]t has been the longstanding policy of the Postal Service to try to ensure that every return ballot mailed by voters receives a postmark."); D. 107 at 29 n.9. Defendants provide no evidence that this farfetched scenario has ever occurred, and "'mere allegations are not entitled to weight in the summary judgment calculus.'" *Quintana-Dieppa v. Dep't of Army*, 130 F.4th 1, 10 (1st Cir. 2025) (quoting *Borges v. Serrano-Isern*, 605 F.3d 1, 3 (1st Cir. 2010)).

    Next, Defendants observe that Illinois allows ballots to be counted as timely based on the date of certification, even if they lack a postmark.[13] D. 166 at 28 (citing 10 Ill. Comp. Stat. Ann. 5/19-8(c)). Defendants find it "possible to imagine" a late-mailed ballot being counted based on a "fraudulent certification date" due to USPS's failure to apply a postmark. *Id.* at 28-29. Their

---

[12] *But see* Domestic Mail Manual § 507.5 (Package Intercept) https://perma.cc/NEQ4-VP46 ("Interception of eligible mailpieces is not guaranteed").

[13] Defendants wholly ignore Illinois election officials' use of "intelligent mail barcode tracking system[s]" to verify ballot timeliness. *See* 10 Ill. Comp. Stat. Ann. 5/19-8(c).

imagination has no bearing on statutory interpretation.  The Election Day statues "are silent on methods of determining the timeliness of ballots."  *Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 372 (D.N.J. 2020); *accord* D. 107 at 28.  Nothing in those statutes precludes States from relying on voter certifications to establish timeliness.

Defendants next argue that "permitting absentee ballots to be received after Election Day" is "discriminatory," citing *Bush v. Gore*, 531 U.S. 98, 104-105 (2000).  D. 166 at 28.  But *Bush v. Gore* has no application here.[14]  In that case, the Supreme Court found that Florida's failure to use consistent standards across its counties to interpret marked ballots resulted in "arbitrary and disparate treatment of the members of its electorate."  *Id.* at 105, 107-109.  In contrast, each Ballot Receipt Plaintiff sets uniform deadlines for absentee ballots to be received or cured, or in a handful of cases sets extended deadlines for overseas and military voters due to their particular circumstances.  *See* D. 168-1, ¶¶ 29, 30.  These standards are objective, uniform, and nondiscriminatory.  *Id.*; *Wise v. Circosta*, 978 F.3d 93, 100 (4th Cir. 2020).  "It is thus unclear how Plaintiffs' decision to count these ballots amounts to 'arbitrarily treat[ing] some people's votes differently[.]'"  *Washington*, 2026 WL 73866, at *35.  The sole disparity Defendants claim to perceive in these rules is the possibility that absentee voters may succeed in voting after Election Day "[i]f postmarks are unenforced."  D. 166 at 28.  This is improbable and factually unsupported, as explained above.  Moreover, as this Court has recognized, concerns about non-postmarked ballots are a red herring where Section 7(a) prohibits accepting *any* mail ballots received after Election Day, whether postmarked or not.  D. 107 at 29-30.

Defendants' speculation about late, non-postmarked ballots does not require the Court to accept a requirement that is plainly absent from the text of the Election Day statutes.  Nor does it permit the President to adopt new federal rules governing elections in Congress' stead.

---

[14] The Supreme Court and lower courts alike have regarded *Bush v. Gore* as limited to its unique facts.  *See* 531 U.S. at 109 ("Our consideration is limited to the present circumstances"); *Lyman v. Baker*, 954 F.3d 351, 369 (1st Cir. 2020) (declining to read *Bush* "beyond its facts"); *Kim v. Bd. of Educ. of Howard Cnty.*, 641 F. Supp. 3d 223, 235-236 (D. Md. 2022), *aff'd on other grounds* 93 F.4th 733 (4th Cir. 2024) (collecting cases).

##### 2.    The historical record confirms that the Election Day statutes do not preempt state law ballot receipt deadlines

Defendants also argue, following *Wetzel*, that "[h]istory reveals that the term 'election include[d] both ballot casting and ballot receipt.'" D. 166 at 27 (quoting 120 F.4th at 209). But both Defendants and *Wetzel* ignore or misconstrue key aspects of that history. Properly accounted for, the historical record strongly supports Plaintiff States' position.

First, Defendants argue that absentee voting by soldiers during the Civil War shows that "the act of voting concluded when the vote was received." D. 166 at 27 (citing 120 F.4th at 207). However, as Judge Graves explained in his dissent from denial of rehearing en banc in *Wetzel*, several States explicitly allowed soldiers' ballots to be returned to elections officials after Election Day. 132 F.4th at 785-787; *see also Washington*, 2026 WL 73866, at *34. In fact, the federal government's own amicus brief in *Wetzel* recognizes that, in many States, ballots cast by soldiers in the field would not reach elections officials until after Election Day. *See* Brief for the United States as Amicus Curiae, *Wetzel*, No. 24-60395, 2024 WL 4243563, *19-22 (Sept. 10, 2024). When Congress enacted 2 U.S.C. § 7 the following decade, it specified only the "Time" of the election and set out no rules on the "Manner" of administering balloting, notwithstanding the variation in state procedures so recently showcased by the Civil War. *See* U.S. Const. art. I, § 4, cl. 1; 2 U.S.C. § 7. Then, as now, Congress' choice not to prescribe election procedures left discretion over mechanics like ballot receipt deadlines in the hands of the States.

Next, Defendants vaguely claim that after the Civil War, "[S]tates allowing civil absentee voting still required votes to be received by Election Day." D. 166 at 27 (citing 120 F.4th at 210). Defendants then skip forward to 1977, omitting most of the 20th century from their accounting of the historical record. *Id.* Yet, during that period, numerous States had extended ballot receipt deadlines. And Congress repeatedly acknowledged and incorporated those deadlines into federal law throughout that period and beyond. The federal government catalogued this very history in its *Wetzel* amicus brief. *See* 2024 WL 4243563, at *23-26.

The first decades of the 20th century saw a rapid spread of laws allowing absentee voting. Bellows Decl. Ex. A, P. Orman Ray, *Absent-voting Legislation, 1924-1925*, 20 Am. Pol. Sci.

Rev. 347 (1926) (all States but three allowed absentee voting). From early on, multiple States allowed ballots to be delivered after Election Day so long as they were marked and mailed by that date.[15] A 1938 review of absentee voting laws observed that state law deadlines for officials' receipt of absentee ballots "range from six days before to six days after the date of the election." *Id.* Ex. H, Paul G. Steinbicker, *Absentee Voting in the United States*, 32 Am. Pol. Sci. Rev. 898, 905-906 (1938). In 1944, Congress enshrined States' extended ballot receipt deadlines in federal law on absentee voting by service members during World War II, mandating that "any extension of time for the receipt of absentee ballots permitted by State laws shall apply to ballots cast under this title." 78 Cong. Ch. 277, 58 Stat. 136 § 311(b)(3) (1944).

States continued to use extended ballot receipt deadlines during the second half of the 20th century,[16] and Congress continued to recognize and accommodate those deadlines in federal law. In 1970, Congress set minimum standards for absentee voting in the Voting Rights Amendment Act. Pub. L. 91-285, § 6, 84 Stat. 314 (1970). While that Act requires States to accept absentee

---

[15] Bellows Decl. Ex. B, Cal. Pol. Code § 1360 (Deering 1923) (absentee ballots must be received by registrar of voters "within fourteen days after the date of the election in which such ballots are to be counted"); *id.* Ex. C, 1933 Mo. Laws 218, 222 (absentee ballot must be received by election official "not later than 6 o'clock p.m. of the day next succeeding the day of such election"); *id.* Ex. D, 1933 Wash. Extraordinary Sess. Laws 99, 102, 103, Ch. 41 §§ 3, 5 (ballot must be placed in mail "not later than the day of such election"); *id.* Ex. E, Kan. Stat. § 25-1106 (1935) (mail ballot must reach election official "on or before the tenth day following such primary or general election"); *id.* Ex. F, R.I. General Laws of 1938, ann., Ch. 319 § 6 (mailed ballot must be "received on or before midnight of the Monday following said election"). Congressional hearings in 1943 reflected that eight States had post-election ballot receipt deadlines for civilians, soldiers, or both. *Id.* Ex. G, Hearing on H.R. 3436 Before the H. Comm. On Election of President, Vice President, & Representatives in Congress, 78th Cong. 100, 102, 104 (Oct. 26, 1943).

[16] *See, e.g.*, *Elliot v. Hogan*, 315 S.W.2d 840, 848 (Mo. App. 1958) (Missouri statute allowed an absentee ballot to be counted if it was "postmarked the day of the election and reach[ed] the election official the day next succeeding the election"); *Cothran v. Town Council of Los Gatos*, 209 Cal. App. 2d 647, 659-660 & n.6 (1962) (quoting former Cal. Elec. Code § 5392 as requiring absentee ballots to be "received within six days after the date of the election in which they are to be counted."); *Akizaki v. Fong*, 51 Haw. 354, 355 (1969) (under Hawaii statute, "an absentee ballot received not later than noon on the sixth day following a general election may be counted, but only if it is postmarked not later than the day before the election"); *Hammond v. Hickel*, 588 P.2d 256, 267-268 (Alaska 1978) (quoting Alaska statute as allowing ballots to be returned by the "'most expeditious mail service, postmarked not later than the day of the election, to the election supervisor in his district'"); *Lamb v. Hammond*, 518 A.2d 1057, 1066-1067 (Md. 1987) (absentee ballots mailed and postmarked prior to Election Day were timely if reviewed "'not later than 4pm on the Wednesday following [E]lection [D]ay'").

ballots returned to election officials "not later than the time of closing of the polls" on Election Day, it also preserves the ability of States to "adopt[] less restrictive voting practices," including extended ballot receipt deadlines.  52 U.S.C. § 10502(d), (g); *see Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1176 (9th Cir. 2001).

When Congress enacted UOCAVA in 1986, it again incorporated state ballot receipt deadlines into the federal scheme.  Pub. L. 99-410, 100 Stat. 924, § 103(b)(3) (1986).  Congress directed that federal write-in absentee ballots must be "submitted and processed in the manner provided by law for absentee ballots in the State involved," unless a state absentee ballot is received by the State "not later than the deadline for receipt of the State absentee ballot under State law."  *Id.* (codified at 52 U.S.C. § 20303(b)(3)).  The choice to respect state law deadlines was deliberate.  As the House Report observed, state laws accepting absentee ballots "for a specified number of days after election day" numbered among important initiatives to "protect[] the voting rights" of citizens.  H.R. Rep. No. 99-765 at 2012, 1986 WL 31902, at *8 (1986).

In 2009, Congress amended UOCAVA.  Pub. L. 111-84, 123 Stat. 2190, §§ 575-582 (2009).  Once again, Congress integrated state ballot receipt deadlines into the federal scheme, directing federal officials to "facilitate the delivery of marked absentee ballots . . . not later than the date by which an absentee ballot must be received in order to be counted in the election."  *Id.* § 580(a) (codified at 52 U.S.C. § 20304(b)(1)).

Defendants thus miss the mark when they argue that "Congressional inaction says very little, if anything, about congressional intent."  D. 166 at 29.  Far from remaining silent on the issue, over the last century Congress repeatedly incorporated state law ballot receipt deadlines into federal legislation or affirmatively preserved States' authority to adopt such deadlines.  *See* 78 Cong. Ch. 277, 58 Stat. 136, § 311(b)(3) (1944); Pub. L. 91-285, 84 Stat. 314, § 6 (1970); Pub. L. 99-410, 100 Stat 924, § 103(b)(3) (1986); Pub. L. 111-84, 123 Stat. 2190, §§ 575-582 (2009).  Throughout that period, as shown above, state absentee voting laws have regularly included provisions accepting ballots that are cast on or before Election Day but received afterward.  And in 2022, when Congress last amended one of the Election Day statutes and

defined the term "election day," it left ballot receipt deadlines untouched.  Pub. L. 117-328, 136 Stat. 4459, 5233-5234 § 102 (2022).  On this historical record, "'[t]he case for federal pre-emption is particularly weak.'"  *CTS Corp. v. Waldburger*, 573 U.S. 1, 18 (2014) (citation omitted); *accord* D. 107 at 28-29; *Washington*, 2026 WL 73866, at *34.

### B.    Section 7(b)

Section 7(b) directs the EAC to "condition any available funding to a State on that State's compliance with the requirement in 52 U.S.C. § 21081(a)(6) that each State adopt uniform and nondiscriminatory standards" defining valid votes, and that these standards include a "ballot receipt deadline of Election Day" for all except UOCAVA voters.  EO, § 7(b).  For the reasons explained in Plaintiff States' cross-motion, Section 7(b) imposes funding conditions not authorized by statute and thereby violates the separation of powers.  D. 168 at 17-19; *see also Washington*, 2026 WL 73866, at *36 (holding that "the President lacks any constitutional or statutory authority" to require the EAC to condition funding as directed in Section 7(b)).

As a preliminary point, Defendants only attempt to justify Section 7(b) as to the "requirements" funding program authorized by 52 U.S.C. §§ 21001-21003.  *See* D. 166 at 30. Defendants thus appear to concede (correctly) that 7(b) cannot lawfully apply to the EAC's other statutory funding programs:  "election improvement" funds, 52 U.S.C. §§ 20901-20904, and "election security" matching grants, e.g., Pub. L. 119-4, 139 Stat. 9, 10-11, 26 (2025).

Section 7(b) is equally unlawful as to the requirements funding program.  Defendants claim that "the President is directing the EAC to condition funding on compliance with applicable statutory requirements," but this is wrong.  *See* D. 166 at 30.  First, the requirements funding statute does not authorize the EAC to withhold funding based on an alleged violation of the HAVA provision named in the EO, 52 U.S.C. § 21081(a)(6).  *See* 52 U.S.C. § 21003(b)(3); 21145 (conditioning funding on compliance with other laws, but not HAVA).  The "plan" provision that Defendants identify conspicuously falls short of a certification of compliance with HAVA's substantive provisions, instead requiring a "plan" for how the funding will be spent. *See* 52 U.S.C. §§ 21003(a)(1) & (b)(1), 21004.  Second, as Plaintiff States explained in their

cross-motion, even assuming funding could be conditioned on compliance with 52 U.S.C.
§ 21081(a)(6)'s "uniform and nondiscriminatory standards" for defining votes, Ballot Receipt
Plaintiffs' ballot receipt and curing laws do not violate that provision.  *See* D. 168 at 18-19.

Defendants attack the Court's earlier determination that 52 U.S.C. § 21081(a)(6) requires
"'uniformity within each State, not among the several States.'"  D. 166 at 31 (quoting D. 132 at
27).  But the Court's view is the only reasonable interpretation of the provision.  Section
21081(a)(6) mandates "[e]ach State" to adopt "uniform and nondiscriminatory standards"
defining votes "for each category of voting system used in the State."  A single State only has the
power to set a uniform rule *within that State*.  This statutory design necessarily precludes any
requirement of national uniformity under federal direction.  *See* 52 U.S.C. § 21081(a)(6).
Indeed, HAVA underscores that "[t]he specific choices on the methods of complying with the
requirements of this subchapter"—including Section 21081(a)(6)—"shall be left to the discretion
of the State."  *Id.* § 21085.  That discretion is incompatible with a presidential mandate.

Last, Defendants claim for the President the prerogative to order the EAC to "act within
Congress's commands."  D. 166 at 31-32.  But this appeal is unpersuasive where Section 7(b)
imposes conditions absent from, and therefore contrary to, statute.  The EAC's power to
withhold funding from States has been "'authoritatively prescribed by Congress.'"  *City of
Providence*, 954 F.3d at 31 (quoting *City of Arlington*, 569 U.S. at 297).  Directing it to withhold
funding on extra-statutory grounds violates the separation of powers.  *City of Chicago v. Barr*,
961 F.3d 882, 931 (7th Cir. 2020).

## V.    THE CHALLENGED PROVISIONS OF THE EO ARE ALSO UNCONSTITUTIONAL BECAUSE THEY VIOLATE THE VERTICAL SEPARATION OF POWERS

Plaintiff States have shown that the EO unconstitutionally invades state sovereignty by
requiring Plaintiff States to implement new requirements and procedures beyond those set by
Congress.  D. 76 at 13-14, 20; D. 113 at 19-20; D. 168 at 19-20.  Sections 2(a), 3(d), and 4(a)
compel States to implement documentary proof requirements on voter registration forms, which
would require States to alter election administration infrastructure and procedures.  Sections 7(a)

28

and 7(b) set out to coerce States to alter validly enacted laws governing ballot receipt and curing through enforcement and funding threats.  Neither the Constitution nor statute supports these mandates, and the President has no power to "interfere[] with state election procedures based solely on the federal executive's own initiative."  *Georgia v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023).  These EO provisions therefore unconstitutionally encroach upon Plaintiff States' constitutionally granted powers over elections, U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2, 4, trample on their sovereign right to carry out duly enacted state laws, *see Abbott*, 585 U.S. at 603 n.17 (2018), and unlawfully commandeer state resources to implement presidential policy, *see New York v. United States*, 505 U.S. 144, 188 (1992).

Defendants assert that Congress *has* conscripted States to carry out the EO's mandates, and that the President has unfettered control of the Executive Branch officials tasked with regulating and enforcing federal policy, from the EAC to the Attorney General.  D. 166 at 32-34.  As shown above, however, Congress has never authorized—let alone required—the actions mandated by the challenged EO provisions.  *See supra*, §§ III, IV; *see also ITCA*, 570 U.S. at 9 (Congress's concurrent power over federal elections displaces state law only "'so far as it is exercised, and no farther'") (citation omitted).  Nor does the President enjoy the sweeping authority that Defendants claim.  D. 107 at 18 (rejecting the view that the Executive may exercise complete control over EAC as "untethered from precedent and unsupported by even a maximalist view of 'the executive Power' under our Constitution") (quoting *LULAC I*, 780 F. Supp. 3d at 198); *see also Medellin v. Texas*, 552 U.S. 491, 530 (2008) (applying the principle that the President has no power to unilaterally preempt state law).  Neither of Defendants' assertions credibly rebut that the challenged EO provisions intrude upon Plaintiff States' sovereignty in violation of the vertical separation of powers, further establishing the unconstitutionality of these provisions.

## VI.    THE COURT SHOULD RESOLVE THIS CASE WITHOUT DELAY TO CLARIFY THE STATES' OBLIGATIONS AS TO UPCOMING ELECTIONS

Defendants' request to delay this Court's conclusive resolution of this case so the First Circuit can review an interlocutory order issued on an incomplete record gets it precisely

29

backwards.  *See* D. 166 at 35.  The better course is to decide the parties' motions so the appellate courts can, in due course, benefit from this Court's comprehensive reasoning based on a full record.  It is neither unusual nor improper for a district court to issue a permanent injunction while a preliminary injunction order is on appeal.  *See, e.g.*, *Su v. Ascent Constr., Inc.*, 104 F.4th 1240, 1243-1244 (10th Cir. 2024); *Mayor of Baltimore v. Azar*, 973 F.3d 258, 266, 295-296 (4th Cir. 2020); *Associated Builders & Contractors Fla. E. Coast Chapter v. Miami-Dade Cnty.*, 594 F.3d 1321, 1323-1324 (11th Cir. 2010).

Nor have Defendants made a compelling case to hold the summary judgment motions in abeyance pending the outcome of the appeal.  *See Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 77 (1st Cir. 2004) (court has discretion over whether to stay proceedings) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254-255 (1936).  Defendants have pursued their appeal at a leisurely pace—first obtaining an extension for their opening brief, and then a stay of the appellate proceedings.  *California v. Trump*, No. 25-1726 (1st Cir. Sept. 5, 2025); Order, *California*, No. 25-1726 (Oct. 14, 2025).  It would be inequitable to withhold the permanent relief Plaintiff States seek to wait for appellate review that Defendants themselves have delayed.

"'[C]onsiderations specific to election cases'" also weigh against delay.  *Mi Familia Vota v. Fontes*, 111 F.4th 976, 981 (9th Cir. 2024) (quoting *Purcell*, 549 U.S. at 7); *see also Bost*, 2026 WL 96707, at *4.  As this Court has recognized, "'[r]unning a statewide election is a complicated endeavor'" that requires "'rules of the road' which are 'clear and settled.'"  D. 107 at 15 (quoting *Dem. Nat'l Comm. v. Wisc. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay)).  Plaintiff States respectfully request that the Court act swiftly on their request for permanent injunctive relief so they can secure lasting assurance that, as the midterm election cycle unfolds, they will not face burdensome and disruptive changes to voter registration, loss of funding, or litigation casting a cloud over their state ballot receipt laws.

## CONCLUSION

Plaintiff States respectfully request that the Court deny Defendants' motion.

January 20, 2026                                    Respectfully submitted,


                                                   **ROB BONTA**
                                                   Attorney General of California

                                                   */s/ Anne P. Bellows*
                                                     Anne P. Bellows*
                                                        Deputy Attorney General
                                                   Thomas S. Patterson*
                                                        Senior Assistant Attorney General
                                                   Michael S. Cohen*
                                                   Malcolm A. Brudigam*
                                                   Kevin L. Quade*
                                                   Lisa C. Ehrlich*
                                                   Nicholas R. Green (BBO No. 698510)
                                                        Deputy Attorneys General
                                                   Office of the California Attorney General
                                                   455 Golden Gate Avenue, Suite 11000
                                                   San Francisco, CA 94102
                                                   (415) 510-3847
                                                   Anne.Bellows@doj.ca.gov
                                                   *Counsel for the State of California*
                                                     *Admitted pro hac vice*

                                                   *(additional counsel on following pages)*

**AARON D. FORD**
Attorney General of Nevada

By: */s/ Heidi Parry Stern*
Heidi Parry Stern*
    Solicitor General
Craig Newby*
    First Assistant Attorney General
Kiel B. Ireland
    Chief of Special Litigation
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-9246
hstern@ag.nv.gov
*Counsel for the State of Nevada*


**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ M. Patrick Moore*
M. Patrick Moore (BBO No. 670323)
    First Assistant Attorney General
Anne Sterman (BBO No. 650426)
    Chief, Government Bureau
Phoebe Fischer-Groban (BBO No. 687068)
    Deputy Chief, Constitutional & Administrative Law Division
Chris Pappavaselio (BBO No. 713519)
    Assistant Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2495
Pat.Moore@mass.gov
*Counsel for the Commonwealth of Massachusetts*


**KRISTIN K. MAYES**
Attorney General of the State of Arizona

By: */s/ Joshua M. Whitaker*
Joshua M. Whitaker*
Karen J. Hartman-Tellez*
Kara Karlson*
    Assistant Attorneys General
2005 North Central Ave.
Phoenix, AZ 85004
(602) 542-7738
Joshua.Whitaker@azag.gov
*Counsel for the State of Arizona*

**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ Shannon Stevenson*
Shannon Stevenson*
    Solicitor General
Peter Baumann*
    Senior Assistant Attorney General
1300 Broadway
Denver, Colorado 80203
(720) 508-6400
shannon.stevenson@coag.gov
*Counsel for the State of Colorado*


**WILLIAM TONG**
Attorney General for the State of Connecticut

*/s/ Maura Murphy*
Maura Murphy*
    Deputy Associate Attorney General
Hartford, CT 06106
(860) 808-5020
Maura.Murphy@ct.gov
*Counsel for the State of Connecticut*


**KATHLEEN JENNINGS**
Attorney General of Delaware

By: */s/ Maryanne T. Donaghy*
Maryanne T. Donaghy*
    Deputy Attorney General
Vanessa L. Kassab
    Deputy Attorney General
Ian R. Liston
    Director of Impact Litigation
820 N. French Street
Wilmington, DE 19801
(302) 683-8843
maryanne.donaghy@delaware.gov
*Counsel for the State of Delaware*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ David D. Day*
David D. Day*
    Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes*
    Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
 david.d.day@hawaii.gov
*Counsel for the State of Hawaiʻi*


**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Vikas Didwania*
Vikas Didwania*
    Complex Litigation Counsel
Elizabeth B. Scott*
    Assistant Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-3316
Vikas.Didwania@ilag.gov
*Counsel for the State of Illinois*


**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Jonathan R. Bolton*
Jonathan R. Bolton*
    Assistant Attorney General
6 State House Station
Augusta, ME  04333-0006
(207) 626-8800
Jonathan.Bolton@maine.gov
*Counsel for the State of Maine*


**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Adam D. Kirschner*
Adam D. Kirschner*
    Senior Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-6424
akirschner@oag.state.md.us
*Counsel for the State of Maryland*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Erik Grill*
Erik Grill*
Heather S. Meingast*
    Assistant Attorneys General
525 W. Ottawa, 5th Floor
P.O. Box 30736
Lansing, MI 48909
(517) 335-7659
grille@michigan.gov
*Counsel for the People of the State of Michigan*


**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Peter J. Farrell*
Peter J. Farrell*
    Deputy Solicitor General
Angela Behrens*
    Assistant Attorney General
445 Minnesota Street, Suite 600
St. Paul, MN 55101
(651) 757-1424
Peter.Farrell@ag.state.mn.us
*Counsel for the State of Minnesota*


**MATTHEW J. PLATKIN**
Attorney General Of New Jersey

By: */s/ Meghan K. Musso*
Meghan K. Musso*
Jonathan Mangel*
    Deputy Attorneys General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5276
meghan.musso@law.njoag.gov
*Counsel for the State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ James W. Grayson*
James W. Grayson*
    Chief Deputy Attorney General
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
jgrayson@nmdoj.gov
*Counsel for the State of New Mexico*


**LETITIA JAMES**
Attorney General of New York

By: */s/ Colleen K. Faherty*
Colleen K. Faherty*
    Special Trial Counsel
28 Liberty Street
New York, NY 10005
(212) 416-6046
Colleen.Faherty@ag.ny.gov
*Counsel for the State of New York*


**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ James J. Arguin*
James J. Arguin (BBO No. 557350)
    Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400, Ext. 2078
jarguin@riag.ri.gov
*Counsel for the State of Rhode Island*


**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane*
    Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov
*Counsel for the State of Vermont*

**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: */s/ Charlotte Gibson*
Charlotte Gibson*
    Assistant Attorney General
P.O. Box 7857
Madison, WI  53707-7857
(608) 287-4713
GibsonCJ@DOJ.STATE.WI.US
*Counsel for the State of Wisconsin*


*Admitted pro hac vice*




## CERTIFICATE OF SERVICE

    I, Anne P. Bellows, hereby certify that I served a true copy of the above document upon all counsel of record via this Court's electronic filing system.


Dated:  January 20, 2026        */s/ Anne P. Bellows*

        Anne P. Bellows
        Deputy Attorney General
        *Counsel for the State of California*