**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **STATE OF CALIFORNIA, et al.,** | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| v. | ) | |
| | ) | **No. 25-cv-10810-DJC** |
| | ) | |
| **DONALD TRUMP, et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

**MEMORANDUM AND ORDER**

**CASPER, C. J.**                                                                                         **June 24, 2026**

## I.    Introduction

On April 3, 2025, Plaintiffs, Attorney Generals representing nineteen states, California, Nevada, Massachusetts, Arizona, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, Rhode Island, Vermont and Wisconsin, (collectively, the "States") brought this action against the named Defendants (collectively, the "Defendants" or the "Executive Branch") to challenge §§ 2(a), 2(d), 3(d), 4(a), 7(a) and 7(b) of President Donald J. Trump's March 25, 2025 Executive Order No. 14248, Preserving and Protecting the Integrity of American Elections (the "Executive Order") as *ultra vires* and violations of the separation of powers (Counts I-VII). D. 1.[1] Among other things, these provisions of the Executive Order require the United States Election Assistance Commission (the

---

[1] Due to Arizona law, Arizona does not join Count II of the States' challenge. D. 1 at 28 n.3.

"EAC") and the Secretary of Defense to implement documentary proof of citizenship requirements for federal voter registration forms required to be used by the States, commands the Attorney General to take action against thirteen of the States that have laws either allowing for the counting of ballots mailed on or before Election Day but received afterward, or laws allowing voters to cure timely-submitted ballots with minor technical problems, ("Ballot Receipt States"), and directs the EAC to condition statutory funding upon the States' compliance with documentary proof of citizenship requirements for the Federal Form and with a ballot receipt deadline that is contrary to the respective state laws established by the Ballot Receipt States. As this Court previously noted, while the States do not challenge the undisputed principle that "U.S. citizenship is required to vote in federal elections and the federal voter registration forms require attestation of citizenship," D. 107 at 2, they do challenge the legality of the enumerated sections of the Executive Order.

On June 13, 2025, the Court granted the States' motion for preliminary injunction as sought as to §§ 2(a), 3(d), 2(d) and 7(b) of the Executive Order and § 7(a) of the Executive Order as to civil or criminal enforcement actions, concluding, among other things, that the States' challenges to these provisions are justiciable and likely to succeed on the merits. Id. at 11-33, 43-44.[2] On September 17, 2025, the Court denied Defendants' motion to dismiss the States' challenges against §§ 2(a), 2(d), 3(d) and 7(a) of the Executive Order under Fed. R. Civ. P. 12(b)(1) for lack of standing and to dismiss all of the States' claims against the Challenged Provisions under Fed. R. Civ. P. 12(b)(6). D. 132 at 2, 30. On December 11, 2025, the parties filed a stipulation to dismiss without prejudice the States' challenge to § 2(d) subject to the parties' stipulation and the Court's order that "Section 2(d) of the EO . . . does not have any application to any state or local agency" and the Executive Branch's stipulation that "no Defendant will take any action pursuant to the

---

[2] The States did not move for a preliminary injunction as to § 4(a). See D. 75 at 2-3.

Executive Order to require a Plaintiff State or its designated state or local voter registration agencies under 52 U.S.C. § 20506(a) to assess a person's citizenship prior to providing them with a federal voter registration form," D. 160 at 3, which the Court allowed and entered on December 22, 2025, D. 175, leaving outstanding the States' challenges to §§ 2(a), 3(d), 4(a), 7(a) and 7(b) (collectively, the "Challenged Provisions"). The Executive Branch has now moved for summary judgment as to all of the States' remaining claims. D. 166. The States have moved for partial summary judgment as to their challenges to §§ 2(a), 3(d), 4(a), 7(a) and 7(b) of the Executive Order and their claim against all the Challenged Provisions under the vertical separation of powers, with all the States, except Wisconsin, moving for summary judgment as to their claims against § 2(a) (Counts I and II), all the States moving for summary judgment as to their claims against § 3(d) (Count III) and § 4(a) (Count IV), as well as their claim against all the Challenged Provisions under the vertical separation of powers (Count VII) and the Ballot Receipt States moving for summary judgment as to their claims against §§ 7(a) and 7(b) (Counts V and VI). D. 167; see D. 186.[3]

After careful consideration of the parties' filings, briefs from *amicus curiae* and oral argument by the parties, the Court ALLOWS the Executive Branch's motion for summary judgment as to Wisconsin's claims, the non-Ballot Receipt States' claims against § 7(a) and the non-Ballot Receipts' challenge to § 7(b) in Count VII and DENIES same as to the remaining

---

[3] The States originally moved for partial summary judgment only as to their challenges to §§ 2(a), 3(d)(i), 7(a) and 7(b) of the Executive Order. D. 167. After oral argument, however, the parties jointly stipulated that their February 26, 2026 oral argument as to §§ 3(d)(ii) and 4(a) in response to Defendants' motion for summary judgment as to these provisions and their accompanying briefing be deemed to constitute the States' motion for summary judgment as to §§3(d)(ii) and 4(a) and Defendants' opposition to same. D. 186 at 3-4; see D. 182. The Court hereby ALLOWS and adopts that stipulation, D. 186-1. Accordingly, the States' summary judgment motion now encompasses their challenges to §§ 2(a), 3(d)(i), 3(d)(ii), 4(a), 7(a) and 7(b).

claims, D. 166, and DENIES the States' motion for partial summary judgment as to Wisconsin's claims, and the non-Ballot Receipt States' challenges to §§ 7(a) and 7(b) in Count VII, and ALLOWS same as to the remaining States' claims against §§ 2(a), 3(d) and 4(a) and the Ballot Receipt States' claims against §§ 7(a) and 7(b), D. 167; D. 186, for the reasons explained below.

## II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F. 3d 223, 227 (1st Cir. 1996)). The movant "bears the burden of demonstrating the absence of a genuine issue of material fact." Carmona v. Toledo, 215 F. 3d 124, 132 (1st Cir. 2000); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in her pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor," Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F. 3d 1, 5 (1st Cir. 2010). "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'" Id. (alteration in original) (quoting Anderson, 477 U.S. at 249). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F. 3d 20, 25 (1st Cir. 2009). "When deciding cross-motions for summary judgment, the court must consider each motion separately, drawing inferences against each movant in turn." Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997) (citation omitted).

4

### III.     Background

"Our Constitution vests control over federal elections in the States, subject to some oversight by Congress." League of United Latin Am. Citizens v. Exec. Off. of the President, 780 F. Supp. 3d 135, 156 (D.D.C. 2025) ("LULAC I").  The Constitution's Elections Clause empowers states to prescribe the "Times, Places, and Manner of holding" congressional elections.  U.S. Const. art. I, § 4, cl. 1.  "[T]hese comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes" among other issues.  Smiley v. Holm, 285 U.S. 355, 366 (1932).  The Elections Clause empowers Congress to "make or alter" state election laws. U.S. Const. art. I, § 4, cl. 1.  "In practice, the Clause functions as 'a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices.'"  Arizona v. Inter Tribal Council of Arizona, Inc., 570 U.S. 1, 9 (2013) ("ITCA") (quoting Foster v. Love, 522 U.S. 67, 69 (1997)).  For presidential elections, the Electors Clause provides States with the primary authority to decide how electors are chosen.  U.S. Const. art. II, § 1, cl. 2.

While the Constitution vests the President with "executive Power" and commands him to "take Care that the Laws be faithfully executed," U.S. Const. art. II, §§ 1, 3, it does not grant the President any specific powers over elections.  As a result, the President "plays no direct role in the process" of appointing electors, "nor does he have authority to control the state officials who do." Trump v. United States, 603 U.S. 593, 627 (2024).  As the Supreme Court has noted, "the President's power to see that the laws are faithfully executed refutes the idea that he is to be a

5

lawmaker." Medellín v. Texas, 552 U.S. 491, 526-27 (2008) (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587 (1952)).

A.    **Existing Federal Law**

1.    *The Uniform Overseas Citizens Absentee Voting Act ("UOCAVA")*

Consistent with its constitutional authority, Congress has adopted a comprehensive scheme regarding voter registration and federal elections.  In 1986, Congress enacted the UOCAVA to streamline registration and voting rules for members of the military and for U.S. citizens living abroad.  52 U.S.C. §§ 20301 *et seq*.  The UOCAVA provides for the creation of "an official post card form, containing both an absentee voter registration application and an absentee ballot application" and requires States to use the prescribed form.  Id. §§ 20301(b)(2), 20302(a)(4).  The UOCAVA does not include a documentary proof of citizenship requirement, but requires that voters are citizens and verifies their citizenship through attestation.  Federal Post Card Application (FPCA),  https://www.fvap.gov/uploads/FVAP/Forms/fpca.pdf  (last  visited  June  22,  2026). Defendant Secretary of Defense Pete Hegseth is responsible for promulgating the Federal Post Card Application in accordance with the UOCAVA.  52 U.S.C. § 20301; Exec. Order No. 12,642, 53 Fed. Reg. 21,975 (June 8, 1988) (designating the Secretary of Defense as the UOCAVA presidential designee).

2.    *The National Voter Registration Act ("NVRA")*

Seven years later, in 1993, Congress, recognizing that "the right of citizens of the United States to vote is a fundamental right," enacted the NVRA to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," make it possible for federal, state and local governments to implement its provisions to enhance voter participation by eligible citizens, "protect the integrity of the electoral process" and "ensure that accurate and

current voter registration rolls are maintained." 52 U.S.C. § 20501(a), (b).  The "NVRA's primary emphasis is on simplifying the methods for registering to vote in federal elections." Colón-Marrero v. Vélez, 813 F.3d 1, 10 n.13 (1st Cir. 2016); see 52 U.S.C. § 20506(a)(2)-(3).

As part of its effort to enhance voter participation, the NVRA established baseline voter registration procedures which every state must implement, alongside "any other method of voter registration provided for under State law." 52 U.S.C. § 20503(a).  Specifically, the NVRA requires states to establish procedures to allow voters to register by mail, in tandem with a driver's license application or at designated voter registration agencies. Id.  Designated voter registration agencies must include "all offices in the State that provide public assistance," "all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities" and other offices designated by the state. Id. § 20506(a)(2)-(3).

As relevant here, the NVRA requires the development of a mail voter registration application form for elections for Federal office (the "Federal Form"), which "may require only such identifying information . . . and other information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." Id. § 20508(b)(1).  U.S. citizenship is an eligibility requirement for which the Federal Form requires attestation. Id. § 20508(b)(2).  States subject to the NVRA "shall accept and use" the Federal Form. Id. § 20505(a)(1).  The NVRA requires that certain federal and state agencies ("voter registration agencies") distribute the Federal Form. Id. §§ 20506(a)(4)(i), (a)(6).  "[A]ll offices in the State that provide public assistance" and "all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities" must be designated as voter registration agencies. Id. § 20506(a)(2)(A)-(B).

Congress initially gave responsibility for promulgating the Federal Form to the Federal Election Commission ("FEC"). See Fed. Election Comm'n v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 37 (1981). In 2002, Congress passed the Help America Vote Act ("HAVA"), which created the EAC, a multi-member, bipartisan, "independent entity" and transferred responsibility for the Federal Form to this body. 52 U.S.C. §§ 20508(a), 20921, 20923, 20928. Defendant EAC is composed of Defendants Donald L. Palmer, Thomas Hicks, Christy McCormick and Benjamin W. Hovland. D. 168-1 ¶ 6; D. 180-1 ¶ 6; see 52 U.S.C. § 20921.

The contents of the Federal Form are set by regulation, 11 C.F.R. § 9428.4, and alterations to the Federal Form require notice-and-comment rulemaking, 5 U.S.C. § 553. The NVRA also requires the EAC to consult "with the chief election officers of the States" on changes to the Federal Form. 52 U.S.C. § 20508(a)(2). "States retain the flexibility to design and use their own registration forms, but the Federal Form provides a backstop: [n]o matter what procedural hurdles a State's own form imposes, the Federal Form guarantees that a simple means of registering to vote in federal elections will be available." ITCA, 570 U.S. at 12.

### 3.    The HAVA

In addition to creating the EAC, see 52 U.S.C. §§ 20508(a), 20921, 20923, 20928, the HAVA also established a funding program to support states' administration of elections and required that the EAC distribute the associated funds in accordance with statutory mandates. These payments include "requirements payments," which support compliance with federal standards for election systems and other improvements, id. §§ 21001, 21002, 21003, election improvement funds, id. § 20901, and election security matching grants, Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. 348, 562 (2018); Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, 133 Stat. 2317, 2461 (2019); Consolidated Appropriations Act, 2022, Pub. L. No.

117-103, 136 Stat. 49, 268 (2022); Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4679 (2022); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, 549 (2024) (each appropriating funds for election security grants to be administered under the election improvement funding statute, 52 U.S.C. §§ 20901, 20903, 20904); see Election Security Grant, U.S. Election Assistance Comm'n (Mar. 23, 2026), https://www.eac.gov/grants/election-security-funds.   For example, in March 2025, Congress appropriated an additional $15 million for election security grants.   Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No., 119-4, 139 Stat. 9, 10-11, 26 (2025).  The EAC is responsible for administering formula grants authorized by Congress.  52 U.S.C. §§ 20901, 20904(c), 20922(4), 21001.  All Plaintiff States receive federal funding from the EAC.  D. 168-1 ¶ 35; D. 180-1 ¶ 35.

### B.    The States

The States are sovereign states of the United States of America.  The States and their subdivisions administer elections for federal office.  D. 168-1 ¶ 1; D. 180-1 ¶ 1.  Among other tasks, the States and their subdivisions are responsible for registering voters, providing ballots, tabulating votes and certifying results in all elections for federal office.  D. 168-1 ¶ 2; D. 180-1 ¶ 2.  The States, except Wisconsin and Minnesota, are required under the NVRA to accept and use the Federal Form to register eligible voters for federal elections.  52 U.S.C. § 20503.  Although Minnesota also accepts and uses the Federal Form in accordance with state law, Minn. Stat. § 201.071, Wisconsin does not accept the Federal Form, D. 168-1 ¶ 10 & n.1; D. 180-1 ¶ 10 & n.1.

The Ballot Receipt States (California, Nevada, Massachusetts, Arizona, Colorado, Hawaii, Illinois, Maryland, Michigan, New Jersey, New Mexico, New York and Rhode Island) all maintain state laws that allow for federal election ballots mailed on or before Election Day but received

within a number of days afterward to be counted as timely. Cal. Elec. Code § 3020(b) (seven days); 10 Ill. Comp. Stat. 5/19-8, 5/18A-15 (fourteen days); Mass. Gen. Laws c. 54, §§ 93, 99 (three days, or ten days for UOCAVA voters); Md. Elec. Law, § 11-302(c); Md. Code Regs. § 33.11.03.08B(4)(b) (ten days); Mich. Const. 1963, art. II, § 4(1)(b) (six days); Mich. Comp. Laws § 168.759a(18) (same); Nev. Rev. Stat. § 293.269921(1)(b), (2) (three or four days, depending on postmark status); N.J. Stat. Ann. § 19:63-22(a) (two or six days, depending on postmark status); N.Y. Elec. Law §§ 8-412(1), 8-710(1) (seven days); R.I. Gen. Laws §§ 17-20-16, 17-20-6.1 (three or seven days, depending on the type of election; applicable to UOCAVA voters only). Arizona, California, Colorado, Hawaii, Illinois, Maryland, Michigan, Nevada, New Jersey, New Mexico, New York and Rhode Island also allow voters to "cure" technical ballot defects within a number of days following the election, so that the ballot may be counted. Ariz. Rev. Stat. § 16-550(A) (five days for elections for federal office); Cal. Elec. Code § 3019(d), (e) (twenty-eight days); Colo. Rev. Stat. § 1-7.5-107.3 (eight days); Haw. Rev. Stat. § 11-106 (five days); 10 Ill. Comp. Stat. 5/19-8 (fourteen days); Md. Elec. Law § 11-302; Md. Code Reg. § 33.11.03.06C(1) (ten days); Mich. Comp. Laws § 168.766(3) (three days); Nev. Rev. Stat. § 293.269927 (six days); N.J. Stat. Ann. § 19:63-17 (eleven days); N.M. Code R. § 1.10.22.11, N.M. Stat. § 1-13-15 (thirteen business days); N.Y. Elec. Law § 9-209(3)(e) (seven days); 410 R.I. Code Regs. § 20-00-23.12 (three or seven days, depending on the type of election).

### C. The Present Action

On March 25, 2025, President Trump signed Executive Order, "Preserving and Protecting the Integrity of American Elections." Exec. Order No. 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025). D. 168-1 ¶ 4; D. 180-1 ¶ 4. The States here challenge the sections of the Executive Order which would require the EAC and the Secretary of Defense to implement a documentary proof of

citizenship requirement with the federal voter registration form, would require voter registration agencies to assess citizenship before distributing the Federal Form to enrollees in public assistance programs, would prohibit Plaintiff States from counting ballots timely cast but received shortly after Election Day and would condition statutorily mandated funds under the HAVA upon compliance with the proof of citizenship requirement and an Election Day ballot receipt rule.

Specifically, the States challenge:  (1) § 2(a) of the Executive Order, which instructs the EAC to require "documentary proof of United States citizenship, consistent with 52 U.S.C. [§] 20508(b)(3)," and to record information concerning that documentation; (2) § 3(d) of the Executive Order, which commands the Secretary of Defense to update the Federal Post Card Application provided under the UOCAVA to require documentary proof of citizenship and "proof of eligibility to vote in elections in the State in which the voter is attempting to vote"; (3) § 7(a) of the Executive Order, which orders the Attorney General to "take all necessary action to enforce" federal statutes setting the date of federal elections against States that "violate these provisions by including absentee or mail-in ballots received after Election Day in the final tabulation of votes for the appointment of Presidential electors and the election of members of the United States Senate and House of Representatives," (4) § 7(b) of the Executive Order, which requires the EAC to condition "any available funding to a State" upon its compliance with "a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting," and (5) § 4(a) of the Executive Order, which requires the EAC to "cease providing Federal funds to States" unless "States accept and use the national mail voter registration form . . . including any requirement for documentary proof of United States citizenship."  Exec. Order No. 14248, 90 Fed. Reg. 14,005 (Mar. 25, 2025).

### D.      Other Challenges to the Executive Order

Before this Court ruled on the States' motion for preliminary injunction, the lawfulness of §§ 2(a), 2(d), 7(a) and 7(b) was considered by the United States District Court for the District of Columbia (the "DC Court"), in consolidated cases brought by private parties, LULAC I, 780 F. Supp. 3d 135.  The private plaintiffs sought preliminarily to enjoin enforcement of §§ 2(a), 2(b), 2(d), 7(a) and 7(b) of the Executive Order "arguing that the President lacks the power to issue those orders." Id. at 154.  On April 24, 2025, the DC Court granted the injunction as to §§ 2(a) and 2(d) of the Executive Order, but denied relief as to §§ 2(b), 7(a) and 7(b). Id. at 226.  As to §§ 7(a) and 7(b), the DC Court concluded that the private plaintiffs before it were not the proper parties to challenge these sections. Id. at 212-19 (noting that "the most natural parties to seek an injunction against enforcement under [§] 7(a) are the States themselves").

After this Court ruled on the States' motion for preliminary injunction and the Executive Branch's motion to dismiss in the present action, D. 107; D. 132, the parties in the DC action cross-moved for partial summary judgment on the private plaintiffs' § 2(a) separation of powers claim. League of United Latin Am. Citizens v. Exec. Off. of President, 808 F. Supp. 3d 29, 41 (D.D.C. 2025) ("LULAC II").  On October 31, 2025, the DC Court granted the private plaintiffs' partial summary judgment motion, thereby permanently enjoining the "EAC, its Commissioners, and its Executive Director, from taking any action to implement or give effect to [§ 2(a)], including taking any action based on the Executive Order to modify the content of the Federal Form to require documentary proof of U.S. citizenship." Id. at 87-88.  The decision was appealed, and as of the date of this order, is pending before the DC Circuit. LULAC II, 808 F. Supp. 3d 29 (D.D.C. 2025), appeal docketed, No. 25-5476 (D.C. Cir. Dec. 31, 2025).  Shortly thereafter, the parties cross-moved for summary judgment on the private plaintiffs' remaining claims. League of United Latin

12

Am. Citizens v. Exec. Off. of the President, 818 F. Supp. 3d 34 (D.D.C. 2026) ("LULAC III").

On January 30, 2026, the court granted, as relevant here, partial summary judgment in favor of the

private plaintiffs on their challenge against § 3(d), thereby also permanently enjoining the relevant

members of the Executive Branch from "taking any action to implement or give effect to [§ 3(d)],"

id. at 102-03, and also granted partial summary judgment in the Executive Branch's favor on the

private plaintiffs' claims against §§ 4(a), 7(a) and 7(b), id. at 117, concluding that the private

plaintiffs did not establish that those claims were justiciable, id.[4]

On April 4, 2025, in another parallel proceeding, Washington and Oregon brought a

challenge before the United States District Court for the Western District of Washington (the

"W.D. Washington Court") alleging that "§§ 2(a), 2(b)(iii), 2(d), 2(e)(ii), 3(d), 4(a), 4(b), 4(d),

5(b), 7(a), and 7(b) are *ultra vires*, violate the U.S. Constitution, and are otherwise unlawful under

the NVRA, HAVA, UOCAVA, and Election Day statutes." Washington v. Trump, 814 F. Supp.

3d 1173, 1195 (W.D. Wash. 2025).  The plaintiff-states subsequently moved for partial summary

judgment on their *ultra vires* and separation of powers claims against §§ 2(a), 4(a), 4(b) and 7 of

the Executive Order and the Executive Branch cross-moved to dismiss the action in its entirety for

lack of subject matter jurisdiction and failure to state a claim.  Id.  On January 9, 2026, the court

granted, as relevant here, the plaintiff-states' partial summary judgment motion and denied the

---

[4] As to the private plaintiffs'§ 4(a) claim, the DC Court concluded that it was not ripe because the court "ha[d] already permanently enjoined the implementation of [§ 2(a)'s documentary proof of citizenship] requirement" and "in the absence of any documentary-proof-of-citizenship requirement, Section 4(a)'s requirement to use the Federal Form does not inflict any 'certainly impending' injury" to the private plaintiffs. LULAC III, 818 F. Supp. 3d at 104.  As to the private plaintiffs' §§ 7(a) and 7(b) claims, the court concluded that the private plaintiffs failed to carry their burden of showing that these provisions "present[ed] an imminent threat to their cognizable interests or that a favorable decision from [the court] would alleviate that threat."  Id. at 105-08; see id. at 106 (noting that "'the most natural parties to seek an injunction against enforcement under Section 7(a) are the States themselves,' not the private Plaintiffs currently before [the court]") (quoting LULAC I, 780 F. Supp. 3d at 214).

13

Executive Branch's motion to dismiss, thereby permanently enjoining the Executive Branch from taking any action against Washington and Oregon to implement or give effect to §§ 4(a) and 7(b), and further permanently enjoining the Executive Branch from taking any action to implement or give effect to §§ 2(a) and 4(b).  Id. at 1229.

## IV.    Procedural History

The States filed this action on April 3, 2025.  D. 1.  On May 5, 2025, the States moved to preliminarily enjoin §§ 2(a), 2(d), 3(d), 7(a) and 7(b) of the Executive Order.  D. 75.  The Court granted the motion for preliminary injunction as sought as to §§ 2(a), 3(d), 2(d) and 7(b) of the Executive Order and § 7(a) of the Executive Order as to civil or criminal enforcement actions on June 13, 2025.  D. 107; D. 108; D. 116.  The same day, Defendants moved for dismissal of the complaint.  D. 109.  On July 31, 2025, Defendants appealed the Court's preliminary injunction ruling, D. 123, and as of the date of this Memorandum and Order, this appeal is pending before the First Circuit.  See California v. Trump, 786 F. Supp. 3d 359 (D. Mass. 2025), appeal docketed, No. 25-1726 (1st Cir. Aug. 1, 2025).  On September 17, 2025, the Court denied Defendants' motion to dismiss.  D. 132.  On December 11, 2025, the parties stipulated to the States' voluntary dismissal of their challenge to § 2(d), D. 160, which the Court allowed and entered on December 22, 2025, D. 175.  On December 12, 2025, Defendants moved for summary judgment on all of the remaining claims, D. 166, and the States subsequently moved for partial summary judgment as to their challenges to §§ 2(a), 3(d), 4(a), 7(a) and 7(b) of the Executive Order, D. 167; D. 186.  The Court heard the parties on the pending motions and took these matters under advisement.  D. 182.[5]

---

[5] The Court has received and considered the *amicus curiae* briefs filed by Society for Law Institute arguing that § 7 of the Executive Order is invalid, D. 176, and by Local Election Officials in support of the States' motion for partial summary judgment and in opposition to Defendants' motion for summary judgment, D. 177.

## V.    Discussion

### A.    The Executive Branch's Stay Request

As a preliminary matter, in their motion for summary judgment, the Executive Branch requests that the Court reserve ruling on the present cross-motions for summary judgment until the First Circuit adjudicates their appeal of the Court's preliminary injunction ruling.  D. 166 at 44; see D. 123.  An "'[a]ppeal from an interlocutory order does not divest [district] court[s] of jurisdiction to proceed with matters unrelated to the appeal.'"  Russomano v. Novo Nordisk Inc., No. 20-cv-10077-ADB, 2020 WL 2850253, at *1 (D. Mass. June 2, 2020) (alteration in original) (quoting Rigby v. Damant, 486 F. Supp. 2d 222, 225 (D. Mass. 2007)).  "As a result, '[t]he general rule for an interlocutory appeal of a preliminary injunction is that it "does not defeat the power of the trial court to proceed further with the case."'"  Id. (alteration in original) (quoting Pharm. Care Mgmt. Ass'n v. Me. Att'y Gen., 332 F. Supp. 2d 258, 259 (D. Me. 2004) (quoting 16 Charles Alan Wright et al., Federal Practice and Procedure § 3921.2 at 53 (3d ed. 1999))).  "[A]bsent a statute or rule to the contrary, federal district courts possess the inherent power to stay pending litigation when the efficacious management of court dockets reasonably requires such intervention."  Marquis v. F.D.I.C., 965 F.2d 1148, 1154 (1st Cir. 1992) (citations omitted).  "[S]tays cannot be cavalierly dispensed: there must be good cause for their issuance; they must be reasonable in duration; and the court must ensure that competing equities are weighed and balanced."  Id. at 1155 (citations omitted).

The Executive Branch contends that there is good cause to reserve ruling on the present cross-motions for summary judgment as its appeal of this Court's preliminary injunction ruling "raises myriad, substantial issues— including this Court's subject-matter jurisdiction—that mirror issues raised in the parties' cross motions for summary judgment" and is thus likely to have an

15

effect on the issues in this case.  D. 166 at 44.  The Executive Branch also contends that reserving

ruling "would not unduly prejudice any party or cause delay" as the Court's preliminary injunction

remains in effect and the briefing schedules before this Court and the First Circuit are similar.  Id.[6]

The States argue that the balance of equities weigh against a stay, particularly in light of the

upcoming midterm election cycle.  D. 181 at 40-41 (citing Mi Familia Vota v. Fontes, 111 F.4th

976, 981 (9th. Cir. 2024) (noting that "'considerations specific to election cases'" weigh against

delay) (quoting Purcell v. Gonzalez, 549 U.S. 1, 4 (2006) (alteration omitted)).  Weighing the

competing interests in this case, the court finds that the harm to the States in staying the

proceedings would outweigh the harm of denying the stay, particularly given the upcoming

midterm elections.  See Democratic Nat'l Comm. v. Wis. State Legislature, 141 S. Ct. 28, 31

(2020) (Kavanaugh, J., concurring) (noting that "running a statewide election is a complicated

endeavor" requiring a "massive coordinated effort" and "rules of the road" which are "clear and

settled").  The Court thus declines to exercise its discretion to reserve resolution of the present

motions.

### B.    Justiciability

Defendants first challenge the justiciability of the States' §§ 2(a), 3(d), 4(a) and 7(a) claims

on standing and ripeness grounds.  D. 166 at 14-22.  "Article III confines the federal judicial power

to the resolution of 'Cases' and 'Controversies.'"  TransUnion LLC v. Ramirez, 594 U.S. 413, 423

(2021).  The "interrelated" doctrines of standing and ripeness are both rooted in this Article III

limitation.  Reddy v. Foster, 845 F.3d 493, 499 (1st Cir. 2017) (citations omitted).  "For there to

---

[6] Although oral argument for this appeal was originally scheduled for April 2026, the First Circuit has since rescheduled the oral argument to December 2026 at Defendants' unopposed request.  State of California, et al. v. Trump, et al., No. 25-1726 (1st Cir. Feb. 27, 2026), D. 120; D. 185 at 1-2.

be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case – in other words, standing." TransUnion, 594 U.S. at 423 (citation and internal quotation marks omitted). To establish Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." Id. (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). "If the plaintiff does not claim to have suffered an injury . . . there is no case or controversy for the federal court to resolve." Id. (citation and quotation marks omitted).

"[T]he question of ripeness turns on the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 201 (1983) (internal citation and quotation marks omitted). "The critical question concerning fitness for review is whether the claim involves uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all." Mass. Ass'n of Afro-Am. Police, Inc. v. Bos. Police Dep't, 973 F.2d 18, 20 (1st Cir. 1992). The fitness for review prong is more easily satisfied when it "presents an issue that is 'purely legal, and will not be clarified by further factual development.'" Susan B. Anthony List v. Driehaus, 573 U.S. 149, 167 (2014) (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 581 (1985)). Hardship "typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties." Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 535 (1st Cir. 1995) (internal citation and quotation marks omitted).

As Defendants acknowledge, D. 166 at 14 n.7, Defendants raise substantially similar justiciability arguments against §§ 2(a), 3(d), 4(a) and 7(a) as those advanced in their opposition to the States' motion for preliminary injunction, D. 91 at 4-10, and in their motion to dismiss, D.

17

109 at 6-13; D. 120 at 2-5.  In its preliminary injunction and motion to dismiss rulings, which the Court incorporates by reference here, the Court concluded that the States' challenges to these provisions were justiciable under the applicable standard of review for those stages of the litigation.  D. 107 at 14-16, 20-21, 26-27; D. 132 at 5-12.  At the summary judgment stage, the States must demonstrate standing "with the manner and degree of evidence required at th[is] successive stage[] of the litigation" by "'set[ting] forth' by affidavit or other evidence 'specific facts,' . . . which for purposes of the summary judgment motion will be taken to be true." Lujan, 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e)).  The States must also meet their burden of demonstrating that each of their claims are ripe for judicial review.  See Lab. Rels. Div. of Constr. Indus. of Massachusetts, Inc. v. Healey, 844 F.3d 318, 326 (1st Cir. 2016).  As explained below, the States, except Wisconsin, have met their summary judgment burden of establishing that their challenges to §§ 2(a), 3(d) and 4(a) are justiciable and the Ballot Receipt States have also met their summary judgment burden of establishing that their challenges to §§ 7(a) and 7(b) are justiciable.

> 1.      *§ 2(a)*

§ 2(a) of the Executive Order provides:

(i) Within 30 days of the date of this order, the [EAC] shall take appropriate action to require, in its national mail voter registration form issued under 52 U.S.C. [§] 20508:

> (A) documentary proof of United States citizenship, consistent with 52 [§] U.S.C. 20508(b)(3); and

> (B) a State or local official to record on the form the type of document that the applicant presented as documentary proof of United States citizenship, including the date of the document's issuance, the date of the document's expiration (if any), the office that issued the document, and any unique identification number associated with the document as required by the criteria in 52 U.S.C. [§] 21083(a)(5)(A), while taking appropriate measures to ensure information security.

18

Exec. Order No. 14248 § 2(a)(i).  The Executive Order also dictates what constitutes "documentary proof of United States citizenship."  Id. § 2(a)(ii).

As to § 2(a), Defendants argue that:  (1) the States have failed to plead an injury in fact and (2) the challenge is not ripe for judicial review.  D. 166 at 16-19.  A standing-conferring injury must be "actual or imminent."  Clapper v. Amnesty Int'l, USA, 568 U.S. 398, 409 (2013) (internal citation and quotation marks omitted).  Where the alleged injury has yet to occur, the imminence requirement is met "if the threatened injury is 'certainly impending' or there is a 'substantial risk' that the harm will occur."  Susan B. Anthony List, 573 U.S. at 158 (internal citation omitted).  Imminently threatened fiscal injury, even "'a relatively small economic loss,'" is sufficient to confer jurisdiction in federal court.  Katz v. Pershing, LLC, 672 F.3d 64, 76 (1st Cir. 2012) (quoting Adams v. Watson, 10 F.3d 915, 924 (1st Cir. 1993)).

The States, except Wisconsin, have established an injury in fact.  As the Court previously explained, D. 132 at 7-9, "'running a statewide election is a complicated endeavor,' id. (alteration omitted) (quoting D. 107 at 15 (quoting Democratic Nat'l Comm., 141 S. Ct. at 31 (Kavanaugh, J., concurring)).  Here, all States, except Wisconsin, have provided undisputed evidence from the States' chief election officials that § 2(a) "will result in considerable implementation costs for the States," D. 168 at 33; see D. 168-1 ¶¶ 37-40; D. 180-1 ¶¶ 37-40, including devoting state funds, resources and personnel to implement § 2(a), enacting new trainings and educational programming around § 2(a) and acquiring new technology to support § 2(a)'s adoption.  Lean (CA) Decl., D. 169-1 ¶¶ 15-23; Wlaschin (NV) Decl., D. 169-2 ¶¶ 14-21; Fontes (AZ) Decl., D. 169-3 ¶¶ 20-28; Rudy (CO) Decl., D. 169-4 ¶¶ 14-18; Sullivan (CT) Decl., D. 169-5 ¶¶ 20-31; Albence (DE) Decl., D. 169-6 ¶¶ 17-24; Nago (HI) Decl., D. 169-7 ¶¶ 12-18; Tassinari (MA) Decl., D. 169-8 ¶¶ 14-20; Dorsey (MD) Decl., D. 169-9 ¶¶ 22-47; Flynn (ME) Decl., D. 169-10 ¶¶ 14-20; Brater (MI) Decl.,

19

D. 169-11 ¶¶ 12-19; Linnell (MN) Decl., D. 169-12 ¶¶ 17-20; Barber (NJ) Decl., D. 169-13 ¶¶ 12-17; Vigil (NM) Decl., D. 169-14 ¶¶ 10-18; Stavisky (NY) Decl., D. 169-15 ¶¶ 17-21; Rock (RI) Decl., D. 169-16 ¶¶ 17-21; Hanzas (VT) Decl., D. 169-17 ¶¶ 15-20; see Logan (LA County, CA) Decl., D. 169-18 ¶¶ 8-10, 24; Michalowski (Cook County, IL) Decl., D. 169-19 ¶ 7.  These costs are sufficient to support a finding that the States pled an imminently threatened economic injury. Katz, 672 F.3d at 76; Dep't of Commerce v. New York, 588 U.S. 752, 766-67 (2019); Massachusetts v. U.S. Dep't of Health & Hum. Servs., 923 F.3d 209, 222-27 (1st Cir. 2019) (concluding a state had standing when the "[l]ikely [c]hain of [e]vents" resulted in its imminent fiscal injury); see Washington, 814 F. Supp. 3d at 1198-99 (concluding that Washington and Oregon have standing to challenge § 2(a) where the states provided "declarations by various state and local officials involved in election administration and voter registration activities" establishing that "§ 2(a) will cause concrete and particularized injuries to their proprietary interests that are actual or imminent").  Accordingly, the States, except Wisconsin, have established an injury in fact.

Additionally, the States' challenge to § 2(a) is ripe for judicial review.  As the Court previously explained, D. 107 at 14-16; D. 132 at 9, the fitness prong of the ripeness inquiry "is satisfied here, where, as the DC Court observed, § 2(a) of the Executive Order imposes a deadline (which effectively was April 24, 2024) and dictates the 'precise contours of [its] requirement.'" D. 107 at 14-15 (quoting LULAC I, 780 F. Supp. 3d at 184).  Thus, "'Section 2(a) does not merely "authorize" the EAC to change the Federal Form, or suggest that it "consider" doing so'" but instead "'purports to require the EAC to amend the Federal Form and dictate[s] the precise contents of the new rule.'" Id. at 15 (citing LULAC I, 780 F. Supp. 3d at 185); see Washington, 814 F. Supp. 3d at 1199-1200 (noting same); see also LULAC II, 808 F. Supp. 3d at 65-68 (concluding

20

that "[private] [p]laintiffs' constitutional claims regarding Section 2(a) are both constitutionally and prudentially ripe" where "there is no mystery about what Section 2(a) purports to require or whether Section 2(a) purports to require it"). Further, in their summary judgment opposition, Defendants concede that the EAC has already begun taking "'appropriate action to require' [documentary proof of citizenship]" through the rulemaking process. D. 180 at 11 (quoting § 2(a)). Specifically, Defendants note that "[t]he EAC has already begun [the] consultation process" under 52 U.S.C. § 20508(a) by sending a letter to certain States' chief election officers on April 11, 2025 regarding § 2(a). Id. at 11-12 (citing 52 U.S.C. § 20508(a); D. 169-1 at 21-22; D. 168-1 ¶ 21); see D. 168-1 ¶¶ 20-22; D. 180-1 ¶¶ 20-22.[7] The hardship prong is also satisfied because, as explained above, the States have established that compliance with § 2(a) would result in "considerable implementation costs for the States." D. 168 at 33. Accordingly, the States, except Wisconsin, have established that their challenge to § 2(a) is justiciable.

With respect to Wisconsin, although the States did not move for summary judgment on Wisconsin's claims against § 2(a), D. 167 at 2, Defendants move for summary judgment on, and advance their justiciability challenge against, all of the States' § 2(a) claims, D. 166 at 16-19.

---

[7] Defendants' suggestion that the EAC's April 11, 2025 letter "underscores that the outcome of the EAC's rulemaking process is not preordained" because it merely seeks consultation, D. 180 at 12, is unpersuasive as the letter "contain[s] proposed language for a particular rule . . . quot[ing] verbatim the content of the revision to the Federal Form mandated by Section 2(a)," LULAC I, 780 F. Supp. 3d at 188, and, as the Court has previously noted, "the Executive Branch represented to the DC Court that the administrative process prior to implementation will address only technical details," D. 107 at 15; see Tr. of Apr. 17, 2025 Mot. Hr'g, LULAC I (D.D.C. 2025), D. 100 at 71-72, 74; D. 168-1 ¶ 23; D. 180-1 ¶ 23. Defendants' attempt to frame this representation as a mere "'initial footfault'" in oral argument that should have no bearing on this Court's analysis, see D. 180 at 12-13 (quoting City of Erie v. Pap's A.M., 529 U.S. 277, 309 n.5 (2000) (Scalia, J., concurring)), is also unavailing. This representation is included in the summary judgment record, D. 168-1 ¶ 23; D. 180-1 ¶ 23, is admissible evidence, see Fed. Rules Evid. Rule 801(d)(2)(C), and is thus properly before the Court at this stage, Borges ex rel. S.M.B.W., 605 F. 3d at 5, even if Defendants now "disclaim[]" it, D. 166 at 18.

Accordingly, in opposing Defendants' cross-motion for summary judgment, the States have the burden of providing "'specific facts'" by "affidavit or other evidence" to demonstrate that Wisconsin has standing to challenge § 2(a), see Lujan, 504 U.S. at 561 (internal citation omitted), and of proving that Wisconsin's § 2(a) claims are ripe, see Lab. Rels. Div. of Constr. Indus. of Massachusetts, Inc., 844 F.3d at 326.  As the States acknowledge, D. 168-1 at 14, they do not offer any facts supporting harm as to Wisconsin pursuant to § 2(a), see D. 168-1 ¶¶ 37-40.  As such, they have failed to meet their summary judgment burden of demonstrating that Wisconsin has standing to challenge § 2(a).  Defendants are thus entitled to summary judgment as to Wisconsin's claims against § 2(a) on standing grounds.

        2.        *§ 3(d)*

§ 3(d) of the Executive Order provides:

(d) The Secretary of Defense shall update the Federal Post Card Application, pursuant to the [UOCAVA] to require:

      (i) documentary proof of United States citizenship, as defined by section 2(a)(ii) of this order; and

      (ii) proof of eligibility to vote in elections in the State in which the voter is attempting to vote.

Exec. Order No. 14248 § 3(d).

Defendants argue that as "[h]ow or when section 3(d) will be implemented is [] unsettled," the States "can only speculate about whether the requirement would violate UOCAVA" and thus they fail to allege an immediate harm to support ripeness.  D. 166 at 19-20.  As the Court previously explained, D. 107 at 21; D. 132 at 10, "§ 3(d)'s command is clear:  '[t]he Secretary of Defense shall update the Federal Post Card Application . . . to require . . . documentary proof of United States citizenship,'" D. 107 at 21 (quoting Exec. Order No. 14248 § 3(d)).  "Thus, as with § 2(a),

the fitness prong of the ripeness analysis is satisfied." D. 132 at 10; see Washington, 814 F. Supp. 3d at 1202 (concluding that Washington and Oregon have plausibly alleged that their § 3(d) claim is justiciable where "like with § 2(a), § 3(d)'s mandatory language, coupled with the new voter eligibility requirements, suffices to support Plaintiffs' injury-in-fact argument"); LULAC III, 818 F. Supp. 3d at 97 (concluding same under summary judgment standard as to private plaintiffs). Likewise, as the Court explained as to § 2(a), the hardship prong is also satisfied with respect to § 3(d) as the States, except Wisconsin, have also provided undisputed evidence that § 3(d) will result in "significant injuries flowing from the inevitable imposition of documentary proof of citizenship requirements," D. 168 at 34-35 (citation omitted), including costs to "administer the new requirement," "develop guidance and training materials for election officials" and "update their voter registration databases, election management systems, and other technology to accommodate the new requirement," D. 168-1 ¶¶ 41-43; D. 180-1 ¶¶ 41-43, which would "force a diversion of state resources and could cast uncertainty upon the 'massive coordinated effort' necessary to run state elections." D. 107 at 21 (quoting Democratic Nat'l Comm., 141 S. Ct. at 31 (Kavanaugh, J., concurring)); see D. 168-1 ¶ 44; D. 180-1 ¶ 44. Accordingly, the States, except Wisconsin, have established that their challenge to § 3(d) is justiciable.

With respect to Wisconsin, the States also do not offer any facts supporting harm as to Wisconsin pursuant to § 3(d). See D. 168-1 ¶¶ 41-44. As such, they have failed to meet their summary judgment burden of demonstrating that Wisconsin has standing to challenge § 3(d). Defendants are thus entitled to summary judgment as to Wisconsin's claims against § 3(d) on standing grounds.

        3.     *§ 4(a)*

Section 4(a) of the Executive Order provides:

23

> The Election Assistance Commission shall, pursuant to 52 U.S.C. 21003(b)(3) and 21142(c) and consistent with applicable law, take all appropriate action to cease providing Federal funds to States that do not comply with the Federal laws set forth in 52 U.S.C. 21145, including the requirement in 52 U.S.C. 20505(a)(1) that States accept and use the national mail voter registration form issued pursuant to 52 U.S.C. 20508(a)(1), including any requirement for documentary proof of United States citizenship adopted pursuant to section 2(a)(ii) of this order.

Exec. Order No. 14248 § 4(a).

Defendants contend that "[b]ecause [the States] lack standing to challenge section 2(a) . . . the same outcome is warranted with respect to their challenge to section 4(a)." D. 166 at 20. As to the States aside from Wisconsin, this argument fails because, as explained above, their challenge to § 2(a) is justiciable. These States "have thus shown that § 4(a) will cause injury, as § 4(a) requires states to either use a Federal Form that is promulgated pursuant to § 2(a), and thus suffer the injuries described [above] or fail to comply, and thus face a substantial loss of funds." Washington, 814 F. Supp. 3d at 1202; see 52 U.S.C. §§ 21001–21003. "This potential loss of federal funding is an imminently threatened economic injury sufficient to confer standing." D. 132 at 11 (citing Katz, 672 F.3d at 76); see Washington, 814 F. Supp. 3d at 1202 (noting that "like with § 2(a), § 4(a) contains mandatory language, making [Washington and Oregon's] claimed harms actual and imminent"). The hardship prong is satisfied for the same reasons. Additionally, "[a]s § 4(a)'s implementation is contemporaneous with § 2(a), the States' challenge to § 4(a) is fit for the same reasons as stated as to § 2(a)." D. 132 at 11.

Accordingly, the States, except Wisconsin, have established that their challenge to § 4(a) is justiciable. For the same reasons as stated as to § 2(a), Defendants are entitled to summary judgment as to Wisconsin's claim against § 4(a) on standing grounds.

4.    § 7(a)

"To achieve full compliance with the Federal laws that set the uniform day for appointing

Presidential electors and electing members of Congress," Exec. Order No. 14248 § 7(a) provides:

> The Attorney General shall take all necessary action to enforce 2 U.S.C. [§] 7 and
> 3 U.S.C. [§] 1 against States that violate these provisions by including absentee or
> mail-in ballots received after Election Day in the final tabulation of votes for the
> appointment of Presidential electors and the election of members of the United
> States Senate and House of Representatives.

Id.

Defendants argue that because the Attorney General has yet to take any enforcement

actions, and "the Attorney General is to enforce these statutes 'consistent with applicable law,'"

the States' challenge to 7(a) "fails to establish both standing and ripeness."  D. 166 at 20-22

(internal quotations omitted).

With respect to justiciability, pre-enforcement review of a threatened government action is

appropriate if the government's threat of enforcement is "sufficiently imminent."  Susan B.

Anthony List, 573 U.S. at 159; see Rhode Island Ass'n of Realtors, Inc. v. Whitehouse, 199 F.3d

26, 30 (1st Cir. 1999).  The Ballot Receipt States have provided undisputed evidence that the new

deadline for tabulating votes under the Executive Order conflicts with their state laws, D. 168-1

¶¶ 29-30; D. 180-1 ¶¶ 29-30, and thus exposes them to a substantial risk of impending enforcement.

The Ballot Receipt States have also established imminent economic injuries resulting from § 7(a)

including the "substantial costs" associated with defending any enforcement actions brought by

the Attorney General, "educat[ing] the public about the status of election rules and comply[ing]

with any court-ordered changes to the States' ballot receipt and curing rules" as well as

"reputational harms leading at least some of their voters to question the legitimacy of the State's

administration of federal elections."  D. 168-1 ¶¶ 45-46; D. 180-1 ¶¶ 45-46.  The Ballot Receipt

States have established an injury to support standing and ripeness.  See Washington, 814 F. Supp. 3d at 1205 (concluding that Washington and Oregon have shown that § 7(a) "will cause concrete and particularized economic injuries" where these states "presented specific facts in declarations by state and local elections officials that § 7 will cause financial harm to Plaintiffs").

As the Court previously explained, D. 107 at 26; D. 132 at 11-12, Defendants' insistence that the Attorney General can lawfully enforce § 7(a) "by, e.g., sending letters to the Plaintiff States encouraging compliance with the President's interpretation of 2 U.S.C. § 7 and 3 U.S.C. § 1," D. 166 at 21, is unavailing, as "the government has not indicated that the Attorney General will cabin enforcement of § 7(a) merely to sending such letters," D. 107 at 26; see D. 132 at 12.  As Defendants acknowledge, D. 166 at 22, "where threatened action by government is concerned," a plaintiff is "not require[d] . . . to expose himself to liability before bringing suit to challenge the basis for the threat."  MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128-29 (2007) (emphasis omitted); see Washington, 814 F. Supp. 3d at 1205 (noting same).  Defendants' further argument that the States should not challenge the legality of § 7(a) before enforcement but should instead wait to bring an as-applied challenge to the provision in the event the Attorney General later brings an enforcement action against them under it, D. 166 at 21-22, fails for the same reason.  As does Defendants' contention that "the Executive Branch's enforcement decisions are not subject to judicial review."  Id. at 21; see Washington, 814 F. Supp. At 1205-06 (concluding that "the Executive Branch's inherent enforcement discretion does not affect this imminence analysis" as Washington and Oregon's harms do not "stem from the Attorney General's enforcement discretion" but rather "from 'the Executive Order's [alleged] misapplication of the federal election day statutes'" (alteration in original; internal citation omitted)).

Defendants still argue, however, that even though the States "need not expose themselves to liability before filing suit . . . they must still show that prosecution is 'close to impending,'" D. 166 at 22 (quoting Reddy, 845 F.3d at 500 (internal quotation omitted)), and claim that the Ballot Receipt States "have not adduced any evidence that it is" and thus cannot "defeat summary judgment," id. Whereas "Section 7(a) states that the Attorney General 'shall take all necessary action to enforce 2 U.S.C. 7 and 3 U.S.C. 1 against States' that include 'absentee or mail-in ballots received after Election Day in the final tabulation of votes,'" Washington, 814 F. Supp. 3d at 1205 (emphasis omitted) (quoting Exec. Order No. 14248 § 7(a)), and, as mentioned above, the Ballot Receipt States have provided undisputed evidence that § 7(a)'s deadline for tabulating votes under the Executive Order conflicts with their state laws, D. 168-1 ¶¶ 29-30; D. 180-1 ¶¶ 29-30, the Ballot Receipt States have offered sufficient evidence to establish "a clear and imminent threat of enforcement against [these] states," Washington, 814 F. Supp. 3d at 1205; see D. 181 at 17-18. Additionally, the Ballot Receipt States have offered persuasive evidence of the impending threat of enforcement under § 7(a) by providing undisputed evidence that in September 2025, following the issuance of the Executive Order, the U.S. Department of Justice threatened litigation against Ohio, which is not a party in this lawsuit but maintained similar ballot receipt deadlines to those of the Ballot Receipt States, for accepting election ballots postmarked by Election Day but received thereafter. D. 168-1 ¶ 33; D. 180-1 ¶ 33; D. 170-5 at 2-3. The Ballot Receipt States have thus established an injury sufficient to support standing and ripeness to challenge § 7(a). Accordingly, the Ballot Receipt States have established that their challenge to § 7(a) is justiciable.

With respect to the non-Ballot Receipt States (Connecticut, Delaware, Maine, Minnesota, Vermont and Wisconsin), although the States move for summary judgment only as to the Ballot Receipt States' claim against § 7(a), D. 167 at 3, Defendants move for summary judgment on, and

advance their justiciability challenge against, all of the States' claims against § 7(a), D. 166 at 20-22.[8]  As such, in opposing Defendants' cross-motion for summary judgment, the States have the burden of demonstrating that the non-Ballot Receipt States' § 7(a) claim is justiciable.  Here, the States do not offer any evidence supporting imminent harm as to the non-Ballot Receipt States pursuant to § 7(a).  See D. 168-1 ¶¶ 45-46.  As such, they have failed to meet their summary judgment burden of demonstrating that the non-Ballot Receipt States have standing to challenge § 7(a).  Defendants are thus entitled to summary judgment as to the non-Ballot Receipt States' claims against § 7(a) on standing grounds.

> 5.    § 7(b)

§ 7(b) of the Executive Order provides:

> Consistent with 52 U.S.C. [§] 21001(b) and other applicable law, the Election Assistance Commission shall condition any available funding to a State on that State's compliance with the requirement in 52 U.S.C. [§] 21081(a)(6) that each State adopt uniform and nondiscriminatory standards within that State that define what constitutes a vote and what will be counted as a vote, including that, as prescribed in 2 U.S.C. [§] 7 and 3 U.S.C. [§] 1, there be a uniform and nondiscriminatory ballot receipt deadline of Election Day for all methods of voting, excluding ballots cast in accordance with 52 U.S.C. [§] 20301 et seq., after which no additional votes may be cast.

Exec. Order No. 14248 § 7(b).[9]

---

[8] At the Rule 12(b)(1) motion to dismiss stage, the States and the Executive Branch "cabin[ed] their justiciability arguments to the thirteen Ballot Receipt States."  D. 132 at 12 n.5; see D. 113 at 12-14; D. 120 at 4; see also Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health & Hum. Servs., 557 F. Supp. 3d 224, 234 (D. Mass. 2021) (noting that at the Rule 12(b)(1) stage, "[s]o long as one plaintiff has standing to bring each claim, the court need not address whether other plaintiffs have standing").

[9] Unlike the other provisions, Defendants do not advance any arguments indicating that they moved for summary judgment on the States' claim against § 7(b) on the ground that it is not justiciable, see D. 166 at 14-22, nor do they respond to the States' arguments that this claim is justiciable as to the Ballot Receipt States, D. 180 at 26-28; see D. 168 at 36-37.

As to the Ballot Receipt States, similar to § 4(a), the States have shown that § 7(b) threatens an imminent injury to the Ballot Receipt States because it requires these States to either change their state laws for receiving and curing federal election ballots to comply with § 7(a), or suffer "loss in EAC and DOJ funding" for noncompliance. Washington, 814 F. Supp. 3d at 1205; see D. 168-1 ¶¶ 47-49; D. 180-1 ¶¶ 47-49; D. 168 at 36-37. § 7(b)'s mandate that the EAC "shall condition any available funding to a State on that State's compliance with the requirement . . . [that] there be a uniform and nondiscriminatory ballot receipt deadline of Election Day," Exec. Order No. 14248 § 7(b), further "gives rise to a clear and imminent threat of enforcement against states, like [the Ballot Receipt States], that permit ballots to be received and counted after Election Day," Washington, 814 F. Supp. 3d at 1205. Accordingly, the Ballot Receipt States have standing to challenge § 7(b). Their challenge is also ripe. The hardship prong is satisfied for the same reasons as stated as to the Ballot Receipt States' injury in fact. The challenge is also fit for the same reasons as stated as to their challenge to § 7(a). See D. 168 at 37.

Accordingly, the Ballot Receipt States have also established that their challenge to § 7(b) is justiciable.[10]

_____

[10] In the complaint, all the States challenge § 7(b) in both Count VI and in their vertical-separation-of-powers challenge to all Challenged Provisions under Count VII. D. 1 ¶¶ 165-75, 176-83. The States, however, provide evidence to establish only that the Ballot Receipt States' claims against § 7(b) are justiciable, D. 168 at 36-37; D. 168-1 ¶¶ 47-49; D. 180-1 ¶¶ 47-49, and neither party addresses whether the non-Ballot Receipt States' § 7(b) claims on which Defendants also move for summary judgment, D. 166, are justiciable. As noted above, the States have the burden to establish their standing to challenge § 7(b) in both Counts VI and VII, Lujan, 504 U.S. at 561. As to Count VII, on which the States move for summary judgment, D. 168 at 32-33, the States have failed to meet this burden as to the non-Ballot Receipt States and Defendants are thus entitled to partial summary judgment on Count VII as it applies to the non-Ballot Receipt States' claim against § 7(b). As to Count VI, however, where the non-Ballot Receipt States do not move for summary judgment on this claim and Defendants move on it but do not challenge the justiciability of same, the Court does not address the justiciability of the non-Ballot Receipt States' challenged to § 7(b) under Count VI and, as addressed in footnote 14, *infra*, will give the parties an opportunity to confer about whether the States are pressing this part of this claim.

For the aforementioned reasons, the States have met their summary judgment burden of establishing that all of the States' challenges to §§ 2(a), 3(d) and 4(a), except for Wisconsin's, are justiciable and that the Ballot Receipt States' challenges to §§ 7(a) and 7(b) are justiciable. Defendants are entitled to summary judgment on Wisconsin's claims against §§ 2(a), 3(d) and 4(a), as well as the non-Ballot Receipt States' claim against § 7(a) on standing grounds.

### C.    <u>Cause of Action</u>

Defendants next move for summary judgment on the ground that the States lack a cause of action because their *ultra vires* claims against the Challenged Provisions are "unavailable" as the States "have a means of adequately challenging provisions of the Executive Order without resorting to nonstatutory review: the APA," D. 166 at 22-23; <u>see</u> D. 1 ¶¶ 113-83. "'The basic premise behind nonstatutory review is that, even after the passage of the APA, some residuum of power remains with the district court to review agency action that is *ultra vires*.'" <u>Commonwealth of Puerto Rico v. United States</u>, 490 F.3d 50, 59 (1st Cir. 2007) (quoting <u>Rhode Island Dep't of Env't Mgmt. v. United States</u>, 304 F.3d 31, 42 (1st Cir. 2002)). "To act *ultra vires* a government official is either acting in a way that is impermissible under the Constitution or acting outside of the confines of his statutory authority." <u>New York v. McMahon</u>, 784 F. Supp. 3d 311, 352 (D. Mass. 2025) (internal citation and quotation marks omitted). "If a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still be able to institute a non-statutory review action." <u>Chamber of Commerce v. Reich</u>, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (internal citation omitted)). "The nonstatutory review action finds its jurisdictional toehold in the general grant of federal-question jurisdiction of 28 U.S.C. § 1331." <u>Rhode Island Dep't of Env't Mgmt.</u>, 304 F.3d at 42 (citation omitted).

As explained in the Court's motion to dismiss ruling, which the Court incorporates here, D. 132 at 17-20, "[t]he States may bring nonstatutory causes of action against the Challenged Provisions," id. at 18; see LULAC I, 780 F. Supp. 3d at 172 (recognizing that "plaintiffs 'are entitled to bring a non-statutory cause of action questioning the legality of [an] Executive Order'" (alteration in original) (quoting Reich, 74 F.3d at 1327)); New York, 784 F. Supp. 3d at 352 (noting that "'a claim alleging that the President acted in excess of his statutory authority is judicially reviewable even absent an applicable statutory review provision'") (alteration omitted) (quoting Am. Forest Res. Council v. United States, 77 F.4th 787, 796 (D.C. Cir. 2023)); D. 181 at 19-21. "[B]ecause 'the President is not an agency within the meaning of' the APA, . . . his issuance of an executive order is not a final agency action" and "[a]s a consequence, the APA does not supply a cause of action to challenge an executive order." LULAC I, 780 F. Supp. 3d at 171 (quoting Franklin v. Massachusetts, 505 U.S. 788, 796 (1992)). "Accordingly, non-statutory *ultra vires* challenges against the Executive Order are valid causes of action." D. 132 at 19 (citing LULAC I, 780 F. Supp. 3d at 171-73; D. 107 at 16-20, 21-25, 27-33). Defendants' references to Nuclear Regul. Comm'n and Commonwealth of Puerto Rico, D. 166 at 22-23, as they were at the motion to dismiss stage, see D. 109 at 13-14; D. 120 at 6-8, are unavailing in the instant case as here, "the APA falls short of providing a mechanism to challenge the Executive Order, and as such 'an equitable action may go forward.'" D. 132 at 19-20 (quoting LULAC I, 780 F. Supp. 3d at 171-72); see LULAC II, 808 F. Supp. 3d at 69 (noting that "[b]ecause the Plaintiffs have 'no express cause of action' under any federal statute, they 'must resort to equity' to find relief in this case") (internal quotation omitted); Washington, 814 F. Supp. 3d at 1210 (noting that "there is no statutory review scheme that would provide Plaintiffs with a 'meaningful and adequate opportunity for judicial review'") (quoting Nuclear Regul. Comm'n v. Texas, 605 U.S. 665, 681 (2025)); see

also id. at 1211 (noting that the Washington plaintiff-states' challenge to the Executive Order "is also distinguishable from [Nuclear Regul. Comm'n] on several other important grounds"), 1211 n.49 (distinguishing those two cases).

To the extent Defendants also argue that the States lack a cause of action because their challenges arise from statutory violations, D. 180 at 10-11, this argument also fails. While "an equitable *ultra vires* claim arising from an alleged violation of a statute 'rarely succeeds,'" LULAC II, 808 F. Supp. 3d at 69 (quoting Nat'l Treasury Emps. Union v. Vought, 149 F.4th 762, 791 (D.C. Cir. 2025) (quoting Nuclear Regul. Comm'n, 605 U.S. at 681), reh'g en banc granted, opinion vacated, No. 25-5091, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025)), "controlling precedent affords broader latitude to a plaintiff seeking equitable relief from a constitutional violation," id. (emphasis omitted), such that "'[the Supreme Court] has continued to recognize implied equitable actions "directly under the Constitution,"'" id. (quoting Vought, 149 F.4th at 791 (quoting Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 491 n.2 (2010)). "'The availability of such implied equitable relief substantially depends on whether the plaintiff claims a statutory or constitutional violation.'" Id. (internal citation omitted); see Dalton v. Specter, 511 U.S. 462, 464-78 (1994) (discussing distinction between statutory and constitutional equitable actions).

In LULAC II, the DC Court recognized that the private plaintiffs' "primary argument" against § 2(a) "is not that the President failed to discharge statutory duties or strayed from procedures required by statute" but rather "that the President's directive in Section 2(a) lies outside his constitutional powers and intrudes into the domain of regulating federal election procedure, which the Elections Clause reserves for the States and Congress alone." LULAC II, 808 F. Supp. 3d at 71-72 (citing Dalton, 511 U.S. at 472). Likewise, in Washington, the W.D. Washington Court recognized that the plaintiff-states' challenge to the Executive Order "is rooted in the

argument that the President exceeded his delegated powers and contravened specific prohibitions in the applicable statutes, thereby violating the Constitution's allocation of authority over elections to the states and Congress." Washington, 814 F. Supp. 3d at 1210.  In both these cases, the courts concluded that these challenges were constitutional in nature and thus "fall squarely within the scope of the non-statutory, equitable cause of action caselaw," id.; see LULAC II, 808 F. Supp. 3d at 72 (concluding that "[f]or these claims, which arise 'under the Constitution,' Plaintiffs are entitled to seek equitable redress in federal court, and 'neither the requirements for *ultra vires* review nor those for APA review' are applicable") (internal citation omitted).

As the States note, D. 181 at 20; see D. 168 at 20, the "crux" of their challenges to the Executive Order, like those of the plaintiffs in LULAC II and Washington, is the constitutional claim that the Challenged Provisions fall outside the President's constitutional powers and intrude on Congress's exclusive power to regulate federal election procedure, D. 181 at 20; see D. 1 ¶¶ 113-83; id. at Prayer for Relief ¶ 1.  Specifically, the States allege that the Challenged Provisions violate the separation of powers because "[t]he President has no constitutional authority to interfere with State and Congressional regulations of the times, places, and manner of elections, including voter registration." D. 1 ¶¶ 117, 129, 139, 148, 158, 168, 178 (citing U.S. Const. art. I, § 4, art. II, § 1; ITCA, 570 U.S. at 8, 14-15 (describing the Elections Clause)); see Washington, 814 F. Supp. 3d at 1210 (concluding that "[p]laintiffs have an equitable cause of action to support their separation-of-powers challenges to EO §§ 2(a), 3(d), 4(a), 4(b), 4(d), 7(a), and 7(b)" where "each of these claims is rooted in the argument that the President exceeded his delegated powers and contravened specific prohibitions in the applicable statutes, thereby violating the Constitution's allocation of authority over elections to the states and Congress" (footnote omitted)); LULAC II,

808 F. Supp. 3d at 71 (concluding that "the plaintiffs' separation-of-powers claims [] are best characterized as constitutional, not statutory").

Defendants contend that "[the States]' Complaint alleges statutory—not constitutional—violations," because the States allege that the Executive Order "attempts to amend, repeal, rescind, or circumvent duly enacted federal statutes," D. 180 at 10 (emphasis omitted) (citing D. 1 ¶¶ 132, 141, 151, 160, 172), and that certain of the Challenged Provisions "violate specific statutes" such as the NVRA or the UOCAVA, id. (citing D. 1 ¶¶ 127, 140; D. 168 at 23-24). This argument, however, not only ignores the States' constitutional separation of powers violation allegations, D. 1 ¶¶ 117, 129, 139, 148, 158, 168, 178, but "misread[s][the States]' *ultra vires* theory against President Trump" as the States' "claim is not that the President exceeded his statutory authority, as the Dalton plaintiffs claimed" but rather "is about the President acting without any authority, constitutional or statutory." See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 782 F. Supp. 3d 793, 821 (N.D. Cal. 2025) (emphasis omitted). Defendants also misread the States' summary judgment argument as to §§ 2(a) and 3(d). The States do not, as Defendants contend, advance statutory *ultra vires* arguments divorced from their constitutional claims by contending that § 2(a) violates the NVRA and § 3(d) violates the UOCAVA, see D. 168 at 21-24. Instead, the States argue that these provisions are unconstitutional not only because they "usurps the authority that Congress granted to the independent EAC," id. at 23, but also because they "ignore[] and purport[] to supersede" the respective statutory requirements established by Congress in the NVRA and UOCAVA where "[t]he President has no power" to do so, see id. at 23-26. These arguments are thus "not properly characterized as claims that the President acted in excess of statutory authority," LULAC II, 808 F. Supp. 3d at 72 (citation omitted), but instead are constitutional claims.

34

Accordingly, the States "have an equitable cause of action to support their separation-of-powers challenges to [the Challenged Provisions]." Washington, 814 F. Supp. 3d at 1211; see D. 132 at 17-20.

**D.      The States' *Ultra Vires* and Separation of Powers Claims**

As to the merits of the States' claims, The Executive Branch moves for summary judgment as to all of the States' remaining claims, D. 166, and the States move for partial summary judgment as to their challenges to §§ 2(a), 3(d), 4(a), 7(a) and 7(b) of the Executive Order, D. 167; D. 186.[11]

As noted above, the States challenge the Challenged Provisions on the grounds that they are *ultra vires* and violate the constitutional separation of powers. D. 1 ¶¶ 113-83. "Separation of powers was designed to implement a fundamental insight:  Concentration of power in the hands of a single branch is a threat to liberty." Clinton v. City of New York, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring).  Under the Framers' separation of powers scheme, "whenever the President issues an executive order, the power 'to issue the order must stem either from an act of Congress or from the Constitution itself.'"  Washington, 814 F. Supp. 3d at 1213 (quoting Youngstown, 343 U.S. at 585).  "If the President lacks a statutory or constitutional basis for issuing an executive order (or any provision in it), the act is unlawful, and a federal court may use its equitable powers to enjoin its implementation." Id. (citing Youngstown, 343 U.S. at 589).

---

[11] Having concluded that Defendants are entitled to summary judgment as to Wisconsin's claims against §§ 2(a), 3(d) and 4(a) on standing grounds, the Court's analysis of the States' claims against §§ 2(a), 3(d) and 4(a) (Counts I, II and IV) are cabined to the remaining eighteen States. Likewise, having concluded that Defendants are entitled to summary judgment as to the non-Ballot Receipt States' §7(a) claim on standing grounds, the Court's analysis of the States' claim against §7(a) (Count V) is limited to the Ballot Receipt States.

### 1. Counts I and II: § 2(a)

In their § 2(a) challenge, the States allege and move for summary judgment on the ground that § 2(a) is *ultra vires* and violates the separation of powers by dictating EAC policy in a manner inconsistent with congressional approval (Count I). D. 1 ¶¶ 113-23; D. 168 at 21-24. Further, the States, except Arizona, allege that § 2(a) violates the NVRA by instructing the EAC to amend the Federal Form to require documentary proof of citizenship and by requiring state and local election officials to implement said requirements (Count II). D. 1 ¶¶ 124-35. Defendants move for summary judgment on the grounds that: (1) § 2(a) does not violate the Constitution and (2) § 2(a) is consistent with the NVRA. D. 166 at 24-29. Neither party contends that there is a genuine dispute as to any material fact relating to § 2(a).

As both of our sister courts have now held, "§ 2(a) is not authorized by the Constitution." Washington, 814 F. Supp. 3d at 1214; see LULAC II, 808 F. Supp. 3d at 74 (concluding that "the President has no constitutional power over election regulation that would support this unilateral exercise of authority"). Defendants raise identical arguments to those advanced in their opposition for preliminary injunction, D. 91 at 10-12, and motion to dismiss, D. 109 at 14-19, which the Court has twice rejected, D. 107 at 16-20; D. 132 at 21-23. As fully explained in the Court's prior rulings, id., which the Court incorporates here, § 2(a) is inconsistent with the Constitution as it "'purports to require the EAC to amend the Federal Form' and precisely dictates what should be included, but 'neither the Constitution nor the NVRA grants the President the authority to direct the EAC to change the content of the Federal Form.'" D. 107 at 16 (quoting LULAC I, 780 F. Supp. 3d at 185, 194); accord LULAC II, 808 F. Supp. 3d at 72 (noting that "neither the Constitution nor any statute explicitly grants the President the power to direct that a documentary-proof-of-citizenship requirement be added to the Federal Form"); Washington, 814 F. Supp. 3d at 1214 (noting same).

36

Contrary to Defendants' contention, D. 166 at 24-26, "only Congress has the power to adjust state election rules" which it has done "through its enactment of the NVRA, which . . . includes a mandatory procedure requiring States to 'accept and use' the Federal Form," D. 107 at 16 (citing U.S. Const. art. I, § 4, cl. 1; quoting 52 U.S.C. § 20505(a)(1)).  The argument that "[t]he EAC exercises Executive power when it carries out these duties and is therefore subject to the administrative control of the President," D. 166 at 25, "'is untethered from precedent and unsupported by even a maximalist view of 'the executive Power' under our Constitution,'" D. 107 at 18 (quoting LULAC I, 780 F. Supp. 3d at 198 (citing U.S. Const. art. II, § 1, cl. 1)).  "While the Vesting Clause grants the President some supervisory authority over subordinate executive officials, that authority is not absolute and restrictions upon that authority that do 'not unduly interfere with the functioning of the Executive Branch' are upheld."  Id. (quoting Seila L. LLC v. Consumer Fin. Prot. Bureau, 591 U.S. 197, 217 (2020)).  "Here, where 'the President has no constitutional duty to prescribe the content of election regulations,' the mandate of the Executive Order to the EAC, a bipartisan and independent entity, is such an undue interference."  Id. (quoting LULAC I, 780 F. Supp. 3d at 198); see LULAC II, 808 F. Supp. 3d at 74-79 (concluding that "[n]either the Executive Vesting Clause nor the Take Care Clause empowers the President to direct the outcome of the EAC rulemaking process that Congress has required by statute").

§ 2(a) is also inconsistent with the NVRA.  Under 52 U.S.C. § 20508(b)(1), the Federal Form "may require only such" information "as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."  Id.  "The NVRA mandates a specific procedure to determine what information is necessary for the Federal Form, requiring that the agency responsible for maintaining it set that content 'in consultation with the chief election officers of the States' and

through notice and comment rulemaking." D. 107 at 16-17 (quoting 52 U.S.C. 17 § 20508(a)(1)-(2)). § 2(a)'s directive flouts this procedure, see id., as well as HAVA's procedures for the EAC to revise the Federal Form, id. at 17 (citing 52 U.S.C. §§ 20921-20923, 20928), and § 2(a)'s "instruction to add a documentary proof of citizenship requirement to the Federal Form conflicts with the will of Congress, rendering the President's power 'at its lowest ebb,'" id. at 19 (quoting Youngstown, 343 U.S. at 637 (Jackson, J., concurring)); see LULAC II, 808 F. Supp. 3d at 72-80 (concluding same); Washington, 814 F. Supp. 3d at 1216 (concluding that "[u]nder a straightforward textual analysis, then, § 2(a) directs the EAC to act in contravention of the NVRA's specific procedures for altering the Federal Form"). Additionally, the Executive Order's saving clause, see Exec. Order No. 14248 § 11(b) (providing that "[t]his order shall be implemented consistent with applicable law and subject to the availability of appropriations"), cannot shield § 2(a) from review because § 2(a) "unambiguously requires the EAC to implement a documentary proof of citizenship requirement as part of the Federal Form." D. 107 at 19-20 (citing City & Cnty. of San Francisco v. Trump, 897 F.3d 1225, 1240 (9th Cir. 2018); LULAC II, 808 F. Supp. 3d at 78 (concluding same).

Accordingly, for the reasons stated above (and incorporated herein, D. 107 at 16-20), the States have established their claims as to § 2(a) as a matter of law. The States are thus entitled to summary judgment on Counts I and II, and Defendants are not entitled to same.

###### 2.    Count III: § 3(d)

In their § 3(d) challenge, the States allege and move for summary judgment on the ground that § 3(d) is *ultra vires* and violates the separation of powers because it attempts to alter federal statutes by directing the Secretary of Defense to include documentary proof of citizenship and proof of eligibility to vote requirements for the Federal Post Card Application that are not

38

mandated under the UOCAVA.  D. 1 ¶¶ 136-44; D. 168 at 24-26; see Tr. of Feb. 26, 2026 Mot. Hr'g ("MSJ Tr."), D. 183 at 31-33.  Defendants move for summary judgment on the grounds that: (1) the President has constitutional authority to direct the Secretary of Defense to update the Federal Post Card Application and (2) § 3(d) is consistent with the UOCAVA.  D. 166 at 29-32. Neither party contends that there is a genuine dispute as to any material fact relating to § 3(d).

As the Court previously explained, D. 107 at 21-24, "neither the Constitution nor any statute grants the President the authority to enact § 3(d), and its mandate appears to be in conflict with the will of Congress, which is duly authorized to act in this area, and has acted through its enactment of the UOCAVA," id. at 23; see Washington, 814 F. Supp. 3d at 1217 (concluding that the plaintiff-states have plausibly alleged that § 3(d) is neither authorized by the Constitution nor the UOCAVA); LULAC III, 818 F. Supp. 3d at 98-102 (concluding same on summary judgment). "[B]esides giving the President the power to designate the person responsible for administering the [Federal Post Card Application], the UOCAVA provides no other role for the President in the creation or administration of the [Federal Post Card Application]." Washington, 814 F. Supp. 3d at 1218 (citing 52 U.S.C. § 20301).  "UOCAVA thus does not explicitly authorize the President to mandate changes to the [Federal Post Card Application]'s contents." Id.

Defendants' argument that the Court "read[] too much into the term 'post card' in 52 U.S.C. § 20301(b)(2)," in its prior rulings, D. 166 at 31 (citing D. 132 at 23-24 (citing D. 107 at 21-24)), does not alter this conclusion.  The UOCAVA provides for the creation of "an official post card form, containing both an absentee voter registration application and an absentee ballot application." 52 U.S.C. §§ 20301(b)(2), 20302(a)(4).  In its prior ruling, the Court noted that "[a] postcard is 'a card . . . for mailing without an envelope and to which the sender must affix a stamp.'"  D. 107 at 22 (second alteration in original) (quoting Postcard, Merriam-Webster

39

Dictionary, https://www.merriam-webster.com/dictionary/postcard (last visited Jun. 23, 2026)). According to Defendants, the UOCAVA's postcard requirement does not "preclude a documentation requirement because a literal postcard would not allow it" but rather "precludes a [documentary proof of citizenship] requirement only if there is no way to provide documentary proof of citizenship within the confines of a 'post card form.'" D. 166 at 31. Defendants argue that their interpretation must be correct because "the current 'Federal Post Card Application' is not a traditional 'postcard' at all, but a two-page 8 ½ x 11 form that explains that applicants can either '[r]emove the adhesive liner from the top and sides' of the form and '[f]old and seal tightly,' or . . . 'print[ out] the form, fold it and seal it in an envelope,'" and this would itself be inconsistent with "the Court's interpretation of § 20301(b)(2)." Id. (first, second and fourth alterations in original) (quoting FVAP, "Federal Post Card Application (FPCA)" at 2, https://www.fvap.gov/uploads/fvap/forms/fpca.pdf (last visited Jun. 23, 2026)).

As Defendants' argument concedes, and the parties do not dispute, the current version of the Federal Post Card Application can indeed be mailed "without an envelope," D. 168-1 ¶ 26; D. 180-1 ¶ 26, in accordance with a postcard's definition, Postcard, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/postcard (last visited June 23, 2026); see D. 168 at 25; D. 181 at 28-29. But the question of whether the current Federal Post Card Application is inconsistent with § 20301(b)(2) is not before the Court. The issue here is whether § 3(d)'s directive that the Federal Post Card Application must include documentary proof of citizenship and proof of eligibility is *ultra vires* and violates the separation of powers. See D. 1 ¶¶ 136-44. As the Court previously explained, "[a]lthough 52 U.S.C. § 20301(b)(2) contains no express requirement 'limit[ing] what kind of document requirements the Secretary of Defense may 'prescribe,'" D. 107 at 22 (quoting D. 91 at 23 (emphasis omitted)); see D. 166 at 30, "this Court cannot presume that

40

Congress ignored the meaning of 'postcard' when it employed it in the statute," D. 107 at 22 (citing TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (observing that "[i]t is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant'" (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001))); United States v. Abreu, 106 F.4th 1, 12 (1st Cir. 2024) (noting that statutes must be interpreted "based on their plain and ordinary meaning")); see LULAC III, 818 F. Supp. 3d at 99 (noting that "the ordinary understanding of the statutory phrase 'post card' . . . clearly connotes a simple mail piece designed to be sent without an envelope").[12] Section 3(d)'s requirement of documentary proof of citizenship and proof of eligibility outside the confines of a postcard thus appears to contravene UOCAVA's plain text, regardless of the practice of the current Federal Post Card Application. See 52 U.S.C. § 20301(b)(2); LULAC III, 818 F. Supp. 3d at 99 (concluding same); see also Washington, 814 F. Supp. 3d at 1218 (concluding that plaintiff-states "have plausibly alleged that updating the [Federal Post Card Application] to include a [documentary proof of citizenship] requirement would contravene the UOCAVA's statutory text and purpose").

Moreover, and perhaps more significantly, § 3(d)'s requirement of documentary proof of citizenship and proof of eligibility contravenes UOCAVA's purpose. As previously explained, D. 107 at 21, by passing the UOCAVA, an act "to protect the voting rights of military members, their families, and other United States citizens living overseas," United States v. Alabama, 998 F. Supp. 2d 1283, 1286 (M.D. Ala. 2014), aff'd, 778 F.3d 926 (11th Cir. 2015), "and later by strengthening

---

[12] Defendants' references to different dictionary definitions of "postcards" which they contend impose "more conditions" on what qualifies as a postcard than does the Merriam-Webster definition, D. 180 at 19 & n.7, do not alter this conclusion as they neither materially differ from or conflict with the definition upon which the States rely nor do they provide a definition that embraces a version of the Federal Post Card Application contemplated by § 3(d).

its protections, Congress unequivocally committed to eliminating procedural roadblocks, which historically prevented thousands of service members from sharing in the most basic of democratic rights," United States v. Alabama, 778 F.3d 926, 928 (11th Cir. 2015). The States have demonstrated that adding a documentary proof of citizenship requirement and proof of eligibility to the Federal Post Card Application would present such "procedural roadblocks," see id., by preventing and making it more burdensome for certain American service members and citizens living abroad to vote, "directly undercutting UOCAVA's purpose," LULAC III, 818 F. Supp. 3d at 99; see D. 168 at 26; D. 168-1 ¶¶ 57-60; D. 180-1 ¶¶ 57-60. Further, as the Court previously concluded, D. 107 at 23-24, § 3(d) cannot be interpreted through the lens of the saving clause, id.

Accordingly, for the reasons stated above (and incorporated herein, D. 107 at 21-24), the States have established their claim as to § 3(d) as a matter of law. The States are thus entitled to summary judgment on Count III, and Defendants are not entitled to same.

### 3.    Count V:  § 7(a)

In their § 7(a) challenge, the Ballot Receipt States allege and move for summary judgment on the ground that directing the Attorney General to enforce the President's interpretation of Election Day vote tabulation requirements alters enacted federal statutes and exceeds the President's Article II powers. D. 1 ¶¶ 155-64; see D. 168 at 26-30. Defendants move for summary judgment on the grounds that:  (1) § 7(a) does not alter existing federal statutes and (2) the President may lawfully interpret the Election Day statutes for the Executive Branch under his take-care authority. D. 166 at 33-39. Neither party contends that there is a genuine dispute of material fact as to § 7(a).

First, the Ballot Receipt States have established that § 7(a) alters existing federal statutes. Defendants raise substantially similar arguments to those advanced in their opposition for

preliminary injunction, D. 91 at 16-22, and in support of their motion to dismiss, D. 109 at 23-29, which the Court has twice rejected, D. 107 at 27-30; D. 132 at 24-26.  As fully explained in the Court's prior rulings, id., which the Court incorporates here, "the text of the Election Day statutes require[s] only that all votes are cast by Election Day, not that they are received by that date," D. 107 at 28 (citing 2 U.S.C. § 7; 3 U.S.C. §§ 1, 21(1); Bost v. Illinois State Bd. of Elections, 684 F. Supp. 3d 720, 736 (N.D. Ill. 2023) (upholding an Illinois law allowing ballots postmarked on or before Election Day to be counted if received up to fourteen days thereafter, concluding that this provision "is facially compatible with the relevant federal statutes"), aff'd on other grounds, 114 F.4th 634 (7th Cir. 2024); Donald J. Trump for President, Inc. v. Way, 492 F. Supp. 3d 354, 372 (D.N.J. 2020) (concluding that "the Federal Election Day [s]tatutes are silent on methods of determining the timeliness of ballots" and, therefore, do not preempt a New Jersey law allowing ballots lacking a postmark to be counted if received within 48 hours after polls close)).  "[T]he Court has already addressed at length and rejected Defendants' reliance on the reading of same in Republican Nat'l Comm. v. Wetzel, 120 F.4th 200 (5th Cir. 2024)," D. 132 at 25 (citing D. 107 at 27-28); see D. 166 at 35-38, which the W.D. Washington Court has also rejected, see Washington, 814 F. Supp. 3d at 1223 ("declin[ing] to adopt Wetzel's definition of 'election'").[13]  "The logic behind the requirement only that all votes are cast by Election Day 'is simple:  states that allow ballots received after Election Day to be counted still require that all votes are cast by Election Day, meaning a candidate's "electoral fate is sealed at midnight on Election Day, regardless of the resources he expends after the fact."'"  D. 132 at 25 (quoting D. 107 at 28 (quoting Bost, 684 F. Supp. 3d at 733-34)).

---

[13] As the DC Court noted, the Supreme Court has granted certiorari to review the Fifth Circuit's interpretation of the Election Day Statutes in Wetzel.  LULAC III, 818 F. Supp. 3d at 105 (citing Watson v. Republican Nat'l Comm., __ U.S. __, 146 S. Ct. 355 (2025) (mem.)).

Moreover, the Election Day statutes do not appear to authorize § 7(a)'s enforcement provision, as "the statutes do not define any criminal offenses," "the Executive Branch cites no statute criminalizing the counting of ballots in accordance with a state's ballot-receipt deadlines" and "the Election Day statutes, unlike other election-related statutes, do not include provisions allowing [for civil enforcement actions]."  D. 107 at 30 (citing LULAC I, 780 F. Supp. 3d at 213 & n. 65 (concluding same)).  As explained above, Defendants' reprised reliance upon the saving clause and suggestion that the Attorney General can lawfully enforce § 7(a) by "sending letters to the Plaintiff States encouraging compliance with the President's interpretation of 2 U.S.C. § 7 and 3 U.S.C. § 1," D. 166 at 21-22, is unavailing as the government has not indicated limitation of enforcement of § 7(a) to just sending such letters, D. 107 at 26; see D. 166 at 21-22.

Second, the Ballot Receipt States have also established that § 7(a)'s tabulation and enforcement provisions interfere with these federal election statutes as well as the Ballot Receipt States' laws allowing for votes validly cast by Election Day but received after that date to be counted and cured.  See D. 168 at 28; see also id. at 28 n.9 & n.10.  "Congress has not endorsed the Executive Branch's present interpretation of Election Day statutes even as Congress 'has amended other aspects of federal election administration within the last few years.'"  D. 107 at 28 (citation omitted); see Bost, 684 F. Supp. 3d at 736 (noting that "[d]espite these ballot receipt deadline statutes being in place for many years in many states, Congress has never stepped in and altered the rules").  Indeed, the UOCAVA acknowledges the variances in state ballot receipt deadlines.  52 U.S.C. § 20303(b)(3) (setting the deadline for counting absentee ballots of overseas voters as the "deadline for receipt of the State absentee ballot under State law"); 52 U.S.C. § 20304(b)(1) (noting that officials must count UOCAVA ballots if received by "the date by which an absentee ballot must be received in order to be counted in the election").  "While 'congressional

44

silence, no matter how "clanging," cannot override the words of the statute,' here, where the Executive Branch's interpretation of the Election Day statutes is not reflective of their plain text, such silence is notable."  D. 107 at 29 (quoting Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 495 n. 13 (1985)); see Washington, 814 F. Supp. 3d at 1224-25 (noting same).  The "[h]istorical practice" of the states further supports this point as "around one-third of states," including the Ballot Receipt States, "as well as Washington D.C., Puerto Rico, and the Virgin Islands, currently allow ballots received after Election Day to be counted," Washington, 814 F. Supp. 3d at 1224; see D. 168 at 28 n.9 & n.10, and "courts across the country have upheld state laws that permit ballots to be received after Election Day, concluding that such laws are fully consistent with the Election Day statutes," Washington, 814 F. Supp. 3d at 1225; see id. n.76 (collecting cases).

As "the Court concludes that EO § 7's national ballot-receipt deadline of Election Day is unlawful, . . . it also finds that the President lacks any constitutional or statutory authority to direct the Attorney General to 'enforce' said deadline against states" pursuant to § 7(a).  Id. at 1226 (citation omitted); see D. 107 at 30.  Accordingly, for the reasons stated above (and incorporated herein, D. 107 at 27-30), the Ballot Receipt States have established their claim against § 7(a) as a matter of law.  The Ballot Receipt States are thus entitled to summary judgment on Count V, and Defendants are not entitled to same.

### 4.     Count VI:  § 7(b)

In their challenge to § 7(b), the Ballot Receipt States allege and move for summary judgment on the ground that § 7(b) is *ultra vires* because it conditions required federal funding on states' compliance with the ballot receipt deadline articulated in § 7(a).  D. 1 ¶¶ 165-75; see D. 168 at 30-32.  Defendants move for summary judgment on the ground that § 7(b) permissibly

conditions funding on the adoption of nondiscriminatory standards. D. 166 at 39-41. Neither party contends that there is a genuine dispute of material fact as to § 7(b).

Defendants again raise substantially similar arguments to those advanced in their opposition for preliminary injunction, D. 91 at 22, and in support of their motion to dismiss, D. 109 at 29-31, which the Court has twice rejected, D. 107 at 31-33; D. 132 at 26-27. As explained fully in the Court's prior rulings, id., these arguments fail. The Ballot Receipt States have established their claim against § 7(b) as a matter of law. The First Circuit has recognized that "an agency acts *ultra vires* if it attaches conditions to formula grants that are unauthorized by statute." D. 107 at 31 (citing City of Providence v. Barr, 954 F.3d 23, 45 (1st Cir. 2020)). "HAVA does not allow the EAC to condition states' funding upon their ballot receipt deadlines." Id. at 32; see D. 168 at 30-32; 52 U.S.C. § 21001(a); LULAC I, 780 F. Supp. 3d at 164 (citing H.R. Rep. No. 107-730, at 71 (2002) (Conf. Rep.) (explaining that HAVA "[r]equires" the EAC "to make yearly payments to qualifying States")). As this Court, the DC Court and the W.D. Washington Court have concluded, 52 U.S.C. § 21081(a)(6)'s requirement that "[e]ach State shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State," 52 U.S.C. § 21081(a)(6); see 52 U.S.C. § 21003, does not support § 7(a) or § 7(b) because "'the reference to "uniform and nondiscriminatory standards" appears to refer to uniformity within each State, not among the several States.'" D. 107 at 32 (quoting LULAC I, 780 F. Supp. 3d at 214-15). "In short, while the Defendants assert here that 'Congress itself' set its condition upon funding through § 21081(a)(6) 'as well as [through] the Election Day statutes,' those statutes do not support this contention, just as they do not empower the EAC to add additional conditions to funding." Id. at 32-33 (alteration in original; citation omitted); see Washington, 814 F. Supp. 3d at 1226 (concluding that "the President lacks

46

any constitutional or statutory authority to direct the EAC to condition funding to states based on their compliance with [§ 7's] unlawful deadline"). "Nor can the saving clause shield § 7(b) from review, because that section leaves no ambiguity that it would condition funding to states upon their adoption of a uniform ballot receipt deadline. Any other interpretation of that section would override its meaning." D. 107 at 32-33 (citing City & Cnty. of San Francisco, 897 F.3d at 1240).

Accordingly, for the reasons stated above (and incorporated herein, D. 107 at 31-33), the Ballot Receipt States have established their claim against § 7(b) as a matter of law. The Ballot Receipt States are thus entitled to summary judgment on Count VI, and Defendants are not entitled to same as to all the Plaintiff States' claim.

### 5. Count IV: § 4(a)

In their challenge to § 4(a), the States allege and move for summary judgment on the ground that § 4(a) is *ultra vires* and violates the separation of powers by dictating EAC policy and unlawfully withholding federal funding from states unless they comply with the documentary proof of citizenship requirements under § 2(a) the Executive Order. D. 1 ¶¶ 145-54. For this reason, the States argue that § 4(a) "is *ultra vires* for the same reasons as Section 2(a)." MSJ Tr., D. 183 at 31; see id. at 19-20. Defendants move for summary judgment on the ground that § 4(a) permissibly conditions funding on a state's compliance with HAVA. D. 166 at 32-33. Neither party contends that there is a genuine dispute as to any material fact relating to § 4(a).

The States, except Wisconsin, have established their claim against § 4(a) as a matter of law. Defendants raise substantially similar arguments to those advanced in support of their motion to dismiss, D. 109 at 22-23, which the Court has previously rejected, D. 132 at 27-28. As explained fully in the Court's motion to dismiss ruling, id., which the Court incorporates here, under 52 U.S.C. § 21003(a), the state's chief executive officer or designee must "certify[] that the State is

47

in compliance with the requirements referred to in subsection (b)," which include "compliance with each of the laws described in section 21145," see 52 U.S.C. § 21003(b)(3), to be "eligible to receive a requirements payment," id. § 21003(a).  Apart from those laws enumerated under § 21145, "[s]tates are not required to certify their compliance with any other law."  LULAC I, 780 F. Supp. 3d at 165; see D. 132 at 27-28.  "Defendants' argument that § 4(a) 'only parrots the NVRA's requirement' by conditioning federal funding on states' acceptance and use of the Federal Form," id. (citing D. 109 at 23); see D. 166 at 33, "ignores the language of § 4(a) which adds to this condition 'any requirement for documentary proof of United States citizenship adopted pursuant to section 2(a)(ii) of this order,'" D. 132 at 28 (quoting Exec. Order No. 14248 § 4(a)); see Washington, 814 F. Supp. 3d at 1218-19 (noting same).

As explained as to § 2(a), the States have established that a documentary proof of citizenship requirement is inconsistent with the NVRA, and HAVA does not allow the EAC to condition states' funding upon their requirement of documentary proof of citizenship in their registration form.  "Thus, like § 7(b), § 4(a) 'appears to be in tension with HAVA,'" D. 132 at 28 (quoting LULAC I, 780 F. Supp. 3d at 215 (citing 52 U.S.C. §§ 21001–21003)), "as it purports to condition required federal funding on state's compliance with a documentary proof of citizenship requirement, which is not authorized by statute," id. (citing City of Providence, 954 F.3d at 45); see Washington, 814 F. Supp. 3d at 1219 (concluding that "[a]s the President has no authority to unilaterally impose new conditions on federal funds, § 4(a) exceeds the President's constitutional and statutory authority" and plaintiff-states have thus established their challenge to § 4(a) as a matter of law (citation omitted)).  "And as § 2(a) 'unambiguously requires the EAC to implement a documentary proof of citizenship requirement as part of the Federal Form,'" D. 132 at 28 (quoting D. 107 a 20), "§ 4(a), which unambiguously requires the EAC to condition statutorily

48

mandated federal funding on states' compliance with § 2(a), cannot be interpreted through the lens of the saving clause," id. (citing City & Cnty. of San Francisco, 897 F.3d at 1240).

Accordingly, for the reasons stated above (and incorporated herein, D. 132 at 27-28), the States have established their claim against § 4(a) as a matter of law. The States, except Wisconsin, are thus entitled to summary judgment on Count IV, and Defendants are not entitled to same.

### 6.    Count VII:  All Challenged Provisions

In Count VII, the States allege and move for summary judgment on the ground that, for the same reasons the Challenged Provisions violate constitutional separation of powers, they also "undermine[] the constitutional powers of the States" by "invad[ing] Plaintiff States' sovereignty and their powers to regulate federal elections by Presidential fiat and commandeer[ing] State election administrative personnel and processes to implement a Presidential decree" in violation of the vertical separation of powers. D. 1 ¶¶ 176-83; see D. 168 at 32-33. Defendants move for summary judgment on Count VII on the ground that the Challenged Provisions "[are] tied to the President's execution of duly enacted federal laws." D. 166 at 41-43. For the reasons explained above (and incorporated therein, D. 107 at 16-20, 21-25, 27-30, 31-33), the States have established that the Challenged Provisions violate the vertical separation of powers and the States' sovereignty and elections power under U.S. Const. art. I, § 4. Accordingly, the States, except Wisconsin, are entitled to partial summary judgment on Count VII with the exception of the non-Ballot Receipt States' claim on this Count as it applies to §§ 7(a) and 7(b) which fails on standing grounds. Defendants are entitled to partial summary judgment as to Wisconsin's claim on this Count and the remaining non-Ballot Receipt States' claims on this count as it applies to §§ 7(a) and 7(b).

## VI.   Relief

As to relief, the States request that the Court:  (1) declare that §§ 2(a), 3(d), 4(a), 7(a) and 7(b) of the Executive Order "are legally void as ultra vires, unconstitutionally violate the separation of powers, and are contrary to pertinent federal statutes" and (2) permanently enjoin Defendants, except President Trump, from implementing or enforcing these Challenged Provisions of the Executive Order.  D. 167 at 4-5; see D. 1 at Prayer for Relief ¶¶ 1-2.

### A.   Declaratory Judgment

"Pursuant to the Declaratory Judgment Act, a federal district court may, '[i]n a case of actual controversy within its jurisdiction . . . declare the rights and other legal relations of any interested party seeking such declaration.'"  Transpac Marine, LLC v. Yachtinsure Servs., Inc., 655 F. Supp. 3d 18, 28 (D. Mass. 2023) (alteration in original) (quoting 28 U.S.C. § 2201(a)).  "[A] district court has 'complete discretion in determining whether and when to entertain'" a claim for declaratory judgment.  Id. (internal quotation marks omitted) (quoting Zurich Am. Ins. V. Watts Regul. Co., 796 F. Supp. 2d 240, 246 (D. Mass. 2011)).  In accordance with the Court's determination that the States, except Wisconsin, are entitled to summary judgment as to their claims against §§ 2(a), 3(d) and 4(a) and the Ballot Receipt States are entitled to summary judgment as to their claims against §§ 7(a) and 7(b), the Court grants the States' request for declaratory judgment as to these provisions.

### B.   Permanent Injunction

To obtain permanent injunctive relief, a plaintiff "must show actual success on the merits," Caroline T. v. Hudson Sch. Dist., 915 F.2d 752, 755 (1st Cir. 1990) (citation omitted), and "must satisfy a four-factor test before a court can grant such relief," Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 156-57 (2010) (citation omitted).  A plaintiff must demonstrate "(1) that

[they] ha[ve] suffered—or, as here, will suffer—an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the [parties], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." Glob. NAPs, Inc. v. Verizon New England, Inc., 706 F.3d 8, 13 (1st Cir. 2013) (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)). "The first two of the four factors are satisfied on a showing of 'substantial injury that is not accurately measurable or adequately compensable by money damages.'" CoxCom, Inc. v. Chaffee, 536 F.3d 101, 112 (1st Cir. 2008) (quoting Ross–Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8, 13 (1st Cir. 2000) (citation and internal quotation marks omitted)). The last two factors merge when, as here, the Government is the opposing party. See Does 1-6 v. Mills, 16 F.4th 20, 37 (1st Cir. 2021).

### 1.    Irreparable Harm

As the Court previously concluded in its preliminary injunction ruling, D. 107 at 33-40, the States have established that §§ 2(a), 3(d), 7(a) and 7(b) imminently threaten irreparable harm in the time, cost and effort associated with compliance, id. at 33-37, threatened loss of federal funding, id. at 37, and chilling of voter registration and participation, id. at 38-39, to the States and the Ballot Receipt States, respectively. See D. 168 at 38-41; D. 168-1 ¶¶ 37-49; D. 180-1 ¶¶ 37-49; see also Washington, 814 F. Supp. 3d at 1227-28 (concluding that plaintiff-states "have shown that they will suffer irreparable harm in the absence of an injunction" for their §§ 2(a), 4(a), 4(b), 7(a), and 7(b) claims and "[g]iven these substantial sovereign and financial injuries, as well as the impracticability of states altering election processes or results after the fact . . . monetary damages and other remedies available at law are inadequate to compensate [plaintiff-states] for their injuries"). For similar reasons as explained as to § 7(b), D. 107 at 37, § 4(a) imminently threatens

loss of federal funding, which likewise constitutes irreparable harm. See City & Cnty. of San Francisco, 897 F.3d at 1236 (identifying harm where plaintiffs showed that "if their interpretation of the Executive Order is correct, they will be forced to either change their policies or suffer serious consequences"); Washington, 814 F. Supp. 3d at 1202, 1227-28; see also D. 168-1 ¶¶ 34-36; D. 180-1 ¶¶ 34-36. Defendants raise substantially similar arguments against irreparable harm as advanced as to standing, D. 180 at 29-31, which the Court rejects here as well.

### 2.      Balance of Equities

The Court also concludes that the balance of equities weighs in the States' favor. On one hand, "[t]he States . . . have shown a 'substantial risk' that, absent an injunction, citizens will be disenfranchised," D. 107 at 42 (quoting LULAC I, 780 F. Supp. 3d at 203 (citing League of Women Voters of United States v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016)); Purcell, 549 U.S. at 4 (noting the "strong interest in exercising the fundamental political right to vote" and observing that "the possibility that qualified voters might be turned away from the polls would caution any district judge to give careful consideration" to a challenge) (internal citation and quotation marks omitted)); see D. 168 at 41-43; D. 168-1 ¶¶ 50-66; D. 180-1 ¶¶ 50-66, and "have also credibly attested that the challenged requirements could create chaos and confusion that could result in voters losing trust in the election process," D. 107 at 42 (citing D. 76-9 ¶ 62; D. 87 at 24-25); see D. 168 at 43; D. 168-1 ¶¶ 61-62; D. 180-1 ¶¶ 61-62; see also Brief for Local Election Officials as Amici Curiae Supporting Plaintiffs and Opposing Defendants, D. 177 at 10-20, 21-24 (noting that §§ 2(a), 3(d), 7(a) and 7(b) would confuse and disenfranchise voters, create administrative burdens and confusion and "create an unfunded requirement that local election officials collect and store sensitive data").

As to §§ 2(a), 3(d) and 4(a), the States have attested that a documentary proof of citizenship requirement can pose a significant barrier for otherwise eligible voters. D. 168-1 ¶ 50; D. 180-1 ¶ 50. Several forms of government-issued identification, including the majority of the REAL IDs administered by the Plaintiff States, do not include citizenship information, D. 168-1 ¶¶ 56-58; D. 180-1 ¶¶ 56-58, and a substantial portion of voting-age U.S. citizens do not possess some of the more common forms of government-issued identification that do, such as a passport, D. 168-1 ¶ 53; D. 180-1 ¶ 53 (noting that in 2023, there were only 160,668,889 valid passports in circulation compared to the 262,083,034 voting age citizens nationwide). Acquiring documentary proof of citizenship that complies with §§ 2(a) and 3(d) poses both financial and administrative burdens for otherwise eligible voters, D. 170-13 at 2 (noting that the minimum fee to obtain a U.S. passport is $65); D. 170-14 at 2 (noting that the routine processing time for a U.S. passport is four to six weeks), particularly for members of the armed forces serving abroad, D. 168-1 ¶¶ 59-60; D. 180-1 ¶¶ 59-60, and could lead to voter confusion and deterrence, D. 168-1 ¶¶ 61-62; D. 180-1 ¶¶ 61-62. The States have demonstrated this impact for Arizona's state-imposed documentary proof of citizenship requirement, under which 37,000 Arizona voters were unable to register for state elections because they did not have the proper proof of citizenship. Fontes (AZ) Decl., D. 169-3 ¶¶ 10-15.

As to §§ 7(a) and 7(b), the undisputed record shows that disqualifying ballots that are postmarked by Election Day but arrive thereafter would disproportionately harm military voters, elderly voters, voters with disabilities and voters in rural areas, all of whom face unique obstacles to mailing access and service. D. 168-1 ¶ 64; D. 180-1 ¶ 64; see, e.g., Dorsey (MD) Decl. D. 169-9 ¶ 84; Wlaschin (NV) Decl., D. 169-2 ¶ 52; Stavisky (NY) Decl., D. 169-15 ¶ 52; Rock (RI) Decl., D. 169-16 ¶¶ 43-44. This harm is compounded by the potential of delays in delivering

timely-mailed ballots. See USPS 2024 Post Election Analysis Report, D. 170-15 at 2; Lean (CA) Decl., D. 169-1 ¶ 48 (noting that during California's most recent Statewide Special Election, 13,909 vote-by-mail ballots with a postmark on or before Election Day arrived on the sixth day after Election Day and an additional 5,804 timely postmarked vote-by-mail ballots arrived on the eighth day after Election Day); Tassinari (MA) Decl., D. 169-8 ¶¶ 42-44 (describing a history of mail delays experienced in connection with elections).  Likewise, the undisputed record shows that eliminating post-Election Day cure periods would risk disenfranchising tens of thousands of voters due to "minor ballot errors," see D. 168-1 ¶ 65; D. 180-1 ¶ 65; see, e.g., Fontes (AZ) Decl., D. 169-3 ¶ 57 (noting that "[i]n the 2024 general election, over 35,000 timely cast ballots were cured, including a substantial portion of which were cured after Election Day"); Barber (NJ) Decl., D. 169-13 ¶ 32 (noting that "in New Jersey's 2022, 2023, and 2024 primary and general elections, 12,002 voters cured their mail-in and provisional ballots after Election Day").

On the other hand, there is no evidence in this record of widespread "illegal voting, discrimination, fraud, and other forms of malfeasance and error" within American elections, which the Executive Order purports to safeguard against, Exec. Order No. 14248 § 1; see D. 168-1 ¶ 52; D. 180-1 ¶ 52.  Further, contrary to Defendants' contention, D. 180 at 31, the Executive Order does not "effectuate[] the mandates laid out by Congress," id., but rather, as explained above, contravenes the NVRA, HAVA and UOCAVA and is *ultra vires* and a violation of the separation of powers.  See Ass'n of Am. Univs. v. U.S. Dep't of Defense, 792 F. Supp. 3d 143, 181 (D. Mass. 2025) (noting that "[t]here is generally no public interest in the perpetuation of unlawful agency action") (internal citation omitted); Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin, 407 F. Supp. 2d 323, 343 (D. Mass. 2005) (noting that "the public has an important interest in making sure government agencies follow the law").

Accordingly, considering the States' undisputed record of harm resulting from the Challenged Provisions of the Executive Order against Defendants' lack thereof, the balance of equities weighs in favor of granting the States permanent injunctive relief.

### 3.    Scope of Permanent Injunction

"It is a general rule that a court of equity . . . may administer complete relief between the parties, even though this involves the determination of legal rights which otherwise would not be within the range of its authority." Kinney-Coastal Oil Co. v. Kieffer, 277 U.S. 488, 507 (1928) (citations omitted). But "'[c]omplete relief' is not synonymous with 'universal relief.'" Trump v. CASA, Inc., 606 U.S. 831, 851 (2025). Accordingly, as the Supreme Court clarified in CASA, "injunctive relief must be limited to 'administer[ing] complete relief between the parties.'" Ass'n of Am. Univs., 792 F. Supp. 3d at 182 (quoting CASA, 606 U.S. at 851).

As to §§ 7(a) and 7(b), the States request a permanent injunction as to only the Ballot Receipt States. D. 168 at 44. The Court concludes, and Defendants do not dispute, that the scope of this injunction is consistent with the Supreme Court's limitations on nationwide injunctions. See CASA, 606 U.S. at 851; see also Washington, 814 F. Supp. 3d at 1228.

As to §§ 2(a) and 3(d), the States request a permanent injunction enjoining Defendants from taking any action to implement or give effect to these provisions. D. 168 at 44-47; see Doe v. Trump, 157 F.4th 36, 80-81 (1st Cir. 2025) (noting that "[n]othing in CASA provides that, as a categorical matter, it is improper for district court to impose [a universal injunction] if it is necessary to do so to provide the plaintiff with complete relief") (citing CASA, 606 U.S. at 853-54), petition for cert. filed, No. 25-899 (U.S. Jan. 30, 2026). The Court notes that both the DC Court and the W.D. Washington Court have granted permanent injunctions of the same scope as to § 2(a), LULAC II, 808 F. Supp. 3d at 80-81 ("hold[ing] that a permanent injunction barring the

55

proper named Defendants from implementing Section 2(a) of Executive Order No. 14,248 is the appropriate equitable remedy in this case"); Washington, 814 F. Supp. 3d at 1228 (concluding same), and the DC Court has likewise granted same as to § 3(d), LULAC III, 818 F. Supp. 3d at 102-03 (concluding that "the appropriate 'party-specific' remedy for Plaintiffs' threatened injury from Section 3(d) is an injunction that bars the relevant Defendants from implementing that provision anywhere in the Nation").  Here too, the scope of the States' requested relief as to §§ 2(a) and 3(d) is proper for two main reasons.

First, as the States note, D. 168 at 44-45, because §§ 2(a) and 3(d) "concern a single (and national) Federal Form, set of voting guidelines, and certification process, [the States] cannot receive complete relief unless the EAC and its Commissioners, directors, and agents, are enjoined from implementing or giving effect to these provisions in full." Washington, 814 F. Supp. 3d at 1228; see LULAC II, 808 F. Supp. 3d at 84-86; LULAC III, 818 F. Supp. 3d at 102.  Second, the States have provided undisputed evidence as to the voter confusion and deterrence, administrative burden and financial harm that the States would endure if the nation was split into two federal election law regimes, as would result absent a total injunction preventing Defendants from implementing §§ 2(a) and 3(d).  D. 168-1 ¶¶ 67-70; D. 180-1 ¶¶ 67-70.  For example, the States have attested that requiring documentary proof of citizenship as to only non-plaintiff states "will foreseeably cause some voter registration applicants seeking to register to vote in Plaintiff States to submit documentary proof of citizenship with their registration applications," D. 168-1 ¶ 68; D. 180-1 ¶ 68, requiring the Plaintiff States to incur costs associated with "[c]reating and implementing appropriate procedures to manage sensitive personal documents submitted in error," D. 168-1 ¶ 70; D. 180-1 ¶ 70; see D. 168 at 46-47.  Additionally, the States have attested that partially enacting a documentary proof of citizenship requirement "will foreseeably deter some

eligible voters from registering in Plaintiff States," D. 168-1 ¶ 67; D. 180-1 ¶ 67, a harm that will require the Plaintiff States to "divert resources to educate voters and the public regarding the rules applicable to voters registering in their States," D. 168-1 ¶ 69; D. 180-1 ¶ 69, to combat. See Doe, 157 F.4th at 82 (affirming district court's issuance of broad injunction where plaintiff-states provided "uncontroverted evidence" that "a narrower injunction would leave unremedied 'administrative and financial harms'"). Given the additional harms that a dual federal election law regime would impose on the Plaintiff States, the Court concludes that a total injunction preventing Defendants from implementing §§ 2(a) and 3(d) is necessary to "'administer complete relief between the parties'" here. CASA, 606 U.S. at 851 (emphasis omitted) (internal citation omitted). Accordingly, the scope of the States' requested permanent injunction as to §§ 2(a) and 3(d) is also proper.

As to § 4(a), the States do not specify the intended scope of their requested permanent injunction as to § 4(a) in their stipulation to move on this provision. See D. 186 at 3. Similar to §§ 7(a) and 7(b), § 4(a) "direct[s] agency officials to take discrete actions against states," thus, the Court "may award Plaintiffs complete relief without enjoining Defendants from taking any action to implement or give effect to" § 4(a). Washington, 814 F. Supp. 3d at 1228. Accordingly, the Court concludes that a permanent injunction enjoining Defendants, except Trump, from implementing or giving effect to § 4(a) only as to the Plaintiff States, except Wisconsin, provides these States with complete relief and is consistent with CASA. See id. (ordering same as to Washington and Oregon).

## VII.    Conclusion

For the foregoing reasons, the Court ALLOWS in part the Executive Branch's motion for summary judgment as to Wisconsin's claims, the non-Ballot Receipt States' claims against § 7(a)

and the non-Ballot Receipt States' challenge to § 7(b) in Count VII and DENIES same as to the remaining claims, D. 166, and DENIES the States' motion for partial summary judgment as to Wisconsin's claims and the non-Ballot Receipt States' challenges to §§ 7(a) and 7(b) in Count VII, and ALLOWS same in part as to the remaining States' claims against §§ 2(a), 3(d) and 4(a) and the Ballot Receipt States' claims against §§ 7(a) and 7(b), D. 167; D. 186.[14]

The Court DECLARES that §§ 2(a), 3(d), 4(a), 7(a) and 7(b) of the Executive Order are unconstitutional and void because they are *ultra vires* and violate the separation of powers under the United States Constitution;

The Court DECLARES that § 2(a) of the Executive Order is inconsistent with the NVRA, and that § 3(d) of the Executive Order is inconsistent with UOCAVA;

The Court PERMANENTLY ENJOINS Defendants, except President Trump, from taking any action to implement or enforce § 2(a) of the Executive Order or otherwise taking any steps to require documentary proof of citizenship as part of the federal mail-in voter registration form provided for in 52 U.S.C. § 20508;

The Court PERMANENTLY ENJOINS Defendants, except President Trump, from taking any action to implement or enforce § 3(d) of the Executive Order or otherwise taking any steps to alter the federal post card form provided for in 52 U.S.C. § 20301(b)(2) to require either documentary proof of citizenship or proof of eligibility to vote in elections in the State in which the voter is attempting to vote;

---

[14] The only remaining claim is the non-Ballot Receipt States' challenge to § 7(b) in Count VI as the Court has denied Defendants' motion for summary judgment on this claim and the non-Ballot Receipt States did not affirmatively move on same. See D. 166. Accordingly, the Court ORDERS the parties to confer regarding the non-Ballot Receipt States' challenge to § 7(b) in Count VI and whether the States press same. By July 10, 2026, the parties must notify the Court in writing of the States' intent in this regard, whether the parties seek the entry of final judgment at that point or propose some other course in this proceeding.

58

The Court PERMANENTLY ENJOINS Defendants, except President Trump, from implementing or enforcing § 7(a) of the Executive Order against the Ballot Receipt States or otherwise taking any actions to enforce a ballot receipt deadline of Election Day against the Ballot Receipt States;

The Court PERMANENTLY ENJOINS Defendants, except President Trump, from implementing or enforcing § 7(b) of the Executive Order against the Ballot Receipt States or otherwise conditioning formula grant funding (including election security grants) to the Ballot Receipt States on their adoption of a ballot receipt deadline of Election Day; and

The Court PERMANTLY ENJOINS Defendants, except President Trump, from implementing or enforcing § 4(a) of the Executive Order against the Plaintiff States, except Wisconsin, or otherwise conditioning formula grant funding (including election security grants) to the Plaintiff States, except Wisconsin, on their adoption of a documentary proof of citizenship requirement provided for under § 2(a) of the Executive Order.

Nothing in this Memorandum and Order shall prevent the Executive Branch from taking any lawful action that is not based upon §§ 2(a), 3(d), 4(a), 7(a) or 7(b) of the Executive Order as described herein. As per footnote 14, the parties have until July 10, 2026 to indicate the States' intent as to the non-Ballot Receipt States' challenge to §7(b) in Count VI, whether the parties seek entry of final judgment at that time or propose some other course in these proceedings.

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge

59